UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| YUKIO KUSADA,<br>        Plaintiff,<br><br>    v.<br><br>BERKSHIRE EAST SKI RESORT, UNION<br>TERMINAL PIERS, INC.,<br>        Defendants,<br><br>and<br><br>NORTHFIELD MOUNT HERMON SCHOOL,<br>FRANCIS MILLARD AND MICHAEL ATKINS<br>        Defendant and<br>        Third-Party Plaintiff,<br><br>    v.<br><br>TAKERU KUSADA,<br>        Third-Party Defendant. | Civil Action No. 05-30043-MAP |

## MEMORANDUM IN SUPPORT OF DEFENDANTS' NORTHFIELD MOUNT HERMON SCHOOL, FRANCIS MILLARD AND MICHAEL ATKINS MOTION FOR SUMMARY JUDGMENT

### I.    INTRODUCTION

A tragic accident happened on February 20, 2004.  An 18 year old Northfield Mount Hermon student skied off the trail and into the woods at Berkshire East Ski Resort ("Berkshire East") in Charlemont, Massachusetts and was seriously injured.  That 18 year old student, who has no memory of what happened and who has been unable to produce a single witness to what happened, has brought a negligence claim against Northfield Mount Hermon School ("NMH"), its Chair of the Physical Education and Athletics Department, Frank Millard ("Millard"), and its Coordinator of Physical Education, Michael Atkins ("Atkins").  The basis of the student's negligence claims is set forth in his answer to Interrogatory 4 propounded by NMH in which he stated:

> On information and belief, plaintiff responds as follows: I was a student
> at Northfield Mount Hermon School and was registered in the

recreational ski program for which I was to receive physical education credit. I informed the school that I was a beginner skier and desired ski lessons. I received no ski lessons. I was on skis that were inappropriate for my level of skiing ability. I was not wearing a helmet. I received no instruction on how to ski from either Northfield Mount Hermon School or Berkshire East Ski Resort. I received no instruction on how to stop, how to control my speed, how to select proper terrain for my level of skiing ability, no instruction on night skiing. I did receive instruction related to wearing warm clothing at night. I skied into a tree and suffered severe injuries as a result. Plaintiff reserves the right to supplement this response.

Assuming those facts to be true, plaintiff Yukio Kusada's ("Kusada") complaint must fail because the claims of negligence are mere speculation. There can be no showing that lessons would have mattered, or that different skis would have mattered, or that different terrain would have mattered, or that instruction on night skiing would have mattered, without any evidence of what happened between the last time Kusada was seen, when he was skiing "okay," and the time he was found in the woods off the trail badly injured. Moreover, defendants had no duty to require an 18 year old student to wear a helmet. Defendants left that responsibility with Kusada, as they did with all students, strongly recommending that he wear a helmet but not requiring that he wear one. Some students followed that recommendation and some did not – just as some skiers at every ski resort in America, including Berkshire East, wear helmets and some do not. Several other schools bring students to Berkshire East. None required their students to wear helmets in 2003-2004. No state or federal law required skiers to wear helmets in 2003-2004. No private secondary school required students in recreational ski programs to wear helmets in 2003-2004. The National Ski Areas Association's position was to recommend but not require helmets in 2003-2004. The AMA recommended but did not require helmets in 2003-2004. The policy at NMH of recommending but not requiring the use of helmets was consistent with helmet utilization policy throughout the United States in 2003-2004. It has been and remains a matter of individual choice. The same is true of choice of skis and ski lessons. Neither NMH, nor Millard, nor Atkins had a duty to inspect Kusada's skis or to mandate that he take lessons. Each student was responsible for his own equipment and for deciding whether to take lessons, which were offered, but not required.

## II. FACTS

### NMH Recreational Ski Program

NMH is a school located in Northfield, Massachusetts. *Statement of Undisputed Facts ("Fact Stmt.")*, ¶ 1. For over thirty years, NMH has run an elective "Recreational Ski Program" as part of its curriculum. *Id.*, ¶¶ 9-12. Since its inception, approximately 3,000 students have participated in the Recreational Ski Program. *Id.*, ¶ 10. Students taking part in the Recreational Ski Program receive credit towards their physical education requirements, but are not tested as part of the program. *Id.*, ¶¶ 13-14. Rather, the only requirements of the Recreational Ski Program are participation and attendance. *Id.*, ¶ 15.

For the entire three decades of its existence, NMH's Recreational Ski Program has taken place at Berkshire East. *Id.*, ¶ 11. Berkshire East is a recognized and well-supervised ski area located in Charlemont, Massachusetts. *Id.*, ¶¶ 16-17. Many other public and private schools besides NMH bring their students to Berkshire East for skiing, and the mountain was in all respects an appropriate ski area for NMH's Recreational Ski Program. *Id.*, ¶¶ 18, 20.

