UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

YUKIO KUSADA,
        Plaintiff,

    v.

BERKSHIRE EAST SKI RESORT, UNION
TERMINAL PIERS, INC.,
        Defendants,

and

NORTHFIELD MOUNT HERMON SCHOOL,
FRANCIS MILLARD AND MICHAEL
ATKINS
        Defendant and
        Third-Party Plaintiff,

    v.

TAKERU KUSADA,
        Third-Party Defendant.

Civil Action No. 05-30043-MAP

## AFFIDAVIT OF HAROLD W. POTTER, JR.

I, Harold W. Potter, Jr., on oath depose and say:

1.      I am an attorney admitted to practice in the Commonwealth of Massachusetts and

to the Federal District Court of Massachusetts.

2.      I am a partner with Holland & Knight, 10 St. James Avenue, Boston,

Massachusetts 02116.

3.      I represent Northfield Mount Hermon School, Francis Millard and Michael Atkins

in this action and have continuously represented each since suit was brought against each in this

action.

4.    In that capacity, I have received responses to interrogatories propounded by all defendants in this matter including now dismissed defendants Berkshire East Ski Resort and Union Terminal Piers, Inc.

5.    In that capacity, I have attended and participated in every one of the multiple depositions taken in this case.

6.    Attached to this affidavit and marked I is a true and accurate copy of the deposition of Yukio Kusada, pages 1-10 and 44.

7.    Attached to this affidavit and marked II is a true and accurate copy of the deposition of Yuki Hasegawa, pages 1-12, 15-17, 24-25, 47, 49, 52, 54, 67-68, 71-74, 76, 96, 104, 106, 107, 109-111, 115, 117-118, 125.

8.    Attached to this affidavit and marked III is a true and accurate copy of the deposition of Katherine Benedetti, pages 1-10 55-56 and 59.

9.    Attached to this affidavit and marked IV is a true and accurate copy of the deposition of Alfred L. Schaeffer, pages 1-16 and 81.

10.    Attached to this affidavit and marked V is a true and accurate copy of the deposition of John A. Herick, Jr., pages 1-8, 74-76.

11.    Attached to this affidavit and marked VI is a true and accurate copy of the deposition of Edward Ralicki, pages 1-12, 114-115, 117.

12.    Attached to this affidavit and marked VII is a true and accurate copy of the deposition of Audra Forstrum, pages 1-10, 25, 38-39.

13.    Attached to this affidavit and marked VIII is a true and accurate copy of the deposition of Lori Bassett, pages 1-18.

14.    Attached to this affidavit and marked IX is a true and accurate copy of the deposition of Robert Fielding, pages 1-8, 15-17.

15.    Attached to this affidavit and marked X is a true and accurate copy of Yukio Kusada's Answers to Interrogatories Propounded by Northfield Mount Hermon School.

16.    Attached to this affidavit and marked XI is a true and accurate copy of Yukio Kusada's Answers to Interrogatories Propounded by Francis Millard.

17.    Attached to this affidavit and marked XII is a true and accurate copy of Yukio Kusada's Answers to Interrogatories Propounded by Union Terminal Pier, Inc.

18.    Attached to this affidavit and marked XIII is a true and accurate copy of the deposition of Marilyn Buck.

19.    Attached to this affidavit and marked XIV is a true and accurate copy of the deposition of James Isham.

Signed under the pains and penalties of perjury this $27$ day of November, 2006.

_____
Harold W. Potter, Jr.


## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on November 27, 2006, via first class mail.

_____
Harold W. Potter, Jr.

# 4203972_v1

- 3 -

**EXHIBIT I**

Yukio Kusada

1

1                              Volume:    I

2                              Pages:    1 to 53

3                              Exhibits:  1 to 6

4

5               UNITED STATES DISTRICT COURT

6                DISTRICT OF MASSACHUSETTS

7    Civil Action No. 05-30043-MAP

8    - - - - - - - - - - - - - - - - - - - - - - - - - x

9    YUKIO KUSADA,

10                 Plaintiff,

11     v.

12    BERKSHIRE EAST SKI RESORT, UNION TERMINAL PIERS,

13    INC., and NORTHFIELD MOUNT HERMON SCHOOL,

14                 Defendants.

15    - - - - - - - - - - - - - - - - - - - - - - - - - x

16

17              DEPOSITION OF YUKIO KUSADA

18            Thursday, September 22, 2005

19                 11:00 a.m.

20               Holland & Knight LLP

21              10 St. James Avenue

22             Boston, Massachusetts

23

24        Reporter:  Lisa A. Moreira, RMR/CRR

Yukio Kusada

2

1    A P P E A R A N C E S

2

3

4         BREAKSTONE, WHITE-LIEF & GLUCK, P.C.

5         (BY: RONALD E. GLUCK, ESQ.)

6         Two Center Plaza

7         Boston, Massachusetts 02108-1906

8         (617) 723-7676

9         Gluck@bwglaw.com

10        Counsel for the Plaintiff

11

12

13

14        DONOVAN & O'CONNOR, LLP

15        (BY: DAVID B. MONGUE, ESQ.)

16        1330 Mass MoCA Way

17        North Adams, Massachusetts 02147

18        (413) 663-3200

19        dmonguedocatty.com

20        Counsel for the Defendant Berkshire East Ski

21        Resort and Union Terminal Piers

22

23

24

3

1    A P P E A R A N C E S (Continued)

2

3           HOLLAND & KNIGHT LLP

4           (BY:  HAROLD W. POTTER, JR., ESQ.)

5           10 St. James Avenue

6           Boston, Massachusetts 02116

7           (617) 573-5815

8           harold.potter@hklaw.com

9           Counsel for the Defendant Northfield Mount

10          Hermon School

11

12

13

14

15

16

17

18   Also Present:

19           Louise Cobbs, United Educators

20

21

22

23

24

Yukio Kusada

4

1                    I N D E X

2  WITNESS:        DIRECT  CROSS  REDIRECT  RECROSS

3  YUKIO KUSADA

4  (By Mr. Porter)      6

5  (By Mr. Mongue)            46

6

7                    E X H I B I T S

8  NO.                DESCRIPTION                    PAGE

9    1  Document entitled "Permissions PE/A      22

10      Activities Permission"

11   2  Skier's responsibility code              27

12   3  Letter from Eveyln Tillotson to          27

13      "Dear Student"

14   4  Letter from Frank Millard to "Dear       28

15      Parent or Guardian"

16   5  Document entitled "Rec Skiing and        29

17      Snowboarding, Northfield Mount

18      Hermon School"

19   6  Document entitled "Rec Skiing and        30

20      Snowboarding"

21

22

23  *Original exhibits retained by Attorney Porter

24

Yukio Kusada

5

1                    P R O C E E D I N G S

2                         YUKIO KUSADA,

3    a witness called on behalf of the Defendant

4    Northfield Mount Hermon School, having first been

5    duly sworn by the Notary Public, was deposed and

6    testified as follows:

7                    DIRECT EXAMINATION

8        BY MR. PORTER:

9        Q.  Mr. Kusada, I'm going to be asking you some

10   questions this morning.

11       A.  Okay.

12       Q.  And I would ask you to wait until I finish

13   my question to give your answer so that we're not

14   both talking at the same time because the

15   stenographer has to take everything down.

16       A.  Okay.

17       Q.  Also, if, when you listen to my question,

18   you don't understand it, let me know that you don't

19   understand it, and I will try to rephrase it.

20       A.  Okay.

21       Q.  If you answer the question as posed to you,

22   I will assume that you understand the question.  Is

23   that okay?

24       A.  Okay.

Yukio Kusada

6

1      Q.  If at any time you want to take a break or

2   stop for any reason, just let us know, and we'll

3   work it out, or if you want coffee or water or

4   anything like that, let us know.  Okay?

5      A.  Okay.

6      Q.  The other thing is that when you respond to

7   a question, you have to say yes or no, a verbal

8   response.  Shaking of the head will not work because

9   they can't record that.

10      A.  Okay.

11      Q.  So if you can try whenever you're responding

12   to a question to respond, yes, no, some sort of

13   verbal response, that would be great.  Thank you.

14      A.  Okay.

15      Q.  Would you state your name.

16      A.  Huh?

17      Q.  Your name.

18      A.  Yukio Kusada.

19      Q.  And your current address?

20      A.  I don't remember -- I live in BU.

21      Q.  You're living at Boston University?

22      A.  Yes, somewhere.  I know the dorm's name.

23      Q.  What's the dorm's name?

24      A.  Miles Standish Hall.

Yukio Kusada

7

```
 1        Q.  And when did you first begin living at Miles
 2   Standish Hall at Boston University?
 3        A.  A couple of weeks ago.
 4        Q.  Are you in a program at Boston University?
 5        A.  I'm am undergraduate student.
 6        Q.  Okay.  And what are you studying?
 7        A.  I don't have a -- I don't really know what
 8   I'm going to be majoring in.
 9        Q.  Okay.  Have you signed up for courses this
10   fall?
11        A.  Yes, I did.
12        Q.  Are you taking courses this fall?
13        A.  Yes.
14        Q.  What courses are you taking?
15        A.  Math and economics.
16             MR. MONGUE:  I didn't hear the last one?
17             THE WITNESS:  Economics.
18        Q.  Any other courses?
19        A.  No, because I have -- my doctor doesn't want
20   me to take more.  My doctor in the office of
21   disability said I should start easier.
22        Q.  Okay.  So you're starting with two courses,
23   one in math and one in economics; is that correct?
24        A.  Yes.
```

Yukio Kusada

8

1      Q.   Could you tell me what your mother's name
2    is?
3      A.   Mari Kusada.
4      Q.   Could you spell the first name?
5      A.   M-a-r-i.
6      Q.   And can you tell me her address?
7      A.   No.
8      Q.   Okay.  What's your father's name?
9      A.   I know she lives in Osaka.  And my father
10   lives in China -- what did you ask me?
11     Q.   All right.  Let's go back to your mother.
12   You couldn't tell me her address, but you could tell
13   me that she lives in Osaka, Japan?
14     A.   Yes.
15     Q.   And is that where she is now?
16     A.   Yes.  I kind of forgot.
17     Q.   You forgot the street address?
18     A.   Yes.
19     Q.   What about your father?  Where does he live?
20     A.   He lives in China.
21     Q.   Where in China?
22     A.   Yantai, a city called Yantai, I guess,
23   near --
24     Q.   Near where?

Yukio Kusada

9

1      A.  Oh, no, it's not Yantai.  He lives in China.

2      Q.  Okay.  Do you know what city he lives near?

3      A.  I don't remember the city name, but I know

4  it's nearby Yantai.

5      Q.  Near Yantai?

6      A.  Yes.

7      Q.  And how do you spell that?

8      A.  Y-a-n-t-a-i.

9      Q.  What's your father's name?

10     A.  Ken.

11     Q.  Do you have any siblings?

12     A.  Yes, I do.

13     Q.  How many siblings do you have?

14     A.  I have a sister.

15     Q.  And what's her name?

16     A.  Yoshimi.

17     Q.  And where does she live?

18     A.  Japan.

19     Q.  Does she live with your mother?

20     A.  I think so.

21     Q.  How old is she?

22     A.  14 or 15 or 16, somewhere between there.

23     Q.  What's your date of birth, Yukio?

24     A.  August 13.

Yukio Kusada

10

1       Q.   What year?

2       A.   1985.

3       Q.   And where were you born?

4       A.   I was born in China.

5       Q.   For the first ten years of your life, can

6    you tell me where you lived?

7       A.   I moved to Japan when I was little.

8       Q.   How old were you when you moved to Japan?

9       A.   About 2 or 3 or something like that.

10      Q.   And did you, after you moved to Japan, live

11   in Japan continuously from the time you moved there

12   from China until you were 10 years old?

13      A.   Huh?  What?

14      Q.   Did you live in Japan -- let me step back.

15           I'm only talking about the period from

16   the time you were born until you were 10 years old,

17   and you told me that you lived in China until you

18   were perhaps 2 or 3 when you moved to Japan; is that

19   correct?

20      A.   Yes.

21      Q.   Okay.  And after you moved to Japan up until

22   the time you were 10 years old, did you always live

23   in Japan?

24      A.   Huh?  What?

JONES REPORTING COMPANY
617-451-8900

Yukio Kusada

44

1    doctor in -- my doctor in Spaulding, yes.

2        Q.  What doctor is that?

3        A.  Dr. Chae.

4        Q.  What did Dr. Chae do for you?

5        A.  Huh?

6        Q.  What did Dr. Chae do for you?

7        A.  He -- I can't really find the words to

8    explain it.

9        Q.  Do you have any memory at all of your

10    accident?

11        A.  No.  I don't remember it.

12        Q.  Do you have any memory of how it happened?

13        A.  No.

14        Q.  Do you have any memory of who found you?

15        A.  No.

16        Q.  Do you have any memory at all of ever skiing

17    on the Big Chief trail --

18        A.  What?

19        Q.  -- at Berkshire East?

20        A.  Trail?

21        Q.  The Big Chief trail.

22        A.  What's that?

23        Q.  Do you remember skiing on a trail called Big

24    Chief at Berkshire East ski center?

**EXHIBIT II**

1

Volume I, Pgs. 1-131

COMMONWEALTH OF MASSACHUSETTS

Federal Court

No. 05-30043-MAP

---------------------------

YUKIO KUSADA,                          )
Plaintiff                              )
v.                                     )
BERKSHIRE EAST SKI RESORT,             )
UNION TERMINAL PIERS, INC.,            )
AND NORTHFIELD                         )
MOUNT HERMAN SCHOOL,                   )
Defendant and Third Party              )
Defendant                              )
v.                                     )
TAKERU KUSADA                          )
Third Party Defendant                  )

---------------------------

DEPOSITION OF YUKI HASEGAWA

Thursday, May 19, 2005

1:12 p.m.

Northfield Mount Herman School

206 Main Street

Northfield, Massachusetts 01360

- - - - - - Terri Clarno - - - - - -

FLYNN REPORTING ASSOCIATES

Professional Court Reporters

One Exchange Place

Worcester, Massachusetts 01608

(508) 755-1303  *  (617) 536-2727

TOLL FREE: (888) 244-8858
FAX:  (508) 752-4611

2

APPEARANCES:
BREAKSTONE, WHITE-LIEF & GLUCK, P.C.
    RONALD E. GLUCK, ESQ.
    Two Center Plaza, Suite 530
    Boston, Massachusetts 02108-1906
    617-723-7676
    on behalf of the Plaintiff


DONOVAN & O'CONNOR, LLP
    DAVID B. MONGUE, ESQ.
    1330 Mass MoCA Way
    North Adams, Massachusetts 01247
    413-663-3200
    on behalf of the Defendant, Berkshire East Ski
    Resort


HOLLAND & KNIGHT, LLP
    HAROLD W. POTTER, JR., ESQ.
    10 St. James Avenue, 11th Floor
    Boston, Massachusetts 02116
    617-573-5815
    on behalf of the Defendant, Northfield Mount
    Herman School


SEYFARTH SHAW
    JONATHAN L. MOLL, ESQ.
    Two Seaport Lane, Suite 300
    Boston, Massachusetts 02210-2028
    617-946-4800
    on behalf of the Defendant, Northfield Mount
    Herman School

3

1                         I N D E X

2    Testimony of:     Direct  Cross  Redirect Recross

3     Mr. Hasegawa

4      by Mr. Gluck    12                 122,126
       by Mr. Potter         103,124
5      by Mr. Mongue            111

6

7

8

9

10                        E X H I B I T S

11   Exhibit No.        Description            For I.D.

12       1        Subpoena                        12

13       2        A Skier's Responsibility Code   29

14       3        Rec. Skiing & Snowboarding 3/04 30

15       4        '03 Permission Slip             31

16       5        Accident Report                 79

17       6        Ski List of Attendance 3/04    102

18

19

20

21

22

23

24

```
 1                      STIPULATIONS
 2                      It is stipulated by and between
 3     counsel for the respective parties that the
 4     deposition transcript will be read and signed by the
 5     deponent within thirty (30) days of receipt of
 6     transcript under the pains and penalties of perjury.
 7     The filing and the notarization are hereby waived.
 8                      It is further agreed that all
 9     objections, except as to the form of the question
10     and motions to strike, are reserved until the time
11     of trial.
12                      YUKI HASEGAWA, sworn.
13                      MR. GLUCK:  Good afternoon.
14     Before we begin I think that Mr. Moll has something
15     that he would like to say on the record and invite
16     him to do so at this time.
17                      MR. MOLL:  Thank you.  My name is
18     Jonathan Moll.  I'm with the firm Seyfarth Shaw and
19     I serve as outside counsel for Northfield Mount
20     Herman.  While Mr. Potter is representing the school
21     during the course of this deposition, I'm here at
22     the request of the school because certain parents
23     have expressed concerns about their sons' or
24     daughters' participation in the deposition process.
```

5

```
1              Although I represent the school and not

2     Yuki, I'm here to assist by making myself available

3     to ask any questions you may have about the

4     deposition, the deposition process, or your

5     obligations as a participant in the process so that

6     these depositions can continue as scheduled.

7              As was noted, I need to remind you again

8     that you must answer the questions that you will be

9     asked and that you should ask for clarification if

10    you do not understand any questions or any part of

11    any questions by saying "I don't understand" or "I

12    don't understand your question"; and in addition, if

13    any question contains words that you do not

14    understand please say so.  Finally, if you feel like

15    you need to take a break at any time just let us

16    know.

17              MR. GLUCK:  Just let me tell you

18    before we begin that my name is Ron Gluck and I

19    represent the plaintiff, Yukio Kusada, in a lawsuit

20    that's been filed in connection with injuries that

21    he suffered on February 20, 2004.

22              The other people around the table, I invite

23    them to introduce themselves at this time just so

24    that you know who everybody is and who they
```

```
 1    represent and then we'll talk about what we're doing
 2    here, okay?
 3                    MR. MONGUE:   I'm David Mongue.
 4    I'm an attorney up in North Adams, west of here, and
 5    I represent the Berkshire East Ski area.
 6                    MR. POTTER:   And I'm Harold Potter
 7    and I represent Northfield Mount Herman School.
 8                    MR. GLUCK:   And Mr. Moll is also
 9    here on behalf of the school, but you understand
10    that at this point in time that you do not have a
11    lawyer here representing you?
12                    THE WITNESS:   Yes.
13                    MR. GLUCK:   I just want to make
14    that clear from the very beginning, okay?   I'm going
15    to go over some ground rules after I actually ask
16    you to identify yourself, so if you would please
17    state your full name.
18                    THE WITNESS:   My name is Yuki
19    Hasegawa.
20                    MR. GLUCK:   Would you please spell
21    your last name.
22                    THE WITNESS:   H-A-S-E-G-A-W-A.
23                    MR. GLUCK:   May I call you Yuki
24    during the course of the deposition?
```

```
 1                    THE WITNESS:  Yes.

 2                    MR. GLUCK:  Yuki, as I've said, my

 3    name is Ron Gluck and I represent Yukio Kusada in

 4    connection with injuries that he allegedly suffered

 5    on February 20, 2004, at the Berkshire East Ski

 6    mountain.

 7           We've asked you to come here today -- or

 8    I've asked you to come here today -- to answer some

 9    questions that I have and the other attorneys may

10    also have some questions about various things.  I'm

11    sure that I speak for all when I say that we ask you

12    to listen carefully to our questions.  If there is

13    question that I ask you that you don't understand,

14    I'd ask you to please tell me that you don't

15    understand it.  I'll be happy to rephrase it.

16           If you do answer a question, I'll assume

17    that you've understood the question and your answer

18    will stand.  Now, I'd like to tell you in terms of

19    some ground rules that you have the right to read

20    the stenographer's transcript that will be produced

21    in approximately two weeks and I'll be happy to send

22    it to you.

23           You can review it and make changes if you

24    feel that the stenographer incorrectly transcribed
```

8

```
 1   or typed what you've said.  If you'd like to let me
 2   know now that you'd like to do that, I'll be happy
 3   to arrange for that.
 4                    THE WITNESS:  I have a question
 5   about that.  I would like to read that as well as my
 6   parents and my parents -- I will be going back to
 7   Japan in June 5 -- well, June 9 and I would like to
 8   show it to my parents as well at that time.
 9                    MR. GLUCK:  That's fine.
10                    THE WITNESS:  But you said two
11   weeks or so.  Is there more time I could get?
12                    MR. GLUCK:  Yes.  Of course.  What
13   I'm saying is that in about two weeks the
14   stenographer will send me the little booklet, also
15   known as a transcript.  At that point in time I'll
16   be happy to send it to you wherever you tell me to
17   send it.
18                    THE WITNESS:  How many days do I
19   have?
20                    MR. GLUCK:  Then typically you
21   have 30 days to read it and make any corrections if
22   you feel that something is inaccurate, and then you
23   send that sheet of paper, called an errata sheet,
24   you send that back to me and that becomes part of
```

9

    1    the transcript.

    2                    THE WITNESS:  Is there any chance

    3    I could get a little more time?

    4                    MR. GLUCK:  How much time would

    5    you like?

    6                    THE WITNESS:  Sixty.

    7                    MR. GLUCK:  Sixty days?

    8                    THE WITNESS:  I just doubled it.

    9                    MR. GLUCK:  I don't have a problem

   10    with it.  Anybody have a problem with that?

   11                    MR. POTTER:  No.

   12                    MR. MOLL:  No.

   13                    MR. MONGUE:  No.

   14                    THE WITNESS:  During that time

   15    would I be responsible for all the things I said

   16    still?

   17                    MR. GLUCK:  Well, no.  You don't

   18    become fully responsible for it until you make the

   19    changes that you feel need to be made in terms of

   20    the stenographer incorrectly typing what you've

   21    said.

   22         Typically they're pretty good.  They write

   23    down -- they type what you've said and what I've

   24    said, what everybody here has said so we wouldn't

1    expect there to be big, big changes, but, yes.  You

2    do have 60 days to make those changes and then you

3    send that sheet back to me.

4              And if you don't send the sheet back to me

5    within that period of time, then the deposition

6    would stand as typed.

7                        THE WITNESS:  Is there any chance

8    that my parents could show that to some other person

9    that wasn't, like, involved in this?

10                       MR. GLUCK:  Well, there's nothing

11   confidential about it.  Your parents can show it to

12   whomever they would like, but you understand that

13   those people have nothing to do with this case and

14   the testimony that you're giving is your testimony.

15                       THE WITNESS:  Yes.  They just

16   asked me that and also I can just send it.  I don't

17   have to, like, come over to the United States?

18                       MR. GLUCK:  Correct.  You can just

19   send it right back to me.  When I send the

20   transcript to you, I'll tell you where you can

21   return it to me.  I'll probably send you an envelope

22   and you can just stick it in and send it back.

23                       THE WITNESS:  Okay.

24                       MR. GLUCK:  Now, some other ground

          1    rules, that all of your responses must be verbal so

          2    that the stenographer can take down everything you

          3    say because she can't take down nods of the head or

          4    shakes of the head or something like that.

          5                   THE WITNESS:  Yes.

          6                   MR. GLUCK:  You and I must speak

          7    at separate times because when two people are

          8    talking at once, it makes it very difficult for the

          9    stenographer to type what each person is saying.  Do

         10    you have any questions before we begin?

         11                   THE WITNESS:  Am I allowed to ask

         12    questions during the deposition?

         13                   MR. GLUCK:  Well, no.  If you

         14    don't understand a question you can ask me to

         15    rephrase it, but you're not permitted to ask me

         16    questions that I would be required to answer, okay?

         17                   THE WITNESS:  I should be fine.

         18                   MR. GLUCK:  We'll put these

         19    stipulations on the record that all objections

         20    except as to the form of the questions and all

         21    motions to strike will be reserved until the time of

         22    trial.  Is that a fair statement?

         23                   MR. MOLL:  That's fair.

         24                   MR. POTTER:  Yes.

```
 1                    MR. MONGUE:  That's fine.

 2                    (Exhibit No. 1 premarked for

 3   identification.)

 4                    DIRECT EXAMINATION

 5   BY MR. GLUCK:

 6        Q.  Would you please tell me your current

 7   address?

 8        A.  Here?

 9        Q.  Yes.

10        A.  Box No. 2534, 206 Main Street, Northfield,

11   Massachusetts 01360.

12        Q.  When will that cease to be your address?

13        A.  I'm not sure.

14        Q.  Are you graduating from school soon?

15        A.  Yes.  I'm graduating from school here, but

16   might be transferred.

17        Q.  When do you plan to leave the school?

18        A.  June 5.

19        Q.  June 5, 2005.

20        A.  Yes.

21        Q.  Then you'll be returning to where?

22        A.  Brandeis University.

23        Q.  Will you be entering Brandeis in September?

24        A.  August, September.
```

1      Q.  When was the first time that you became a

2   student at the Northfield Mount Herman school?

3      A.   The fall of 2002.  Is that true?  Yes.   The

4   fall of 2002.

5      Q.   Have you been a student at this school

6   since that time on a continual basis with the

7   exception of vacations?

8      A.   Yes.

9      Q.   Prior to coming to Northfield Mount Herman

10   had you ever skied?

11      A.   Yes.

12      Q.   When did you begin skiing, at what age?

13      A.   I don't remember, but it was really, really

14   long time; when I was a really small kid.

15      Q.   Before the age of ten?

16      A.   Yes.

17      Q.   Before the age of seven?

18      A.   Probably about five.

19      Q.   Was that in Japan?

20      A.   Yes.   And I also skied in Switzerland where

21   I lived for three years.

22      Q.   You were born in Japan?

23      A.   Yes.

24      Q.   You lived in Japan for how many years

16

1    before you moved to Switzerland?

2         A.   About seven years.

3         Q.   So when you were seven years old you moved

4    to Switzerland?

5         A.   Yes.

6         Q.   And you lived there for three years?

7         A.   Yes.

8         Q.   When you were approximately ten where did

9    you move?

10        A.   Came back to Japan.

11        Q.   Did you live in Japan continuously until

12   you came to Northfield Mount Herman school?

13        A.   Yes.

14        Q.   Starting at the age of -- did you say five

15   you started skiing? -- about that?

16        A.   Yes.

17        Q.   How often would you ski on an annual basis

18   when you were young?

19        A.   It varied.   I -- you mean how many times?

20        Q.   Yes.   How many days would you go skiing?

21        A.   It really varies, but I'll probably go,

22   like, four or five times a year and then that would

23   be -- most of the time it would be, like, two or

24   three days long; the whole weekend.

1        Q.  You did that, for the most part, every

2    year?

3        A.  Every year in Japan; and in Switzerland I

4    had a little longer time.

5        Q.  So in February of 2004 how would you rate

6    yourself as a skier?

7        A.  In Berkshire or in, like, worldwide?

8        Q.  When you would ski at an average mountain.

9        A.  I can pretty much ski everywhere.

10       Q.  So you would you consider yourself a person

11   who was capable of skiing black diamonds, expert

12   slopes?

13       A.  I go to black diamonds a lot of time, like,

14   probably once or twice every single time I go to

15   ski.

16       Q.  Did you feel comfortable skiing difficult

17   mogul runs?

18       A.  At certain times -- like, during the day,

19   yes.

20       Q.  Did you, in your own mind -- did you

21   consider yourself a beginner skier, intermediate

22   skier, or an expert skier?

23       A.  Intermediate to expert.  Close to expert.

24   Again, if you're thinking about expert being the

24

```
 1        A.  Yes.

 2        Q.  How do you know that they understood it?

 3        A.  I sent a translated e-mail.  Like, I send a

 4   translated slip in the e-mail so they could

 5   understand it.

 6        Q.  Did the school request that you do that?

 7        A.  No.

 8        Q.  Why did you do that?

 9        A.  Because -- why did I do that?

10        Q.  Yes.

11        A.  Because I wasn't sure if my parents would

12   understand everything that it said on the slip.

13   Since it was my first year and they had to sign

14   something I wanted them to be sure and confident

15   that they are signing something that they believe

16   in.

17        Q.  During the course of that first year that

18   you were involved in the ski program here, were you

19   required to wear a helmet?

20        A.  No.

21        Q.  Was anything said to you by any faculty

22   member or any person from Northfield Mount Herman

23   about wearing a helmet?

24        A.  Anybody?
```

1        Q.  Yes.

2        A.  Could you repeat the question?

3        Q.  Was anything said to you by any faculty

4    member of Northfield Mount Herman about wearing a

5    helmet when participating in the ski program?

6        A.  Yes.

7        Q.  Who said it to you and what did that person

8    say?

9        A.  I don't remember who said it, but I'm not

10    quite sure what he or she said either, but, no, I

11    can't recall.

12        Q.  Do you have any memory at all what they

13    said, even if it's general?

14        A.  They said -- I believe said -- not

15    word-by-word -- wearing helmet is good.  I don't

16    know the English.

17        Q.  If I were to mention the word

18    "recommended"?

19        A.  Yes.  Recommended.

20        Q.  Go on.

21        A.  That's it.

22        Q.  It's recommended, but not required, is that

23    correct?

24        A.  Yes.

47

1    the sides of a mountain or a trail?

2                    MR. POTTER:   Objection.

3        A.   I can't recall.

4        Q.   During the course of the second year in the

5    program, your second year in the program, was there

6    something called a buddy system?

7        A.   Meaning.

8        Q.   Have you ever heard that term before?

9        A.   No.

10       Q.   Never heard the term "buddy system" before?

11       A.   Does that mean, like, ski together?

12       Q.   Well, I'm asking you at this point if

13   you've ever heard of that term "buddy system"?

14       A.   No.

15       Q.   During your second year in the ski program,

16   which is the 2003, 2004 year, were you aware of any

17   requirement that you ski together with someone?

18       A.   No.

19       Q.   So as an example -- strike that.  So as an

20   example, if the bus from Northfield Mount Herman

21   took you to Berkshire East and you got out of the

22   bus and you put on your skis and you went skiing on

23   the mountain, you can ski by yourself the whole time

24   until the bus was ready to leave?

49

1       Q.   Before February 20, 2004, had you ever

2    skied with Yukio?

3       A.   Yes.

4       Q.   On how many occasions?

5       A.   Most of the skiing days.

6       Q.   Why did you ski together?

7       A.   We were the only Japanese students and I

8    knew how to ski, he didn't, so I started teaching

9    him how to ski.

10      Q.   As far as you know did he receive any ski

11   instruction from anybody else other than you?

12      A.   I don't know.

13      Q.   Did he have his own skis?

14      A.   No.

15      Q.   Whose skis did he use?

16      A.   I don't know.

17      Q.   If you were to suggest the name Samuel

18   Wilson, would that refresh your recollection?

19      A.   I don't know whose skis he used.

20      Q.   Do you know Samuel Wilson?

21      A.   No.

22      Q.   Do you know whether Mr. Kusada used the

23   same skis each time that he skied with you up until

24   February 20, 2004?

1          Q.  Yes.  That's the question.

2          A.  Yes.

3          Q.  What does a green ball indicate to you when

4     you see it on a ski mountain?

5          A.  Easy.  Beginners.

6          Q.  And what does a blue triangle indicate?

7          A.  Intermediate.

8          Q.  And what does a black diamond indicate?

9          A.  The hardest, expert.

10          Q.  When you were skiing with Yukio on the

11     occasions before February 20, 2004, which trails

12     would you ski on with Yukio?

13                    MR. POTTER:  Objection.

14          A.  It varied.  The beginning of the course it

15     was green and then we went onto blue as the time

16     passed and he got better and he -- right before

17     February 20, like, I don't know how many times, but

18     we sometimes went onto the black diamond.

19          Q.  Had you ever received any materials from

20     Northfield Mount Herman that addressed the issue of

21     what the signs meant?

22          A.  No.

23          Q.  Do you know if Yukio knew what those signs

24     meant?

54

```
 1        Q.   Do you know the name of the manufacturer of
 2   the skis?
 3        A.   No.
 4        Q.   Can you think of anything, as you sit here
 5   today, that would help us identify the skis that he
 6   was wearing on February 20, 2004?
 7        A.   No.
 8        Q.   Do you know if they were skis designed for
 9   a beginner, an intermediate, or an expert?
10        A.   I don't know.  It's not my skis.
11        Q.   Now, you indicated just before that as
12   Yukio got better as a skier you would move from the
13   easy slopes to the intermediate slopes and even onto
14   the expert slopes, is that correct?
15        A.   Yes.
16        Q.   Who would decide which slopes you and Yukio
17   would ski on when you were skiing with him?
18                    MR. POTTER:  Objection.
19        A.   We both talked to each other and decided
20   if -- if I think he is -- he became good enough to
21   ski there and if he was feeling comfortable enough
22   to ski there.
23        Q.   And that's how the decision was made?
24        A.   Yes.
```

```
 1        A.  Yes.

 2        Q.  What is your best memory of when you

 3   arrived at the mountain that day?

 4        A.  I don't remember at all.

 5        Q.  Was it at nighttime?

 6        A.  No.  It was in the afternoon.

 7        Q.  It was in the afternoon.  Was it later than

 8   three o'clock?

 9        A.  Yes.

10        Q.  Was it later than five o'clock?

11        A.  Somewhere around.

12        Q.  Around five o'clock?

13        A.  Yes.

14        Q.  At some point after you arrived did you see

15   Yukio Kusada?

16        A.  Yes.

17        Q.  At some point did you talk to him?

18        A.  Yes.

19        Q.  Did you decide to ski together that day?

20        A.  Yes.

21        Q.  How did that decision come to be on that

22   day?

23        A.  I don't remember how it came.

24        Q.  For how long were you skiing -- strike
```

68

1    that.  When was the last time that you saw Yukio

2    Kusada on February 20, 2004?

3        A.  Before eight o'clock, but I don't remember

4    the exact time.

5        Q.  Was there any faculty member from

6    Northfield Mount Herman that skied with you?  I'm

7    talking about just you on February 20, 2004.

8        A.  No.

9        Q.  Where was the last time you saw Yukio

10   Kusada on February 20, 2004?

11       A.  The -- I don't know what it's called.  The

12   middle of the Big Chief.

13       Q.  Big Chief is an intermediate slope, is that

14   correct?

15       A.  Yes.

16       Q.  Had you started together at the top of Big

17   Chief with Yukio?

18       A.  Yes.

19       Q.  After you got off the chairlift who went

20   down the mountain first?

21       A.  He did.  Yukio did.

22       Q.  Did you have any conversation with him

23   after you got off the chairlift, but before he

24   started going down the mountain at that time?

1        A.   I don't remember.   It was dark in places

2    where there weren't any lights and it was pretty

3    bright when there was some lighting.

4        Q.   So were there times on the evening of

5    February 20, 2004, where you actually were skiing in

6    places where you considered it dark?

7        A.   Yes.

8        Q.   Was Yukio also skiing in those places?

9        A.   Yes.   Dark includes the shade of the trees

10   and -- yes.

11       Q.   So getting back to the time when you had

12   gotten off the ski lift and Yukio went first, is

13   that the last time when you saw him?

14       A.   No.   I saw him again in the middle of Big

15   Chief.

16       Q.   So is it fair to say that he went first and

17   at some point he stopped and you skied down to where

18   he was?

19       A.   No.   We always stop at the middle of Big

20   Chief because the top of the Big Chief is a little

21   more difficult than the bottom and we always stop

22   there and it's also safe to stop in the middle and

23   there's a pathway going down.   I believe it's called

24   "competition trail" that -- so we all stop there to

```
 1    make sure which way we're going.
 2         Q.  Is that what you did on this occasion as
 3    well?
 4         A.  Yes.
 5         Q.  So in the middle of Big Chief you got
 6    together and you had a conversation?
 7         A.  Yes.
 8         Q.  What did you talk about in this
 9    conversation?
10         A.  We decided to go down the Big Chief instead
11    of taking the path to the competition and I don't
12    remember anything else.
13         Q.  How long did that conversation take?
14         A.  Not long.
15         Q.  Less than a minute?
16         A.  I don't know.  Less than five minutes.
17         Q.  Did Yukio seem okay at that time?
18         A.  Yes.
19         Q.  What happened next?
20         A.  I knew the trail down the trail below the
21    middle of Big Chief is easier than the top half so I
22    let him start skiing and then I passed him and then
23    I was waiting down at the bottom of the trail for
24    him to come down.
```

1       Q.   When you passed him did you see him skiing?

2       A.   Yes.

3       Q.   How did he seem to be doing?

4       A.   Doing okay.  The same Yukio.

5       Q.   Was he on the right side of the trail or

6    the left side of the trail or in the middle?

7       A.   I don't remember.  I go pretty fast so I

8    don't know.

9       Q.   So you skied by him.  And as you skied by

10   him did you say anything to him?

11      A.   No.

12      Q.   As you skied by him did he say anything to

13   you?

14      A.   No.  Not that I heard him.

15      Q.   So then you skied down to the bottom, is

16   that correct?

17      A.   Yes.

18      Q.   Obviously he never made it to the bottom,

19   correct?

20      A.   Yes.

21      Q.   How long did you wait for him down at the

22   bottom?

23      A.   I waited at least 5 to 7 minutes right at

24   the bottom of the trail and I also went down a

74

```
 1    little more to the chairlift.  That's why I was

 2    taking off my skis and going into the lodge just in

 3    case I missed him by any chance so including that

 4    about 10 to even close to 15 minutes.

 5        Q.  So you took off your skis and you went into

 6    the lodge?

 7        A.  Yes.  And I came again once I knew he

 8    wasn't there.

 9        Q.  You came back outside and you put your skis

10    back on, is that correct?

11        A.  Yes.

12        Q.  Then what did you do?

13        A.  I went back and forth at the bottom of the

14    trail and the chairlift and just that.

15        Q.  You continued to ski?

16        A.  After, yes.

17        Q.  What time did you stop skiing that night?

18        A.  I stopped before eight for dinner and I ate

19    dinner and started skiing again and stopped skiing,

20    like, 15 minutes before the bus.

21        Q.  Now, on the other occasions when you skied

22    with Yukio, would you ski with him for the whole

23    time that you were at the mountain?

24        A.  Yes.  Most of the time, yes.
```

     1        A.   You mean I had no idea where he was or,

     2   like, I knew he was somewhere on the top of the

     3   trail and he maybe fell or something so it's taking

     4   time; do you know what I mean?

     5        Q.   So what I'm asking you is prior to February

     6   20, 2004, what is the longest period of time that

     7   you were skiing with Yukio, but you didn't know

     8   where he was?

     9        A.   Less than 15 minutes.

    10        Q.   If it's true that Yukio had skied on 11

    11   occasions at Berkshire East in that 2003, 2004 ski

    12   season, of those 11 occasions, what's your best

    13   estimate of how many occasions you skied with him of

    14   those 11?

    15                  THE WITNESS:  Do I have to make an

    16   estimation?

    17        Q.   Yes.  First of all, he's not your lawyer so

    18   you can't ask him any questions, but the rules of

    19   the deposition are that you are allowed to make a

    20   best estimate if you're able to do so.

    21        A.   Eight or nine.

    22        Q.   During the time after -- strike that.  On

    23   February 20, 2004, did you ever tell any faculty

    24   member that you didn't know where Yukio was?

96

```
 1          Q.  Do you recall whether Yukio --
 2                    MR. POTTER:  Was that a no?
 3          A.  I don't remember.
 4          Q.  Prior to February 20, 2004, did you see
 5    Yukio, other than when you were skiing, like, around
 6    school?
 7          A.  Sometimes, yes.
 8          Q.  On those occasions would he be wearing
 9    eyeglasses?
10          A.  Sometimes, yes.
11          Q.  When you would ski with him before February
12    20, 2004, would he be wearing eyeglasses?
13          A.  Sometimes, yes.
14          Q.  Sometimes, yes; sometimes, no?
15          A.  Before --
16          Q.  Before February 20, 2004.
17          A.  Yes.
18          Q.  Do you know if he also wore contact lenses?
19          A.  Yes.  When he wasn't wearing glasses he
20    wore them.
21          Q.  But you don't recall whether on February
22    20, 2004, he was wearing glasses or not?
23          A.  That's correct.  I don't remember.
24          Q.  Was he wearing goggles on February 20,
```

104

1    2004, is that correct?

2        A.  Yes.

3        Q.  Is that correct?

4        A.  Yes.

5        Q.  Did you ski on all of the trails at

6    Berkshire East?

7        A.  No.

8        Q.  What trails did you not ski on?

9        A.  There's some trails that I don't know.

10       Q.  Had you skied with him on Big Chief before

11   February 20, 2004?

12       A.  Yes.

13       Q.  On how many occasions?

14       A.  Many times.  I don't know the number.  It

15   was more than five times.

16       Q.  More than five times on Big Chief?

17       A.  Yes.

18       Q.  With Yukio prior to the accident, correct?

19       A.  Yes.

20       Q.  On any of those prior occasions had he

21   skied off the trail?

22       A.  No.

23       Q.  Now, you indicated that Big Chief is an

24   intermediate slope, is that correct?

106

```
 1        Q.  Where did you do that?
 2        A.  On the bunny hill; that's what we call it.
 3        Q.  Gradually you moved to some other trails,
 4   is that correct?
 5        A.  Yes.
 6        Q.  As you moved to the other trails, you moved
 7   to trails that you felt that he could handle, is
 8   that correct?
 9        A.  Yes.
10        Q.  At the time you were between an
11   intermediate and an expert skier, is that correct?
12        A.  Yes.
13        Q.  Now, on February 20, 2004, you said it was
14   dark in some spots, is that correct?
15        A.  Dark how?
16        Q.  Dark in some spots on the trail.
17        A.  Yes.
18        Q.  Were you always able to see the trail ahead
19   of you?
20        A.  How many meters do you mean by "ahead"?
21        Q.  How many meters would you say ahead?
22                  MR. GLUCK:  Objection.
23        A.  I don't know.
24        Q.  Did you have any difficulty yourself
```

107

1    picking out the trail as you were skiing down?

2        A.  Could you rephrase that?

3        Q.  As you were skiing down the trails that you

4    skied on on February 20, 2004, could you see where

5    you were going?

6        A.  Yes.

7        Q.  When you skied down Big Chief could you see

8    where you were going?

9        A.  Yes.

10        Q.  You indicated that when you got to the

11    bottom Yukio was not there, correct?

12        A.  Yes.

13        Q.  And you looked around for him there, is

14    that correct?

15        A.  Yes.

16        Q.  Then you went into the lodge, is that

17    correct?

18        A.  Yes.

19        Q.  And you looked for him in the lodge, isn't

20    that correct?

21        A.  Yes.

22        Q.  And you asked people in the lodge, Has

23    anybody seen Yukio, isn't that correct?

24        A.  I asked a few people.

109

```
 1          Q.  When you didn't find Yukio you went on
 2    skiing, is that correct?
 3          A.  Yes.
 4          Q.  Who did you ski with?
 5          A.  I skied by myself.
 6          Q.  Had you ever skied by yourself before?
 7          A.  Yes.
 8          Q.  There was no requirement that said you
 9    can't ski by yourself, was there?
10          A.  No.
11          Q.  Now, on -- during -- strike that.  During
12    your participation in the program from the 2003,
13    2004 program, did you have occasion to observe other
14    skiers on the mountain?
15          A.  Other skiers as in?
16          Q.  Did you see other skiers on the mountain?
17          A.  Yes.
18          Q.  Were there other skiers on the mountain who
19    were skiing without helmets?
20          A.  Yes.
21          Q.  Were most of the skiers skiing on the
22    mountain without helmets?
23                   MR. GLUCK:  Objection.
24          A.  I don't know.
```

110

```
1        Q.  Were any of the students that you knew from

2   Northfield Mount Herman that you knew, were any of

3   them wearing helmets?

4        A.  Yes.

5        Q.  Were any of them just wearing a ski hat?

6        A.  Ski hat?

7        Q.  Yes.  Were any of them just wearing a ski

8   hat?

9        A.  Yes.

10       Q.  Were any of them without either a ski hat

11  or a helmet?

12       A.  On that day specifically?

13       Q.  On that day, if you recall.

14       A.  On that day, no.  It was a cold night.

15       Q.  So they either had a helmet or a ski hat

16  on, is that correct?

17       A.  Yes.

18       Q.  To your observation?

19       A.  Can you say that again?

20       Q.  From what you could see?

21       A.  Yes.

22       Q.  Now, there were other schools that skied at

23  Berkshire East, correct?

24       A.  Yes.
```

111

```
 1        Q.   Did you know any of the other students from

 2   any of the other schools?

 3        A.   No.

 4        Q.   Did you ski with any of the other students

 5   from any of the other schools?

 6        A.   No.

 7        Q.   Did all of the students from the other

 8   schools wear helmets?

 9                  Objection.

10        A.   Could you repeat that question?

11        Q.   To your observation when you saw the

12   students from the other schools, were all of them

13   wearing helmets?

14                  MR. GLUCK:   Objection.

15        A.   No.

16        Q.   Were some of them wearing ski hats?

17                  MR. GLUCK:   Objection.

18        A.   Yes.

19                  MR. POTTER:   I have no further

20   questions.

21                  MR. MONGUE:   Just a few.

22                  CROSS-EXAMINATION

23   BY MR. MONGUE:

24        Q.   Do you know if -- is it Yukio; is that how
```

115

1        A.  I don't remember.

2        Q.  You took him to the bunny slope?

3        A.  Yes.

4        Q.  Could he turn when he went down the bunny

5    slope?

6        A.  No.

7        Q.  Did you have to teach him how to turn?

8        A.  Yes.

9        Q.  Could he stop when you took him down the

10   bunny slope?

11       A.  No.

12       Q.  You had to teach him how to stop?

13       A.  Yes.

14       Q.  And by February 20, 2004, was he able to

15   turn while he went down a trail?

16       A.  Yes.

17       Q.  Was he able to stop?

18       A.  Yes.

19       Q.  Describe for me how he stopped.

20       A.  I don't know how to describe how he

21   stopped.

22       Q.  Do you know what a hockey stop is?

23       A.  No.

24       Q.  How do you stop if you're going down a

117

1   difficulty stopping that day I didn't push him to do

2   something a little more difficult.

3       Q.  Do you know if the skis that he was using

4   that day, if he had used them on any other prior

5   occasion?

6       A.  I don't know.

7       Q.  Once you got to Berkshire East you could

8   ski on any trail that you wanted to ski on, correct?

9       A.  Yes.

10      Q.  The choice was yours as a skier, correct?

11      A.  Could you rephrase that?

12      Q.  You, as a skier, had the choice to ski on

13  any trail at Berkshire East?

14      A.  When I was with Yukio?

15      Q.  At any time.

16      A.  When I was by myself I could ski wherever I

17  wanted.  When I was with Yukio I talked to him and

18  listened to how he feels about this particular slope

19  and it was up to me and him.

20      Q.  Did you ever talk to Yukio about skiing on

21  Big Chief trail?

22      A.  Yes.

23      Q.  Was that a trail that he felt comfortable

24  skiing on?

118

```
 1        A.  Yes.
 2        Q.  I think you indicated in response to a
 3   question asked a few minutes ago that you skied with
 4   Yukio about -- more than five times on Big Chief
 5   trail?
 6        A.  Yes.
 7        Q.  Did you ski on Big Chief with Yukio every
 8   time you went to Berkshire East?
 9        A.  Yes.
10        Q.  Was that one of your favorite trails?
11        A.  Yes.
12        Q.  A lot of students ski that trail, don't
13   they?
14        A.  Yes.
15        Q.  When you went to Berkshire East did you
16   usually ski Big Chief more than one time?
17        A.  Yes.
18        Q.  Many times?
19        A.  Many as in?
20        Q.  Four, five times?
21        A.  Two, three times.
22        Q.  So if you were skiing with Yukio eight to
23   nine times and you skied Big Chief two or three
24   times, we're talking about skiing Big Chief,
```

125

```
1        A.   Yes.

2        Q.   Did you ski with him the prior Friday or

3   February 13?

4        A.   I believe I did.

5        Q.   Did you ski with him the Wednesday before

6   that on February 11?

7        A.   Yes.

8        Q.   Now, when you say that it was an hour to an

9   hour and a half after you had this conversation with

10  Audra --

11                    MR. GLUCK:   Objection.

12       Q.   This is an estimate on your part, is that

13  correct?

14       A.   Yes.

15       Q.   And you don't, in fact, know how long it

16  was, is that correct?

17       A.   Yes.

18       Q.   Of course you wouldn't have continued

19  skiing if you knew that Yukio had skied off the

20  trail, would you?

21       A.   I wouldn't be skiing.

22                    MR. POTTER:   No further questions.

23       A.   Wait.

24       Q.   I was saying you wouldn't have continued
```

EXHIBIT III

Page 1

Volume I

Pages  1 - 65

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
C.A. No. 05-30043-MAP

YUKIO KUSADA,

      Plaintiff,

vs.

BERKSHIRE EAST SKI RESORT,

UNION TERMINAL PIERS, INC.,

      Defendants,

and

NORTHFIELD MOUNT HERMON SCHOOL,

      Defendant and

      Third-Party Plaintiff,

vs.

TAKERU KUSADA,

      Third-Party Defendant.

* * * * * *

      DEPOSITION of KATIE BENEDETTI, called as a
witness by counsel for the Plaintiff, pursuant to the
applicable provisions of the Massachusetts Rules of
Civil Procedure, before Rachel Marie Grady,
CSR No. 146900-S, Certified Shorthand Reporter and
Notary Public in and for the Commonwealth of
Massachusetts, taken at BERKSHIRE EAST SKI RESORT,
South River Road, Charlemont, Massachusetts, on
Monday, December 19, 2005, commencing at 10:50 A.M.

* * * * * * * * * * * * * * * * * * * * * * * * *

FLYNN REPORTING ASSOCIATES
Professional Court Reporters
One Exchange Place
Worcester, Massachusetts 01608
(508) 755-1303  *  (617) 536-2727
TOLL FREE: (888) 244-8858
FAX:  (508) 752-4611
* * * * * * * * * * * * * * * * * * * * * * * * *

DUPLICATE

Page 2

1

   APPEARANCES:

2

   BREAKSTONE, WHITE-LIEF & GLUCK, P.C.

3  BY:  Ronald E. Gluck, Esq.
   Two Center Plaza, Suite 530

4  Boston, Massachusetts 02108-1906
   for the Plaintiff.

5

6

   DONOVAN & O'CONNOR, LLP

7  BY:  David B. Mongue, Esq.
   1330 Mass MoCA Way

8  North Adams, Massachusetts 01247
   for the Defendant/Berkshire East Ski Resort,

9  Union Terminal Piers, Inc.

10

11 HOLLAND & KNIGHT, LLP
   BY:  Harold W. Potter, Jr., Esq.

12 10 St. James Avenue, 11th Floor
   Boston, Massachusetts 02116

13 for the Defendant and Third-Party Plaintiff
   Northfield Mount Hermon School.

14

15

16

17

18

19

20

21

22

23

24

1                          I N D E X

2

    Testimony of:         Direct  Cross  Redirect Recross

3

    KATIE BENEDETTI

4

    by Mr. Gluck            5                 58/61

5   by Mr. Potter                  55                    60

    by Mr. Mongue                  63

6

7

8

9

10

11

12

                        E X H I B I T S

13

14  Exhibit No.        Description              Page

15  1        None

16

17

18

19

20

21

22

23

24

Page 4

1                    S T I P U L A T I O N S

2                    It is stipulated by and between

3       counsel for the respective parties that the deposition

4       transcript will be read and signed by the deponent

5       within thirty (30) days of receipt of the transcript

6       under the pains and penalties of perjury.  The filing

7       and the notarization are hereby waived.

8                    It is further agreed that all

9       objections, except as to the form of the question and

10      motions to strike, are reserved until the time of

11      trial.

12                    KATIE BENEDETTI, appears before us

13      today for her deposition.

14                    This witness does not at present have

15      adequate documentation attesting to her identity that

16      satisfies the standards required by the Commonwealth

17      of Massachusetts for Notaries Public in administering

18      oaths.

19                    The parties in this action therefore

20      stipulate and agree to hold harmless this Notary

21      Public if this witness is later discovered to have

22      falsified her identity.

23                    KATIE BENEDETTI, whose identity was

24      attested to by Attorney David Mongue, and duly sworn

Page 5

1    By the Notary Public, was examined and testified as

2    follows:

3                    DIRECT EXAMINATION

4    BY MR. GLUCK:

5         Q.   Would you please state your full name?

6         A.   Katherine Benedetti.

7         Q.   Ms. Benedetti, my name is Ron Gluck.  I

8    represent Yukio Kusada in connection with injuries he

9    suffered here at Berkshire East on February 20, 2004.

10   I've asked you to come here to answer some questions

11   in connection with any information you may have linked

12   to the question I'll ask you.  I ask you to listen

13   carefully to my question.  If I ask you a question and

14   you don't understand it or a part of the question,

15   please ask me to rephrase it.

16            I'll be happy to do so.  If you need to

17   take a time out for any reason, just let me know.

18   I'll be happy to accommodate you.  You and I need to

19   speak at separate times so that the stenographer can

20   take down everything that we both say.  All of your

21   answers must be verbal.

22            She can't take down nods or shakes of the

23   head and that sort of thing.  Okay?

24        A.   Okay.

1        **Q.**  If you can't hear me for any reason, let me

2  know.  Where do you live?

3        A.  Charlemont, Mass.

4        **Q.**  And your address, please?

5        A.  Oh, 39 High Street.

6        **Q.**  How long have you lived there?

7        A.  For 30 years.

8        **Q.**  Your date of birth, please?

9        A.  ██████████.

10        **Q.**  Your Social Security number?

11        A.  ██████████████

12        **Q.**  Just some brief educational background.

13  Did you graduate from high school?

14        A.  Yes.

15        **Q.**  Where and when?

16        A.  Pittsfield High School in 1971.

17        **Q.**  Have you had any education beyond that?

18        A.  Yes.  University of Mass., Bachelor of --

19  BS, BA.

20        **Q.**  What year did you graduate?

21        A.  1985.

22        **Q.**  '85?

23        A.  Yes.

24        **Q.**  Had any education beyond that?

1      A.   Yes.   Graduate courses at Western New

2  England.

3      Q.   In what?

4      A.   Finance.

5      Q.   Are you presently employed?

6      A.   Yes.

7      Q.   By whom?

8      A.   Berkshire East ski area.

9      Q.   When did you first become employed by

10  Berkshire East?

11     A.   In 1978.

12     Q.   In what capacity?

13     A.   Ticket seller.

14     Q.   What is your job title now?

15     A.   Business manager.

16     Q.   When did you become the business manager at

17  Berkshire East?

18     A.   I don't exactly know, but I would say about

19  1984/1985.

20     Q.   Now, what jobs did you hold, between '78

21  and '84, here at Berkshire East?

22     A.   Ticket seller, bookkeeping, then

23  accounting.

24     Q.   Then in '84/'85 you became the business

Page 8

1    manager?

2          A.   Um-hm.

3          Q.   Is that yes?

4          A.   Yes.

5          Q.   Was that a full-time position?

6          A.   Yes.

7          Q.   Are you employed on a full-time basis now?

8          A.   Yes.

9          Q.   Have your duties and responsibilities as a

10   business manager been the same throughout the time

11   that you've held that job?

12         A.   No.   The longer I've been here the more

13   they've changed.

14         Q.   What were your duties and responsibilities

15   when you took the job in '84/'85?

16         A.   Payroll.   It was more accounting than

17   managing people or managing supervisors.

18         Q.   What are your duties and responsibilities

19   at this time?

20         A.   Overseeing the financial ends of Berkshire

21   East and hiring people, firing people.   I'm managing

22   supervisors, some selling.   A lot of everything.

23   During the off season, from December to March, there's

24   only two or three people, so we do a lot of things.

1    **Q.**  What were your duties and responsibilities

2    in January of 2004?

3        **A.**  The same as what I just outlined.

4        **Q.**  The same as now?

5        **A.**  Yeah.  Oh, 1984?  I'm sorry.  Did you say

6    2004?

7        **Q.**  I said 2004.

8        **A.**  Oh, you did.  Yeah, basically the same.

9        **Q.**  You said that you managed supervisors; is

10   that correct?

11       **A.**  Yes.

12       **Q.**  What supervisors do you manage?

13       **A.**  All of the supervisors.  Either Roy

14   Schaefer or myself are in charge.  If we see something

15   that we don't think is right or we want somebody to do

16   something, we would go to the supervisor and see that

17   people under us then do what needs to be done.

18       **Q.**  What are the different departments here at

19   Berkshire East?

20       **A.**  Maintenance, ski school, racing, food

21   services, ski patrol, lift operations.

22       **Q.**  Are there any others?

23       **A.**  I'm trying to think.

24       **Q.**  Take a minute if you need to think about

Page 10

1    it.

2        A.   What did I list?

3        Q.   You listed maintenance, ski school, racing,

4    food services, ski patrol, and lift operations.

5        A.   Oh, ticketing, rental shop, cashiers.

6        Q.   Do each of those departments have a

7    supervisor?

8        A.   Yes.

9        Q.   And you manage each of those supervisors;

10   is that correct?

11       A.   Most departments are fairly independent.

12   If we have something that we want done or changed, we

13   would see the supervisor from that department.  But it

14   is up to that supervisor to run those departments.

15       Q.   In February of 2004, were the ski

16   patrollers paid by Berkshire East?

17       A.   Some are paid, and some are not paid.

18       Q.   Were they employees in February of 2004 at

19   Berkshire East?

20       A.   Some are, and some are not.

21       Q.   How is it determined which will be

22   employees and which will not?

23       A.   Employees are people who we set the hours

24   for, and we employ them, and they get paid for it.

Page 55

1            MR. POTTER:   I just have a couple

2    of questions.

3                    CROSS-EXAMINATION

4    BY MR. POTTER:

5        Q.   The last answer that you gave was as to how

6    many schools bring their students here, correct?

7        A.   I'm just guessing.   I could get a count for

8    you.   I would say approximately 100.   Are you talking

9    throughout the season?

10       Q.   Yes.

11       A.   Some will come one time, and some will come

12   four, eight, six, or ten times.

13       Q.   You're not aware of any of those schools

14   that require their students all to wear helmets,

15   except for racers; is that correct?

16       A.   Except for racers, right.

17       Q.   How many of the private schools are you

18   aware of that bring their students here to ski?

19       A.   Not including racers?

20       Q.   Not including racers.

21       A.   Northfield, Stoneleigh, Deerfield,

22   Eaglebrook, Linden Hill -- there's ten that I can

23   think of off the top of my head.

24       Q.   Could you list them for me?

Page 56

1        A.  Eaglebrook, Deerfield, Stoneleigh,

2 Northfield.  There's Eagle Hill.  There's three Eagle

3 Hill schools out of Connecticut.  They're related, but

4 they're different.  Did I say Linden Hill?

5        Q.  I think you did.

6        A.  There's one down in Worcester.  I can't

7 think of the name.  Then there's a couple of Catholic

8 schools.  Would you consider those private schools?

9        Q.  Yes.

10        A.  Holy Trinity and Our Lady of Hope.  I think

11 that's ten.

12        Q.  Now, does Berkshire East require every

13 single person who comes here to ski to take lessons

14 before they're allowed to ski?

15        A.  No.

16        Q.  Does Berkshire East test every single

17 person who comes here to ski before they're allowed to

18 ski?

19        A.  No.

20        Q.  Does Berkshire East test the equipment of

21 every single person who comes here to ski before they

22 are allowed to ski?

23        A.  No.

24        Q.  How long has Berkshire East had a night

Page 59

1    Q.  Of the others do you know if their students

2    take lessons?

3    A.  Stoneleigh takes lessons.  Any of them --

4    well, I mean, any of them can take lessons.  All they

5    have to do is ask.  But whether they schedule lessons

6    in, I don't believe they do.  Bement skis here, too.

7    They give their own students lessons.  That

8    is another private school.

9    Q.  Who was that one?

10   A.  Bement.

11   Q.  They give their students lessons on their

12   own?

13   A.  Yes.

14   Q.  How do they do that here at the mountain?

15   A.  How do they?

16   Q.  Yeah.  How do they actually do it?  Do they

17   have an area set aside where they can give their

18   students lessons?

19   A.  No.

20   Q.  Do they provide their own instructors?

21   A.  As far as I'm aware, I know that when I

22   sold the program to Bement originally I said, Do you

23   want lessons?  They said, No, we're going to teach our

24   own.  I assume it is just with their chaperones.

**EXHIBIT IV**

```
 1                                    Volume I
                                      Pages: 1-88
 2                                    Exhibits: 2

 3            IN THE UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF MASSACHUSETTS
 4
      YUKIO KUSADA,
 5                      Plaintiff

 6            vs.                    C.A. No. 05-30043-MAP

 7    BERKSHIRE EAST SKI RESORT and
      UNION TERMINAL PIERS, INC.,
 8                      Defendants

 9            and

10    NORTHFIELD MOUNT HERMON SCHOOL,
                        Defendant and Third-
11                      Party Plaintiff
              vs.
12
      TAKERU KUSADA,
13                      Third-Party Defendant

14            *    *    *    *    *    *    *    *

15        DEPOSITION of ALFRED L. SCHAEFER called as a
      witness by the Plaintiff, pursuant to the
16    applicable provisions of the Federal Rules of
      Civil Procedure, before Susan E. Lepore,
17    Registered Professional Reporter and Notary
      Public within and for the Commonwealth of
18    Massachusetts, taken at the Berkshire East Ski
      Resort, South River Road, Charlemont,
19    Massachusetts, on Wednesday, January 25, 2006,
      commencing at 1:25 p.m.
20
              ***************************
21            FLYNN REPORTING ASSOCIATES
              Professional Court Reporters
22             One Exchange Place
            Worcester, Massachusetts  01608
23          (508)755-1303  * (617)536-2727
             TOLL FREE: (888)244-8858
24             Fax (508)752-4611
              ***************************
```

DUPLICATE

```
 1    APPEARANCES:

 2    FOR THE PLAINTIFF:

 3        BREAKSTONE, WHITE-LIEF & GLUCK, P.C.
          By:  Ronald E. Gluck, Esq.
 4        Two Center Plaza
          Suite 530
 5        Boston, Massachusetts   02108

 6    FOR THE DEFENDANTS BERKSHIRE EAST SKI
      RESORT and UNION TERMINAL PIERS, INC.:
 7
          DONOVAN & O'CONNOR, LLP
 8        By:  David B. Mongue, Esq.
          1330 Mass MoCA Way
 9        North Adams, Massachusetts   01247

10    FOR THE DEFENDANT AND THIRD-PARTY PLAINTIFF
      NORTHFIELD MOUNT HERMON SCHOOL:
11
          HOLLAND & KNIGHT, LLP
12        By:  Harold W. Potter, Jr., Esq.
          10 St. James Avenue, 11th Floor
13        Boston, Massachusetts   02116

14                * * * * * * * * * * * *

15

16

17

18

19

20

21

22

23

24
```

3

1                        I N D E X

2

3    Witness:  Alfred L. Schaefer

4                                        Page

5        Examination by Mr. Gluck       4

6        Examination by Mr. Potter      81

7        Examination by Mr. Gluck       82

8        Examination by Mr. Potter      84

9

10   EXHIBITS FOR IDENTIFICATION:

11   Schaefer's        Description       Page

12   1        Letter dated 11/3/03,

13            Benedetti to Atkins      27

14   2        Philips 400-watt light

15            bulb                     64

16        ***EXHIBIT 1 RETAINED BY ATTY. GLUCK***

17         ***EXHIBIT 2 RETAINED BY WITNESS***

18

19

20

21

22

23

24

```
 1               P R O C E E D I N G S

 2                  STIPULATIONS

 3          It is stipulated by and between

 4    counsel for the respective parties that the

 5    deponent will read and sign the deposition

 6    within thirty (30) days of receipt of the

 7    transcript.  The filing and the notarization are

 8    hereby waived.

 9              It is further agreed that all

10    objections except as to the form of the question

11    and motions to strike are reserved until the

12    time of trial.

13              ALFRED L. SCHAEFER,

14          having been first duly sworn,

15             testified as follows to

16                DIRECT EXAMINATION

17    BY MR. GLUCK:

18         Q.     Good afternoon.

19         A.     Good afternoon.

20         Q.     Please state your name.

21         A.     Roy A. Schaefer.

22         Q.     Mr. Schaefer, my name is Ron Gluck,

23    and I represent Yukio Kusada in connection with

24    injuries that he suffered here at Berkshire East
```

1    on February 20, 2004.

2            I've asked you to come here today --

3    actually, you've invited me here today to be at

4    your office -- to ask you some questions, and

5    I'd ask you to listen carefully to my questions.

6    If there's any question that I ask you that you

7    don't understand, please ask me to rephrase it

8    and I'll be happy to do so.  I just want to get

9    your best answer to questions that you've

10   understood.  If you answer a question, I'll

11   assume that you've understood the question.

12   Okay?

13        A.    Okay.

14        Q.    All right.  You and I must speak at

15   separate times so that the stenographer can take

16   down everything that we say, and I'd also ask

17   you to perhaps give a pause before you answer,

18   not a long one, just a short one, to give any

19   lawyers here, who may want to object to one of

20   my questions, a chance to do so.  Okay?

21        A.    Okay.

22        Q.    All right.  All of your responses

23   must be verbal so that she can take down your

24   responses, because she can't take down a nod of

6

```
 1    the head or an "uh-hum," or something like that.
 2    Okay?
 3         A.    Okay.
 4         Q.    What is your address?
 5         A.    14 Schaefer Way, Charlemont,
 6    Massachusetts, zip code, 01339.
 7         Q.    And your date of birth, please?
 8         A.    August 19th, 1939.
 9         Q.    Do you live on 14 Schaefer Way year-
10    round?
11         A.    No.  Basically, from the fall until
12    the spring of the year, different times in the
13    fall to different times in the spring.
14         Q.    And then where do you go?
15         A.    We go to Michigan.
16         Q.    And do you have an address in
17    Michigan?
18         A.    Yes.  1133 North State Street, Saint
19    Ignace, Michigan, 49781.
20         Q.    And you graduated from high school in
21    what year?
22         A.    1957.
23         Q.    From what high school?
24         A.    West Branch High School.
```

1      Q.      Where is that?

2      A.      West Branch, Michigan.

3      Q.      Did you go on to college?

4      A.      Yes.

5      Q.      Where?

6      A.      Western Michigan, Kalamazoo,

7   Michigan.

8      Q.      And you graduated in what year?

9      A.      '62.

10     Q.      With what degree?

11     A.      In education, phys ed and history.

12     Q.      Have you had any education beyond

13   Western Michigan?

14     A.      I've taken classes in accounting and

15   business administration and various business

16   classes.

17     Q.      Okay.  Have you served in the

18   military?

19     A.      No, I have not.

20     Q.      After graduating in 1962 from Western

21   Michigan, did you go to work?

22     A.      Yes, I did.

23     Q.      And I'm going to try to get your

24   chronological employment history, so if we --

1      A.      Okay.

2      Q.      -- could go along in that way?

3      A.      Okay.

4      Q.      Where did you first work in 1962 or

5   '63?

6      A.      I taught skiing at -- on Nub's Knob,

7   Michigan -- well, Nub's Knob Ski Resort, Harbor

8   Springs, Michigan, and I coached football and

9   taught seventh and eighth grade at Petoskey St.

10  Francis High School.

11     Q.      And for how long did you work as a

12  ski instructor in Michigan at that resort?

13     A.      I worked at Nub's from 19-  -- what

14  I'd do is drop out of college, so I'd -- I

15  taught winters prior to that, also.

16     Q.      Okay.

17     A.      '60, '61, '62, and then in -- if

18  you -- I'll just go through my work history --

19     Q.      Sure.

20     A.      -- for you.

21     Q.      Sure.

22     A.      I coached football there and taught

23  school for five years.  At the same time, I was

24  teaching skiing from '63 to -- through '67, I

```
 1   taught skiing at Boyne Mountain.  That's Boyne
 2   Falls, Michigan.
 3        Q.    Okay.
 4        A.    And I taught in South America, in
 5   Portillio, Chile, from '63 to '66.
 6        Q.    Taught skiing there?
 7        A.    Uh-hum.
 8        Q.    Okay.
 9        A.    That would be in the summertime.
10        Q.    In our summertime, their winter?
11        A.    Right.
12        Q.    Yes, okay.  And what employment did
13   you have then, starting in 1967?
14        A.    I got married.  I've worked like a
15   slave since.  Starting in 1968 we moved to East
16   Lansing, Michigan, and I ran a ski school and
17   ran a private ski area from '68 to -- through
18   the year 1975.
19        Q.    What was the name of that area?
20        A.    That was called Lansing Ski Club.  It
21   was a private club.  And I also sold real estate
22   during those years.
23        Q.    In Michigan?
24        A.    Yes.  In fact, I've had a -- let me
```

```
 1    think.   I've had a sales license from probably

 2    1962 or '63, real estate sales, and I've had my

 3    broker's license from 1969, 1970.

 4         Q.     Okay.  And so you operated the

 5    Lansing Ski Club from 1968 to 1975; is that

 6    correct?

 7         A.     That's correct.

 8         Q.     Now, you said that was a private

 9    club?

10         A.     Uh-hum.

11         Q.     Does that differ from the way that

12    Berkshire East is operated, as an example?

13         A.     Well, it was 500 families, but during

14    the week we would take -- we were open to the

15    public.  On weekends and -- on weekends and

16    holidays, it was private to members and guests.

17         Q.     Okay.  And did that facility, Lansing

18    Ski Club, have a ski school?

19         A.     Yes, it did.  I ran the ski school as

20    well.

21         Q.     Okay.  And did you sell the Lancing

22    Ski Club in 1975?

23         A.     I didn't own it.  It was owned by the

24    membership.  And then I moved -- I moved out
```

1    here in '76, '77, and I've been here ever since.
2    Then after I left, the Lansing Ski Club survived
3    about three years.
4        Q.    Okay.  And why did you move to
5    Massachusetts in '76, '77?
6        A.    To take over Berkshire East.
7        Q.    Who was the owner at that time?
8        A.    When I came here?
9        Q.    Yes.
10        A.    Or before I came here?
11        Q.    Right before you came here.
12        A.    Waterbury Savings Bank, out of
13    Waterbury, Connecticut.
14        Q.    And did you purchase it from the
15    bank?
16        A.    At that time, I and two other
17    individuals purchased it from the bank.
18        Q.    And did you purchase it in your
19    names, or as a corporate entity?
20        A.    Corporate entity.
21        Q.    And what was the name of that entity?
22        A.    Boy, oh boy.  I believe it -- I'm
23    almost positive it was called the Charlemont
24    Berkshire East Ski Corp.

1    Q.    Okay.  And you have been here at

2    Berkshire East since that time; is that correct?

3    A.    Since then.

4    Q.    Okay.  And at some point, did the

5    other two shareholders sell their interest to

6    you?

7    A.    No.  We sold in 19-  -- let me think.

8    1989, to the Union Terminal Piers.

9    Q.    Okay.  So up until 1989 you were a

10   shareholder of the entity that owned Berkshire

11   East, and then in 1989 that entity sold --

12   A.    Right.

13   Q.    -- the mountain to Union Terminal

14   Piers, Inc.; is that correct?

15   A.    That's correct.

16   Q.    And have you been employed by Union

17   Terminal Piers since that time?

18   A.    Yes, I have.

19   Q.    And have you had the same title

20   throughout that time?

21   A.    Yes, I have.

22   Q.    And what is that title?

23   A.    General manager.

24   Q.    Have your duties and responsibilities

1     remained the same throughout that time?

2          A.     Yes, they have.

3          Q.     What are your duties and

4     responsibilities as the general manager of

5     Berkshire East?

6          A.     Well, I'm really responsible for all

7     phases of the operation.

8          Q.     So you're responsible for the ski

9     school?

10         A.     Yes.

11         Q.     You're responsible for chair lifts?

12         A.     Yes, maintenance.

13         Q.     You're responsible for all

14    communications with schools, such as Northfield

15    Mount Hermon, that bring their students to ski

16    at Berkshire East?

17         A.     Well, the people under me, certainly,

18    yeah.

19         Q.     You have ultimate authority over

20    that, though?

21         A.     Yeah.  Yes.

22         Q.     And you have ultimate authority and

23    responsibility for safety here at the mountain?

24         A.     Yes, I do.

```
 1        Q.    And you have ultimate authority and
 2   responsibility for the rental shop?
 3        A.    Yes.
 4        Q.    For the cafeteria?
 5        A.    Yes.
 6        Q.    For the Ski Patrol?
 7        A.    Well, yes.  Ski Patrol is a little
 8   different in the sense that it's National Ski
 9   Patrol.
10        Q.    Okay.  So how does that make it
11   different from the other items I just listed?
12        A.    Well, they're organized and operate
13   under the National Ski Patrol rules and
14   regulations.
15        Q.    Do you have any certifications?
16        A.    Sure.
17        Q.    Can you please list them for me?
18        A.    I'm a Certified Ski Instructor.
19        Q.    Certified by whom?
20        A.    PSIA.
21        Q.    Is that certification current?
22        A.    No, I'm an honorary -- they made me
23   an honorary lifetime member.
24        Q.    When did that happen?
```

1          A.     Oh, boy.  18 or 20 years ago.

2          Q.     Okay.  When did you first receive

3     your certification from PSIA?

4          A.     In 1961.  My national number is 252

5     or 257.

6          Q.     All right.  What other certifications

7     do you have?

8          A.     As far as skiing goes?

9          Q.     Yes.

10         A.     Once you get to the top of the

11    ladder, there's no other place to go.

12         Q.     Okay.  So in your mind, being

13    certified by PSIA is the top of the ladder; is

14    that correct?

15         A.     Well, I've been an examiner for ski

16    instructors early on, been very instrumental in

17    the present day techniques of skiing.

18         Q.     What do you mean by that?

19         A.     Well, early on, ski -- you know,

20    skiing's a relatively new sport for our country,

21    as far as techniques go.  I mean, it was

22    developed pretty much in Europe, and I've worked

23    in all -- in Austrian ski schools, at that

24    point, and in Chile.  I've coached ski racing.

1          I've been teaching skiing really
2     since 1956 or '55, so I -- I've been at it a
3     long, long time, and early on we -- I mean a lot
4     of changes were made in ski technique, a lot of
5     what we picked up from the Europeans, a lot of
6     what we developed ourselves in clinics and
7     sessions that we -- you know, that we have.
8          Q.    You mentioned that you were
9     instrumental, I believe you said, for present
10    day techniques in skiing?
11         A.    A lot of examiners during the '60s
12    would be credited for that.
13         Q.    And how were you involved in that,
14    that's what I'm getting at.
15         A.    I was an examiner for ski
16    instructors.
17         Q.    Okay.  What were the duties and
18    responsibilities of an examiner for ski
19    instructors?
20         A.    Well, you hold clinics.  I happened
21    to be located in the Midwest, you know, which
22    covered Minnesota all the way through to Ohio,
23    Michigan, Indiana.  That whole region of the
24    country, you know, was part of PSIA at that

```
1                    EXAMINATION

2    BY MR. POTTER:

3        Q.    When a beginner comes to the mountain

4    for the first time, just a general member of the

5    public who's a beginning skier, is there any

6    requriement that that skier has to take a lesson

7    before they can go on the mountain?

8        A.    No, there isn't.

9        Q.    Have you ever known of such a

10   requirement?

11       A.    No, I have not.

12       Q.    When a beginning skier comes to the

13   mountain for the first time, is there any

14   requirement that somebody affiliated with

15   Berkshire East check their skis and their

16   equipment before they're permitted to go on the

17   mountain?

18       A.    No.

19       Q.    Is there any requirement, at

20   Berkshire East, for a beginning skier to wear a

21   helmet?

22       A.    No.

23       Q.    As we sit here today, I'm looking out

24   and there's a lift right behind us.  What's the
```

**EXHIBIT V**

```
 1                                Volume I
                                  Pages:  1-85
 2                                Exhibits:  None.

 3           IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF MASSACHUSETTS
 4
     YUKIO KUSADA,
 5                      Plaintiff

 6           vs.              C.A. No. 05-30043-MAP

 7   BERKSHIRE EAST SKI RESORT and
     UNION TERMINAL PIERS, INC.,
 8                      Defendants

 9           and

10   NORTHFIELD MOUNT HERMON SCHOOL,
                        Defendant and Third-
11                      Party Plaintiff
             vs.
12
     TAKERU KUSADA,
13                      Third-Party Defendant

14           *   *   *   *   *   *   *   *

15       DEPOSITION of JOHN A. HERICK, JR., called as
     a witness by the Plaintiff, pursuant to the
16   applicable provisions of the Federal Rules of
     Civil Procedure, before Susan E. Lepore,
17   Registered Professional Reporter and Notary
     Public within and for the Commonwealth of
18   Massachusetts, taken at the Berkshire East Ski
     Resort, South River Road, Charlemont,
19   Massachusetts, on Wednesday, January 25, 2006,
     commencing at 11:05 a.m.
20
             *************************************
21           FLYNN REPORTING ASSOCIATES
             Professional Court Reporters
22             One Exchange Place
         Worcester, Massachusetts  01608
23       (508)755-1303  *  (617)536-2727
             TOLL FREE: (888)244-8858
24             Fax (508)752-4611
             *************************************
```

**DUPLICATE**

```
 1    APPEARANCES:

 2    FOR THE PLAINTIFF:

 3        BREAKSTONE, WHITE-LIEF & GLUCK, P.C.
          By:  Ronald E. Gluck, Esq.
 4        Two Center Plaza
          Suite 530
 5        Boston, Massachusetts    02108

 6    FOR THE DEFENDANTS BERKSHIRE EAST SKI
      RESORT and UNION TERMINAL PIERS, INC.:
 7
          DONOVAN & O'CONNOR, LLP
 8        By:  David B. Mongue, Esq.
          1330 Mass MoCA Way
 9        North Adams, Massachusetts  01247

10    FOR THE DEFENDANT AND THIRD-PARTY PLAINTIFF
      NORTHFIELD MOUNT HERMON SCHOOL:
11
          HOLLAND & KNIGHT, LLP
12        By:  Harold W. Potter, Jr., Esq.
          10 St. James Avenue, 11th Floor
13        Boston, Massachusetts    02116

14              * * * * * * * * * * * *

15

16

17

18

19

20

21

22

23

24
```

3

```
 1                    I N D E X

 2

 3    Witness:   John A. Herick, Jr.

 4                                    Page

 5       Examination by Mr. Gluck      4

 6       Examination by Mr. Potter    70

 7       Examination by Mr. Gluck     78

 8       Examination by Mr. Potter    80

 9

10    EXHIBITS FOR IDENTIFICATION:

11    None.

12

13

14

15

16

17

18

19

20

21

22

23

24
```

FLYNN REPORTING ASSOCIATES

4

```
 1              P R O C E E D I N G S

 2                 STIPULATIONS

 3          It is stipulated by and between

 4    counsel for the respective parties that the

 5    deponent will read and sign the deposition

 6    within thirty (30) days of receipt of the

 7    transcript.  The filing and the notarization are

 8    hereby waived.

 9          It is further agreed that all

10    objections except as to the form of the question

11    and motions to strike are reserved until the

12    time of trial.

13              JOHN A. HERICK, JR.,

14          having been first duly sworn,

15              testified as follows to

16              DIRECT EXAMINATION

17    BY MR. GLUCK:

18       Q.      Please state your full name.

19       A.      John Arthur Herick, Jr.

20       Q.      Mr. Herick, my name is Ron Gluck.  I

21    represent Yukio Kusada in connection with

22    injuries he suffered on February 20, 2004.  I've

23    asked you to come in today to answer some

24    questions.
```

1          Just some ground rules first.  If I

2    ask you a question that you don't understand,

3    please ask me to rephrase it.  I just want to

4    get your best answer to questions that you've

5    understood.

6          A.    Okay.

7          Q.    If you've answered a question, I'll

8    assume you've understood it.  Please keep your

9    answers verbal so that the stenographer can take

10   down everything you say, and you and I need to

11   speak at separate times so that she can make a

12   clean record for us all.  Okay?

13         A.    Okay.

14         Q.    Okay.  What's your date of birth?

15         A.    6/9/78.

16         Q.    Where do you live?

17         A.    Right now I live out in Charlemont,

18   Mass., and --

19         Q.    And what's your --

20         A.    -- my hometown residence is in

21   Gloucester, Mass.

22         Q.    Okay.  So what is your current

23   residence address?

24         A.    506 Zoar Road, Charlemont.

1        Q.    And what's the Gloucester address?

2        A.    It's Two Bridgewater Street, in

3    Gloucester.

4        Q.    During what months do you live in

5    Charlemont, and during what months do you live

6    in Gloucester?

7        A.    I live in Charlemont from December

8    through -- depending on the season, really, but

9    April 1st pretty much, around here.

10       Q.    And the rest of the time in

11   Gloucester?

12       A.    Yes.

13       Q.    Who do you live with in Gloucester?

14       A.    Myself.

15       Q.    I just want to get some educational

16   background.  Did you graduate from high school?

17       A.    Yes.

18       Q.    What year, what high school?

19       A.    1996, from Gloucester High School.

20       Q.    Did you go on to college?

21       A.    Yes.

22       Q.    Where?

23       A.    Johnson State College and UPM,

24   graduated in 2000.

```
 1          Q.      Where is Johnson State College?
 2          A.      It's in Vermont.
 3          Q.      What was your major at Johnson State
 4   College?
 5          A.      Outdoor education and small business
 6   management.
 7          Q.      Have you had any formal education
 8   beyond Johnson State College?
 9          A.      No.
10          Q.      Are you currently employed?
11          A.      Yes.
12          Q.      Where?
13          A.      Berkshire East Ski area.
14          Q.      In what capacity?
15          A.      Ski school director.
16          Q.      When did you first become employed by
17   Berkshire East?
18          A.      Seven years ago.
19          Q.      In what capacity?
20          A.      As a ski instructor.
21          Q.      Who hired you?
22          A.      Cheryl Lawless.
23          Q.      Is she currently employed by
24   Berkshire East?
```

```
 1          A.      No.
 2          Q.      When did you become the ski school
 3     director?
 4          A.      Four years ago.
 5          Q.      As a ski school director, what are
 6     your dates of active employment?
 7          A.      Usually right around Thanksgiving, I
 8     would say, maybe a week before Thanksgiving,
 9     through the middle of March to April 1st,
10     depending on how long our season goes.
11          Q.      And do you have another job during
12     the off season?
13          A.      Yes.
14          Q.      What is that?
15          A.      Yes, I run the Waterfront at a yacht
16     club in Gloucester.
17          Q.      What's the name of that yacht club?
18          A.      The Annisquam Yacht Club.
19               MR. MONGUE:  Can you spell that?
20               THE WITNESS:  A N N I S Q U A M.
21          Q.      What were your duties and
22     responsibilities as a school ski director when
23     you were first employed, four years ago, by
24     Berkshire East?
```

1   Q.  Is there any requirement that a

2 beginning skier, who comes here to Berkshire

3 East, must have their skis inspected by somebody

4 here at the mountain before they can go skiing?

5   A.  There's no requirement that you need

6 to have your skis checked before you can get on

7 the mountain.

8   Q.  Is there any requirement that a

9 beginning skier coming here must be tested

10 before they can go on the mountain?

11   A.  There is no requirement that they be

12 tested beforehand.

13   Q.  Is there any requirement that a

14 beginning skier only ski on certain trails?

15   A.  There is no requirement.  It's a

16 recommendation.

17   Q.  All right.  If a -- and you were

18 asked some questions about this.  If someone was

19 in a class and had been taking -- well, strike

20 that.

21    If somebody was in a class, and one

22 of your instructors recommended that they change

23 their skis, what if the student said no?

24    MR. GLUCK:  Objection.

```
 1          A.      We would not have that discussion

 2     with the student, we'd have it with the

 3     chaperone from the school.

 4          Q.      What if the chaperone said no?

 5               MR. GLUCK:  Objection.

 6          A.      We have no -- no ability to tell

 7     someone they cannot take lessons based on not

 8     changing their equipment.  We would not force

 9     someone to change their equipment in the lesson.

10          Q.      And you wouldn't --

11          A.      We would recommend, basically.

12          Q.      And you would recommend, if an 18-

13     year-old-young man said:  This is what I want to

14     ski on -- you would let him ski on them;

15     correct?

16          A.      (Witness nods head affirmatively.)

17               MR. GLUCK:  Objection.

18          Q.      You have to answer.

19          A.      Yes.

20          Q.      Okay.  And you would allow him to

21     continue to take a lesson; is that correct?

22               MR. GLUCK:  Objection.

23          A.      Yes.

24          Q.      In your observations, having been
```

1    here at Berkshire East, do you have -- have you

2    observed beginning skiers, people you considered

3    beginning skiers, to be coming down intermediate

4    trails?

5         A.    Have I observed beginning skiers on

6    intermediate terrain?

7         Q.    Yes.

8         A.    Yes.

9         Q.    Frequently?

10        A.    More frequently than I would prefer.

11        Q.    Okay.  Have you observed beginning

12   skiers coming down Big Chief?

13        A.    Yes.

14        Q.    Did you tell them they couldn't come

15   down Big Chief?

16        A.    Not that they couldn't.

17        Q.    Did you interfere in any way, if they

18   weren't in a ski class with you?

19        A.    If they were not in a ski class I

20   would not interfere, unless it was a safety

21   concern or they looked like they were at a point

22   where they couldn't get down the hill safely and

23   they needed Ski Patrol's help, or something to

24   that extent.

**EXHIBIT VI**

```
 1                                    Volume I
                                      Pages:  1-133
 2                                    Exhibits:  1-18

 3                 IN THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF MASSACHUSETTS
 4
        YUKIO KUSADA,
 5                         Plaintiff

 6           vs.                         C.A. No. 05-30043-MAP

 7      BERKSHIRE EAST SKI RESORT and
        UNION TERMINAL PIERS, INC.,
 8                         Defendants

 9           and

10      NORTHFIELD MOUNT HERMON SCHOOL,
                          Defendant and Third-
11                        Party Plaintiff
             vs.
12
        TAKERU KUSADA,
13                        Third-Party Defendant

14               *    *    *    *    *    *    *    *

15        DEPOSITION of EDWARD A. RALICKI called as a
        witness by the Plaintiff, pursuant to the
16      applicable provisions of the Federal Rules of
        Civil Procedure, before Susan E. Lepore,
17      Registered Professional Reporter and Notary
        Public within and for the Commonwealth of
18      Massachusetts, taken at the Shelburne Falls Fire
        District, 51 Bridge Street, Buckland,
19      Massachusetts, on Wednesday, November 9, 2005,
        commencing at 11:25 a.m.

20
                 * * * * * * * * * * * * * * * * * * * * * * *
21               FLYNN REPORTING ASSOCIATES
                 Professional Court Reporters
22                  One Exchange Place
              Worcester, Massachusetts  01608
23            (508)755-1303  *  (617)536-2727
                 TOLL FREE: (888)244-8858
24                 Fax (508)752-4611
                 * * * * * * * * * * * * * * * * * * * * * * *
```

DUPLICATE

```
1    APPEARANCES:

2    FOR THE PLAINTIFF:

3        BREAKSTONE, WHITE-LIEF & GLUCK, P.C.
         By:  Ronald E. Gluck, Esq.
4        Two Center Plaza
         Suite 530
5        Boston, Massachusetts    02108

6    FOR THE DEFENDANTS BERKSHIRE EAST SKI
     RESORT and UNION TERMINAL PIERS, INC.:
7
         DONOVAN & O'CONNOR, LLP
8        By:  David B. Mongue, Esq.
         1330 Mass MoCA Way
9        North Adams, Massachusetts   01247

10   FOR THE DEFENDANT AND THIRD-PARTY PLAINTIFF
     NORTHFIELD MOUNT HERMON SCHOOL:
11
         HOLLAND & KNIGHT, LLP
12       By:  Harold W. Potter, Jr., Esq.
         10 St. James Avenue, 11th Floor
13       Boston, Massachusetts  02116

14            *  *  *  *  *  *  *  *  *  *  *  *

15

16

17

18

19

20

21

22

23

24
```

1                     I N D E X

2

3    Witness:   Edward A. Ralicki

4                                    Page

5        Examination by Mr. Gluck        4

6        Examination by Mr. Potter      97

7        Examination by Mr. Gluck      115

8        Examination by Mr. Potter     130

9

10   EXHIBITS FOR IDENTIFICATION:

11   Ralicki's   Description       Page

12   1       Incident Report        45

13   2       Patrol Run Sheet       46

14   3       L. Bassett's Report    47

15   4       F. Field's Supplemental

16           Report                 56

17   5-15    Photographs of accident/

18           recovery area          57

19   16      Diagram of accident/

20           recovery area          72

21   17      Marked-up trail map    85

22   18      Unmarked trail Map     86

23           ***ORIGINAL EXHIBITS RETAINED

24                 BY ATTY. GLUCK***

```
 1                 P R O C E E D I N G S
 2         MR. GLUCK:  Counsel agree that all
 3  objections except as to the form of the question
 4  and all motions to strike will be reserved until
 5  the time of trial.  The witness will read and
 6  sign the deposition.  Is 30 days sufficient?
 7         MR. MONGUE:  Yes.
 8         MR. GLUCK:  We'll waive notarization
 9  and filing of the deposition.  Is that a correct
10  statement, gentleman?
11         MR. MONGUE:  That's correct.
12         MR. POTTER:  Yes.
13             EDWARD A. RALICKI,
14         having been first duly sworn,
15           testified as follows to
16           DIRECT EXAMINATION
17  BY MR. GLUCK:
18      Q.    Good morning.
19      A.    Good morning.
20      Q.    Would you please state your full
21  name?
22      A.    Edward Ralicki, Edward A.
23      Q.    Please spell your last name.
24      A.    R A L I C K I.
```

1          Q.     Mr. Ralicki, my name is Ron Gluck and

2     I represent a young man by the name of Yukio

3     Kusada in connection with injuries that he

4     suffered on February 20th, 2004 at Berkshire

5     East.  You're here today to answer some

6     questions, and I'd just like to give you some of

7     the ground rules for the deposition itself.

8              If you don't understand any question

9     that I ask you, or any part of a question,

10    please ask me to rephrase it and I'll be happy

11    to do so.  You and I must speak at separate

12    times so that the stenographer can take down

13    everything that I say and everything that you

14    say.  If you have a hard time hearing me for any

15    reason and you'd like me to repeat the question,

16    please let me know and I'll be happy to do that

17    as well.

18              All of your answers must be verbal.

19    The stenographer can't take down shakes of head

20    or nods of the head, so everything must be

21    verbal.  Okay?  If at any time you need to take

22    a break, speak to your attorney, or for any

23    other reason, please let me know and I'll be

24    happy to accommodate you.  Okay?

```
 1            A.      Okay.

 2            Q.      Thank you.  Can you give me your

 3     residential address, please?

 4            A.      47 Deer Run Lane, Shelburne Falls,

 5     Massachusetts, 01370.

 6            Q.      And where do you work?

 7            A.      I work at Hallmark Imaging in Turners

 8     Falls, Massachusetts.

 9            Q.      And what is the address of Hallmark

10     Imaging?

11            A.      253 Millers Falls Road, Turners

12     Falls, it's T U R N E R S Falls, Massachusetts,

13     and it's 01376.

14            Q.      What is your date of birth?

15            A.      9/29/42.

16            Q.      And your Social Security number,

17     please?

18            A.      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.

19            Q.      How long have you worked at Holland

20     Imaging?

21            A.      Hallmark Imaging?

22            Q.      Hallmark Imaging, yes.

23            A.      '72.

24            Q.      Since 1972?
```

1          A.      (Witness nods head affirmatively.)

2          Q.      What do you do there?

3          A.      I've had various positions at certain

4   times.  Right now, I'm business manager.  I'm

5   also in charge of all of -- of most of the data

6   processing images, as well as buying and the --

7   you know, it's a small place, you're doing a

8   lot.

9          Q.      Okay.  What is the business of

10  Hallmark Imaging?

11         A.      We do photo finishing.  We develop

12  film, we process film, we print film.

13         Q.      Okay.

14         A.      We do digital files, and we print

15  from files, too.

16         Q.      Okay.  Did you graduate from high

17  school?

18         A.      Yes, sir.

19         Q.      What year?

20         A.      1960.

21         Q.      Did you go on to any formal education

22  beyond high school?

23         A.      Graduate of UMass in 1969, military

24  from -- I'm sorry, that's wrong.  It's military

1  from '64 to '68, '72 would have been when I got

2  out of college.

3      Q.    Okay.  What branch of the military

4  were you in?

5      A.    Navy.

6      Q.    Honorably discharged?

7      A.    Of course.

8      Q.    Did you serve aboard?

9      A.    I was on four or five different

10  aircraft carriers so, yes, I was overseas in a

11  lot of different places.

12      Q.    Okay.  What did you do from the time

13  you graduated from high school until you went

14  into the military?

15      A.    I was working in graphic arts.

16      Q.    For four years, approximately?

17      A.    Somewhere around in there, right.  In

18  other words, we did printing and did layout work

19  there.

20      Q.    So from '60 to '64, approximately,

21  you did graphic arts, and then from '64 to '68

22  you were in the Navy --

23      A.    Right.

24      Q.    -- correct?  And then you graduated

1      from UMass in 1972?

2           A.      Right.

3           Q.      And then you --

4           A.      '71, '72, somewhere around in there.

5      Again I'm not totally sure.

6           Q.      Okay.  And then you went to work at

7      Hallmark Imaging, where --

8           A.      Right.

9           Q.      -- you've been ever since?

10          A.      Yes.

11          Q.      What is your relationship at this

12     time to Berkshire East Mountain?

13          A.      I have patrolled there since -- I've

14     actually been there as -- I started there in

15     1967.  At that point, I was in the ski school.

16     I started to patrol there in '75, been the

17     patrol director, oh, I'm going to say 1995 till

18     now.

19          Q.      Okay.  So the first time that you

20     worked at Berkshire East was in 1967?

21          A.      That is correct.

22          Q.      Okay.  And what was your position at

23     that time?

24          A.      At that point, I was a ski

1    instructor, just part-time.

2         Q.    Were you paid as a ski instructor at

3    that time?

4         A.    You get paid for whatever session

5    you're doing.  It's fairly standard.

6         Q.    What was your background in skiing

7    prior to becoming a ski instructor in 1967?

8         A.    Well, I always liked to ski.  My dad

9    got me my first pair of skis when I was six and,

10   you know, we would go out and bushwhack hills

11   around the house and go up in there and ski and

12   stuff.  So it's something I've always liked to

13   do.

14        Q.    Okay.  Had you been certified as a

15   ski instructor prior to 1967?

16        A.    No.

17        Q.    Have you ever been certified as a ski

18   instructor?

19        A.    Yes, sir, I was.

20        Q.    When was that?

21        A.    Maybe '72?  Full cert PSI A.

22        Q.    In 1972?

23        A.    Somewhere around in there, right.

24        Q.    Okay.

```
 1        A.    I didn't keep it up.  When I went

 2   into -- when I went into patrolling I, you know,

 3   let my dues lapse and let the membership lapse,

 4   too.  They should have records of me somewhere

 5   in there.

 6        Q.    So from 1967 until 1975, you were a

 7   ski instructor at Berkshire East part time?

 8        A.    That, and up at Haystack, too.  I was

 9   up there for two years, three years, around in

10   there.

11        Q.    Who owned Berkshire East in 1967, if

12   you can recall?

13        A.    A fellow by the name of Ambrossi

14   (ph).

15        Q.    Ambrossi?

16        A.    I think.

17        Q.    Did he sell it at some point?

18        A.    Can I spell it?

19        Q.    No, I'm sorry.  Did he sell it --

20        A.    Oh, did he sell it?

21        Q.    -- at some point?

22        A.    Yes.  He sold it to Roy Schaeffer,

23   and I'm not sure of the date -- or, I would say

24   Mr. Schaeffer's corporation.  I'm not so sure it
```

1    was sold to him, I'm not privy to the details on

2    that, of course.

3         Q.    Sure.  And in 1975, you became a ski

4    patroller?

5         A.    That is correct.

6         Q.    And at some point, I think you said

7    in 1995, you became the patrol director?

8         A.    Right.

9         Q.    And you're still the patrol director?

10        A.    Yes, sir.

11        Q.    What were your duties and

12   responsibilities as a ski instructor from 1967

13   through 1975 or so?

14        A.    Basically, teach.  You teach and you

15   train.  It could be all levels, you know.  I

16   mean, you might have a beginner class, you might

17   have a private, you might have an upper level.

18        Q.    Did you teach beginner skiers?

19        A.    Yes, sir.

20        Q.    As part of teaching beginner skiers,

21   what would you do on the very first lesson?

22        A.    Well, I've been out of it for a

23   while.  But the very first lesson, you would

24   find someplace fairly flat and you'd get them to

1    there, you might have a Greenfield rec group.  I

2    think there's a group from Hampton that comes

3    up, too.

4          Q.    From where?

5          A.    Hampton, meaning Northampton.

6          Q.    Okay.

7          A.    So I'm not -- you know, totally sure.

8          Q.    And do they usually come in buses?

9                MR. GLUCK:  Objection.

10         A.    As far as I'm aware of, yes.

11         Q.    Okay.  Now, do --

12         A.    Although some don't, too, I guess.

13         Q.    Now, do all of the students from any

14   of these schools that you referred to, to your

15   knowledge, do all of them wear helmets?

16         A.    No.

17         Q.    Do some of them wear helmets?

18         A.    Some do.

19         Q.    Do some of them just wear ski hats?

20         A.    Some we'd like to get to wear hats.

21   You know, they'll do that.  They'll just go up

22   there when it's zero and they won't have a hat,

23   or they won't have --

24         Q.    They won't have a hat, they won't

1    have a helmet, they might not even have a

2    jacket, right?

3        A.    You got it.

4             MR. POTTER:  I have nothing further.

5             MR. MONGUE:  I have nothing.

6             MR. GLUCK:  I have some questions.

7                    EXAMINATION

8    BY MR. GLUCK:

9        Q.    Have you ever seen a beginner skier

10   attempting to ski a Black Diamond --

11       A.    Yes, sir.

12       Q.    -- at Berkshire East?  Have you

13   removed them from the mountain?

14       A.    Depends on how bad they were.  You

15   know, if they obviously had no control at all,

16   we would ask them, you know, to -- and we have.

17   We would ask them to go to another trail.

18       Q.    Have you permitted some of what

19   appeared to be beginner skiers to ski on Black

20   Diamonds?

21       A.    Would we permit it?

22       Q.    Yes.

23       A.    Again, it depends on the ability, on

24   how well they were doing.  I mean, I wouldn't

1    Black Diamond slopes when you have seen them?

2         A.    If they -- you know, when it's

3    obvious that they cannot control their speed,

4    we -- that's the issue.  As I said before, the

5    issue is:  Can you control your speed.  All

6    right?

7         Q.    So are there some beginner skiers

8    that you've witnessed on Black Diamond slopes,

9    at Berkshire East, that you have permitted to

10   continue skiing on the Black Diamond slopes?

11        A.    If they were a hazard, and if we

12   could do something about it, no.

13        Q.    Are there some that you have -- are

14   their some beginner skiers that you've seen

15   skiing on Black Diamond slopes that you have

16   permitted to continue skiing on the Black

17   Diamond slopes?

18        A.    Well --

19        Q.    It's a yes or no.

20        A.    Well, I'll qualify that, too.  We

21   will ask them, and if they're insistent upon it,

22   then we'll let them do it.

23        Q.    Okay.  Are there any beginner skiers

24   that you have seen ski on -- skiing on Black

**EXHIBIT VII**

Volume I, Pgs. 1-65
COMMONWEALTH OF MASSACHUSETTS
Federal Court
No. 05-30043-MAP

---------------------------

YUKIO KUSADA,                    )
Plaintiff                        )
v.                               )
BERKSHIRE EAST SKI RESORT,       )
UNION TERMINAL PIERS, INC.,      )
AND NORTHFIELD                   )
MOUNT HERMAN SCHOOL,             )
Defendant and Third Party        )
Defendant                        )
v.                               )
TAKERU KUSADA                    )
Third Party Defendant            )

---------------------------

DEPOSITION OF AUDRA FORSTRUM

Wednesday, July 27, 2005

10:34 a.m.

Northfield Mount Herman School

206 Main Street

Northfield, Massachusetts 01360

- - - - - - Terri Clarno - - - - - -

FLYNN REPORTING ASSOCIATES

Professional Court Reporters

One Exchange Place

Worcester, Massachusetts 01608

(508) 755-1303  *  (617) 536-2727

TOLL FREE: (888) 244-8858
FAX:  (508) 752-4611

DUPLICATE

APPEARANCES:

BREAKSTONE, WHITE-LIEF & GLUCK, P.C.

    RONALD E. GLUCK, ESQ.

    Two Center Plaza, Suite 530

    Boston, Massachusetts 02108-1906

    617-723-7676

    on behalf of the Plaintiff


DONOVAN & O'CONNOR, LLP

    DAVID B. MONGUE, ESQ.

    1330 Mass MoCA Way

    North Adams, Massachusetts

    01247

    413-663-3200

    on behalf of the Defendant, Berkshire East Ski

    Resort


HOLLAND & KNIGHT, LLP

    HAROLD W. POTTER, JR., ESQ.

    10 St. James Avenue, 11th Floor

    Boston, Massachusetts 02116

    617-573-5815

    on behalf of the Defendant, Northfield Mount

    Herman School

Page 3

I N D E X

| Testimony of: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| Ms. Forstrum | | | | |
| by Mr. Gluck | 6 | | 57 | |
| by Mr. Mongue | | 52 | | |

E X H I B I T S

Exhibit No.        Description                    For I.D.

No Exhibits Marked

1           STIPULATIONS

2               It is stipulated by and between

3    counsel for the respective parties that the

4    deposition transcript will be read and signed by the

5    deponent within thirty (30) days of receipt of

6    transcript under the pains and penalties of perjury.

7    The filing and the notarization are hereby waived.

8               It is further agreed that all

9    objections, except as to the form of the question

10   and motions to strike, are reserved until the time

11   of trial.

12               AUDRA FORSTRUM, sworn.

13               MR. GLUCK:  As far as stipulation

14   are concerned, the usual fine?

15               MR. POTTER:  I'll put it on the

16   record.  Counsel agree that all objections except as

17   to form of the questions and motions to strike will

18   be reserved until the time of trial.  The witness

19   will have 30 days to read and sign the deposition.

20   We'll waive the notarization and sealing of the

21   deposition.

22               MR. GLUCK:  Would you please state

23   your full name?

24               THE WITNESS:  Audra Lynn Forstrum.

Page 5

1              MR. GLUCK:  Would you please spell

2    that?

3              THE WITNESS:  A-U-D-R-A, L-Y-N-N,

4    F-O-R-S-T-R-O-M.

5              MR. GLUCK:  Ms. Forstrum, my name

6    is Ron Gluck and I represent Yukio Kusada in

7    connection with injuries he suffered on February 20,

8    2004.  A lawsuit has been filed and I've asked you

9    to come here today to answer some questions.

10          There's some ground rules; if you don't

11   understand any question that I ask you, please ask

12   me to rephrase it, I'll be happy to do so.  I just

13   want to get your answers to questions that you do

14   understand.  If you answer a question I'll assume

15   that you've understood the question, okay?

16              THE WITNESS:  Yes.

17              MR. GLUCK:  The stenographer must

18   listen to what we both say and take down what we

19   both say so we have to speak at separate times,

20   okay, so please let me ask my question and I'll let

21   you answer your question.  If you need to take a

22   break at any time please let me know, I'll be happy

23   to accommodate you.  All of your answers must be

24   verbal as the stenographer can't take down nods of

Page 6

1    the head, okay?

2                    THE WITNESS:  Yes.

3                    DIRECT EXAMINATION

4    BY MR. GLUCK:

5        Q.  Where do you live?

6        A.  Northfield, Massachusetts.

7        Q.  And your address, please?

8        A.  Mailing address?

9        Q.  Mailing, whatever, address.

10       A.  206 Main Street.

11       Q.  That's in Northfield?

12       A.  In Northfield.

13       Q.  How long have you lived there?

14       A.  I'm going on my fifth year.

15       Q.  Is that the address of the school, by

16   chance?

17       A.  Yes.

18       Q.  So you live at the school?

19       A.  Yes.

20       Q.  What's your date of birth?

21       A.  December 4, 1978.

22       Q.  And your Social Security number?

23       A.  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.

24       Q.  Just get some educational background; did

1    you graduate from high school?

2         A.   Yes.

3         Q.   What year and what school?

4         A.   Lincoln Academy, 1996.

5         Q.   Where is that?

6         A.   New Castle, Maine.

7         Q.   Did you go onto college?

8         A.   Yes.

9         Q.   Where?

10        A.   Dickinson College.

11        Q.   That's in Pennsylvania?

12        A.   Yes.

13        Q.   When did you graduate?

14        A.   Pardon?

15        Q.   When did you graduate?

16        A.   2000.

17        Q.   With what degree?

18        A.   Mathematics, BS in mathematics.

19        Q.   Have you had any education beyond that?

20        A.   No.

21        Q.   Starting in 2000, please give me your

22   employment.

23        A.   I worked with Guardian Savings Bank until

24   the summer of 2001.

Page 8

Q.   Where is that?

A.   That was in -- based out of Houston, but I
worked in Sudbury.

Q.   Sudbury, Mass.?

A.   Yes.  I think since then they've changed
their name and possibly gone out of business.  I'm
not sure.

Q.   What did you do there?

A.   It was a bank so I worked as a teller,
savings counselor.

Q.   Why did you leave the bank?

A.   I didn't enjoy the bank environment.

Q.   Where did you work next?

A.   Northfield Mount Herman.

Q.   When did you begin employment at Northfield
Mount Herman?

A.   Late August 2001, I guess.

Q.   In what capacity at that time?

A.   As a math teacher.

Q.   Was there anything else?

A.   I mean, I worked as a coach.  I mean, it's
a boarding school; I lived in the dorm, I coached --
assistant coached junior soccer team, girl's junior
soccer team, and assistant coach to the varsity

1  softball team.

2       Q.  Have you held any other positions at the

3  school since that time?

4       A.  I mean, helping chaperoning the

5  recreational ski and snowboarding class.

6       Q.  Anything else?

7       A.  I think that's it.

8       Q.  Who was your direct supervisor when you

9  were hired in August of 2001 at Northfield Mount

10  Herman?

11       A.  My direct supervisor? -- the head of the

12  math department.  I guess Dick Beller was the head

13  of the math department.

14       Q.  Did you have a direct supervisor for your

15  coaching positions?

16       A.  Yes.  Probably Frank Millard.

17       Q.  Spell his last name.

18       A.  M-I-L-L-A-R-D.

19       Q.  What is his position at the school?

20       A.  He was the athletic director, but he

21  stepped down.

22       Q.  Did he step down at the end of the 2005

23  school year?

24       A.  Yes.

1    Q.  Were you paid additional sums for your

2  coaching responsibilities when you began teaching at

3  the school?

4    A.  No.  It's part of the whole package here.

5  You get a certain number of points for everything

6  that you do so if you're coaching you teach less.

7  So it all kind of balances out that way.

8    Q.  And with respect to your chaperoning of the

9  recreational ski program, did you receive additional

10  sums for that?

11    A.  It was the same thing for coaching, I just

12  got a couple of points for that.

13    Q.  And in exchange for that you had fewer

14  teaching responsibilities?

15    A.  I actually probably had the same amount of

16  teaching.  They expect you to get within a certain

17  number of points per year and it's flexible so those

18  few points just kept me within that range.

19    Q.  What was the first time that you acted as a

20  chaperon for the recreational ski program?

21    A.  I think I was a chaperon my first year here

22  so the winter of 2001, 2002.  There was other head

23  chaperones at that time, but I helped out.

24    Q.  Have you acted as a chaperon for the ski

Page 25

1  wearing a helmet, what would that be?

2       A.  I would say 90 percent of the time.

3       Q.  As a chaperon in the ski program did you

4  ever encourage any students to wear a helmet?

5       A.  I don't remember.  I may have in a passing

6  conversation.

7       Q.  Did you ever -- but you never had any

8  conversations with Mr. Kusada about wearing a

9  helmet?

10      A.  No.

11      Q.  Approximately what time was it that you

12  first became aware that Mr. Kusada was missing?

13      A.  When I checked with the buses that night to

14  see their attendance sheets.  Again, I can't

15  remember the time.  I don't remember what time we

16  left the mountain or what time the students were

17  supposed to be back at the buses, but when I went to

18  check with the buses was when I learned that he

19  wasn't there.

20      Q.  Would that be toward the end of the evening

21  when --

22      A.  At the end of the evening.  It was at the

23  end of the skiing, the end of the snowboarding time.

24      Q.  You know Mr. Yuki Hasegawa?

Page 38

Q.  What you do remember is you didn't call any
representative of Northfield Mount Herman to try to
determine where Yukio might be at that time, is that
correct?

                    MR. POTTER:  Objection.

A.  Yes.

Q.  Prior to February 20, 2004, had you ever
taken any action to try to locate a student whom you
had been informed their friend hadn't seen for
awhile?

A.  No.

Q.  What is the next thing that you do remember
after Yuki Hasegawa asked you if you knew where
Yukio was?

A.  The next thing I remember -- I remember
checking on the attendance on the buses.

Q.  So does that mean you actually walked over
to the buses?

A.  Yes.

Q.  And got onto one of the buses?

A.  I got on both of them or stood at the door
at least to talk to the chaperon on the bus, each of
them.

Q.  Exactly what do you remember about what

Page 39

1    took place at that time?

2        A.  I remember checking both buses.  I don't

3    remember what order.  I remember the Northfield bus

4    was full, they had everybody there so I took the

5    attendance sheet and they went back to Northfield;

6    and then checking the Mount Herman bus and finding

7    that eventually they were missing just Yukio.  I

8    don't remember if there were other students late or

9    not.

10       Q.  When you learned that Yukio was not on the

11   Mount Herman bus -- was Yuki on that bus at that

12   time?

13       A.  Yuki was on the other bus.

14       Q.  Was there any way to communicate between

15   the buses?

16       A.  Not that I know of.

17       Q.  At the time that you learn that Yukio was

18   not on the Mount Herman bus, what did you do?

19       A.  I obviously told them to stay there until I

20   came back.  I went back up toward the mountain, I

21   stopped at the first-aid tent to see if they had

22   anybody there that had maybe fallen or had anybody

23   and informed them that we were missing a student at

24   the bus.

**EXHIBIT VIII**

Volume I

Pages  1 - 45

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

C.A. No. 05-30043-MAP

YUKIO KUSADA,

Plaintiff,

vs.

BERKSHIRE EAST SKI RESORT,

UNION TERMINAL PIERS, INC.,

Defendants,

and

NORTHFIELD MOUNT HERMON SCHOOL,

Defendant and

Third-Party Plaintiff,

vs.

TAKERU KUSADA,

Third-Party Defendant.

* * * * * *

DEPOSITION of LORI BASSETT, called as a witness by counsel for the Plaintiff, pursuant to the applicable provisions of the Massachusetts Rules of Civil Procedure, before Rachel Marie Grady, CSR No. 146900-S, Certified Shorthand Reporter and Notary Public in and for the Commonwealth of Massachusetts, taken at BERKSHIRE EAST SKI RESORT, South River Road, Charlemont, Massachusetts, on Monday, December 19, 2005, commencing at 12:18 P.M.

************************

FLYNN REPORTING ASSOCIATES

Professional Court Reporters

One Exchange Place

Worcester, Massachusetts 01608

(508) 755-1303  *  (617) 536-2727

TOLL FREE: (888) 244-8858

FAX:  (508) 752-4611

DUPLICATE

************************

Page 2

APPEARANCES:


BREAKSTONE, WHITE-LIEF & GLUCK, P.C.
BY:  Ronald E. Gluck, Esq.
Two Center Plaza, Suite 530
Boston, Massachusetts 02108-1906
for the Plaintiff.



DONOVAN & O'CONNOR, LLP
BY:  David B. Mongue, Esq.
1330 Mass MoCA Way
North Adams, Massachusetts 01247
for the Defendant/Berkshire East Ski Resort,
Union Terminal Piers, Inc.


HOLLAND & KNIGHT, LLP
BY:  Harold W. Potter, Jr., Esq.
10 St. James Avenue, 11th Floor
Boston, Massachusetts 02116
for the Defendant and Third-Party Plaintiff
Northfield Mount Hermon School.

1
2
                              I N D E X

   Testimony of:        Direct  Cross  Redirect Recross

3
   LORI BASSETT
4
   by Mr. Gluck          4
5  by Mr. Potter                41
6
7
8
9
10
11
12
                       E X H I B I T S
13
14 Exhibit No.        Description              Page
15 1        None
16
17
18
19
20
21
22
23
24

Page 4

1                    S T I P U L A T I O N S

2              It is stipulated by and between

3    counsel for the respective parties that the deposition

4    transcript will be read and signed by the deponent

5    within thirty (30) days of receipt of the transcript

6    under the pains and penalties of perjury.  The filing

7    and the notarization are hereby waived.

8              It is further agreed that all

9    objections, except as to the form of the question and

10   motions to strike, are reserved until the time of

11   trial.

12              LORI BASSETT, having been

13   satisfactorily identified and duly sworn by the Notary

14   Public, was examined and testified as follows:

15                   DIRECT EXAMINATION

16   BY MR. GLUCK:

17        Q.   Would you please state your name?

18        A.   Lori A. Bassett.

19        Q.   My name is Ron Gluck.  I represent Yukio

20   Kusada.  I've asked you to come here today to answer

21   some questions in connection with an incident that

22   occurred on February 20, 2004.  If you don't

23   understand any question I ask you, please ask me to

24   rephrase it.  I'll be happy to do so.

Page 5

1           You need to keep your responses verbal so

2    that the stenographer can take down everything you

3    say.

4           A.   Okay.

5           Q.   We have to speak at separate times so that

6    she can make a clear record of everything that is

7    being said here.  If you need to take a break at any

8    time, let me know.  I'll be happy to accommodate you.

9           Where do you live?

10          A.   Enfield, Connecticut.

11          Q.   What is your address, please?

12          A.   It's 22 Riviera Drive.

13          Q.   Your date of birth, please?

14          A.   7/7/1959.

15          Q.   Your Social Security number?

16          A.   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.

17          Q.   What year did you graduate from high

18   school?

19          A.   '77.

20          Q.   What high school?

21          A.   Enrico Fermi High School.  That's in

22   Enfield.

23          Q.   And you went to college?

24          A.   I took some courses at Asnuntuck College.

Page 6

1    Q.   Where?

2    A.   Asnuntuck College.

3    Q.   Where did you go to work after you

4  graduated from high school?

5    A.   My first job was with Attorney Phillip

6  Tatoian's office in Enfield, Connecticut.

7                    MR. MONGUE:  Can spell that?

8                    THE WITNESS:  T-A-T-O-I-A-N.

9    Q.   What did you do there?

10    A.   A legal secretary training.

11    Q.   How long did you work there?

12    A.   It was a long time ago.  I was there for,

13  let's see, almost a year.

14    Q.   What kind of law did Mr. Tatoian practice?

15    A.   A lot of real estate law was mostly what he

16  practiced there.  He did some divorce law.  Mostly

17  real estate law, as I remember.

18    Q.   Where did you work next?

19    A.   After that I went to Hamilton Standard in

20  Windsor Locks.

21    Q.   What did you do there?

22    A.   I was a secretary as well.

23    Q.   For how long?

24    A.   I was there for almost ten years.

Page 7

1      Q.   What is Hamilton Standard?

2      A.   They produce aerospace parts and also NASA

3   space-related things.

4      Q.   Where did you work next?

5      A.   After that I went to Kaman Aerospace.

6   That's K-A-M-A-N.   That's in Bloomfield, Connecticut.

7      Q.   How long did you work there?

8      A.   About eight years.

9      Q.   Were you a secretary there as well?

10     A.   Yes.

11     Q.   Where did you work next?

12     A.   Cigna Insurance in Bloomfield, Connecticut.

13     Q.   For how long?

14     A.   About eight-and-a-half years.

15               MR. MONGUE:   How long was it?

16               THE WITNESS:   About

17   eight-and-a-half years.

18     Q.   When did you stop working there?

19     A.   I stopped there in November of 2001.

20     Q.   What did you do at Cigna?

21     A.   I started off as an administrative

22   assistant, and then I worked in underwriting as an

23   underwriting assistant.

24     Q.   Underwriting what kinds of policies?

Page 8

1        A.   Of commercial lines.

2        Q.   Liability lines?

3        A.   Yeah.

4        Q.   Where did you go to work next?

5        A.   Where I presently am, at Denunzio

6   Incorporated, D-E-N-U-N-Z-I-O.   That's in Somers,

7   Connecticut, S-O-M-E-R-S.

8        Q.   What does Denunzio do?

9        A.   They produce framed canvas art replicas.

10       Q.   What do you do there?

11       A.   I'm the assistant to the vice president

12   there.

13       Q.   Have you always been a skier, since you

14   were a little kid?

15       A.   No.   Actually, since I was 20 or 21.

16   That's when I started.

17       Q.   Where did you learn how to ski?

18       A.   Mt. Tom in Holyoke, Mass.

19       Q.   How did you learn how to ski?

20       A.   My husband -- my boyfriend at that time --

21   skied, so I thought I would try it.   That's how I got

22   into it.

23       Q.   Did you take ski lessons?

24       A.   Yes.

Page 9

1    Q.   Where did you take those lessons?

2    A.   At Mt. Tom.

3    Q.   For how long did you take lessons?

4    A.   I believe I took lessons for about three

5    years.  Actually, they offered a program through

6    Hamilton Standard at that time for people that worked

7    there.  That's how I got the lessons.

8    Q.   Were they helpful?

9    A.   Yes.

10   Q.   When you first started taking lessons, do

11   you recall what you did in your very initial lessons?

12   A.   As far as what I learned?

13   Q.   Yes.

14   A.   How to snowplow, basically, down a very,

15   very short, easy slope.  It was a very gradual grade.

16   Q.   How many times a year would you ski, when

17   you first started out, when you were 20 or 21?

18   A.   We probably went a good dozen times,

19   because my husband was a big skier.  We would go

20   almost every single weekend.  It was probably about a

21   dozen times that first year or two.

22   Q.   How many lessons would you take a year, of

23   the three years?

24   A.   The program was, I believe, a package of

1    five lessons with free skiing afterwards.  You'd have

2    your lesson first.  Then you had free skiing for the

3    rest of the night.  It was every Monday night for five

4    weeks.

5        Q.  You did that for three years?

6        A.  Yes.

7        Q.  At some point did you become a member of

8    the National Ski Patrol?

9        A.  Yeah.  In 1994.

10        Q.  When was the first time you skied at

11    Berkshire East?

12        A.  The first time was probably 19 -- I'd have

13    to guess here that it was 1985.  It was with some

14    friends.

15        Q.  At that point what was your level of skiing

16    ability?

17        A.  Probably low intermediate.

18        Q.  At that point you had been skiing for -- if

19    I do the math -- about six years?

20        A.  About that because I started the winter of

21    1980, learning.  It was about six years.

22        Q.  How is it that you came to become a member

23    of the National Ski Patrol?

24        A.  We acquired a season pass the winter of, I

Page 11

1    think, '85/'86.  And we proceeded to get a pass every

2    year until '93, when we were actually approached by, I

3    believe, the assistant director of the patrol.  He had

4    seen us up here very, very often, almost every single

5    weekend.  He asked, Why don't you come out with us?  I

6    see you up here every weekend.

7             It would be worth your while.  Come join

8    us.  We had been thinking about it for a while.

9        Q.  Who was that individual?

10       A.  That was Stanley Owsczarski.  He is still

11   the assistant ski patrol director.

12       Q.  Did you have any background in emergency

13   medical training or anything like that?

14       A.  Yeah.  At that point I did.  I was an EMT

15   at that time.

16       Q.  Where had you worked as an EMT?

17       A.  I worked for Suffield Volunteer Ambulance

18   for about ten years in Suffield, Connecticut.

19       Q.  During what years did you do that?

20       A.  1990 to 2000.

21       Q.  What were you required to do to become a

22   member of the ski patrol?

23       A.  We actually met with Stanley first, and

24   then that was in the spring of '93.  Then he had us

1    come that fall just to help at their refresher, and

2    he'd also told us at that time, Come fall you need to

3    get into an outdoor emergency care course.  That's

4    what was needed to get on.  You'll need your CPR cert,

5    too.  We got a course in the fall and got into that

6    and worked with the refresher and working with them.

7        Q.  Did you have to demonstrate any level of

8    skiing ability in order to become a member of the ski

9    patrol?

10       A.  Yeah.  We both went up the end of -- I

11    believe it was the '93 season.  We skied with both

12    Stanley and with Ed Ralicki.  I don't think he was

13    patrol director then, but he was one of the skiing

14    instructors there and on the patrol, too.  We went up

15    with them, and they took us down a few trails to see

16    what our ability was.

17            They wanted you to be at least a low-level

18    intermediate skier.  You know, once you got on the

19    patrol, your skiing -- you'd be out there a lot.

20    You'd be learning a lot.  Your skiing and everything

21    would definitely get better.

22       Q.  Did you have to take a written test to

23    become a member of the patrol?

24       A.  Only through the outdoor emergency care

Page 13

1   course that we took, we had a final exam, both written

2   and practical.

3          Q.   When you ski, do you wear a helmet?

4          A.   No.

5          Q.   Have you ever worn a helmet?

6          A.   No.

7          Q.   Why not?

8          A.   To be honest with you, I have been thinking

9   about getting a helmet in the past year, from what

10  I've seen out on the hill.

11         Q.   What have you seen --

12         A.   I would feel safer myself with a helmet, so

13  I have been thinking about getting one.

14         Q.   What have you seen out on the hill that has

15  kind of made you think that?

16         A.   A lot of speeding.  People skiing with a

17  lot of speed.

18         Q.   So you became a ski patroller here at

19  Berkshire East in 1994; is that correct?

20         A.   Yes.

21         Q.   Have you had the same schedule over the

22  last ten years or so as a ski patroller?

23         A.   Yeah.  We work the weekends.  We were

24  working -- I was working on Saturdays until about

Page 14

three years ago, and then I had to change it to Sunday

due to my work schedule back home.

Q.  What is the equipment that you're required

to carry as a ski patroller here at Berkshire East?

A.  We have a belt that has really some basic

first aid equipment in it.  Mine, in particular, has

cravats in there.  I have a sand splint in there.  I

have what we call "tongue depressors," like splints

for fingers.  There's tape, pad, pen, penlights, oral

airway set or kit, trauma shears, Band-Aids.

I think that's about it.

Q.  No flashlight?

A.  A penlight, not an actual flashlight.

Q.  A penlight to look in someone's eyes?

A.  Yes.

Q.  Is that the same equipment you carried over

the course of your ten years or so here as a

patroller?

A.  Yes.

Q.  How is it that you came to choose that

particular set of equipment?  Is that something that's

required by the National Ski Patrol?

A.  I'm not certain if it's required.  I know

everybody's pack has a little bit -- a lot of the same

Page 15

1    and a little bit of different things in it.  That's

2    what I've always carried, those same items.

3         Q.  How did you decide what to carry?

4         A.  Also, gloves are included in that, too.  I

5    have two or three pair of gloves.  I came to that

6    decision, I would say, on my own, with the guidance of

7    the patrol director as to what we might need on the

8    hill.

9         Q.  Does Berkshire East have any set

10   requirement for what equipment patrollers must carry?

11        A.  On their person?

12        Q.  Yes.

13        A.  No.

14        Q.  What are your typical duties and

15   responsibilities as a patroller here at Berkshire

16   East?

17        A.  I am at a level of what they call

18   "auxiliary," and I perform every function.  The only

19   thing I do not do is handle a sled or a toboggan.  My

20   duty on an average day would be a -- I kind of break

21   it up between working in the base and working up on

22   the hill.  We open the trails in the morning.  We open

23   the whole mountain.

24             As far as what I usually do, I usually

Page 16

1    spend my morning in the base.  I take care of all the

2    radio communication back and forth, filling out any

3    report that needs to be filled out, as far as trail

4    reports, snow conditions, or that kind of thing.  I'm

5    not actually up on the hill, opening it up.

6         Q.  What are your typical hours on the weekend

7    days that you work?

8         A.  Eight to five.

9         Q.  What do you do after you finish with the

10   morning routine?

11        A.  After we finish opening the mountain and

12   everything has been marked and secured and checked,

13   mainly everybody splits up.  They just ski around and

14   watch for hazards, watch -- you know, do a lot of

15   public relations.  We do a lot of conversing with the

16   customers and just making sure everything is running

17   smoothly.

18        Q.  Were you present on the date of February

19   20, 2004, here at Berkshire East?

20        A.  I was.  I was here for a night duty, from

21   six to ten.

22        Q.  What were your duties and responsibilities

23   on that shift?

24        A.  That night I did spend the evening down in

Page 17

1   the base.  That would be, once again, attending to any

2   administrative issues that come up, attending to any

3   walk-in patients that we may have had.  It is just

4   mainly running the base.

5        Q.  You're a volunteer; is that correct?

6        A.  Yes.

7        Q.  Have you ever been paid --

8        A.  No.

9        Q.  -- as a patroller?

10       A.  No.

11       Q.  What time did you actually leave Berkshire

12  East on the evening of February 20th?

13       A.  When did I actually leave?

14       Q.  Yes, to go home.

15       A.  Not until the morning of the 21st.

16       Q.  Do you recall what time that was,

17  approximately?

18       A.  It was about 5:30 in the morning.

19       Q.  At some point during that evening, were you

20  informed that there was a student that Northfield

21  Mount Hermon was looking for?

22       A.  Not until about ten of ten that night.

23       Q.  Where were you at that time?

24       A.  I was in the base, our ski patrol base.

Page 18

1        Q.   What were you told at that time?

2        A.   At that time the chaperone for Northfield

3   Mount Hermon came in and informed me that there was --

4   that she had a missing skier.

5        Q.   Was that Ms. Forstrum, Audra Forstrum?

6        A.   Yes.

7        Q.   What did you say to her at that time?

8        A.   I asked her, What does he look like?  What

9   is he wearing?  Basically, that was -- how old he was.

10       Q.   What did she tell you?  Are you referring

11  to a report that's on your lap?

12       A.   Yes.  May I?

13       Q.   We're going to get to that.  I'm just

14  curious now.  Just base it on your knowledge, your

15  memory.

16       A.   Most of it is here.

17       Q.   All right.

18       A.   Most of it is here.

19       Q.   It's okay if you would like to refer to the

20  report.

21       A.   All I'm telling you is coming from this.

22       Q.   That's fine.  Go ahead.

23       A.   She told me he was wearing -- I believe he

24  was 17 or 18 years old at that time.  He was wearing a

**EXHIBIT IX**

Page 1

Volume I
Pages  1 - 50

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS
C.A. No. 05-30043-MAP

YUKIO KUSADA,
     Plaintiff,

vs.

BERKSHIRE EAST SKI RESORT,
UNION TERMINAL PIERS, INC.,
     Defendants,

and

NORTHFIELD MOUNT HERMON SCHOOL,
     Defendant and
     Third-Party Plaintiff,

vs.

TAKERU KUSADA,
     Third-Party Defendant.
           * * * * * *

     DEPOSITION of ROBERT FIELDING, called as a
witness by counsel for the Plaintiff, pursuant to the
applicable provisions of the Massachusetts Rules of
Civil Procedure, before Rachel Marie Grady,
CSR No. 146900-S, Certified Shorthand Reporter and
Notary Public in and for the Commonwealth of
Massachusetts, taken at BERKSHIRE EAST SKI RESORT,
South River Road, Charlemont, Massachusetts, on
Monday, December 19, 2005, commencing at 1:58 P.M.

                *************************
              FLYNN REPORTING ASSOCIATES
            Professional Court Reporters
               One Exchange Place
          Worcester, Massachusetts 01608
       (508) 755-1303  *  (617) 536-2727
         TOLL FREE: (888) 244-8858
           FAX:  (508) 752-4611  DUPLICATE
           *************************

Page 2

APPEARANCES:


BREAKSTONE, WHITE-LIEF & GLUCK, P.C.
BY:  Ronald E. Gluck, Esq.
Two Center Plaza, Suite 530
Boston, Massachusetts 02108-1906
for the Plaintiff.



DONOVAN & O'CONNOR, LLP
BY:  David B. Mongue, Esq.
1330 Mass MoCA Way
North Adams, Massachusetts 01247
for the Defendant/Berkshire East Ski Resort,
Union Terminal Piers, Inc.


HOLLAND & KNIGHT, LLP
BY:  Harold W. Potter, Jr., Esq.
10 St. James Avenue, 11th Floor
Boston, Massachusetts 02116
for the Defendant and Third-Party Plaintiff
Northfield Mount Hermon School.

Page 3

I N D E X

Testimony of:          Direct   Cross   Redirect  Recross

ROBERT FIELDING

by Mr. Gluck            4
by Mr. Potter                    36

E X H I B I T S

Exhibit No.          Description                    Page
1          None

Page 4

S T I P U L A T I O N S

It is stipulated by and between

counsel for the respective parties that the deposition

transcript will be read and signed by the deponent

within thirty (30) days of receipt of the transcript

under the pains and penalties of perjury.  The filing

and the notarization are hereby waived.

It is further agreed that all

objections, except as to the form of the question and

motions to strike, are reserved until the time of

trial.

ROBERT FIELDING, having been

satisfactorily identified and duly sworn by the Notary

Public, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. GLUCK:

Q.  Would you please state your full name?

A.  Robert B. Fielding.

Q.  Mr. Fielding, my name is Ron Gluck.  I

represent Yukio Kusada in connection with injuries he

suffered on February 20, 2004.  I've asked you to come

in here today -- I appreciate you coming in today --

to answer some questions about the incident that

occurred that evening and your knowledge about that

Page 5

1    incident.  If I ask you a question that you don't

2    understand, please ask me to rephrase it.  I'll be

3    happy to do so.

4           You need to keep all your responses verbal

5    so that the stenographer can take down everything you

6    say.  And you and I must speak at separate times so

7    that she can make a clear record.  Okay?

8        A.   Okay.

9        Q.   Where do you live?

10       A.   I live in Granville, Mass.

11       Q.   And your address, please?

12       A.   368 Water Street.

13       Q.   And your date of birth?

14       A.   5/10/1962.

15       Q.   Your Social Security number?

16       A.   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.

17       Q.   Did you graduate from high school?

18       A.   Yes, I did.

19       Q.   What high school and what year?

20       A.   Ludlow High School in 1980.

21       Q.   Did you have any education beyond that?

22       A.   One year of technical school.

23       Q.   Are you employed?

24       A.   Yes, I am.

1    Q.   Where?

2    A.   Grosky Service in Springfield, Mass.

3    Q.   What do you do there?

4    A.   I'm an HVAC tech.

5    Q.   How long have you worked there?

6    A.   For 17 years.

7    Q.   What did you do for work before you became

8    an HVAC tech at Grosky?

9    A.   I was in the same trade.  I've been in that

10   trade for 24 years.

11   Q.   When did you begin skiing?

12   A.   Thirteen years ago.

13   Q.   How old were you at that time?

14   A.   Thirty.

15   Q.   Where did you first ski?

16   A.   Here.

17   Q.   Berkshire East?

18   A.   Yes.

19   Q.   Why did you start skiing at the age of 30?

20   A.   I've played hockey for 20 years.  There's a

21   long story behind it, but it was something I always

22   wanted to do.

23   Q.   How did you learn how to ski?

24   A.   Relatives.

Page 7

1        Q.   They taught you here at the mountain?

2        A.   Yes.

3        Q.   When you began skiing at Berkshire East,

4   what trails did you ski on, in the very beginning?

5        A.   In the very beginning, I skied the

6   beginner's trail for four runs, and then I skied the

7   rest of the mountain.

8        Q.   On the first day?

9        A.   On the first day.  I played hockey for 25

10  years, so it was easy.

11       Q.   Are you a member of the National Ski

12  Patrol?

13       A.   Yes, I am.

14       Q.   When did you become a member?

15       A.   Eleven years ago.  This is my 12th year

16  starting now, I believe.

17       Q.   So that would be about one or two years

18  after you began skiing?

19       A.   Yes.

20       Q.   How is it that you came to apply for

21  membership to the National Ski Patrol?

22       A.   Through -- I have -- my wife has two uncles

23  that are patrollers here.

24       Q.   Who are they?  What are their names?

1          A.  Bob Ouillette and Ken Burdick.

2          Q.  What training did you have to become a

3    National Ski Patroller, when you applied for

4    membership?

5          A.  I took their outdoor emergency care course.

6          Q.  What year was that?

7          A.  It was 11 or 12 years ago.  It was the

8    early '90s.

9          Q.  Have you been on the National Ski Patrol at

10   Berkshire East since that time?

11         A.  Yes.

12         Q.  Have you patrolled anywhere else?

13         A.  Occasionally, I go on another mountain.

14         Q.  Which other mountain?

15         A.  I've patrolled at Otis Ridge once in a

16   while.  We do sign on at other mountains as a visitor

17   patroller.

18         Q.  Did you receive any training to become a

19   ski patroller at Berkshire East?

20         A.  Yes.  As soon as you take the course,

21   you're a candidate here for a year.  Then you go

22   through toboggan training and first-aid training on

23   the hill.

24         Q.  Do you carry some equipment with you when

Page 15

Q.   Prior to yesterday, had anyone asked you if you had made any kind of a report?

A.   No.

MR. GLUCK:   I hate to say this, but there's a chance this may have to be suspended.

Q.   When was the last time you reviewed your own notes?

A.   Just I wrote them a couple of days after this happened.

Q.   Have you looked at them since that time?

A.   Just yesterday.

Q.   Just yesterday.  Why don't you go ahead and tell me what your notes say.

A.   It is just what happened that night.

Q.   Please tell me what that is.

A.   We received the call about ten of ten that they were missing a student, and we did our usual sweep of the mountain, which is the main trail or, I mean, the night-skiing trails.  They had no other information for us at the time.  Once we finished sweeping our regular night-skiing trails -- we didn't find anything -- we continued to sweep the rest of the mountain.  Upon not finding anything -- I don't know the time frames or anything.  Obviously, we were on

Page 16

1    the mountain all night -- we decided to call the state

2    police in and call the local police, who, in turn,

3    called the fire departments.

4            We put together a search and rescue because

5    we didn't find the boy.  After we were ready to go

6    back on the mountain, there was a state police trooper

7    that had a canine.  He held us up for an hour because

8    he wanted to sweep the trail with his dog.  We waited

9    for him to do that.  Then I believe somewhere around

10   11:30 or midnight the school confirmed that the boy

11   wasn't back at school.

12           They didn't have any idea where the boy was

13   at the time.  They were running several buses back and

14   forth.  So once we were allowed on the mountain, we

15   came up -- the state police, before allowing us back

16   on the mountain, asked us how we wanted to handle the

17   mountain, since we searched it once.  We decided we

18   were going to go east of the mountain and west of the

19   mountain so that we wouldn't miss anything.  The first

20   trail we swept was Mohawk, which took a little while

21   because there were a lot of side trails off of that.

22           Kids go into the woods.  It took a while to

23   clear that trail.  We wanted to make sure we didn't

24   miss anything.  The next trail we came down was Chief.

1    I was on the right side.

2              I got about three-quarters of the way down.

3    I had one of the firefighter's lights, and I can

4    remember shining through the trees and down into the

5    gully.  I saw a patch of red, and I can remember, for

6    a second, I was like, What was that?  Then I caught

7    his hand moving.  I called on the radio.

8              I got them, and we went in.  I found him

9    lying downhill.  Most of his body was downhill, behind

10   a tree.  The only part that was visible above the

11   ground was just a red shoulder.  His head had melted

12   down below the level of snow so that you couldn't see

13   his head at all.

14              MR. MONGUE:  Let me just stop you

15   there.  You've been going on, and I'm not sure what

16   the question even is at this point.

17              MR. GLUCK:  I'm asking him to tell

18   me what his report says.

19              MR. MONGUE:  Are you still

20   following your report?

21              THE WITNESS:  Yes.

22    A.   And my partner, who I was on that trial

23   with, came.  I came in to Yukio on the hillside.  He

24   was laying with both his skis still on.  His right leg

**EXHIBIT X**

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| YUKIO KUSADA,<br>　　　Plaintiff<br><br>v.<br><br>BERKSHIRE EAST SKI RESORT,<br>UNION TERMINAL PIERS, INC.,<br>and<br>NORTHFIELD MOUNT HERMON<br>SCHOOL,<br>　　　Defendant and<br>　　　Third Party Plaintiff<br><br>v.<br><br>TAKERU KUSADA<br>　　　Third Party Defendant | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)　　　Civil Action No.: 05-30043-MAP |

## PLAINTIFF'S ANSWERS TO DEFENDANT, NORTHFIELD MOUNT HERMON SCHOOL'S, FIRST SET OF INTERROGATORIES

**Interrogatory No. 1**

Please identify the Plaintiff, including date of birth, all names the Plaintiff has gone by at any time, all addresses where the Plaintiff has lived or resided (on either a temporary or permanent basis) and the names and dates of birth with whom the Plaintiff has resided and identify all persons and documents the Plaintiff consulted in preparing these answers.

**Answer No. 1**

Yukio Kusada; 8/13/85; Northfield Mount Hermon School, 206 Main Street, Northfield, MA 01360; Boston University, 700 Commonwealth Avenue, Boston, MA 02215, I lived at Miles Standish Hall; Shattuck St. Mary's School, 1000 Shumway

2

Avenue, Faribault, MN 55021, Harpin, China and 1-8-3 Ebisu-Higashi, Naniwa-ku, Osaka, Japan 556-0002, I lived with my mother, Mari Kusada, and father, Ken Kusada.

Interrogatory No. 2

Please describe in detail the events and circumstances concerning the Plaintiff's February 20, 2004 injury, as alleged in the Complaint, from the time the Plaintiff arrived at Berkshire East Ski Area until the time the Plaintiff first received medical attention, including a detailed description of how the injury occurred.

Answer No. 2

I don't have a memory of the incident. On information and belief, I was brought to Berkshire East on a school bus from Northfield Mount Hermon School. On information and belief, I was skiing on Big Chief Trail and skied into a tree. On information and belief, I first received medical attention at approximately 4:00 A.M. of February 21, 2004.

Interrogatory No. 3

Please identify and describe in detail the factual basis for the Plaintiff's claims against Northfield Mount Hermon.

Answer No. 3

On information and belief, plaintiff responds as follows: I was a student at Northfield Mount Hermon School and was registered in the recreational ski program for which I was to receive physical education credit. I informed the school

3

that I was a beginner skier and desired ski lessons. I received no ski lessons. I was on skis that were inappropriate for my level of skiing ability. I was not wearing a helmet. I received no instruction on how to ski from either Northfield Mount Hermon School or Berkshire East Ski Resort. I received no instruction on how to stop, how to control my speed, how to select proper terrain for my level of skiing ability, no instruction on night skiing. I did receive instruction related to wearing warm clothing at night. I skied into a tree and suffered severe injuries as a result. Plaintiff reserves the right to supplement this response.

**Interrogatory No. 4**

Please describe how Northfield Mount Hermon alleged negligence is responsible for the Plaintiff's injuries.

**Answer No. 4**

Objection. This question calls for expert opinion which will be provided in compliance with the court order.

**Interrogatory No. 5**

Please identify all witnesses to the events described in the Plaintiff's Complaint, including but not limited to, the following:

a)    all Northfield Mount Hermon students, teachers, administrators and representatives that the Plaintiff encountered at any time while present at Berkshire East Ski Area on February 20, 2004;

b)    all persons with whom the Plaintiff skied;

c)    all persons with whom the Plaintiff rode the chairlift;

d)    all persons who were skiing with the Plaintiff on the trial that the alleged accident described in the Complaint occurred.

4

**Answer No. 5**

    a)      On information, plaintiff skied with Yuki Hasegawa on February 20, 2004 and was on a bus that was chaperoned either by Audra Fordstrum or Richard Eisenberg or Susan Clough on February 20, 2004;

    b)      On information and belief, the plaintiff skied with Yuki Hasegawa;

    c)      On information and belief, the plaintiff rode the chairlift with Yuki Hasegawa; and

    d)      On information and belief, plaintiff skied on the trail with Yuki Hasegawa.

**Interrogatory No. 6**

Please describe the circumstances surrounding the receipt, execution and return of Northfield Mount Hermon's PE/A Activities Permissions form for the school year 2003-2004 including the following:

    a)      when the PE/A Activities Permissions form was received by the Plaintiff and Northfield Mount Hermon;

    b)      the person who executed the PE/A Activities Permissions form; and

    c)      when the PE/A Activities Permissions form was executed.

**Answer No. 6**

As a result of my brain injury, I have no memory of said circumstances.

**Interrogatory No. 7**

Please describe the circumstances surrounding the receipt, execution and return of Northfield Mount Hermon's "Rec Ski and Snowboarding" permission form for the school year 2003-2004, including the following:

5

a)    when the form was received by the Plaintiff and returned to Northfield
Mount Hermon;

b)    the person who executed the form; and

c)    when the form was executed.

Answer No. 7

As a result of my brain injury, I have no memory of said circumstances.

Interrogatory No. 8

Please describe the Plaintiff's reasons for enrolling in and participating in
Recreational Skiing and Snowboarding.

Answer No. 8

As a result of my brain injury, I do not recall what my reasons were for
enrolling in and participating in the Recreational Skiing and Snowboarding.

Interrogatory No. 9

Please identify the Plaintiff's skill level in the sport of skiing prior to
February 20, 2004.

Answer No. 9

Upon information and belief, I was a beginner.

Interrogatory No. 10

Please identify the instructors and describe each and every occasion on which
the Plaintiff received formal or informal instruction in the sport of skiing, including
instruction from Northfield Mount Hermon.

6

**Answer No. 10**

Upon information and belief, I never received any instruction from Northfield Mount Hermon or from Berkshire East Ski Resort or from any other instructor in my life.

**Interrogatory No. 11**

Please identify all dates on which the Plaintiff has ever been downhill skiing, including for each date, the locations where the Plaintiff skied.

**Answer No. 11**

Upon information and belief, I went down hill skiing on ten or eleven occasions as part of the ski course from Northfield Mount Hermon School at Berkshire East Ski Resort in January and February of 2004.

**Interrogatory No. 12**

For each instance where you attended the Recreational Skiing and Snowboarding during the 2003-2004 school year, please identify the skis that the Plaintiff used and the protective equipment that the Plaintiff wore; including the following:

    a)    brand and model of the skis or protective equipment;

    b)    the length of the skis;

    c)    the DIN setting on the bindings on February 20, 2004;

    d)    where or from whom the Plaintiff obtained the skis or protective equipment;

    e)    when the skis were last tuned;

7

f)      when the bindings were last calibrated to the Plaintiff's weight and
        height, if at all;

g)      what level of skier the skis or protective equipment were recommended
        for.

## Answer No. 12

Plaintiff responds upon information and belief, as follows:

a)      Atomic SX 11 skis were used on February 20, 2004.  I have no
        information about what skis I used on other occasions;

b)      170 on February 20, 2004;

c)      unknown;

d)      Sam Wilson;

e)      unknown;

f)      unknown; and

g)      I learned after the accident that they were recommended for an
        advanced skier.

## Interrogatory No. 13

Please itemize all damages that the Plaintiff seeks to recover in this action.

## Answer No. 13

Plaintiff seeks to recover damages for his medical expenses as follows:

Spaulding Rehab Hospital
3/10/04 – 4/10/04                    $53,243.07

Baystate Medical Center
2/21/04 – 3/10/04                    47,055.70

Baystate Health Ambulance
2/21/04 & 3/10/04                    2,045.84

8

First Hospital of Harbin Medical Univ.
7/28/04 – 5/26/05                           3,790.76

Medical Care in Japan             155,356.64
Total                              $261,492.01

Expenses from China
Including room and board,
supply fees, transportation, labor
costs, tutor and travel and physical
therapy. Upon information and belief
these expenses amount to:          $69,837.26

Plaintiff seeks to recover for his loss of earning capacity which will be
outlined in an expert report and for his pain and suffering and emotional distress.

Interrogatory No. 14

Please identify all medical conditions from which the Plaintiff suffers as a
result of the injuries alleged in his Complaint, including the symptoms from which
the Plaintiff suffers.

Answer No. 14

I suffer from the effects of a traumatic brain injury and from the effects of
compartment syndrome to my left leg for which I underwent surgery at Bay State
Medical Center. I also suffer from depression. I also suffer from back pain and jaw
pain. My brain injury leaves me with severe memory problems. It makes it very
difficult for me to concentrate and focus. It makes me less able to do computations
that I was once able to do and makes it very difficult to learn new things. It makes
it very difficult for me to study and perform well on tests, makes it impossible for
me to take a full course load in college. It makes it difficult for me to be social with
people as I once was. It makes it difficult for me to understand what I'm reading.

9

people as I once was.  It makes it difficult for me to understand what I'm reading.

Overall, I am not the same person I used to be.  It makes it hard for me to feel any

happiness.  Also, I get lost easily when going places.  I have great trouble trying to

make decisions like simple ones like trying to decide what to eat in cafeterias.

My left leg is not strong, and it is awkward for me if I even attempt to run.

**Interrogatory No. 15**

Please identify all medical care and treatment the Plaintiff has received and

is currently receiving as a result of the injuries alleged in his Complaint, including

the following:

    a)     the date of the care and treatment;

    b)     the provider of the care and treatment;

    c)     the diagnosis based on the care and treatment;

    d)     the treatment received; and

    e)     the medical provider's recommendation.

**Answer No. 15**

Upon information and belief I received treatment by the following providers:
I don't know what treatment was given to me but I am informed that the medical
records from this treatment, except Japan and China, has been provided to defense
counsel:

Ambulance
2/21/04 & 3/10/04

Baystate Health Systems
2/21/04 – 3/10/04

Spaulding Rehab Hospital
3/29/04 through present

10

Plaintiff reserves the right to supplement this response.

**Interrogatory No. 16**

Please identify any illnesses, operations or injuries that the Plaintiff had within three years prior to the time of the injury alleged in Plaintiff's Complaint.

**Answer No. 16**

Upon information and belief, none.

**Interrogatory No. 17**

For each and every person whom you expect to call as an expert witness at the time of trial, please state the following:

a)    the identity of each such expert by name and address;

b)    the subject matter on which each of the experts referred to in your previous answer is expected to testify;

c)    the substance of the facts and opinions to which each of the aforementioned experts is expected to testify; and

d)    a summary of the grounds for each of the aforesaid opinions of experts

**Answer No. 17**

Plaintiff will provide expert identification and opinions in compliance with court order.

Signed under the pains and penalties of perjury this _29th_ day of March, 2006.

_____
Yukio Kusada

11

## Certificate of Service

I, Ronald E. Gluck, of Breakstone, White-Lief & Gluck, P.C., hereby certify that on this date I served a copy of the within pleading by mailing a copy of same, postage prepaid, to:

David B. Mongue, Esquire
Donovan & O'Connor, LLP
1330 Mass MoCA Way
North Adams, MA 01247

and

Harold W. Potter, Jr.
Holland & Knight, LLP
10 St. James Avenue, 11th Floor
Boston, MA 02116

March 29, 2006

_____
Ronald E. Gluck

**EXHIBIT XI**

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

YUKIO KUSADA,  )
     Plaintiff  )
        )
        )
vs.  )    Civil Action
        )    No.: Civil Action No.: 05-30043-MAP
        )
BERKSHIRE EAST SKI RESORT,  )
UNION TERMINAL PIERS, INC.,  )
NORTHFIELD MOUNT HERMON  )
SCHOOL,  )
FRANCIS MILLARD and  )
MICHAEL ATKINS,  )
     Defendants  )
        )
v.  )
        )
TAKERU KUSADA  )
     Third Party Defendant  )

PLAINTIFF'S ANSWERS TO DEFENDANT, FRANCIS MILLARD'S,
FIRST SET OF INTERROGATORIES

**Interrogatory No. 1**

Please state your name, date of birth and residential address.

**Answer No. 1**

**Answer No. 1**

Yukio Kusada; 8/13/85; 1-8-3 ebisu-higashi, naniwa-ku, Osaka, Japan 556-002.

**Interrogatory No. 2**

Please identify and describe in detail the factual basis for your claim against Francis Millard.

2

Answer No. 2

I have relied upon my attorney in making decisions on what claim to make, but upon information and belief, I answer as follows:  Francis Millard was the Director of Athletics at Northfield Mount Herman School during the time that I was a student in the Physical Education course entitled the Recreational Ski Program. Francis Millard failed to require that I receive ski instruction.  He had supervisory responsibility for the program.  Francis Millard failed to ensure that I was using ski equipment that was appropriate for my level of skiing ability.  Francis Millard failed to ensure that I was wearing a helmet.  Francis Millard failed to ensure that I received ski instruction concerning terrain selection.  Francis Millard failed to ensure that I was instructed on proper methods of turning on skis, stopping on skis. Francis Millard failed to ensure that I receive ski instruction concerning night skiing.  Francis Millard failed to implement a buddy system for the recreational ski program.  Francis Millard failed to adequately train the chaperones in supervision of student participants in the Recreational Ski Program.  I am informed that expert opinion will also provide an answer which may be responsive to this question. Plaintiff reserves the right to supplement this response.

Interrogatory No. 3

Please describe how Francis Millard's alleged negligence is responsible for your injuries.

Answer No. 3

3

Objection.  This calls for expert opinion.

Interrogatory No. 4

Do you claim that you never received any instruction from Berkshire East Ski Resort on January 7, 2004, January 9, 2004, January 14, 2004, January 16, 2004, January 21, 2004, January 28, 2004, February 4, 2004, February 6, 2004, February 11, 2004, February 13, 2004 February 18, 2004 or February 20, 2004.

Answer No. 4

Upon information and belief: yes.

Interrogatory No. 5

If you claim that you never received any instruction from Berkshire East Ski Resort on January 7, 2004, January 9, 2004, January 14, 2004, January 16, 2004, January 21, 2004, January 28, 2004, February 4, 2004, February 6, 2004, February 11, 2004, February 13, 2004 February 18, 2004 or February 20, 2004, please provide all information which you rely upon in support of that claim.

Answer No. 5

I am informed that witnesses for Northfield Mount Herman School have testified concerning ski instruction and based upon this information and belief I form the answer that I provided to Interrogatory No. 4.

Interrogatory No. 6

If you claim that you never received any instruction from ski instructors at Berkshire East Ski Resort on January 7, 2004, January 9, 2004, January 14, 2004,

4

January 16, 2004, January 21, 2004, January 28, 2004, February 4, 2004, February

6, 2004, February 11, 2004, February 13, 2004 February 18, 2004 or February 20,

2004, please provide the name and address of all witnesses who have provided

information in support of that claim and, for each such witness, state what

information was provided.

**Answer No. 6**

Please see answer to No. 5 above.

**Interrogatory No. 7**

On February 20, 2004 did you attempt to stop at any point from the midpoint

on Big Chief to the point where you left the trail on Big Chief.

**Answer No. 7**

I have no memory of the incident.

**Interrogatory No. 8**

Unless your answer to the preceding interrogatory in words or substance is "I

do not remember," please state how many times you attempted to stop and what

happened each time.

**Answer No. 8**

Please see answer to Interrogatory No. 7.

**Interrogatory No. 9**

If you claim that you attempted to stop at any point from the midpoint on Big

Chief to the point where you left the trail on Big Chief on February 20, 2004, please

5

state the factual basis for that claim and provide any information you have in support of that claim.

**Answer No. 9**

Please see answer to Interrogatory No. 7.

**Interrogatory No. 10**

On February 20, 2004 did you stop at any point from the midpoint on Big Chief to the point where you left the trail on Big Chief on February 20, 2004.

**Answer No. 10**

Please see answer to Interrogatory No. 7.

**Interrogatory No. 11**

Unless your answer to the preceding interrogatory in words or substance is "I do not remember," please state how many times you stopped, where you were on the slope when you stopped and approximately how far you were from the point where you left the trail.

**Answer No. 11**

Please see answer to Interrogatory No. 7.

**Interrogatory No. 12**

If you claim that you stopped at any point from the midpoint on Big Chief to the point where you left the trail on Big Chief on February 20, 2004, please state the factual basis for that claim and provide any information you have in support of that claim.

6

**Answer No. 12**

Please see answer to Interrogatory No. 7.

**Interrogatory No. 13**

On February 20, 2004 did you attempt to turn your skis at any point from the midpoint on the Big Chief trail to the point where you left the trail on Big Chief on February 20, 2004.

**Answer No. 13**

Please see answer to Interrogatory No. 7.

**Interrogatory No. 14**

Unless your answer to the preceding interrogatory in words or substance is "I do not remember," please state how many times you attempted to turn, where you attempted to turn and what happened each time.

**Answer No. 14**

Please see answer to Interrogatory No. 7.

**Interrogatory No. 15**

If you claim that you attempted to turn your skis at any point from the midpoint on Big Chief to the point where you left the trail on Big Chief on February 20, 2004, please state the factual basis for that claim and provide any information you have in support of that claim.

**Answer No. 15**

Please see answer to Interrogatory No. 7.

7

**Interrogatory No. 16**

Did you turn your skis at any point from the midpoint on Big Chief to the point where you left the trail on Big Chief on February 20, 2004.

**Answer No. 16**

Please see answer to Interrogatory No. 7.

**Interrogatory No. 17**

Unless your answer to the preceding interrogatory in words or substance is "I do not remember," please state how many times you turned your skis and what happened each time.

**Answer No. 17**

Please see answer to Interrogatory No. 7.

**Interrogatory No. 18**

If you claim that you turned your skis at any point from the midpoint on Big Chief to the point where you left the trail on Big Chief on February 20, 2004, please state the factual basis for that claim and provide any information you have in support of that claim.

**Answer No. 18**

Please see answer to Interrogatory No. 7.

**Interrogatory No. 19**

Were you wearing goggles on February 20, 2004 at the time you left the trail.

8

**Answer No. 19**

Please see answer to Interrogatory No. 7.

**Interrogatory No. 20**

Did you fall at anytime on February 20, 2004 between the time you began skiing at the midpoint on Big Chief and the time you left the trail on Big Chief.

**Answer No. 20**

Please see answer to Interrogatory No. 7.

**Interrogatory No. 21**

Did you see the trees in the area where you left the trail on Big Chief on February 20, 2004 just prior to leaving the trail.

**Answer No. 21**

Please see answer to Interrogatory No. 7.

**Interrogatory No. 22**

Were you cut off by any other skier between the midpoint on Big Chief and the point where you left the trail on Big Chief on February 20, 2004.

**Answer No. 22**

Please see answer to Interrogatory No. 7.

**Interrogatory No. 23**

Please identify each document which supports your claim that Francis Millard was negligent.

9

**Answer No. 23**

Objection.  This interrogatory calls for information which is protected by attorney work product and information which is subject to an expert opinion.

**Interrogatory No. 24**

Please identify each document which supports your claim that Francis Millard's negligence caused you to ski off the trail on February 20, 2004.

**Answer No. 24**

Objection.  This interrogatory calls for information which is protected by attorney work product and information which is subject to an expert opinion.

**Interrogatory No. 25**

Were you skiing in control on February 20, 2004 between the midpoint on Big Chief and the point where you left the trail on Big Chief.

**Answer No. 25**

I have no memory of the incident.

**Interrogatory No. 26**

Unless your answer to the preceding interrogatory in words or substance is "I do not remember," please state the factual basis for your answer to the preceding question and provide any information you have in support of that claim.

**Answer No. 26**

Please see answer to Interrogatory No. 25.

10

Interrogatory No. 27

Please describe in full and complete detail the path you took from the midpoint on Big Chief to the point where you left the trail on February 20, 2004.

Answer No. 27

Please see answer to Interrogatory No. 25.

Interrogatory No. 28

Please state the factual basis for your allegation in paragraph 20 of the First Amended Complaint that "the injuries sustained by the plaintiff were due to the carelessness and negligence of defendant, Francis Millard, in the care and/or supervision of the plaintiff."

Answer No. 28

I have relied upon my attorney in making decisions on what claim to make, but upon information and belief, I answer as follows:   Francis Millard was the Director of Athletics at Northfield Mount Herman School during the time that I was a student in the Physical Education course entitled the Recreational Ski Program. Francis Millard failed to require that I receive ski instruction.   Francis Millard failed to ensure that I receive ski instruction.   Francis Millard failed to ensure that I was using ski equipment that was appropriate for my level of skiing ability. Francis Millard failed to ensure that I was wearing a helmet.  Francis Millard failed to ensure that I received ski instruction concerning terrain selection.   Francis Millard failed to ensure that I was instructed on proper methods of turning on skis,

11

stopping on skis. Francis Millard failed to ensure that I receive ski instruction concerning night skiing. Francis Millard failed to implement a buddy system for the recreational ski program. Francis Millard failed to adequately train the chaperones in supervision of student participants in the Recreational Ski Program. I am informed that expert opinion will also provide an answer which may be responsive to this question. Plaintiff reserves the right to supplement this response.

**Interrogatory No. 29**

If you contend that lessons would have prevented you from skiing off the trail and into a tree on February 20, 2004, please state the factual basis for that contention and provide any information you have in support of that claim.

**Answer No. 29**

Objection. This interrogatory calls for expert opinion.

**Interrogatory No. 30**

For each and every person whom you expect to call as an expert witness or liability against Francis Millard at trial, please state the following:

a)      the identity of each such expert by name and address;

b)      the subject matter on which each of the experts referred to in your previous answer is expected to testify;

c)      the substance of the facts and opinions to which each of the aforementioned experts is expected to testify; and

12

d)    a summary of the grounds for each of the aforesaid opinions of experts.

Plaintiff has provided defendant with complete expert identification of expert witnesses against Francis Millard.

Signed under the pains and penalties of perjury this _28_ day of August, 2006.

Yukio Kusada

**EXHIBIT XII**

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| YUKIO KUSADA,<br>    Plaintiff | )<br>)<br>) |
| v. | )<br>) |
| BERKSHIRE EAST SKI RESORT,<br>UNION TERMINAL PIERS, INC.,<br>and<br>NORTHFIELD MOUNT  HERMON<br>SCHOOL,<br>    Defendant and<br>    Third Party Plaintiff | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) |
| v. | )<br>) |
| TAKERU KUSADA<br>    Third Party Defendant | )<br>) |

Civil Action No.: 05-30043-MAP

PLAINTIFF'S ANSWERS TO DEFENDANT,
UNION TERMINAL PIERS, INC., INTERROGATORIES

**Interrogatory No. 1**

Please identify yourself by stating your name, date of birth, residence address, social security number, business or occupation and business address.

**Answer No. 1**

Yukio Kusada; 8/13/85; Boston University, Box 3236, 700 Commonwealth Avenue Boston, MA 02215; 1-8-3 Ebisu-Higashi, Naniwa-ku, Osaka, Japan 556-0002; student.

**Interrogatory No. 2**

With reference to those injuries referred to in your complaint, please describe all of said injuries together with the signs and symptoms thereof in as precise medical terms as you are able.

**Answer No. 2**

I suffer from the effects of a traumatic brain injury and from the effects of compartment syndrome to my left leg for which I underwent surgery at Bay State Medical Center. I also suffer from depression. I also suffer from back pain and jaw pain. My brain injury leaves me with severe memory problems. It makes it very difficult for me to concentrate and focus. It makes me less able to do computations that I was once able to do and makes it very difficult to learn new things. It makes it very difficult for me to study and perform well on tests, makes it impossible for me to take a full course load in college. It makes it difficult for me to be social with people as I once was. It makes it difficult for me to understand what I'm reading. Overall, I am not the same person I used to be. It makes it hard for me to feel any happiness. Also, I get lost easily when going places. I have great trouble trying to make decisions like simple ones like trying to decide what to eat in cafeterias.

My left leg is not strong, and it is awkward for me if I even attempt to run.

**Interrogatory No. 3**

With reference to those injuries referred to in your complaint, set forth each and every date during which you were confined to a hospital, hospitals, clinics,

3

sanitariums or nursing homes because of said injuries, together with the name and address of each such hospital, clinic, sanitarium or nursing home involved.

**Answer No. 3**

1.      Baystate Health Systems
        759 Chestnut Street
        Springfield, MA 01199
        2/21/04 – 3/10/04

2.      Spaulding Rehab Hospital
        125 Nashua Street
        Boston, MA 02114-1198
        3/10/04 – 4/9/04

Plaintiff reserves the right to seasonably supplement this response.

**Interrogatory No. 4**

With reference to those injuries referred to in your complaint, set forth each and every date during which you were confined to your bed because of said injuries.

**Answer No. 4**

Please see Answer No. 3 above.  I also was confined to my bed in Japan and China for periods of time.  I do not recall what those time periods were.

**Interrogatory No. 5**

With reference to those injuries referred to in your complaint, set forth each and every date during which you were confined to you home because of said injuries.

**Answer No. 5**

Upon information and belief after I returned to Japan, I was confined to a hospital.  After about 30 days, I believe I was transferred to China to undergo

4

different medical treatment which I underwent for approximately one year. During this time I was occasionally confined to my home and spent most of my time at home when I was not having medical treatment.

**Interrogatory No. 6**

With reference to those injuries referred to in your complaint, set forth the name and address of each physician, chiropractor, dentist, therapist or other medical provider consulted by you or from whom you received treatment because of said injuries, indicating also each and every date during which you consulted or received treatment from the indicated physicians, chiropractors, dentists therapists or other medical providers.

**Answer No. 6**

Bay State Health Ambulance
338 High Street
Greenfield, MA 01301
2/21/04 & 3/10/04

Baystate Health Systems
759 Chestnut Street
Springfield, MA 01199
2/21/04 – 3/10/04

Spaulding Rehab Hospital
125 Nashua Street
Boston, MA 02114-1198
3/29 – 4/9/04 in patient
Heechin Chae, M.D.
Kaaren E. Bekken, Ph.D.
presently out-patient

Medical care in Japan and China. The names of doctors are not known at this time.

Plaintiff reserves the right to supplement this response.

**Interrogatory No. 7**

With reference to those injuries referred to in your complaint, describe in as great detail as you are able the nature of the treatment rendered you on each of the dates enumerated in your answer to the preceding interrogatory. (In your answer, please describe as best you can all that the physician, chiropractor, dentist therapist or other medical provider did during such treatment and all that you did during such treatment).

**Answer No. 7**

I do not know what medical treatment was provided to me but I am informed I was treated by the following entities:

Bay State Ambulance
2/21/04 & 3/10/04

Baystate Health Systems
2/21/04 – 3/10/04

Spaulding Rehab Hospital
3/29/04 through present

Medical care in Japan and China

Plaintiff reserves the right to supplement this response.

**Interrogatory No. 8**

With reference to those injuries referred to in your complaint, set forth each and every date during which you allege that you were precluded from pursuing your usual occupation because of said injuries.

6

**Answer No. 8**

February 20, 2004 – September 2005 when I began taking a partial course

load at Boston University.   I am still precluded from being a full-time student.

**Interrogatory No. 9**

With reference to those injuries referred to in your complaint, describe in

detail all of said injuries together with the signs and symptoms thereof from which

you allege you have not yet fully recovered.

**Answer No. 9**

I have not fully recovered from the injuries I suffered.

**Interrogatory No. 10**

Please set forth in detail all losses and expenses allegedly incurred by you on

your behalf as a result of the incident referred to in your complaint (including in

your answer such things as itemized doctor bills, itemized hospital bills, itemized

nurses' bills and loss of wages).

**Answer No. 10**

Upon information and belief, I have incurred the following medical expenses:

| | |
|---|---|
| Spaulding Rehab Hospital<br>3/10/04 – 4/10/04 | $53,243.07 |
| Baystate Medical Center<br>2/21/04 – 3/10/04 | 47,055.70 |
| Baystate Health Ambulance<br>2/21/04 & 3/10/04 | 2,045.84 |
| First Hospital of Harbin Medical Univ.<br>7/28/04 – 5/26/05 | 3,790.76 |

| | |
|---|---|
| Japanese Medical Receipts | 155,356.64 |
| Total | $261,492.01 |

Expenses from China
Including room and board,
supply fees, transportation, labor
costs, tutor and travel and physical
therapy. Upon information and belief
these expenses amount to:                    $69,837.26

**Interrogatory No. 11**

For each and every person whom you expect to call as an expert witness at the time of trial, please state:

a.    the identity of each such expert by name and address;

b.    the subject matter on which each of the experts referred to in your previous answer is expected to testify;

c.    the substance of the fact and opinions to which each of the aforementioned experts is expected to testify; and

d.    a summary of the grounds for each of the aforesaid opinions of experts.

**Answer No. 11**

Plaintiff will supply expert reports and identification in compliance with court order.

**Interrogatory No. 12**

With reference to that accident referred to in your complaint, please describe in as great detail as you are able each and every act or omission of the party who has propounded these interrogatories which you allege caused or contributed to the happening of said accident.

8

**Answer No. 12**

This question calls for an expert opinion which plaintiff will supply in compliance with court order.

**Interrogatory No. 13**

With reference to that accident referred to in your complaint, please describe in as great detail as you are able each and every act or omission of persons other than the party who has propounded these interrogatories which you allege caused or contributed to the happening of said accident and in your answer please identify each such person.

**Answer No. 13**

Please refer to Answer No. 12.

**Interrogatory No. 14**

Please state all facts and identify all persons and documents relied upon by you in setting for the allegation in your complaint that "the injuries sustained by the plaintiff were due to the carelessness and negligence of defendant. Union Terminal Piers, Inc., its agents, servants, employees and/or others for whom it was legally responsible in the operation and/or maintenance of the premises" as stated in Paragraph 13 of your complaint.

**Answer No. 14**

On information and belief, ski lessons were to take place but did not take place. In addition upon information and belief, I was not found for approximately 8 hours after I hit a tree.

**Interrogatory No. 15**

Please state the names and addresses of all persons having knowledge of discoverable facts pertinent to the allegations contained in the complaint.

**Answer No. 15**

Plaintiff responds as follows:

Upon information and belief all of the people who the lawyers have deposed in the case would have information about discoverable facts. In addition, all of my medical providers would have information. My attorney informs me that medical records have been provided to defendant's counsel.

**Interrogatory No. 16**

Please set forth the names and addresses of all witnesses to the incident alleged in the complaint.

**Answer No. 16**

Upon information and belief, none.

**Interrogatory No. 17**

If you or anyone acting on your behalf has had any communication, written or oral, with any parties to this suit relative to the happening of the incident referred to in the complaint, please set forth in detail for each such communication:

    a.    the date thereof;

    b.      the type of communication, written or oral;

    c.      the identity of the person or persons to whom each such communication was made;

    d.      who on your behalf made said communication; and
    e.      the substance thereof.

**Answer No. 17**

Upon information and belief other than my lawyer, no one.

**Interrogatory No. 18**

If you prepared, submitted or made any statement or report, written or oral regarding the incident referred to in the complaint, please indicate for each such statement or report:

    a.      the date, time and place of each such report;

    b.      the name and address of any person or persons to whom the statement or report was given; and

    c.      the substance or contents of the statement or report.

**Answer No. 18**

Upon information and belief, not applicable.

**Interrogatory No. 19**

Identify by name and address all persons that have been interviewed by you or by anyone on your behalf regarding the incident and claims asserted in the complaint and as to each such person state:

    a.      the date when each such person was interviewed;

    b.      whether a written statement was taken;

    c.      whether the statement was signed by the person interviewed;

    d.      whether the interview was recorded or preserved in any way, by written or electronic means;

    e.      the identity of the person who conducted the interview; and

    f.      the identity of the person having possession, custody or control of such statement.

**Answer No. 19**

Objection. This calls for information which was prepared in anticipation of litigation which is attorney work product. Without waiving said objection, plaintiff responds as follows:

Upon information and belief, the following depositions have been taken in the case:

| | |
|---|---|
| Samuel Wilson | 5/19/05 |
| Yuki Hasegawa | 5/19/05 |
| Roy Schaefer | 6/23/05 |
| Audra Forstrum | 7/27/05 |
| Richard Eisenberg | 7/27/05 |
| Susan Clough | 7/27/05 |
| Frank Millard | 10/24/05 & 11/15/05 |
| Loren Byrom | 10/24/05 |
| Frank Field, Jr. | 11/9/05 |
| Edward Ralicki | 11/9/05 |
| Michael Atkins | 11/15/05 |
| Lori Bassett | 12/19/05 |

Kathy Benedetti    12/19/05

Rob Fielding    12/19/05

John Herrick

**Interrogatory No. 20**

Please state in complete detail how the alleged accident occurred stating fully what you saw and did, and what happened to you in the order in which the events took place, including what you were doing immediately prior and up to the receipt of the injuries alleged in the complaint.

**Answer No. 20**

I don't have a memory of the incident.   On information and belief, I was brought to Berkshire East on a school bus from Northfield Mount Hermon School. On information and belief, I was skiing on Big Chief Trail and skied into a tree.   On information and belief, I first received medical attention at approximately 4:00 A.M. of February 21, 2004.

**Interrogatory No. 21**

Please identify by name and address each and every person with whom you skied at the Berkshire East Ski Area on February 20, 2004, state the time or time that you skied with each such person.

**Answer No. 21**

Upon information and belief, I skied with Yuki Hasegawa.

**Interrogatory No. 22**

Describe in detail your ski experience prior to and up to the date of the accident referred to in your complaint to include your skiing ability, whether beginner, novice, intermediate, advanced intermediate or expert.

**Answer No. 22**

Upon information and belief, I was a beginner skier.  Also upon information and belief, I went down hill skiing on ten or eleven occasions as part of the Northfield Mount Hermon School ski course at Berkshire East Ski Resort.

**Interrogatory No. 23**

Please identify by name and address each and every person who was skiing with you on the trail at the time of your accident in which you sustained personal injuries.

**Answer No. 23**

Upon information and belief, Yuki Hasegawa.

**Interrogatory No. 24**

Please state the time when you began skiing at Berkshire East Ski Area on February 20, 2004 and identify by name all trails and lifts used by you on that date prior to your accident.

**Answer No. 24**

Upon information and belief, I skied Big Chief right before I skid into a tree.

Signed under the pains and penalties of perjury this _____ day of March, 2006.

14

Yukio Kusada

## Certificate of Service

I, Ronald E. Gluck, of Breakstone, White-Lief & Gluck, P.C., hereby certify that on this date I served a copy of the within pleading by mailing a copy of same, postage prepaid, to:

David B. Mongue, Esquire
Donovan & O'Connor, LLP
1330 Mass MoCA Way
North Adams, MA 01247

and

Harold W. Potter, Jr.
Holland & Knight, LLP
10 St. James Avenue, 11th Floor
Boston, MA 02116

March 29, 2006

_____
Ronald E. Gluck

Page 73

1    than the number of individuals who were involved
2    in the Northfield Mount Hermon program?
3  A. Without doing a complete assessment of it, I can't
4     respond one way or the other.
5  Q. Would it be fair to say that you would have to
6     hire people with greater qualifications than the
7     people who were involved in the program?
8  A. The individuals either had to have prior
9     qualifications or be trained.
10 Q. And when you say "be trained," be trained by whom?
11 A. Mr. Millard or Mr. Atkins could have provided the
12    instruction that they needed in terms of what it
13    meant to supervise the situation in terms of the
14    skis and that particular equipment if they did not
15    have -- if no one at the school had that
16    particular knowledge, then it would be -- they
17    would need to be asking the assistance of
18    Berkshire East to help them with that aspect of
19    the program.
20 Q. And assuming, once again, that we've got over 50
21    students in the program, do you have any idea of
22    what the cost of implementing that would be?
23 A. I have no idea what the costs would be because I
24    don't know what kinds of cost that they charge for
25    those types of situations, but it's something

Page 74

1     that's important to provide a safe environment for
2     these students. That's the ultimate piece that's
3     of concern. If you're going to run the program,
4     it has to be one where you can provide the safest
5     possible environment for everyone.
6  Q. So at least it would be your opinion that when it
7     comes to setting up a program like the one at
8     Northfield Mount Hermon, there is never a
9     balancing of cost with what you provide at least
10    as it relates to safety; is that correct?
11 A. That would be correct.
12 Q. So that you do whatever you have to do to provide
13    a safe environment regardless of the cost;
14    correct?
15 A. If not, you should not run the program.
16 Q. And based upon your training and experience and
17    your review of the record in this case, then is it
18    your opinion that Northfield Mount Hermon School
19    should not have had this program if it was going
20    to run it in this way?
21 A. That would be correct.
22 Q. Now is it your opinion, and I ask you to assume
23    for a minute that Yukio Kusada was eighteen years
24    old and reasonably intelligent, I think Mr. Gluck
25    would agree with that, that Mr. Kusada was not

Page 75

1     capable of making decisions about whether or not
2     he should wear a helmet?
3  A. My concern is not so much his age as his ability
4     level, and that's the more important issue at this
5     point is where his ability level was.
6  Q. And what you're saying is because he was a
7     beginner, he was not capable of making a decision
8     about whether or not to wear a helmet; is that
9     correct?
10 A. He should not have been allowed to make that
11    decision.
12 Q. Okay. And because he was a beginner, he should
13    not have been allowed to make the decision about
14    whether or not to take lessons; correct?
15 A. That's correct. He should have been required as a
16    beginner to take lessons.
17 Q. And because he was a beginner, even though he was
18    eighteen years old, he should not have been
19    allowed to select his own equipment; is that
20    correct?
21 A. Without someone reviewing to make a determination
22    of whether or not it was appropriate, that would
23    be correct.
24 Q. And, of course, following up on that, once he had
25    skied several times, you would say that each time

Page 76

1     the school or Berkshire East or somebody should
2     have checked his equipment; is that correct?
3  A. Yes.
4  Q. And that he as an eighteen-year-old was not
5     responsible enough to do that for himself; is that
6     correct?
7  A. As a beginner, he was not responsible to make
8     those kinds of decisions. If he chose to bring
9     different equipment, it should be checked.
10 Q. And are you saying that Mr. Kusada as an
11    eighteen-year-old was not responsible enough to go
12    to Berkshire East to get his equipment from the
13    rental office?
14 A. As a beginner. And from what Mr. Herrick had
15    indicated in his deposition, if they had gone to
16    the rental office, they would have assured that he
17    got the appropriate equipment.
18 Q. What I'm asking you is, are you saying that
19    Mr. Kusada was not responsible enough as an
20    eighteen-year-old to go to the rental office to
21    get his equipment?
22 A. As a beginner, he was not responsible enough to
23    make a decision as to what equipment he used.
24 Q. Or as to where he should go to get his equipment;
25    is that correct?

Page 77

1  A. If he was not getting it at the rental office,
2    then it should have been checked to make sure that
3    it was appropriate for him, for his ability level.
4  Q. And are you taking it one step further and saying
5    that Northfield Mount Hermon personnel should
6    accompany every beginner who is eighteen years old
7    to the Berkshire East rental office to ensure that
8    they're getting their skis there?
9  A. Be my opinion that if they're getting on the bus,
10    that it would be obvious if they had their own
11    equipment with them or not. And if they're going
12    to ski and if they don't have any equipment with
13    them, then there is no option except to go to the
14    rental office to get it. And given that, in
15    Mr. Herrick's deposition indicating that they
16    would provide proper equipment, then he would be
17    fine.
18    MR. GLUCK: I'm sorry.
19  Q. What about the students in the program who brought
20    their skis from home, were they required to have
21    that equipment checked by somebody?
22    MR. GLUCK: Objection.
23  A. If I'm providing a program for students, again,
24    that's high risk, then the equipment that if I'm
25    not individually providing that equipment, then it

Page 78

1    should all be checked to make sure that those
2    students have safe equipment.
3    MR. GLUCK: I'm sorry. Can I have --
4    MR. POTTER: Go ahead.
5    (A recess is taken, after which the following
6    proceedings are had:)
7    (The prior question and answer are read by the
8    reporter.)
9  Q. Now if you could turn to your opinion on the
10    second page where you have --
11    MR. GLUCK: What page?
12    MR. POTTER: The second page.
13    MR. GLUCK: Under Opinion?
14    MR. POTTER: No, under Facts.
15    MR. GLUCK: Okay.
16  QUESTIONS CONTINUING BY MR. POTTER:
17  Q. You list the facts upon which you relied in
18    forming your opinions; correct?
19  A. That's correct.
20  Q. And did you list all of the facts that were
21    important in forming your opinion?
22  A. I believe that I did. That was my attempt.
23  Q. As you sit here today, are there any facts that
24    you wish to add to the facts that you listed on
25    pages 2 and 36 in your report?

Page 79

1  A. At this point I can't think of anything that I
2    would want to add.
3  Q. Now, you indicate at the end of the first set of
4    facts, "On or before February 20, 2004, Yukio
5    Kusada received no instruction on skiing from any
6    representative, faculty member or administrative
7    individual at Northfield Mount Hermon School."
8    And I take it from that statement that you are
9    limiting that description to somebody who worked
10    for Northfield Mount Hermon School?
11  A. That's correct.
12  Q. And based upon your review, that is an accurate
13    statement; correct?
14  A. Correct.
15  Q. And also you indicate that -- the second line --
16    that, "Yukio Kusada received no ski lessons at
17    Berkshire East on or before February 20, 2004."
18    And you believe based upon your review of the
19    record that that is a factually accurate
20    statement; is that correct?
21  A. From the depositions that were provided, yes.
22  Q. And you in part based your opinion upon those two
23    facts, is that correct, stated in those two
24    sentences?
25  A. Instruction is a critical part of what goes on in

Page 80

1    a physical education program, and so the fact that
2    there was no instruction was important in this
3    situation.
4  Q. Now in the next sentence you refer to Mr. Atkins
5    and Mr. Millard and state that neither provided
6    active supervision at the program site Berkshire
7    East. What do you mean when you say "active
8    supervision"?
9  A. In this case as I remember from their depositions,
10    neither one of them were there at the site, and,
11    therefore, didn't provide any type of supervision.
12    And active is a piece that I defined earlier as
13    being where they were out with the students and
14    involved.
15  Q. And in your opinion Mr. Millard and Mr. Atkins
16    should have been at Berkshire East on each day
17    that the skiing program was going on, is that what
18    you're saying?
19  A. No, they did not have to be there. They needed to
20    have qualified people there.
21  Q. So assuming that they had qualified people there,
22    they did not have to be there; is that correct?
23  A. That is correct.
24  Q. And if they did not have qualified people there,
25    then they had to be there; is that correct?

Page 81

1  A. They should either have been there or provided
2     that there were qualified people to be there and
3     provide training for those that were there and
4     they did neither one of those.
5  Q. Is it your opinion that Mr. Millard had the
6     background and training to actively supervise this
7     program?
8  A. In physical education training generally when
9     someone has a degree in that area that they would,
10    in fact, have an understanding of what was
11    required for active supervision.
12 Q. And so it would be your opinion that the
13    probabilities are that Mr. Millard had those
14    qualifications; correct?
15 A. Probably did.
16 Q. And would it also be -- would you hold the same
17    opinion of Mr. Atkins?
18 A. Since he had a degree in physical education, yes.
19 Q. Okay. Now, in the next sentence you're talking
20    about the chaperones Richard Eisenberg, Audra
21    Forstrum and Susan Clough. And you say, "I'm not
22    aware if any of them received formal training as
23    coaches within their degree programs or by other
24    means." What do you mean when you say "received
25    formal training as coaches," first of all?

Page 82

1  A. There are opportunities at this point and have
2     been for several years for individuals to receive
3     a coaching certification that would require them
4     to actually have some training in a variety of
5     areas. Risk management is one. Instruction in
6     the proper instruction become other areas that are
7     things that they would actually be trained within
8     those particular coaching certification programs.
9  Q. And so if they had participated in one of those
10    coaching certification programs, you would change
11    your opinion; correct?
12 A. I would change -- I would have a belief that they
13    probably had more training in how to actively
14    supervise a physical education or a physical
15    activity setting than what it appears that was
16    true in this case.
17 Q. And "I am not aware if any of them received
18    training," I guess you're saying, "by other
19    means." What do you mean by that?
20 A. There are two ways in which individuals can get a
21    certification. They might pick up a minor in
22    their undergraduate degree program which would be
23    the first piece that I'm referring to in terms of
24    degree programs, or there are opportunities to
25    receive coaching certification through various

Page 83

1     programs that are offered. They can be workshop,
2     conference kind of thing that would result in a
3     coaching certification. There are specific
4     programs, different types that are available that
5     they could take that could result in a coaching
6     certification or some training of some sort in
7     that particular area.
8  Q. So am I correct in concluding that what you're
9     saying is that an essential requirement here of
10    the three chaperones was that they at a minimum
11    have coaching certification, whether they got it
12    through formal training or by other means?
13 A. No.
14 Q. No. Okay. How am I wrong?
15 A. What I'm referring to in this is their
16    qualifications to be supervisors of a physical
17    activity, and there's two fairly acceptable ways
18    that if the people had particular training would
19    assume that they did, in fact, have an
20    understanding of how to supervise in those areas.
21    Being trained as a physical educator would be one,
22    to be trained as a coach would be the second one.
23    And their depositions indicated that they had not
24    been trained in physical education. It was not
25    clear -- no one had specifically asked them about

Page 84

1     their training in the area of coaching, so I had
2     no way to make a judgment in regards to whether or
3     not they had qualifications from that area. It
4     appeared they did not.
5  Q. Okay. And with respect to coaching, refresh my
6     memory once again, how can they get the required
7     certification in coaching as distinguished from
8     taking a physical education program?
9  A. There are programs where they offer a minor in an
10    undergraduate program. There are other programs
11    that have been set up various places to -- that
12    would provide training in coaching a particular
13    area, so they could have gotten them in school or
14    out of school.
15 Q. And am I correct then in assuming that the mere
16    fact that you have been a coach does not mean that
17    you're certified to coach; correct?
18 A. That would be correct, and I believe Ms. Forstrum
19    actually indicated that she taught math, I believe
20    it was, and coached. But the fact that she
21    coached did not necessarily mean that she'd had
22    any training in the area.
23 Q. So the key for you is not experience but training?
24 A. For what we're talking about in this particular
25    situation, yes.

Page 85

1  Q. So the fact that somebody may have had, let's say,
2     years of experience coaching kids, as far as
3     you're concerned would not be significant because
4     they had not had the training?
5  A. There's no way of knowing whether or not they
6     understood the things that are required to
7     supervise a physical activity just because they
8     have been out in the field and not actually had
9     someone who helped them to understand the concepts
10    and things that they ought to be doing.
11 Q. But without evaluating the individual coach, you
12    wouldn't know whether that applied to a particular
13    individual; is that correct?
14 A. That would be an assessment that would have to be
15    made of their particular abilities and knowing
16    some more about the background than what we know
17    in this particular case.
18 Q. So let's take Audra Forstrum for an example. Is
19    it conceivable in your mind that as a coach she
20    rose to the level where she didn't really need
21    training because she already knew it?
22 A. I would not make that assumption at all.
23 Q. I'm not asking you to assume it. I'm saying is it
24    conceivable? Can you do it that way is what I'm
25    saying? Can you do it that way? Can you learn on

Page 86

1     the job or do you have to go through some
2     training?
3  A. I'm not comfortable without people having some
4     formal training from experts.
5  Q. Okay. So you are not a believer in the old coach
6     who learns on the job?
7  A. That's correct.
8     MR. GLUCK: Can I use the restroom?
9     MR. POTTER: Oh, sure. Always can do that.
10    (A recess is taken, after which the following
11    proceedings are had:)
12 Q. Now turning to the next page before we get to the
13    Standard of Care, you say, "Skiing instruction was
14    expected to be provided for students who requested
15    it, but for some reason it did not occur for this
16    group," and, once again, you're basing that
17    factual statement upon the deposition transcripts
18    of Forstrum, Eisenberg and Clough; is that
19    correct?
20 A. The fact that it did not occur, yes. It had been
21    arranged. Mr. Millard and Mr. Atkins had believed
22    that it had been set up.
23 Q. And when you say, "It did not occur," you're
24    saying it did not occur at any time from the
25    beginning of January until February 20, 2004; is

Page 87

1     that correct?
2  A. That's my understanding from what they've stated
3     in their depositions.
4  Q. You said here that, "She," and that's
5     Ms. Forstrum, "did not report any problem with the
6     lesson unavailability to any of her supervisors of
7     the ski program." Did her failure to report that
8     fall below the standard of care?
9  A. It's a situation where she should have provided
10    that information. If it was her understanding
11    that lessons were to be provided, she should have
12    been reporting to her supervisor that they were
13    not provided because instruction is important
14    here, and it gets back to the training that was
15    provided by Mr. Millard and Mr. Atkins to their
16    chaperones. That should have been part of the
17    pieces that they were expected to have known to
18    make sure occurred and did not.
19 Q. And so are you saying that someone Audra
20    Forstrum's age needs to be taught to call their
21    supervisor if a part of the program that they
22    understood was to be set up was, in fact, not set
23    up?
24 A. There should have been some procedures outlined
25    that took place and this was one of the situations

Page 88

1     that was there.
2  Q. And the procedure should have been that Mr.
3     Millard or Mr. Atkins should have put in writing
4     to Audra Forstrum that in the event the lessons
5     are not available, you are to report that to me
6     immediately, is that what you're saying?
7  A. No.
8  Q. What are you saying?
9  A. I'm not suggesting it has to be in writing, but it
10    should be part of the discussions that take place
11    within those two. It's better if it's in writing
12    because then they can prove that, in fact, the
13    information was provided, but it would not have to
14    be put into a writing piece.
15 Q. So if they'd said it orally to her, then they
16    would have discharged their responsibility;
17    correct?
18 A. No, because they should have also asked her the
19    same thing as they came back to find out if
20    everything had been followed through as they had
21    set it up and indicated it was there; did the
22    lessons take place and asking questions about what
23    happened within the program.
24 Q. But I'm not getting to that point. I'm still at
25    the point where Audra Forstrum knows that lessons

Page 89

1  haven't been provided and the supervisors do not
2  know that lessons haven't been provided and the
3  communication hasn't come back to Mr. Atkins or
4  Mr. Millard. I'm not -- I haven't gone beyond
5  that. And at that point, was it -- are you saying
6  that Mr. Millard or Mr. Atkins had to provide
7  either written or oral instructions to Audra
8  Forstrum to let them know if the lessons which
9  were arranged were not being provided?
10 A. That should be one of the things that they
11    would -- that she would have reported back to them
12    after this -- the program got started.
13 Q. You're saying that she would have or should have
14    reported back to them. What I'm asking is: Did
15    they fall below the standard of care because they
16    did not tell her either in writing or orally that
17    that was one of her duties?
18 A. They fell below the standard of care because they
19    did not make sure that the instruction was taking
20    place, and one of the ways they could have done
21    that would have been to have -- have asked her to
22    report on how that would had occurred. They did
23    not follow up.
24 Q. So it all has to do with the follow-up and not the
25    initial instruction; in other words, if they

Page 90

1  hadn't said anything, but they called her and
2  asked her whether or not the instruction had taken
3  place, they would have discharged their duties; is
4  that correct?
5 A. It was their duty to make sure that instruction
6    was provided; that was their duty, and it didn't
7    occur, so they needed to have done things that
8    would have made sure that it occurred.
9 Q. And those things didn't necessarily have to be
10    telling her in advance as long as they followed
11    up; is that correct?
12 A. There should have been some information provided
13    for her in her training that indicated what the
14    expectations were about what was going to happen
15    there, and that instruction was part of it and
16    specifics about who had arranged it, not just that
17    students if they wanted it were to show up at a
18    particular place.
19 Q. But are you saying that Audra Forstrum did not
20    know that lessons were supposed to be available?
21 A. From the depositions, my understanding is that she
22    knew that they were available, but there was
23    nothing more that was done with it in terms of
24    giving her any specifics about with whom
25    arrangements had been made and what was -- how

Page 91

1  they were supposed to have occurred.
2 Q. And you're saying, if I understand it, that Frank
3    Millard and Michael Atkins are responsible for the
4    fact that Audra Forstrum didn't have the common
5    sense to call them; is that correct?
6 A. No, I would not put it that way.
7 Q. Isn't it common sense if something doesn't happen
8    in a program to speak to your supervisor?
9    MR. GLUCK: Objection.
10 Q. Wouldn't you say that's common sense for any
11    teacher?
12 A. There's a lot of factors that would indicate
13    whether they would do that or not do that, and I
14    cannot make that particular judgment as to whether
15    or not she would have known that she should have
16    done that or not.
17 Q. So that a person who's been a teacher and a coach
18    and a college graduate, in your mind cannot be
19    relied upon to let his or her supervisor know when
20    something doesn't take place in the program that
21    the supervisor is supervising; is that correct?
22 A. The piece that we don't know is whether, at least
23    I have not read in any of the depositions, is how
24    much information she was provided other than
25    saying the lessons are available, and -- she

Page 92

1  needed to know more than that in terms of the
2  specific arrangements, and I don't know if she was
3  given that or not.
4 Q. Well, do you know that Audra Forstrum had been a
5    chaperone the prior year and that she had worked
6    with Frank Borland who was a long-time chaperone?
7 A. My understanding was that -- from her deposition
8    was that she had worked with the program the year
9    before but not as the head chaperone.
10 Q. And is it your understanding that lessons were
11    available the prior year?
12 A. If I remember correctly, it was indicated that in,
13    I believe it was '03 -- or '93 and '94 that they
14    had, somewhere around that time period, that there
15    had been lessons that were required at one point,
16    and that Mr. Millard made the decision not to
17    require them after that point in time, so -- but
18    that they would be available.
19 Q. So am I correct that Audra Forstrum understood,
20    based on what you have read, that lessons were
21    available during the 2002-2003 year?
22 A. It's my understanding the circumstances were the
23    same the way the program was set up in those two
24    years.
25 Q. And so we have a person who worked in the program

Page 93

1  the prior year who knew that lessons were
2  available, that lessons were taken?
3 A. We don't know that.
4 Q. Okay. But if you knew that she knew that lessons
5  were taken the prior year, not just available but
6  taken the prior year, is it your opinion that she
7  had no responsibility without instructions to give
8  a call to Michael Atkins or Frank Millard when
9  instructions were not available when the 2003-
10  2004 program started?
11    MR. GLUCK: Objection.
12 A. First of all, I don't know whether or not there
13  was anyone who had taken any lessons the previous
14  year; and, second of all, I don't know what she
15  was told from her experiences from the previous
16  year. Again, this was the first time from my
17  understanding that she was the head chaperone, and
18  there are different responsibilities if you're the
19  head chaperone than if you are not.
20 Q. But as someone who has been involved in the
21  program, isn't it correct that you would know
22  whether or not the program has changed from year
23  to year just by observation?
24    MR. GLUCK: Objection.
25 A. Not necessarily because, again, it gets down to

Page 94

1  what you were told in the training you received.
2 Q. Well, wouldn't something as basic as whether or
3  not lessons are available be something that would
4  be obvious to the average person?
5    MR. GLUCK: Objection.
6 A. I have no idea if they were -- they were told --
7  they knew that lessons -- it appears that they
8  were told and knew that the lessons were
9  available. Whether or not it's different from the
10  year before, I do not know.
11    MR. GLUCK: Would you mind?
12    MR. POTTER: Sure. Go ahead.
13    (A recess is taken, after which the following
14  proceedings are had:)
15 Q. At the bottom of the page under Standard Of Care,
16  you indicate that, "The amount of supervision
17  required depends upon the participant's age and
18  skill level, the activity, the risk associated
19  with the activity and their ability to understand
20  and appreciate the risks and consequences of their
21  own actions." Now how big a factor is the
22  participant's age?
23 A. The most important factor is their ability.
24 Q. So the age is a minor factor?
25 A. It -- within a -- there is points where obviously

Page 95

1  age would be an issue, but, in this case, ability
2  is the issue.
3 Q. Okay. So age here was not an issue. Mr. Kusada
4  was old enough to understand everything that was
5  being told to him, wouldn't you say that?
6 A. No, because I don't know him to know whether he
7  could or couldn't understand. His ability makes a
8  difference in what his understanding level is.
9 Q. So you can't say whether or not Mr. Kusada had the
10  capacity as an eighteen-year-old to understand
11  anything that was said to him about this program;
12  is that right?
13 A. As a beginner it changes what the understanding
14  level is going to be irrespective of the fact that
15  he was eighteen.
16 Q. But you would agree, would you not, that an
17  eighteen-year-old is better able to process
18  information than a three-year-old?
19 A. That would be correct.
20 Q. And you would agree, would you not, that an
21  eighteen-year-old is considered an adult under the
22  law; correct?
23    MR. GLUCK: Objection.
24 A. It's a statement of fact.
25 Q. And you would agree, would you not, that Mr. Yukio

Page 96

1  Kusada was a fairly intelligent kid?
2 A. I have no way of making that judgment from the
3  information that's been provided for me.
4 Q. Assume for a moment that he was a fairly
5  intelligent kid; did he have the ability to
6  understand what he was being told?
7    MR. GLUCK: Objection.
8 A. As a beginning skier, it changes the understanding
9  that you're going to have because of the lack of
10  experience.
11 Q. Does it eliminate understanding?
12 A. It will affect the level of understanding that an
13  individual is going to have. You're not going to
14  be expected to have the same level of
15  understanding as someone with advanced ability.
16 Q. I understand, but are you saying that he had the
17  inability to understand because he was a beginner?
18 A. He had the ability to learn as he was taught, and
19  he was not taught in this particular case to gain
20  an understanding and no one made an assessment of
21  his actual understanding as well.
22 Q. So would it be fair to say that what you're saying
23  is that you not only have to tell an
24  eighteen-year-old what the risks are, what the
25  expectations are, what you're going to do, but

Kusada v. Berkshire East, et al.    Document 43-15    Filed 11/27/2006    Page 7 of 20

Case 3:05-cv-30043-MAP         Condenselt!         10/11/06    MARILYN BUCK, ED.D.

Page 97

1 before you can allow them to go on the slope, you
2 need to test them so that you can understand
3 whether or not they understand, is that what
4 you're saying?
5 A. There is a level of instruction that requires that
6 you try to make a determination of their level of
7 understanding before you would turn them loose in
8 a high-risk activity.
9 Q. And how do you try to assess that?
10 A. It's going to be done in a couple of ways. It
11 could be done by asking questions, and then you
12 know their verbal understanding of the piece -- of
13 their level of understanding. And another would
14 be through their actual demonstration of their
15 abilities in a skiing situation.
16 Q. Okay. Let's stick with asking questions. Does
17 that mean that you need to ask individual
18 questions of each student?
19 A. Ideally, yes.
20 Q. Do you fall below the standard if you don't hit
21 the ideal?
22 A. If you are not certain that each individual
23 understands, then, yes, you have.
24 Q. How can you ever be certain?
25 A. You can't be -- you can't be entirely certain but

Page 98

1 you can have the opportunity to ask them to
2 respond and get a good understanding of their
3 level.
4 Q. But what I'm asking is, do you have to go to these
5 students individually, either by giving all of
6 them a written test or by interviewing each one of
7 them individually so that you can satisfy yourself
8 that each one has the understanding and the
9 maturity to participate in the program?
10 A. In a high-risk activity I would want to find out
11 from each individual.
12 Q. So that you would either test them all or
13 interview every one of them?
14 A. I would assess every one of them as to their
15 abilities.
16 Q. Individually?
17 A. They can also be done by an expert in a group
18 setting as well where they would have a chance to
19 watch individuals as they ski.
20 Q. Any other way?
21 A. That's the way that it ought to be done is by way
22 of watching them ski and working with them as a
23 group and individually.
24 Q. And I understand the way it ought to be done, but
25 I'm trying to figure out is that exclusive or is

Page 99

1 there another way it can be done?
2 A. Not to my satisfaction.
3 Q. So from your perspective and in your opinion,
4 that's the way it must be done?
5 A. In a high-risk activity there is more required
6 than there is in a lower-risk activity. An
7 assessment of their abilities is absolutely
8 critical. They need to know that that student is
9 qualified to go up on that mountain.
10 Q. So is your answer to my question yes?
11 A. Repeat the question so I can make sure.
12    MR. POTTER: Could you read it back.
13    (The requested material is read by the
14 reporter.)
15 A. Put on the what it must be done.
16 Q. And that came from a prior question, and the
17 answer that you gave me.
18    Go ahead and read it back to her.
19    (The requested material is read by the
20 reporter.)
21 A. Yes.
22 Q. On the next page before you get to the opinion,
23 you say, "Supervision guidelines require the
24 supervisors to move about the area to maximize
25 contact with the participants and to keep the

Page 100

1 activities within the ability level of the
2 individual students." Are you saying that the
3 chaperones in this instance did not move about the
4 area?
5    MR. GLUCK: Are you talking about the actual
6 date of this incident, is that what you're
7 referring to? You said "in this instance." I
8 don't know what you mean.
9 Q. Okay. During this program, 2003-2004?
10 A. From the depositions of three chaperones, it's not
11 clear to me other than the fact that there was one
12 of them who was in the lodge exactly what they did
13 during the time that they were there.
14 Q. And if the other two were moving around the
15 mountain, was that appropriate conduct on their
16 part?
17 A. I'm not sure in terms of how they're moving about
18 the mountain, so I'm not able to respond in terms
19 of whether it was appropriate or not.
20 Q. All right. Was it appropriate to have somebody in
21 the lodge?
22 A. Yes.
23 Q. And as to the people who were moving around the
24 mountain, what were they supposed to be doing in
25 your opinion?

Page 101

1  A. They need to be having contact with the students.
2     They need to have kept track of what trails the
3     students were on. And part of their instruction
4     is to be sure that if an individual who's a
5     beginner is not on trails that are not appropriate
6     for a beginner.
7  Q. I'd like to go back to something I asked earlier,
8     and I know that you've answered in a particular
9     way. How many people would that take to do it,
10    assuming fifty or more students?
11 A. Again, I would have to assess the program and that
12    was what should have been done to determine what
13    is appropriate, and I cannot give you a number.
14 Q. In a high-risk activity, as you've described it,
15    where there are fifty or more students, should
16    there be a two-to-one student-to-teacher ratio?
17 A. Again, without being able to do a proper
18    assessment of the program, I cannot give you a
19    specific number.
20 Q. Should there be a three-to-one student-to-teacher
21    ratio?
22 A. Again, if I -- without being able to do a proper
23    assessment of the situation and the program, I
24    can't make that judgment. That's what Mr. Millard
25    and Mr. Atkins are responsible to determine.

Page 102

1  Q. Should there be a four-to-one student-to-teacher
2     ratio?
3  A. Again, without properly assessing, I cannot give
4     you an answer to whether that is correct or not.
5  Q. From reading the depositions and your knowledge of
6     this program, would it fall below the standard of
7     care to have a hundred-to-one student-to-teacher
8     ratio?
9  A. That one is a fairly obvious piece that that's not
10    providing proper supervision in any situation.
11 Q. What about fifty to one?
12 A. That's the minimum generally required for a
13    playground situation.
14 Q. And a playground situation is not high risk;
15    correct?
16 A. No, that would not be considered a high risk.
17 Q. So fifty to one would still not meet the standard
18    of care, at least in your opinion, correct, for a
19    skiing activity?
20 A. Correct.
21 Q. What about twenty-five to one?
22 A. From that point on, I -- there's -- without
23    assessing the situation, there's no cut and dried
24    guidelines to be able to establish that. That's
25    up to an individual to assess the program and make

Page 103

1     that determination.
2  Q. And are you saying from twenty-five to one below
3     or are you indicating that it may include
4     forty-nine down to one, that's what I'm trying
5     to --
6  A. Again, without assessing the situation, I mean the
7     guidelines that are established generally indicate
8     fifty to one is a minimum for a playground
9     situation. Beyond that, there are no specific
10    guidelines. It depends upon the circumstances,
11    and those who are responsible are expected to make
12    an assessment of what is required.
13 Q. And if you made the assessment and had, let's say,
14    a thirty-to-one ratio and in your judgment that
15    was sufficient, would you say that's wrong?
16    MR. GLUCK: Objection.
17 Q. In their judgment that that was sufficient, would
18    you say that's wrong?
19 A. Again, without knowing the particulars of a
20    situation, that's -- it's inappropriate to
21    indicate whether it is or isn't.
22 Q. Would you say that when you're talking about
23    proper student-to-teacher ratio, that it's not
24    scientific, that there's a degree of judgment
25    involved and that people would disagree, I mean

Page 104

1     reasonable people in your field?
2  A. There potentially could be some disagreement in
3     terms of what's there, but, again, that needs to
4     be demonstrated that they did a proper assessment
5     of the situation to determine if they had the
6     right numbers involved.
7  Q. And so in your field, if someone looked at the
8     situation and said, I think twenty-five to one is
9     adequate, and you said no, I think it should be
10    ten to one, is that a reasonable disagreement?
11 A. Without knowing all the facts, no, it's not.
12 Q. So there is something that's really quantifiable
13    in terms of student-to-teacher ratio?
14 A. It's not quantifiable. If it was, it would be
15    easier for me to provide you with a response in
16    terms of what it ought to be in this situation.
17    It's a piece where there is some judgment that's
18    involved, but the individuals need to make those
19    kinds of assessments as to what takes -- needs to
20    take place such that all students are provided
21    with a safe experience.
22 Q. You indicated that it's fifty to one in a
23    playground situation; correct? Are you talking
24    about a playground situation with children under
25    ten years of age?

Page 105

1    MR. GLUCK: Objection.
2  A. Generally people look at this as a recess
3     supervision type of thing which would generally be
4     in an elementary school.
5  Q. So that as the students get older, presumably,
6     there's less need for supervision; is that
7     correct?
8     MR. GLUCK: Objection. In what sport?
9  Q. Just generally?
10 A. See, generally, I would not respond that less is
11    required. There are still issues depending upon
12    the ability levels of the individuals and the
13    activity within which they're participating.
14 Q. But certainly age is a factor?
15 A. Generally ability is much -- again, much more of a
16    factor than is age in terms of this piece. There
17    are, and it depends on the circumstances within
18    which they are participating as to what that
19    supervision.
20 Q. And I understand that abilities are a more
21    important factor but age is a factor, you even say
22    that in your report; correct?
23 A. It can be depending upon the circumstance. It
24    plays a role, but it's not the most important
25    role.

Page 106

1  Q. Was it a factor in this program?
2  A. Not as I understand the facts in this case.
3  Q. So that the fact that Yukio Kusada was eighteen
4     year old and an adult had no bearing on your
5     analysis of this situation; correct?
6     MR. GLUCK: Objection.
7  A. That's correct.
8  Q. And so you would say that you would apply the same
9     standard to him for participation in this program
10    as a beginner that you would to a four-year-old;
11    correct?
12 A. No.
13 Q. So at some point there is a difference?
14 A. A four-year-old -- yes, there is a difference
15    because of cognitive ability that you would expect
16    between a four-year-old and someone who was in
17    high school.
18 Q. And someone who is in high school you would expect
19    would have reasonable cognitive ability; correct?
20 A. Not necessarily.
21 Q. So are you saying that because there may be some
22    students who don't have reasonable cognitive
23    ability, that the same standards that you would
24    apply to those students must be applied to
25    students who have reasonable cognitive ability?

Page 107

1  A. No. What I'm saying is my concern here was the
2     ability of the student and the fact that it was a
3     beginner and should have been provided with
4     instruction and was not. That his age was not a
5     factor in that determination.
6  Q. All right. Now, in your opinion you have listed
7     four ways that Mr. Millard and Mr. Atkins and
8     Northfield Mount Hermon deviated from the standard
9     of care. One is, "Inadequate supervisory training
10    for the chaperones"; correct?
11 A. Correct.
12 Q. The second one is, "Inadequate supervision of
13    students"; correct?
14 A. Correct.
15 Q. But you've really said to us that on that one you
16    really don't have enough information to figure
17    that out; correct?
18    MR. GLUCK: Objection.
19 A. That's not correct. If there had been adequate
20    supervision, the chances of Yukio being on the
21    intermediate hill are slim.
22 Q. So you are offering the opinion having never
23    skied, having never been a ski instructor, having
24    never worked at a ski resort, that if there had
25    been adequate supervision, there is a slim chance

Page 108

1     that Yukio Kusada, an eighteen-year-old, would be
2     on any slope other than a beginner slope; that's
3     your opinion?
4  A. This would be the appropriate thing to expect,
5     that he should have been not allowed to go down
6     any slope but the beginner until his ability was
7     assessed by an expert to make the determination
8     that he could go to another slope.
9  Q. But it is your opinion that the chances that he
10    would be allowed on a slope other than a beginner
11    slope if there had been adequate supervision were
12    slim; is that correct?
13 A. That's correct.
14    MR. GLUCK: Be allowed by whom?
15    MR. POTTER: Anybody.
16    MR. GLUCK: Oh.
17    MR. POTTER: Including the school, including
18    the people at the ski area.
19    MR. GLUCK: I think her opinion is she has
20    testified it's -- her opinion is specifically
21    targeted toward Millard, Atkins and the school,
22    not Berkshire East.
23    MR. POTTER: No, and I understand that.
24    MR. GLUCK: Okay.
25    MR. POTTER: She's saying that the chances

**Page 109**

1  that that would occur at a ski area running a
2  program like this with an eighteen-year-old.
3      MR. GLUCK: But you used the word "allowed,"
4  and I just wanted to be clear about who was doing
5  the allowing here.
6      MR. POTTER: And we can get philosophical here
7  but I won't.
8      MR. GLUCK: We can do it in the car.
9      MR. POTTER: No, I'll do it in the courtroom.
10     MR. GLUCK: That's fine.
11     MR. POTTER: I don't want to waste your time
12  here. I'm not here to argue. Just here to find
13  out.
14 QUESTIONS CONTINUING BY MR. POTTER:
15 Q. You have also indicated, "Inadequate instruction,
16  feedback and continuous evaluation of the
17  performance of the students." Is it your opinion
18  that on every single occasion that they went to
19  the mountain during the 2003-2004 ski program,
20  each student needed to be assessed individually,
21  is that your opinion?
22 A. State that again because --
23 Q. Okay. Is it your opinion that during the
24  2003-2004 Northfield Mount Hermon recreational ski
25  program, every student in that program needed to

**Page 110**

1  be assessed on every occasion that they went to
2  the mountain in January and February of 2004; so,
3  in other words, they had to be assessed when they
4  first went there, they had to be assessed the
5  second time, assessed again on the third time and
6  so on, is that your opinion?
7 A. They would not have had to have been -- every
8  student to have been assessed every time that they
9  went to the mountain. It would depend on their
10  abilities and what they demonstrated as to whether
11  or not they needed to be continually assessed
12  before they actually took the chairlift up the
13  mountain to ski down each particular night.
14 Q. So that some of students might have progressed to
15  a point where they no longer needed to be
16  assessed; is that correct?
17 A. That would be correct.
18 Q. And, in fact, some of the students might have
19  started at a point where they no longer needed to
20  be assessed; is that correct?
21 A. That's correct, but the only way that that was
22  known is they ask the students, and there was
23  never any assessment in this particular case done
24  of their abilities or someone who was an expert
25  actually watched them ski to know whether or not

**Page 111**

1  their own personal assessment was correct.
2 Q. And then you say, "Inadequate creation of and
3  implementation of rules requiring use of
4  appropriate safety equipment." And if I
5  understand you correctly, that would have been
6  satisfied if they had required each student to
7  wear a helmet, number one; and, number two, if
8  they had required each student to get their skis
9  from Berkshire East; is that correct?
10 A. No.
11 Q. Okay. How am I incorrect?
12 A. They did not have to get their skis from Berkshire
13  East. They could have brought their own had they
14  been checked to make sure that they were
15  appropriate for their ability level and for them
16  in terms of size, poles, the right length, things
17  of that sort, but whatever the experts know in
18  terms of the ski piece, but that they were -- the
19  proper equipment for that particular student to be
20  using. And there's another piece here in terms of
21  the rules, and that is that they were actually
22  enforced.
23 Q. So you have to have the rules and you have to
24  enforce the rules; correct?
25 A. Correct.

**Page 112**

1 Q. But those are the two rules basically related to
2  equipment -- to the helmet and to the other ski
3  equipment?
4 A. In terms of equipment.
5 Q. Yeah.
6 A. Yes, but there are other issues with safety but
7  that's the equipment issue.
8 Q. But appropriate -- well, you're saying appropriate
9  safety equipment, is there other safety equipment
10  they should have had?
11 A. No.
12 Q. I was confused there. Are there any other
13  opinions that you have other than those four,
14  having reviewed this case?
15 A. Specifically what it's saying there is that had --
16     MR. GLUCK: That's a yes or no, were there any
17  other opinions.
18 A. No.
19     MR. POTTER: Let me just take a minute and
20  look at this.
21 Q. Now on the next page you make a statement,
22  "Students would be taught that if they were having
23  trouble with their equipment that they should seek
24  assistance from a supervisor or mountain staff."
25  Do students need to be taught that?

Case 3:05-cv-30043-MAP    Document 43-15    Filed 11/27/2006    Page 11 of 20

Kusada v. Berkshire East, et al.    Condenselt!    10/11/06    MARILYN BUCK, ED.D.

Page 113

1 A. It's my experience that, yes, they do, depending
2   upon their ability level. Sometimes they don't
3   know if it's because of the equipment or if it's
4   because of their own abilities as a skier as to
5   what's causing the difficulty.
6 Q. You say here "having trouble with their
7   equipment," so you've characterized it as trouble
8   with their equipment, not as we don't know what
9   the trouble is, I'm just having trouble. "Trouble
10  with their equipment." Are you saying that an
11  eighteen-year- old who is having trouble with his
12  equipment needs to be told to bring that to the
13  attention of the ski staff or the mountain
14  personnel?
15      MR. GLUCK: Are you talking about in the
16  context of the physical education class, Harry, is
17  that right?
18 Q. Yes.
19 A. In the context of the physical education program,
20  yes. There should be someone who is there to help
21  them with their equipment.
22 Q. No, not to help them.
23 A. They should be taught -- they should be taught --
24 Q. They should be taught to tell somebody at the
25  mountain or in the program that they are having

Page 114

1   trouble with their equipment, even though they're
2   eighteen years of age; is that correct?
3 A. That's correct. It's not a given.
4 Q. Okay. Now in the next paragraph you say,
5   "Specifically, no one provided any guidance to
6   Mr. Kusada about what skis he should use or not
7   use when taking part in the ski course." Now,
8   where do you get that?
9 A. Again, according to the depositions, there was no
10  training provided of any kind whatsoever, in which
11  case whether he had the proper equipment or did
12  not have the proper equipment was never -- he was
13  never taught that particular piece of information,
14  nor did anyone check to give him feedback as to
15  whether or not he had the appropriate equipment or
16  not.
17 Q. So are you saying that as part of the course,
18  before they should allow anybody to go skiing,
19  that they should provide each student with
20  instruction about what types of skis to buy, what
21  length of skis to buy, what camber of skis to buy
22  and so on, all of the kinds of things that you
23  would normally look at in determining what ski you
24  want to buy?
25 A. They should as a part of instruction be taught

Page 115

1   about the differences in equipment. And the
2   detail would depend upon the level of ability that
3   they have and the kinds of things that they are
4   going to be doing in terms of their skiing.
5 Q. So, once again, before they should be allowed to
6   go skiing, they need to be given instruction on
7   the different types of equipment that is available
8   for skiers?
9 A. Yes.
10 Q. You indicate, "None of the chaperones conveyed any
11  information to Yukio Kusada...." You actually
12  have it "Kudada," but it's Kusada.
13      MR. GLUCK: Where are you, Harry?
14 Q. Oh, I'm sorry. I'm on the last page of her
15  written opinion. "...in the nature of ski
16  instruction, terrain selection, or equipment
17  selection." Where did you get that?
18 A. My understanding from -- as I read the
19  depositions, that there was no ski instruction
20  provided, and that they made -- that other than at
21  the orientation meeting that they were given, that
22  the chaperones, this was not their responsibility,
23  and they did -- did, in fact, not to do it -- did
24  not do that.
25 Q. So that none of the chaperones gave any ski

Page 116

1   instructions, is that your memory of the facts as
2   you read the depositions?
3 A. That's my memory of the facts as I read the
4   depositions.
5 Q. All right. And none of the chaperones gave
6   anybody any information about terrain selection,
7   is that your memory as you read the depositions?
8      MR. GLUCK: I think this is particular to
9   Yukio Kusada. She's not talking about anybody.
10  That's what you said information to Yukio Kusada.
11 Q. All right. To Yukio Kusada, and you're saying
12  that in their depositions they said they did not
13  give any information to Yukio Kusada in the nature
14  of ski instruction, did they say that?
15 A. What -- the only information that was listed, and
16  Yuki mentioned this in his deposition, that they
17  would talk to them about the weather and whether
18  or not things were icy, and those were the kinds
19  of -- but nothing that specifically said anything
20  about what they were to do in those cases, other
21  than dress warm.
22 Q. But you're saying that you read the depositions to
23  say that none of the chaperones conveyed any
24  information to Yukio Kusada in the nature of ski
25  instruction, and I'm just asking you, is that what

Page 117

1   was said in the depositions?
2 A. That's as I remember it.
3 Q. All right. And that none of the chaperones
4   conveyed any information to Yukio Kusada in the
5   nature of terrain selection, is that your memory?
6 A. That's my memory.
7 Q. And that none of the chaperones conveyed any
8   information to Yukio Kusada in the nature of
9   equipment selection, is that your memory?
10 A. That's my memory.
11 Q. Now you have listed a lot of articles that you've
12   written or authored or participated in. And they
13   appear on pages 7 through 21. And what I would
14   like to know is that whether you've ever written
15   any article concerning the sport of skiing in any
16   way?
17 A. Sport of skiing, no.
18 Q. I would like to also know looking through those
19   articles whether you would say that any of those
20   articles that you have listed have any relevance
21   to your testimony in this case?
22 A. The question I guess is in the terms of the
23   publications and if I used the term publications
24   rather than articles, there is.
25 Q. Okay. Well, start with publications and then I'll

Page 118

1   go to articles, okay, yes.
2 A. Well, there is a textbook that I have been a part
3   of that's in the -- I believe it's the third
4   edition that I've had a role in part in doing some
5   of the writing which deals with --
6 Q. Could you look at Exhibit A and tell me which one
7   you're talking about, which publication?
8 A. The publications aren't in Exhibit A.
9 Q. Oh, I think they are.
10 A. Are they back -- excuse me. I'm sorry.
11 Q. Yes.
12 A. I didn't realize they were back here.
13 Q. They are back there and I start on page 7.
14 A. Gotcha.
15 Q. And we go to page 21. And if there are
16   publications that you participated in that have
17   some relevance to this case, I'd like you to
18   identify them for me.
19 A. On page 7.
20 Q. Yeah.
21 A. The Buck and Lund which is listed "In Press" and
22   since that time it's actually come out,
23   "Instructional Strategies for Secondary School
24   Physical Education."
25 Q. So that one has some relevance, okay.

Page 119

1 A. And there are two previous editions, I believe,
2   that will show up in terms of the one at the very
3   bottom of that page is the fifth edition.
4 Q. Okay.
5 A. And on page 8 I think is where I saw the other
6   one. I think I saw it. Yes. Kind of in the
7   middle of the page. Only at that point, as it is
8   in the bottom of the page, the lead author was
9   Harrison.
10 Q. Okay. I'm going to take a quick break. Could you
11   look through that because I want to ask you about
12   any articles that have any relevance to what you
13   think your testimony is in this case so that I can
14   identify them.
15 A. Okay.
16   (A recess is taken, after which the following
17   proceedings are had:)
18 A. Can I ask your definition of relevance so I kind
19   of know what level you're looking at.
20 Q. Well, any of the publications or articles that
21   would support in any way the opinions that you've
22   rendered in this case in your opinion?
23 A. Okay. Other than the textbook, I don't believe
24   that there's anything that directly relates to
25   this -- to my opinions in this case.

Page 120

1 Q. I always get a little concerned with somebody says
2   "directly." And I'm not trying to be tricky here.
3   I'm just trying to find out whether there, in your
4   opinion, is anything else in there that would
5   support your opinions, so that I can take a look
6   at it rather than reading all of these.
7 A. And I assumed that that was partly why you were
8   asking the question.
9 Q. Sure.
10 A. And I can't think -- I was trying to think through
11   the content of each of them beyond the initial
12   title and what they were focused on as to whether
13   there were anything in there that dealt directly
14   with supervision, dealt directly with appropriate
15   instruction and assessment. And a lot of them
16   refer to some research that deals with trials that
17   I don't believe has any connection with what we're
18   talking about here.
19 Q. So you say then that the publication
20   "Instructional Strategies For Secondary School
21   Physical Education" and its prior editions are the
22   ones that you would single out for that purpose?
23 A. Yeah, and they're major works, yes.
24 Q. They're major works, okay. And what about going
25   to Abstracts, is there anything there?

Page 121

1 A. Not in the Abstracts.
2 Q. Okay. And what's the next section, the Creative
3   Endeavors?
4 A. No.
5 Q. On page 12?
6 A. No.
7 Q. The Published Communications on page 12?
8 A. No.
9 Q. The Professional Papers and Presentations starting
10   on page 13?
11 A. Have to find that. There's a couple of
12   presentations I have made that deal with risk
13   management kinds of issues but it's a matter of
14   trying to -- finding where they are. Page 15.
15 Q. Page 15.
16 A. Third one down.
17 Q. No. 3, "Liability in Coaching"?
18 A. Mm-hmm.
19 Q. Okay.
20 A. And on that page the third from the bottom.
21 Q. "Liability Issues in Physical Education:
22   Implications of Court Decisions On Teaching."
23 A. Page 16.
24 Q. Yep.
25 A. Third one down.

Page 122

1 Q. Yep. That's "Legal Liability Issues in Physical
2   Education"?
3 A. Page 19, third one down.
4 Q. "Safe Practices in Physical Education"?
5 A. Mm-hmm.
6 Q. Okay.
7 A. That's it, I believe.
8 Q. Okay. And just in a general way, could you tell
9   me, Dr. Buck, how the "Instructional Strategies
10   for Secondary School Physical Education" has some
11   relevance to the case, just in a general way?
12 A. In a general -- well, for one, there is a chapter
13   that's called "Physical Education and the Law."
14 Q. "Physical Education and the Law"?
15 A. And the law.
16 Q. Okay.
17 A. And discusses many of the concepts that are
18   included, and I did author that particular
19   chapter.
20 Q. Okay.
21 A. In each edition about half of the chapters I
22   authored. That was one of them.
23 Q. Okay.
24 A. And then there are other chapters that deal
25   specifically with appropriate physical education.

Page 123

1 Q. All right. And so that would be true of the
2   instructional strategies and all of those things.
3 A. Yes.
4 Q. And if we turn to, let's see what page we're on.
5   Page 15, "Liability in Coaching." Just in a
6   general way what relevance does that have, if you
7   recall?
8 A. In each of those presentations I talk about pretty
9   much very similar to what's in the chapter on law
10   in the textbook but talking about the
11   requirements, the expectations for supervision,
12   the requirements and expectations for instruction.
13 Q. And so that would also be true of the article on
14   page 16, "Legal Liability Issues in Physical
15   Education"?
16 A. Correct.
17 Q. And also page 19, "Legal Liability Issues";
18   correct?
19 A. Correct.
20   MR. POTTER: I have only one additional
21   request and that is, and we'll take this up later,
22   but I'm requesting of you on the record that you
23   provide me a copy of your notes, and I'll talk to
24   you, Ron, about it because I think I'm entitled to
25   it under the rules, so keep the notes. Do not

Page 124

1 destroy them and we'll deal with it, okay?
2   MR. GLUCK: We'll talk about that, sure.
3   MR. POTTER: And I'm finished.
4   MR. GLUCK: I have nothing. Thank you.
5
6   FURTHER THE DEPONENT SAITH NOT.
7
8   _____
9   MARILYN MARGARET BUCK, ED.D.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 125

STATE OF INDIANA     )
                     ) SS.
COUNTY OF DELAWARE)

CERTIFICATE OF COURT REPORTER

I, Mary Beth Schafer, the undersigned Court Reporter and Notary Public, residing and maintaining offices in the City of Muncie, County of Delaware, State of Indiana, do hereby certify:

That at the time and place described in this transcript, the deponent, MARILYN BUCK, presented herself before me for administration of an oath of truthfulness, which oath I then administered;

That I then reported to the best of my ability in machine shorthand all of the words spoken by all parties in attendance during the course of the ensuing proceedings, including objections, if any, made by all counsel present;

That I later reduced my stenographic notes into the foregoing typewritten transcript form, which typewritten transcript is a true record of the testimony given by this witness as stated above;

I do further certify that I am a disinterested person in this cause of action; that I am not a relative or attorney or employee of any of the parties, that I am not a relative of an employee of such attorney or counsel, and that I am not financially interested in this action.

IN WITNESS HERETO, I have affixed my Notarial Seal and subscribed my signature below this _____ day of _____, 2006.

_____
Mary Beth Schafer, Notary Public

County of Residence: Delaware
My Commission Expires: April 11, 2007


DEFENDANT'S
EXHIBIT
A
10-11-06



B A L L   S T A T E
U N I V E R S I T Y

COLLEGE OF APPLIED SCIENCES AND TECHNOLOGY                    Muncie, Indiana 47306-0245
                                                             Phone: 765-285-5818
                                                             Fax: 765-285-1071

March 31, 2006

Ronald E. Gluck
Attorney at Law
Breakstone, White-Lief & Gluck, P. C.
Two Center Plaza
Suite 530
Boston, MA 02108-1906

RE:   =   Yukio Kusada

Dear Mr. Gluck:

At your request, I have reviewed discovery information to perform an objective assessment of the standard of care and deviation, if any, from the standard of care in connection with the athletic department at Northfield Mount Herman School and, specifically, Frank Millard and Michael Atkins in connection with the skiing incident involving Yukio Kusada on February 20, 2004 at Berkshire East.

In connection with my assignment, I have reviewed deposition transcripts of the following individuals:

1.    Frank Millard

2.    Michael Atkins

3.    Richard Eisenberg

4.    Audra Forstrum

5.    Susan Clough

6.    Yuki Hasaegawa

7.    Yukio Kusada

8.    John Herrick

In addition, I have reviewed documents from Northfield Mount Herman School from students who participated in the physical education course known as the recreational ski program at Northfield Mount Herman School in the year 2003 – 2004.

## FACTS

During his senior year at Northfield Mount Herman School, Yukio Kusada registered for the physical education course known as the Recreational Ski Program. He informed the school that he was a beginner skier and desired to take ski lessons. Northfield Mount Herman School recommended that students participating in the physical education class wear a helmet, but did not require that they do so. Northfield Mount Herman School notified the students that they were to obtain ski equipment, including skis, poles and boots, on their own. Mr. Kusada borrowed his skis from a student, Samuel Wilson. They were Atomic SX11 skis, which I understand are designed for an advanced skier. Prior to taking part in the 2003 - 2004 ski course at Northfield Mount Herman School, Yukio Kusada had never skied. No one from the administration of Northfield Mount Herman School was aware of what kind of skis and equipment Yukio Kusada was using throughout the ski course. Prior to the evening of February 20, 2004, no one from the administration and/or the athletic department at Northfield Mount Herman School knew whether or not Yukio Kusada used a helmet while participating in the ski course. On or before February 20, 2004, Yukio Kusada received no instruction on skiing from any representative, faculty member or administrative individual at Northfield Mount Herman School. Yukio Kusada received no ski lessons at Berkshire East on or before February 20, 2004.

Michael Atkins was the coordinator of the ski course, and Frank Millard was his supervisor in 2003 and 2004. Mr. Atkins had daily responsibility for the skiing program. Mr. Millard had secured the contract with Berkshire East and had been involved with the program for many years. Mr. Atkins and Mr. Millard stated no instruction was provided by the school and was not necessary because this was a recreational ski program. Neither provided active supervision at the program site, Berkshire East.

The chaperones, Richard Eisenberg, Audra Forstrum, and Susan Clough, were assigned to chaperone the ski program for which students received course credit. None of the chaperones were provided any ski training as supervisors, nor were any of them trained as physical educators. I am not aware if any of them received formal training as coaches within their degree programs or by other means. They were told that the duties of a chaperone included taking

attendance while boarding the buses at the school and when returning from the mountain; controlling behavior on the bus; maintaining one chaperone in the lodge at all times so that students did not take too long a break; watching to make sure rules were observed; and driving injured students to the hospital as indicated by the staff at Berkshire East.

As stated earlier, helmets were recommended, but not required to be worn by students. The reason provided for not requiring helmets was that the requirement could not be enforced.

Skiing instruction was expected to be provided for students who requested it, but for some reason it did not occur for this group. Ms. Forstrum, the head chaperone, did not know why lessons were unavailable. She did not report any problem with the lesson unavailability to any of her supervisors of the ski program. Neither Mr. Millard nor Mr. Atkins inquired of the chaperones if lessons were taking place or how they were progressing.

On February 20, 2004 Mr. Kusada had been skiing with a student, Yuki Hasegawa and went down an intermediate trail in contrast to his beginner level of ability. When Mr. Hasegawa did not see him at the end of the run, the friend provided this information to one of the chaperones who dismissed the information, indicating that this type of information was provided all the time. It was determined when buses were loading to go back to the school at approximately 9:45 p.m. that Mr. Kusada was missing. It is my understanding that Mr. Kusada was found near a tree in an unconscious state at approximately 4:00 a.m.

## STANDARD OF CARE

The standard of care for physical education teachers requires the individuals to provide effective supervision, appropriate and well-conducted activities and safe and appropriate environmental conditions. Supervision is defined as the quality and quantity of control exerted by teachers or coaches over the individuals for whom they are responsible. The supervisors must be trained and demonstrate the skills necessary to fulfill the duties assigned. The amount of supervision required depends upon the participant's age and skill level, the activity, the risk associated with the activity and their ability to understand and appreciate the risks and consequences of their own actions. These risks must be explained to the student who must demonstrate knowledge of the risks before engaging in the activity.

Supervision guidelines require the supervisors to move about the area to maximize contact with the participants and to keep the activities within the ability level of the individual students It is not required that students be insight at all times.  The activity, capacity and experience of the student and the number of participants in the class dictate the level of supervision required. With each of these guidelines, staff training is critical for the supervisors to have the appropriate supervisory skills.

Students should expect that every effort has been made to provide a safe environment.  This includes the requiring of safety equipment as indicated by the activity in which the student is participating.  It also includes the school providing appropriate and safe equipment for the level of ability that the student possesses in the particular event. The age, skill, experience and level of play will play a role in determining the level of risk and the type and amount of safety equipment needed.  Failure to use protective measures within a program of instructional competition would constitute a violation of proper professional procedure.

Teachers are to select activities that are reasonable for the ability levels of the individuals involved.  In addition to selecting appropriate activities, the teacher is expected to provide instruction that is both accurate in its detail and is presented in a manner that maximizes the likelihood of the participant's success.  This instruction should include not only information regarding the techniques for successful performance, but warnings regarding any potentially hazardous element of the activity and specific guidelines for minimizing these risks.

To be effective, instruction must be augmented by accurate and detailed feedback.  The simple act of telling a person how to perform a particular skill in no way guarantees success.

In the area of environmental conditions, the student must be provided with equipment equal to the individual's skill level.  Equipment requiring a skill level beyond that of the individual in question would be a violation of the above-stated standard.

In summary, the standard of care for a physical education program at a school requires that the activities to be selected are at a level appropriate to the student's skill level.  In addition, instruction with feedback and continuous evaluation should be provided, the amount determined by the skill level of the individual.  Further, the equipment should be appropriate to the skill level of the individual who is using it, and protective equipment should be required whenever available, especially in situations of increased risk of injury. In

addition, supervision should be provided by individuals who have been trained to perform the specific supervisory role and who have received ongoing staff development. Individuals should not be allowed to participate in an activity at a level at which the individual has not demonstrated the ability to safely perform the activity. This requires demonstration of competency by the student to individuals with expertise in instruction and supervision in the activity in question.

## OPINION

It is my opinion with a reasonable degree of educational expertise and scientific certainty that the following deviations from the standard of care occurred in this matter:

1.    Inadequate supervisory training for the chaperones;

2.    Inadequate supervision of the students;

3.    Inadequate instruction, feedback and continuous evaluation of performance of the students; and

4.    Inadequate creation of and implementation of rules requiring use of appropriate safety equipment.

Skiing is a sport in which the risk of injury is very real. To minimize the risk of injury, within the context of a physical education class, instruction is mandatory. Asking the students to self-report skiing ability is an appropriate beginning to determine ability level of all students. After that, a skill assessment should have been completed by individuals competent to make this determination. Those individuals determined to need instruction to begin skiing should have been required to receive instruction prior to ever beginning any skiing. It should have begun on the first day and continued throughout the program to check on progress. This would have met the standard for feedback and evaluation of performance. Another aspect of instruction that should have occurred was to provide each student with a list of safety rules and expectations of the orientation session and they should have been reminded often of those rules. Mr. Millard stated that it was the students' responsibility to get a lesson if they wanted one. The standard of care required teachers to be sure that it was provided. Through instruction, students will be taught proper terrain selection so that they are informed of the risks of skiing on terrain which is beyond their ability. Students would be taught how to properly stop and turn on their equipment. Students would be taught about the importance of using

skis which are appropriate for their level of ability. Students would be taught that if they were having trouble with their equipment that they should seek assistance from a supervisor or mountain staff. Failure to provide instruction is a deviation from the standard of care for physical education programs in general and specifically for the physical education course in which Mr. Kusada was enrolled, which was administered by Michael Atkins and Frank Millard. Deposition testimony revealed that instruction was required in all of the other physical education courses offered by Northfield Mount Herman School in 2003 and 2004. The only exception to this rule was the ski course.

Northfield Mount Herman School, Frank Millard and Michael Atkins also deviated from the standard of care of requiring appropriate safety equipment. Specifically, no one provided any guidance to Mr. Kusada about what skis he should use or not use when taking part in the ski course. It is well known in the ski industry, that equipment is specifically designed for various levels of ability. The standard of care required that Mr. Kusada receive guidance on the selection of the skis and that the physical education instructors and/or supervisors be aware of the equipment that he was using to minimize the risk of injury.

Further, the standard of care required that Mr. Kusada be required to wear a helmet. Due to the risk of head injury in skiing helmets were available at the time of this incident which were intended to minimize the risk of head injury. In the context of a physical education program at a school the standard of care required that the students be taught about helmet use and that they be required to use helmets to minimize the risk of injury. The explanation given for not requiring a helmet was that this requirement could not be enforced. There are measures available to enforce rules such as this. As an example, a rule could have been implemented stating that if a student was found on the mountain without a helmet, they would be removed from the ski class that day, and for a second violation they would be expelled from the class for which they were receiving credit. This type of deterrent is effective in physical education programs. Supervisors and chaperones should be on the mountain, skiing and/or stationed at the top or bottom of the lift to make sure that students were wearing helmets and to make sure that they were not having difficulties while on the mountain. These methods should have been employed to ensure student compliance with rules concerning helmet use. If three chaperones were an inadequate amount to supervise the number of students skiing, then additional chaperones should have been employed to make supervision effective.

The physical education program at Northfield Mount Herman School and Frank Millard and Michael Atkins also deviated from the standard of care requiring appropriate supervisory training for the chaperones. Mr. Eisenberg, Ms. Forstrum and Ms. Clough received no training in actual ski instruction, in

Page 73

1  than the number of individuals who were involved
2  in the Northfield Mount Hermon program?
3  A. Without doing a complete assessment of it, I can't
4    respond one way or the other.
5  Q. Would it be fair to say that you would have to
6    hire people with greater qualifications than the
7    people who were involved in the program?
8  A. The individuals either had to have prior
9    qualifications or be trained.
10 Q. And when you say "be trained," be trained by whom?
11 A. Mr. Millard or Mr. Atkins could have provided the
12   instruction that they needed in terms of what it
13   meant to supervise the situation in terms of the
14   skis and that particular equipment if they did not
15   have -- if no one at the school had that
16   particular knowledge, then it would be -- they
17   would need to be asking the assistance of
18   Berkshire East to help them with that aspect of
19   the program.
20 Q. And assuming, once again, that we've got over 50
21   students in the program, do you have any idea of
22   what the cost of implementing that would be?
23 A. I have no idea what the costs would be because I
24   don't know what kinds of cost that they charge for
25   those types of situations, but it's something

Page 74

1    that's important to provide a safe environment for
2    these students. That's the ultimate piece that's
3    of concern. If you're going to run the program,
4    it has to be one where you can provide the safest
5    possible environment for everyone.
6  Q. So at least it would be your opinion that when it
7    comes to setting up a program like the one at
8    Northfield Mount Hermon, there is never a
9    balancing of cost with what you provide at least
10   as it relates to safety; is that correct?
11 A. That would be correct.
12 Q. So that you do whatever you have to do to provide
13   a safe environment regardless of the cost;
14   correct?
15 A. If not, you should not run the program.
16 Q. And based upon your training and experience and
17   your review of the record in this case, then is it
18   your opinion that Northfield Mount Hermon School
19   should not have had this program if it was going
20   to run it in this way?
21 A. That would be correct.
22 Q. Now is it your opinion, and I ask you to assume
23   for a minute that Yukio Kusada was eighteen years
24   old and reasonably intelligent, I think Mr. Gluck
25   would agree with that, that Mr. Kusada was not

Page 75

1    capable of making decisions about whether or not
2    he should wear a helmet?
3  A. My concern is not so much his age as his ability
4    level, and that's the more important issue at this
5    point is where his ability level was.
6  Q. And what you're saying is because he was a
7    beginner, he was not capable of making a decision
8    about whether or not to wear a helmet; is that
9    correct?
10 A. He should not have been allowed to make that
11   decision.
12 Q. Okay. And because he was a beginner, he should
13   not have been allowed to make the decision about
14   whether or not to take lessons; correct?
15 A. That's correct. He should have been required as a
16   beginner to take lessons.
17 Q. And because he was a beginner, even though he was
18   eighteen years old, he should not have been
19   allowed to select his own equipment; is that
20   correct?
21 A. Without someone reviewing to make a determination
22   of whether or not it was appropriate, that would
23   be correct.
24 Q. And, of course, following up on that, once he had
25   skied several times, you would say that each time

Page 76

1    the school or Berkshire East or somebody should
2    have checked his equipment; is that correct?
3  A. Yes.
4  Q. And that he as an eighteen-year-old was not
5    responsible enough to do that for himself; is that
6    correct?
7  A. As a beginner, he was not responsible to make
8    those kinds of decisions. If he chose to bring
9    different equipment, it should be checked.
10 Q. And are you saying that Mr. Kusada as an
11   eighteen-year-old was not responsible enough to go
12   to Berkshire East to get his equipment from the
13   rental office?
14 A. As a beginner. And from what Mr. Herrick had
15   indicated in his deposition, if they had gone to
16   the rental office, they would have assured that he
17   got the appropriate equipment.
18 Q. What I'm asking you is, are you saying that
19   Mr. Kusada not responsible enough as an
20   eighteen-year-old to go to the rental office to
21   get his equipment?
22 A. As a beginner, he was not responsible enough to
23   make a decision as to what equipment he used.
24 Q. Or as to where he should go to get his equipment;
25   is that correct?

Case 3:05-cv-30043-MAP    Document 43-16    Filed 11/27/2006    Page 2 of 20

Kusada v. Berkshire East, et al.    Condenselt!    10/11/06    MARILYN BUCK, ED.D.

Page 77

1 A. If he was not getting it at the rental office,
2    then it should have been checked to make sure that
3    it was appropriate for him, for his ability level.
4 Q. And are you taking it one step further and saying
5    that Northfield Mount Hermon personnel should
6    accompany every beginner who is eighteen years old
7    to the Berkshire East rental office to ensure that
8    they're getting their skis there?
9 A. Be my opinion that if they're getting on the bus,
10    that it would be obvious if they had their own
11    equipment with them or not. And if they're going
12    to ski and if they don't have any equipment with
13    them, then there is no option except to go to the
14    rental office to get it. And given that, in
15    Mr. Herrick's deposition indicating that they
16    would provide proper equipment, then he would be
17    fine.
18    MR. GLUCK: I'm sorry.
19 Q. What about the students in the program who brought
20    their skis from home, were they required to have
21    that equipment checked by somebody?
22    MR. GLUCK: Objection.
23 A. If I'm providing a program for students, again,
24    that's high risk, then the equipment that if I'm
25    not individually providing that equipment, then it

Page 78

1    should all be checked to make sure that those
2    students have safe equipment.
3    MR. GLUCK: I'm sorry. Can I have --
4    MR. POTTER: Go ahead.
5    (A recess is taken, after which the following
6    proceedings are had:)
7    (The prior question and answer are read by the
8    reporter.)
9 Q. Now if you could turn to your opinion on the
10    second page where you have --
11    MR. GLUCK: What page?
12    MR. POTTER: The second page.
13    MR. GLUCK: Under Opinion?
14    MR. POTTER: No, under Facts.
15    MR. GLUCK: Okay.
16 QUESTIONS CONTINUING BY MR. POTTER:
17 Q. You list the facts upon which you relied in
18    forming your opinions; correct?
19 A. That's correct.
20 Q. And did you list all of the facts that were
21    important in forming your opinion?
22 A. I believe that I did. That was my attempt.
23 Q. As you sit here today, are there any facts that
24    you wish to add to the facts that you listed on
25    pages 2 and 36 in your report?

Page 79

1 A. At this point I can't think of anything that I
2    would want to add.
3 Q. Now, you indicate at the end of the first set of
4    facts, "On or before February 20, 2004, Yukio
5    Kusada received no instruction on skiing from any
6    representative, faculty member or administrative
7    individual at Northfield Mount Hermon School."
8    And I take it from that statement that you are
9    limiting that description to somebody who worked
10    for Northfield Mount Hermon School?
11 A. That's correct.
12 Q. And based upon your review, that is an accurate
13    statement; correct?
14 A. Correct.
15 Q. And also you indicate that -- the second line --
16    that, "Yukio Kusada received no ski lessons at
17    Berkshire East on or before February 20, 2004."
18    And you believe based upon your review of the
19    record that that is a factually accurate
20    statement; is that correct?
21 A. From the depositions that were provided, yes.
22 Q. And you in part based your opinion upon those two
23    facts, is that correct, stated in those two
24    sentences?
25 A. Instruction is a critical part of what goes on in

Page 80

1    a physical education program, and so the fact that
2    there was no instruction was important in this
3    situation.
4 Q. Now in the next sentence you refer to Mr. Atkins
5    and Mr. Millard and state that neither provided
6    active supervision at the program site Berkshire
7    East. What do you mean when you say "active
8    supervision"?
9 A. In this case as I remember from their depositions,
10    neither one of them were there at the site, and,
11    therefore, didn't provide any type of supervision.
12    And active is a piece that I defined earlier as
13    being where they were out with the students and
14    involved.
15 Q. And in your opinion Mr. Millard and Mr. Atkins
16    should have been at Berkshire East on each day
17    that the skiing program was going on, is that what
18    you're saying?
19 A. No, they did not have to be there. They needed to
20    have qualified people there.
21 Q. So assuming that they had qualified people there,
22    they did not have to be there; is that correct?
23 A. That is correct.
24 Q. And if they did not have qualified people there,
25    then they had to be there; is that correct?

Page 81

1 A. They should either have been there or provided
2 that there were qualified people to be there and
3 provide training for those that were there and
4 they did neither one of those.
5 Q. Is it your opinion that Mr. Millard had the
6 background and training to actively supervise this
7 program?
8 A. In physical education training generally when
9 someone has a degree in that area that they would,
10 in fact, have an understanding of what was
11 required for active supervision.
12 Q. And so it would be your opinion that the
13 probabilities are that Mr. Millard had those
14 qualifications; correct?
15 A. Probably did.
16 Q. And would it also be -- would you hold the same
17 opinion of Mr. Atkins?
18 A. Since he had a degree in physical education, yes.
19 Q. Okay. Now, in the next sentence you're talking
20 about the chaperones Richard Eisenberg, Audra
21 Forstrum and Susan Clough. And you say, "I'm not
22 aware if any of them received formal training as
23 coaches within their degree programs or by other
24 means." What do you mean when you say "received
25 formal training as coaches," first of all?

Page 82

1 A. There are opportunities at this point and have
2 been for several years for individuals to receive
3 a coaching certification that would require them
4 to actually have some training in a variety of
5 areas. Risk management is one. Instruction in
6 the proper instruction become other areas that are
7 things that they would actually be trained within
8 those particular coaching certification programs.
9 Q. And so if they had participated in one of those
10 coaching certification programs, you would change
11 your opinion; correct?
12 A. I would change -- I would have a belief that they
13 probably had more training in how to actively
14 supervise a physical education or a physical
15 activity setting than what it appears that was
16 true in this case.
17 Q. And "I am not aware if any of them received
18 training," I guess you're saying, "by other
19 means." What do you mean by that?
20 A. There are two ways in which individuals can get a
21 certification. They might pick up a minor in
22 their undergraduate degree program which would be
23 the first piece that I'm referring to in terms of
24 degree programs, or there are opportunities to
25 receive coaching certification through various

Page 83

1 programs that are offered. They can be workshop,
2 conference kind of thing that would result in a
3 coaching certification. There are specific
4 programs, different types that are available that
5 they could take that could result in a coaching
6 certification or some training of some sort in
7 that particular area.
8 Q. So am I correct in concluding that what you're
9 saying is that an essential requirement here of
10 the three chaperones was that they at a minimum
11 have coaching certification, whether they got it
12 through formal training or by other means?
13 A. No.
14 Q. No. Okay. How am I wrong?
15 A. What I'm referring to in this is their
16 qualifications to be supervisors of a physical
17 activity, and there's two fairly acceptable ways
18 that if the people had particular training would
19 assume that they did, in fact, have an
20 understanding of how to supervise in those areas.
21 Being trained as a physical educator would be one,
22 to be trained as a coach would be the second one.
23 And their depositions indicated that they had not
24 been trained in physical education. It was not
25 clear -- no one had specifically asked them about

Page 84

1 their training in the area of coaching, so I had
2 no way to make a judgment in regards to whether or
3 not they had qualifications from that area. It
4 appeared they did not.
5 Q. Okay. And with respect to coaching, refresh my
6 memory once again, how can they get the required
7 certification in coaching as distinguished from
8 taking a physical education program?
9 A. There are programs where they offer a minor in an
10 undergraduate program. There are other programs
11 that have been set up various places to -- that
12 would provide training in coaching a particular
13 area, so they could have gotten them in school or
14 out of school.
15 Q. And am I correct then in assuming that the mere
16 fact that you have been a coach does not mean that
17 you're certified to coach; correct?
18 A. That would be correct, and I believe Ms. Forstrum
19 actually indicated that she taught math, I believe
20 it was, and coached. But the fact that she
21 coached did not necessarily mean that she'd had
22 any training in the area.
23 Q. So the key for you is not experience but training?
24 A. For what we're talking about in this particular
25 situation, yes.

Page 85

1 Q. So the fact that somebody may have had, let's say,
2    years of experience coaching kids, as far as
3    you're concerned would not be significant because
4    they had not had the training?
5 A. There's no way of knowing whether or not they
6    understood the things that are required to
7    supervise a physical activity just because they
8    have been out in the field and not actually had
9    someone who helped them to understand the concepts
10   and things that they ought to be doing.
11 Q. But without evaluating the individual coach, you
12   wouldn't know whether that applied to a particular
13   individual; is that correct?
14 A. That would be an assessment that would have to be
15   made of their particular abilities and knowing
16   some more about the background than what we know
17   in this particular case.
18 Q. So let's take Audra Forstrum for an example. Is
19   it conceivable in your mind that as a coach she
20   rose to the level where she didn't really need
21   training because she already knew it?
22 A. I would not make that assumption at all.
23 Q. I'm not asking you to assume it. I'm saying is it
24   conceivable? Can you do it that way is what I'm
25   saying? Can you do it that way? Can you learn on

Page 86

1    the job or do you have to go through some
2    training?
3 A. I'm not comfortable without people having some
4    formal training from experts.
5 Q. Okay. So you are not a believer in the old coach
6    who learns on the job?
7 A. That's correct.
8    MR. GLUCK: Can I use the restroom?
9    MR. POTTER: Oh, sure. Always can do that.
10   (A recess is taken, after which the following
11   proceedings are had:)
12 Q. Now turning to the next page before we get to the
13   Standard of Care, you say, "Skiing instruction was
14   expected to be provided for students who requested
15   it, but for some reason it did not occur for this
16   group," and, once again, you're basing that
17   factual statement upon the deposition transcripts
18   of Forstrum, Eisenberg and Clough; is that
19   correct?
20 A. The fact that it did not occur, yes. It had been
21   arranged. Mr. Millard and Mr. Atkins had believed
22   that it had been set up.
23 Q. And when you say, "It did not occur," you're
24   saying it did not occur at any time from the
25   beginning of January until February 20, 2004; is

Page 87

1    that correct?
2 A. That's my understanding from what they've stated
3    in their depositions.
4 Q. You said here that, "She," and that's
5    Ms. Forstrum, "did not report any problem with the
6    lesson unavailability to any of her supervisors of
7    the ski program." Did her failure to report that
8    fall below the standard of care?
9 A. It's a situation where she should have provided
10   that information. If it was her understanding
11   that lessons were to be provided, she should have
12   been reporting to her supervisor that they were
13   not provided because instruction is important
14   here, and it gets back to the training that was
15   provided by Mr. Millard and Mr. Atkins to their
16   chaperones. That should have been part of the
17   pieces that they were expected to have known to
18   make sure occurred and did not.
19 Q. And so are you saying that someone Audra
20   Forstrum's age needs to be taught to call their
21   supervisor if a part of the program that they
22   understood was to be set up was, in fact, not set
23   up?
24 A. There should have been some procedures outlined
25   that took place and this was one of the situations

Page 88

1    that was there.
2 Q. And the procedure should have been that Mr.
3    Millard or Mr. Atkins should have put in writing
4    to Audra Forstrum that in the event the lessons
5    are not available, you are to report that to me
6    immediately, is that what you're saying?
7 A. No.
8 Q. What are you saying?
9 A. I'm not suggesting it has to be in writing, but it
10   should be part of the discussions that take place
11   within those two. It's better if it's in writing
12   because then they can prove that, in fact, the
13   information was provided, but it would not have to
14   be put into a writing piece.
15 Q. So if they'd said it orally to her, then they
16   would have discharged their responsibility;
17   correct?
18 A. No, because they should have also asked her the
19   same thing as they came back to find out if
20   everything had been followed through as they had
21   set it up and indicated it was there; did the
22   lessons take place and asking questions about what
23   happened within the program.
24 Q. But I'm not getting to that point. I'm still at
25   the point where Audra Forstrum knows that lessons

Page 89

1  haven't been provided and the supervisors do not
2  know that lessons haven't been provided and the
3  communication hasn't come back to Mr. Atkins or
4  Mr. Millard. I'm not -- I haven't gone beyond
5  that. And at that point, was it -- are you saying
6  that Mr. Millard or Mr. Atkins had to provide
7  either written or oral instructions to Audra
8  Forstrum to let them know if the lessons which
9  were arranged were not being provided?
10 A. That should be one of the things that they
11    would -- that she would have reported back to them
12    after this -- the program got started.
13 Q. You're saying that she would have or should have
14    reported back to them. What I'm asking is: Did
15    they fall below the standard of care because they
16    did not tell her either in writing or orally that
17    that was one of her duties?
18 A. They fell below the standard of care because they
19    did not make sure that the instruction was taking
20    place, and one of the ways they could have done
21    that would have been to have -- have asked her to
22    report on how that would had occurred. They did
23    not follow up.
24 Q. So it all has to do with the follow-up and not the
25    initial instruction; in other words, if they

Page 90

1  hadn't said anything, but they called her and
2  asked her whether or not the instruction had taken
3  place, they would have discharged their duties; is
4  that correct?
5 A. It was their duty to make sure that instruction
6    was provided; that was their duty, and it didn't
7    occur, so they needed to have done things that
8    would have made sure that it occurred.
9 Q. And those things didn't necessarily have to be
10    telling her in advance as long as they followed
11    up; is that correct?
12 A. There should have been some information provided
13    for her in her training that indicated what the
14    expectations were about what was going to happen
15    there, and that instruction was part of it and
16    specifics about who had arranged it, not just that
17    students if they wanted it were to show up at a
18    particular place.
19 Q. But are you saying that Audra Forstrum did not
20    know that lessons were supposed to be available?
21 A. From the depositions, my understanding is that she
22    knew that they were available, but there was
23    nothing more that was done with it in terms of
24    giving her any specifics about with whom
25    arrangements had been made and what was -- how

Page 91

1  they were supposed to have occurred.
2 Q. And you're saying, if I understand it, that Frank
3    Millard and Michael Atkins are responsible for the
4    fact that Audra Forstrum didn't have the common
5    sense to call them; is that correct?
6 A. No, I would not put it that way.
7 Q. Isn't it common sense if something doesn't happen
8    in a program to speak to your supervisor?
9        MR. GLUCK: Objection.
10 Q. Wouldn't you say that's common sense for any
11    teacher?
12 A. There's a lot of factors that would indicate
13    whether they would do that or not do that, and I
14    cannot make that particular judgment as to whether
15    or not she would have known that she should have
16    done that or not.
17 Q. So that a person who's been a teacher and a coach
18    and a college graduate, in your mind cannot be
19    relied upon to let his or her supervisor know when
20    something doesn't take place in that program that
21    the supervisor is supervising; is that correct?
22 A. The piece that we don't know is whether, at least
23    I have not read in any of the depositions, is how
24    much information she was provided other than
25    saying the lessons are available, and -- she

Page 92

1  needed to know more than that in terms of the
2  specific arrangements, and I don't know if she was
3  given that or not.
4 Q. Well, do you know that Audra Forstrum had been a
5    chaperone the prior year and that she had worked
6    with Frank Borland who was a long-time chaperone?
7 A. My understanding was that -- from her deposition
8    was that she had worked with the program the year
9    before but not as the head chaperone.
10 Q. And is it your understanding that lessons were
11    available the prior year?
12 A. If I remember correctly, it was indicated that in,
13    I believe it was '03 -- or '93 and '94 that they
14    had, somewhere around that time period, that there
15    had been lessons that were required at one point,
16    and that Mr. Millard made the decision not to
17    require them after that point in time, so -- but
18    that they would be available.
19 Q. So am I correct that Audra Forstrum understood,
20    based on what you have read, that lessons were
21    available during the 2002-2003 year?
22 A. It's my understanding the circumstances were the
23    same the way the program was set up in those two
24    years.
25 Q. And so we have a person who worked in the program

Page 93

1    the prior year who knew that lessons were
2    available, that lessons were taken?
3  A. We don't know that.
4  Q. Okay. But if you knew that she knew that lessons
5    were taken the prior year, not just available but
6    taken the prior year, is it your opinion that she
7    had no responsibility without instructions to give
8    a call to Michael Atkins or Frank Millard when
9    instructions were not available when the 2003-
10    2004 program started?
11     MR. GLUCK: Objection.
12  A. First of all, I don't know whether or not there
13    was anyone who had taken any lessons the previous
14    year; and, second of all, I don't know what she
15    was told from her experiences from the previous
16    year. Again, this was the first time from my
17    understanding that she was the head chaperone, and
18    there are different responsibilities if you're the
19    head chaperone than if you are not.
20  Q. But as someone who has been involved in the
21    program, isn't it correct that you would know
22    whether or not the program has changed from year
23    to year just by observation?
24     MR. GLUCK: Objection.
25  A. Not necessarily because, again, it gets down to

Page 94

1    what you were told in the training you received.
2  Q. Well, wouldn't something as basic as whether or
3    not lessons are available be something that would
4    be obvious to the average person?
5     MR. GLUCK: Objection.
6  A. I have no idea if they were -- they were told --
7    they knew that lessons -- it appears that they
8    were told and knew that the lessons were
9    available. Whether or not it's different from the
10    year before, I do not know.
11     MR. GLUCK: Would you mind?
12     MR. POTTER: Sure. Go ahead.
13     (A recess is taken, after which the following
14    proceedings are had:)
15  Q. At the bottom of the page under Standard Of Care,
16    you indicate that, "The amount of supervision
17    required depends upon the participant's age and
18    skill level, the activity, the risk associated
19    with the activity and their ability to understand
20    and appreciate the risks and consequences of their
21    own actions." Now how big a factor is the
22    participant's age?
23  A. The most important factor is their ability.
24  Q. So the age is a minor factor?
25  A. It -- within a -- there is points where obviously

Page 95

1    age would be an issue, but, in this case, ability
2    is the issue.
3  Q. Okay. So age here was not an issue. Mr. Kusada
4    was old enough to understand everything that was
5    being told to him, wouldn't you say that?
6  A. No, because I don't know him to know whether he
7    could or couldn't understand. His ability makes a
8    difference in what his understanding level is.
9  Q. So you can't say whether or not Mr. Kusada had the
10    capacity as an eighteen-year-old to understand
11    anything that was said to him about this program;
12    is that right?
13  A. As a beginner it changes what the understanding
14    level is going to be irrespective of the fact that
15    he was eighteen.
16  Q. But you would agree, would you not, that an
17    eighteen-year-old is better able to process
18    information than a three-year-old?
19  A. That would be correct.
20  Q. And you would agree, would you not, that an
21    eighteen-year-old is considered an adult under the
22    law; correct?
23     MR. GLUCK: Objection.
24  A. It's a statement of fact.
25  Q. And you would agree, would you not, that Mr. Yukio

Page 96

1    Kusada was a fairly intelligent kid?
2  A. I have no way of making that judgment from the
3    information that's been provided for me.
4  Q. Assume for a moment that he was a fairly
5    intelligent kid; did he have the ability to
6    understand what he was being told?
7     MR. GLUCK: Objection.
8  A. As a beginning skier, it changes the understanding
9    that you're going to have because of the lack of
10    experience.
11  Q. Does it eliminate understanding?
12  A. It will affect the level of understanding that an
13    individual is going to have. You're not going to
14    be expected to have the same level of
15    understanding as someone with advanced ability.
16  Q. I understand, but are you saying that he had the
17    inability to understand because he was a beginner?
18  A. He had the ability to learn as he was taught, and
19    he was not taught in this particular case to gain
20    an understanding and no one made an assessment of
21    his actual understanding as well.
22  Q. So would it be fair to say that what you're saying
23    is that you not only have to tell an
24    eighteen-year-old what the risks are, what the
25    expectations are, what you're going to do, but

Page 97

1  before you can allow them to go on the slope, you
2  need to test them so that you can understand
3  whether or not they understand, is that what
4  you're saying?
5 A. There is a level of instruction that requires that
6  you try to make a determination of their level of
7  understanding before you would turn them loose in
8  a high-risk activity.
9 Q. And how do you try to assess that?
10 A. It's going to be done in a couple of ways. It
11  could be done by asking questions, and then you
12  know their verbal understanding of the piece -- of
13  their level of understanding. And another would
14  be through their actual demonstration of their
15  abilities in a skiing situation.
16 Q. Okay. Let's stick with asking questions. Does
17  that mean that you need to ask individual
18  questions of each student?
19 A. Ideally, yes.
20 Q. Do you fall below the standard if you don't hit
21  the ideal?
22 A. If you are not certain that each individual
23  understands, then, yes, you have.
24 Q. How can you ever be certain?
25 A. You can't be -- you can't be entirely certain but

Page 98

1  you can have the opportunity to ask them to
2  respond and get a good understanding of their
3  level.
4 Q. But what I'm asking is, do you have to go to these
5  students individually, either by giving all of
6  them a written test or by interviewing each one of
7  them individually so that you can satisfy yourself
8  that each one has the understanding and the
9  maturity to participate in the program?
10 A. In a high-risk activity I would want to find out
11  from each individual.
12 Q. So that you would either test them all or
13  interview every one of them?
14 A. I would assess every one of them as to their
15  abilities.
16 Q. Individually?
17 A. They can also be done by an expert in a group
18  setting as well where they would have a chance to
19  watch individuals as they ski.
20 Q. Any other way?
21 A. That's the way that it ought to be done is by way
22  of watching them ski and working with them as a
23  group and individually.
24 Q. And I understand the way it ought to be done, but
25  I'm trying to figure out is that exclusive or is

Page 99

1  there another way it can be done?
2 A. Not to my satisfaction.
3 Q. So from your perspective and in your opinion,
4  that's the way it must be done?
5 A. In a high-risk activity there is more required
6  than there is in a lower-risk activity. An
7  assessment of their abilities is absolutely
8  critical. They need to know that that student is
9  qualified to go up on that mountain.
10 Q. So is your answer to my question yes?
11 A. Repeat the question so I can make sure.
12     MR. POTTER: Could you read it back.
13     (The requested material is read by the
14  reporter.)
15 A. Put on the what it must be done.
16 Q. And that came from a prior question, and the
17  answer that you gave me.
18     Go ahead and read it back to her.
19     (The requested material is read by the
20  reporter.)
21 A. Yes.
22 Q. On the next page before you get to the opinion,
23  you say, "Supervision guidelines require the
24  supervisors to move about the area to maximize
25  contact with the participants and to keep the

Page 100

1  activities within the ability level of the
2  individual students." Are you saying that the
3  chaperones in this instance did not move about the
4  area?
5     MR. GLUCK: Are you talking about the actual
6  date of this incident, is that what you're
7  referring to? You said "in this instance." I
8  don't know what you mean.
9 Q. Okay. During this program, 2003-2004?
10 A. From the depositions of three chaperones, it's not
11  clear to me other than the fact that there was one
12  of them who was in the lodge exactly what they did
13  during the time that they were there.
14 Q. And if the other two were moving around the
15  mountain, was that appropriate conduct on their
16  part?
17 A. I'm not sure in terms of how they're moving about
18  the mountain, so I'm not able to respond in terms
19  of whether it was appropriate or not.
20 Q. All right. Was it appropriate to have somebody in
21  the lodge?
22 A. Yes.
23 Q. And as to the people who were moving around the
24  mountain, what were they supposed to be doing in
25  your opinion?

Page 101

1  A. They need to be having contact with the students.
2     They need to have kept track of what trails the
3     students were on. And part of their instruction
4     is to be sure that if an individual who's a
5     beginner is not on trails that are not appropriate
6     for a beginner.
7  Q. I'd like to go back to something I asked earlier,
8     and I know that you've answered in a particular
9     way. How many people would that take to do it,
10    assuming fifty or more students?
11 A. Again, I would have to assess the program and that
12    was what should have been done to determine what
13    is appropriate, and I cannot give you a number.
14 Q. In a high-risk activity, as you've described it,
15    where there are fifty or more students, should
16    there be a two-to-one student-to-teacher ratio?
17 A. Again, without being able to do a proper
18    assessment of the program, I cannot give you a
19    specific number.
20 Q. Should there be a three-to-one student-to-teacher
21    ratio?
22 A. Again, if I -- without being able to do a proper
23    assessment of the situation and the program, I
24    can't make that judgment. That's what Mr. Millard
25    and Mr. Atkins are responsible to determine.

Page 102

1  Q. Should there be a four-to-one student-to-teacher
2     ratio?
3  A. Again, without properly assessing, I cannot give
4     you an answer to whether that is correct or not.
5  Q. From reading the depositions and your knowledge of
6     this program, would it fall below the standard of
7     care to have a hundred-to-one student-to-teacher
8     ratio?
9  A. That one is a fairly obvious piece that that's not
10    providing proper supervision in any situation.
11 Q. What about fifty to one?
12 A. That's the minimum generally required for a
13    playground situation.
14 Q. And a playground situation is not high risk;
15    correct?
16 A. No, that would not be considered a high risk.
17 Q. So fifty to one would still not meet the standard
18    of care, at least in your opinion, correct, for a
19    skiing activity?
20 A. Correct.
21 Q. What about twenty-five to one?
22 A. From that point on, I -- there's -- without
23    assessing the situation, there's no cut and dried
24    guidelines to be able to establish that. That's
25    up to an individual to assess the program and make

Page 103

1     that determination.
2  Q. And are you saying from twenty-five to one below
3     or are you indicating that it may include
4     forty-nine down to one, that's what I'm trying
5     to --
6  A. Again, without assessing the situation, I mean the
7     guidelines that are established generally indicate
8     fifty to one is a minimum for a playground
9     situation. Beyond that, there are no specific
10    guidelines. It depends upon the circumstances,
11    and those who are responsible are expected to make
12    an assessment of what is required.
13 Q. And if you made the assessment and had, let's say,
14    a thirty-to-one ratio and in your judgment that
15    was sufficient, would you say that's wrong?
16    MR. GLUCK: Objection.
17 Q. In their judgment that that was sufficient, would
18    you say that's wrong?
19 A. Again, without knowing the particulars of a
20    situation, that's -- it's inappropriate to
21    indicate whether it is or isn't.
22 Q. Would you say that when you're talking about
23    proper student-to-teacher ratio, that it's not
24    scientific, that there's a degree of judgment
25    involved and that people would disagree, I mean

Page 104

1     reasonable people in your field?
2  A. There potentially could be some disagreement in
3     terms of what's there, but, again, that needs to
4     be demonstrated that they did a proper assessment
5     of the situation to determine if they had the
6     right numbers involved.
7  Q. And so in your field, if someone looked at the
8     situation and said, I think twenty-five to one is
9     adequate, and you said no, I think it should be
10    ten to one, is that a reasonable disagreement?
11 A. Without knowing all the facts, no, it's not.
12 Q. So there is something that's really quantifiable
13    in terms of student-to-teacher ratio?
14 A. It's not quantifiable. If it was, it would be
15    easier for me to provide you with a response in
16    terms of what it ought to be in this situation.
17    It's a piece where there is some judgment that's
18    involved, but the individuals need to make those
19    kinds of assessments as to what takes -- needs to
20    take place such that all students are provided
21    with a safe experience.
22 Q. You indicated that it's fifty to one in a
23    playground situation; correct? Are you talking
24    about a playground situation with children under
25    ten years of age?

Kusada v. Berkshire East, et al.
Case 3:05-cv-30043-MAP    Document 43-16    Filed 11/27/2006    Page 9 of 20
CondenseIt!    10/11/06    MARILYN BUCK, ED.D.

Page 105

1    MR. GLUCK: Objection.
2  A. Generally people look at this as a recess
3    supervision type of thing which would generally be
4    in an elementary school.
5  Q. So that as the students get older, presumably,
6    there's less need for supervision; is that
7    correct?
8    MR. GLUCK: Objection. In what sport?
9  Q. Just generally?
10 A. See, generally, I would not respond that less is
11    required. There are still issues depending upon
12    the ability levels of the individuals and the
13    activity within which they're participating.
14 Q. But certainly age is a factor?
15 A. Generally ability is much -- again, much more of a
16    factor than is age in terms of this piece. There
17    are, and it depends on the circumstances within
18    which they are participating as to what that
19    supervision.
20 Q. And I understand that abilities are a more
21    important factor but age is a factor, you even say
22    that in your report; correct?
23 A. It can be depending upon the circumstance. It
24    plays a role, but it's not the most important
25    role.

Page 106

1  Q. Was it a factor in this program?
2  A. Not as I understand the facts in this case.
3  Q. So that the fact that Yukio Kusada was eighteen
4    year old and an adult had no bearing on your
5    analysis of this situation; correct?
6    MR. GLUCK: Objection.
7  A. That's correct.
8  Q. And so you would say that you would apply the same
9    standard to him for participation in this program
10    as a beginner that you would to a four-year-old;
11    correct?
12 A. No.
13 Q. So at some point there is a difference?
14 A. A four-year-old -- yes, there is a difference
15    because of cognitive ability that you would expect
16    between a four-year-old and someone who was in
17    high school.
18 Q. And someone who is in high school you would expect
19    would have reasonable cognitive ability; correct?
20 A. Not necessarily.
21 Q. So are you saying that because there may be some
22    students who don't have reasonable cognitive
23    ability, that the same standards that you would
24    apply to those students must be applied to
25    students who have reasonable cognitive ability?

Page 107

1  A. No. What I'm saying is my concern here was the
2    ability of the student and the fact that it was a
3    beginner and should have been provided with
4    instruction and was not. That his age was not a
5    factor in that determination.
6  Q. All right. Now, in your opinion you have listed
7    four ways that Mr. Millard and Mr. Atkins and
8    Northfield Mount Hermon deviated from the standard
9    of care. One is, "Inadequate supervisory training
10    for the chaperones"; correct?
11 A. Correct.
12 Q. The second one is, "Inadequate supervision of
13    students"; correct?
14 A. Correct.
15 Q. But you've really said to us that on that one you
16    really don't have enough information to figure
17    that out; correct?
18    MR. GLUCK: Objection.
19 A. That's not correct. If there had been adequate
20    supervision, the chances of Yukio being on the
21    intermediate hill are slim.
22 Q. So you are offering the opinion having never
23    skied, having never been a ski instructor, having
24    never worked at a ski resort, that if there had
25    been adequate supervision, there is a slim chance

Page 108

1    that Yukio Kusada, an eighteen-year-old, would be
2    on any slope other than a beginner slope; that's
3    your opinion?
4  A. This would be the appropriate thing to expect,
5    that he should have been not allowed to go down
6    any slope but the beginner until his ability was
7    assessed by an expert to make the determination
8    that he could go to another slope.
9  Q. But it is your opinion that the chances that he
10    would be allowed on a slope other than a beginner
11    slope if there had been adequate supervision were
12    slim; is that correct?
13 A. That's correct.
14    MR. GLUCK: Be allowed by whom?
15    MR. POTTER: Anybody.
16    MR. GLUCK: Oh.
17    MR. POTTER: Including the school, including
18    the people at the ski area.
19    MR. GLUCK: I think her opinion is she has
20    testified it's -- her opinion is specifically
21    targeted toward Millard, Atkins and the school,
22    not Berkshire East.
23    MR. POTTER: No, and I understand that.
24    MR. GLUCK: Okay.
25    MR. POTTER: She's saying that the chances

Page 109

1 that that would occur at a ski area running a
2 program like this with an eighteen-year-old.
3    MR. GLUCK: But you used the word "allowed,"
4 and I just wanted to be clear about who was doing
5 the allowing here.
6    MR. POTTER: And we can get philosophical here
7 but I won't.
8    MR. GLUCK: We can do it in the car.
9    MR. POTTER: No, I'll do it in the courtroom.
10    MR. GLUCK: That's fine.
11    MR. POTTER: I don't want to waste your time
12 here. I'm not here to argue. Just here to find
13 out.
14 QUESTIONS CONTINUING BY MR. POTTER:
15 Q. You have also indicated, "Inadequate instruction,
16 feedback and continuous evaluation of the
17 performance of the students." Is it your opinion
18 that on every single occasion that they went to
19 the mountain during the 2003-2004 ski program,
20 each student needed to be assessed individually,
21 is that your opinion?
22 A. State that again because --
23 Q. Okay. Is it your opinion that during the
24 2003-2004 Northfield Mount Hermon recreational ski
25 program, every student in that program needed to

Page 110

1 be assessed on every occasion that they went to
2 the mountain in January and February of 2004; so,
3 in other words, they had to be assessed when they
4 first went there, they had to be assessed the
5 second time, assessed again on the third time and
6 so on, is that your opinion?
7 A. They would not have had to have been -- every
8 student to have been assessed every time that they
9 went to the mountain. It would depend on their
10 abilities and what they demonstrated as to whether
11 or not they needed to be continually assessed
12 before they actually took the chairlift up the
13 mountain to ski down each particular night.
14 Q. So that some of the students might have progressed to
15 a point where they no longer needed to be
16 assessed; is that correct?
17 A. That would be correct.
18 Q. And, in fact, some of the students might have
19 started at a point where they no longer needed to
20 be assessed; is that correct?
21 A. That's correct, but the only way that that was
22 known is they ask the students, and there was
23 never any assessment in this particular case done
24 of their abilities or someone who was an expert
25 actually watched them ski to know whether or not

Page 111

1 their own personal assessment was correct.
2 Q. And then you say, "Inadequate creation of and
3 implementation of rules requiring use of
4 appropriate safety equipment." And if I
5 understand you correctly, that would have been
6 satisfied if they had required each student to
7 wear a helmet, number one; and, number two, if
8 they had required each student to get their skis
9 from Berkshire East; is that correct?
10 A. No.
11 Q. Okay. How am I incorrect?
12 A. They did not have to get their skis from Berkshire
13 East. They could have brought their own had they
14 been checked to make sure that they were
15 appropriate for their ability level and for them
16 in terms of size, poles, the right length, things
17 of that sort, but whatever the experts know in
18 terms of the ski piece, but that they were -- the
19 proper equipment for that particular student to be
20 using. And there's another piece here in terms of
21 the rules, and that is that they were actually
22 enforced.
23 Q. So you have to have the rules and you have to
24 enforce the rules; correct?
25 A. Correct.

Page 112

1 Q. But those are the two rules basically related to
2 equipment -- to the helmet and to the other ski
3 equipment?
4 A. In terms of equipment.
5 Q. Yeah.
6 A. Yes, but there are other issues with safety but
7 that's the equipment issue.
8 Q. But appropriate -- well, you're saying appropriate
9 safety equipment, is there other safety equipment
10 they should have had?
11 A. No.
12 Q. I was confused there. Are there any other
13 opinions that you have other than those four,
14 having reviewed this case?
15 A. Specifically what it's saying there is that had --
16    MR. GLUCK: That's a yes or no, were there any
17 other opinions.
18 A. No.
19    MR. POTTER: Let me just take a minute and
20 look at this.
21 Q. Now on the next page you make a statement,
22 "Students would be taught that if they were having
23 trouble with their equipment that they should seek
24 assistance from a supervisor or mountain staff."
25 Do students need to be taught that?

Page 113

1  A. It's my experience that, yes, they do, depending
2     upon their ability level.  Sometimes they don't
3     know if it's because of the equipment or if it's
4     because of their own abilities as a skier as to
5     what's causing the difficulty.
6  Q. You say here "having trouble with their
7     equipment," so you've characterized it as trouble
8     with their equipment, not as we don't know what
9     the trouble is, I'm just having trouble.  "Trouble
10    with their equipment."  Are you saying that an
11    eighteen-year- old who is having trouble with his
12    equipment needs to be told to bring that to the
13    attention of the ski staff or the mountain
14    personnel?
15        MR. GLUCK:  Are you talking about in the
16    context of the physical education class, Harry, is
17    that right?
18 Q. Yes.
19 A. In the context of the physical education program,
20    yes.  There should be someone who is there to help
21    them with their equipment.
22 Q. No, not to help them.
23 A. They should be taught -- they should be taught --
24 Q. They should be taught to tell somebody at the
25    mountain or in the program that they are having

Page 114

1     trouble with their equipment, even though they're
2     eighteen years of age; is that correct?
3  A. That's correct.  It's not a given.
4  Q. Okay.  Now in the next paragraph you say,
5     "Specifically, no one provided any guidance to
6     Mr. Kusada about what skis he should use or not
7     use when taking part in the ski course."  Now,
8     where do you get that?
9  A. Again, according to the depositions, there was no
10    training provided of any kind whatsoever, in which
11    case whether he had the proper equipment or did
12    not have the proper equipment was never -- he was
13    never taught that particular piece of information,
14    nor did anyone check to give him feedback as to
15    whether or not he had the appropriate equipment or
16    not.
17 Q. So are you saying that as part of the course,
18    before they should allow anybody to go skiing,
19    that they should provide each student with
20    instruction about what types of skis to buy, what
21    length of skis to buy, what camber of skis to buy
22    and so on, all of the kinds of things that you
23    would normally look at in determining what ski you
24    want to buy?
25 A. They should as a part of instruction be taught

Page 115

1     about the differences in equipment.  And the
2     detail would depend upon the level of ability that
3     they have and the kinds of things that they are
4     going to be doing in terms of their skiing.
5  Q. So, once again, before they should be allowed to
6     go skiing, they need to be given instruction on
7     the different types of equipment that is available
8     for skiers?
9  A. Yes.
10 Q. You indicate, "None of the chaperones conveyed any
11    information to Yukio Kusada...."  You actually
12    have it "Kudada," but it's Kusada.
13        MR. GLUCK:  Where are you, Harry?
14 Q. Oh, I'm sorry.  I'm on the last page of her
15    written opinion.  "...in the nature of ski
16    instruction, terrain selection, or equipment
17    selection."  Where did you get that?
18 A. My understanding from -- as I read the
19    depositions, that there was no ski instruction
20    provided, and that they made -- that other than at
21    the orientation meeting that they were given, that
22    the chaperones, this was not their responsibility,
23    and they did -- did, in fact, not to do it -- did
24    not do that.
25 Q. So that none of the chaperones gave any ski

Page 116

1     instructions, is that your memory of the facts as
2     you read the depositions?
3  A. That's my memory of the facts as I read the
4     depositions.
5  Q. All right.  And none of the chaperones gave
6     anybody any information about terrain selection,
7     is that your memory as you read the depositions?
8        MR. GLUCK:  I think this is particular to
9     Yukio Kusada.  She's not talking about anybody.
10    That's what you said information to Yukio Kusada.
11 Q. All right.  To Yukio Kusada, and you're saying
12    that in their depositions they said they did not
13    give any information to Yukio Kusada in the nature
14    of ski instruction, did they say that?
15 A. What -- the only information that was listed, and
16    Yuki mentioned this in his deposition, that they
17    would talk to them about the weather and whether
18    or not things were icy, and those were the kinds
19    of -- but nothing that specifically said anything
20    about what they were to do in those cases, other
21    than dress warm.
22 Q. But you're saying that you read the depositions to
23    say that none of the chaperones conveyed any
24    information to Yukio Kusada in the nature of ski
25    instruction, and I'm just asking you, is that what

Page 117

1    was said in the depositions?
2  A. That's as I remember it.
3  Q. All right. And that none of the chaperones
4      conveyed any information to Yukio Kusada in the
5      nature of terrain selection, is that your memory?
6  A. That's my memory.
7  Q. And that none of the chaperones conveyed any
8      information to Yukio Kusada in the nature of
9      equipment selection, is that your memory?
10 A. That's my memory.
11 Q. Now you have listed a lot of articles that you've
12     written or authored or participated in. And they
13     appear on pages 7 through 21. And what I would
14     like to know is that whether you've ever written
15     any article concerning the sport of skiing in any
16     way?
17 A. Sport of skiing, no.
18 Q. I would like to also know looking through those
19     articles whether you would say that any of those
20     articles that you have listed have any relevance
21     to your testimony in this case?
22 A. The question I guess is in the terms of the
23     publications and if I used the term publications
24     rather than articles, there is.
25 Q. Okay. Well, start with publications and then I'll

Page 118

1      go to articles, okay, yes.
2  A. Well, there is a textbook that I have been a part
3      of that's in the -- I believe it's the third
4      edition that I've had a role in part in doing some
5      of the writing which deals with --
6  Q. Could you look at Exhibit A and tell me which one
7      you're talking about, which publication?
8  A. The publications aren't in Exhibit A.
9  Q. Oh, I think they are.
10 A. Are they back -- excuse me. I'm sorry.
11 Q. Yes.
12 A. I didn't realize they were back here.
13 Q. They are back there and I start on page 7.
14 A. Gotcha.
15 Q. And we go to page 21. And if there are
16     publications that you participated in that have
17     some relevance to this case, I'd like you to
18     identify them for me.
19 A. On page 7.
20 Q. Yeah.
21 A. The Buck and Lund which is listed "In Press" and
22     since that time it's actually come out,
23     "Instructional Strategies for Secondary School
24     Physical Education."
25 Q. So that one has some relevance, okay.

Page 119

1  A. And there are two previous editions, I believe,
2      that will show up in terms of the one at the very
3      bottom of that page is the fifth edition.
4  Q. Okay.
5  A. And on page 8 I think is where I saw the other
6      one. I think I saw it. Yes. Kind of in the
7      middle of the page. Only at that point, as it is
8      in the bottom of the page, the lead author was
9      Harrison.
10 Q. Okay. I'm going to take a quick break. Could you
11     look through that because I want to ask you about
12     any articles that have any relevance to what you
13     think your testimony is in this case so that I can
14     identify them.
15 A. Okay.
16     (A recess is taken, after which the following
17     proceedings are had:)
18 A. Can I ask your definition of relevance so I kind
19     of know what level you're looking at.
20 Q. Well, any of the publications or articles that
21     would support in any way the opinions that you've
22     rendered in this case in your opinion?
23 A. Okay. Other than the textbook, I don't believe
24     that there's anything that directly relates to
25     this -- to my opinions in this case.

Page 120

1  Q. I always get a little concerned with somebody says
2      "directly." And I'm not trying to be tricky here.
3      I'm just trying to find out whether there, in your
4      opinion, is anything else in there that would
5      support your opinions, so that I can take a look
6      at it rather than reading all of these.
7  A. And I assumed that that was partly why you were
8      asking the question.
9  Q. Sure.
10 A. And I can't think -- I was trying to think through
11     the content of each of them beyond the initial
12     title and what they were focused on as to whether
13     there were anything in there that dealt directly
14     with supervision, dealt directly with appropriate
15     instruction and assessment. And a lot of them
16     refer to some research that deals with trials that
17     I don't believe has any connection with what we're
18     talking about here.
19 Q. So you say then that the publication
20     "Instructional Strategies For Secondary School
21     Physical Education" and its prior editions are the
22     ones that you would single out for that purpose?
23 A. Yeah, and they're major works, yes.
24 Q. They're major works, okay. And what about going
25     to Abstracts, is there anything there?

Page 121

1 A. Not in the Abstracts.
2 Q. Okay. And what's the next section, the Creative
3    Endeavors?
4 A. No.
5 Q. On page 12?
6 A. No.
7 Q. The Published Communications on page 12?
8 A. No.
9 Q. The Professional Papers and Presentations starting
10    on page 13?
11 A. Have to find that. There's a couple of
12    presentations I have made that deal with risk
13    management kinds of issues but it's a matter of
14    trying to -- finding where they are. Page 15.
15 Q. Page 15.
16 A. Third one down.
17 Q. No. 3, "Liability in Coaching"?
18 A. Mm-hmm.
19 Q. Okay.
20 A. And on that page the third from the bottom.
21 Q. "Liability Issues in Physical Education:
22    Implications of Court Decisions On Teaching."
23 A. Page 16.
24 Q. Yep.
25 A. Third one down.

Page 122

1 Q. Yep. That's "Legal Liability Issues in Physical
2    Education"?
3 A. Page 19, third one down.
4 Q. "Safe Practices in Physical Education"?
5 A. Mm-hmm.
6 Q. Okay.
7 A. That's it, I believe.
8 Q. Okay. And just in a general way, could you tell
9    me, Dr. Buck, how the "Instructional Strategies
10    for Secondary School Physical Education" has some
11    relevance to the case, just in a general way?
12 A. In a general -- well, for one, there is a chapter
13    that's called "Physical Education and the Law."
14 Q. "Physical Education and the Law"?
15 A. And the law.
16 Q. Okay.
17 A. And discusses many of the concepts that are
18    included, and I did author that particular
19    chapter.
20 Q. Okay.
21 A. In each edition about half of the chapters I
22    authored. That was one of them.
23 Q. Okay.
24 A. And then there are other chapters that deal
25    specifically with appropriate physical education.

Page 123

1 Q. All right. And so that would be true of the
2    instructional strategies and all of those things.
3 A. Yes.
4 Q. And if we turn to, let's see what page we're on.
5    Page 15, "Liability in Coaching." Just in a
6    general way what relevance does that have, if you
7    recall?
8 A. In each of those presentations I talk about pretty
9    much very similar to what's in the chapter on law
10    in the textbook but talking about the
11    requirements, the expectations for supervision,
12    the requirements and expectations for instruction,
13 Q. And so that would also be true of the article on
14    page 16, "Legal Liability Issues in Physical
15    Education"?
16 A. Correct.
17 Q. And also page 19, "Legal Liability Issues";
18    correct?
19 A. Correct.
20    MR. POTTER: I have only one additional
21    request and that is, and we'll take this up later,
22    but I'm requesting of you on the record that you
23    provide me a copy of your notes, and I'll talk to
24    you, Ron, about it because I think I'm entitled to
25    it under the rules, so keep the notes. Do not

Page 124

1    destroy them and we'll deal with it, okay?
2    MR. GLUCK: We'll talk about that, sure.
3    MR. POTTER: And I'm finished.
4    MR. GLUCK: I have nothing. Thank you.
5
6    FURTHER THE DEPONENT SAITH NOT.
7
8    _____
9    MARILYN MARGARET BUCK, ED.D.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 125

STATE OF INDIANA    )
                    )  SS.
COUNTY OF DELAWARE)

CERTIFICATE OF COURT REPORTER

I, Mary Beth Schafer, the undersigned Court
Reporter and Notary Public, residing and maintaining
offices in the City of Muncie, County of Delaware,
State of Indiana, do hereby certify:

That at the time and place described in this
transcript, the deponent, MARILYN BUCK,
presented herself before me for administration of an
oath of truthfulness, which oath I then administered;

That I then reported to the best of my ability
in machine shorthand all of the words spoken by all
parties in attendance during the course of the
ensuing proceedings, including objections, if any,
made by all counsel present;

That I later reduced my stenographic notes into
the foregoing typewritten transcript form, which
typewritten transcript is a true record of the
testimony given by this witness as stated above;

I do further certify that I am a disinterested
person in this cause of action; that I am not a
relative or attorney or employee of any of the
parties, that I am not a relative of an employee of
such attorney or counsel, and that I am not
financially interested in this action.

IN WITNESS HERETO, I have affixed my Notarial
Seal and subscribed my signature below this _____ day
of _____, 2006.

_____
Mary Beth Schafer, Notary Public

County of Residence:  Delaware
My Commission Expires:  April 11, 2007



DEFENDANT'S
EXHIBIT
A
10-11-06



B A L L   S T A T E
U N I V E R S I T Y

COLLEGE OF APPLIED SCIENCES AND TECHNOLOGY

Muncie, Indiana 47306-0245
Phone: 765-285-5818
Fax: 765-285-1071

March 31, 2006

Ronald E. Gluck
Attorney at Law
Breakstone, White-Lief & Gluck, P. C.
Two Center Plaza
Suite 530
Boston, MA 02108-1906

RE:   =   Yukio Kusada

Dear Mr. Gluck:

At your request, I have reviewed discovery information to perform an objective assessment of the standard of care and deviation, if any, from the standard of care in connection with the athletic department at Northfield Mount Herman School and, specifically, Frank Millard and Michael Atkins in connection with the skiing incident involving Yukio Kusada on February 20, 2004 at Berkshire East.

In connection with my assignment, I have reviewed deposition transcripts of the following individuals:

1.    Frank Millard

2.    Michael Atkins

3.    Richard Eisenberg

4.    Audra Forstrum

5.    Susan Clough

6.    Yuki Hasaegawa

7.    Yukio Kusada

8.    John Herrick

In addition, I have reviewed documents from Northfield Mount Herman School from students who participated in the physical education course known as the recreational ski program at Northfield Mount Herman School in the year 2003 – 2004.

## FACTS

During his senior year at Northfield Mount Herman School, Yukio Kusada registered for the physical education course known as the Recreational Ski Program. He informed the school that he was a beginner skier and desired to take ski lessons. Northfield Mount Herman School recommended that students participating in the physical education class wear a helmet, but did not require that they do so. Northfield Mount Herman School notified the students that they were to obtain ski equipment, including skis, poles and boots, on their own. Mr. Kusada borrowed his skis from a student, Samuel Wilson. They were Atomic SX11 skis, which I understand are designed for an advanced skier. Prior to taking part in the 2003 - 2004 ski course at Northfield Mount Herman School, Yukio Kusada had never skied. No one from the administration of Northfield Mount Herman School was aware of what kind of skis and equipment Yukio Kusada was using throughout the ski course. Prior to the evening of February 20, 2004, no one from the administration and/or the athletic department at Northfield Mount Herman School knew whether or not Yukio Kusada used a helmet while participating in the ski course. On or before February 20, 2004, Yukio Kusada received no instruction on skiing from any representative, faculty member or administrative individual at Northfield Mount Herman School. Yukio Kusada received no ski lessons at Berkshire East on or before February 20, 2004.

Michael Atkins was the coordinator of the ski course, and Frank Millard was his supervisor in 2003 and 2004. Mr. Atkins had daily responsibility for the skiing program. Mr. Millard had secured the contract with Berkshire East and had been involved with the program for many years. Mr. Atkins and Mr. Millard stated no instruction was provided by the school and was not necessary because this was a recreational ski program. Neither provided active supervision at the program site, Berkshire East.

The chaperones, Richard Eisenberg, Audra Forstrum, and Susan Clough, were assigned to chaperone the ski program for which students received course credit. None of the chaperones were provided any ski training as supervisors, nor were any of them trained as physical educators. I am not aware if any of them received formal training as coaches within their degree programs or by other means. They were told that the duties of a chaperone included taking

attendance while boarding the buses at the school and when returning from the mountain; controlling behavior on the bus; maintaining one chaperone in the lodge at all times so that students did not take too long a break; watching to make sure rules were observed; and driving injured students to the hospital as indicated by the staff at Berkshire East.

As stated earlier, helmets were recommended, but not required to be worn by students. The reason provided for not requiring helmets was that the requirement could not be enforced.

Skiing instruction was expected to be provided for students who requested it, but for some reason it did not occur for this group. Ms. Forstrum, the head chaperone, did not know why lessons were unavailable. She did not report any problem with the lesson unavailability to any of her supervisors of the ski program. Neither Mr. Millard nor Mr. Atkins inquired of the chaperones if lessons were taking place or how they were progressing.

On February 20, 2004 Mr. Kusada had been skiing with a student, Yuki Hasegawa and went down an intermediate trail in contrast to his beginner level of ability. When Mr. Hasegawa did not see him at the end of the run, the friend provided this information to one of the chaperones who dismissed the information, indicating that this type of information was provided all the time. It was determined when buses were loading to go back to the school at approximately 9:45 p.m. that Mr. Kusada was missing. It is my understanding that Mr. Kusada was found near a tree in an unconscious state at approximately 4:00 a.m.

## STANDARD OF CARE

The standard of care for physical education teachers requires the individuals to provide effective supervision, appropriate and well-conducted activities and safe and appropriate environmental conditions. Supervision is defined as the quality and quantity of control exerted by teachers or coaches over the individuals for whom they are responsible. The supervisors must be trained and demonstrate the skills necessary to fulfill the duties assigned. The amount of supervision required depends upon the participant's age and skill level, the activity, the risk associated with the activity and their ability to understand and appreciate the risks and consequences of their own actions. These risks must be explained to the student who must demonstrate knowledge of the risks before engaging in the activity.

Supervision guidelines require the supervisors to move about the area to maximize contact with the participants and to keep the activities within the ability level of the individual students It is not required that students be insight at all times. The activity, capacity and experience of the student and the number of participants in the class dictate the level of supervision required. With each of these guidelines, staff training is critical for the supervisors to have the appropriate supervisory skills.

Students should expect that every effort has been made to provide a safe environment. This includes the requiring of safety equipment as indicated by the activity in which the student is participating. It also includes the school providing appropriate and safe equipment for the level of ability that the student possesses in the particular event. The age, skill, experience and level of play will play a role in determining the level of risk and the type and amount of safety equipment needed. Failure to use protective measures within a program of instructional competition would constitute a violation of proper professional procedure.

Teachers are to select activities that are reasonable for the ability levels of the individuals involved. In addition to selecting appropriate activities, the teacher is expected to provide instruction that is both accurate in its detail and is presented in a manner that maximizes the likelihood of the participant's success. This instruction should include not only information regarding the techniques for successful performance, but warnings regarding any potentially hazardous element of the activity and specific guidelines for minimizing these risks.

To be effective, instruction must be augmented by accurate and detailed feedback. The simple act of telling a person how to perform a particular skill in no way guarantees success.

In the area of environmental conditions, the student must be provided with equipment equal to the individual's skill level. Equipment requiring a skill level beyond that of the individual in question would be a violation of the above-stated standard.

In summary, the standard of care for a physical education program at a school requires that the activities to be selected are at a level appropriate to the student's skill level. In addition, instruction with feedback and continuous evaluation should be provided, the amount determined by the skill level of the individual. Further, the equipment should be appropriate to the skill level of the individual who is using it, and protective equipment should be required whenever available, especially in situations of increased risk of injury. In

addition, supervision should be provided by individuals who have been trained to perform the specific supervisory role and who have received ongoing staff development. Individuals should not be allowed to participate in an activity at a level at which the individual has not demonstrated the ability to safely perform the activity. This requires demonstration of competency by the student to individuals with expertise in instruction and supervision in the activity in question.

## OPINION

It is my opinion with a reasonable degree of educational expertise and scientific certainty that the following deviations from the standard of care occurred in this matter:

1.    Inadequate supervisory training for the chaperones;

2.    Inadequate supervision of the students;

3.    Inadequate instruction, feedback and continuous evaluation of performance of the students; and

4.    Inadequate creation of and implementation of rules requiring use of appropriate safety equipment.

Skiing is a sport in which the risk of injury is very real. To minimize the risk of injury, within the context of a physical education class, instruction is mandatory. Asking the students to self-report skiing ability is an appropriate beginning to determine ability level of all students. After that, a skill assessment should have been completed by individuals competent to make this determination. Those individuals determined to need instruction to begin skiing should have been required to receive instruction prior to ever beginning any skiing. It should have begun on the first day and continued throughout the program to check on progress. This would have met the standard for feedback and evaluation of performance. Another aspect of instruction that should have occurred was to provide each student with a list of safety rules and expectations of the orientation session and they should have been reminded often of those rules. Mr. Millard stated that it was the students' responsibility to get a lesson if they wanted one. The standard of care required teachers to be sure that it was provided. Through instruction, students will be taught proper terrain selection so that they are informed of the risks of skiing on terrain which is beyond their ability. Students would be taught how to properly stop and turn on their equipment. Students would be taught about the importance of using

skis which are appropriate for their level of ability. Students would be taught that if they were having trouble with their equipment that they should seek assistance from a supervisor or mountain staff. Failure to provide instruction is a deviation from the standard of care for physical education programs in general and specifically for the physical education course in which Mr. Kusada was enrolled, which was administered by Michael Atkins and Frank Millard. Deposition testimony revealed that instruction was required in all of the other physical education courses offered by Northfield Mount Herman School in 2003 and 2004. The only exception to this rule was the ski course.

Northfield Mount Herman School, Frank Millard and Michael Atkins also deviated from the standard of care of requiring appropriate safety equipment. Specifically, no one provided any guidance to Mr. Kusada about what skis he should use or not use when taking part in the ski course. It is well known in the ski industry, that equipment is specifically designed for various levels of ability. The standard of care required that Mr. Kusada receive guidance on the selection of the skis and that the physical education instructors and/or supervisors be aware of the equipment that he was using to minimize the risk of injury.

Further, the standard of care required that Mr. Kusada be required to wear a helmet. Due to the risk of head injury in skiing helmets were available at the time of this incident which were intended to minimize the risk of head injury. In the context of a physical education program at a school the standard of care required that the students be taught about helmet use and that they be required to use helmets to minimize the risk of injury. The explanation given for not requiring a helmet was that this requirement could not be enforced. There are measures available to enforce rules such as this. As an example, a rule could have been implemented stating that if a student was found on the mountain without a helmet, they would be removed from the ski class that day, and for a second violation they would be expelled from the class for which they were receiving credit. This type of deterrent is effective in physical education programs. Supervisors and chaperones should be on the mountain, skiing and/or stationed at the top or bottom of the lift to make sure that students were wearing helmets and to make sure that they were not having difficulties while on the mountain. These methods should have been employed to ensure student compliance with rules concerning helmet use. If three chaperones were an inadequate amount to supervise the number of students skiing, then additional chaperones should have been employed to make supervision effective.

The physical education program at Northfield Mount Herman School and Frank Millard and Michael Atkins also deviated from the standard of care requiring appropriate supervisory training for the chaperones. Mr. Eisenberg, Ms. Forstrum and Ms. Clough received no training in actual ski instruction, in

terrain selection, in equipment selection or in any other aspect of ski safety awareness that would have made them appropriate candidates for being a chaperone. None of the chaperones conveyed any information to Yukio Kudada in the nature of ski instruction, terrain selection, or equipment selection.

Mr. Millard and Mr. Atkins failed to instruct the chaperones that if a student was reported missing, they were to report that fact promptly to the appropriate personnel at the mountain. In this case, the information was reported to Ms. Forstrum by Yuki Hasaegawa, and she did not report this information to the officials at the mountain for approximately 2 hours when the buses were about to leave for the school. This was a violation of the standard of care in the physical education setting. Mr. Atkins and Mr. Millard provided no guidance or rules for the chaperones to follow in the event that this type of situation materialized.

Mr. Millard and Mr. Atkins also failed to give instruction to the chaperones about exactly what information they were to obtain from any student who reported a student to be missing. In this case, the standard of care required that Ms. Forstrum obtain all material information concerning Mr. Kusada's last known whereabouts, the type of clothing he was wearing, and the time that he was last seen and that she provide this information to the authorities at Berkshire East.

Procedures to provide appropriate supervision for a skiing activity were not in place, which should have included a buddy system and a faster response to a missing student who might have been injured.

These opinions are made with a reasonable degree of educational and scientific certainty.

*Marilyn M. Buck*

Marilyn M. Buck, Ed.D.
Professor of Physical Education
Associate Dean
College of Applied Sciences and Technology
Ball State University
Muncie, IN 47306

## VITA
## MARILYN M. BUCK

**Home:**     625 E 200 S, Tipton, IN 46072  (765) 675-9091

**Work:**     AT 202, College of Applied Sciences and Technology,  Ball State University,
Muncie, IN 47306  (765) 285-5955  FAX (765) 285-1071
E-mail:mbuck@bsu.edu

## ACADEMIC DEGREES

B. S.   in physical education with a math minor
Iowa State University, Ames, Iowa
May 1974
Graduated with distinction

M. S.   in physical education with an emphasis in sport psychology and a minor in educational
psychology
University of Utah, Salt Lake City, Utah
June 1978

Ed. D.  in physical education-sports with an emphasis in curriculum and instruction and a minor
in educational leadership (administration)
Brigham Young University, Provo, Utah
August 1989

## PROFESSIONAL EXPERIENCE

2005 - present Associate Dean, College of Applied Sciences and Technology, Ball State
University

2003 - 2005    Associate Chair, Sport and Physical Education Division, School of Physical
Education, Sport, and Exercise Science, Ball State University

2001 - present Professor, Ball State University, Muncie, Indiana
Area of specialty:  Teaching methodology.

2000 - 2002    Coordinator, Sport and Physical Education Graduate Programs

1999 - 2003    Assistant to the Chair, Sport and Physical Education Division, School of Physical
Education, Ball State University

1999 - 2005    Coordinator, Physical Education Teaching Major

1996 - 2001    Associate Professor, Ball State University, Muncie, Indiana
Area of specialty:  Teaching methodology.

2

Other classes taught:  Computer competency,  swimming, measurement and evaluation, skill analysis, foundations, research design, curriculum design

1989 - 1996    Assistant Professor, Ball State University, Muncie, Indiana
Area of specialty:  Teaching methodology.
Other classes taught:  Computer competency, softball/volleyball teaching techniques, basketball officiating, swimming, measurement and evaluation, skill analysis

1986 - 1989    Graduate teaching assistant, Brigham Young University, Provo, Utah
Classes taught:  Archery, beginning and intermediate swimming, beginning and intermediate badminton, beginning basketball, beginning volleyball, water fitness, skills and teaching techniques in basketball and softball, teaching methods, assisted with student teaching supervision, basketball and volleyball officiating

1974 - 1986    Health and physical education instructor, junior high girls basketball and track coach, Ballard Junior High, Ballard Community Schools, Huxley, Iowa

1981 - 1986    Varsity girls cross country coach, Ballard High School, Ballard Community Schools, Huxley, Iowa

1979 - 1986    Organizer and coach, South Story Track Club, Huxley, Iowa
Coached one age-group national champion and four other top ten finishers and many state champions

1976 - 1979    Assistant varsity softball coach, Ballard High School, Ballard Community Schools, Huxley, Iowa

1973 - 1974    Exercise physiology lab assistant, Iowa State University, Ames, Iowa

1972 - 1974    Clerical secretary and administrative assistant, Women's Intramurals, Iowa State University, Ames, Iowa

1973    Swimming instructor, Iowa State University, Ames, Iowa

## SPECIAL AREA OF PROFESSIONAL INTEREST

Main emphasis:          Curriculum development and instruction
Minor emphases:         Computers and administration
Certifications:         Permanent teaching certificate, state of Iowa
                        Physical education, math, and coaching endorsements
                        National Safety Council Adult CPR

3

## NON-DEGREE STUDY, CONTINUING EDUCATION

| 1984 | Des Moines Area Community College |
| | BASIC Computer Programming |

| 1983-1984 | American Institute of Business, Des Moines, Iowa |
| | Computer Programming |
| | Accounting |

| 1979 | University of Northern Iowa |
| | Cross Country Coaching Workshop |

| 1976 | Concordia University, Montreal, Canada |
| | Health and Fitness Practices in Sweden |
| | Track and Field Symposium, World Cup II |

## PROFESSIONAL ORGANIZATIONS

American Alliance for Health, Physical Education, Recreation and Dance - Life Member
Midwest District of the American Alliance for Health, Physical Education, Recreation and Dance
Indiana Association for Health, Physical Education, Recreation and Dance - Life Member
National Association for Kinesiology and Physical Education in Higher Education
Phi Kappa Phi
Phi Delta Kappa
International Council for Health, Physical Education, Recreation, Sport, and Dance

## OFFICES HELD IN PROFESSIONAL ORGANIZATIONS

International Council for Health, Physical Education, Recreation, Sport, and Dance
     Member -- Sport Pedagogy Commission, 2004 - present
     Director – Sport Pedagogy Commission, 1998 - 2004

American Alliance for Health, Physical Education, Recreation and Dance
     Member of the Local Planning Committee – 2005 American Alliance for Health, Physical
     Education, Recreation, and Dance National Convention, Chicago
     Nominations Committee Member for President-Elect, 2004-2006
     Member of the Board of Governors, 2002-2003, 2005-present

National Association for Sport and Physical Education
     Middle and Secondary School Physical Education Council Executive Committee, 1998-
     2001
     Member, National Planning Committee for Standards #1 & 2 Conference, 2000-2001
     Member, National Planning Committee for Sport and Physical Education Technology
     Conference, 1999

4

Chair, National Planning Committee for Sport and Physical Education Technology
Conference, 1997
Technology Task Force, 1995-1996

National Association for Kinesiology and Physical Education in Higher Education
Parliamentarian - 2005-2006
Past President - 2004-2005
President - 2003-2004
President-Elect - 2002-2003
Elections Committee, Chair - 2000-2001
Vice President - 1999-2000
Vice President-Elect - 1998-1999
Future Directions Committee - 1998
Membership Committee, Chair and Co-chair - 1994-1995
Membership Committee - 1992-1995
Member, Presidential Advisory Committee - 1993
Associate Editor, Scholarly Publications, *Chronicle of Physical Education in Higher
Education* - 1996-1999
Technology Task Force - 1996
Developed Electronic Physical Education in Higher Education Directory

Midwest District of the American Alliance for Health, Physical Education, Recreation, and
Dance
Board of Governors Representative - 2005-present
Past President - 2004-2005
President - 2003-2004
President-elect - 2002-2003
Secretary - 1999-2002
Executive Secretary Evaluation Committee - 1999-present
Constitution and Bylaws Committee - 2004-2005
Leadership Committee - 1999, 2000
Executive Secretary Search Committee - 1998-1999
Restructure Committee - 1998-2000
Past Vice President, Physical Education - 1998-1999
Vice President, Physical Education - 1997-1998
Vice President-Elect, Physical Education - 1996-1997
Chair, Professional Preparation - 1995-1996
Chair-Elect, Professional Preparation - 1994-1995

Indiana Association for Health, Physical Education, Recreation, and Dance
Technology Council, 1997-2001
Home Page Committee Chair, 1997

5

## SERVICE TO BALL STATE UNIVERSITY

University-Level Service Summarized

Member, Vice President for Marketing, Communications, and Enrollment Management – 1 year
Member, President Search Committee – 1 year
Member, Provost and Vice President for Academic Affairs Search Committee – 2 years
Member, Vice President for Information Technology and Executive Assistant to the President
     Search Committee – 1 year
Member, Assistant Dean of Students Search Committee – 1 year
Member, Strategic Plan Implementation and Assessment Committee – 3 years
Undergraduate Core Curriculum Task Force I – 2 years
Undergraduate Core Curriculum Task Force II – 1 year
Phi Kappa Phi – Vice President – 1 year
Membership Committee – Phi Kappa Phi – 1 year
Selection Committee for Emens Outstanding Senior – 3 years
Selection Committee for Junior Scholarship Award – 3 years
Participant, Cardinal Roundtable – 3 years
Member, Administrative Group – 3 years
Member, Governance Task Force, NCA Self-study – 2 years
Member, NCAA Self-study Steering Committee – 2 years
Member, Governance and Commitment to Rules Compliance Sub-committee, NCAA Self-study
     – 2 years
Member, University Senate – 11 years
Chair, University Senate – 3 years
Vice Chair, University Senate – 2 years
Chair, University Governance Committee – 2 years
Member, University Governance Committee – 4 years
Member, American Council for Education/Kellogg Leadership Team – 5 years
Member, Teacher Education Committee – 6 years
Chair, Teacher Education Committee – 2 years
Member, University Senate Agenda Committee – 6 years
Member, Retention Grant Review Committee – 1 year
Represented University on Indiana Commission for Higher Education State Nominating
     Committee to select next faculty member – 3 years (chair)
Represented University at the Faculty Leadership Conference hosted by Indiana Commission for
     Higher Education – 2 years
Member, Student Teaching Evaluation Forms Committee – 3 years
Member, Past Senate Chairs Group – 1 year
Member, Budget Focus Groups – 1 year
Member, Senate Ad Hoc Advisory Committee on Enrollment and Resources – 1 year
Participant, PEW Roundtable Discussions – 2 years
Member, Professional Affairs Council – 6 years
Secretary, Professional Affairs Council – 1 year
Vice-Chair, Professional Affairs Council – 1 year

6

Chair, Professional Affairs Council - 1 year
Member, Salary and Benefits Committee - 3 years
Chair, Salary and Benefits Committee - 1 year
Member, Undergraduate Education Council - 3 years
Secretary, Undergraduate Education Council - 1 year
Member, Provost's Blue Ribbon Commission on ways Ball State University Can Improve K-12
      Education in Indiana - 3 years

College Service Summarized

College Representative to TEPASC - 2 years
College Representative on Web Advisory Committee - 1 year
Alternate for College Appeal Panel - 1 year
College PEW Roundtable Planning Committee - 1 year

School of Physical Education Service Summarized

Search Committees for various positions - 16 years
Mentor - 5 different faculty
Majors Admission and Retention Committee (MARC) - 13 years
Sport and Physical Education Curriculum Committee - 10 years
Computer Competency Committee - 10 years
International Committee - 7 years (2 years as chair)
Promotion and Tenure Committee - 5 years (secretary - 1 year)
Director of Physical Education Teacher Education Lab - 11 years
Coordinate Multimedia Cart Use - 7 years
Coordinate Advising - 5 years
Departmental Honors Coordinator - 4 years
Web Publisher - 6 years
Korsgaard Outstanding Graduate Student Selection Committee - 4 years
Salary Committee - 1 year
Expenditure Reduction Committee - 1 year
Physical Education Program Board - 3 years
Task Force for School Restructuring - 1 year
Graduate Council - 2 years
Awards Committee - 3 years (chair - 2 years, secretary - 1 year)
Name Change Committee - 1 year

## HONORS AND AWARDS

Meritorious Service Award, Midwest District of the American Alliance for Health, Physical
      Education, Recreation, and Dance, 2004
Service Award, National Association for Physical Education in Higher Education, 2001
Research highlighted in Ball State University publication, *BeneFacta*, 2000

7

Leadership Recognition Award, Indiana Association for Health, Physical Education, Recreation
and Dance, 1998
Outstanding Tenure-line Teacher, School of Physical Education, Ball State University, 1993-
1994
Listed in Who's Who in American Education, 1992

## PUBLICATIONS

Buck, M. M. (In Press). Technology chapter. In N. Schmottlach & J. McManama, *Physical
Education Activity Handbook*, (11th ed.). San Francisco, CA: Benjamin Cummings.

Buck, M. M., & Lund, J. (In Press). *Instructional strategies for secondary school physical
education* (6th ed.). Dubuque, IA: McGraw-Hill.

Woodard, R., Lund, J., Wayda, V., & Buck, M. (2004). Daily physical education, physical
fitness, and middle school students. *Journal of the International Council for Health,
Physical Education, Recreation, Sport & Dance, 40*(4), 20-23.

Buck, M. M., Floyd, P., & Jable, T. (2004). *Foundation of physical education*. Atlanta, GA:
Wadsworth.

Lund, J., Woodard, R., Wayda, V., & Buck, M. (2003). An examination of content knowledge
used by inservice physical education teachers in Indiana. *Indiana Journal for Health,
Physical Education, Recreation, and Dance, 32*(1), 10-17.

Lund, J., Woodard, R., Wayda, V., & Buck, M. (2002). Survey of Indiana physical educator's
content knowledge. *Indiana Journal for Health, Physical Education, Recreation and
Dance, 31*(3), 23-28.

Buck, M. M. (2002). Video aids improvement of physical skills. *Curriculum Technology
Quarterly, 11*(3), 4.

Buck, M. M. (2002). *Heart rate assessment*. NASPE Assessment Series Monograph. Reston,
VA: NASPE.

Buck, M. M. (2002). Softball. In N. Schmottlach & J. McManama, Ed., *Physical education
activity handbook*. San Francisco: Benjamin Cummings. (pp. 295-309).

Buck, M. M. (2002). Technology and physical education programs of the future. In N.
Schmottlach & J. McManama, Ed., *Physical education activity handbook*. San Francisco:
Benjamin Cummings. (pp. 17-23).

Harrison, J. M., Blakemore, C. L., & Buck, M. M. (2001). *Instructional strategies for secondary
school physical education* (5th ed.). Dubuque, IA: McGraw-Hill.

8

Buck, M. (2000). A physical fitness requirement: Results of implementation. In *Research on Teaching and Research on Teacher Education*, Proceedings of the AIESEP International Seminar, Lisbon, Portugal, November 21-24, 1996, Carriero da Costa, F., Diniz, J. A., Carvalho, L. M., & Onofre, M. S., Eds.

Buck, M. (2000). Departments respond to teacher education reform effort. *Institution Transformation: A Report on the ACE Project on Leadership and Institutional Transformation*, p. 11.

Buck, M. (1999). Teaching methods: meeting the needs of students throughout the world – summary of sport pedagogy symposium. *International Council for Health, Physical Education, Recreation, Sport, and Dance Journal, 36*(1), 28.

Buck, M. M. (1999). Technology: A tool to enhance achievement of physical education objectives. *Indiana Journal for Health, Physical Education, Recreation and Dance, 28*(1), 17-18.

Buck, M. M. (1996). Interdisciplinary approach to teaching: K-12 physical education. *Journal of Interdisciplinary Research in Physical Education, 1*(1), 7-14.

Harrison, J. M., Blakemore, C. L., Buck, M. M., & Pellett, T. L. (1996). *Instructional strategies for secondary school physical education* (4th ed.). Dubuque, IA: Brown & Benchmark.

Harrison, J. M., Blakemore, C. L., Buck, M. M., & Pellett, T. L. (1996). *Instructor's manual for Instructional strategies for secondary school physical education* (4th ed.). Dubuque, IA: Brown & Benchmark.

Harrison, J. M., Fellingham, G. W., & Buck, M. M. (1995). Self-efficacy, attribution, and volleyball achievement. *International Journal of Physical Education, 32*(4), 4-10.

Kirkpatrick, B., & Buck, M. M. (1995). Heart adventures challenge course: A lifestyle education activity. *The Journal of Physical Education, Recreation & Dance, 66*(2), 17-24.

Kirkpatrick, B., & Buck, M. M. (1995). Ultra physical education -- Looking to the future. *Journal of the International Council for Health, Physical Education, Recreation, Sport, and Dance, 31*(2), 33-37.

Buck, M. M., & Kirkpatrick, B. (1995). Funding sources for new wellness programs: Finding your way through the maze. *Strategies, 8*(5), 5-9.

9

Harrison, J. M., Fellingham, G. W., Buck, M. M., & Pellett, T. L. (1995). The effects of practice and command styles of instruction on rate of change in volleyball performance and self-efficacy of high-, medium-, and low-skilled learners. *Journal of Teaching in Physical Education, 14*, 328-339.

Harrison, J. M., Buck, M., & Pellett, T. (1995, April/May). Volleyball instruction: Results of using game and equipment modifications. *Coaching Volleyball,* 12-15.

Buck, M. M., & Assmann, N. (1995). Computer training received and needed by Indiana public school physical education teachers. *Indiana Journal for Health, Physical Education, Recreation and Dance, 24*(1), 34-37.

Buck, M. M., & Assmann, N. (1994). Computer usage by Indiana public school physical education teachers: Part II. *Indiana Journal for Health, Physical Education, Recreation and Dance, 23*(3), 9-12.

Buck, M. M., & Assmann, N. (1994). Computer usage by Indiana public school physical education teachers. *Indiana Journal for Health, Physical Education, Recreation and Dance, 23*(2), 14-16.

Buck, M. M. (1994). NAPEHE survey results: Part II. *The Chronicle of Physical Education in Higher Education, 5*(3), 6, 12-13.

Buck, M. M. (1994). NAPEHE survey results: Part I. *The Chronicle of Physical Education in Higher Education, 5*(2), 5, 13.

Masters, K. S., Lindsay, G. B., Buck, M. M., & Dobbs, G. M. (1993). Physical fitness of seventh graders: A descriptive analysis with implications for physical education teachers and administrators. *Indiana Journal for Health, Physical Education, Recreation and Dance, 22*(3), 33-36.

Buck, M. M. (1992). Softball. In D. C. Seaton, N. Schmottlach, J. L. McManama, I. A. Clayton, H. C. Leibee, & L. L. Messersmith, *Physical Education Handbook,* Englewood Cliffs, NJ: Prentice-Hall (pp. 279-293).

Harrison, J. M., & Buck, M. M. (1992). Instructor's manual for *Instructional Strategies for Secondary School Physical Education* (3rd. ed.). Wm. C. Brown Publishers.

Buck, M., Harrison, J. M., & Bryce, G. R. (1991). An analysis of learning trials and their relationship to achievement in volleyball. *Journal of Teaching in Physical Education, 10,* 134-152.

Buck, M., & Harrison, J. M. (1990). An analysis of game play in volleyball. *Journal of Teaching in Physical Education, 10,* 38-48.

10

Buck, M., & Harrison, J. M. (1990). Improving student achievement in physical education. *Journal of Physical Education, Recreation & Dance, 62*(7), 40-44.

Buck, M., Harrison, J. M., Fronske, H., & Bayles, G. (1990). Teaching biomechanics concepts to junior high physical education classes. *Journal of Physical Education, Recreation and Dance, 61*(6), 91-95.

Buck, M., Harrison, J. M., Fronske, H., & Bayles, G. (1990). Quad ball. *Journal of Physical Education, Recreation and Dance, 61*(2), 7.

## ABSTRACTS

Wayda, V., Lund, J. L., Buck, M., & Woodard, R. (2004). Employability skills: What are we teaching our students. *Research Quarterly for Exercise and Sport, 75*, A-84.

Lund, J. L., Woodard, R., Wayda, V., & Buck, M. M. (2003). Survey of Indiana physical educator's content knowledge. *Research Quarterly for Exercise and Sport, 74*, A-48.

Griffin, L. L., Hall, S. J., Meaney, K. S., Dunn, J. M., Buck, M., LaMaster, K. J., Chen, A., & Cruz, L. M. (2003). Life as an academic in the 21st century–Part 1: Establishing strong mentoring and Part II: Navigating the tenure and promotion process. *Research Quarterly for Exercise and Sport, 74*, A-93, A-94.

Buck, M. M. (2002). Use of technology in physical education. *2002 China-US Conference on Physical Education Program and Abstracts*, 10. Beijing, China.

Buck, M. M., & Lund, J. (2002). Performance based assessment of pedagogical skills. *2002 China-US Conference on Physical Education Program and Abstracts*, 10. Beijing, China.

Buck, M. M. (1997). The skill-fit model for improving fitness and skills simultaneously, 37. AIESEP World Conference on Teaching, Coaching and Fitness Needs in Physical Education and the Sport Sciences, Singapore.

Buck, M. M. (1997). Incorporating interdisciplinary units into physical education classes, 111. AIESEP World Conference on Teaching, Coaching and Fitness Needs in Physical Education and the Sport Sciences, Singapore.

Buck, M. M. (1996). Review of research using heart rate monitors: Implications for effective teaching. *Book of Abstracts: Research on Teaching and Research on Teacher Education*,15. AIESEP International Seminar, Lisbon, Portugal.

11

Buck, M. M. (1996). A physical fitness requirement: Results of implementation. *Book of Abstracts: Research on Teaching and Research on Teacher Education,*16. AIESEP International Seminar, Lisbon, Portugal.

Buck, M. M. (1996). Symposium: Heart rate monitor research. *Research Quarterly for Exercise and Sport, 67*(Supplement), A-36.

Burton, C. J., & Buck, M. M. (1996). The heart rates of elementary children during physical education. *Research Quarterly for Exercise and Sport, 67*(Supplement), A-37.

McManama, J., Buck, M. M., Burton, C. J., & O'Connor, C. (1996). Improving cardiovascular fitness in a college beginning volleyball class. *Research Quarterly for Exercise and Sport, 67*(Supplement), A-37-38.

Kirkpatrick, B., & Buck, M. M. (1996). Comparing changes in cardiovascular measures of middle school students. *Research Quarterly for Exercise and Sport, 67*(Supplement), A-38.

Buck, M. M., & McManama, J. (1995). Improving skill and fitness concurrently: Can it be done? *Abstracts of the '95 World Congress of the International Council for Health, Physical Education, Recreation, Sport, and Dance.* Gainesville, FL.

Harrison, J., & Buck, M. (1991). Relationship of learning trials and learner characteristics to volleyball achievement using USVBA-recommended game modifications. *Abstracts of the 1991 World Congress of the International Association of Physical Education Schools in Higher Education.* Atlanta, GA.

Buck, M., & Harrison, J. M. (1990). A new research technique for analyzing learning. *Abstracts of Research Papers, 56th Annual Convention of the Southwest District of the American Alliance for Health, Physical Education, Recreation, and Dance.* Albuquerque, NM.

Buck, M. (1990). An analysis of learning trials and their relationship to achievement in volleyball. *Abstracts of Research Papers, 56th Annual Convention of the Southwest District of the American Alliance for Health, Physical Education, Recreation, and Dance.* Albuquerque, NM.

Buck, M. (1990). An analysis of learning curves in volleyball. *Abstracts of Research Papers, 56th Annual Convention of the Southwest District of the American Alliance for Health, Physical Education, Recreation, and Dance.* Albuquerque, NM.

Buck, M., & Harrison, J. M. (1989). An analysis of learning trials and their relationship to achievement in volleyball. *The R. Tait McKenzie Symposium on Sport.* Knoxville, TN.

12

## CREATIVE ENDEAVORS

Buck, M., & McManama, J. (2000). Space Shuttle Adventure. Curriculum materials and videotape marketed and sold by US Games.

Buck, M., & McManama, J. (1997). Time travel adventure activity. Curriculum materials and videotape being marketed and sold by US Games.

## PUBLISHED COMMUNICATIONS

Buck, M. (2003-2004). President's Messages in *The Chronicle of Higher Education in Physical Education*

Buck, M. (2003). Wrote greetings for the Michigan AHPERD Convention, Illinois AHPERD Convention, Wisconsin AHPERD Convention, and NAPEHE Convention which were included in the convention programs.

Buck, M. (September, 1998). Scholarly publications. *The Chronicle of Physical Education in Higher Education, 9*(3), 2,19.

Buck, M. (May, 1998). Scholarly publications. *The Chronicle of Physical Education in Higher Education, 9*(2), 2.

Buck, M. (February, 1998). Scholarly publications. *The Chronicle of Physical Education in Higher Education, 9*(1), 2.

Buck, M. (September, 1997). Scholarly publications. *The Chronicle of Physical Education in Higher Education, 8*(3), 2,19.

Buck, M. (May, 1997). Scholarly publications. *The Chronicle of Physical Education in Higher Education, 8*(2), 2, 19.

Buck, M. (February, 1997). Scholarly publications. *The Chronicle of Physical Education in Higher Education, 8*(1), 2, 19.

Buck, M. (September, 1996). Scholarly publications. *The Chronicle of Physical Education in Higher Education, 7*(3), 2,19.

Buck, M. (May, 1996). Scholarly publications. *The Chronicle of Physical Education in Higher Education, 7*(2), 2.

## PROFESSIONAL PAPERS AND PRESENTATIONS

Wayda, V., Lund, J., Buck, M., & Woodard, R. (2005). Physical Education Student and Teacher
  Perceptions of Dispositions
    AAHPERD National Convention, Chicago, IL

Wayda, V., & Buck M. (2005). Learning More by Doing: A Teaching Strategy that Eliminates
  the "But"
    NAKPEHE Conference, Tucson, AZ

Buck, M. (2004, December). National Physical Education Standards: What Are They? Why Do
  We Need Them?
    Michigan Association for Health, Physical Education, Recreation and Dance Convention,
    Columbus, OH.

Buck, M., Crouch, S., & Hicks, L. (2004, November). A Comprehensive Education for Every
  Child: Physical Education and Health Education Are Core
    IAHPERD Convention, Indianapolis, IN.

Buck, M. M. (2004, September). No Child Left Behind
    Midwest District AAHPERD Leadership Conference, Angola, IN.

Davis, R., & Buck, M. (2004, September) Special Education and Adapted Physical Education in
  the United States
    Intensive Program, University College Worcester, Worcester, UK.

Wayda, V., Lund, J.L., Buck, M. & Woodard, R. (2004, April) Employability skills: What are we
  teaching our students?
    AAPHERD, New Orleans, LA.

Lund, J.L., Wayda, V., & Buck, M. (2004, January).  Teacher Preparation for Physical Activity:
  The Past, the Present, the Future
    NAPEHE, Clearwater Beach, FL.

Buck, M. (2003, November). Eliminating the barriers to physical activity.
    Michigan Association for Health, Physical Education, Recreation and Dance Convention,
    Traverse City, MI.

Buck, M., Hicks, L., Duchane, K., Cothran, D, & Hare, M. (2003, November). Meeting both
  physical education standards and health standards.
    IAHPERD Convention, Indianapolis, IN.

14

Buck, M. M. & Lund, J. (2003, October) Meeting standards through performance-based
    assessment: The Ball State model
        Physical Education Teacher Education Conference, Baton Rouge, LA.
            Prepared and submitted proposal and assisted in the development of the poster but
            was unable to attend due to the dates conflicting with the Midwest District
            Leadership Conference

Griffin, L. L., Hall, S. J., Meaney, K. S., Dunn, J. M., Buck, M., LaMaster, K. J., Chen, A., &
    Cruz, L. M. (2003, April). Life as an academic in the 21st century–Part 1: Establishing
    strong mentoring and Part II: Navigating the tenure and promotion process.
        AAHPERD, Philadelphia, PA.

Lund, J.L., Woodard, R., Wayda, V., & Buck, M. (2003, April) Survey of Indiana Physical
    Educator's Content Knowledge.
        AAPHERD, Philadelphia, PA.

Lund, J.L., Wayda, V., & Buck, M. (2003, January).  Employability Skills: Setting the Stage for
    Student Success after Graduation.
        NAPEHE, Long Beach, CA

Buck, M. M. (2002, July). Use of technology in physical education. 2002 China-US Conference
    on Physical Education, Beijing, China.

Buck, M. M. (2002, April) Seeking national board certification in physical education: Support
    system.
        American Alliance for Health, Physical Education, Recreation, and Dance National
        Convention, San Diego, CA

Woodard, R., Lund, J. L., Wayda, V., & Buck, M. (2002, April). Daily physical education,
    physical fitness, and middle school students.
        American Alliance for Health, Physical Education, Recreation, and Dance National
        Convention, San Diego, CA

Lund, J. L., Wayda, V., & Buck, M. (2002, April). Evaluating preservice teachers' attitudes and
    dispositions: Mentioning the "Unmentionables".
        American Alliance for Health, Physical Education, Recreation, and Dance National
        Convention, San Diego, CA

Buck, M. (2002, February). United States perspective on the structure of sport.
        International Week, University College Worcester, Worcester, UK

Lund, J., & Buck, M. (2002, January). Assessment project report.
        Professional Preparation Conference, Mitchell, IN.

Buck, M. (2002, January). Standards usage.
   Professional Preparation Conference, Mitchell, IN.

Lund, J., Buck, M., & Wayda, V. (2002, January). Using accountability effectively in teacher
   education.
   National Association for Physical Education in Higher Education Conference, San
   Antonio, TX.

Buck, M. (2001, November). Liability in coaching.
   Indiana Association for Health, Physical Education, Recreation and Dance Conference,
   Indianapolis, IN

Buck, M. (2001, July). National boards: How universities can help. Catch the Thrill of the Skill,
   NASPE National Standards Conference, Kansas City, MO

Buck, M. (2000, November). Uses of technology in physical education
   IVth International Sports Sciences Congress, Hacettepe University, Ankara, Turkey

Buck M. (2000, November). New research techniques for analyzing learning
   IVth International Sports Sciences Congress, Hacettepe University, Ankara, Turkey

Buck, M. (2000, July). Training PETE students to use heart rate monitors: The Ball State
   University model
   Linking Physical Activity and Fitness, National Association for Sport and Physical
   Education Standards #3 & 4 Conference, Baltimore, MD

Buck, M. (2000, July). Required fitness tests for preservice teachers: Preparation for modeling
   Standard 3
   Linking Physical Activity and Fitness, National Association for Sport and Physical
   Education Standards #3 & 4 Conference, Baltimore, MD

Buck, M. (1999, November). Liability issues in physical education: Implications of court
   decisions on teaching
   Indiana Association for Health, Physical Education, Recreation and Dance Conference,
   Ft. Wayne, IN

Buck, M., McManama, J., Barker, T., & Northcroft, S. (1999, November). Space Shuttle
   Adventure: K-12
   Indiana Association for Health, Physical Education, Recreation and Dance Conference,
   Ft. Wayne, IN

Buck, M. M. (1999, October). Training preservice and inservice teachers in the use of technology
   in physical education
   NASPE National Teacher Education Conference in Physical Education: Exemplary
   Practice in Teacher Education, Bloomingdale, IL

Buck, M. M. (1999, July). Achieving individual fitness goals: Using heart rate monitors
    International Council for Health, Physical Education, Recreation, Sport, and Dance
    World Congress, Cairo, Egypt

Buck, M. M. (1999, April). Healthy alternatives for enhancing physical education and health with
    technology
    Legacy 21 Professional Development Series - TV Program
    Broadcast from Ball State but had national audience

Buck, M. (1998, November). Legal liability issues in physical education.
    Indiana Association for Health, Physical Education, Recreation and Dance Conference,
    Indianapolis, IN

Buck, M., & McManama, J. (1998, November). Fitness standards for physical education majors:
    issues and answers
    Indiana Association for Health, Physical Education, Recreation and Dance Conference,
    Indianapolis, IN

Buck, M. (1998, November). Technology – What's happening in Indiana.
    Indiana Association for Health, Physical Education, Recreation and Dance Conference,
    Indianapolis, IN

Buck, M. (1998, November). PowerPoint basics.
    Indiana Association for Health, Physical Education, Recreation and Dance Conference,
    Indianapolis, IN

Buck, M. M. (1998). Uses of technology in physical education.
    HyperMedia 98, Muncie, IN

Wilson, T., Buck, M., & Wayda, V. (1998, April). Interscholastic coaching certification.
    American Alliance for Health, Physical Education, Recreation and Dance National
    Conference, Reno, NV

Buck, M. M. (1998, April). Technology in high school physical education.
    Legacy 21 Professional Development Series - TV Program
    Broadcast from Ball State but had national audience

Buck, M. M. (1998, February). Technology in middle school physical education.
    Legacy 21 Professional Development Series - TV Program
    Broadcast from Ball State but had national audience

Buck, M. M.  (1997, December). The skill-fit model for improving fitness and skills
        simultaneously.
        AIESEP World Conference on Teaching, Coaching and Fitness Needs in Physical
        Education and the Sport Sciences, Singapore.

Buck, M. M. (1997, December) Incorporating interdisciplinary units into physical education
        classes.
        AIESEP World Conference on Teaching, Coaching and Fitness Needs in Physical
        Education and the Sport Sciences, Singapore

Buck, M. (1997, November). Computer programs to enhance physical education.
        Indiana Association for Health, Physical Education, Recreation and Dance Conference,
        Indianapolis, IN

Buck, M. (1997, November). Creating a homepage.
        Indiana Association for Health, Physical Education, Recreation and Dance Conference,
        Indianapolis, IN

Buck, M. (1997, November). Using video cameras to increase skill learning in physical
        education.
        Indiana Association for Health, Physical Education, Recreation and Dance Conference,
        Indianapolis, IN

Buck, M. (1997, November). Using presentation software.
        Indiana Association for Health, Physical Education, Recreation and Dance Conference,
        Indianapolis, IN

Ignico, A., & Buck, M. (1997, November). Tap into new sources of funding for your program.
        Indiana Association for Health, Physical Education, Recreation and Dance Conference,
        Indianapolis, IN

Buck, M. (1997, October). Integrating technology into physical education teaching.
        HyperMedia 97: Integrating Technologies into Teaching & Learning Conference, Muncie,
        IN

Buck, M., & Thomson, W. (1997, March).  Practical applications of technology in teaching
        physical education.
        American Alliance for Health, Physical Education, Recreation, and Dance National
        Convention, St. Louis, MO

Strand, B., Reeder, S., Pratt, B., Levine, J., Greenburg, J., & Buck, M. M. (1997, March). Using
        Polar heart rate monitors as a grading and motivating tool.
        American Alliance for Health, Physical Education, Recreation, and Dance National
        Convention, St. Louis, MO

18

Buck, M. (1997, February). Introducing pre-service teachers to physical education national
content standards.
Midwest District of the American Alliance for Health, Physical Education, Recreation,
and Dance Conference, Milwaukee, WI

Buck, M., Thomson, W. C., McManama, J., & Ignico, A. (1997, February). Enhancing fitness
and skill using heart rate monitors.
Midwest District of the American Alliance for Health, Physical Education, Recreation,
and Dance Conference, Milwaukee, WI

Buck, M., Thomson, W. C., McManama, J., & Ignico, A. (1997, February). Infusing fitness into
skill development units.
Midwest District of the American Alliance for Health, Physical Education, Recreation,
and Dance Conference, Milwaukee, WI

Buck, M. (1996, November). Review of research using heart rate monitors: Implications for
effective teaching.
Research on Teaching and Research on Teacher Education,
AIESEP International Seminar, Lisbon, Portugal.

Buck, M. M. (1996, November). A physical fitness requirement: Results of implementation.
Research on Teaching and Research on Teacher Education,
AIESEP International Seminar, Lisbon, Portugal

Buck, M. (1996, October). Technology moving physical education into the 21st century.
Indiana Association for Health, Physical Education, Recreation and Dance Conference,
Evansville, IN.

Sparks, W., Buck, M., Blakemore, C., & Pellett, T. (1996, April). Preparing teachers in a
changing world: An overview of quality programs in physical education teacher
education.
American Alliance for Health, Physical Education, Recreation, and Dance National
Convention, Atlanta, GA.

Burton, C. J., & Buck, M. M. (1996, April). The heart rates of elementary children during
physical education.
American Alliance for Health, Physical Education, Recreation, and Dance National
Convention, Atlanta, GA.

McManama, J., Buck, M. M., Burton, C. J., & O'Connor, C. (1996, April). Improving
cardiovascular fitness in a college beginning volleyball class.
American Alliance for Health, Physical Education, Recreation, and Dance National
Convention, Atlanta, GA.

19

Kirkpatrick, B., & Buck, M. M. (1996, April). Comparing changes in cardiovascular measures of
     middle school students.
     American Alliance for Health, Physical Education, Recreation, and Dance National
     Convention, Atlanta, GA.

Assmann, N., & Buck, M. (1996, January). Technology: Training teachers for the future.
     Midwest District of the American Alliance for Health, Physical Education, Recreation,
     and Dance Conference, Dearborn, MI.

Buck, M. (1996, January). Safe practices in physical education: Legal liability issues.
     Midwest District of the American Alliance for Health, Physical Education, Recreation,
     and Dance Conference, Dearborn, MI.

Buck, M., McManama, J., & Ignico, A. (1995, October). Using heart rate monitors in physical
     education.
     National Conference on Teacher Education in Physical Education (Sponsored by the
     National Association for Sport and Physical Education), Morgantown, WV.

Buck, M. M., & McManama, J. (1995, July). Improving skill and fitness concurrently: Can it
     be done?
     '95 World Congress of the International Council for Health, Physical Education,
     Recreation, Sport, and Dance, Gainesville, FL.

Buck, M. M. with Barb Ettl, Cathie Burton, & Caryn O'Connor. (1995, April - May).
     Technology workshops for Indiana physical education teachers. Conducted 6 workshops
     throughout the state of Indiana under the sponsorship of the Indiana Department of
     Education, Ball State University, and the Indiana Association for Health, Physical
     Education, Recreation, and Dance.

Ignico, A., & Buck, M. (1995, March). A practical strategy for enhancing sport skill assessment.
     American Alliance for Health, Physical Education, Recreation, and Dance, Portland, OR.

Buck, M, & Sparks, W. (1995, February). Physical education teacher education curriculum
     round table: Concerns and possible solutions.
     Midwest District of the American Alliance for Health, Physical Education, Recreation,
     and Dance, Arlington Heights, IL.

Buck, M., & McManama, J. (1995, January). Tech training for the future I: From college to
     public schools.
     Expanding Horizons: Technology in Physical Education Conference, San Antonio, TX.

Burgess, S., Ignico, A., & Buck, M. (1995, January). Tech training for the future III: Computer
     applications for physical education classes.
     Expanding Horizons: Technology in Physical Education Conference, San Antonio, TX.

Ignico, A., & Buck, M. (1994, November). Integrating heart rate technology into the
undergraduate teacher preparation program.
Indiana Association for Health, Physical Education, Recreation & Dance State
Convention, Merrillville, IN.

Buck, M., Kirkpatrick, B., & Burton, C. (1994, April). A computerized fitness system.
American Alliance for Health, Physical Education, Recreation, and Dance, Denver, CO.

Buck, M., & Pellett, T. L. (1994, February). Knowledge of teacher effectiveness and content
development: Implications for teacher education.
Midwest District Conference of the American Alliance for Health, Physical Education,
Recreation and Dance, Morgantown, WV.

Buck, M. M. (1993, November). The heart adventure and tropical rain forest challenge courses.
Vigo County School Corporation, Terre Haute, IN.

Buck, M. M. (1993, November). Using heart rate monitors.
Vigo County School Corporation, Terre Haute, IN.

Assmann, N., & Buck, M. (1993, October). Beginning computer workshop for physical
educators.
Indiana Association for Health, Physical Education, Recreation & Dance State
Convention, Indianapolis, IN.

Buck, M., & Assmann, N. (1993, October). Results of a survey of computer usage by Indiana
physical education teachers.
Indiana Association for Health, Physical Education, Recreation & Dance State
Convention, Indianapolis, IN.

Harrison, J. M., Pellett, T., & Buck, M. M. (1993, March). The effect of drill, game and
equipment modifications on achievement by low-skilled learners.
American Alliance for Health, Physical Education, Recreation, and Dance, Washington,
DC.

Buck, M. M. (1993, February). A step by step approach to evaluating teaching with a goal of
improving teacher effectiveness.
Midwest District Conference of the American Alliance for Health, Physical Education,
Recreation and Dance, Toledo, OH

Buck, M. M., & Feingold, R. (1993, January). Is NAPEHE working toward the future or the
past? A view of one member.
National Association for Physical Education in Higher Education National Conference,
Fort Lauderdale, FL

Buck, M. M. (1992, October).  Improving teacher effectiveness in middle and high school physical education.
   Indiana Association for Health, Physical Education, Recreation & Dance State Convention,  Fort Wayne, IN

Buck, M. M. (1992, August).  Classroom management.
   S.H.A.P.E. Workshop,  Elkhart, IN

Buck, M. (1992, May).  Physical Best changes.
   Presentation for county physical education teachers, Wes-Del High School, Gaston, IN.

Harrison, J., & Buck, M.  (1992, April).  Relationships of self-efficacy, causal dimension, and sport orientation to volleyball achievement.
   American Alliance for Health, Physical Education, Recreation and Dance,  Indianapolis, IN.

Harrison, J., & Buck, M.  (1992, February).  An analysis of practice and command styles of instruction on the volleyball achievement and self-efficacy of high-, medium-, and low-skilled learners.
   Southwest District of the American Alliance for Health, Physical Education, Recreation and Dance,  Phoenix, AZ.

Harrison, J., & Buck, M.  (1992, January).  Game play changes in volleyball resulting from instruction using game and equipment modifications:  A follow-up study.
   National Association of Physical Education in Higher Education.  Scottsdale, AZ.

Buck, M. (1991, June).  Physical Best workshop for Delaware County, Indiana, physical education teachers.  Muncie, IN.

Buck, M. (1991, March).  7th grade assessment results.  School Health Task Force Presentation/Press Conference, Muncie, IN.

Harrison, J., & Buck, M.  (1991, January).  Relationship of learning trials and learner characteristics to volleyball achievement using USVBA-recommended game modifications. World Congress of the International Association of Physical Education Schools in Higher Education.  Atlanta, GA.

Buck, M. (1990, November).  School Health Task Force:  Physical Best program.  Live Healthy, Delaware County Workshop VII, Muncie, IN.

Buck, M. (1990, March).  Preserving the future of physical education through increasing student achievement.
   Chadron State College.  Chadron, NB.



COLLEGE OF APPLIED SCIENCES AND TECHNOLOGY

Muncie, Indiana 47306-0245
Phone: 765-285-5818
Fax: 765-285-1071

March 31, 2006

Ronald E. Gluck
Attorney at Law
Breakstone, White-Lief & Gluck, P. C.
Two Center Plaza
Suite 530
Boston, MA 02108-1906

RE: Yukio Kusada

Dear Mr. Gluck:

My fee schedule for this case is $40 per hour. I have not served as an expert witness before.

Please let me know if you need additional information.

Sincerely,

Marilyn M. Buck
Professor of Physical Education
Associate Dean
College of Applied Sciences and Technology
Ball State University
Muncie, IN 47306

**EXHIBIT XIV**

# In The Matter Of:

*YUKIO KUSADA    v.*

*NORTHFIELD MOUNT HERMON SCHOOL, ET AL.*

---

*JAMES WALTER ISHAM*

*October 19, 2006*

---

*KENDRA TELLEZ COURT REPORTING, INC.*

*300 CENTRAL, SW*

*SUITE 1500-EAST*

*ALBUQUERQUE, NM  87102*

*(505) 243-5691    FAX: (505) 242-0313*

*Original File 10-19-~1.PRT, 153 Pages*
*Min-U-Script® File ID: 2148403736*

# Word Index included with this Min-U-Script®

Page 1

[1] UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
[2]
[3] YUKIO KUSADA, )
[4] Plaintiff, )
vs. ) Civil Action No. 05-30043-MAP
[5]
NORTHFIELD MOUNT HERMON )
[6] SCHOOL, et al., )
[7] Defendants )
[8]
[9]
[10] DEPOSITION OF JAMES WALTER ISHAM
[11] Thursday, October 19, 2006
1:09 p.m.
[12] Albuquerque Hilton Garden
Conference Room
[13] 2601 Yale Blvd., S.E.
Albuquerque, New Mexico
[14]
[15]
[16]
[17] PURSUANT TO THE FEDERAL RULES OF CIVIL PROCEDURE this
deposition was:
[18]
[19] TAKEN BY: HAROLD W. POTTER, JR.
ATTORNEY FOR THE DEFENDANT NORTHFIELD MOUNT
[20] HERMON SCHOOL
[21]
REPORTED BY: KENDRA TELLEZ COURT REPORTING
[22] YVONNE C. GONZALES, CCR #62
[23] Albuquerque, New Mexico 87102
[24]
[25]

Page 2

APPEARANCES
[2] For the Plaintiff:
[3] BREAKSTONE, WHITE-LIEF & GLUCK, P.C.
Two Center Plaza, Suite 530
[4] Boston, Massachusetts 02108
BY: RONALD E. GLUCK
[5]
For the Defendant Northfield Mount Hermon School:
[6]
HOLLAND & KNIGHT, LLP
[7] 10 St. James Avenue, 11th Floor
Boston, Massachusetts 02116
[8] BY: HAROLD W. POTTER, JR.
[9]
[10]
[11]

INDEX
[12] Page
[13] EXAMINATION OF JAMES WALTER ISHAM
[14] By Mr. Potter 3
[15]
REPORTER'S CERTIFICATE 151
[16]
SIGNATURE/CORRECTION PAGE 153
[17]
[18] EXHIBITS FORMALLY MARKED/IDENTIFIED
[19] No. Page
[20] 1 - Report letter dated 3/23/06 to Ron Gluck 3
from James W. Isham
[21]
2 - A Skiers Responsibility Code 35
[22]
3 - Rec Skiing and Snowboarding form 37
[23]
4 - Permission form 44
[24]
[25]

Page 3

[1]            JAMES WALTER ISHAM

[2] after having been first duly sworn under oath, was

[3] questioned and testified as follows:

[4]            EXAMINATION

[5]            BY MR. POTTER:

[6]     Q: Would you state your name and address for the

[7] record, please?

[8]     A: James Walter Isham. Mailing address, P.O. Box

[9] 2619, Taos, New Mexico, 87571.

[10]     MR. POTTER: Could we have marked as the first

[11] exhibit a document that is dated 3-23-2006, Isham and

[12] Associates, to Ron Glock from Mr. Isham.

[13]     (Exhibit 1 was marked for identification.)

[14]     Q: (By Mr. Potter) Mr. Isham, first, would you take a

[15] look at that Exhibit Number 1. Is that your report?

[16]     A: Yes, it is.

[17]     Q: Have you at any time supplemented that report in

[18] this case?

[19]     A: I have reviewed some additional materials, but I

[20] haven't written any supplement, no.

[21]     Q: You haven't written any supplement. Okay. What

[22] additional materials have you reviewed?

[23]     A: Some Answers to Interrogatories and a deposition of

[24] Ms. Clough.

[25]     Q: Anything else?

Page 4

[1]     A: No.

[2]     MR. GLUCK: I don't mean to interrupt. I

[3] think you saw Mr. Shealy's report.

[4]     A: I'm sorry. I just got that the other day.

[5]     MR. POTTER: Whose report?

[6]     MR. GLUCK: Dr. Shealy.

[7]     Q: (By Mr. Potter) Did the Answers to Interrogatories

[8] cause you to change your opinions in any way in this case?

[9]     A: No, sir.

[10]     Q: Did the deposition of Ms. Clough cause you to

[11] change your opinion in any way in this case?

[12]     A: No, sir.

[13]     Q: Did Dr. Shealy's report cause you to change your

[14] opinion in any way in this case?

[15]     A: No, it did not.

[16]     Q: Does Exhibit A, as it exists there, contain all the

[17] opinions that you have formed on the Yukio Kusada case?

[18]     A: Yes.

[19]     Q: Does it contain all of the opinions that you expect

[20] to testify at trial about the surface; is that correct?

[21]     A: They do, unless you ask questions of me during this

[22] deposition that would expand these opinions. But I don't

[23] anticipate changing them.

[24]     Q: Do you feel, as you sit here today, that there's

[25] anything more you need to do to arrive at the opinions

Page 5

[1] you've expressed in Exhibit 1?

[2]     A: No.

[3]     Q: You're not going to do anything more unless

[4] something comes up in your deposition; is that correct?

[5]     A: That's correct.

[6]     Q: Now, you have an "Observations" section in Exhibit

[7] 1, correct?

[8]     A: Yes, sir.

[9]     Q: In the "Observations" section on Pages 2, 3 and 4,

[10] you state — and I'm reading — "By Yuki's account, the two

[11] rode the Main lift (Summit Express) several times prior to

[12] the accident. Sometime between 7:00 and 8:00 while Yukio

[13] and Yuki had been skiing together on a trail named Big

[14] Chief, Yuki arrived at the bottom of the mountain and

[15] observed that Yukio was no longer with him." Did I read

[16] that correctly?

[17]     A: I believe you did.

[18]     Q: That was one of the observations that you made,

[19] correct?

[20]     A: Yes.

[21]     Q: Now, absent from your report are any observations

[22] about what Yukio Kusada did between the last time that Yuki

[23] Hasegawa saw him and when he was found at 4 a.m. the next

[24] morning, correct?

[25]     A: What he did?

Page 6

[1]     Q: What he did.

[2]     A: Correct.

[3]     Q: Do you have any — do you know of any witness, any

[4] person, who observed what he did between the time that Yuki

[5] Hasegawa last saw him on the Big Chief trail on February 20,

[6] 2004, and the time that he was found in the woods at 4 a.m.

[7] on February 21, 2004?

[8]     A: Not to this time.

[9]     Q: Are you aware, as you sit here today, of any

[10] physical evidence that you observed on the slope that would

[11] tell you or anybody else what Yukio Kusada did between the

[12] point where Yuki Hasegawa last saw him and the point where

[13] he left the trail?

[14]     A: The only thing I can say to that is, he obviously

[15] slid down the hill from one location to the point he went

[16] off the trail. But I know of no information whatsoever how

[17] did he it, where he did it. I know where he went off the

[18] trail, as far as I can go.

[19]     Q: When you say he slid off the trail, what do you

[20] mean by that?

[21]     A: Well, skiing is a sliding sport. Sliding over a

[22] surface, wet slippery surface. So he had to have traveled

[23] from last seen to the point of rest somehow.

[24]     Q: Do you have any knowledge or any information about

[25] whether he made any turns between those two points?

YUKIO KUSADA, vs.                                  JAMES WALTER ISHAM
NORTHFIELD MOUNT HERMON SCHOOL, ET AL.                October 19, 2006

Case 3:03-cv-30043-MAP    Document 43-18    Filed 11/27/2006    Page 35 of 51

Page 7

[1]    A: There's no way to know.

[2]    Q: Do you have any knowledge about whether he stopped

[3]  at any time between those two points?

[4]    A: No. The only thing that could come to bear from my

[5]  experience is the distance from the edge of the trail to the

[6]  — my best understanding — the point of rest would indicate

[7]  that he made some turns or had some control before he got to

[8]  the point at which he left the trail.

[9]    Q: What from your experience would indicate that he

[10] made some turns between the time that he was last seen by

[11] Yuki Hasegawa and the point where he left the trail?

[12]   A: Observation of thousands of skiers making turns and

[13] knowing how people proceed down the hill. Understanding

[14] that he was like a skier. He made some turns in some

[15] fashion or another. And just reasoning from the point he

[16] was last seen to the point he came to rest. Over that

[17] distance, I believe he probably made some sort of turn or

[18] made some sort of effort to control his speed, which is what

[19] turns effectively do in skiing.

[20]   Q: You're assuming that, sir, in your opinion; is that

[21] correct?

[22]   A: Yes.

[23]   Q: Once again, I'm trying to understand, is there any

[24] witness who has told you that? And the answer is no,

[25] correct?

Page 8

[1]    A: Correct.

[2]    Q: Is there any physical evidence on the ski slope or

[3]  photographs or anything else that you have seen that would

[4]  allow you to draw the conclusion on — forget about your

[5]  experience, draw the conclusion that you can point to that

[6]  he made turns between those two points?

[7]    A: Aside from drawing from my experience, no.

[8]    Q: So you couldn't say, for example, that this

[9]  accident happened because some other skier came along and

[10] cut him off, can you?

[11]   A: No, I can't.

[12]   Q: You can't say, for example, that this accident

[13] happened because his friend passed him on the ski slope and

[14] he decided to chase him, can you?

[15]   A: I can't.

[16]   Q: You can't say, sir, that he might have lost his

[17] glasses on the way down and couldn't see where he was going,

[18] can you?

[19]   A: I didn't know he was wearing glasses, but I can't

[20] do that.

[21]   Q: Well, let me represent to you that he wears glasses

[22] — either contacts or glasses. You don't know whether or

[23] not he lost them during that interval and couldn't see where

[24] he was going, do you?

[25]   A: No.

Page 9

[1]    Q: You don't know whether another skier bumped into

[2]  him on the way down, do you?

[3]    A: I thought my first answer to your question was, I

[4]  don't know of any witness that can tell me what happened

[5]  from the time he was last seen to the time he went into the

[6]  woods. So all the questions you're asking me, the answer is

[7]  obviously no.

[8]    Q: I know that you've testified a lot before,

[9]  Mr. Isham. In the last, let's say, four years, how many

[10] times have you testified?

[11]   A: At deposition or in court or both?

[12]   Q: If you can break it down —

[13]   A: Approximately.

[14]   Q: — that would be great.

[15]   A: I'd have to give you a rough estimate.

[16]   Q: Yes.

[17]   A: It's probably — in four years, could be 50 times.

[18] Twenty-five to 50, let's say.

[19]   Q: Can you break that down in any way between actually

[20] testifying in court and in depositions or

[21]   A: It's probably 80 percent depositions. Best

[22] estimate.

[23]   Q: Did any of those cases —

[24]   A: Excuse me just a moment. It's probably a lot more

[25] in deposition than court. Very few of my cases get to

Page 10

[1]  trial.

[2]    Q: Of any of those cases that you testified in in the

[3]  last four years, did any of them concern somebody skiing off

[4]  of a slope — or a trail, I should say, not a slope. A

[5]  trail?

[6]    A: Hold on just a minute, please. Skiing off a slope.

[7]    Q: Skiing off a trail. I'm saying. I amended it.

[8]    A: What's the difference?

[9]    Q: To me, just — there is a trail designated by the

[10] ski area. The trails are usually fairly well defined. I'm

[11] talking about somebody skiing off the trail into an area

[12] that is not part of the trail. Such as happened here where

[13] he ended up in the trees.

[14]   A: Right. Basically, one. And by your definition of

[15] the trail, which I would assume — particularly, in this

[16] case, is defined by the tree line, which we generally, in

[17] the industry, agree that's the boundary of any ski trail.

[18]   This other one was a little bit different than

[19] that, but the context of the case was that he was off the

[20] trail. It just wasn't about the tree line.

[21]   I have to amend my answer in the numbers of trials

[22] and depositions. Depositions number about — at this point,

[23] about 25. And trials, about probably five of that. I'm

[24] sorry if I misspoke.

[25]   Q: No. That's okay. What was the one case that

Page 11

[1] involved the skier who skied off the trail?

[2] A: That case is still pending, which is my best

[3] understanding at this point. But this was a young man who

[4] was skiing down a defined trail and at the bottom, without

[5] warning, the defined trail became no longer the groomed

[6] slope. He was drawn through the vagaries of the snow

[7] surface and the terrain into the left side and banged into a

[8] steel post that had been pounded into the ground by the ski

[9] area, unpadded.

[10] Q: What's the name of that case?

[11] A: Shepler versus Lee Canyon.

[12] Q: At least in the last four years, no other cases

[13] that you can think of that fall into that category?

[14] A: Not in my listings that I've got here, no.

[15] Q: You've brought some listings with you today. Did

[16] you add any cases to that since your report of May 23, 2006?

[17] A: I don't believe I've added the cases that I've

[18] testified in the last — well, both deposition and trial,

[19] in the last three or four months.

[20] Q: How many have those been, Mr. Isham?

[21] A: I believe I would be correct in saying there have

[22] been three depositions and one trial.

[23] Q: Did any of those matters involve a situation where

[24] an individual skied off the defined trail?

[25] A: Arguably, no. I say that because one of these was

Page 12

[1] a case that there was an argument about the defined area of

[2] the trail and the ski area putting a steel box inside the

[3] boundaries of the trail onto which a gentleman impacted and

[4] died.

[5] Q: What was the name of that case and where is it

[6] pending?

[7] A: It's over. Garmann versus — G-a-r-m-a-n-n —

[8] versus Grand Targhee.

[9] Q: Versus Grand?

[10] A: Targhee, T-a-r-g-h-e-e.

[11] Q: Where in the country is that pending or what —

[12] A: It's not.

[13] Q: Where was it?

[14] A: It's been to trial. It was tried in Laramie,

[15] Wyoming. The Grand Targhee is in Wyoming, up in the

[16] northern end.

[17] Q: When did the trial occur?

[18] A: About two months ago.

[19] Q: You testified during that trial?

[20] A: I did.

[21] Q: How did it turn out?

[22] A: We settled it during trial. Turned out very well.

[23] Q: Have you met or had you met Mr. Gluck before you

[24] became involved in this case?

[25] A: No, sir.

Page 13

[1] Q: How did you meet Mr. Gluck?

[2] A: Through a search firm by the name of TASA.

[3] Q: What does TASA stand for?

[4] A: I don't know just exactly. Technical Assistance

[5] something, something.

[6] Q: Are you listed as an expert with TASA?

[7] A: Yes.

[8] Q: Do you have an arrangement with them whereby they

[9] refer you to attorneys and attorneys to you?

[10] A: Well, I believe it works that attorneys call TASA

[11] and ask if they have an expert in my expertise. If they say

[12] yes, then I'm referred to contact him and we talk.

[13] Q: From that point forward, do you deal through TASA

[14] at all or is it solely directly with Mr. Gluck?

[15] A: Both. I do — the billing statements are sent to

[16] TASA. They send them to Mr. Gluck. Everything else that I

[17] deal with is directly between me and Mr. Gluck. All the

[18] facts of the case. All the other performance that has to do

[19] with it.

[20] Q: For example, to arrange for your deposition here

[21] today, does Mr. Gluck just call you directly or does TASA

[22] arrange that?

[23] A: Mr. Gluck calls me directly.

[24] Q: How long have you been listed as — or possibly

[25] referred as an expert with TASA?

Page 14

[1] A: I'd have to give you a best estimate —

[2] Q: Sure.

[3] A: — of somewhere around the late '80s.

[4] Q: I know in 2004 you indicated that for the past five

[5] years, prior to 2004, 80 percent of your cases were for

[6] plaintiffs and 20 percent were for defendants. Is that

[7] correct? Roughly?

[8] A: Say that again. Well, let me answer it this way.

[9] Prior to the year 2000, where the ski areas were named as

[10] defendants, I testified on behalf of the defendant, the ski

[11] area.

[12] Q: Prior to 2000?

[13] A: Prior to 2000.

[14] Q: And then what happened?

[15] A: Exceptions to that, of course, were collision cases

[16] or where the ski area was not a named party. Then it could

[17] have been either plaintiff or defendant.

[18] Q: As of 2000, you have testified for plaintiffs in

[19] cases where the ski area is a defendant?

[20] A: That's correct.

[21] Q: Taking it, if we could, for the last five years,

[22] 2006 back to 2001, what percentage of your work is for

[23] plaintiffs in the ski area and what percentage is for any

[24] type of defendant?

[25] A: I would say somewhere in the 90 percent for

Page 15

[1] plaintiff.

[2] **Q:** And so 10 percent is for defendants. What's the
[3] last case that you recall that you worked for a defendant?

[4] **A:** A case by the name of Upke, U-p-k-e versus Marshall
[5] Mountain.

[6] **Q:** Where is Marshall Mountain located?

[7] **A:** Montana. I think. Yes. Missoula, Montana.

[8] **Q:** That's the Missoula case that's listed on your list
[9] of cases?

[10] **A:** Yes, sir.

[11] **Q:** Now, you've listed in your — in Exhibit 1 the
[12] materials that you reviewed in this case. This is on Page
[13] 2, correct?

[14] **A:** Right.

[15] **Q:** You have now told me today that you reviewed a
[16] couple of additional items?

[17] **A:** Yes.

[18] **Q:** One was the Answers to Interrogatories. One was
[19] the deposition transcript of Clough and the third one
[20] was ....

[21] **A:** Dr. Shealy.

[22] **Q:** Dr. Shealy?

[23] **A:** Yes.

[24] **MR. GLUCK:** There's also another one, Harry.
[25] The Plaintiff's deposition.

Page 16

[1] **Q:** So you did —

[2] **A:** Yes, I did. Would you like me to list those so we
[3] just don't have any more confusion around here. I've got
[4] them —

[5] **Q:** Sure.

[6] **A:** — the ones I received and reviewed since then.

[7] **Q:** I would like to know what you have reviewed and
[8] what you haven't reviewed.

[9] **A:** Thank you. Okay. Plaintiff's Answers to Defendant
[10] Michael Atkins' First Set of Interrogatories, Plaintiff's
[11] Answers to Defendant Francis Mallard's First Set of
[12] Interrogatories, Plaintiff's Answers to Defendant Northfield
[13] Mount Hermon School's First Set of Interrogatories,
[14] Plaintiff's Answers to Defendant Union Terminal Piers,
[15] Incorporated, Interrogatories, Answers of Defendant
[16] Northfield Mount Hermon School to First Set of
[17] Interrogatories propounded by Yukio Kusada, Answers of
[18] Michael Atkins to First Set of Interrogatories propounded by
[19] the Plaintiff Yukio Kusada, Answers of Francis Mallard to
[20] First Set of Interrogatories propounded by the Plaintiff
[21] Yukio Kusada, deposition of Yukio Kusada.

[22] And I'm looking for Ms. Clough's first name. If
[23] you have it, we can shorten this.

[24] **Q:** Susan.

[25] **A:** Deposition of Susan Clough.

Page 17

[1] **Q:** I have read your CV. I just want to confirm some
[2] things. You've never worked, I take it, at a private
[3] secondary school; is that correct?

[4] **A:** That's correct.

[5] **Q:** And obviously, then, you've never worked at a
[6] private secondary school in New England; is that correct?

[7] **A:** That's correct.

[8] **Q:** You have never taught a recreational ski program or
[9] been responsible for a recreational ski program at a private
[10] secondary school anywhere, correct?

[11] **A:** As an employee of the school, that's correct.

[12] **Q:** Have you done it not as an employee of the school?

[13] **A:** Yes.

[14] **Q:** What school?

[15] **A:** Don't remember the name of the school. I can give
[16] you sort of the venue, if you will.

[17] **Q:** Yes.

[18] **A:** It's a private school out of the Dallas, Texas,
[19] area who came to Copper Mountain Ski Area on an annual
[20] basis. It's a private school. We arranged with them to do
[21] the teaching program while they were there.

[22] **Q:** So am I correct in understanding that you were not
[23] an employee of the school running their recreational ski
[24] program?

[25] **A:** Yes, you are correct.

Page 18

[1] **Q:** That what you did was you functioned as an
[2] instructor or a teacher for the students that the school
[3] sent you; is that correct?

[4] **A:** Not quite. I functioned as the intermediary, as
[5] the representative of the ski area and the ski school that
[6] would do the teaching. The private school called me.
[7] Between us, we made the arrangements for the lessons of
[8] teaching, the rental skis. They did their own lodging, et
[9] cetera. And that was my function.

[10] **Q:** Now, when did this occur? What time period?

[11] **A:** My best estimate is it was around — somewhere in
[12] the early '80s.

[13] **Q:** At that time what was your position at Copper
[14] Mountain?

[15] **A:** I believe that would be ski school director.

[16] **Q:** Now, did this happen over a period of years or just
[17] one year?

[18] **A:** Again, my best estimate or best recommendation is
[19] that happened over a period of approximately three years.
[20] They returned year after year. I'm not sure how many years
[21] more than that or less, but that's my

[22] **Q:** If I understand you correctly, they came to the
[23] mountain and stayed. How long did they stay?

[24] **A:** I believe they were there for three or four days.

[25] **Q:** How many kids?

Page 19

[1] A: No recollection.

[2] Q: What were the ages?

[3] A: High school through elementary school.

[4] Q: You have no idea of the name?

[5] A: I don't. I remember it came to me about two years

[6] ago, but I honestly can't — I wouldn't be able to drag that

[7] out of my murky memory.

[8] Q: You haven't, then, I take it, from your answers,

[9] been responsible for or worked at a private secondary school

[10] in New England and been responsible for their recreational

[11] ski program, correct?

[12] A: The only private or secondary schools that I've

[13] worked in, have been as a substitute teacher in Ruidoso, New

[14] Mexico.

[15] Q: Could you spell that?

[16] A: The town?

[17] Q: Yes.

[18] A: R-u-i-d-o-s-o.

[19] Q: R-u-i-d-s-o.

[20] A: O-s-o.

[21] Q: O-s-o. Substitute teacher?

[22] A: Yes.

[23] Q: What did you teach?

[24] A: Whatever they needed me to substitute to teach.

[25] Well, I was —

Page 20

[1] Q: Was it skiing?

[2] A: No, no, no. It was off season from skiing.

[3] Q: Off season. How long did you work as a substitute

[4] teacher there?

[5] A: I think I did that for a couple of years.

[6] Q: When was that?

[7] A: Oh, let's see. Probably 1966, '67.

[8] Q: Any other involvement with private secondary

[9] schools?

[10] A: Anywhere in the United States?

[11] Q: Anywhere in the United States.

[12] A: I'm going — the only way I can answer that is —

[13] specifics, I can't recall, but at Copper Mountain in

[14] Colorado, we had occasion to work with a fair number of

[15] schools that brought groups up, aside from the groups that

[16] we organized, to bring up out of Denver.

[17] When I say "bring up," Denver to Copper Mountain.

[18] I cannot recall any specifics.

[19] Q: When was this?

[20] A: Well, I was at Copper Mountain from '72 to '76 and

[21] again from '82 to '89.

[22] Q: You don't remember when during that time period you

[23] did this?

[24] A: Well, my job title for a great deal of that time

[25] was ski school director, which involved youth and adult ski

Page 21

[1] schools and the education of anybody that wanted to come up.

[2] We were in the business of selling lessons and teaching

[3] people to ski.

[4] So we spent part of our time promoting our lessons

[5] to whomever we might be able to get to bring a group up.

[6] That's a terrible sentence. I apologize.

[7] Q: That's okay. Have you ever spoken to anybody at

[8] Northfield Mount Hermon about their ski school?

[9] A: About what?

[10] Q: Their recreational ski school program.

[11] A: No, not specifically that.

[12] Q: Have you spoken to anybody at Northfield Mount

[13] Hermon about anything?

[14] A: Well, not really. The ski patrolman that assisted

[15] me when I was doing my site inspection, I believe, had a

[16] child that was a student there. He was complimentary of the

[17] school. That's the extent of my personal involvement with

[18] even getting close to Mount Hermon.

[19] Q: You didn't go over and visit Mount Hermon?

[20] A: I did not.

[21] Q: Have you done any studies of recreational ski

[22] programs at private secondary schools in New England?

[23] A: No, sir.

[24] Q: Have you, in doing your report, relied on any

[25] studies done by somebody else of recreational ski programs

Page 22

[1] at private schools in New England?

[2] A: I'm not familiar with any of those studies.

[3] Q: So you haven't relied on them?

[4] A: That's correct.

[5] Q: You're not even aware that there are any such

[6] studies, correct?

[7] A: Correct.

[8] Q: Broadening it from Northfield Mount Hermon, have

[9] you spoken with anyone at any private secondary school in

[10] New England who has any responsibility for the recreational

[11] ski program at that school?

[12] A: No.

[13] Q: Are you familiar in any way with any recreational

[14] ski program at any secondary school in New England other

[15] than Northfield Mount Hermon?

[16] A: Familiar in any way?

[17] Q: In any way, yes.

[18] A: Not in any way enough to comment about their

[19] operation or efficacy or safety considerations or whatnot.

[20] Q: Well, tell me what familiarity you do have and with

[21] what specific schools.

[22] A: There are no specific schools, to answer that part

[23] of the question. The familiarity that I have was developed

[24] during the time I was chairman of the National PSIA — PSIA

[25] National Ski School Directors' Committee. And during that

Page 23

[1] time, I talked with ski school directors around the country,
[2] including New England, about their operation, their programs
[3] and how the programs were run and developed.
[4]     Understand that I told you I have no specifics
[5] available to support that comment any further.
[6]     Q: But you're talking about ski school directors. Are
[7] you talking about ski school directors at ski resorts in New
[8] England?
[9]     A: Yes, sir.
[10]     Q: So you're not talking about ski school directors at
[11] a private secondary school, correct?
[12]     A: I don't know that there are any ski school
[13] directors at private or secondary schools.
[14]     Q: But you know that, for example, Michael Adkins was
[15] the coordinator of the recreational ski program at
[16] Northfield Mount Hermon, correct?
[17]     A: Right.
[18]     Q: During 2004, correct?
[19]     A: Yes.
[20]     Q: What I'm asking is, did you talk with people who
[21] were doing the same thing that Michael Adkins was doing at
[22] another school for a similar type program?
[23]     A: I think the answer to that question is no, because,
[24] as I understand the question, you're putting it into private
[25] schools and people who would direct or run programs there.

Page 24

[1]     My conversations with — in this line of
[2] questioning — were with ski school directors at ski areas
[3] who brought private school programs from the private school
[4] to the ski areas and provided the lessons for them.
[5]     Q: You don't recall any specifics of those
[6] conversations?
[7]     A: No, sir.
[8]     Q: You are telling me that the people you were talking
[9] with were the people who were employed by the ski resort,
[10] the mountain, not by the school, correct?
[11]     A: Almost correct. Certainly correct as far as that
[12] went. A large number of people that I talked with also were
[13] people who ran independent programs.
[14]     Q: What do you mean by that?
[15]     A: I'll use — let's say Mr. Gluck is interested in
[16] developing a new business venture that's going to be the
[17] Gluck Sliders. He's going to get kids out of the Boston
[18] area to come to his bus on Saturday morning that he's
[19] leased.
[20]     They're going to have their ski equipment, their
[21] helmet, all their clothing and so forth, ride the bus from
[22] Boston up to Mohawk Mountain, I suppose. Get off the bus,
[23] be put into a ski class.
[24]     He is responsible for organizing the ski lessons,
[25] making sure the kids get on the bus, off the bus, into the

Page 25

[1] lessons and that the lessons are conducted properly. And
[2] then evaluate — evaluation forms are given from the
[3] instructors that are teaching the lessons to him, that he
[4] can pass on to the parents when they return to Boston.
[5]     This is an independent operator running an
[6] independent program from — independent from schools —
[7] private schools, if you will, and independent from the ski
[8] areas. But he is the glue that connects these two people
[9] and provides the transportation and pricing and so forth.
[10]     Q: And independent from public schools, correct?
[11]     A: Correct.
[12]     Q: You say that you participated in that at some
[13] level, or are you saying that you talked with people about
[14] that?
[15]     A: Both.
[16]     Q: In New England, who did you participate with?
[17]     A: I don't know. No, wait. I didn't participate with
[18] anyone in New England.
[19]     Q: Anyone else in the United States did you
[20] participate with?
[21]     A: Well, I ran a program just like the one I
[22] described. I was the ski school director and organized it
[23] from that end. We actually did the whole thing. So I
[24] shouldn't say that I participate with, because I wasn't
[25] independent of the ski area for whom I worked. But the

Page 26

[1] program was on its own.
[2]     Copper Choppers was its name. And I hired a person
[3] to manage and coordinate the program.
[4]     Q: Would it be fair to say that you were doing the
[5] same thing that Berkshire East was doing in the Northfield
[6] Mount Hermon case?
[7]     MR. GLUCK: Objection. What do you mean by
[8] that?
[9]     A: I don't know that it would be fair to say that.
[10]     Q: What's wrong with that statement?
[11]     A: Well, I don't know who generated the initial
[12] contact, who was trying to generate the business. It sounds
[13] like from the materials I've read that Mount Hermon School
[14] wanted to do a ski program. They contacted Berkshire East
[15] to see if they could provide the skiing and the lessons and
[16] so forth that accompanied Berkshire East's program.
[17]     In the scenario I tried to describe to you, if I
[18] had been at Berkshire East, I would have been going out to
[19] Mount Hermon School and trying to generate their business.
[20]     Q: So you would have been drumming up the business?
[21]     A: There you go.
[22]     Q: But in this case, Berkshire East didn't have to
[23] drum up the business, the business came to them?
[24]     A: It was beautiful.
[25]     Q: But it was the same business, correct?

Page 27

[1]    A: Basically, yes.

[2]    Q: That is, Berkshire East runs the ski resort. They

[3] provide ski lessons. They provide ski lessons to groups.

[4] They provide ski lessons to individuals. That's what you

[5] were in the business of doing, correct?

[6]    A: Correct.

[7]    Q: So anybody could come to you? Any group?

[8]    A: Or individuals.

[9]    Q: Or individuals and look for ski lessons and you

[10] would provide it, or the area where you were working would

[11] provide it. That's the capacity in which you worked; is

[12] that correct?

[13]    A: That's correct.

[14]    Q: Now, speaking of 2003-2004, that time period,

[15] Mr. Isham, are you aware of any ski area in the United

[16] States that required any 18-year-old who came to that

[17] mountain to ski to wear a helmet?

[18]    A: In the United States, no.

[19]    Q: Are you aware of any ski area in the United States

[20] in 2003-2004 which required anyone, any age group, to wear a

[21] helmet before they could ski?

[22]    A: No.

[23]    Q: Are you —

[24]    A: Hold on just a second. I'm sorry to be —

[25]    Q: No. That's all right.

Page 28

[1]    A: — so quick on that answer, but I'm not sure about

[2] the time frame. So we may not be coincidental. But it's my

[3] understanding now that Aspen Ski School requires their

[4] children classes to wear helmets. That doesn't go up to

[5] 18-year-olds, however.

[6]    Q: How high does it go?

[7]    A: I think it probably — well, I'm going to have to

[8] estimate that it goes up to around 12.

[9]    Q: You don't know, but you think it's around 12?

[10]    A: I think it's around 12.

[11]    Q: Now, you ran a bunch of ski schools throughout your

[12] history at these resorts. Did you ever require that helmets

[13] be worn by your students?

[14]    A: No, sir. And for good reason.

[15]    Q: What was the reason?

[16]    A: Well, helmets had not been developed to the point

[17] that they have become developed in the '90s.

[18]    Q: Have they —

[19]    A: Or the 2000s, rather.

[20]    Q: Have they developed to the point where the National

[21] Ski Association mandates that skiers wear them?

[22]    A: No. National Ski Association doesn't even mandate

[23] that people wear skis. Helmets are outside of their

[24] purview. I don't know that helmets are mandated any place

[25] in skiing in North America — well, in the United States,

Page 29

[1] aside from — in the ski racing world.

[2]    Q: So —

[3]    A: And freestyle skiing and — events. Skiing events.

[4]    Q: They are mandated in racing, correct?

[5]    A: Correct.

[6]    Q: Who mandates them?

[7]    A: United States Ski Association, I believe.

[8]    Q: So the United States Ski Association gets into that

[9] business; is that correct?

[10]    A: Yes.

[11]    Q: What about the Alpine — bump skiing or jumping

[12] that you're talking about?

[13]    A: United States Ski Association is the umbrella for

[14] that. Snowboarding and all of those events that you see on

[15] TV.

[16]    Q: But the United States Ski Association has not said

[17] that all skiers generally must wear helmets; is that

[18] correct?

[19]    A: Of course it's correct.

[20]    Q: Do you know of a law in any state in the country

[21] that requires a skier going to a ski resort to wear a

[22] helmet?

[23]    A: I don't. I know there's some gentleman in the East

[24] that's — I believe New York State — that's attempting to

[25] get that done for children, but has been unsuccessful.

Page 30

[1]    Q: Do you know of any ski area in the United States

[2] which requires every skier who comes to the mountain to take

[3] a lesson before they can ski?

[4]    A: I only wish it were so.

[5]    Q: I understand, but do you know that?

[6]    A: No, I don't.

[7]    Q: In fact, none of them do; isn't that correct?

[8]    A: That's correct.

[9]    Q: Do you know any ski area in the United States that

[10] requires every skier who comes to the mountain to have his

[11] abilities assessed before he could go on the mountain?

[12]    A: I don't know that either. I don't believe that

[13] exists.

[14]    Q: It's never existed, has it?

[15]    A: Not to my knowledge.

[16]    Q: Do you know any ski area in the country that

[17] inspects a skier's equipment before the skier is allowed on

[18] a lift?

[19]    A: No, sir.

[20]    Q: Never has been; isn't that correct?

[21]    A: Not to my knowledge. Aside from — well, as a ski

[22] area in general, no.

[23]    Q: Do you know any ski area in the United States which

[24] requires that an individual who is a beginner ski only on

[25] beginner slopes?

Page 31

[1]    A: Recommends only.

[2]    Q: They don't require it. They just recommend it?

[3]    A: That's correct.

[4]    Q: So in the case of Yukio Kusada, for example, there
[5] was nothing prohibiting him from skiing on any slope he
[6] wanted to at Berkshire East, as far as Berkshire East was
[7] concerned, as far as you know; is that correct?

[8]    A: That is correct.

[9]    Q: Have you ever known any mountain or ski area in the
[10] United States to remove beginners involuntarily from slopes?

[11]    A: Remove beginners involuntarily?

[12]    Q: Involuntarily.

[13]    A: I'm going to answer that this way: generally,
[14] that's not done, but there are times that people get up on
[15] slopes and are beginners and the slope is considerably
[16] beyond their ability and they're creating a danger for
[17] others, and the ski patrols will get them off the hill. Or
[18] the guest services people are empowered with the same
[19] responsibilities.

[20]    Q: I just want to ask you a couple of questions —

[21]    A: Before the break.

[22]    Q: — that I know you know the answer to. Just to
[23] nail it down, Mr. Isham. Do you know of any private
[24] secondary school in New England which had a recreational ski
[25] program in 2003-2004 which required its beginning skiers to

Page 32

[1] stay on slopes designated for beginners?

[2]    A: I don't know any answer to that.

[3]    Q: Are you aware of any private secondary school in
[4] New England which had a recreational ski program in
[5] 2003-2004 which required that all skiers have their
[6] equipment inspected and evaluated each time the skier went
[7] skiing before the skier hit the slopes?

[8]    A: No.

[9]    Q: You've referred in your report to a buddy system.
[10] What do you mean by "buddy system"?

[11]    A: A buddy system — I guess my best description will
[12] be: we have a group of people that are going to go out on
[13] the hill and go ski. Each one is assigned to be with, stay
[14] in touch with, respond to another person, so that it's —
[15] there aren't people out there on the hill alone. But
[16] they're with another person. Another assigned person.

[17]    Their responsibility is to stay with, be with and
[18] go get help, if needed, for the person, in case something
[19] should happen.

[20]    Q: Do you know of any ski area in the United States
[21] that mandates a buddy system?

[22]    A: No.

[23]    Q: Do you know of any private secondary school in New
[24] England which has a recreational ski program which requires
[25] a buddy system?

Page 33

[1]    A: I should answer that question this way: I only
[2] know of the Mount Hermon private school operating a ski
[3] program in New England. I don't know of any others. I'm
[4] not familiar with them and the specifics. So perhaps I
[5] could save you a lot of questions by just giving you that
[6] answer.

[7]    Q: I understand, but I just want to go through my
[8] checklist, if you don't mind. So you don't know?

[9]    A: I'm happy to do that. May we take a break.

[10]    Q: Well, sure.

[11]

[12] (A recess was taken from 1:55 p.m. to 2:05 p.m.)

[13]

[14]    Q: (By Mr. Potter) Mr. Isham, have you ever met Yukio
[15] Kusada?

[16]    A: No, sir.

[17]    Q: Have you ever talked to any member of his family?

[18]    A: No, sir.

[19]    Q: Have you ever talked to him on the telephone or
[20] anything like that?

[21]    A: Have not.

[22]    Q: So your only real contact with Yukio Kusada is
[23] reviewing his deposition and Answers to Interrogatories; is
[24] that correct?

[25]    A: That is correct.

Page 34

[1]    Q: Have you spoken to anyone who's given you any
[2] information about Yukio Kusada's athletic ability prior to
[3] the accident on February 20, 2004?

[4]    A: No.

[5]    Q: Do you have any knowledge of his athletic ability
[6] prior to February 20, 2004?

[7]    A: No, I don't.

[8]    Q: You know that Yukio Kusada, from the information
[9] you read, attended a meeting on December 15, 2003, at
[10] Northfield Mount Hermon, concerning the recreational ski
[11] program, correct?

[12]    A: Correct.

[13]    Q: It was run by Mike Adkins, correct?

[14]    A: That's what I understand.

[15]    Q: Yukio Kusada was 18 years old on that date,
[16] correct?

[17]    A: I believe so.

[18]    Q: Eighteen is the age of adulthood, correct?

[19]    MR. GLUCK: Object.

[20]    A: Correct. Well, in some states anyway.

[21]    Q: In Massachusetts?

[22]    A: Very good.

[23]    Q: How well did Yukio Kusada speak and understand
[24] English?

[25]    A: I'm not sure. It sounds like, from the best I

Page 35

[1] understand, he was a good student with — anecdotally, I've

[2] been told — high skills in mathematics, which is the

[3] universal language. So as far as English is concerned, I

[4] have no idea.

[5] Q: Do you know what documents he was given on

[6] December 15, 2003, in connection with the recreational ski

[7] program?

[8] A: Yes. I believe I have a copy of them in my file.

[9] Q: If I were to show you the skier's responsibility

[10] code, do you understand that he was given that document?

[11] A: Yes. That was the file piece I was referring to,

[12] yes.

[13] Q: You have no reason to believe he wasn't given that

[14] document on December 15, 2003, correct?

[15] A: It's my understanding that all the attendees at the

[16] meeting received that document.

[17] MR. POTTER: Could you mark this as Exhibit 2,

[18] please.

[19] (Exhibit 2 was marked for identification.)

[20] Q: (By Mr. Potter) Now, if we could take a look at

[21] the skier's responsibility code, Exhibit Number 2. And

[22] you're familiar with that, correct?

[23] A: Yes. That's correct. This is — I would just

[24] point out to you that they've changed the title of these

[25] items from a skier's responsibility code to the first

Page 36

[1] person: your responsibility code.

[2] Q: When was that change made?

[3] A: Somewhere in the last ten years.

[4] Q: Was it made as of 2004, to your knowledge?

[5] A: Yes.

[6] Q: As of 2003?

[7] A: Probably.

[8] Q: Did the bullet points, 1 through 7, change at all?

[9] A: Number 7 has been added in the last — I'm not

[10] exactly sure. Probably — within the last ten years.

[11] Otherwise, they're basically the same. They're — they

[12] personalized the skier's code from the original skier's

[13] responsibility code, which is on the top part of this sheet.

[14] They're both essentially the same. They're just written in

[15] first and third person. Essentially the same, yes.

[16] Q: You have every reason to believe that Mr. Kusada

[17] received that on December 15, 2003, correct?

[18] A: It's my understanding.

[19] Q: You don't know whether he read it or understood it;

[20] right?

[21] A: I don't know.

[22] Q: You don't have any reason to believe he didn't read

[23] it?

[24] A: Not at all.

[25] Q: Do you have any reason that he didn't understand

Page 37

[1] it?

[2] A: No, I don't.

[3] MR. POTTER: Could I have marked as Exhibit

[4] Number 3 a document which is titled "Rec Ski and

[5] Snowboarding, Northfield Mount Hermon School, Student Name:

[6] Yukio Kusada."

[7] (Exhibit 3 was marked for identification.)

[8] THE WITNESS: Could I go off the record for

[9] just a second, please.

[10] MR. POTTER: Yes. Sure.

[11] (A discussion was held off the record.)

[12] Q: (By Mr. Potter) Showing you, if I could, Exhibit

[13] Number 3 —

[14] A: Do you want me to keep this?

[15] Q: You can hang on to it and we'll go through it.

[16] A: Thanks.

[17] Q: Looking at Exhibit Number 3, have you seen that

[18] document before?

[19] A: I don't believe I have.

[20] Q: If I could see the document. You are not aware

[21] that this document had been filled out and returned to

[22] Northfield Mount Hermon, correct?

[23] A: No. That's not correct. I had this referred to,

[24] but I don't recognize it in my file. I don't believe it

[25] exists. But I'm aware that there is this document that's

Page 38

[1] been signed.

[2] Q: It says in the second sentence, "I understand that

[3] my son/daughter is responsible for their own ski or

[4] snowboard equipment. NMH and Berkshire East Ski Area are

[5] not responsible." Is it your position and your opinion that

[6] an 18-year-old young man who's an adult in Massachusetts is

[7] incapable of assuming responsibility for their own ski or

[8] snowboard equipment?

[9] A: No. It's not my opinion that they're incapable of

[10] it. I'm not sure what your — "responsible" for your

[11] equipment means. I would interpret that to mean that I'm

[12] responsible to produce some equipment to use.

[13] Q: And so that's the limit of your responsibility as

[14] an individual?

[15] A: May I? I don't know how else you would interpret

[16] that. My son or daughter is "responsible for their own ski

[17] or snowboard equipment" — it means to me that they're going

[18] to have their own equipment. They're going to get or

[19] acquire their own equipment.

[20] Q: The fact that —

[21] A: And take care of it.

[22] Q: — it says "NMH and Berkshire Ski area are not

[23] responsible" has no significance to you?

[24] A: That's kind of a tricky question. Has significance

[25] to me, as you ask it, I'm not sure where you're leading with

Page 39

[1] that. What I understand is the son or daughter is
[2] responsible to get equipment in order to go ski. I don't
[3] think that implies any more or less than that. It doesn't
[4] require them to maintain their equipment or — they just
[5] have to have it.

[6]     Q: So, in your opinion, it is limited simply to
[7] getting the equipment and then the responsibility shifts to
[8] Northfield Mount Hermon?

[9]     A: For what?

[10]     Q: To inspect the equipment, to ensure that the
[11] equipment is appropriate for them, to take all of those
[12] steps; is that correct?

[13]     A: That's what's generally expected if a person is,
[14] for example, participating in a ski lesson. The ski
[15] instructor's responsibility at the outset of the lesson is
[16] to inspect the equipment.

[17]     Q: Did Mr. Kusada participate in a ski lesson in this
[18] case?

[19]     A: No.

[20]     Q: Do you know —

[21]     A: Not to our understanding.

[22]     Q: Do you know that?

[23]     A: Well, the information that I've read, he did not
[24] participate in a formal ski lesson.

[25]     Q: Who said he didn't?

Page 40

[1]     A: Who said?

[2]     Q: Yes. Who said he didn't?

[3]     A: I believe his friend Yuki said he didn't.

[4]     Q: If I suggest that Yuki Hasegawa said that he didn't
[5] know, does that refresh your memory?

[6]     A: No. I would have to look that up. He may have
[7] said he didn't know, but I believe Yuki indicated he didn't
[8] think he had taken a lesson. I guess that equates to —

[9]     Q: The testimony will stand for what it is. The last
[10] check says, "I understand that for my son's/daughter's
[11] safety, NMH strongly recommends that they wear a helmet
[12] while snowboarding/skiing."

[13]     Is it your position that Yukio Kusada was not
[14] capable of deciding whether or not to wear a ski helmet?

[15]     A: No. I believe he was capable of making that
[16] decision.

[17]     Q: I believe that you have opined that it was
[18] Northfield Mount Hermon's responsibility to require him to
[19] wear a helmet; is that correct?

[20]     A: No.

[21]     Q: So you don't think it was Northfield Mount Hermon's
[22] responsibility to require him to wear a ski helmet?

[23]     A: I think that would have been prudent safety
[24] practice and would have been good, reasonable practice for a
[25] school like Northfield Mount Hermon to require that he wear

Page 41

[1] — that all of their students wear helmets.

[2]     Q: So you think it would have been good practice,
[3] correct?

[4]     A: Yes, I do.

[5]     Q: You think it would be good practice for all skiers
[6] in the country to require ski helmets, correct?

[7]     A: Well, that's a really interesting logical trip. I
[8] think helmets are very good —

[9]     Q: So you favor —

[10]     A: — for skiing. I ski with a helmet on. I support
[11] it totally.

[12]     Q: When did you start skiing with a helmet?

[13]     A: When?

[14]     Q: Yes.

[15]     A: I don't remember exactly. Probably somewhere
[16] around 2000, 2001.

[17]     Q: Fairly recently?

[18]     A: Yeah. Yes. Excuse me.

[19]     Q: Is it your opinion, given the state of the art,
[20] that it should be required at every ski resort that a skier
[21] who skis at the ski resort wear a helmet?

[22]     A: No. It's not.

[23]     Q: Why not?

[24]     A: Well, I don't — I just can't get past some little
[25] independence issue around that. I think it would be better

Page 42

[1] for people if everybody skied with a helmet. Better for
[2] their own safety. But as you, I assume, are familiar with
[3] the article that I co-authored for the New York Times,
[4] helmets have also a potential downside.

[5]     Q: What's the potential downside?

[6]     A: It can create a false sense of security for the
[7] skiers using them.

[8]     Q: Are there other downsides to them?

[9]     A: No more than with probably hats or so forth. I
[10] mean, helmets can be ill-fitted and not work very well.

[11]     Q: Are there certain types of injuries that are more
[12] likely if you're wearing a helmet than if you're not wearing
[13] a helmet?

[14]     A: If the helmet is not fitted properly and it slips
[15] down in front of your eyes, obstructs your view, that would
[16] be an injury, I guess, that could be related to a helmet.
[17] Generally speaking, a properly fitted helmet, in my opinion,
[18] is more beneficial for all skiers than not wearing a helmet.

[19]     Q: The independent streak that you're talking about,
[20] is that sort of the same independent streak that we hear all
[21] the time about motorcycle helmets?

[22]     A: You know, it probably is. I think that's an
[23] excellent question. I thank you for asking it. It's the
[24] same independent streak that lets people come out skiing in
[25] Levi's when the temperature is 20 below.

Page 43

[1]    It's the same independent streak that invites
[2] people to wear skis that are 20 years old and not up to the
[3] latest in safety consideration, to use bindings that are
[4] older. We are not, in the ski industry, able to control a
[5] lot of things and choose not to. We make our strongest
[6] recommendations where we see fit.
[7]    **Q:** Why do you choose not to?
[8]    **A:** Not to?
[9]    **Q:** Not to insist that they wear proper clothing.
[10] Insist that they wear skis that are of recent vintage.
[11] Insist that they have bindings that are of recent vintage
[12] and that have all of the latest developments?
[13]    **A:** Well, to begin with, it's an economic issue. And
[14] the second answer to it is, skiing has been going on now for
[15] quite a long time. And there's never been any mandate or
[16] proper insistence that you had to use this, that or the
[17] other in order to slide down the hill.
[18]    Finally, skiing is getting to be more of a
[19] recreational activity than it is some nuance sport. The
[20] freedom of expression, the joy of sliding down a hill that's
[21] slippery and tipped up, is part of the joy of skiing. And
[22] to try to put a lot of controls and mandates on everybody
[23] that goes there, I think would probably kill the sport very
[24] quickly.
[25]    **Q:** So although personally you think it would be a good

Page 44

[1] idea, you wouldn't mandate it; is that correct?
[2]    **A:** That is correct. Having said that, if I were
[3] running a school program, like the Mount Hermon School
[4] program where you have children that are under your control
[5] and guidance, I think mandating helmets would have been an
[6] excellent idea.
[7]    **Q:** Would it also have been an excellent idea for every
[8] ski school in the country to mandate them? They have
[9] students come to them who are under their control. Would
[10] that also have been an excellent idea?
[11]    **A:** I think it would be a good idea, but I don't think
[12] it's workable. Your deduction of reasoning is just amazing
[13] to me.
[14]    **MR. POTTER:** Could I have marked as Exhibit
[15] Number 4 the permission form.
[16]    (Exhibit 4 was marked for identification.)
[17]    **MR. GLUCK:** Can we take a break so he can look
[18] at it?
[19]    **MR. POTTER:** Sure. Absolutely. Take your
[20] time.
[21]
[22]    (A short recess was taken.)
[23]
[24]    **A:** We're on Exhibit 4 right now?
[25]    **Q:** (By Mr. Potter) You haven't seen it? You don't

Page 45

[1] have it?
[2]    **A:** I do not have that in my file.
[3]    **Q:** That's all I need to know.
[4]    **A:** May I see that, please.
[5]    **Q:** Oh, sure. You know that Yukio Kusada was told that
[6] ski equipment was available for rental at Berkshire East,
[7] correct?
[8]    **A:** It's my understanding.
[9]    **Q:** You assume that he was told?
[10]    **A:** I do.
[11]    **Q:** And that he chose not to get his ski equipment
[12] there, correct?
[13]    **A:** It's a little bit unclear as to the first time he
[14] went skiing. I'm not sure whether he used these skis that
[15] he ultimately ended up on, but it's my understanding that he
[16] didn't for most of his skiing time rent from Berkshire East.
[17]    **Q:** Now, you've read Michael Adkins' testimony,
[18] correct?
[19]    **A:** Correct.
[20]    **Q:** About that first meeting, correct?
[21]    **A:** Yes.
[22]    **Q:** Have you assumed, in your opinion, that he told the
[23] students what the difference between green, blue and black
[24] diamond trails were?
[25]    **A:** No. I don't assume that. I don't even know

Page 46

[1] exactly how you would tell someone that at a meeting, other
[2] than that the symbols represent different abilities. And
[3] that, I can understand, would be very possible that he said.
[4]    **Q:** That the symbols —
[5]    **A:** Pointing out the symbols.
[6]    **Q:** So that you would know that a green symbol meant a
[7] beginners' trail and a blue symbol meant an intermediary
[8] trail and a black diamond meant an expert trail, correct?
[9]    **A:** It would be the normal part of an orientation like
[10] it was given on the 15th of December.
[11]    **Q:** Do you assume or did you assume that on February
[12] 20, by that time, 2004, Yukio Kusada understood the
[13] difference between the green, blue and black diamond trails?
[14]    **A:** Well, I can't really safely make that assumption.
[15] I know the available — the information was available to him
[16] at the ski area. Whether he knew it or not, I don't know.
[17]    **Q:** But you also know that he was a reasonably
[18] intelligent 18-year-old, correct?
[19]    **A:** It sounds like he was.
[20]    **Q:** Now, Yukio Kusada skied in this program 8 to 11
[21] times, according to your report; is that correct?
[22]    **A:** That's correct.
[23]    **Q:** How did you arrive at the 8 to 11 times?
[24]    **A:** I think those were the numbers that we've seen as
[25] far as the listings of the dates that the program was in

Page 47

[1] operation. And I believe one of the sponsors said that
[2] Yukio had perfect attendance.
[3]    Q: If he had perfect attendance, would that mean 13
[4] times?
[5]    A: Eight to 11. I'm not sure what they meant by
[6] perfect attendance, but he was there most of the time.
[7] How's that?
[8]    Q: He was there most of the time. Okay. Fair enough.
[9] Now, if we start with the first time that he went, that was
[10] on February — what? — 4th?
[11]    A: The first time?
[12]    Q: Yes. The first time he went — no. I'm sorry.
[13] January. I'm sorry.
[14]    A: I believe so.
[15]    Q: He began in January, correct?
[16]    A: Yes.
[17]    Q: Do you know what he did that first day?
[18]    A: No.
[19]    Q: Do you know where he did that first day?
[20]    A: I don't.
[21]    Q: Do you know whether he took lessons or not that
[22] first day?
[23]    A: It's my understanding that he did not.
[24]    Q: Where do you get that understanding?
[25]    A: From everything I've read in regard to the program,

Page 48

[1] the availability didn't seem to be there. Specifically, I'm
[2] not going to be able to give you an answer. The combined
[3] assessment was that he didn't take any lessons from the ski
[4] area.
[5]    Q: The first day was actually January 7, 2004. So if
[6] we go to January 9, 2004, what did he do that day?
[7]    A: Sounds like he went skiing.
[8]    Q: How was he skiing?
[9]    A: We don't know.
[10]    Q: Could he turn?
[11]    A: Still don't know.
[12]    Q: Could he stop?
[13]    A: Well, he got back on the bus. So wherever he went,
[14] he must have at least stopped.
[15]    Q: Did he take any lessons?
[16]    A: Not to our knowledge.
[17]    Q: What about January 14, 2004? What did he do that
[18] day when he went skiing?
[19]    A: I think all my answers will be the same all the way
[20] through the times that he went skiing. I don't know what he
[21] did. Although I know he put skis on, obviously rode lifts,
[22] skied down trails. I'm not sure what trails he skied down
[23] other than Big Chief.
[24]    Q: Had he progressed at all in his skiing ability
[25] between January 7 and January 14?

Page 49

[1]    A: January 7 and January 14?
[2]    Q: Yes. He had been there January 7, January 9 and
[3] January 14. Had he progressed at all in his skiing ability?
[4]    A: My experience indicates that, yes, he has
[5] progressed. I mean, you can't —
[6]    Q: To what degree?
[7]    A: I have no way of answering that.
[8]    Q: It's different for different people; isn't that
[9] correct?
[10]    A: That's correct.
[11]    Q: And some students learn faster than others; isn't
[12] that correct?
[13]    A: It's interesting, but yes, that is correct.
[14]    Q: What about — you don't know whether Yukio Kusada
[15] learned faster than others at all; is that correct?
[16]    A: I don't. I don't believe he was a student, so —
[17] other than at Mount Herman School.
[18]    Q: But setting aside whether or not he was a student,
[19] the question is the ability to maneuver on skis. Was he
[20] better on January 14 than he was on January 7? Was he
[21] better on January 9 than he was on January 7? Did he
[22] progress in his skiing?
[23]    MR. GLUCK: Objection.
[24]    A: I wasn't there to observe him. My experience is
[25] that as people ski, they progress.

Page 50

[1]    Q: What about —
[2]    A: From nothing to I don't know what.
[3]    Q: What about January 16, 2004? How was he turning on
[4] that day?
[5]    A: I have no idea.
[6]    Q: Was he able to stop?
[7]    A: He got back on the bus, so I guess he did get
[8] stopped.
[9]    Q: What skis was he using?
[10]    A: I think he was using the Atomics at that time.
[11]    Q: By January 16 he was using the Atomics?
[12]    A: Yes. I don't know the exact date, but we could
[13] look it up from deposition testimony. But yes.
[14]    Q: Whose deposition testimony?
[15]    A: The guy that lent him the skis.
[16]    Q: So —
[17]    A: Do you want me to get his name for you?
[18]    Q: No. Sam Wilson.
[19]    A: Sam Wilson. There he is.
[20]    Q: So January 16, 2004, he began using Sam Wilson's
[21] skis, correct?
[22]    MR. GLUCK: Objection.
[23]    A: January 16?
[24]    Q: January 16.
[25]    A: Is that —

Page 51

[1] Q: No. I'm just — you told me that you thought he
[2] began using the skis on January 16, 2004?
[3] MR. GLUCK: You want him to assume that now,
[4] Harry?
[5] MR. POTTER: No. He told me, I think, that he
[6] started using the skis on January 16, 2004.
[7] MR. GLUCK: He thinks that "maybe."
[8] A: That's what I thought. Now, I'm looking at
[9] Mr. Wilson's — my answer now is revised to "I don't know,"
[10] because Mr. Wilson didn't know. Page 12, Line 9. Or Line
[11] 8. I'm sorry.
[12] Q: (By Mr. Gluck) What does he say in there?
[13] A: Question was, do you know on how many occasions
[14] before February 20 — that's the date of his accident —
[15] before February 20, 2004, he actually used your skis?
[16] Answer, I don't know how many times.
[17] Q: So if we look at the possibilities, he could have
[18] used them from January 7 on or he could have started using
[19] them on January 16 or he could have used them, first time,
[20] on February 20?
[21] A: All possibilities are open on the table.
[22] Q: We don't know. You don't know, correct?
[23] A: That is correct.
[24] Q: What about January 21, 2004? Was he able to turn
[25] on that day?

Page 52

[1] A: More than likely.
[2] Q: How were his turns coming along?
[3] A: Reasonably better than the last time he went.
[4] Q: You know the difference between parallel turns and
[5] turning using a wedge. How was he doing with respect to
[6] that?
[7] MR. GLUCK: On what day, Harry?
[8] MR. POTTER: On January 21, 2004.
[9] A: My best understanding is he was — well, he most
[10] likely was using a wedge at that time, but I — not being
[11] there, I couldn't tell you. I don't have any deposition
[12] information that clearly defines that question — or that
[13] answer.
[14] Q: (By Mr. Potter) Assuming that he was using a wedge
[15] on that day, January 21, 2004, you are of the opinion, if he
[16] skied that day, that he was able to stop and turn, correct?
[17] MR. GLUCK: Objection.
[18] A: It would be difficult to imagine he couldn't.
[19] After several times of skiing, most people who persist in
[20] skiing can stop and turn in a wedge.
[21] Q: What about — strike that. You don't know what
[22] trails he was skiing on that day, do you?
[23] A: No, sir.
[24] Q: Do you know who skied with him that day?
[25] A: No. I think he generally skied with Yuki.

Page 53

[1] Q: What about January 23, 2004? How was he doing on
[2] that occasion?
[3] A: Impossible to say.
[4] Q: So you don't know whether he progressed from a
[5] wedge to sort of a — wedge partial —
[6] A: Christy.
[7] Q: — parallel? Christy?
[8] A: Stem christy.
[9] Q: Stem christy.
[10] A: I don't know.
[11] Q: You don't know?
[12] A: That's dated.
[13] Q: Huh?
[14] A: Wedge christy will be fine.
[15] Q: Would you explain what "christy" is?
[16] A: Generally, christy is the arcing of skis in a
[17] parallel fashion.
[18] Q: We don't know that he progressed to that level as
[19] of January 23, 2004, correct?
[20] A: No, we don't. There's not a — some straight line
[21] progression that one does. You go skiing on one day. The
[22] snow conditions are of a certain type. Last time you were
[23] there you were doing great doing something. All of a
[24] sudden, the snow conditions changed, the weather changed, et
[25] cetera. You couldn't do what you did the last time.

Page 54

[1] I would parallel that to just about any sport you
[2] participate in. Golf being an example. The last time you
[3] went out you shot an 82. Yesterday you went out and played,
[4] and, for whatever reasons unknown to mankind, you shot a 97.
[5] Skiing can be the same thing. One day you go out,
[6] you feel you're like you're a brilliant skier and making
[7] wedge turns and controlling your speeds. And the next time
[8] you go out, the snow conditions, surface conditions have
[9] changed considerably and you couldn't do all the things you
[10] did last time.
[11] Q: Is that true across the whole spectrum of skiers
[12] from novice to expert?
[13] A: Less true with expert skiers. They've been there.
[14] They've done that. So they have a better understanding,
[15] more familiarity with the vagaries of outdoor sports and
[16] winter weather.
[17] Q: You would agree with me, would you not, that expert
[18] skiers also have difficulty skiing at times?
[19] A: I have a freshly broken femur to attest to that.
[20] Q: Sorry to hear that.
[21] A: So am I.
[22] Q: Expert skiers sometimes ski off the trails
[23] themselves, correct?
[24] A: Sometimes they do.
[25] Q: Expert skiers sometimes fall?

Page 55

[1]　A: Yes.

[2]　Q: Expert skiers sometimes get out of control,
[3] correct?

[4]　A: Yes.

[5]　Q: And that's true for beginners and intermediates,
[6] too, correct?

[7]　A: Yes, sir.

[8]　Q: Now, January 28. Do you have any information about
[9] how he was skiing on that day?

[10]　A: No, sir.

[11]　Q: Do you have any information about how he was skiing
[12] on February 4 of 2004?

[13]　A: No, sir.

[14]　Q: Do you have any information about how he was skiing
[15] on February 6, 2004?

[16]　A: No.

[17]　Q: Do you have any information about how he was skiing
[18] on February 11, 2004?

[19]　A: I don't.

[20]　Q: Do you have any information about how he was skiing
[21] on February 13, 2004?

[22]　A: No.

[23]　Q: Do you have any information about February 18,
[24] 2004?

[25]　A: I don't.

Page 56

[1]　Q: So you don't know at least as of February 18, 2004,
[2] whether he was a beginner, an advanced beginner, a beginner
[3] intermediate, where he was, do you?

[4]　A: No. I can only make some reasonable assumptions.

[5]　Q: What are your reasonable assumptions?

[6]　A: That — well, his friend, Yuki, said that his turns
[7] were sort of mixed on February 20, that — it sounded like
[8] he was kind of trying to match his skis a little bit, but he
[9] still had the skis working in a wedge and then maybe not a
[10] wedge or maybe so, which sounds fairly reasonable for the
[11] circumstances.

[12]　Q: What do you mean when you say he was trying to
[13] match his skis?

[14]　A: That was that wedge christy that we were talking
[15] about a moment ago.

[16]　Q: So trying to move from wedge into a parallel?

[17]　A: Correct.

[18]　Q: That's a normal progression for most skiers,
[19] correct?

[20]　A: That's the progression that he would have gone
[21] through had he been in lessons.

[22]　Q: Now, did you — strike that. Do you have any
[23] reason to believe that Yukio took any lessons from any of
[24] the chaperones?

[25]　A: No. I have no reason to believe that at all.

Page 57

[1]　Q: What was Susan Clough's experience as a skier?

[2]　A: I believe Susan Clough was an expert. Or a very
[3] good skier.

[4]　Q: What about Mr. Eisenberg?

[5]　A: Don't know.

[6]　Q: Audra Forstrum was snowboarding. I won't ask about
[7] that. You know that Yukio Kusada skied Big Chief before
[8] February 20, 2004; is that correct?

[9]　A: I believe that's my understanding.

[10]　Q: In fact, he skied it multiple times, correct?

[11]　A: Well, on the day of the accident, yes.

[12]　Q: And prior to the accident, correct?

[13]　A: I don't know that I recall reading that
[14] specifically, but it wouldn't surprise me.

[15]　Q: You know that Yuki Hasegawa said he was comfortable
[16] on Big Chief, correct?

[17]　MR. GLUCK: Objection.

[18]　A: I don't recall that.

[19]　Q: But you do know that he never skied off the trail
[20] on Big Chief on prior occasions, correct?

[21]　A: Well, I don't know that, but I know that he didn't
[22] ski off the trail and hit a tree and get knocked out.

[23]　Q: But if you look at Yuki's testimony on Page 104,
[24] Lines 20 to 22, he never skied off the trail on prior
[25] occasions, correct?

Page 58

[1]　A: Right. As far as he knew.

[2]　Q: As far as he knew. If you turn to 117, 118, Lines
[3] 20 and twenty — and Line 1 on 118 —

[4]　A: 118.

[5]　Q: Yes. The end of 117, the beginning of 118.

[6]　A: Okay.

[7]　Q: What did he say about —

[8]　MR. GLUCK: Start on 117, I think. What he
[9] wants you to do.

[10]　A: Your question, please.

[11]　Q: What did he say about Yukio's comfort level on Big
[12] Chief, if anything?

[13]　MR. GLUCK: Where are you referring?

[14]　A: Twenty-two was at a — was Big Chief. They're
[15] speaking of a trail that he felt comfortable on. There's a
[16] little bit before that, that we might need to bring in, but
[17] he answered, yes, it was a trail he felt comfortable on.

[18]　Q: You have no reason to disbelieve that, correct?

[19]　A: I don't have any reason to disbelieve that. I do
[20] have a reason to question what exactly he means, because
[21] just before that, on 117, 16, he says, "When I was by
[22] myself, I could ski wherever I wanted. When I was with
[23] Yukio, I talked to him and listened to how he feels about
[24] this particular slope and it was up to me and him."

[25]　Q: What does that mean to you?

Page 59

[1] A: It means that when Yuki was skiing with Yukio, he
[2] had to be concerned about where he went. He couldn't go
[3] anywhere. He couldn't go with the skis he wanted. But he
[4] had to adjust his skiing down to Yukio's ability level.
[5] Q: You have no reason to believe that Yuki did not do
[6] that when he was skiing with Yukio, correct?
[7] A: That he didn't grade down?
[8] Q: Exactly.
[9] A: Right.
[10] Q: You have no reason to believe, for example, that
[11] Yuki was trying to force Yukio to ski on slopes that he
[12] shouldn't be skiing on, do you?
[13] A: No. I don't have that feeling at all.
[14] Q: Now, you did yourself go to Berkshire East,
[15] correct?
[16] A: Correct.
[17] Q: You went a little more than a month after the
[18] accident, correct?
[19] A: Yes.
[20] Q: Had there been any changes made to the slope as of
[21] that point?
[22] A: I have no idea. I wasn't there at the time of the
[23] accident.
[24] Q: Did you look at pictures of the slope at the time
[25] of the accident?

Page 60

[1] A: Yes.
[2] Q: What pictures did you look at?
[3] A: I have one here that I could present to you
[4] somewhere in this pile of pictures. It was a picture — it
[5] is a picture of the location, in the trees, that Yukio was
[6] found with an orange and black ski pole in the foreground.
[7] Q: Could you tell anything from that picture about the
[8] slope?
[9] A: From that picture? No, I couldn't tell a thing.
[10] It was looking in the trees from the slope.
[11] Q: So you couldn't tell anything about the design of
[12] the slope, correct?
[13] A: From that picture?
[14] Q: Yes.
[15] A: No.
[16] Q: Could you tell anything about the conditions of the
[17] snow?
[18] A: Well, there wasn't any snow in the trees, so I
[19] couldn't tell you that, no.
[20] Q: There wasn't any snow on the trees or in the trees?
[21] A: In the trees, to speak of. It was very marginal.
[22] Q: Off the trail?
[23] A: Correct.
[24] Q: What do you mean when you say "very marginal"?
[25] A: Well, Berkshire East used to make snow on their

Page 61

[1] designated skiing trails. And they — from the time I was
[2] there, they do a very good job of it. They don't make snow
[3] in the trees purposely because they're not encouraging
[4] people to ski in the trees. They want them to be on the
[5] trails.
[6] So when I say snow was marginal in the trees,
[7] basically, there was little or no snow in the trees. But I
[8] will find that picture for you in just a second.
[9] Q: Have you seen any pictures, other than the one that
[10] you are about to retrieve for me, of the conditions on the
[11] day of the accident?
[12] A: No, sir.
[13] Q: Have you read any descriptions of the conditions on
[14] the day of the accident?
[15] A: Well, the incident report has a description, kind
[16] of covers the snow surface conditions at the time of the
[17] accident.
[18] Q: What does it say?
[19] A: Varied.
[20] Q: What does that mean?
[21] A: My best assumption of what that means is that it
[22] was — because the temperature — it was indicated to be
[23] somewhere around 30 degrees, that there would be a variety
[24] of melted, frozen, kind of loose granular conditions around
[25] the slope.

Page 62

[1] The photograph that I'm referring to, I'm holding
[2] in my left hand right now, shows a pretty clear delineation
[3] of the edge of the trail. Since I've been there and know
[4] this spot, I can understand it better. When you look in the
[5] trees, compare or contrast the snow in the trees to the snow
[6] on the trail, there is snow in the trees, but not as much,
[7] obviously, not as deep.
[8] Q: Was the trail groomed to the edge of the trail?
[9] A: Basically, yes. It's groomed up reasonably close
[10] to the trees. They don't get in the trees with the
[11] groomers, but it looks like there's a space in this
[12] photograph of — well, the ski patrolman is holding a bamboo
[13] pole, which I assume to be about 7 feet long. And he
[14] appears to — since we can't see him — be standing on the
[15] groomed surface. The pole is poking into the trees where
[16] Yukio was found.
[17] Q: Now, you went to the scene on March 23, 2005,
[18] correct?
[19] A: Yes, sir.
[20] Q: And that was a little more than a month after the
[21] accident, correct?
[22] A: Yes.
[23] Q: Had you ever been there before — by there, I mean
[24] Berkshire East?
[25] A: No, sir.

**Page 63**

[1] Q: Have you ever been there since?

[2] A: No, I haven't.

[3] Q: When you went there, who did you go with?

[4] A: Myself. I was alone.

[5] Q: Did you talk with anybody who worked at Berkshire

[6] East?

[7] A: Yes, I did.

[8] Q: Who did you talk to?

[9] A: I don't know their names. Ski patrol.

[10] Q: The ski patrol?

[11] A: Yes. I have his photograph.

[12] Q: That is the photograph of the ski patroller that

[13] you were with on March 23, 2004?

[14] A: Yes. It's one of them. I inquired of — I don't

[15] believe it was this gentleman, but this patrolman had been

[16] skiing down the trail. I seen him several times before. I

[17] inquired of another ski patrolman up on the hill and

[18] introduced myself and told him I was here doing this thing.

[19] They became somewhat concerned and made some radio

[20] contact with some other group, because I had asked them if

[21] they could help me identify the location that Yukio went off

[22] the trail. And they were first kind of concerned, because I

[23] was representing a little bit of a spook, dark-side guy.

[24] They got permission to show me the location of the accident.

[25] This is the gentleman that took me there, pointed

**Page 64**

[1] it — pointed me out to the spot. I believe he was one of

[2] the responders to the rescue.

[3] MR. GLUCK: One point of correction. I want

[4] to make sure you understand that his report says that he was

[5] there in 2005, not 2004.

[6] MR. POTTER: Oh, I'm sorry.

[7] THE WITNESS: Right. I apologize for not

[8] paying careful attention.

[9] MR. POTTER: No, no, no.

[10] THE WITNESS: But thank you. That's why they

[11] pay you the big bucks.

[12] MR. POTTER: That's my fault.

[13] Q: (By Mr. Potter) In other words, it was —

[14] A: A year later.

[15] Q: — a year later, 13 months later?

[16] A: Yes.

[17] Q: I'm sorry. Did you — well, strike that. Tell me

[18] everything that you remember that you said to this ski

[19] patroller and that he said to you.

[20] A: This is going to be my best recollection.

[21] Q: Sure.

[22] A: I'm going to truncate it to the extent of what

[23] we're looking at here. There were several ski patrolmen in

[24] the group. And I asked if they knew of this accident. And

[25] they said yes.

**Page 65**

[1] At that point they kind of got concerned that they

[2] didn't know what the limits of what they could tell me were.

[3] They checked with somebody in management and got permission

[4] to show me the location that Yukio went off of the trail.

[5] This gentleman skied me down there. I think the

[6] other patrolmen were nearby. We were all kind of skiing

[7] together. But he had — appeared to have very specific

[8] knowledge of this location and went right to it. I was

[9] trying to find it from the photograph that I had. And it

[10] was impossible. So this was a tremendous help.

[11] We got there. He's standing there in the

[12] photograph where I — about where a person could go off of

[13] this slope and be where Yukio landed. As you see in this

[14] photograph, 13 months later, there's — snow is just

[15] virtually gone. There was more snow in the trees at the

[16] time of the accident, obviously. But same spot. Same

[17] trees, apparently.

[18] Q: Did you do any examination of the design of the

[19] slope? The design of the trail, I should say?

[20] A: Yes. I looked at the — carefully at the slope and

[21] the design of the trail. I skied it numerous times. I

[22] don't know how many, but probably five or six.

[23] Q: Did you draw any conclusions?

[24] A: Regarding what? It's a trail.

[25] Q: The design of the trail. You're an expert in

**Page 66**

[1] designing trails, correct?

[2] A: Yeah.

[3] Q: Did you draw any conclusions about the design of

[4] the trail? Was it good, bad, indifferent? Should there

[5] have been changes?

[6] A: I thought it was a nice, little trail to ski. I

[7] enjoyed it. It had rolls and pitches. It was interesting.

[8] I have no criticism of the design of the trail at all.

[9] Q: Do you know whether there have been any changes to

[10] the design of that trail since the date of that accident?

[11] A: I don't know for a fact. I see no reason to

[12] believe there would have been. The lighting on the side of

[13] the trail seemed to be there. The trail — no, I don't

[14] imagine there were, but I couldn't tell you definitely.

[15] Q: What time of day were you there?

[16] A: I was there in the mid-afternoon.

[17] Q: Did they have night skiing that night?

[18] A: I believe they had stopped the night skiing because

[19] they were only a few days before closing for the season.

[20] Q: So you didn't — yourself — stay and ski at night

[21] because they didn't have it at that time?

[22] A: That's my best recollection, correct.

[23] Q: Now, in the area — strike that. Were you able to

[24] determine what Upper Big Chief is from Lower Big Chief?

[25] A: That's pretty easy.

**Page 67**

[1]  Q: How do you do that?

[2]  A: Look down the trail. Ski down the hill. I'm not

[3]  trying to be flip with that answer, but I'll give you a

[4]  photograph underneath my thumb. I think it's in my report

[5]  as well.

[6]  I was standing on the top of Upper Big Chief,

[7]  watching that lady ski down or start her trip down. You

[8]  notice in that photograph that terrain is pitched down

[9]  fairly aggressively, like it's about 20 — 19 or 20 degrees,

[10]  I believe, up there.

[11]  Q: Is that aggressive?

[12]  A: For this mountain, it is.

[13]  Q: But is it aggressive in the ski industry generally?

[14]  Ski resort generally?

[15]  A: I can't answer that question.

[16]  Q: There are different designations and levels

[17]  depending upon the ski area; isn't that correct?

[18]  A: Well, there are only basically four. Green circle,

[19]  blue square, black diamond and now double black diamond.

[20]  Q: Are you of the opinion, with your knowledge of all

[21]  of the ski areas in the country, that sometimes a ski trail

[22]  that is designated "intermediate" at a particular slope

[23]  would be designated "green" at another slope or vice versa?

[24]  A: Absolutely. The requirement on that designation is

[25]  to divide the ski area into beginner, intermediate, advanced

**Page 68**

[1]  or super advanced now. Based on that ski area, not by any

[2]  preset criteria of slope pitch from any other part of the

[3]  country.

[4]  It's just a — Berkshire East has certain pitches

[5]  on its — in its terrain. It's the responsibility of

[6]  management to go say, okay, relative to the rest of the

[7]  mountain, this is beginner. This is intermediate. Now it's

[8]  pitched up a little more. This would be appropriate to be

[9]  expert.

[10]  Q: So that's relative to the rest of Berkshire East;

[11]  isn't that correct?

[12]  A: Only Berkshire East.

[13]  Q: Because, for example, an expert trail at Berkshire

[14]  East could, conceivably, at another ski area be considered

[15]  intermediate, correct?

[16]  A: Correct.

[17]  Q: Intermediate in another area could be considered

[18]  beginner, correct?

[19]  A: Yes.

[20]  Q: There's no science to it as such. It's just

[21]  relative to the particular area; is that correct?

[22]  A: That's generally correct. There's a chart that

[23]  gives kind of a range, done by Erickson Engineering. I

[24]  didn't bring it with me, but it has the general slope

[25]  pitches that fit in the beginner category and the

**Page 69**

[1]  intermediate and advanced categories.

[2]  MR. POTTER: Can I ask a question? Do I have

[3]  all of these pictures?

[4]  MR. GLUCK: I don't remember.

[5]  MR. POTTER: I don't think so, but I'd like

[6]  copies of them.

[7]  Q: (By Mr. Potter) You've shown me a number of

[8]  pictures here, Mr. Isham. I'd like to ask you this

[9]  question: what did you learn from these pictures, if

[10]  anything? What do these pictures tell you?

[11]  A: Well, these pictures tell you that I was there and

[12]  was on that trail. And they don't tell you a whole lot more

[13]  than that.

[14]  Q: Did you — strike that. Are you able to draw any

[15]  conclusions about what happened here based upon the pictures

[16]  that you took?

[17]  A: I know what happened here. I don't have any

[18]  question about — I mean, I know that Yukio was on this

[19]  trail and went into the woods here. That's all I can

[20]  determine. We've gone through whether he went straight or

[21]  made turns or —

[22]  Q: But you don't know how it happened, correct?

[23]  A: Of course not.

[24]  Q: Did you also take a videotape?

[25]  A: I did.

**Page 70**

[1]  Q: What was the purpose of the videotape?

[2]  A: Just support of the photographs. To give an

[3]  impression of how skiing on that trail was. What it looked

[4]  like. I did, as I best recall, some moving shots and then

[5]  some still shots, showing other people skiing the trail.

[6]  Q: Did you do it yourself?

[7]  A: I did.

[8]  Q: Did you draw any conclusions from the videotape?

[9]  A: Aside from the fact that I was on the trail that

[10]  the accident happened and found the location of the

[11]  accident, skied the trail and wanted to show the jury what

[12]  skiing looked like there and on that trail, there were no

[13]  more conclusions to draw.

[14]  Q: Did you draw any conclusions about how the accident

[15]  happened from the videotape that you took?

[16]  A: No. Yukio skied off the trail. He went off the

[17]  trail.

[18]  Q: He went off the trail?

[19]  A: I assumed he was skiing, but he might have fallen

[20]  up above and slide into the trees. We don't know.

[21]  Q: How long did you stay there?

[22]  A: Two or three hours.

[23]  Q: Yuki said in his deposition that in his opinion

[24]  Lower Big Chief was between a green and an intermediate for

[25]  that mountain. Would you agree with that assessment?

**Page 71**

[1]   A: I think that's a reasonable assessment. On my
[2] photo report on Page 6, we're looking at the bottom of Big
[3] Chief trail near the location of the accident — down below
[4] the location. Even from up above, oftentimes, things look
[5] steeper if you photograph them from the up side going down.
[6] This looks very flat and it is.
[7]   Q: By, "very flat," you're referring to the Lower Big
[8] Chief?
[9]   A: Below the accident site, which is 1-B. Lower Big
[10] — and this is the lower half of Lower Big Chief. Or lower
[11] third perhaps. But this area down here is quite flat.
[12] Maybe eight to ten degrees, tops.
[13]   Up above that it's got rolls and pitches that make
[14] it a very entertaining trail, but as you see in some of
[15] these other photographs —
[16]   Q: You were on Page 6 when you were talking, correct?
[17]   A: That's correct. Now I'm over here on 1 — Page 1.
[18] The second photograph on the page. We're standing up near
[19] the top of Big Chief — Upper Big Chief, if you will. You
[20] can see the pitch is considerably steeper.
[21]   MR. GLUCK: Could we take a break, please.
[22]   MR. POTTER: Sure.
[23]
[24]   (A recess was taken from 3:04 p.m. to 3:11 p.m.)
[25]

**Page 72**

[1]   MR. GLUCK: Mr. Isham would like to clarify an
[2] answer that he gave just before we took a break — shortly
[3] before we took a break.
[4]   MR. POTTER: Sure.
[5]   A: We were talking about the photographs that we had
[6] and you were asking questions about the trail pitch on Big
[7] Chief trail, on lower Big Chief trail. And I pointed out
[8] that the area in the photograph on Page 6 below the accident
[9] site feathered out to a very gentle slope. I meant in no
[10] way to indicate that the slope up above that had been gentle
[11] or of a lesser pitch. It was clearly intermediate.
[12]   And the upper part of Big Chief, if we took
[13] clinometers up on the hill, the upper section of Big Chief
[14] was definitely intermediate and on probably the upper end of
[15] that.
[16]   Q: He had skied this trail multiple times before,
[17] according to Yuki Hasegawa, correct?
[18]   A: He had gone down this trail multiple times before.
[19] But Yuki Hasegawa made it very clear that there was a
[20] differentiation from the upper part to the lower half.
[21]   Q: Correct.
[22]   A: So, yeah, he got down the trail to the point that
[23] he went off the trail. But the trail went from steeper
[24] upper end of intermediate to definitely intermediate trail
[25] at the point of the accident. It wasn't a beginner trail

**Page 73**

[1] for that mountain at all.
[2]   Q: But you know that as a skier when you're skiing
[3] down a section and you see a run-out at the bottom, there is
[4] a tendency to ski faster than you should, correct?
[5]   MR. POTTER: Objection.
[6]   A: The answer to your specific question is "correct."
[7] But I think you'll find when we show the video to the jury,
[8] that that specific section would not have been in view as
[9] that — as a run-out at the location above which Yukio went
[10] into the trees.
[11]   Q: That may be, but Yuki had skied the — Yukio had
[12] skied the trail many times before, correct?
[13]   A: Yeah.
[14]   Q: So you have no reason to believe that Yukio was not
[15] aware that there was run-out coming up?
[16]   A: That specific question, I'll answer that I agree
[17] with you. But I'd say that the run-out had not occurred by
[18] any means above the location at which Yukio went in the
[19] trees. There are still some — as I pointed out — tried to
[20] point out earlier and you could see in the video pretty
[21] clearly, that there are rolls and pitches that would not be
[22] conducive at all to letting them go for a person at the
[23] beginner level that Yukio was attributed to be.
[24]   Q: What level was Yukio at on February 20, 2004?
[25]   A: Beginner.

**Page 74**

[1]   Q: Do you know? Was he advanced beginner?
[2]   A: Well, I would imagine he was advanced beginner.
[3]   Q: Was he beginning intermediate?
[4]   A: I don't know. It's impossible — these are terms
[5] that you're tossing to me that we don't have any definition
[6] for.
[7]   Q: But they're terms that are used, correct? We've
[8] got to try and understand what happened, correct?
[9]   A: Right. We talked about the mechanics of what Yuki
[10] described, that Yukio was sort of trying to get his skis to
[11] get matched in some sort of parallel fashion but wasn't able
[12] to ski parallel turns, which would be kind of in the
[13] intermediate range.
[14]   So he was, by my understanding, best understanding,
[15] he was at the — in the beginner and advanced beginner —
[16] whatever that is. Could have been that. You know, he skied
[17] eight or nine times. But he was still using — I'm using my
[18] hands now to sort of indicate a wedge. He was still, from
[19] my best understanding, breaking and holding on as he went
[20] into turns.
[21]   And then as people get to the advanced beginner
[22] stage, they're trying to match the skis. Those are the
[23] terms we use in the ski industry.
[24]   Q: Insofar as you know, he had done that successfully
[25] on that trail multiple times before, correct?

Page 75

[1]   MR. GLUCK: Objection.

[2]   A: Well, he was — he didn't go in the trees until he
[3] went into the trees. So he had been on the trail before.
[4] We don't know any more than that.

[5]   Q: Well, you know from what Yuki Hasegawa said in his
[6] deposition, that he's been on the trail multiple times
[7] before, correct?

[8]   A: Yes.

[9]   Q: You know from what Yuki Hasegawa said that on none
[10] of these occasions did he ski into the trees, correct?

[11]   A: That's my understanding, yes.

[12]   MR. GLUCK: He may have skied down on his ass.
[13] Who knows what happened to him. I withdraw that. Withdraw
[14] that.

[15]   MR. POTTER: I didn't say anything about how
[16] he was skiing.

[17]   Q: (By Mr. Potter) I said, he skied down and he
[18] didn't ski into the trail — into the woods, correct?

[19]   A: Not that we know of.

[20]   Q: Mr. Gluck has brought up a good point. That is, we
[21] don't know what he was doing at all. We don't know whether
[22] he fell immediately after Yuki Hasegawa passed him?

[23]   A: That is correct.

[24]   Q: We don't know when he fell, that he slid into the
[25] woods, correct?

Page 76

[1]   A: That's correct.

[2]   Q: Falling, by the way, is an inherent risk of skiing,
[3] isn't it?

[4]   A: It's part of skiing.

[5]   Q: It's an inherent risk of skiing, isn't it?

[6]   A: Well, if falling is a risk.

[7]   Q: You've testified many times, Mr. Isham. You've
[8] testified every time that falling is an inherent risk of
[9] skiing. Do you want to retreat from that?

[10]   A: Well, I don't want to retreat, for falling is part
[11] of skiing. And if that — you can get hurt falling.

[12]   Q: You can get hurt falling. It's a risk of skiing.
[13] You've testified many times before that it's an inherent
[14] risk of skiing —

[15]   A: Okay. Fine.

[16]   Q: — haven't you? Skiers can fall regardless of what
[17] the terrain is; isn't that correct?

[18]   A: It certainly is.

[19]   Q: Changing snow conditions are an inherent risk of
[20] skiing; isn't that correct?

[21]   A: Yes.

[22]   Q: Skiing out of control is an inherent risk of
[23] skiing, isn't it?

[24]   A: Well, skiing has inherent risks. That's what I've
[25] testified to over and over again. There are a lot of things

Page 77

[1]   that can contribute to this inherent risk because you're
[2] sliding down an inclined slope on a slippery surface.
[3] Falling is part of that. Snow conditions can contribute to
[4] your — to the — to a fall or to a lack of — loss of
[5] control.

[6]   Q: Skiing out of control is an inherent risk, isn't
[7] it?

[8]   MR. GLUCK: Objection.

[9]   A: Somehow I'm getting hung up on the way you're
[10] posing these questions. Skiing has inherent risks. Skiing
[11] out of control is one of them. Falling is — can be one of
[12] them. Snow conditions can cause a fall which would produce
[13] injury and inherent risk.

[14]   Q: In fact, you have testified in another case, have
[15] you not, that you've seen thousands of skiers who ski out of
[16] control?

[17]   A: I'm sure I have.

[18]   Q: Because you have seen thousands of skiers skiing
[19] out of control, correct?

[20]   A: Sure. I see loss of control all of the time. I
[21] also see skiers regain control, so

[22]   Q: Correct.

[23]   A: I've seen it all, until I saw my own fall.

[24]   Q: Skiing off the trail is an inherent risk of skiing,
[25] isn't it?

Page 78

[1]   A: It could present an inherent risk.

[2]   Q: You've seen skiers ski off the trail; isn't that
[3] correct?

[4]   A: Oh, yeah. That's become a part of industry. But I
[5] would never tell you that I would expect a skier to ski off
[6] the trail here at — on Big Chief. The woods are very
[7] clearly defined on the edge of the trail.

[8]   Nobody in their right mind, in my opinion, would go
[9] into these woods and try to ski because of the density.
[10] It's not part of this mountain's ski offering.

[11]   Q: Well, let's put it this way. It's an inherent risk
[12] of skiing that you lose control and ski off the trail,
[13] correct?

[14]   A: Yes. Or fall. Fall off the trail.

[15]   Q: Is it your opinion that Yukio Kusada lost control
[16] on this occasion, February 20, 2004, and that that caused
[17] him to ski off the trail?

[18]   A: I can't imagine that Yukio would have chosen to go
[19] off the trail at this location.

[20]   Q: Is it your position or your opinion that he lost
[21] control and that's why he ended up in the woods?

[22]   A: Yes.

[23]   Q: Whose fault is it that he lost control?

[24]   MR. GLUCK: Objection.

[25]   A: It depends on how far back you want to take the

Page 79

[1] answer to that. Yukio was on his skis and he was on this
[2] trail which he had been on before. And so up to that point,
[3] these were his choices made, as near as I can tell, because
[4] he had not been given adequate information about how to
[5] ensure his control, how to choose the right trail, how to
[6] stay on a beginner trail when he was a beginner. And all
[7] those things reduce back to the failure of the program.
[8]     Q: How can you even make that statement, Mr. Isham,
[9] when you don't even know what happened between the time that
[10] Yuki Hasegawa last saw him and the time that he was found
[11] off the trail? How can you even begin to make that
[12] statement?
[13]     A: I don't know how to answer that question.
[14]     Q: I'm asking you, what is the factual basis upon
[15] which you make that statement? What was Yuki Hasegawa doing
[16] — what did he actually do from the time that Yuki Hasegawa
[17] passed him until he went off the trail? Everything, from
[18] any source you've got?
[19]     A: We have already determined that I don't have any
[20] sources that witnessed what he did.
[21]     Q: You don't know what he did; isn't that correct?
[22]     A: That is correct.
[23]     Q: So that everything that you've said to me is an
[24] assumption on your part; isn't that correct?
[25]     A: Yes.

Page 80

[1]     MR. GLUCK: Objection. "Everything" the whole
[2] day? What do you mean "everything"?
[3]     MR. POTTER: No. I'm talking about —
[4]     THE WITNESS: Just about this.
[5]     MR. POTTER: — this. I'm talking about this.
[6]     MR. GLUCK: I mean, he didn't assume that he
[7] didn't have lessons. He didn't assume he was on the wrong
[8] skis. He didn't assume he was on an intermediate slope as a
[9] beginner. He knows all these things to be true. These
[10] aren't assumptions.
[11]     MR. POTTER: He knows all those things to be
[12] true. He knows that Yuki — Yukio Hasegawa, who he never
[13] saw ski, didn't belong on this slope.
[14]     Q: (By Mr. Potter) You know that?
[15]     MR. GLUCK: He based it on the record.
[16]     Q: Do you know that?
[17]     A: Based on what I've —
[18]     Q: What?
[19]     A: — been given as information.
[20]     Q: What, Mr. Isham?
[21]     A: What, what?
[22]     Q: What. What have you been given as information?
[23]     A: The testimony of Yuki Hasegawa to his ability. The
[24] testimony of the school staff and how they constructed the
[25] program, the skis he was on are a fact.

Page 81

[1]     Q: Do you know that the skis he was on had anything to
[2] do with this accident, sir?
[3]     A: No, but it's reasonable —
[4]     Q: No, no, wait a minute. No. Okay. Now you can go
[5] on and explain your answer. I'm asking you: do you know if
[6] it had anything to do with it?
[7]     A: Well, you know, you've beaten this one virtually to
[8] death, it seems to me. You know, that I know, that you know
[9] I know that I was not there and nobody else was there that
[10] has come forward to say, we saw this happen —
[11]     Q: But what you're doing —
[12]     A: — period.
[13]     Q: What you're doing — and I'm putting it to you
[14] directly — what you're doing is you're speculating, aren't
[15] you?
[16]     MR. GLUCK: He's opining.
[17]     Q: You're speculating, aren't you?
[18]     MR. GLUCK: It's his opinion.
[19]     Q: Because you don't know?
[20]     MR. GLUCK: He's giving an opinion as a —
[21]     MR. POTTER: Please, Ron. Ron, I'm asking the
[22] questions, please. I'm asking the questions.
[23]     MR. GLUCK: I understand.
[24]     MR. POTTER: You know if you want to make an
[25] objection, make an objection.

Page 82

[1]     MR. GLUCK: I understand, Eric.
[2]     MR. POTTER: And that's as far as it goes.
[3]     MR. GLUCK: Don't point your finger at me.
[4]     MR. POTTER: That's as far as it goes.
[5]     MR. GLUCK: Just don't point your finger at
[6] me.
[7]     MR. POTTER: I'll point my finger if I feel
[8] like it.
[9]     THE WITNESS: Whichever one you choose. Okay.
[10]     Q: (By Mr. Potter) You're speculating, aren't you?
[11]     A: I am opining based on information provided to me
[12] and my experience in the industry. I don't know where you
[13] differentiate opine and speculate, but it sounds — I think
[14] I've got a pretty solid understanding of his abilities, his
[15] knowledge, or lack of ability, lack of knowledge, bad
[16] choices of terrain for all that ability and bad choice of
[17] equipment and a school that didn't give him any information
[18] about how to not have that.
[19]     Q: How did the bad choice of equipment affect his
[20] ability to ski between the point where Yuki Hasegawa last
[21] saw him and the point where he skied off the trail?
[22]     A: Stop it. How many times can we say, I know that I
[23] don't know what happened. Nobody knows.
[24]     Q: So then you're speculating, aren't you?
[25]     A: I'm opining. I like that word.

Page 83

[1]  **Q:** You like the word, that you're opining?

[2]  **A:** Well, that's what I've seemed to be asked to do a

[3] lot. Now, nobody has ever hired me to speculate on a case

[4] because of my experience and background.

[5]  **Q:** But if you don't know what happened, how can it be

[6] anything other than speculation, Mr. Isham?

[7]  **A:** Because I add up all the pieces of information that

[8] I'm able to get and come up with — given those pieces of

[9] information — my opinion about —

[10]  **Q:** You're saying the lessons — the failure to have

[11] lessons affected it. Are you saying that the failure to

[12] teach him how to stop had an effect on him?

[13]  **A:** Yes.

[14]  **Q:** Do you know, in fact, whether he tried to stop?

[15]  **A:** No.

[16]  **Q:** Then how can you say that? How can you say it had

[17] an effect when you don't know whether he tried to stop?

[18]  **A:** Well, because it's reasonable to opine that a

[19] person who had skied on this mountain both in daytime and

[20] nighttime with some level of success would do their very

[21] best not to get in whatever situation Yukio got in that

[22] caused him to go off the trail.

[23]  And if he had been taught about terrain choice,

[24] about how to make appropriate turns, about skiing on the

[25] right equipment that would be easier for a beginner's

Page 84

[1] ability, rather than something that's designed for very

[2] advanced performance, if he had had a helmet — all of which

[3] could have been done but weren't. All of those things would

[4] have combined to allow him to be a better, safer more

[5] competent skier —

[6]  **Q:** Are you telling me —

[7]  **MR. GLUCK:** I think he was still answering the

[8] question. Let him finish his answer.

[9]  **Q:** Go ahead. Finish.

[10]  **A:** At this point.

[11]  **Q:** Are you telling me that if all of those things had

[12] happened, that this accident would not have happened?

[13]  **A:** Well, that's impossible for me to say definitively

[14] that this accident would not have happened, but more likely

[15] than not it would not have happened if those things had been

[16] taken care of properly.

[17]  **Q:** What impact did the failure to give lessons have?

[18] I want you to relate it to what actually happened.

[19]  **MR. GLUCK:** Now, I don't need to be an

[20] obstructionist here, but what you mean, Harry, is, what

[21] impact did the failure to have lessons have on him skiing

[22] into a tree? Is that what the question is? Because you

[23] said what actually happened. That's kind of general.

[24]  **Q:** What impact did the failure to have lessons have on

[25] what he did between the point when he was last seen and the

Page 85

[1] point where he went off the trail?

[2]  **A:** Where I'm trying to go with that is to say it's

[3] more likely than not that if he had had lessons, then he

[4] probably or could reasonably have not gotten into the

[5] situation that caused him to go off the trail. I have no

[6] idea what it was.

[7]  **Q:** What situation caused him to go off the trail?

[8]  **A:** I just told you, I have no idea.

[9]  **Q:** You have no idea?

[10]  **A:** But he sure as heck didn't get himself turned or

[11] stopped before the accident happened.

[12]  **Q:** Do you know whether he was even trying to turn?

[13]  **A:** Do I know? Reasonably, he was —

[14]  **Q:** Do you know?

[15]  **A:** No. We've gone there a hundred times already. I

[16] don't know. Nobody else knows. I'm just trying to put all

[17] the information that I can gather from all these sources and

[18] my experience to give you an opinion.

[19]  **Q:** Have you seen skiers ski on slopes who don't look

[20] where they're going?

[21]  **A:** Not typically. They all seem to be — skiers all

[22] seem to be kind of facing the direction they're going.

[23]  **Q:** Have you seen skiers who are looking down the hill

[24] to see what somebody else is doing at the same time they're

[25] skiing?

Page 86

[1]  **A:** I'm sure. I do that myself.

[2]  **Q:** We all do it, don't we? Do you know whether Yukio

[3] was doing it that evening?

[4]  **A:** It's reasonable to assume he was.

[5]  **Q:** That he was not looking where he was going?

[6]  **A:** No, he was looking where he was going. Why would I

[7] think not?

[8]  **Q:** Yuki Hasegawa had just passed him?

[9]  **A:** Yeah.

[10]  **Q:** Why wouldn't he be looking at Yuki Hasegawa?

[11]  **A:** What's to say that if he was looking down the slope

[12] and Yuki Hasegawa is in his vision down there someplace,

[13] he's not looking at the slope that he's on; A; and B, he was

[14] standing still when Yuki Hasegawa passed him. So why

[15] wouldn't he be looking at Yuki Hasegawa.

[16]  **Q:** If he wasn't standing still when Yuki Hasegawa went

[17] past him, would you change your opinion?

[18]  **A:** No.

[19]  **MR. GLUCK:** Objection.

[20]  **A:** No.

[21]  **Q:** Now, what about the ski conditions on the trail

[22] caused or contributed to this accident?

[23]  **A:** As soon as I answer that question, you're going to

[24] say, you weren't there, were you, Mr. Isham. The snow

[25] surface conditions were mixed. In eastern skiing, my

Page 87

[1] experience is mixed. As I explained earlier, it's a
[2] combination of — can be a combination of ice, loose
[3] granular, wet, slushy snow. Who knows.
[4]     The temperature was 30 degrees. So it's a pretty
[5] safe assumption that it wasn't packed powder. At least the
[6] report says so. So when you've got a varied surface
[7] condition and you've got a beginner skier on an intermediate
[8] slope, you have a combination that could result in a loss of
[9] balance, a loss of control, a fall, a slide. Who knows.
[10]     It's nighttime. So we've got light pools going
[11] down the mountain. It's less easy, when you're skiing at
[12] night in these conditions, to anticipate changes in the
[13] surface conditions immediately in front of you or react to
[14] them. You're less likely to recognize them if you're on
[15] terrain that's above your ability and if you're standing on
[16] skis that are not conducive to emergency movements for a
[17] beginner skier.
[18]     Q: Do you know, as you sit here today, what the
[19] condition was on Big Chief — the condition of the trail
[20] from side to side from the time that Yuki Hasegawa passed
[21] him until he went off the trail?
[22]     A: You make such broad sweeping questions. The answer
[23] is, of course, I don't and it would be impossible to know.
[24] I don't know that anybody does know that.
[25]     Q: So you don't know, as you sit here, whether he had

Page 88

[1] hit any ice or not, correct?
[2]     A: Correct.
[3]     Q: You don't know whether he hit any granular surface
[4] or not, correct?
[5]     A: Correct.
[6]     Q: You don't know whether any other condition on that
[7] slope had any impact on him at all, correct?
[8]     A: But I do know that those conditions could have
[9] reasonably existed in this circumstance and that on a
[10] beginner trail, it wouldn't have presented much of a problem
[11] to a skier who seems to be Yuki's ability. And an
[12] intermediate trail, it would provide a much greater
[13] opportunity for him to lose control.
[14]     Q: In your lessons — when you give lessons, do you
[15] spend a lot of time in that first lesson talking about the
[16] ski conditions and the terrain to the beginner skiers?
[17]     A: No. But —
[18]     Q: You spend any time?
[19]     A: Yes. Absolutely yes.
[20]     Q: Haven't you testified that it's virtually a waste
[21] of time?
[22]     A: No. I certainly have not.
[23]     Q: That the average beginner can't even understand it?
[24] Haven't you testified to that?
[25]     A: I don't know what you're talking about. It's not a

Page 89

[1] waste of time to point out — and we do that as a matter of
[2] course in lessons — green beginner, blue intermediate,
[3] black is advanced. You're a beginner. These are the trails
[4] that are appropriate to your ability. Most typically, snow
[5] conditions aren't discussed because beginner skiers are
[6] having plenty of a struggle just trying to stand up on
[7] whatever they're standing on.
[8]     Ski instructors often like to talk a great deal to
[9] their students, so it's not infrequent that some of these
[10] things are addressed. But generally, beginner skiers are on
[11] ideal terrain. Ski areas provide the best grooming, the
[12] best slope pitch possible for the beginners to learn as
[13] effectively and comfortably as they can.
[14]     But two things: the skier's responsibility code
[15] and the relative difficulty of trails are covered in
[16] virtually every beginner lesson. I think they're
[17] understood.
[18]     Q: You're saying that Yukio Kusada, in your opinion,
[19] did not understand the skier's responsibility code —
[20]     A: I don't know.
[21]     Q: — when he was skiing on February 20, 2004?
[22]     A: I don't know.
[23]     Q: You don't know whether he —
[24]     A: I don't know how much of it he understood and
[25] didn't understand. I can only imagine that he was given the

Page 90

[1] sheet with the information on it and read it. I don't know
[2] that he had any application from the reading of it on the
[3] 15th of December to what it meant on the hill the first,
[4] second and eighth time he went skiing. Because he didn't
[5] have anybody there to interpret these words to these
[6] conditions.
[7]     Q: So in order for Northfield Mount Hermon to have
[8] done its job, you're saying somebody should have been skiing
[9] with him on every occasion who was, say, an instructor or a
[10] chaperone? Is that what you're saying?
[11]     A: There you go again. On every occasion, I'm not
[12] saying that. I'm saying that he would have benefited by
[13] being in lessons as they were available — or allegedly
[14] available if Northfield Mount Hermon had said — had
[15] continued with their earlier policy: you're going to be in
[16] lessons if you're a beginner.
[17]     Q: Now, sir, you have given a lot of lessons, correct?
[18]     A: Yes.
[19]     Q: You've seen a lot of lessons given, correct?
[20]     A: Correct.
[21]     Q: Is it the responsibility of the ski school after a
[22] lesson is done and after the student goes out skiing to
[23] check to see where they're skiing?
[24]     A: Well, you need to tell me whether this is a
[25] walk-in, paying customer off the street or it's somebody

Page 91

[1] that's in a group from a school whose parents have given the
[2] responsibility to them to be in lessons and to be guided and
[3] coached during the day.
[4]    Q: So let's say in this particular instance the
[5] lessons took place at Berkshire East. Mr. Herrick was
[6] running the lessons. Are you saying that when the students
[7] came the next time, assuming they opted not to take a lesson
[8] — he had given them lessons, but it was his duty to go out
[9] and check on them on the slopes to see whether or not they
[10] were staying on the slopes that they should be on?
[11]    A: I'm not saying that at all. I'm saying that if
[12] they came to lessons the first time and returned to
[13] Berkshire East and were in lessons again, that lesson would
[14] have continued. And they would have been checked on in the
[15] matter of — in the course of the lesson. But no, I
[16]    Q: After the lesson is over and the student goes out
[17] skiing, is it the duty of the ski school to go out and check
[18] to see where they're skiing?
[19]    A: In the scenario that you described, it certainly is
[20] not. But —
[21]    Q: Okay.
[22]    A: — in many of the programs, if not most of the
[23] programs, that I am familiar with, students get off the
[24] bus. They're met by an instructor. They're in a lesson.
[25] They stay in that lesson until the program is over and

Page 92

[1] they're brought back to the bus.
[2]    Q: You lost me there. What programs are you familiar
[3] with that do that?
[4]    A: Well, the programs that I ran at Copper Mountain
[5] all do that. They do that to this day. Most of the
[6] organized ski programs that come out from the cities that
[7] I'm familiar with have students in class — have
[8] participants in class and that class continues throughout
[9] the day until the day is over and then they get on the bus
[10] and go home.
[11]    Q: So the instructor stays with them the whole time?
[12]    A: Yes.
[13]    Q: You're not familiar with a program where a student
[14] comes and gets a lesson and then goes out free skiing, so to
[15] speak?
[16]    A: Absolutely, I'm familiar with that.
[17]    Q: Taking that kind of program —
[18]    A: Okay.
[19]    Q: — are you telling me that it's a ski instructor's
[20] duty to go check on those students to see what slopes
[21] they're skiing on?
[22]    A: No. I'm not telling you that. I think it's very
[23] creative for you to think that I am. I'm sorry if I
[24] misspoke. The typical walk-up lesson in a ski area: you
[25] come to the ski area. You buy a lesson ticket. You show up

Page 93

[1] at the ski school meeting place. Get assigned to an
[2] instructor. Take the lesson.
[3]    When the lesson is over, the instructor's
[4] obligation is to wrap up the lesson, give you pointers about
[5] what was covered and to help you understand what terrain and
[6] trails you might best ski at your ability in the future.
[7] And then say good-bye.
[8]    And for the walk-up business, you more than likely
[9] have time after the lesson that you can go ski on your own
[10] wherever you choose. But you're given the information or
[11] some guidance from the instructor.
[12]    You're a beginner. There are these green circles
[13] that are beginner trails. We're on one of them right now.
[14] Look over here just on the other side of the lift. There's
[15] another beginner trail. If you want to go practice, if
[16] you're not too tired after the lesson is over, these would
[17] be good places to ski and stay on and not go, if you have
[18] the occasion to, to blue squares or black diamonds.
[19]    Q: If they disregard your advice and just go to blue
[20] squares or black diamonds, are you at fault?
[21]    A: No.
[22]    Q: Is the ski school at fault?
[23]    A: Well, I was representing the ski school.
[24]    Q: So you're not at fault. You don't have any
[25] continuing obligation to them?

Page 94

[1]    A: No, sir.
[2]    Q: But in the case of Northfield Mount Hermon, they
[3] have a continuing obligation for the kind of program that
[4] they have to check on the students to make sure that they're
[5] on the trails that only the school thinks they should be on?
[6]    A: I think you've misunderstood my answer. I'm
[7] familiar with the programs that take the students off the
[8] bus, give them to an instructor, the instructor stays with
[9] them through the duration of the lesson and returns them to
[10] the bus. Now, I don't know the confines of the Mount Hermon
[11] program.
[12]    Q: The kind of program that you're speaking of the one
[13] where a group comes, an instructor is assigned to the group
[14] and the instructor spends the whole day — or for the time
[15] that they're there —
[16]    A: For the period, yeah.
[17]    Q: — with the group is very different than the normal
[18] ski instruction that takes place at most resorts, isn't that
[19] correct?
[20]    MR. GLUCK: Objection.
[21]    A: Well, it's correct to the extent the normal, as you
[22] call it, ski instruction that takes place at a ski area is
[23] not an organized group of youth and adults up — to 18 years
[24] old brought up from town in a bus in a specific program to
[25] do this skiing event with an instructor.

**Page 95**

[1] A person that drives his car — and 18 year olds
[2] certainly drive their car — could drive up to any ski area
[3] in North America, go to the ski school desk, buy a ski
[4] school ticket, get a — depending on where they are, one
[5] hour- or two-hour or all-day lesson and be finished at 3:30
[6] and have 30 minutes to the end of the day that they would be
[7] all on their own. They would have the lunch period all on
[8] their own.
[9] Q: So it is a fact that you can — if you come in,
[10] arrange for an all-day lesson, correct?
[11] A: You can.
[12] Q: What does that cost for an individual?
[13] A: Varies at ski areas.
[14] Q: What's the range?
[15] A: Well, if — are you talking about a private lesson?
[16] Q: Yes, private lesson. Individual, all day long.
[17] A: I think it varies somewhere from $300 to $1,200.
[18] Q: $300 to $1,200?
[19] A: Yeah. I'm really probably off on the upper end,
[20] but I'm thinking of Aspen or Vail.
[21] Q: If you did a week package, let's say, for a week
[22] and you were skiing all day long with an instructor, how
[23] many students normally?
[24] A: Oh, five to seven.
[25] Q: What would that cost?

**Page 96**

[1] A: For all week long?
[2] MR. GLUCK: Objection.
[3] Q: Yes.
[4] A: I don't know specifically.
[5] Q: The range?
[6] A: Like I said, there's a range. If we're doing a
[7] private lesson, let's say five — let's say it's $300 for
[8] you and me to go out for an all-day lesson. One. Today.
[9] But let's say, as you inquired, you want to do five days.
[10] Well, you'd probably get a discount for — you know, you do
[11] multiple days, the price goes down.
[12] Q: Is it your position that Northfield Mount Hermon
[13] represented to the parent in this case that there would be a
[14] ski instructor with them throughout their participation in
[15] the program from beginning to end?
[16] A: No.
[17] Q: You know that the representation was that beginning
[18] ski lessons would be available but not required, correct?
[19] A: That lessons would be available but not required.
[20] Including beginning, of course.
[21] Q: Including beginning. Yuki Hasegawa was 18 years
[22] old at that time, correct?
[23] A: Correct.
[24] Q: Do you have any reason to believe he didn't
[25] understand that?

**Page 97**

[1] A: I don't have any reason to believe he didn't
[2] understand it. Somehow the communication between "lessons
[3] are available" and the actual connecting with the lessons
[4] didn't happen.
[5] Q: You don't really know that, do you?
[6] A: Well, yes, I think I do. Something went wrong with
[7] the providing of instructors or the clear number of students
[8] that would be in lessons. So there was a default in there.
[9] Q: In recreational ski programs like the recreational
[10] ski program at Northfield Mount Hermon and at other
[11] secondary schools, is it usual for students to forgo the
[12] lesson and just go out and ski?
[13] MR. GLUCK: Objection.
[14] A: I don't know the answer to that.
[15] Q: So you're not saying, if I understand you
[16] correctly, that you couldn't have a program like that,
[17] correct?
[18] MR. GLUCK: Like what?
[19] Q: A program where the student decides whether they
[20] want to take lessons or whether they just want to go learn
[21] on their own?
[22] A: That is possible, isn't it? I think it is. That
[23] could happen. I'm pretty sure that does happen.
[24] Q: Are you saying that if there is such a program,
[25] it's per se negligent?

**Page 98**

[1] A: That gives the student the choice?
[2] Q: Yes.
[3] A: No. I'm not saying it's per se negligent. I'm
[4] saying that the safety of the students is allegedly a major
[5] concern for Mount Hermon School — Northfield Mount Hermon
[6] School. And making sure that the students were in lessons
[7] up to some level of understanding and competence in my
[8] opinion should have been part of the requirement of the
[9] school as they had had in the past.
[10] Q: The safety of a skier at every ski resort in the
[11] United States is of concern to the ski resort; isn't that
[12] correct?
[13] A: Yes, sir.
[14] Q: And yet you can't give me a single ski resort that
[15] requires every person who comes to the mountain to take a
[16] lesson, correct?
[17] A: I've been down this road already. Correct.
[18] Q: Now, did Berkshire East have any responsibility to
[19] put up signs about the ski conditions?
[20] A: Well, I believe they do put up signs about the ski
[21] conditions in various locations. I don't recall which, but
[22] I'm pretty sure that when I was there, I saw something that
[23] said something about ski conditions. It's typical at all
[24] ski areas.
[25] Q: If they did not do that, are you saying that they

Page 99

[1] caused or contributed to this accident?

[2]    MR. GLUCK: Objection.

[3]    A: No.

[4]    THE WITNESS: Sorry. Objection.

[5]    A: No.

[6]    Q: Why not?

[7]    MR. GLUCK: Objection.

[8]    A: Telling someone about ski conditions gives them

[9] information, if they know how to process it, to make

[10] decisions and choices about whether to use the ski area that

[11] day and where to go, what trails are groomed and what trails

[12] are not and so forth.

[13]    Q: And so you're offering the opinion that Northfield

[14] Mount Hermon should have arranged for a lesson that taught

[15] the students how to process that information; is that

[16] correct?

[17]    A: Well, somehow at this point it sounds like you're

[18] trying to say we're offering you processing 101 for ski

[19] school. That's not what I'm saying. But I am saying that

[20] typically in the course of the ski lesson, information is

[21] given to students about the snow conditions, the terrain to

[22] choose, their ability relative to all of that.

[23]    It's a progressive thing. So the first-time

[24] beginner is probably not going to get much of that

[25] information, but as they go the second time, they might get

Page 100

[1] more. So they can process that information more effectively

[2] and on it would go.

[3]    Q: Did you attend any of the ski lessons at Berkshire

[4] East?

[5]    A: No.

[6]    Q: Have you ever seen —

[7]    A: I don't think there were any going on at the time I

[8] was there.

[9]    Q: Have you ever seen any of the instructors at

[10] Berkshire East teach a ski lesson?

[11]    A: Actually, I've never even seen a ski instructor at

[12] Berkshire East.

[13]    Q: So you don't know what they teach or what they

[14] don't teach in a first lesson?

[15]    A: Not correct.

[16]    Q: You do know what they teach?

[17]    A: Yes.

[18]    Q: How do you know that?

[19]    A: The Professional Ski Instructors of America is kind

[20] of the umbrella organization that offers teaching

[21] procedures. They've got manuals and videos and so forth

[22] that give either trainers and/or instructors information

[23] about what to teach, when to teach it.

[24]    It's a wonderful organization to give all this

[25] training. I don't know of any ski areas that don't have

Page 101

[1] some involvement with Professional Ski Instructors of

[2] America, either directly, like most of them do, member ski

[3] schools, or indirectly. Because that's the basis of

[4] teaching in the United States. And at the beginner levels,

[5] it's pretty standardized.

[6]    Q: What do they teach you at the first lesson? Let's

[7] say you have a class of — how many — what's the typical

[8] class size?

[9]    A: Six or eight.

[10]    Q: Six or eight?

[11]    A: Smaller than when you started.

[12]    Q: I skipped the lessons.

[13]    A: You're lucky to be alive.

[14]    Q: What about if you had a lesson that had more than

[15] that? Is that too many?

[16]    A: Well, the more people you have in the classes, as

[17] you well know, the learning is spread out. Individual

[18] attention is less available. So it's just not as desirable.

[19]    Q: So the idea is six to eight?

[20]    A: That's a good number. There's no ideal.

[21]    Q: Is that the recommended number by the Ski

[22] Instructors Association?

[23]    A: You know, I'm not sure whether they make that —

[24] whether they step that far out or not. It's a number that's

[25] fairly customary today.

Page 102

[1]    Q: If you had, let's say, 15 —

[2]    A: Yeah.

[3]    Q: — is that an inherently bad number?

[4]    A: No. It's just not as desirable as a smaller

[5] number. Less individual attention.

[6]    Q: So 15 students in an hour lesson isn't as valuable

[7] as — six to eight students in an hour lesson, correct?

[8]    A: Right. Six to eight students in a two-hour lesson

[9] is more desirable than 15 students in a two-hour lesson.

[10] There's just so many combinations of these things that you

[11] can do. The premium being one student — one or two

[12] students and one instructor.

[13]    Q: Now, the fact that this skiing occurred at night

[14] figure into your opinion at all?

[15]    A: I believe that — because of the nature of the

[16] light pools, it's less easy to see the surface conditions as

[17] they come in and out of the light pools.

[18]    Q: Does the ski area have a duty to warn skiers about

[19] that?

[20]    A: That the sun went down?

[21]    Q: About the light pools.

[22]    A: No. I don't think they do.

[23]    Q: Have you ever seen any warning signs at areas where

[24] they do night skiing, about the differences between night

[25] and day skiing?

Page 103

[1] **A:** No. We're coming on the next break, you know.

[2] **Q:** That's okay. All right. Go ahead. Take a break.

[3]

[4] (A recess was taken from 3:58 p.m. to 4:09 p.m.)

[5]

[6] **A:** Where were we? Six to eight, 15 in a class.

[7] **Q:** (By Mr. Potter) Yes, six to eight, 15 in a class.

[8] That's right. It would be better with six to eight than 15,

[9] correct?

[10] **A:** Yeah. Or two or three than six to eight.

[11] **Q:** I don't want to misrepresent what you said,

[12] Mr. Isham, but I just want to state it the way I understand

[13] it. You can correct me if I'm wrong.

[14] **A:** Okay.

[15] **Q:** What you're saying is that you cannot say whether

[16] it was the lessons or the skis or the slope or any other

[17] single factor that caused Yukio Kusada to ski off the trail

[18] on February 20, 2004, but the combination of those, in your

[19] opinion, was the cause; is that correct?

[20] **MR. GLUCK:** Objection.

[21] **A:** It's correct to say that I would never attempt to

[22] pick one item that caused his accident. I would say,

[23] however, that the long list, not complete, that you just

[24] gave of oversights, for lack of a better word, that were

[25] done by Mount Hermon School were shocking, in my opinion.

Page 104

[1] **Q:** Now, I want to be sure that I've gotten them all.

[2] So I'm going to go through them one at a time just to make

[3] sure we have all of the oversights. The absence of lessons

[4] was one, correct?

[5] **A:** The lessons not being a required part of the

[6] package, one. Leading to.

[7] **Q:** Leading to?

[8] **A:** Lack of information to Yukio.

[9] **Q:** Just spell out the information he should have had

[10] that he did not get, in your opinion.

[11] **A:** His relative ability as a beginner. The terrain

[12] choices that he should reasonably make.

[13] **Q:** By that, you mean the green, blue and black?

[14] **A:** Yes. Where he would apply his current skiing skill

[15] levels that he had gotten through his lessons and what

[16] terrain then he would ski on. The lesson — the beginner's

[17] lessons or the early lessons — all right. Skis.

[18] **Q:** Skis. That's another one?

[19] **A:** Well, it is and it isn't. If he had been in the

[20] lessons, the beginner lessons, with those skis — the

[21] instructor's first job is to check equipment. And to look

[22] down and see these skis on a beginner would have been a big

[23] red light.

[24] **Q:** In that particular case, Mr. Isham, that would have

[25] meant that he would have had to take a lesson on

Page 105

[1] February 20, 2004, correct?

[2] **A:** No. We're talking about in the early stages of his

[3] learning.

[4] **Q:** But we don't know that he was wearing those skis in

[5] the early stages of his learning, correct?

[6] **A:** We don't know exactly when.

[7] **Q:** That's correct. So the only day we know for sure

[8] he had them on is February 20. Now, if you want to take it

[9] back and tell me you know for sure earlier, that's okay.

[10] I'm not concerned about that. But the only day, as far as I

[11] know, that we know for sure he had them was February 20,

[12] 2004?

[13] **A:** At this point that seems to be correct. It appears

[14] that he had them earlier, but we don't know for a fact. So

[15] I will accept that.

[16] **Q:** So assuming that that was the date, you would say

[17] that he should have been required to take a lesson that day

[18] even though he had been skiing and, let's say, taken lessons

[19] prior to that?

[20] **A:** Good. Let's go back —

[21] **MR. GLUCK:** Objection. Go ahead.

[22] **THE WITNESS:** I'm sorry.

[23] **MR. GLUCK:** That's okay.

[24] **A:** — to the next item. Supervision from the school

[25] to the student functionally did not exist.

Page 106

[1] **Q:** (By Mr. Potter) What do you mean "functionally did

[2] not exist"?

[3] **A:** There was no monitoring of student's progress by

[4] class monitoring cards that would have been generated out of

[5] a ski lesson or that would have been generated by the

[6] instructor talking to the supervisors about the progress of

[7] the students.

[8] The man in charge of the program admitted that he

[9] never even once went to the ski area to see the program

[10] operate. He had his supervisors. They were on the bus and

[11] that's all that happened. And the supervisors basically

[12] said what they do is make sure they got on the bus, got off

[13] the bus, didn't loiter in the day lodge for too long. But

[14] they didn't monitor their skiing progress.

[15] Had that been going on —

[16] **Q:** Any other factor you want to put down here?

[17] **A:** I'm working on it. It's just that's such a long

[18] list, I'm having a hard time.

[19] **Q:** All right.

[20] **A:** I want to expand on the supervising to the extent

[21] that it just seems surprising to me that there was so little

[22] oversight of the kids out skiing. Let loose at a ski area

[23] at night. No helmets. Of course, we want to put helmets on

[24] the kids and make it a requirement. That's a very

[25] reasonable thing to do.

Page 107

[1]    If you were one of the parents, I would imagine
[2] that you would feel much more comfortable if your kid was
[3] with a helmet than without.
[4]    MR. POTTER: Off the record.
[5]    (A discussion was held off the record.)
[6]    Q: (By Mr. Potter) Anything else?
[7]    A: In the same pool of things, there is this night
[8] skiing issue. Is that people can have an accident at night
[9] and be lost in the woods and not be found more easily than
[10] they could in the daytime. So that leads to the absolute
[11] necessity of some sort of buddy system or check-in system so
[12] that people wouldn't be left in the woods for hours on end.
[13]    Q: Now, you've indicated — and let me just address
[14] that point. You have indicated that Audra Forstrum should
[15] have reported to the ski area that Yukio Kusada was missing
[16] when Yuki Hasegawa came in and asked whether she had seen
[17] him, correct?
[18]    A: No. Audra Forstrum was told that Yuki and Yukio
[19] had lost contact at around 8:00 or 8:15. And at that point
[20] was put on notice by a specific individual who had been seen
[21] with the person that was going to turn up missing later in
[22] the day. I don't believe that at 8:00 there would be any
[23] reason for her to have reported that somebody is missing,
[24] because in the course of skiing in the evening under these
[25] circumstances that's not what would be done.

Page 108

[1]    But at the end of the session, when Yukio was
[2] missing from the bus and Yuki had reported to Audra earlier,
[3] then to track it back through Yuki, where he was skiing and
[4] what was going on would have — seems to me like shortened
[5] the search considerably or at least originated at a certain
[6] place.
[7]    Her failure to do so and the failure of them to be
[8] able to identify that one bus was gone and maybe he was on
[9] that bus, but we don't know how to get in touch with them,
[10] so he's supposed to be on this bus — and all those things
[11] — instead of keeping both buses until everybody was
[12] accounted for and then having everybody, so they could check
[13] through the system, just wasn't done. So that's where I
[14] fault —
[15]    Q: Did it slow down the search at all from the point
[16] where Audra Forstrum reported that he was missing?
[17]    A: I don't believe it was a matter of speeding up or
[18] slowing down the search. Focusing the search, I think,
[19] would have been the issue at hand.
[20]    Q: Are you saying and is it your opinion that if Yuki
[21] Hasegawa had told Audra Forstrum and Audra Forstrum had
[22] immediately told — as soon as she knew — told the folks at
[23] the mountain that he was last seen on Big Chief, that Big
[24] Chief is the only place that should have been searched?
[25]    A: No. I'm not saying that. I'm saying that there)

Page 109

[1] was one person at 8:00 that told her, where is Yukio. Then
[2] it comes to be 9:00 and we're loading the buses and Yukio is
[3] missing.
[4]    At that point, Yuki could have been brought forward
[5] if he were there to be brought forward and presented to the
[6] ski area. And they could have inquired of him, well, where
[7] were you skiing, when did you last see him, and have gotten
[8] that information and started the search intensely, at least
[9] halfway down Big Chief.
[10]    Q: Do you know that they did not search Big Chief?
[11]    A: They did search Big Chief, but they didn't have the
[12] information that they could have gotten from Yuki about him
[13] and where he was seen.
[14]    Q: What difference does it make? They took a police
[15] dog down there and couldn't find him.
[16]    A: I think it would make a difference.
[17]    Q: They took a police dog down that trail. They had
[18] searched it several times before. What difference did it
[19] make? They didn't find him. If you don't find somebody in
[20] one area, are you going to just stay there?
[21]    A: No. They did a good search.
[22]    Q: They did a good search?
[23]    A: From the information they had, they did a good
[24] search, I believe. The police dog — I don't recall meeting
[25] the police dog in this process, but I accept that they did,

Page 110

[1] if you say so.
[2]    Q: They did.
[3]    A: Okay.
[4]    Q: And the trail they went down was Big Chief. And
[5] they got everybody off the mountain.
[6]    A: They were off the mountain a long time ago.
[7]    Q: No. The search was continuing. I'm talking about
[8] they took every ski patroller and everybody off the mountain
[9] and specifically searched Big Chief with the dog and didn't
[10] find him. Does that change your opinion in any way?
[11]    A: No.
[12]    Q: Assuming that to be the fact.
[13]    A: No. Because my opinion is centered around getting
[14] the information from Yuki specifically from halfway down to
[15] where it was. They possibly could, by talking to him, have
[16] gotten a better picture, at least of that moment in time and
[17] worked the search a little more intensely or a little
[18] differently at that point.
[19]    Because they did eventually find him. It's
[20] reasonable that they couldn't see him. But if they had a
[21] better clue or more clues about his ability, where he was,
[22] what was he last seen doing, et cetera —
[23]    Q: You saw the area. In fact, he was down in the
[24] gully, isn't that correct?
[25]    A: It was in the gully. In a little depression.

**Page 111**

[1] Q: Very difficult to see, correct?

[2] A: Yes. At night. With no lights on that spot, of

[3] course.

[4] Q: It was really just per chance that one of the ski

[5] patrollers fortunately saw his arm flagged up; isn't that

[6] correct?

[7] A: Your knowledge of details are greater than mine.

[8] But yes, per chance, of course.

[9] Q: Now, how much earlier would they have found him?

[10] A: I have no idea. It could have been anywhere from

[11] four hours to ten minutes. I mean, who knows.

[12] Q: You just don't know, correct?

[13] A: No.

[14] Q: And nobody knows?

[15] A: Nobody knows.

[16] Q: Would it have made any difference in his injuries?

[17] A: I don't know.

[18] MR. GLUCK: Objection. It's a medical

[19] question.

[20] Q: So you have no opinion about that?

[21] A: No. I would only hope so, but I certainly don't

[22] know.

[23] Q: Now, going back to this list, we got the night

[24] skiing issue. What else have we got? I've got absence of

[25] lessons, leading to lack of information, relative ability as

**Page 112**

[1] a beginner, terrain choices, green, blue and black, skis.

[2] They're on the wrong skis. Supervision, school to the

[3] students, functionally did not exist. No monitoring of

[4] students. Absent supervision because they were let loose at

[5] the ski area at night. Night skiing issue. Is there any

[6] other?

[7] A: You did have helmets in there. I just didn't

[8] hear —

[9] MR. GLUCK: Helmets and the buddy system.

[10] Q: Helmets.

[11] A: I saw you writing "buddy system." You're not

[12] reading what you're writing?

[13] Q: Well, I'm trying to leave some things out. No.

[14] Helmets and the buddy system. You can't say that any one of

[15] those would have made a difference; is that correct?

[16] A: I can say any one of those would have helped. All

[17] of them would have helped more. It's like one in a class or

[18] 15. Is that — that's hard to get.

[19] Q: I'm trying to understand whether you are placing

[20] emphasis on any one of these or whether you're just sort of

[21] throwing them into a bowl and saying, hey, the combination

[22] here is bad.

[23] A: Good question.

[24] Q: That's what leads me to my conclusions. It's the

[25] combination. I can't single out a single one of these

**Page 113**

[1] things, because we don't have enough facts to do it. But

[2] it's the combination?

[3] MR. GLUCK: Objection.

[4] Q: Is that what you're saying?

[5] A: I want to thank you for asking that question,

[6] because I do need to clarify.

[7] Q: Okay.

[8] A: It's kind of a sequence of events that started out

[9] with one short meeting, with a piece of paper handed out.

[10] No rules, no requirements for the program. Sign up, show

[11] up, go. That starts this chain of events.

[12] The next step in that is the ski school and the

[13] lessons and the information they would have passed on. The

[14] next steps are more in a bowl of things that would have

[15] helped. But it started with the school, the lack of

[16] supervision, the lack of direction/control and went on to

[17] not getting information to this young man.

[18] We don't know when he got skis that were above his

[19] ability, but he definitely had them out there at some point.

[20] No way of being informed that these were problems. Could

[21] have been problems. No requirements for helmets. Goes down

[22] the line. A helmet, in my opinion, would be a benefit.

[23] Might have helped him not get injured, but I don't know.

[24] So did I clarify that, to tell you that I think it

[25] stems from their real loose — total lack of direction and

**Page 114**

[1] control of the kids, to get them moving through a learning

[2] sequence that would be safer and more beneficial for them in

[3] the process. And they're a school —

[4] Q: Once again —

[5] A: — still.

[6] Q: Once again, going back to where we were earlier,

[7] can you point to a single private school in New England that

[8] had a recreational ski program of the type that Northfield

[9] Mount Hermon might have that does all of these things that

[10] you have just listed?

[11] A: You know, I only know one private school in New

[12] England at this point that has a ski program that didn't do

[13] any of these things. I don't know any other schools, so I

[14] can't answer that question.

[15] Q: But you do know from reading the depositions in

[16] this case that there were a number of students that went to

[17] North — I mean to Berkshire East, correct?

[18] A: Correct.

[19] Q: You do know that none of them require students to

[20] wear helmets, for example, correct?

[21] A: I don't know that.

[22] Q: You do know that there was testimony to that effect

[23] from the ski area, correct?

[24] A: More than likely there was. I don't know that from

[25] my recollections of reading.

Page 115

[1] Q: Let me ask you — by the way, are you familiar with
[2] the statute in Massachusetts which requires that skiers
[3] remain under control?
[4] A: I'm not — I've read the statute in Massachusetts.
[5] I'm not familiar with it through my memory, but almost —
[6] not almost, every statute I've ever read says that. So I
[7] can be very comfortable accepting what you say.
[8] Q: Let me just —
[9] A: Statutes seem to parallel the skier's
[10] responsibility code, it seems to me. And then expand on
[11] them with legalese.
[12] Q: I'll represent to you that I'm reading from General
[13] Laws, Chapter 143, Section 710 — or "O." It's not zero.
[14] It's "O." The last sentence in the first paragraph says, "A
[15] skier shall maintain control of his speed and course at all
[16] times and shall stay clear of any snow grooming equipment,
[17] any vehicle, tower, poles or other equipment."
[18]      And my question to you, sir, is, did you know and
[19] do — did you know that that is a statutory requirement in
[20] Massachusetts for skiers?
[21] A: Until you read it to me, I didn't know the
[22] specifics of it and never heard it read out loud, but I do
[23] now.
[24] Q: Do you know that that statute also says "A skier
[25] shall be presumed to know the range of his own ability to

Page 116

[1] ski on any slope, trail or area." Did you know it said
[2] that?
[3] A: I did not.
[4] Q: That's a statutory presumption in Massachusetts,
[5] that Yukio Kusada was presumed to know the range of his own
[6] ability to ski on any slope, trail or area. It also says,
[7] "A skier shall be presumed to know of the existence of
[8] certain unavoidable risks inherent in the sport of skiing,
[9] which shall include, but not be limited to, variations in
[10] terrain, surface or subsurface snow, ice conditions or bare
[11] spots and shall assume the risk of injury or loss caused by
[12] such inherent risks." Did you know that was the statutory
[13] law in Massachusetts?
[14] A: I did not.
[15] Q: Does that cause you to change your opinion in any
[16] way?
[17] A: No.
[18] Q: Now, in assessing a particular skier — and we
[19] talked about this a little bit earlier. They all — they
[20] come to the slope with different abilities, correct?
[21] A: Yes, sir.
[22] Q: Different physical abilities, correct?
[23] A: Yes, sir.
[24] Q: Different abilities to balance themselves, to move
[25] with equipment on their feet and so on, correct?

Page 117

[1] A: Correct.
[2] Q: You have testified that that basic ability of an
[3] individual skier is a critical, critical factor in assessing
[4] a skier's ability; isn't that correct?
[5] A: For who's assessing their ability?
[6] Q: Well —
[7] A: Themselves or an instructor? Who are you talking
[8] about?
[9] Q: Well, for anybody, in determining what level of
[10] ability a particular individual has when it comes to skiing.
[11] That his — that the physical skills the person comes with
[12] when they come to the mountain is a critical, critical
[13] factor in evaluating what their ability is to handle skiing,
[14] correct?
[15] A: Yeah. I'm assuming for them to evaluate their own
[16] ability to know their limitations —
[17] Q: Yes.
[18] A: — is who you're talking about?
[19] Q: For them to —
[20] A: I know how I do.
[21] Q: For them to know their own limitations. But also
[22] for anybody evaluating them to see how they handle lessons.
[23] What they can handle, what terrain they could handle and so
[24] on. Some come —
[25] A: Like an instructor.

Page 118

[1] Q: Exactly. Some come to you with greater physical
[2] ability than other students, correct?
[3] A: Yes.
[4] Q: In this case, you don't know what Yukio Kusada's
[5] physical abilities were, correct?
[6] A: No. I don't at all. I certainly don't know
[7] relative to sliding on a ski hill.
[8]      MR. GLUCK: Excuse me. Let me just say, just
[9] for clarification purposes — you say sliding. That could
[10] be a term that's used by the people in the skiing industry.
[11] Do you mean skiing when you say sliding?
[12]      THE WITNESS: Yes.
[13]      MR. GLUCK: At least sliding means you're like
[14] on your bottom and you're sliding down the mountain.
[15]      THE WITNESS: That's it.
[16]      MR. GLUCK: Just for clarification purposes.
[17]      THE WITNESS: It's all the same thing.
[18]      MR. GLUCK: I didn't mean to interrupt.
[19]      MR. POTTER: It's a good clarification. I, in
[20] fact, was thinking back to his earlier definition of it.
[21] Q: (By Mr. Potter) So I understood what you meant.
[22] But for most of us, it's skiing?
[23] A: Sliding on your —
[24] Q: You have testified, I believe, Mr. Isham, as
[25] follows: "Extensive discussion about slope conditions. The

Page 119

[1] beginner skier would not understand it. It is needless.

[2] Just a brief mention." That's your opinion, correct?

[3]    A: Yes. I would support that happily. Are you sure I

[4] said that?

[5]    Q: I know you did.

[6]    A: Just kidding.

[7]    Q: Now, have you ever talked to anybody who took a

[8] lesson — a ski lesson at Berkshire East?

[9]    A: No, sir.

[10]    Q: Do you have the exhibits in front of you?

[11]    A: Here's one of them.

[12]    Q: The skier's responsibility code.

[13]    A: Yeah.

[14]    Q: The first bullet point on Exhibit 2 says, "Always

[15] stay in control and be able to stop or avoid objects." Can

[16] we agree, sir, that Yukio Kusada did not stay in control on

[17] February 20, 2004, and was not able to stop or avoid

[18] objects?

[19]    A: Well, we can certainly agree that he wasn't and

[20] didn't.

[21]    Q: It is his duty to stay in control, correct?

[22]    A: I believe that's everybody's duty and intent. It's

[23] not an absolute realistic requirement for skiing, as you

[24] well know, as a skier yourself. There are moments that we

[25] lose control. Often we — more often than not, it's lost

Page 120

[1] and regained in a snap of a finger.

[2]    But the intent of every skier that I've ever seen

[3] is to maintain control of their course and direction and

[4] speed.

[5]    Q: In fact, every skier has a duty to do that,

[6] correct?

[7]    A: Yes. I think that would be — I mean, yes, of

[8] course.

[9]    Q: Number 2 says that "People ahead of you have the

[10] right of way. It is your responsibility to avoid them,"

[11] correct?

[12]    A: Yes.

[13]    Q: Do we know whether there was anybody ahead of Yuki

[14] Kusada during that period of time after Yuki had skied past

[15] him?

[16]    A: Apparently, nobody went in and reported being run

[17] down by him, so, no.

[18]    Q: Nobody reported that they had run him down, either,

[19] did they?

[20]    A: No. But that's a new one.

[21]    Q: You probably wouldn't report that, would you?

[22]    A: Well, I would. But I'm not sure about you.

[23]    Q: Skiers do get run down on the slope, correct?

[24]    A: Yes, they do.

[25]    Q: Skiers do get run off the slope, correct?

Page 121

[1]    MR. GLUCK: Objection.

[2]    A: Well, yes. It does happen and I'm aware of it.

[3]    Q: Now, the next point is, "Do not stop where you

[4] obstruct the trail or are not visible from above." We don't

[5] know whether that occurred in this particular case, do we?

[6]    A: No, we don't.

[7]    Q: "Whenever starting downhill or merging into a

[8] trail, yield to others." We don't know when Yukio started

[9] down the trail, whether there was somebody else that should

[10] have yielded to him and didn't, correct?

[11]    A: No, we don't.

[12]    Q: "Always use devices to help prevent runaway

[13] equipment." Did he have devices to help prevent runaway

[14] equipment, as far as you know?

[15]    A: I haven't seen the skis personally. But they come

[16] with first training devices.

[17]    Q: You've never inspected these skis —

[18]    A: No, sir.

[19]    Q: — is that correct? It says, "Observe all posted

[20] signs and warnings." Were there any signs and warnings in

[21] the area of the accident?

[22]    A: Well, I couldn't tell you. There was the day I

[23] went there down below. A "Slow" sign in the far distance.

[24] And there were signs uphill — the mountain was

[25] appropriately signed.

Page 122

[1]    Q: It was appropriately signed?

[2]    A: I thought so.

[3]    Q: No deficiencies there?

[4]    A: None that I noticed, certainly considering the time

[5] of year and conditions and so forth.

[6]    Q: This was a year later, correct?

[7]    A: Yes.

[8]    Q: You don't really know what they were on

[9] February 20, 2004, correct?

[10]    A: I do not.

[11]    Q: The next one, it says, "Keep off closed trails and

[12] out of closed areas." Would the area where he was found be

[13] considered a closed trail and a closed area?

[14]    A: In the tight sense of close, probably not. But it

[15] was off the skiing trail. So it's the place that was —

[16] that would not be reasonable to be skied. The density of

[17] that —

[18]    (Cell phone ringing.)

[19]    MR. GLUCK: Sorry.

[20]    Q: (By Mr. Potter) Now, the next one says, "Prior to

[21] using any lift, you must know how to load, ride and unload

[22] safely," correct?

[23]    A: Yes.

[24]    Q: Do you know whether Yukio could load, ride and

[25] unload safely?

Page 123

[1] A: Well, up until this accident, he did exhibit the
[2] ability to do that.
[3] Q: Now, at some ski areas they do have fencing along
[4] the sides of the trail to prevent skiers from going off the
[5] trail, correct?
[6] A: Yes.
[7] Q: They do that in certain spots, correct?
[8] A: Correct.
[9] Q: If a fence had been erected in the area where Yukio
[10] went off the trail, would it have prevented this accident?
[11] A: It would be impossible to say. It could have. But
[12] there's no way of knowing.
[13] Q: Would it have been a good idea to have a fence
[14] there?
[15] A: Well, if you ask Yukio, I suppose he would say yes.
[16] Q: Would it have been prudent to have one? There's a
[17] gully right beyond it. Would it have been prudent?
[18] A: In my experience and opinion, no.
[19] Q: Why not?
[20] A: I believe the tree line defines the edge of the
[21] trail. It's particularly easy to see here. Fencing the
[22] edge of the trail — I don't know what kind of fence you
[23] would put on it, the edge of a trail.
[24] I'll give you this example, however. We do, in
[25] certain places at Taos Ski Valley, put fencing along the

Page 124

[1] edge of the trail, even though the woods are very clearly
[2] delineating trail edge from the slope. It's an extra
[3] measure of care and precaution done by Taos Ski Valley.
[4] Frankly, I haven't seen that done anywhere else.
[5] I'm not — I haven't interviewed the ski patrol people that
[6] made that decision, so I don't know why they did it. I
[7] think it's a nice thing. It's an additional piece of
[8] information. But it's not my — it's not my belief that
[9] trails should be fenced along the tree line.
[10] Q: So is it your opinion, from what you're saying,
[11] that the only reason you would put up a fence is to define
[12] the trail?
[13] A: Well, the question, as you asked it earlier about
[14] some ski areas put fences along the edge of trails —
[15] Q: Yes.
[16] A: — all ski areas put fences along the edge of
[17] trails when there's a reason to warn people that there's
[18] something on the other side of the fencing.
[19] Q: Okay. In this particular case, where there was a
[20] gully on the other side, was this an appropriate place to
[21] put a fence?
[22] A: I don't think it's necessary or reasonable to do
[23] that.
[24] Q: Would it have been prudent to do that?
[25] A: Not necessarily.

Page 125

[1] Q: Would it have been safer to do that?
[2] A: Hard to say. Depends on the kind of fence. Fences
[3] of the type I believe you're speaking of, which could
[4] consist either in bumblebee, quarter-inch rope or they could
[5] be those orange mesh fences or the fences that are even
[6] thicker mesh, are put up almost always to put people on
[7] alert that there's something serious off the edge of the
[8] trail.
[9] The drop-off that we have along the edge of this
[10] trail is just normal snow depth dropping off into less snow
[11] depth into the woods. The woods serve as the notice or the
[12] fencing.
[13] Q: So it's your opinion that this drop-off was not a
[14] serious drop-off; is that correct?
[15] A: That is correct.
[16] Q: So —
[17] A: Well, you know, it's serious to Yukio. But I don't
[18] know that the drop-off was the issue.
[19] MR. GLUCK: It's completely outside the scope
[20] of his opinions expressed in his report. Objection.
[21] Q: If there had been, for example, a rope fence at the
[22] edge of that trail, the fact is, it would have prevented
[23] Yukio from going off that trail; isn't that correct?
[24] A: No. It's not correct at all. Not related to the
[25] rope fences I think of, because they've got 3 feet in

Page 126

[1] between the ropes. Was he standing up when he went off?
[2] Was he down on the ground?
[3] Q: So you've never seen a roped fence in New England
[4] that has a fairly thick piece of rope at the top and mesh
[5] all through it that is rope? Is that what you're telling
[6] me?
[7] A: You're talking about little squares of mesh?
[8] Q: Very little, yes.
[9] A: Yeah, I've seen those.
[10] Q: Have you seen those in New England?
[11] A: I've seen them everywhere.
[12] Q: Have you seen them strung sometimes even with a
[13] cable?
[14] A: Yes, I have.
[15] Q: You're saying that that kind of thing would not
[16] have prevented Yukio from skiing off the slope?
[17] A: Well, I'll say this: if they had been done as you
[18] described, strung with a cable, mesh, attached to the
[19] ground, it absolutely would have prevented Yukio from going
[20] in the trees. Very much like we see on downhill race
[21] courses and so forth.
[22] Q: But you also see them on ski slopes, correct?
[23] A: Not very often. I can recall one instance of them
[24] being on a ski slope. It was in Debuque, Iowa. It was a
[25] very severe drop-off that they were protecting from.

Page 127

[1]    **Q:** Are you going to offer any diagrams in this case?

[2]    **MR. GLUCK:** Who are you talking to?

[3]    **MR. POTTER:** Him.

[4]    **MR. GLUCK:** Oh.

[5]    **A:** I don't know.

[6]    **Q:** (By Mr. Potter) Do you have any diagrams?

[7]    **A:** I don't believe that I do. The diagram would be
[8]    generated from the video, though. I do have a recording on
[9]    the video that I made when I made the video of the slope
[10]   pitch and width and so forth. I can create a diagram from
[11]   what I did, if I am requested to. However, I think the
[12]   video speaks for itself.

[13]   **Q:** When you went out there to view the ski area and
[14]   take these videos and take these pictures, why didn't you
[15]   invite the attorney for the ski area along with you?

[16]   **A:** Him?

[17]   **Q:** No. The attorney for the ski area.

[18]   **A:** Oh. Why would I do that? I can't think of a
[19]   reason I would want to — it was not — I was asked to go
[20]   and inspect the site and look it over.

[21]   **Q:** You wouldn't want him to see what you were doing?

[22]   **A:** Obviously, it wasn't a secret, because I talked to
[23]   a bunch of patrolmen. I'm not trying to be mysterious out
[24]   there.

[25]   **Q:** Did the patrolmen follow you around?

Page 128

[1]    **A:** Yeah. They stayed with me.

[2]    **Q:** The whole time?

[3]    **A:** Well, once I asked them some questions, they did.
[4]    They stayed with me until I left.

[5]    **Q:** You don't know their names?

[6]    **A:** No. I could come up with one of their names, I'm
[7]    sure.

[8]    **Q:** Would you please do that and let Mr. Gluck know so
[9]    that I can have that information?

[10]   **A:** Sure. Be happy to, I think.

[11]   **Q:** Now, in your "Observations" on Page 3, the next to
[12]   the last paragraph, you say, "the Northfield bus left
[13]   Berkshire East area with Yukio still missing from the bus."
[14]   Are you saying that Yukio was missing from the Northfield
[15]   bus?

[16]   **A:** He certainly was.

[17]   **Q:** Do you know, sir, that Yukio was on the Mount
[18]   Hermon campus, not the Northfield campus?

[19]   **A:** I'm aware of that.

[20]   **Q:** Do you know, sir, that the Northfield bus goes back
[21]   to the Northfield campus and the Mount Hermon bus goes back
[22]   to the Mount Hermon campus?

[23]   **A:** Yes.

[24]   **Q:** Yet you expected Yukio to be on the Northfield bus?

[25]   **A:** No.

Page 129

[1]    **Q:** Now, you say in the next page, "According to Yuki's
[2]    statement, he" — and "he" means —

[3]    **A:** Where are you?

[4]    **Q:** — Yukio. This is the second paragraph, Page 4.

[5]    **A:** Okay.

[6]    **Q:** "He" — and that means Yukio — "was not a very
[7]    adept skier." Did Yuki say he was not an adept skier?

[8]    **A:** I don't think he said that in this — as specific
[9]    as I have presented it here. That's what I have derived
[10]   from what I understood.

[11]   **Q:** So that's your interpretation of what Yuki said,
[12]   correct?

[13]   **A:** Yes, sir.

[14]   **Q:** You're not representing to me that Yuki said that?

[15]   **A:** No, he didn't say that specifically.

[16]   **Q:** Now, you say in your conclusions that "Mount Hermon
[17]   School skiing program failed to provide its student
[18]   participants with even the minimum, basic ... information
[19]   prior to traveling to the mountain to ski"?

[20]   **MR. GLUCK:** "Basic safety information" is the
[21]   word.

[22]   **Q:** "Basic safety information." Now, are you telling
[23]   me that the statements that you have made about what they
[24]   should have done constitute the minimum?

[25]   **A:** I'm lost.

Page 130

[1]    **Q:** You used the word "minimum." When you have been
[2]    describing what Northfield Mount Hermon should have done in
[3]    terms of its providing safety information, have you been
[4]    using a minimum standard or a maximum standard? What
[5]    standard have you been using?

[6]    **A:** I haven't really considered that as far as a
[7]    standard is concerned from a minimum to a maximum. But I
[8]    think what I'm — where I'm aiming with this is that the
[9]    students were not — they weren't given information about
[10]   what to expect because they weren't going to go into lessons
[11]   to get what I think would be the minimum amount of
[12]   information to ski within a safe skiing environment.

[13]   **Q:** What I'm asking you is, are the things that you
[14]   said that they should have gotten the minimum?

[15]   **A:** Oh, that's the question?

[16]   **Q:** Yes.

[17]   **THE WITNESS:** Read that back, please.

[18]   (The record was read by the reporter.)

[19]   **Q:** (By Mr. Potter) It's perfectly appropriate, but I
[20]   will restate it.

[21]   **A:** Thank you.

[22]   **Q:** You have described the safety instruction that you
[23]   feel should have been provided to these students in this
[24]   case, correct?

[25]   **A:** Correct.

Page 131

[1] Q: Does that description encompass the minimum or does
[2] it encompass more than the minimum? Does it encompass the
[3] maximum? What are you talking about? Is your statement the
[4] minimum that every single program of this type should be
[5] doing?

[6] A: Those things that you've got written down there are
[7] the complete program. I don't know that I've ever
[8] considered what a minimum amount of information would be
[9] aside from saying that the minimum basic stuff would be
[10] imparted to the students if they had been through the lesson
[11] program, if they had been put in the lesson program.

[12] Q: What I'm trying to figure out is, what is the
[13] minimum basic stuff. Is it what you have told me or is
[14] there something different?

[15] MR. GLUCK: I think he just answered that
[16] question.

[17] MR. POTTER: I'm not sure. We're going back
[18] to minimum, maximum. I don't know whether he's telling me
[19] the minimum or maximum.

[20] MR. GLUCK: Can you read back his last answer,
[21] please.

[22] (The record was read by the reporter.)

[23] MR. POTTER: He still hasn't said what the
[24] minimum is.

[25] A: I don't think there is a minimum in that sense.

Page 132

[1] Going to the lesson —

[2] Q: (By Mr. Potter) But you used the word "minimum."
[3] I didn't —

[4] A: All right. Fine.

[5] MR. GLUCK: I thought he just said the minimum
[6] is going through the lesson program.

[7] A: Going to the lesson.

[8] Q: So the minimum is — so, in other words, if they
[9] had had a lesson and required a lesson, they would have met
[10] the minimum standards?

[11] MR. GLUCK: Lesson program.

[12] Q: The lesson. All right. Now, we're talking about
[13] program. How much of a program? Are we talking one lesson?
[14] Are we talking two lessons? What is the minimum? That's
[15] what I'm asking.

[16] A: Well, I guess I'm going to go with one lesson
[17] should be the barest of minimum. It would give the
[18] information about where to go ski, how to control speed,
[19] what terrain to choose. Their equipment would have been
[20] inspected at that time. I say that because I'm acquainted
[21] with the large majority of people that go learn to ski and
[22] go to one lesson.

[23] There are a lot of people that don't go to any
[24] lesson like yourself, of course, but — the basic safety
[25] information is intended to be imparted at the first lesson.

Page 133

[1] Q: That first lesson usually is about an hour?

[2] A: It depends on where you are. I come from the West.
[3] I'm accustomed to a two-hour lesson. I know the Midwest has
[4] more inclination toward a one-hour session. I'm not
[5] certain. I think the East varies between one and two. I
[6] don't know.

[7] Q: But if they had done that, they would have met the
[8] minimum?

[9] A: That's a very difficult question. I admire you for
[10] thinking it up. But I never considered what the minimum is,
[11] but I'd look at the beginner lesson and what we teach the
[12] instructor to impart in the beginner lesson. That would be
[13] the minimum amount of information.

[14] Q: The next sentence, you say —

[15] A: You know what? We're at that time again. Are you
[16] done in five minutes or oh, God, no?

[17] MR. POTTER: No. I won't be done in five
[18] minutes. I'm going to try and get done. I know she wants
[19] to go.

[20]

[21] (A short recess was.)

[22]

[23] Q: (By Mr. Potter) You remember the Shepler case,
[24] right? Shepler?

[25] A: Yes.

Page 134

[1] Q: In the Shepler case, on Page 71 of that deposition
[2] — do you keep these depositions, by the way?

[3] A: Some. I still have that one, because the case is
[4] still alive, I think.

[5] Q: The question was, "Is loss of control a common and
[6] ordinary experience for skiers at all levels?" And your
[7] answer was, "I think it is."

[8] A: Uh-huh (yes).

[9] Q: That's still your opinion?

[10] A: Uh-huh (yes).

[11] Q: You have to answer "yes."

[12] A: Yes.

[13] Q: "Question: And is loss of control a common and
[14] ordinary experience in all kinds of snow?" Your answer was,
[15] "Yes." Is that correct?

[16] A: You're reading from my deposition.

[17] Q: Do you have any reason to — do you want to read
[18] it?

[19] A: Check your reading ability? No. You're probably
[20] competent to do it.

[21] Q: Is that your opinion today?

[22] A: It is.

[23] Q: "QUESTION: Do all skiers fall?
[24] "ANSWER: Some claim they don't.
[25] "But do all skiers fall?

Page 135

[1] "ANSWER: I believe they do." And is that your
[2] opinion today?
[3] A: It is.
[4] Q: "And do all skiers lose control?"
[5] "ANSWER: Pretty generally, yes, if you — yes."
[6] Is that your opinion today?
[7] A: Yes. All skiers lose control. More often they
[8] regain it from a momentary loss than lose control and crash
[9] or run into somebody or something.
[10] Q: You were asked, I guess, the recovery rate. "We're
[11] talking about the recovery rate on loss of control depends
[12] upon how great of a skier you are?" Your answer was "or
[13] athlete." Correct?
[14] A: Okay.
[15] Q: Is that your opinion still?
[16] A: It depends on how good a — yes. It depends how
[17] good a skier you are or how athletic you are able to react.
[18] Q: It's a number of factors, but certainly your
[19] athleticism is one of the factors, correct?
[20] A: Most typically, I believe it is.
[21] Q: "Now, in your opinion, do skiers know the potential
[22] for loss of control exists?"
[23] "ANSWER: I would think so." That's still what you
[24] think?
[25] A: Yes.

Page 136

[1] Q: "Do skiers know that there's a potential for
[2] injury?"
[3] MR. GLUCK: Objection.
[4] Q: "ANSWER: I believe so."
[5] MR. GLUCK: Objection. What skiers? Yukio
[6] Kusada? People from Northfield Mount Hermon? Who? Who are
[7] we talking about?
[8] MR. POTTER: Skiers generally.
[9] MR. GLUCK: Skiers generally who were in a
[10] program like Northfield Mount Hermon who didn't have
[11] lessons, didn't have the right skis on? What skiers?
[12] MR. POTTER: Any skiers including them.
[13] MR. GLUCK: I think it should be
[14] distinguished. It should be answered in the way that you
[15] understand —
[16] Q: (By Mr. Potter) Let me ask you: do skiers who ski
[17] in the Northfield Mount Hermon ski program in 2003-2004 know
[18] — did they know at that time that there was a potential for
[19] injury?
[20] A: I'm not sure.
[21] Q: Have you —
[22] A: Probably — skiing throughout the ages has been a
[23] sport that's been spoken of, as you can get hurt. You can
[24] break your ankle or break your leg. Now, whether a young
[25] person in the Northfield Mount Hermon program recognizes and

Page 137

[1] acknowledges that is quite another issue, because in my
[2] experience, younger people of that age think they're fairly
[3] invulnerable.
[4] So I don't know for a fact, despite what I said in
[5] that deposition, whether people — all people know that they
[6] could get hurt skiing.
[7] Q: Isn't there a difference, sir, between believing
[8] that you will get hurt and knowing that the activity can
[9] cause you harm? Isn't there a difference between that?
[10] MR. GLUCK: Objection.
[11] A: Believing that I would get hurt or knowing —
[12] Q: Isn't it true — and I'm basing it on the testimony
[13] that you've just given — that young people, in particular,
[14] believe that they're not vulnerable —
[15] MR. GLUCK: Objection.
[16] Q: — to injury?
[17] MR. GLUCK: Objection.
[18] A: Is that a question?
[19] Q: Yes.
[20] A: That's my general impression.
[21] Q: They believe that they're not likely to be the one
[22] who will get injured, correct?
[23] MR. GLUCK: Objection.
[24] A: You know, Mr. Potter, I can't restrict that to
[25] young people. I didn't think I was really ever going to get

Page 138

[1] injured skiing either and it happened. So I've been — I
[2] don't know how else to answer that.
[3] Q: But let me go back to the question. You were
[4] asked, "In your opinion, are all skiers at risk for injury?"
[5] You were asked again, "In your opinion, are all skiers at
[6] risk for injury?"
[7] And your answer was, "Insofar as all people walking
[8] down the street could be injured by a car running across or
[9] stumbling off a curb, skiers could fall and become injured.
[10] Anything can happen to anybody at any time." Is that your
[11] opinion still?
[12] A: I remember that question. My answer is the same
[13] now as it was then. In fact, now you — I'm going to kill
[14] Margo. Don't you dare write that.
[15] Q: You were asked, "Skiing is considered to be a
[16] high-risk sport; is it not?" And your answer was "No. It's
[17] considered to be a dangerous sport." Is that your opinion
[18] today?
[19] A: I believe that's the third or fourth time I've been
[20] asked that same question from that deposition. It's
[21] interesting each time I get it. By many people, skiing is
[22] considered to be a dangerous sport. By the participants in
[23] skiing, there's an awareness of what's legally termed
[24] "inherent risk." You can get injured at the sport.
[25] Whether danger is a constant in the minds of people

Page 139

[1] who go skiing, I'm not sure that that is. In fact, I'm kind
[2] of inclined to think that the way it's become such a
[3] recreation rather than a sport, that danger issue is less
[4] prevalent.
[5] Q: Would you then soften your answer to say that
[6] skiing is considered to be a high-risk sport? Would you
[7] agree with that?
[8] A: You know, I really have to kind of go that — the
[9] route of saying, by whom?
[10] Q: Well, on this occasion, you were asked — and I
[11] guess you have confronted it before — "skiing is considered
[12] to be a high-risk sport; is it not?" And you said, "No.
[13] It's considered to be a dangerous sport."
[14] So I'm trying to figure out — you seem to have
[15] changed your opinion on that. And I understand, I'm trying
[16] to figure out where you are on that spectrum. Is it a
[17] high-risk sport? Is it an inherent risk sport? What is it?
[18] A: Well, it's a sport that — it's an activity that
[19] has the potential for injury.
[20] Q: That's generally known by people who participate in
[21] the sport of skiing; isn't that correct?
[22] MR. GLUCK: Object.
[23] A: I'm not sure that I would represent that all people
[24] that participate in the sport really do believe that, but it
[25] would seem reasonable that you know that you could get hurt

Page 140

[1] doing this. It's probably a little more risky than stepping
[2] off the curb and walking across the street.
[3] Q: My question was whether people generally know that.
[4] I didn't say whether everybody knew that. But generally
[5] they know that?
[6] A: When I go to cocktail parties, I find that most of
[7] the people I talk to generally know that skiing is a
[8] high-risk or dangerous sport.
[9] Q: Change of terrain conditions can happen at any time
[10] when you're skiing, correct?
[11] A: Correct.
[12] Q: That's just —
[13] A: Hold it. You're mixing up a couple of things.
[14] Terrain or conditions. Which one do you want? The answer
[15] is yes to both.
[16] Q: Terrain can change at any time. The conditions of
[17] the snow can change at any time when you're skiing, correct?
[18] A: Well, the repetitive change in conditions of the
[19] snow is much slower than the terrain change.
[20] Q: It's easier for the skier to adjust to that,
[21] correct?
[22] A: Probably.
[23] Q: Are you saying it's not easy for a skier to adjust
[24] to a terrain change?
[25] A: Well, it sure depends.

Page 141

[1] MR. GLUCK: Could I have a moment? Do you
[2] mind if I have a moment?
[3] MR. POTTER: Yes. Go ahead.
[4]
[5] (A short recess was taken.)
[6]
[7] MR. GLUCK: Can you read back the last
[8] question.
[9] (The record was read by the reporter.)
[10] A: If a skier doesn't know anything about terrain
[11] changing, then there's no reason to expect them to be able
[12] to change — to adjust or change. That's why they take
[13] lessons. That's why — they become informed about terrain
[14] changes. That's how they could become informed about snow
[15] condition changes as well.
[16] Q: (By Mr. Potter) What you're talking about, then,
[17] when you're talking about terrain changes, is the designated
[18] level for the particular trail?
[19] A: I'm not restricting it to that.
[20] Q: Well, if you're skiing down a trail, the terrain
[21] changes as you go down the trail, doesn't it?
[22] A: Yes.
[23] Q: It certainly did on Big Chief, correct?
[24] A: It does.
[25] Q: Are you saying that it is difficult for a skier to

Page 142

[1] adjust to those changes that happen on every single trail?
[2] A: Am I saying is it difficult for a skier to adjust?
[3] Q: Yes.
[4] A: If a skier is a beginner and doesn't know that he's
[5] going to be on terrain that's more difficult, doesn't know
[6] the differentiation between easier or more difficult and
[7] most difficult, then it's not going to be easy for them to
[8] know to adjust. Because they don't know what they're going
[9] to get when they're going down the hill.
[10] Take the case of Mount Hermon School. This is, as
[11] I understand it, a school program. It's a course. A class
[12] in school. To go learn skiing. You were asking me earlier
[13] about the minimum standard of what a school should do. In
[14] the context of what should a school program teach kids, a
[15] minimum standard would not be just one lesson, but it would
[16] be subsequent lessons just like they get in classes, which
[17] would build on each learning level.
[18] At the first lesson as we've talked about before,
[19] they're given the basic information about skiers'
[20] responsibility, the big sign up here and you look at it and
[21] read it. Trail of — levels of difficulty, showing the
[22] colors and telling people about it. And then recommending
[23] where they should ski. First lesson.
[24] If that was all it was going to be, that would be a
[25] minimum to be covered. But this is a school program that

Page 143

[1] we're talking about in this deposition. And in the learning
[2] process, each lesson would inform the students more about
[3] going to a different terrain, how terrain changes, how to
[4] deal with terrain changes, snow condition changing, how to
[5] deal with the condition changes.
[6]     And that's how people learn through the lesson
[7] process. People learn otherwise, I agree and admit. But
[8] for a school like Mount Hermon, which sounds to me like a
[9] very good, high-end school whose parents have given their
[10] kids over to this learning process, the education sequence
[11] should have been, take these lessons. You have to be in
[12] lessons for a period of time so that you learn the things
[13] that you need to know to be a safe and more competent skier.
[14]     Q: So that if there's a school in New England that
[15] simply takes its students to the mountain and drops them off
[16] and let's them ski all day, that school is negligent? Is
[17] that your opinion, in the type of program that it puts
[18] together?
[19]     A: My opinion I was just offering was just relative
[20] specifically to what I understand about Mount Hermon School.
[21]     Q: I'm taking it one step further, because if another
[22] school can do it, why can't Northfield Mount Hermon?
[23]     MR. GLUCK: Harry, what you mean by this, is a
[24] recreational ski program for which kids get course credits.
[25] It's part of the physical education curriculum.

Page 144

[1]     MR. POTTER: Correct.
[2]     A: I think — I've never had that question asked
[3] before. I'm trying to understand it in this short period of
[4] time. I think I'm going to answer yes. I think if — if a
[5] person is going to school, they don't just go to the first
[6] class and then be dismissed and expect to go learn the rest
[7] on their own, unless maybe they're in college or graduate
[8] school or something.
[9]     Q: (By Mr. Potter) So, if I understand you correctly,
[10] you fundamentally disagree — I mean, fundamentally disagree
[11] with how Northfield Mount Hermon set up its recreational ski
[12] program, correct?
[13]     A: I couldn't have said it better myself.
[14]     Q: You feel that they should have had a completely
[15] different program; isn't that correct?
[16]     A: No.
[17]     Q: You feel they should have had a program that
[18] followed all of the guidelines that you have outlined,
[19] correct?
[20]     A: I think they should have had a comprehensive
[21] educational program that was advertised in their curriculum
[22] as, you're going to school and when you go to school, you're
[23] learning and you're being taught by teachers.
[24]     Q: What were the requirements for this particular
[25] recreational ski program at Northfield Mount Hermon?

Page 145

[1]     A: Well, my understanding is money and parental
[2] consent.
[3]     Q: Pardon me?
[4]     A: Money. You had to pay for the program, I believe.
[5] And you had to get the parental consent forms signed.
[6]     Q: What was the requirement for credit?
[7]     A: Attendance to the program.
[8]     Q: All you had to do is attend, right?
[9]     A: As far as I know. I don't believe there was any —
[10]     Q: There were no tests. There were no requirements.
[11] There were no markings, correct?
[12]     A: Not to my knowledge.
[13]     Q: What you're saying is that they should have set up
[14] a program that incorporated all of those things; is that
[15] correct?
[16]     A: Rec Skiing and Snowboarding 2003-2004 says in the
[17] second sentence in the paragraph, this program — the
[18] program is a physical education course.
[19]     Q: What were the requirements of the course?
[20]     MR. GLUCK: I think it was asked and answered.
[21]     MR. POTTER: Well, he just read that to me.
[22] I'm saying what were the requirements of the course.
[23]     Q: (By Mr. Potter) My understanding is the
[24] requirements of the course — you've told me — were
[25] participation only. Correct?

Page 146

[1]     A: Yeah. That's correct.
[2]     Q: You're saying that Northfield Mount Herman was
[3] wrong to run a participation-only program; is that correct?
[4] That's your opinion?
[5]     A: Basically, I think, that's — it was run
[6] improperly. It was run unsafely. It was run without care
[7] and consideration for the outcome of the program.
[8]     Q: They had no right to run a program the way that
[9] they wanted to run the program, correct?
[10]     A: I think they had every right to do what they did.
[11]     MR. GLUCK: Objection.
[12]     A: But in my opinion, it was run very poorly.
[13]     Q: In your opinion, they could have run a better
[14] program?
[15]     A: A lot better program —
[16]     Q: You've never —
[17]     A: — with very little effort —
[18]     MR. GLUCK: Let him answer your question.
[19] Wait. Wait.
[20]     Q: You've never run a recreational school program,
[21] correct?
[22]     A: Of course I've run a lot of them.
[23]     Q: At a secondary school?
[24]     A: No. No, no, no.
[25]     Q: Now, your CV here, if I can find it, attaches —

**Page 147**

[1] attaches a list of publications. Your first one is "Helmets
[2] do not make the ski slope safe."

[3]    A: Safer.

[4]    Q: Well, this one says "safe."

[5]    A: Well, okay.

[6]    Q: That's what it says.

[7]    A: All right.

[8]    Q: You wrote that article?

[9]    A: You're right. I'm sorry.

[10]    Q: You wrote that article, correct?

[11]    A: I did.

[12]    Q: Do you subscribe today to all the opinions that you
[13] set forth in that article?

[14]    A: I haven't read that article in quite some time, but
[15] I don't think of anything that I don't agree with or don't
[16] ascribe to. I co-authored it with Grace. We worked on it
[17] for a while.

[18]    Q: Peer reviewed materials. What do you mean by peer
[19] reviewed materials?

[20]    A: When I was writing for the ski and skiing magazine,
[21] I would go to a particular trade show with a number of
[22] articles that I wanted them to publish in the magazines.
[23] They have reviewed the materials, and some articles they
[24] would accept. We want to do this. Some they would say, no,
[25] we don't want to use this one.

**Page 148**

[1]    So the editor of the skiing — editor of the
[2] magazine was the reviewer. That's what I mean by that, in
[3] general. Or there may be in there, that I'm not familiar —
[4] thinking about, but I've asked other people to review but
[5] have not been published.

[6]    Q: You wrote an article, "How do you learn?" What's
[7] that about?

[8]    A: More than likely, that's about — and because I
[9] don't remember it specifically, but it's about the learning
[10] process. You learn through visual, doing or being told.
[11] People have different learning methods. And ski instructors
[12] need to know about those different learning methods when
[13] they're trying to present material to opposing counsel — I
[14] mean, to students.

[15]    Q: So you do agree that individuals do have different
[16] learning methods, correct?

[17]    A: Of course.

[18]    Q: Where does this article appear?

[19]    A: That's under the peer review.

[20]    Q: No. I mean, where can I get it?

[21]    A: You can't.

[22]    MR. GLUCK: You can't get it, Harry. I'm
[23] just kidding.

[24]    A: No. I'm not kidding. You can't get it.

[25]    Q: Why can't I get it?

**Page 149**

[1]    A: Because I don't have it.

[2]    MR. GLUCK: I don't have it.

[3]    A: I don't know where it is.

[4]    Q: I'd like for you to look for —

[5]    A: It didn't get published, but I do have all the
[6] pieces.

[7]    Q: I'd like for you to look for it. If you have it, I
[8] want it. Okay.

[9]    A: I bet you do.

[10]    Q: The next one says, on the next page, "Watch Out for
[11] Trees." What was that about? For "the trees." What was
[12] that about?

[13]    A: Well, that was about skiing in trees. You know,
[14] some ski areas, on their advanced slopes, blade the slope.

[15]    Q: Are only advanced skiers allowed in there?

[16]    MR. GLUCK: Objection.

[17]    A: Thank you. No. There are no policemen on the
[18] slopes generally around the tree areas. The article is
[19] about watching out for the spaces between the trees rather
[20] than looking at the trees.

[21]    Q: You've seen plenty of beginners among the trees —

[22]    MR. GLUCK: Objection.

[23]    Q: — in your experience?

[24]    A: Beginners in the trees, I haven't.

[25]    Q: You have not?

**Page 150**

[1]    A: No.

[2]    THE WITNESS: Have you?

[3]    MR. POTTER: I have.

[4]    THE WITNESS: Cut it out.

[5]    MR. POTTER: I have. At Whistler.

[6]    MR. GLUCK: We're still on the record.

[7]    MR. POTTER: That's not on the record.
[8] No. You see them everywhere.

[9]    MR. GLUCK: She's typing.

[10]    MR. POTTER: That's okay.

[11]    Q: (By Mr. Potter) Let me see if there's anything
[12] else to ask you, Mr. Isham. Just a second.

[13]    MR. POTTER: I don't think I have any further
[14] questions.

[15]    MR. GLUCK: I have no questions. Thank you.

[18]    (The Deposition concluded at 5:31 p.m.)

Page 151

[1]        UNITED STATES DISTRICT COURT

           DISTRICT OF MASSACHUSETTS

[2]

[3] YUKIO KUSADA,                    )

[4]      Plaintiff,                  )

     vs.                             ) Civil Action No. 05-30043-MAP

[5]

     NORTHFIELD MOUNT HERMON         )

[6] SCHOOL, et al.,                  )

[7]      Defendants                  )

[8]

[9]        REPORTER'S CERTIFICATE

[10]

     BE IT KNOWN that the foregoing transcript of proceedings

[11]

     was taken by me; that I was then and there a Certified Court

[12]

     Reporter and Notary Public in and for the County of

[13]

     Bernalillo, State of New Mexico, and by virtue thereof,

[14]

     authorized to administer an oath; that the witness before

[15]

     testifying was duly sworn by me; that the foregoing 150

[16]

     pages contain a true and accurate transcript of the

[17]

     proceedings, all to the best of my skill and ability.

[18]

     BE IT FURTHER KNOWN THAT examination of this transcript

[19]

     and signature of the witness was requested by the witness

[20]

     and all parties present. On October 31, 2006, a letter was

[21]

     mailed or delivered to JAMES W. ISHAM regarding obtaining

[22]

     signature of the witness.

[23]

[24]

[25]

Page 152

[1] I FURTHER CERTIFY that I am not related nor employed by

[2] any of the parties hereto, and that I have no interest in

[3] the outcome hereof.

[4] DATED at Albuquerque, New Mexico, this 30th day of

[5] October 2006.

[6]

[7]

[8]           YVONNE C. GONZALES, CCR

              Certified Court Reporter #62

[9]           License Expires: 12-31-2006

[10]

     My Notary Commission Expires:

[11]   3/20/2009

[12]

[13]

[14]

[15]

[16]

[17]

[18]

[19]

[20]

[21]

[22]

[23]

[24]

[25]

Page 153

[1] YUKIO KUSADA vs. NORTHFIELD MOUNT HERMON SCHOOL, et al.

[2]        DEPONENT SIGNATURE/CORRECTION PAGE

[3]    If there are any typographical errors to your

[4]    deposition, indicate them below.

[5] Page     Line

[6]

[7] _____Change to_____

[8] _____Change to_____

[9] _____Change to_____

[10] _____Change to_____

[11]

[12] Any other changes to your deposition are to be

[13] listed below with a statement as to the reason for

[14]    such change.

[15] PAGE    LINE CORRECTION   REASON FOR CHANGE

[16]

[17]

[18]

[19]

[20]

[21]

     I, JAMES WALTER ISHAM, do hereby certify that I have

[22] read the foregoing transcript of my deposition taken on

     October 19, 2006, and that it is a true and correct record

[23] of my testimony given at that time, except as to any

     corrections submitted.

[24]

[25] Date              JAMES WALTER ISHAM

# ISHAM & ASSOCIATES

P.O. Box 2619  Taos, NM 87571
(505) 776-8268    Fax 776-2131
e-mail jisham@newmex.com

3/23/2006

Ron Gluck, Esq.
Two Center Plaza, Suite 530
Boston, Massachusetts 102108-1906

      Re: Yukio Kusada v Mount Hermon School
      Expert Report

This report covers my review of relevant materials on the above matter and my site inspection of Berkshire East Ski Area on 3/23/2005.

My conclusions and opinions are based on my 25+ years as a Snow Sports Safety Expert and my 45 years of involvement in the snow sports industry in multiple capacities of resort operations and management. In addition to the above, I have visited skiing/ snowsports operations and facilities, as a consultant in Virginia, Vermont, Maine, Pennsylvania, Colorado, California, Connecticut, Nevada, New Mexico, New Hampshire, North Carolina, Minnesota, Illinois, Ohio, British Columbia, Montana, Idaho, Arizona, Wisconsin, Wyoming and Utah.

I James W. Isham, state that I have been declared an expert in the field of Snow Sports Safety in courts in New Mexico, Colorado, Utah, California, Vermont, Minnesota, Virginia, New Hampshire and Pennsylvania. I have served as a Snow Sports Safety consultant and Expert Witness since 1979, a ski area management and operations specialist since 1963 and have been a Professional Ski Instructor since 1959. I have directed numerous ski school operations in the United States and New Zealand and been Director of Skier Services operations and Risk Management at ski areas in the United States. My experience in the Snow Sports industry spans more than 45 years and covers virtually every aspect of ski area operation from design, layout and construction of facilities to facilities management, including trail design and layout, lift construction and operation, ski school operation, rental shop operation, first aid training, employee training, skier safety and risk management.

I am enclosing a copy of my current resume plus a listing of my publications.



EXHIBIT NO. 1

Page 2.

Materials Reviewed:
- Photo of tree and surrounding area where Mr. Kusada was found.
- Timeline of events from Mount Hermon School.
- Trail map of Berkshire East.
- Incident Report from Berkshire East Mountain (Laurie Bassett)
- Patrol Run Sheet.
- Report on Yukio Kusada accident from Mt Hermon School.
- Supplemental report of skiing accident (Frank Field).
- Massachusetts State Police Report.
- One page document outlining seasonal schedule-Mt. Hermon School.
- Rec Skiing and Snow Boarding 2003-2004.
- Letter from Mt. Hermon School to parents.
- Skiers Responsibility Code.
- Incident Report from Berkshire East.
- Deposition of Yuki Hasegawa.
- Deposition of John A. Herrick, Jr.
- Deposition of Katie Benedetti.
- Deposition of Michael P. Atkins.
- Deposition of Samuel Wilson.
- Deposition of Audra Forstrum.
- Deposition of Richard Eisenberg.
- Site Inspection, photos and videotape done on 3/23/2005.

## OBSERVATIONS:

On Friday, February 20, 2004, Yukio Kusada went skiing on a Mount Hermon School sponsored trip. The busses from the school took two busloads of students up to Berkshire East ski area for a night session. The busses were scheduled to leave Mt. Hermon school at 4:00 pm and leave Berkshire East after skiing at 9:15 p.m.

The Mt. Hermon skiing program was scheduled to operate Wednesday afternoons and Friday evenings starting January 7, 2004. All sessions were to be at Berkshire East ski area and night sessions were to leave the school campus at between 4:00 p.m. and 4:50 p.m.

On the evening in question, after arriving at Berkshire East, Yukio and his friend Yuki Hasegawa began skiing together. By Yuki's account the two rode the Main lift (Summit Express) several times prior to the accident. Sometime between 7:00 and 8:00 while

Page 3.

Yukio and Yuki had been skiing together on a trail named Big Chief, Yuki arrived at the bottom of the mountain and observed that Yukio was no longer with him. Yuki said he waited several minutes outside at the bottom of the mountain for Yukio then went into the base lodge and found one of the chaperones, Audra Forstrom. Yuki said he inquired of Ms. Forstrom if she had seen Yukio to which she replied "no". Ms. Forstrom encouraged Yuki to go on out, ski some more and she would meet him at the bus later.

Yuki, after his conversation with Ms. Forstrom, resumed skiing and reported to the proper return bus at the assigned time of 9:15.

The busses were scheduled to leave Berkshire East ski area at 9:30 p.m. When all the students had returned to the busses, attendance was checked and it was discovered that one was missing. The missing student was Yukio Kusada. The bus chaperones elected to send one of the busses back to its destination and to hold the second bus until they found the missing Yukio.

Yukio's absence from the bus was then reported to the Berkshire East ski patrol (at around 9:50 p.m.) and the patrol planned to look for Yukio during their end of day mountain sweep.

Once Yukio's absence was reported to the ski patrol and plans to search for him during sweep, the chaperone that was attending to the last bus, the Northfield bus, left Berkshire East ski area with Yukio still missing from the bus and returned with the bus to its assigned destination at Mount Hermon School.   Upon arrival at around 10:15, it is learned that Yuki had seen Yukio between 7:30 and 8:00 p.m. on the mountain. It was not until approximately 11:30 that the information from Yuki having last seen Yukio on Big Chief trail was relayed to the ski patrol. The ski patrol had been searching intensely since Yukio's absence was reported.

After many hours of searching, including assistance from the State Highway department, snowmobiles and the entire ski patrol staff, Yukio was found. Yukio was discovered at approximately 3:55 p.m. When found, Yukio was unconscious, off the skiing surface in the wooded area bordering the lower Big Chief trail, unresponsive, but breathing. The patrol performed their assessment according protocol, located an abrasion on the right side of Yukio's head above the eye and determined that Yukio a possible femur fracture and serious head trauma. The patrol staff loaded Yukio onto a backboard, administered oxygen and transported him to the the base of the mountain from where he was taken to the base of the mountain for further evaluation and treatment.

Page 4.

Inclement weather prevented a State police chopper from evacuating Yukio from Berkshire East. Yukio was taken by ambulance from Berkshire East to the nearest hospital facility by the Charlemont EMS. Yukio's parents who lived in Japan, were contacted and in the days following, arrangements for the parents to come to the United States were made. Yukio was moved to the Spaulding Rehabilitative hospital in Boston for further treatment.

By all reports, Yukio had been skiing between 8 and 11 times at the time of the accident. Although lessons were supposed to be offered to all students who wanted them, none were actually made available to t he Mount Hermon School skiing program. Yukio had been obliged to learn to ski on his own and according to Yuki's statement, he was not a very adept skier and was even having trouble stopping on the evening of his accident.

Students could make their own choice for obtaining skis. Yukio had borrowed a pair of skis from a friend. The skis Yukio was using at the time of his accident were Atoimic Supercross SX11, 170 cm. in length. Yukio told Yuki that he was having difficulty stopping with these skis, which were lent to him by a friend, Samuel Wilson. The Atomic Supercross SX11 is a ski designed for a very advanced skiing ability. The materials, flex characteristics and torsional rigidity of this ski would discourage the skidding skills necessary for a beginner skier. This ski is built for high speed, all mountain carving at advanced skill levels, and would negatively affect a beginner skiers attempts to ski safely, turn and stop.

CONCLUSIONS:

1. Mount Hermon School skiing program failed to provide its student participants with even the minimum , basic safety information prior to traveling to the mountain to ski. The handout information given to students at the only pre skiing session was information concerning school policy, grading, bus schedules and dates of the program.

2. It is customary when organizing and sponsoring any type of outdoor sports program, like skiing, which has the inherent potential for serious injury that the sponsoring organization provide comprehensive training and information sessions for participants which focus on basic safety information. Mount Hermon School provided no training or information to its participants regarding the inherent risks of skiing, the skiers responsibility or basic safety considerations to employ while skiing.

3. According to testimony of Mike Atkins, program co-ordinator, there was no attention given to the skiers in the skiing program's safety and well being by providing lessons to the participants. On the information sheets given to potential participants it is

Page 5.

indicated that lessons would be available, however no lessons were available or given to the participants in Mt.. Hermon's skiing program.Other school sponsored activities, like volleyball, tennis and badminton which were offered by Mount Hermon School all had instruction as a component of the activity.

4. The chaperones for the skiing program received no training in what to do with the students aside from their requirement to take roll on the bus and make sure students were not loitering in the day lodge during skiing hours. The chaperones were not instructed in how to teach the participants to ski, how to evaluate their progress or how to check each students' equipment to ensure that the student was using proper equipment and had skiing skills and ability appropriate to the equipment they were using while skiing.

5. The communication between the busses and the emergency group on the grounds of Berkshire East when trying to find Yukio was hopelessly lacking. Word did not get back to Berkshire East that Yuki had been skiing with Yukio on Big Chief trail until after 11:30 p.m., yet Yuki had inquired of Yukio's whereabouts from the chaperone much earlier in the evening. The communication in this situation was hopelessly inadequate.

6. Both busses were allowed to leave Berkshire East and return to Mount Hermon School before they found Yukio. Leaving a ski area in a group bus without all students whereabouts being accounted for is unconscionable. Both busses should have been held at Berkshire East until all students could have been notified of Yukio's absence and given the opportunity to tell the chaperones if, when and where they had last seen Yukio. If Mt. Hermon chaperones had been trained to do this proceedure, Yuki could have very early on identified a time and location that he had last seen Yukio, therefore, most likely Yukio would have been found and rescued many hours earlier.

7. No extra caution or safety information was given to the Mt. Hermon School participants as regards the potential for more hazardous conditions that could likely exist when skiing at night. Mount Hermon School failed to initiate any sort of "buddy" system with its participants which if such a system, which is a commonly used method, would have minimized the rescue problems that occurred and would have provided a good way for the chaperones to know the whereabouts of their participants.

8. Although represented as a graded activity, Mount Hermon School made no effort to monitor the progress, abilities or equipment being used by its participants. As a result Yukio Kusada was allowed to ski with no training, at a very low skill level with loaned skis which were considerably more difficult to use for a person with his limited skiing ability.

Page 6.

9. Although mention is made in the handout materials from Mount Hermon School to the skiing participants that helmets are "recommended" it would have been advisable and in the best interests of the students to require that helmets be worn while skiing. It appears that had Yukio been wearing a helmet at the time of his accident, his injury would have been much less severe.


OPINIONS:

1. Mount Hermon School's organization, training and execution of their skiing program was grossly inadequate and negligent.

2. Mount Hermon School failed to provide instruction, as advertised in their handout literature, for beginning skiers and as a result of this failure contributed to Yukio Kusadas accident. Ski lessons are a great benefit for all beginner skiers. Instruction serves to provide the lesson taking student with the necessary skills for safe skiing, equipment awareness as well as information about dealing with the environment of skiing. Students are taught how to stop, turn, control their speed through use of turn shape and terrain as well as their Responsibilities for safe skiing. Yukio did not have the benefit if this skilll development and as a result was not able to safely control his course and direction while skiing on the night of the accident..

3. Mount Hermon School failed to train and equip their chaperones with adequate skills and knowledge on accepted practices of group management and safety related issues and as a result contributed to Yukio Kusada's accident.

4. Mount Hermon School's lack of policy which allowied busses to leave the ski area before all students are present or accounted for was negligent and careless and clearly contributed to Yukio Kusada's not being found for at least eight hours after his accident.

5. Mount Hermon School carelessy and negligently ignored the necessity of providing the skiing participants with complete information surrounding safe skiing and information for how to ski safely at night.

6. Mount Hermon School was negligent in their failure to require all students to wear a helmet at all times while skiing.

Page 7.

This preliminary report was prepared at the request of counsel for the Plaintiff. I reserve the right to change or amend this report as needed when and if new information becomes available.

Very truly yours,

James W. Isham

# ISHAM & ASSOCIATES

P.O. Box 2619   Taos, NM 87571
(505) 776-8268     Fax 776-2131
e-mail jisham@newmex.com

## JAMES WALTER ISHAM

### EMPLOYMENT HISTORY

Mr. Isham's experience ranges from operation management and instructing at family-owned operations to upper level responsibility in one of the country's premier ski resorts. During his employment in the ski industry, Mr. Isham has been involved in all facets of building and running ski resorts including design and construction of trails, lifts, snow making, grooming, signage and marking. He is experienced in all issues affecting ski instruction, from both the student's perspective and the perspective of training and certifying of ski instructors. His mountain operations knowledge and expertise includes snowmaking, slope maintenance, signage, lighting, skier safety and risk management.

| | |
|---|---|
| 1959-1960 | Taos Ski Valley, Taos, New Mexico, Ski Instructor |
| 1960-1963 | Sierra Blanca Ski Resort (Ski Apache), Ruidoso, New Mexico Lift construction, Snowmaking Crew, Head Ski Instructor |
| 1963-1972 | Sierra Blanca Ski Resort, Ski School Director, Slope Layout and Construction, Lift Construction, Ruidoso, New Mexico |
| 1969-1971 | Coronet Peak, New Zealand, Ski School Director, Grooming and Lifts Layout |
| 1969 | Canadian Ski Instructors Alliance, Guest Examiner, Banff, Alberta |
| 1971 | Founder, New Zealand Ski Instructors Alliance Created organization and established New Zealand's first National Instructor's Certification Program (still in existence) Established and operated the first New Zealand/United States International Exchange of Ski Area Management Personnel for the purposes of training and educating New Zealand management staff in grooming, slope maintenance and operational procedures. |
| 1972-1976 | Copper Mountain Resort, Colorado, Ski School/Skier Services Director. Duties included operation of ski rental facilities, cross country and Nordic Nursery programs, Adult and Children's Ski Schools and Accessory Sales. This upper level management position included weekly consulting and participation in signage, trail marking, grooming and maintenance. |
| 1977 | Parallel Haus, Dallas, Texas, General Manager and Ski School Director |
| 1977-1980 | Taos Ski Valley, Taos, New Mexico, Ski School Supervisor, Instructor and |

# ISHAM & ASSOCIATES

P.O. Box 2619    Taos, NM 87571
(505) 776-8268    Fax 776-2131
e-mail jisham@newmex.com

NASTAR Racing Coordinator

| | |
|---|---|
| 1981-1988 | Copper Mountain Resort, Copper Mountain, Colorado, Ski School Operations Director, Duties included Cross-Country Ski School, Two Children's Nurseries, Community Day Care, Adult and Youth Ski Schools, Racing Education, the Seniors Program (Over the Hill Gang) and the snow-boarding staff. These functions employed approximately 250 people. |
| 1988-1989 | Eldora Mountain Resort, Nederland, Colorado, Skier Services Manager, Duties included Cross-Country Center, including its trail layout and maintenance and Ski School, Adult and Youth Ski Schools, Children's Nursery Programs, Off Site Sales, Rental Shop, Racing Department, Ski Area Risk Management and General Manager On Duty. |
| 1989-2000 | Taos Ski Valley, Taos, New Mexico, Ski School Safety Coordinator, Masters Program Coordinator |
| 2000 – Present | Sales Representative for various sports equipment and accessory companies. Snow sports expert – Isham & Associates – principal. |

## PROFESSIONAL SKI INSTRUCTOR ACHIEVEMENTS

Mr. Isham has been a member of the Professional Ski Instructors of America since 1960. The Rocky Mountain Division has more than 12,000 members and includes the states of New Mexico, Colorado, Texas, Arizona and Wyoming. PSIA is recognized nationally as the authority on proper instructional technique and is the certifying body for ski instructors. Mr. Isham has held many of the top elected posts at Regional and National PSIA levels. He is a major contributor to the formalization and definition of ski instruction and to the expansion of the PSIA.

Mr. Isham has been a guest lecturer for National Ski Areas Association, National Ski Patrol and PSIA in their fall seminar series which travels from coast to coast giving lectures and training on various aspects of ski area operation. Mr. Isham has, at these seminars, lectured on topics including: Risk Management, Skier Safety and Management, Development and Training.

## NATIONAL LEADERSHIP HIGHLIGHTS:

National Board of Directors (PSIA)
Chairman, National Ski School Management Committee
National Education Committee, 1987-1992
Chairman, National Ski Safety Education Committee
National Certification Committee, 1987-1992
PSIA Education Committee, 1979-1986
PSIA Safety Committee, 1983-1992
Divisional Representative (PSIA-RM)
National Ski School Directors Committee, 1983-1992

# ISHAM & ASSOCIATES

P.O. Box 2619    Taos, NM 87571
(505) 776-8268     Fax 776-2131
e-mail jisham@newmex.com

Seminar leader for PSIA and NSAA management training;
Conducted a series of seminars across the country for the purpose of better educating ski
area management in the latest staff training, risk management and safety
programs in 1987, 1988, 1989, 1990, 1991, 1997.
Chairman, PSIA Ski School Management Committee, 1988-1992.
Member, School Management Committee 1992-2000.

## PSIA- ROCKY MOUNTAIN DIVISION LEADERSHIP:

| | |
|---|---|
| 1964- present | Board of Directors |
| 1972-1978 | Certification Vice-President |
| 1979-1983 | President |
| 1981-1987 | Education Vice-President |
| 1988-1992 | PSIA Representative, Ski School Director's Committee |
| 1992-1999 | Member, Ski School Management Committee |

## MAJOR CONTRIBUTIONS TO PSIA AND PSIA-ROCKY MOUNTAIN DIVISION:

Founded Divisional Clinic Program. This program now operates all training programs
for PSIA-RM and has been adopted by all other PSIA divisions.
Created and implemented the Divisional Clinic Leader Program. This program defines
the standard nationwide for instructor education at the divisional levels. The DCL brings
the national guidelines of the PSIA directly to the individual ski instructor through clinics
and examinations.
During tenure as President, established the educational master plan which has
been adopted by many PSIA divisions.
As Certification Vice-President, wrote and produced the first certification
handbook for candidates and examiners.
As Education Vice-President, created special training and education programs for
children's instructors.
Served as PSIA Examiner for ski instructor certification from 1969 to 2002.

## CONTRIBUTIONS TO EDUCATION:

Keynote Speaker, Central Division, PSIA, 1990, Fall Seminar
Keynote Speaker, Canadian Alliance, 1993
Designed curriculum and hired staff for New Mexico Highlands University
Associates of Arts degree course in ski instruction.
Established curriculum and conducted a course in Ski School Management for
Colorado Mountain College.
Staff Guest Lecturer for NSAA Fall Seminar National Tour, 1987-1997

## RACING & SKI COACHING EXPERIENCE:

Current member U.S. Ski Coaches Association, Certified Coach
Eldora Ski Area, Racing Coordinator for NASTAR, Businessman's League and

# ISHAM & ASSOCIATES

P.O. Box 2619   Taos, NM 87571
(505) 776-8268      Fax 776-2131
e-mail jisham@newmex.com

Race Camps, 1989-1990
Adult Recreational Race Training Coordinator, Copper Mountain Resort, 1981-1988
NASTAR Race Coordinator, Taos Ski Valley, 1979-1981
Race Coordinator, Coronet Peak, New Zealand, 1969-1971
NASTAR Pace Setter, 1972-1985

## NATIONAL & REGIONAL PUBLICATIONS:

Strategy for Risk Management in the Ski School Operation
Isham, PSIA, NSAA (revised 1998)
Contributing writer to:
Ski Area Management
Ski Magazine
Ski Business Magazine
Skiing Magazine
Member Update, NSAA
Instructor to Instructor, PSIA Publication
Newspapers throughout New Mexico, Colorado and Texas
Operation and policy manuals for ski schools, rental and repair shops.
Television and panel discussion group leader.
The Professional Skier
Ski School Management Newsletter
Advanced Educator Newsletter

## QUALIFICATIONS IN OTHER FIELDS AND ADDITIONAL CAREER HIGHLIGHTS:

Memberships:
National Ski Patrol
American Society of Testing and Materials
United States Ski Coaches Association, Certified Coach
United States Ski Association


Professional Ski Instructors Association
Awarded recognition and lifetime membership in 1991

Colorado Ski Country USA:
Consultant for safety and risk management
Member task force on skier safety, 1989-1990

American National Red Cross:
Staff Instructor, American Red Cross National Aquatics School,
Lake Murray, Oklahoma
First Aid Instructor
Water Safety Instructor

# ISHAM & ASSOCIATES

P.O. Box 2619    Taos, NM 87571
(505) 776-8268    Fax 776-2131
e-mail jisham@newmex.com

Boy Scouts of America:
    Eagle Scout and Silver Explorer Awards
    Annual Report to the Governor of Texas

Member, United States Professional Tennis Association
    1980-1991 Examiner of Tennis Instructors for United States
    Professional Tennis Registry

    1976 Staff Tennis Instructor, Vic Braden, Coto de Caza, California
    1980-1987 Head Tennis Professional, Copper Mountain Resort, Colorado
    1988-1991 Staff Instructor, Quail Ridge Inn, Taos, New Mexico

## EDUCATION:

Texas Tech University,
    1958-1962, Major English Literature, Business Minor
    Masters Program, Texas Tech (Allowed to begin graduate school before
    completing undergraduate program -- no degree)
Advanced Management Studies, Mountain States Employers Council
Advanced Presentation Skills,
    AT & T National Training Center, Denver, Colorado
Management Development, Copper Mountain, Colorado
Management and Personnel Training, Mountain States Employers Council,
Denver, Colorado

## PERSONAL INFORMATION:

Birth date:    October 9, 1940
Citizen by birth of the U.S.A.
Military Service: United States Army, Honorable discharge, 1965

# ISHAM & ASSOCIATES

P.O. Box 2619   Taos, NM 87571
(505) 776-8268     Fax 776-2131
e-mail jisham@newmex.com

*To the best of my knowledge, the following list includes all of my testimonies given either at trial or deposition during the period of 2002 to 2006:*

| Case Name: | Date of testimony: | Court and Case No.: | Attorney: | Type of Testimony: | Location: |
|---|---|---|---|---|---|
| McIntire v. Haggard | April, 2002 | Denver District Court | Jim Chalat | Deposition | Colorado |
| Kane v. Telluride Ski Company | January, 2003 | San Miguel, Telluride District F 01-CV-75 | Peter Riciardelli | Deposition | Colorado |
| Platt v. Aspen Ski Co. | March, 2003 | Pitkin District Court, Aspen County 02-CV-3 | Peter Thomas | Deposition | Colorado |
| Pelkowski v. Little Switzerland | April, 2004 | Washington County, Crevit Ct Branch 2 Melguon, WI 03-CV-115 | Kelly Centofanti | Deposition | Wisconsin |
| Griggs v. Wintergreen | April, 2004 | Albermarle County Circuit Court Charlottesville, VA CL-03-9452 | Bruce Rasmussen/ Brian Slaughter | Deposition | Virginia |
| Griggs v. Wintergreen | July, 2004 | Albermarle County Circuit Court Charlottesville, VA CL-03-9452 | Bruce Rasmussen/ Brian Slaughter | Trial Testimony | Virginia |

# ISHAM & ASSOCIATES

P.O. Box 2619   Taos, NM 87571
(505) 776-8268     Fax 776-2131
e-mail jisham@newmex.com

| Case Name: | Date of testimony: | Court and Case No.: | Attorney: | Type of Testimony: | Location: |
|---|---|---|---|---|---|
| Shepler v. Lee Canyon | August, 2004 | 8th District of Nevada, Clark County A452622 | Dennis Prince | Deposition | Nevada |
| Stephens v. Breckenridge | 2005 | District Court, Summit County, State of Colorado 2004CV 236 | Robert Schuetze | Deposition | Colorado |
| Carlson v. Solitiude | April 2005 | 3rd District Court, Salt Lake County, State of Utah 020900689 | Mark Ethington | Deposition | Utah |
| ABS v. Wilson | September 2005 | Civil No. 020500398, Sate of Utah | Christian Hague | Deposition | Utah |
| Mavreshko v. Fernwood | November 2005 | Civil Action No. 04-CV-457 Pennsylvania | Dennis Callahan, | Trial | Pennsylvania |
| Upke v. Marshall Mountain | December 2005 | Mont. Case No.: BVO 2112 State District Court, Missoula, Montana | Maxon Davis | Trial | Missoula, Montana |
| Vine v Bear Valley | December 2005 | California Superior Ct CV31705 | Mike Danko | Deposition | California |

MAR-20-06 01:29 ...  4.420.203.2770242000.

# ISHAM & ASSOCIATES

P.O. Box 2619   Taos, NM 87571
(505) 776-8268    Fax 776-2131
e-mail jisham@newmex.com

| Case Name: | Date of testimony: | Court and Case No.: | Attorney: | Type of Testimony: | Location: |
|---|---|---|---|---|---|
| Albert v OberGatlinburg et.al | January 2006 | US District court Eastern Dist/Tennessee No:3:02-CV-277 | Richard Baker | Deposition | Tennessee |

# ISHAM & ASSOCIATES

P.O. Box 2619    Taos, NM 87571
(505) 776-8268    Fax 776-2131
e-mail jisham@newmex.com

## JAMES W. ISHAM
## BIBLIOGRAPHY OF WRITTEN MATERIALS

### *Published Materials:*

Isham, James W. , "Helmets Do Not Make the Ski Slopes Safe," New York Times, Sunday, January 19, 2003.

Isham, James W. , "Watch Your Weight." Skiing Magazine, September 1979.

Isham, James W., "Skiing Tip: Hold a Pole for Good Arm-Hand Positioning," Skiing Magazine, November, 1979.

Isham, James W., "Skiing Tip: Do the Wedge Hop," Skiing Magazine, Spring 1980.

Isham, James W., "Unbuckle for Shakey Turns" Skiing Magazine, December 1980

Isham, James W., "Low Hands for Better Balance," Skiing Magazine, January 1981

Isham, James W., "Air the Armpit for Balanced Turns," Skiing Magazine, December 1982.

Isham, James W., "Skiing Tip: Anticipate with Matador Turns," Skiing Magazine, December 1982.

Isham, James W., "Use the Ski Tips as a Sensor," Skiing Magazine, February 1983 pp. 108.

Isham, James W., "Inside Foot Under the Belly Button," Skiing Magazine, September 1983

Isham, James W., "Skiing Quiz- Which Stance for Best Balance, " Skiing Magazine, October 1983.

Isham, James W., "Skiing Quiz - What's the Best Way to Edge," Skiing Magazine, November, 1983.

Isham, James W., "Visualization: Get an Eyeful," The Copper Cable, November 1983.

# ISHAM & ASSOCIATES

P.O. Box 2619   Taos, NM 87571
(505) 776-8268 · Fax 776-2131
e-mail jisham@newmex.com

Isham, James W., "Skiing Quiz - Which Motion Increases Ski Pressure," Skiing Magazine, December 1983.

Isham, James W., "Skiing Quiz - What's the Best Way to Start Your Turn?" Skiing Magazine, January 1984

Isham, James W., "Skiing Quiz - What's the Best Arm Position," Skiing Magazine, October 1984.

Isham, James W., "Skiing Quiz - What Kind of Turn, Long or Short?" Skiing Magazine, February 1984.

Isham, James W., "Raise One Ski to Avoid a Ski," Skiing Magazine, February 1984

Isham, James W., "Ski Pro Says 'hike the hip" The Copper Cable, October 25 - November 7, 1985

Isham, James W., "Skiing Tip: For Checking Your Stance. . . The Shadow Knows." Skiing Magazine, Spring, 1985

Isham, James W., "Skiing Tip: Are you a Butterfly or a Bee? Skiing Magazine.

Isham, James W.,  "What to Expect Your First Days on Skis," Skiers Directory, 1987.

*Peer Reviewed Materials:*

Isham, James W., "Control the Turn Finish One Foot at a Time."

Isham, James W., "Air the Armpit to Balance Your Turns."

Isham, James W., "Drive the Downhill Hand."

Isham, James W. "How do you Learn?"

Isham, James W. "Soar From Turn to Turn."

Isham, James W., "Use Matador Turns to Learn Anticipation."

Isham, James W., "Put the Inside Foot Under the Belly Button."

# ISHAM & ASSOCIATES

P.O. Box 2619  Taos, NM 87571
(505) 776-8268    Fax 776-2131
e-mail jisham@newmex.com

Isham, James W., "Feel the Steel"

Isham, James W.,  "Watch Out for The Trees!"

Isham, James W., "Ski With Bicycle Handlebars for Smoother (Rounder) Turns."

Isham, James W., "Use the Tip as a Radar Sensor"

Isham, James W., "Tighten the Grip - Tighten the Radius"

Isham, James W., "Step On Your Soapbox for Better Turns"

Isham, James W., "Skiing with Geronimo's Relatives"

Isham, James W., "Pointer: Exploding the Powder Myth."

Isham, James W., "Observe the SLOW Signs."

Isham, James, W., "Make Mogul Skiing Easier"

Isham, James W., "Create a Visual Aid for Your Turns"

Isham, James W., "Caution: Trails Merge Dowhill"

Isham, James W., "Zone Therapy at Taos Ski Valley"

## *Newsletters Published by Isham & Associates:*

Isham & Associates for PSIA, PSIA Rocky Mountain Ski School Management, Winter, 1989

Isham & Associates for PSIA, PSIA Rocky Mountain Ski School Management, Spring 1990

Isham, James W., "Taos' Ski School Helps Preserve Resort's Bottom Line and Boosts Employee Enthusiasm," Member Update NSAA, October, 1994

Isham, James W., "Negligence Claim Against Nevada Ski Area Denied by Jury" Update, Isham & Associates February 1991.

# ISHAM & ASSOCIATES

P.O. Box 2619   Taos, NM 87571
(505) 776-8268      Fax 776-2131
e-mail jisham@newmex.com

Isham, James W., "Snowboarder Collision - Defense Verdict." Update, Isham & Associates
February 1995.

Isham, James W., "Negligence Claim Against Arizona Ski Area Denied" Update, Isham &
Associates, August 1994.

Isham, James W., "Ghionis v. Deer Valley - Ski School ACL Injury - Defense Verdict," Update,
Isham & Associates, January 1996.

## *Manuals & Handbooks:*

Isham, James W., Taos Ski Valley Safety Program Handbook

Isham, James W., Taos Ski Valley Skiing Personnel Evaluation Program

Isham, James W., Masters Ski Week, Taos Ski Valley, 1995-1996

Isham, James W., Risk Management in the Ski School Operation, Manual, NSAA, PSIA, NSP

# A Skiers Responsibility Code

**Know the Code**

The National Ski Areas Association established "Your Responsibility Code" in 1966 as a code of ethics for all skiers on the mountain. Today, the code reflects not only skier safety, but snowboarder and lift safety as well.

Ultimately, safe skiing and snowboarding on the mountain is each person's responsibility.

Following "Your Responsibility Code" will help all skiers and snowboarders have a safer mountain experience.

**Your Responsibility Code** Safety on the slopes is everyone's responsibility. Ski safely - not only for yourself, but for others as well.

- Always stay in control and be able to stop or avoid objects.
- People ahead of you have the right of way. It is your responsibility to avoid them.
- Do not stop where you obstruct the trail or are not visible from above.
- Whenever starting downhill or merging into a trail, yield to others.
- Always use devices to help prevent runaway equipment. Observe all posted signs and warnings.
- Keep off closed trails and out of closed areas.
- Prior to using any lift, you must know how to load, ride, and unload safely.

**Know The Code. It's Your Responsibility.** This is a partial list. Be safety conscious.

Skiing can be enjoyed in many ways. At ski areas you may see people using alpine, snowboard, telemark, cross country and other specialized ski equipment, such as that used by disabled or other skiers. Regardless of how you decide to enjoy the slopes, always show courtesy to others and be aware that there are elements of risk in skiing that common sense and personal awareness can help reduce. Observe the code listed below and share with other skiers the responsibility for a great skiing experience.

**1.** Always stay in control.

**2.** People ahead of you have the right of way.

**3.** Stop in a safe place for you and others.

**4.** Whenever starting downhill or merging, look uphill and yield.

**5.** Use devices to help prevent runaway equipment.

**6.** Observe signs and warnings, and keep off closed trails.

**7.** Know how to use the lifts safely.

EXHIBIT NO. 2

KNOW THE CODE. IT'S YOUR RESPONSIBILITY.
This is a partial list. Be safety conscious.
Officially endorsed by: NATIONAL SKI AREAS ASSOCIATION.

Please fax to 413-498-3649 or mail
to be received by Dec 3 to be
considered for enrollment.

Rec Ski & Snowboarding
Northfield Mt. Hermon School
Meany Gym, 206 Main Street
Northfield, MA 01360

Student Name _Yukio Kusada_ Parent / Guardian _____

Signature

___√___ I give permission for my son / daughter to participate in the NMH Rec Skiing and
Snowboarding program.

___√___ I understand that my son / daughter is responsible for their own ski or snowboard
equipment. NMH and Berkshire East Ski Area are not responsible.

___√___ I understand that the class fee is approx $375-$400. Ski rentals are an additional charge.

___√___ I understand that the class is graded on the basis of attendance and participation.
Students are required to attend every class.

___√___ I understand that for my son's / daughter's safety, NMH strongly recommends that they
wear a helmet while snowboarding / skiing.

EXHIBIT NO. 2

2003/04

NORTHFIELD MOUNT HERMON SCHOOL
*Athletic Office*

## Permissions

**Graduation Year**
☐ 2004  ☐ 2005
☐ 2006  ☐ 2007

Name of student _____Yukio Kusada_____

Student house _____C II_____
<small>FOR RETURNING STUDENTS</small>

**Campus Address**
*(for returning students)*
☐ Northfield
☐ Mount Hermon

**Day Student**
☐ Yes ☐ No

### PE/A Activities Permission

During the year, some courses offered by physical education and athletics or activities sponsored by student programs require off-campus trips by students and include the use of facilities that we feel require special parental permission. These activities will be supervised by a responsible adult, and necessary safety precautions will be taken.

**This permission will remain in effect for the duration of your son's or daughter's career at NMH.**

*I am willing to have my son/daughter take part in the activities indicated below. I release and will hold the school and its staff harmless from any liability that might result from my son/daughter engaging in these activities.*

☑ Yes ☐ No **Canoeing**—on the Connecticut River and nearby lakes, rivers, and ponds. A swimming test and a tip test are required before any participation.

☑ Yes ☐ No **Recreational Alpine Skiing and Snowboarding**—slopes and lifts at public areas. Cost is approximately $375.

☑ Yes ☐ No **Swimming**—outdoors

☑ Yes ☐ No **Hiking, Snowshoeing, Nordic Skiing, or Camping**—day and/or overnight trips

☑ Yes ☐ No **Rock Climbing and Rappeling**—as an organized activity

☐ Yes ☐ No **Zip Line Traversing**—as an organized activity

☑ Yes ☐ No **Tree Climbing**—as an organized activity

☑ Yes ☐ No **Varsity Golf**—two practices a week and some home matches at Crumpin-Fox Golf Club. Cost is approximately $150.

☑ Yes ☐ No **Scuba Diving**—confined water and open water training

☑ Yes ☐ No **Mountain Biking**

☑ Yes ☐ No **Varsity Alpine Skiing**—lift tickets for four days a week and bus transportation. Cost is approximately $400.

☑ Yes ☐ No **Varsity Nordic Skiing**—trail fees at a cross-country ski center when no snow at NMH. Cost is approximately $150.

☑ Yes ☐ No **Varsity Ultimate Frisbee**—transportation to and from National Championships, when invited. Cost is approximately $400.

*Parent/Guardian signature* _____

EXHIBIT NO. 4