Berkshire East has a ski patrol which patrols the mountain, and is also equipped with a First-Aid Station and on-site Emergency Medical Technicians. *Id.*, ¶ 19. As a matter of policy, Berkshire East (1) does not require skiers to wear helmets; (2) does not mandate that beginning skiers have their skis and equipment inspected; (3) does not require beginner skiers to take ski lessons before traversing down the mountain; and (4) did not restrict beginner skiers to beginner trails during the 2003-2004 winter season. *Id.*, ¶¶ 21-24. Furthermore, Berkshire East would not remove beginner skiers from intermediate or black diamond trails, although such beginners would be assisted if they were having difficulty. *Id.*, ¶ 25.

### Yukio Kusada

Plaintiff Kusada was born on August 13, 1985. *Id.*, ¶ 6. On February 20, 2004, the date of his accident, Kusada was 18 years old. *Id.*, ¶ 6. Kusada attended NMH for his junior and senior years in high school, and was in the second semester of his senior year at the time of his accident. *Id.*, ¶ 7. Kusada's eyesight required him to wear contacts or eyeglasses at all times. *Id.*, ¶ 8.

- 3 -

### NMH's 2003-2004 Recreational Ski Program

Kusada was a participant in NMH's Recreational Ski Program during the 2003-2004 school year. *Id.*, ¶ 40. That year, students wishing to participate in the Recreational Ski Program were required to have their parents sign a PE/A Activities Permissions Form ("PE/A Form") for a number of elective activities that included skiing. *Id.*, ¶ 10. The 2003-2004 PE/A Form states in bold italic lettering: "*I am willing to have my son/daughter take part in the activities indicated below. I release and will hold the school and its staff harmless from any liability that might result from my son/daughter engaging in these activities.*" *Id.*, ¶ 31. Kusada's PE/A Form was returned to NMH signed. *Id.*, ¶ 30.

In November 2003, a second permission form specific to the Recreational Ski Program ("Ski Form") was sent to each NMH student signed up for the program. *Id.*, ¶ 32. Among other statements, the Ski Form required parents to affirm that (1) "I understand that the class is graded on the basis of attendance and participation"; (2) "I understand that my son/daughter is responsible for their own ski or snowboard equipment. NMH and Berkshire East are not responsible"; and (3) "I understand that for my son/daughter's safety, NMH strongly recommends that they wear a helmet while snowboarding/skiing." *Id.*, ¶¶ 35-37. Once again, Kusada's Ski Form was returned to NMH signed. *Id.*, ¶ 38.

Prior to the first scheduled ski trip for the 2003-2004 winter season, every student who had signed up to participate in the Recreational Ski Program was required to attend a one hour organizational meeting. *Id.*, ¶ 41. NMH has two campuses which are located approximately five miles apart. *Id.*, ¶ 4. The organizational meeting held at the "Mount Hermon" campus was conducted by Michael Atkins, and the organizational meeting held at the "Northfield" campus was conducted by Audra Forstrum, a chaperone for the program. *Id.*, ¶ 42. Kusada, who lived on the Mount Hermon campus, attended the meeting on December 15, 2003 held by Michael Atkins. *Id.*, ¶ 43.

All students who attended these meetings were given a Recreational Skiing and Snowboarding information package. *Id.*, ¶ 44. This package included (1) a description of the program, and (2) the Skier's Responsibility Code. *Id.*, ¶ 44. The program description portion of the information package

- 4 -

provides, in part, that: "Beginner skiers may receive a one hour ski lesson each week and approximately 6 hours of free skiing time per week." *Id.*, ¶ 46.

At the Mount Hermon organizational meeting attended by Kusada, Michael Atkins told the assembled students that helmets were strongly recommended. *Id.*, ¶ 48. Atkins also told the students (1) that they were responsible for their own skis which were available for purchase at a local retail shop or at the Berkshire East rental shop; (2) that lessons were not mandatory but would be available and were recommended for beginners; and (3) that expert slopes were marked with black diamonds, intermediate slopes were marked with blue squares and beginner slopes were marked with green circles. *Id.*, ¶¶ 49-51.

### NMH's 2003-2004 Helmet Policy

NMH strongly recommended that the students in the Recreational Ski Program wear helmets, but it did not require them to do so. *Id.*, ¶¶ 31, 48, 70. This position was consistent with general helmet utilization policy throughout the United States. Jasper Shealy ("Shealy") has been offered by NMH, Millard and Atkins as an expert who is familiar with snow sports helmet use in the United States for recreational skiers. *Id.*, ¶¶ 76-77. With no known exceptions, Shealy states that mandatory recreational snow sports helmet usage for alpine skiing is not the rule in United States school districts. *Id.*, ¶ 77.

During the 2003-2004 ski season, Berkshire East did not require skiers to wear helmets, no state or federal law required skiers of any age to wear helmets, no private or secondary school required skiers to wear helmets, and no ski resort in the United States required skiers to wear helmets. *Id.*, ¶¶ 75, 77, 79-81, 129, 132. In addition, both the National Ski Association and American Medical Association recommended, but did not mandate, helmet use during the winter of 2003-2004. *Id.*, ¶¶ 78, 131. Consistent with these policies, helmet use among students skiing at Berkshire East on February 20, 2004 was mixed – some students from NMH and other schools were wearing helmets, and some students were not. *Id.*, ¶¶ 72-74.

### Kusada's Participation in the 2003-2004 Recreational Ski Program

The 2003-2004 NMH Recreational Ski Program ran twice a week from Wednesday, January 7, 2004 to March 3, 2004, for a total of 16 ski trips. *Id.*, ¶ 53. Prior to his accident on February 20, 2004,

Kusada traveled to Berkshire East to attend at least 11 out of a possible 13 ski trips, inclusive of the February 20, 2004 visit. *Id.*, ¶ 55.

During his visits to Berkshire East during the 2003-2004 winter season, Kusada would ski together with the only other Japanese student in the program, Yuki Hasegawa ("Hasegawa"). *Id.*, ¶ 56. Hasegawa, who lived on the Northfield campus, was an intermediate to expert skier who began skiing about the age of 5. *Id.*, ¶¶ 5, 59. In all, Hasegawa skied with Kusada on 8 or 9 of the trips to Berkshire East in 2004, during which time Hasegawa taught Kusada how to ski. *Id.*, ¶ 58. At first, Kusada and Hasegawa skied on the "bunny trail," but as Kusada got better as a skier, Hasegawa and Kusada moved from the easy slopes onto the intermediate and expert slopes. *Id.*, ¶¶ 61-62. By the time of his accident, Kusada was able to ski on black diamond slopes with Hasegawa. *Id.*, ¶ 63. According to Hasegawa, Kusada never skied off the trail on prior trips, and was able to turn and stop by February 20, 2004. *Id.*, ¶¶ 64-66. Hasegawa also describes Kusada as skiing between a parallel and a wedge by February 20, 2004. *Id.*, ¶ 67.

Hasegawa and Kusada skied on the Big Chief Trail every time they went to Berkshire East in the winter of 2003-2004. *Id.*, ¶ 68. The Big Chief Trail is an intermediate trail. *Id.*, ¶ 84. As it was one of his favorites, and because he felt comfortable on it, Kusada would usually ski on the Big Chief Trail with Hasegawa more than once on each visit. *Id.*, ¶¶ 68-69. Berkshire East ski patrol personnel do not interfere with beginner skiers who wish to ski on Big Chief Trail unless they are having trouble. *Id.*, ¶ 26.

### February 20, 2004

As was their custom, Hasegawa and Kusada skied together on February 20, 2004, and were skiing together at approximately 7:30 to 8:00 p.m. that evening on the Big Chief Trail. *Id.*, ¶¶ 82-83. On that run, although the Big Chief trail was dark at places and light at places, Hasegawa could see where he was going as he skied down the trail. *Id.*, ¶¶ 85-86. Hasegawa skied behind Kusada to the midpoint on the Big Chief trail, where they both stopped for a brief break. *Id.*, ¶ 87. Kusada then began skiing down the bottom half of the Big Chief trail. *Id.*, ¶ 88. Hasegawa followed Kusada, and subsequently passed him further down the trail. *Id.*, ¶ 89. According to Hasegawa, when he skied by, Kusada was "doing okay"

and appeared to be "the same Yukio." *Id.*, ¶ 90. However, when Hasegawa got to the bottom of the trail he could not locate Kusada. *Id.*, ¶¶ 91-92. Hasegawa continued skiing after he could not find Kusada, but states that he would not have done so if he knew that Kusada had skied off the trail. *Id.*, ¶ 93. Neither Hasegawa nor any other person saw Kusada for the balance of the evening. *Id.*, ¶¶ 91, 92, 94, 95.

The students were due to return to NMH in two buses – a Northfield bus and a Mount Hermon bus – at approximately 9:30 p.m. on the evening of February 20, 2004. *Id.*, ¶ 94. A NMH chaperone went to the Berkshire East Ski Patrol at about 9:50 p.m. to report that Kusada was missing. *Id.*, ¶ 95. After an all night search of Berkshire East, Kusada was located at approximately 4:00 a.m. on Saturday morning. *Id.*, ¶¶ 96-97. When he was found, Kusada was lying in a gully behind a tree located in the woods adjacent to the Big Chief Trail about three quarters of the way down the trail. *Id.*, ¶ 98.

Kusada has no memory of his accident. *Id.*, ¶ 99. He does not know whether he turned between the time Hasegawa last saw him on Big Chief Trail and the point where he skied into the woods. *Id.*, ¶ 100. He is also unable to recall whether he tried to turn, whether he stopped, or whether he tried to stop between the time Hasegawa last saw him on Big Chief Trail and the point where he skied into the woods. *Id.*, ¶¶ 100-103. There are also no eyewitnesses who can account for Kusada's movements or activities between the time Hasegawa last saw Kusada skiing on Big Chief Trail and the time Kusada was found at 4:00 a.m. the next morning. *Id.*, ¶ 104.

### Kusada's Experts

Marilyn Buck

Marilyn Buck ("Buck") is the Associate Dean in the College of Applied Sciences and Technology at Ball State University and presents herself as "an expert in physical education and providing a good physical education program." *Id.*, ¶ 105. Buck, however, admits that she is "not an expert in the skiing area," that she has never skied, that she has never worked at a ski resort, and that she has never been to Berkshire East. *Id.*, ¶¶ 107-110.

Buck also has no idea what Kusada did between the point where he was last seen by Hasegawa on the Big Chief Trail on February 20, 2004 and the point where Kusada skied off the trail. *Id.*, ¶ 106. She

does not know, and has not been told, whether he turned or tried to turn, whether he stopped or tried to stop, where he was looking as he was skiing, whether he was wearing glasses, whether he lost his glasses, whether he was chasing Hasegawa, or whether he was cut off by another skier. *Id.*, ¶ 106.

Buck is similarly unfamiliar with NMH and has, in fact, never been to any private secondary school in New England. *Id.*, ¶¶ 111-112. She has also never taught at a private secondary school, nor has she taught recreational skiing at a private secondary school. *Id.*, ¶ 113. In addition, Buck admits that she has never reviewed any studies of any recreational ski programs at private or public secondary schools, and has never personally done any study of any recreational ski programs at private or public secondary schools. *Id.*, ¶¶ 114-115.

Buck is not aware of any ski area, including Berkshire East, in the United States which (1) requires skiers to wear helmets; (2) requires skiers to have their equipment inspected; (3) requires skiers to take lessons; (4) restricts the trails on which paying skiers are allowed to ski; or (5) which prohibits beginner skiers from entering expert slopes. *Id.*, ¶ 116. Buck also does not know of any private secondary school recreational ski program which requires beginners to stay on beginner slopes, and she is likewise unaware of any private or public secondary school in the United States which requires a "buddy system" in its recreational ski program. *Id.*, ¶¶ 118-119. Finally, Buck is not aware of any ski association or law which requires skiers to wear helmets. *Id.*, ¶ 117.

James Isham

James Isham ("Isham") resides in Taos, New Mexico and has been offered by Kusada as a Snow Sports Safety Expert. *Id.*, ¶ 120. Isham, however, has not offered any opinions regarding the conduct of Millard or Atkins. *Id.*, ¶¶ 123-124. His only opinions in this case concern the conduct of NMH. *Id.*, ¶¶ 123-124. Isham's expert report (attached as Exhibit A to his deposition transcript) contains all of the opinions Isham has formed on the Kusada case. *Id.*, ¶ 123.

Isham does not have, and was not given, any information about what Kusada did or did not do on February 20, 2004 between the point when Kusada was last seen by Hasegawa and the point where

Kusada skied off the trail and into the woods. *Id.*, ¶ 121. Isham states that he does not know what happened to Kusada that night and that, moreover, "nobody knows." *Id.*, ¶ 122.

Isham has never taught a recreational ski program as an employee of a school, nor has he ever been responsible for running a recreational ski program as an employee of any school. *Id.*, ¶ 125. Isham did not perform any studies of recreational ski programs at private secondary schools in New England, and did not rely on any similar studies in forming his opinions. *Id.*, ¶ 126.

The NMH Recreational Ski Program is the only recreational ski program at a private secondary school in New England that Isham is familiar with. *Id.*, ¶ 127. As such, he is not aware of any private secondary school recreational ski program in New England that required ski inspections or imposed a "buddy system" as part of its program. *Id.*, ¶ 128.

In the time period 2003-2004, Isham is not aware of any ski area or ski school in the United States that required anyone to wear a helmet. He is similarly unaware of any United States ski area which (1) requires lessons or a skill assessment as a condition for entry onto the mountain; (2) requires ski inspections; or (3) restricts beginner skiers to beginner slopes. Isham himself has run many ski schools at several resorts and never required his students to wear helmets. *Id.*, ¶¶ 129-133.

## ARGUMENT

Summary judgment is appropriate in those cases where no genuine issue of material fact exists and the movant is entitled to judgment as a matter of law. *Cmty. Nat'l Bank v. Dawes*, 369 Mass. 550, 553 (1976); Mass. R. Civ. P. 56(c). A moving party may satisfy its burden by demonstrating that proof of an essential element of the plaintiff's case is unlikely to be forthcoming at trial. *See Glidden v. Maglio*, 430 Mass. 694, 696 (2000); *Kourouvacilis v. Gen. Motors Corp.*, 410 Mass. 706, 716 (1991); *see also O'Sullivan v. Shaw*, 431 Mass. 201, 203 (2000) ("A complete failure of proof concerning an essential element of the non-moving party's case renders all other facts immaterial.") (internal citations omitted). In making the determination of whether a genuine issue of material fact exists, the court must draw all inferences from the underlying facts in the light most favorable to the party opposing the motion. *Attorney Gen. v. Bailey*, 386 Mass. 376, 371 (1982).

A plaintiff asserting a negligence claim bears the burden of establishing four elements: (1) a legal duty owed to the plaintiff by the defendant; (2) a breach of that duty by the defendant; (3) causation; and (4) actual loss by the plaintiff. *Glidden*, 430 Mass. at 696; *Delaney v. Reynolds*, 63 Mass. App. Ct. 239, 241 (2005). In the circumstances of this case, NMH, Millard and Atkins are entitled to summary judgment because the undisputed record establishes that Kusada will be unable to establish at least two of these essential elements at trial. First, because Kusada can offer no evidence to explain how his accident occurred, he will be completely unable to establish that the alleged negligence of any moving defendant was the proximate cause of his accident. Even if that were not the case, summary judgment would still be appropriate because the undisputed facts establish that the moving defendants had no legal duty to require helmet use, to inspect Kusada's skis, or to mandate that he take lessons.

## III.   NMH, Millard And Atkins Are Entitled To Judgment As A Matter Of Law Because Kusada Can Only Speculate As To The Cause Of His Accident.

If nothing else, the undisputed material facts in this case establish that <u>no one</u>, including Kusada, can explain how or why this unfortunate skiing accident occurred. Kusada does not himself remember what happened and he freely admits that no one else witnessed the accident. As such, Kusada and his experts are only speculating when they allege that the moving defendants' failure to inspect Kusada's equipment or to require lessons was the proximate cause of his accident. In these circumstances, Kusada cannot prove the causation element of his negligence claim, and the moving defendants are therefore entitled to summary judgment.

### 1.   <u>Kusada has not offered any affirmative evidence to establish that the alleged negligence of any moving defendant was the proximate cause of his accident.</u>

Massachusetts law is clear that the mere happening of an accident does not mean, in and of itself, that someone was negligent. *See Kelly v. Lahn Transp.*, 376 F.2d 588, 589 (1st Cir. 1967) (citing to *Callahan v. Lach*, 338 Mass. 233 (1958)); *Moynihan v. Boston & M.R.R.*, 227 Mass. 180, 182 (1917). To be sure, a plaintiff is not required to show precisely how an accident occurred, or to conclusively establish one version of events to the exclusion of all others. *See, e.g., Thomas v. Spinney*, 310 Mass. 749, 751

(1942). However, a plaintiff must offer affirmative evidence of circumstances which establish that the defendant caused the plaintiff harm by breaching a duty. *See Kelly*, 376 F.2d at 589-590 ("[Plaintiff] does have the burden of proving that [the accident] was caused by the negligence of the defendant … This is an affirmative burden which cannot be left to surmise, conjecture or imagination.")

That burden cannot be met here. Even when the summary judgment record is viewed in the light most favorable to Kusada, he still cannot identify any cause for his accident, let alone identify a cause that was attributable to the alleged negligence of any moving defendant. In these circumstances, Kusada has left the cause of his accident to "surmise, conjecture or imagination." *See id*. This is precisely what the law does not allow. *See O'Connor v. SmithKline Bio-Science Labs., Inc.*, 36 Mass. App. Ct. 360, 363 (1994) (holding that where a plaintiff "establishes no more than a possibility" that harm was caused by the negligence of a defendant, "any resulting jury verdict would be based on speculation and could not stand.")

Indeed, the facts of this case bear a striking resemblance to other cases in which Massachusetts courts have rejected negligence claims as speculative. For example, in *Kelly v. Lahn Transportation*, a pedestrian was hit by a slow-moving tractor trailer as she crossed Massachusetts Avenue in Boston. 376 F.2d at 589. Although it was apparent that she had been run over by the vehicle, the plaintiff could produce no eyewitnesses to the accident. *Id.* at 590. As a result, there was no evidence in the record to establish that the driver should have seen the plaintiff in the exercise of due care, or to re-create the plaintiff's exact movements "from the time she stepped off the sidewalk until she was discovered on the pavement." *Id.* ("It is a matter of pure speculation and conjecture what [plaintiff] was doing, or in what direction she was moving when she made contact, apparently, with the left side, as distinguished from the front, of the truck.") Based on this lack of causation evidence, the First Circuit affirmed a directed verdict for the defendant because "the mere happening of an accident between a motor vehicle and a pedestrian, where, as here, the circumstances immediately preceding it are left to speculation and conjecture, is not in and of itself sufficient to prove negligence on the part of the motor vehicle operator." *Id.*

- 11 -

Almost identical circumstances were presented in *Moynihan v. Boston & M.R.R.*, where the plaintiff was killed by a moving train. 227 Mass. at 181. Even though several witnesses observed the plaintiff examining a train switch in the freight yard "a few minutes" before the accident, no witness could account for the plaintiff's activities in the moments just preceding the accident, and the plaintiff died before he could give his version of events. *Id.* at 181-182. Reasoning that "there is an entire absence of evidence to show what [the plaintiff] was doing after he was seen at the switch or how he happened to be run over by the train," the Massachusetts Supreme Judicial Court concluded that the cause of the accident was "purely a matter of conjecture," and affirmed a directed verdict in favor of the defendants. *Id.; see also Glidden*, 430 Mass. at 696 (affirming grant of summary judgment where plaintiff injured by scaffold collapse could think of a "thousand different reasons" for the collapse, but could only speculate as to the precise cause) ("[T]he record reflects that the plaintiffs failed to proffer any evidence explaining why the scaffold collapsed and therefore cannot establish any causal link between their injuries and the defendant's breach of any duty …")

The facts in the instant case are identical. Just as in *Kelly* and *Moynihan*, no one witnessed Kusada's accident, and there is a complete lack of evidence to establish how it occurred. Kusada was last seen skiing "okay" on the Big Chief Trail, but it is undisputed that there are no eyewitnesses to account for his movements thereafter.[1] Without evidence that Kusada tried to stop or turn – or, indeed, without any evidence of what Kusada did or did not do between the time he was last seen and the time he was found in the gully – it is nothing more than conjecture for Kusada to allege that lessons or different skis would have made a difference.[2] From all that appears in the summary judgment record, Kusada's

---

[1] One can think of literally dozens of reasons as to why Kusada may have skied off the Big Chief Trail, and none are more likely to have occurred than any other. Was Kusada trying to stop or turn? Was he chasing his friend, Yuki Hasegawa, who had just passed him? Was he inadvertently cut off by Hasegawa or another skier? Did he fail to perceive the edge of trail because he was looking at Hasegawa? Did he fail to perceive the edge of the trail because he was looking at something else? Was he sitting back on his skis? Was he blinded by the night lights? Did he catch a clump of snow or hit a patch of ice? Did he lose his contacts? Did he fall after Hasegawa passed him, get up without incident, and then ski into the woods on a later run while skiing by himself?

[2] Causation analysis starts and ends with what happened as an accident unfolded. Without knowing what happened, causation cannot be determined. Kusada says lessons should have been required and, if required, the accident would not have happened because he would have had knowledge and ability that would have prevented the accident. Teenagers learn to drive every year. Driver's Education classes are common. Learner's permits are required for six months. G.L. c. 90, § 8B. To get a learner's

accident could have been caused by bizarre set of circumstances that would have caused even the most

expert skier, wearing appropriate equipment, to lose control and ski off the trail. NMH, Millard and

Atkins cannot be held liable in these circumstances. In the absence of eyewitnesses,[3] Kusada's "evidence

of causation establishes no more than a possibility that [the] negligence [of the moving defendants]

caused the harm of which [Kusada] complains." *O'Connor*, 36 Mass. App. Ct. at 364; *see Kelly,* 376 F.2d

at 589 ("Plaintiff's testimony as to how this accident happened is woefully lacking on the question of

liability, and she produced no eyewitnesses to the accident.") In this case, Kusada's testimony as to how

this accident happened is nonexistent and he has produced no eyewitnesses. Accordingly, Kusada's

negligence claim must fail as a matter of law.

> 2.    Kusada's expert opinions are incapable of establishing causation.

Nor can Kusada's experts cure this fundamental flaw in his case. "A verdict may not be based on

conjuncture and surmise, and expert opinion does not help if it is demonstrated that it rests on

speculation." *Swartz v. Gen. Motor Corp.*, 375 Mass. 628, 633 (1978) (internal citations omitted); *accord*

*Carey v. Gen. Motors Corp.*, 377 Mass. 736, 741 (1979); *Kennedy v. U-Haul Co.*, 360 Mass. 71, 73-74

(1971). Just as the lack of eyewitnesses prevent Kusada from identifying the cause of his accident, so too

are his experts left without a nucleus of facts on which to base their opinions. Accordingly, this Court

must disregard the expert opinions offered by Kusada to establish that the alleged negligence of the

moving defendants caused his accident.

---

permit, an applicant has to pass a test given by the registrar. Thereafter, for six months, the learner has to drive with a licensed driver, 21 years old or older. Then the learner can get a junior operator's license if he passes a driving test given by the registry. There are many hurdles and yet sadly, not infrequently, there is a story in the newspaper of teenagers killed or seriously injured when the teenage driver left the road and slammed into a tree. All the lessons in the world will not tell anyone what happened or what did not happen which caused a teenager to slam his car into a tree. Was it excessive speed? Was the driver blinded by the high beams of another driver? Did the teenager swerve to avoid something in his path? Were the brakes applied? Did the teenager swerve to avoid an oncoming vehicle? Was the road slick? It is the underlying facts about what happened which are critical to a determination of causation, not lessons or the performance characteristics of the car.

[3] Nor does the doctrine of *Res Ipsa Loquitur* solve Kusada's problem of proof. For *Res Ipsa Loquitur* to apply, three conditions must be met: "'(1) the accident must be of a kind which ordinarily does not occur in the absence of someone's negligence; (2) it must be caused by an agency or instrumentality within the exclusive control of defendant; [and] it must not be due to any voluntary action on the part of the plaintiff.'" (Citation omitted.) *Grajales-Romero v. American Airlines, et al.*, 194 F.3d 288, 296 (1st Cir. 1999). None of these three conditions are satisfied in this case.

In *LaClair v. Silberline Manufacturing Co.,* the plaintiff's expert was prepared to testify that a fatal explosion was caused by the ignition of a cloud of aluminum powder that surrounded the plaintiff's workspace. 379 Mass. 21, 32 (1979). However, the trial judge excluded this testimony because the trial record up to that point was completely barren of any evidence that a cloud of aluminum had actually been present near the plaintiff's workspace on the day of the accident. *See id.* The Massachusetts Supreme Judicial Court affirmed this exclusion, because an "[e]xpert opinion ... must be based on either the expert's direct personal knowledge, on evidence already in the record or which the parties represent will be presented during the course at trial, or on a combination of those sources." *Id.* (internal citations omitted). Here, this Court must reach the same result. Buck and Isham have both acknowledged that they do not know what happened, or what Kusada did or did not do, between the point where Kusada was last seen skiing "okay" on lower Big Chief and the point where he skied off the trail. They freely admit that they lack any knowledge of the specific facts leading up to Kusada's accident, and their opinions regarding causation must therefore be disregarded as speculative.

**IV.    NMH, Millard And Atkins Are Entitled To Judgment As A Matter Of Law Because They Had No Legal Duty To Require And Ensure Helmet Use, To Inspect Kusada's Skis, Or To Require And Mandate Lessons.**

Kusada's claims also must fail for another reason. A plaintiff asserting a negligence claim bears the burden of proof to "establish that the defendant owed a legal duty of care." *See, e.g., Remy v. MacDonald,* 440 Mass. 675, 677 (2004); *see also Jupin v. Kask,* 447 Mass. 141, 146 (2006) (holding that the existence or non-existence of a duty of care is a question of law). Here, Kusada can not meet that burden. Kusada simply cannot establish that NMH, Millard or Atkins owed him a legal duty of care that would have required any one of them to ensure that he wore a helmet, to inspect his equipment, or to mandate that he take lessons before participating in the Recreational Ski Program. Consequently, Kusada will be unable to prove an essential element of his negligence claim at trial, and summary judgment in favor of the moving defendants is therefore appropriate.

1.     <u>Massachusetts courts do not require schools to guarantee the safety of adult students involved in off-campus activities.</u>

In determining whether the actions of school officials are reasonable in the circumstances, courts refer to existing social values, customs, and social policy. *See, e.g., Davis v. Westwood Group*, 420 Mass. 739, 743 (1995); *Mullins v. Pine Manor College*, 389 Mass. 47, 51 (1983); *see also O'Sullivan v. Shaw*, 431 Mass. 201, 204 (2000) ("Whether a defendant has a duty of care to the plaintiff in the circumstances is a question of law for the court, to be determined by reference to existing social values and customs and appropriate social policy.")  Utilizing this standard, Massachusetts courts have uniformly concluded that the general duty of care owed to students of Kusada's age by school officials does not ordinarily extend to off-campus activities such as the Recreational Ski Program run by NMH.

For example, in *Judson v. Essex Agricultural and Technical Institute* the plaintiff was a student at a technical institute which required students to find a job related to their coursework with a third-party employer from outside of the school.  418 Mass. 159, 160 (1994).  The plaintiff secured such employment at a farm, but was injured while at work when she fell from a hay loft.  *Id.* at 161.  The technical institute was subsequently sued in negligence by the plaintiff, who alleged that the school had a duty to inspect the farm to ensure that it was safe.  *Id.* at 163.  The trial judge rejected this argument, and the Massachusetts Supreme Judicial Court affirmed.  In doing so, the court observed that the school did not owe the plaintiff any legal duty because it could "discern no existing social values or customs demonstrating that vocational schools ... have recognized an obligation to protect students during their employment with third persons creating an expectation in students and their parents that [ the school ] would use reasonable care to inspect the plaintiff's place of employment ... "  *Id.* at 164.

The Massachusetts Superior Court has reached the same conclusion based on highly analogous facts.  In *Erickson v. Tsutsumi*, the plaintiff was a Boston College freshman who was a member of the crew team.  2005 WL 1299515 at *1 (Mass. Super. Ct. 2000).  The daily practices for the crew team were held at a boat house which was located across the street from campus, and the team members were required by their coach to run or ride their bike to practice.  *Id.*  On her return from practice one evening,

- 15 -

the plaintiff was injured while crossing the street. *Id.* In the ensuing lawsuit, a judge concluded that the college did not owe the plaintiff a duty of care on the facts presented because "existing social values and customs" mitigated against such a result. *Id.* at 2. The court found it particularly telling that the plaintiff offered no evidence that other colleges provided security staff or crossing guards for the safety of their adult students engaged in extracurricular activities, and also found it notable that participation on the crew team was not a required element of the college curriculum. *See id.*[4] Accordingly, the court concluded that "it cannot be said that colleges of ordinary prudence customarily exercise care to protect the well-being of their [athletic] students against the [hazards of crossing a busy street in order to attend a team practice]." *Id.* (internal citations omitted).

These cases establish that Massachusetts courts consistently refuse to impose a duty of care on school officials that would require them to closely monitor the activities of young adult students participating in extracurricular activities outside the four walls of campus. *Compare Mullins,* 389 Mass. at 51 (college had duty to protect student residing in a dormitory on campus from the criminal act of third-party intruder). There is no reason for this Court to deviate from that reasoned approach here.

2.    <u>There was no community consensus that would have required any of the moving defendants to ensure that Kusada wore a helmet, to inspect his equipment or to mandate that he take lessons.</u>

On the summary judgment record before this Court, Kusada will be unable to meet his burden of establishing that the moving defendants had a legal duty to ensure his safety on the ski slopes. In the first instance, the record is completely devoid of any evidence regarding the existing social values, customs and policies of the only "community" that is relevant to this case – private secondary schools in New England operating recreational ski programs. Neither liability expert disclosed by Kusada has ever taught at any private secondary school in New England, nor has either one ever been responsible for a recreational ski program at a private secondary school in New England. Moreover, neither expert has any

---

[4] The same is true here. There is no evidence that other New England private schools operating recreational ski programs in the winter of 2003-2004 required and ensured helmet use, inspected students' skis before each outing or mandated lessons. Likewise, as in *Erickson,* participation in the Recreational Ski Program was voluntary. It was an elective.

familiarity with recreational ski programs at private secondary schools in New England, and both admit that they did not conduct or rely on any studies regarding recreational ski programs at private secondary schools in New England. On this failure of proof alone, Kusada's negligence claims must be rejected. *Compare Mullins*, 389 Mass. at 51 n.5 (finding expert testimony persuasive in case involving campus security where the expert was the Chief of Campus Police at Wellesley College and, in addition, visited eighteen area colleges to survey their security systems).

However, even when the evidence is viewed in the light most favorable to Kusada, he still cannot establish that community consensus required the moving defendants to do any more than they did with regard to his safety. Community consensus "stems from the nature of the situation." *Mullins*, 389 Mass. at 51.[5] At the time of Kusada's accident, community consensus did not require the moving defendants to closely monitor the activities of adult students involved in off-campus extracurricular activities, and it also generally allowed young men of Kusada's age to reach their own informed decisions as to how they should behave on the ski slopes. NMH, Millard and Atkins had no duty established by existing social values, custom, and social policy to ensure that Kusada wore a helmet, to inspect Kusada's skis, or to require that Kusada take lessons.

Kusada was 18 years old. NMH strongly recommended that he wear a helmet but it was not required. Kusada had the ability, some would say that right, to make that decision. Some NMH students in the Recreational Ski Program wore helmets. Some did not. Some skiers at Berkshire East wore helmets. Some did not. Several schools bring students to Berkshire East. None required their students to wear helmets in 2003-2004. Berkshire East did not require skiers to wear helmets in 2003-2004. No ski resort in the United States required skiers to wear helmets in 2003-2004. No ski school at any ski resort in the United States required high school aged students to wear helmets in 2003-2004. No private

---

[5] In *Mullins*, the Court analyzed the nature of the situation thusly: "No student has the ability to design and implement a security system, hire and supervise security guards, provide security at the entrance of dormitories, install proper locks and establish a system of announcement for authorized visitors .... Thus, the college must take responsibility on itself if anything is to be done at all." 389 Mass. at 51-52. (internal citation omitted.) Contrast Kusada. He was 18 and fully capable of deciding whether to wear a helmet, whether to have his skis inspected at the Berkshire East rental shop and whether to take lessons from Berkshire East or from his more experienced friend, Hasegawa.

secondary schools required students in recreational ski programs to wear helmets in 2003-2004.  The
National Ski Areas Association's position was to recommend but not require helmets in 2003-2004.  The
AMA recommended but did not require helmets in 2003-2004.  The NMH policy of recommending but
not requiring the use of helmets in its recreational ski program in 2003-2004 was consistent with helmet
utilization policy throughout the United States in 2003-2004.  Whether or not to wear a helmet was and
remains a matter of individual choice.

        NMH made it clear that Kusada was responsible for his own ski equipment.  Berkshire East does
not require beginning skiers to have their skis and equipment inspected before skiing at Berkshire East
nor does any ski area in the United States.  Kusada's expert, Marilyn Buck, has admitted that she was not
aware of any ski area in the United States which required skiers to have their skis inspected before they
are allowed to ski.  Moreover, she has not taught at a private secondary school, she has not conducted any
studies of recreational ski programs at any private secondary schools and she has not reviewed any studies
done by others of recreational ski programs at any private secondary schools.  Kusada's other expert,
James Isham, is no different.  He was not aware of any ski area in the United States which required skiers
to have their skis inspected before they could ski.  He did not do any studies of private secondary schools
operating recreational ski programs in New England, he was not aware of any studies done by any other
person, and he did not rely on any such study in forming his opinion.  The same analysis applies to
mandating lessons, mandating buddy systems and so on.  Kusada simply has offered no evidence of
existing social values, customs and policy that would establish any such legal duty.  In fact, all of the
available evidence is to the contrary, and the moving defendants are therefore entitled to judgment as a
matter of law.

## CONCLUSIONS

For the reasons stated and upon the authorities cited, summary judgment should be granted to NMH, Millard and Atkins.

> NORTHFIELD MOUNT HERMON SCHOOL
> FRANCIS MILLARD and MICHAEL ATKINS
>
> By its Attorneys,
>
> HOLLAND & KNIGHT LLP
>
>
> Harold W. Potter, Jr. (BBO #404240)
> Benjamin M. McGovern (BBO #661611)
> 10 St. James Avenue
> Boston, MA  02116
> (617) 523-2700

Dated:  November 22, 2006

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on November 27, 2006, via first class mail.

> Harold W. Potter, Jr.

# 3920917_v2