UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| YUKIO KUSADA,<br>    Plaintiff | ) | |
| | ) | |
| | ) | |
| vs. | ) | Civil Action |
| | ) | No.:  Civil Action No.: 05-30043-MAP |
| | ) | |
| NORTHFIELD MOUNT HERMON | ) | |
| SCHOOL, FRANCIS MILLARD and | ) | |
| MICHAEL ATKINS, | ) | |
|     Defendants | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| TAKERU KUSADA | ) | |
|     Third Party Defendant | ) | |

### AFFIDAVIT OF RONALD E. GLUCK

I, Ronald E. Gluck, on oath depose and say:

1.    I am an attorney admitted to practice in the Commonwealth of Massachusetts and to the Federal District Court of Massachusetts.

2.    I am a principle with Breakstone, White-Lief & Gluck, P.C., Two Center Plaza, Suite 530, Boston, MA 02108.

3.    I represent Yukio Kusada and have continuously represented him since suit was filed.

4.    In that capacity, I have received responses to interrogatories by all defendants in this matter including now dismissed defendants Berkshire East Ski Resort and Union Terminal Piers, Inc.

5.    In that capacity, I have attended and participated in every one of the multiple deposition taken in this case.

6.    Attached to this affidavit marked Appendix 1 is a true and accurate copy of the Affidavit of Francis Millard.

7.    Attached to this affidavit marked Appendix 2 is a true and accurate copy of the Affidavit of Michael Atkins.

8.      Attached to this affidavit marked Appendix 3 is a true and accurate copy of the deposition of Michael Atkins, pages 19,  23, 32 – 33,  44, 61,  77 – 80, 85 – 86, 97, 117, 121 - 122, 129, 131.

9.      Attached to this affidavit marked Appendix 4 is a true and accurate copy of the deposition of Francis Millard, day one, pages 11 – 12,  19, 50,  54 – 55, 66 – 68, 70, 72, 113.

10.     Attached to this affidavit marked Appendix 5 is a true and accurate copy of the deposition of Francis Millard day two,  pages 7 – 8.

11.     Attached to this affidavit marked Appendix 6 is a true and accurate copy of the deposition Yuki Hasegawa, pages 39, 40, 52 – 53, 69, 73 – 74, 80 - 81, 94, 112 – 113, 116 – 118, 126 – 127.

12.     Attached to this affidavit marked Appendix 7 is a true and accurate copy of the deposition of Audra Forstrum, pages 4 – 8,  12 – 14, 18, 20 – 22, 28, 39, 46,  53 – 54.

13.     Attached to this affidavit marked Appendix 8 is a true and accurate copy of the deposition of Richard Eisenberg, pages 9,  12 – 13, 17, - 18, 25  – 27, 29, 38.

14.     Attached to this affidavit marked Appendix 9 is a true and accurate copy of the deposition of John A. Herrick, Jr., pages 17, 21, 22, 29 - 31, 34, 37 – 40, 46, 59 -  60, 71, 80 - 81.

15.     Attached to this affidavit marked Appendix 10 is a true and accurate copy of the deposition of Samuel Wilson, pages, 10 - 11.

16.     Attached to this affidavit marked Appendix 11 is a true and accurate copy of the deposition of Susan Clough, pages 11, 14, 16 – 17.

17.     Attached to this affidavit marked Appendix 12 is a true and accurate copy of the deposition of Mari Kusada, pages 18, 37 – 38.

18.     Attached to this affidavit marked Appendix 13 is a true and accurate copy of the Affidavit of Marilyn Buck, Ed.D., Curriculum Vitae of Marilyn M. Buck, Report of Marilyn Buck.

3

19.     Attached to this affidavit marked Appendix 14 is a true and accurate copy of the Affidavit of Lawrence E. Thibault, Sc.D., the report of Lawrence E. Thibault, Sc.D., Curriculum Vitae of Lawrence E. Thibault, Sc.D.

20.     Attached to this affidavit marked Appendix 15 is a true and accurate copy of the Report of James W. Isham, Curriculum Vitae of James W. Isham.

21.     Attached to this affidavit marked Appendix 16 is a true and accurate copy of the NMH list of ski class participants.

22.     Attached to this affidavit marked Appendix 17 is a true and accurate copy of the Physical Education/Athletic Activities form.

23.     Attached to this affidavit marked Appendix 18 is a true and accurate copy of the Permission Slip.

24.     Attached to this affidavit marked Appendix 19 is a true and accurate copy of the Course Description.

25.     Attached to this affidavit marked Appendix 20 is a true and accurate copy of the Answers of Michael Atkins to First Set of Interrogatories Propounded by the Plaintiff, Yukio Kusada.

Signed under the pains and penalties of perjury this 22nd day of December, 2006.

Ronald E. Gluck

### Certificate of Service

I, certify that this document field through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on December 22, 2006 via first class mail.

Heather A. Engman

Ronald E. Gluck

APPENDIX 1

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

YUKIO KUSADA,
　　　　　Plaintiff,

v.

BERKSHIRE EAST SKI RESORT, UNION
TERMINAL PIERS, INC.,
　　　　　Defendants,

and

NORTHFIELD MOUNT HERMON SCHOOL,
FRANCIS MILLARD AND MICHAEL
ATKINS
　　　　　Defendant and
　　　　　Third-Party Plaintiff,

v.

TAKERU KUSADA,
　　　　　Third-Party Defendant.

Civil Action No. 05-30043-MAP

## AFFIDAVIT OF FRANCIS MILLARD

I, Francis Millard, on oath depose and say:

1.　　I reside at 75 Highland Avenue, Northfield, Massachusetts.

2.　　I have been employed at Northfield Mount Hermon School ("NMH") since 1985.

3.　　NMH is a Massachusetts educational institution which had a usual place of

business at 206 Main Street, Northfield, Massachusetts in 2003-2004.

4.　　NMH had two campuses in 2004, a Northfield campus and a Mount Hermon

Campus.  The campuses were about five miles apart.

5.　　I was Chair of the Physical Education and Athletics Department at NMH in 2003-

2004.

6.　　I am familiar with the Recreational Ski program at NMH.

7.      Michael Atkins was the Coordinator of Physical Education in 2003-2004.

8.      I was the direct supervisor for Michael Atkins in 2003-2004.

9.      In 2003-2004, the Coordinator of Physical Education was the supervisor for the Recreational Ski program.

10.     NMH has had a Recreational Ski program for over thirty years.

11.     NMH had been taking its students in its Recreational Ski program to Berkshire East, a ski area located in Charlemont, Massachusetts for over thirty years.

12.     Approximately 3,000 students have participated in the Recreational Ski program since its inception.

13.     The Recreational Ski program is an elective.

14.     Students receive credit toward their physical education requirement for their participation in the Recreational Ski program.

15.     There is no testing for the Recreational Ski program.

16.     The only requirements of the Recreational Ski program are participation and attendance.

17.     Each year, including 2003-2004, I contacted Berkshire East to make arrangements for the Recreational Ski program at Berkshire East that year.

18.     I have skied at Berkshire East many times and I am familiar with Berkshire East.

19.     Berkshire East is a recognized and well supervised ski area.

20.     It is in all respects an appropriate ski area for the NMH Recreational Ski program.

21.     Berkshire East has a ski patrol which patrols the mountain.  It also has a first aid station and EMT's.

- 2 -

22.     Many of the public and private schools in the geographical area bring their students to Berkshire East for the recreational ski program.

23.     Helmets were strongly recommended but not required for participants in the NMH Recreational Ski program.

24.     Helmets were not required by Berkshire East.

25.     Helmets were not required to my knowledge by any private secondary or public school in our geographical area for a recreational ski program from the time I first assumed the duties of Chairman of the Athletic Department at NMH through February 20, 2004 when Yukio Kusada was injured.

26.     Helmets, to my knowledge, were not required equipment by law in Massachusetts in 2003-2004 for skiers participating in a recreational ski program offered by a private secondary school.

27.     Helmets, to my knowledge, were not required by any ski association for recreational skiers in 2003-2004.

Signed under the pains and penalties of perjury this __16__ day of November, 2006.

Francis Millard

# 4191300_v1                          **CERTIFICATE OF SERIVCE**

    I hereby certify that the document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on November 27, 2006, via first class mail.

Harold W. Potter, Jr.

- 3 -

APPENDIX 2

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

YUKIO KUSADA,
      Plaintiff,

  v.

BERKSHIRE EAST SKI RESORT, UNION
TERMINAL PIERS, INC.,
      Defendants,

and

NORTHFIELD MOUNT HERMON SCHOOL,
FRANCIS MILLARD AND MICHAEL
ATKINS
      Defendant and
      Third-Party Plaintiff,

 v.

TAKERU KUSADA,
      Third-Party Defendant.

Civil Action No. 05-30043-MAP

## AFFIDAVIT OF MICHAEL ATKINS

I, Michael Atkins, on oath depose and say:

1.     I reside at Northfield Mount Hermon School ("NMH") on the Mount Hermon

campus.

2.     I have been employed at NMH since 1986 in the athletic department.

3.     I have been involved with the Recreational Ski program at NMH since 1991-1992

season, first as a chaperone accompanying the students to Berkshire East for many years and

later as the Coordinator of Physical Education.

4.     I was Coordinator of Physical Education at NMH in 2003-2004.

5. Yukio Kusada ("Kusada") lived on the Mount Hermon campus in 2003-2004 and, his friend with whom he was skiing on February 20, 2004, Yuki Hasegawa ("Hasegawa"), lived on the Northfield campus in 2003-2004.

6. Berkshire East Ski Resort ("Berkshire East") is located in Charlemont, Massachusetts.

7. Berkshire East is a recognized and well supervised ski area.

8. It was in all respects an appropriate ski area for the NMH Recreational Ski program.

9. Berkshire East has a ski patrol which patrols the mountain. It also has a First-Aid station and EMTs.

10. In 2003-2004 the parents of every student participating in physical education and athletics at NMH were asked to sign a PE/A Activities Permissions form for a number of elective activities including skiing.

11. A copy of the PE/A Activities Permissions form for 2003-2004 is attached and marked Exhibit A.

12. A student could not participate in the Recreational Ski program in 2003-2004 unless the PE/A Activities Permissions form was signed and returned.

13. Kusada's PE/A Activities Permission form was signed and returned. A copy is attached and marked Exhibit B.

14. The form states in bold italic lettering: "I am willing to have my son/daughter take part in the activities indicated below. I release and will hold the school and its staff harmless from any liability that might result from my son/daughter engaging in these activities." (Exhibits A - B.)

15.    In November, a second permission form specific to the Recreational Ski program ("Recreational Ski form") was sent out by Evelyn Tillotson, Secretary to the Athletic Department, to each student who had signed up for the Recreational Ski program.

16.    The Recreational Ski form must be signed and returned for the student to participate in the Recreational Ski program.

17.    A true copy of the Recreational Ski form for 2003-2004 is attached and marked Exhibit C.

18.    The Recreational Ski form for 2003-2004 provides in part: "I understand that the class is graded on the basis of attendance and participation." (Exhibit C.)

19.    The Recreational Ski form for 2003-2004 also provides: "I understand that my son/daughter is responsible for their own ski or snowboard equipment. NMH and Berkshire East are not responsible." (Exhibit C.)

20.    The Recreational Ski form further provides: "I understand that for my son/daughter's safety, NMH strongly recommends that they wear a helmet while snowboarding/skiing." (Exhibit C.)

21.    All of the forms signed for all of the students in the Recreational Ski program were kept on file in the Athletic Department office.

22.    Kusada's Recreational Ski form was returned signed. A true copy is attached and marked Exhibit D.

23.    Prior to the commencement of the ski trips on January 7, 2004, all students who had signed up had to attend a one hour organizational meeting.

24.     One meeting was held at the Mount Hermon campus by me, as Coordinator of Physical Education, and one was held on the Northfield campus by Audra Forstrum, a chaperone for the program.

25.     Kusada, who lived on the Mount Hermon campus, attended the meeting on December 15, 2003 held by me.

26.     I told the group of students at the December 15, 2003 meeting that lessons were not mandatory but would be available and were recommended for beginners.

27.     I told the group of students at the December 15, 2003 meeting that they were responsible for their own skis which were available for purchase at a local retail shop or at the rental shop at Berkshire East.

28.     I told the group of students at the December 15, 20003 meeting that helmets were strongly recommended but not required.

29.     I told the group of students at the December 15, 2003 meeting that the slopes marked with black diamonds were for experts, blue squares were for intermediates and green circles were for beginners.

30.     Every student who attended the at the December 15, 2003 meeting for the Recreational Ski program is given a packet of information at the meeting.  The packet included: a) a description of the program; and b) the Skier's responsibility code.

31.     A true copy of the program description for 2003-2004 is attached and marked Exhibit E.

32.     The program description provides in part:  "Beginner skiers may receive a one hour ski lesson each week and approximately 6 hours of free skiing time per week."  (Exhibit D.)

33.     A true copy of the Skier's Responsibility Code is attached and marked F.

- 4 -

34.    The 2003-2004 NMH Recreational Ski program took place at Berkshire East on Wednesday afternoons and Friday evenings from January through March of 2004.

35.    The 2003-2004 NMH Recreational Ski program ran from Wednesday, January 7, 2004 to March 3, 2004, a total of 16 ski trips at Berkshire East.

36.    There were 12 ski trips that year prior to February 20, 2004, 13 including February 20, 2004.

37.    Kusada made at least 11 of those trips, including the one on February 20, 2004.

Signed under the pains and penalties of perjury this ___16___ day of November, 2006.

_____
Michael Atkins

# 4191319_v1

## CERTIFICATE OF SERIVCE

I hereby certify that the document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on November 27, 2006, via first class mail.

_____
Harold W. Potter, Jr.

EXHIBIT A

2003/04

NORTHFIELD MOUNT HERMON SCHOOL
*Athletic Office*

**Graduation Year**
□ 2004  □ 2005
□ 2006  □ 2007

# Permissions

**Campus Address**
*(for returning students)*
□ Northfield
□ Mount Hermon

Name of student _____

Student house _____
                        FOR RETURNING STUDENTS

**Day Student**
□ Yes  □ No

## PE/A Activities Permission

During the year, some courses offered by physical education and athletics or activities sponsored by student programs require off-campus trips by students and include the use of facilities that we feel require special parental permission. These activities will be supervised by a responsible adult, and necessary safety precautions will be taken.

**This permission will remain in effect for the duration of your son's or daughter's career at NMH.**

*I am willing to have my son/daughter take part in the activities indicated below. I release and will hold the school and its staff harmless from any liability that might result from my son/daughter engaging in these activities.*

□ Yes  □ No  **Canoeing**—on the Connecticut River and nearby lakes, rivers, and ponds. A swimming test and a tip test are required before any participation.

□ Yes  □ No  **Recreational Alpine Skiing and Snowboarding**—slopes and lifts at public areas. Cost is approximately $375.

□ Yes  □ No  **Swimming**—outdoors

□ Yes  □ No  **Hiking, Snowshoeing, Nordic Skiing, or Camping**—day and/or overnight trips

□ Yes  □ No  **Rock Climbing and Rappeling**—as an organized activity

□ Yes  □ No  **Zip Line Traversing**—as an organized activity

□ Yes  □ No  **Tree Climbing**—as an organized activity

□ Yes  □ No  **Varsity Golf**—two practices a week and some home matches at Crumpin-Fox Golf Club. Cost is approximately $150.

□ Yes  □ No  **Scuba Diving**—confined water and open water training

□ Yes  □ No  **Mountain Biking**

□ Yes  □ No  **Varsity Alpine Skiing**—lift tickets for four days a week and bus transportation. Cost is approximately $400.

□ Yes  □ No  **Varsity Nordic Skiing**—trail fees at a cross-country ski center when no snow at NMH. Cost is approximately $150.

□ Yes  □ No  **Varsity Ultimate Frisbee**—transportation to and from National Championships, when invited. Cost is approximately $400.

*Parent/Guardian signature:* _____

EXHIBIT B

2003/04

### NORTHFIELD MOUNT HERMON SCHOOL
*Athletic Office*

**Graduation Year**

❏ 2004  ❏ 2005

❏ 2006  ❏ 2007

## Permissions

**Campus Address**
*(for returning students)*

❏ Northfield

Name of student  _Yukio Kusada_

❏ Mount Hermon

Student house  _C II_

**Day Student**

FOR RETURNING STUDENTS

❏ Yes ❏ No

## PE/A Activities Permission

During the year, some courses offered by physical education and athletics or activities sponsored by student programs require off-campus trips by students and include the use of facilities that we feel require special parental permission. These activities will be supervised by a responsible adult, and necessary safety precautions will be taken.

**This permission will remain in effect for the duration of your son's or daughter's career at NMH.**

*I am willing to have my son/daughter take part in the activities indicated below. I release and will hold the school and its staff harmless from any liability that might result from my son/daughter engaging in these activities.*

❏ Yes ❏ No    **Canoeing**—on the Connecticut River and nearby lakes, rivers, and ponds. A swimming test and a tip test are required before any participation.

❏ Yes ❏ No    **Recreational Alpine Skiing and Snowboarding**—slopes and lifts at public areas. Cost is approximately $375.

❏ Yes ❏ No    **Swimming**—outdoors

❏ Yes ❏ No    **Hiking, Snowshoeing, Nordic Skiing, or Camping**—day and/or overnight trips

❏ Yes ❏ No    **Rock Climbing and Rappeling**—as an organized activity

❏ Yes ❏ No    **Zip Line Traversing**—as an organized activity

❏ Yes ❏ No    **Tree Climbing**—as an organized activity

❏ Yes ❏ No    **Varsity Golf**—two practices a week and some home matches at Crumpin-Fox Golf Club. Cost is approximately $150.

❏ Yes ❏ No    **Scuba Diving**—confined water and open water training

❏ Yes ❏ No    **Mountain Biking**

❏ Yes ❏ No    **Varsity Alpine Skiing**—lift tickets for four days a week and bus transportation. Cost is approximately $400.

❏ Yes ❏ No    **Varsity Nordic Skiing**—trail fees at a cross-country ski center when no snow at NMH. Cost is approximately $150.

❏ Yes ❏ No    **Varsity Ultimate Frisbee**—transportation to and from National Championships, when invited. Cost is approximately $400.

Parent/Guardian signature  _____

EXHIBIT C

Dear Student,

Your parent or guardian must give their signed permission for you to take part in the Rec Ski & Snowboard program next term.

You must return the permission form by Dec 3.

Please take these papers home during break.  Bring back the signed permission form if you plan to take the course.

International students should take the papers home or email them to your parent or guardian.  The permission form can be hand carried or faxed back to us at fax # 413-498-3649.

Please swis me (reply sender) if you are no longer interested in the program.

Have a great break!

Evelyn Tillotson, etillotson@nmhschool.org
Meany Gym Secretary
413-498-3314

November 13, 2003

Dear Parent or Guardian,

Your son or daughter has requested to participate in Recreational Downhill Skiing or Snowboarding for winter term Physical Education assignment. He or she has received instruction on how to be considered for this program.

This course is designed for beginner and intermediate skiers and snowboarders. The program will operate on Wednesdays and Fridays. Beginning skiers may receive a ski lesson once each week and approximately six hours of skiing time per week. For the safety of your son / daughter, a helmet is recommended for snowboarders / skiers.

An activity fee of approximately $375-$400 will be billed to you to cover transportation and lift ticket at Berkshire East Ski Area in Charlemont, MA. If your child has a ski pass, the cost is approximately $126 for transportation. Ski rentals are available when pre-paid for the term, $105. This includes skis, boots, poles. Snowboards are available when pre-paid for the term, $175. It is the responsibility of the student to provide the rental fee payment by check, payable to Berkshire East, or to provide a credit card number, at the December 3rd campus meeting.

Your son / daughter would enjoy this special program. If you have any questions, please call 413-498-3466 or 413-498-3314. If you would like to give your permission for your son / daughter to participate in this program, see below. We need this permission form signed and returned by Dec 3rd for your son or daughter to be considered for enrollment.

Sincerely,

Frank Millard, Chair of Phys Ed & Athletics
Audra Forstrom, Rec Ski/Snowboard Coordinator
Richard Eisenberg, Rec Ski/Snowboard Coordinator

......................................................................................................................................................

Please fax to 413-498-3649 or mail
to be received by Dec 3 to be
considered for enrollment.

Rec Ski & Snowboarding
Northfield Mt. Hermon School
Meany Gym, 206 Main Street
Northfield, MA 01360

Student Name _____     Parent / Guardian _____
                                                                                                   Signature

_____  I give permission for my son / daughter to participate in the NMH Rec Skiing and
Snowboarding program.

_____  I understand that my son / daughter is responsible for their own ski or snowboard
equipment. NMH and Berkshire East Ski Area are not responsible.

_____  I understand that the class fee is approx $375-$400. Ski rentals are an additional charge.

_____  I understand that the class is graded on the basis of attendance and participation.
Students are required to attend every class.

_____  I understand that for my son's / daughter's safety, NMH strongly recommends that they
wear a helmet while snowboarding / skiing.

EXHIBIT D

Please fax to 413-498-3649 or mail
to be received by Dec 3 to be
considered for enrollment.

Rec Ski & Snowboarding
Northfield Mt. Hermon School
Meany Gym, 206 Main Street
Northfield, MA  01360

Student Name  Yukio Kusada  Parent / Guardian _____

Signature

✓   I give permission for my son / daughter to participate in the NMH Rec Skiing and
Snowboarding program.

✓   I understand that my son / daughter is responsible for their own ski or snowboard
equipment.  NMH and Berkshire East Ski Area are not responsible.

✓   I understand that the class fee is approx $375-$400. Ski rentals are an additional charge.

✓   I understand that the class is graded on the basis of attendance and participation.
Students are required to attend every class.

✓   I understand that for my son's / daughter's safety, NMH strongly recommends that they
wear a helmet while snowboarding / skiing.

**EXHIBIT E**

# REC SKIING & SNOWBOARDING
## 2003 - 2004

This class is designed for beginner and intermediate downhill skiers and snowboarders. PE ski classes will be held at Berkshire East this winter. The program is a physical education course. Beginner skiers may receive a one hour ski lesson each week and approximately 6 hours of free skiing time per week. Snowboarders will receive approximately 7 hours of free boarding time. Snowboarding lessons may be arranged for an additional fee of $7 per lesson, Fridays only.

**CLASS MEETING:** Class will meet Wednesday and Friday when school is in session. The first ski trip will be Jan 7. The last class is Wednesday, Mar 3. There is a required organizational meeting for Rec Skiing & Snowboarding students on Wednesday, Dec. 3 on campus. Students will be sent detailed reminders of this meeting. Attendance will be taken. Students must attend this meeting to be considered for the program.

**TIME SCHEDULES:**

| | | |
|---|---|---|
| Wednesday | 1:30 | Bus # 1 leaves N flagpole and goes to Berkshire East |
| | 1:35 | Bus # 2 leaves N flagpole and goes to H |
| | 1:30 | Bus # 3 leaves H and goes to Berkshire East |
| | 2:35 | Ski lessons |
| | 4:45 | Bus # 1 leaves Berkshire East, goes directly to N |
| | | Bus # 2 leaves Berkshire East, stops at H |
| | | Bus # 3 leaves Berkshire East, goes directly to H |
| Friday | 4:00 | Dinner in Alumni Hall and Marquand |
| | 4:45 | Bus # 1 leaves N flagpole and goes to Berkshire East |
| | 4:50 | Bus # 2 leaves N flagpole and goes to H |
| | 4:45 | Bus # 3 leaves H and goes to Berkshire East |
| | 9:15 | Bus # 1 leaves Berkshire East, goes directly to N |
| | | Bus # 2 leaves Berkshire East, stops at H |
| | | Bus # 3 leaves Berkshire East, goes directly to H |

**CANCELLATIONS:** If skiing must be cancelled on any given day, this information will be put on SWIS, Student Announcements on Wednesday by 12:30, Friday by 3:30.

**MEALS:** Meals will be eaten in Marquand (N) and Alumni Hall (H) before departure.

**COST:** The total cost of the program is approximately $375-$400 which is billed to your parent or guardian. Miscellaneous accounts cannot be billed. This fee includes lift ticket $249 and transportation $126. If you have your own ski pass at Berkshire East, the cost is $126 for transportation.

**REFUNDS:** Refunds will be given for medical reasons only. Only injuries that prevent a skier from completing the season will be considered. A student who is medically excused for the term prior to:

January   15 -  75% refund
February   5 -  50% refund
February 14 -  25% refund

**RENTALS:** Students may rent equipment at Berkshire East. A ski package of skis, boots, and poles is $105 per term pre-paid. Snowboards are available for $175 per term pre-paid. It is the student's

responsibility to provide payment by check (payable Berkshire East) for rentals. Students should bring their rental fee check to the Dec 3rd meeting.

**SKI STORAGE:** There is no ski storage available at Berkshire. NMH will have three coach busses each with available storage space below to accommodate ski equipment.

**GUIDELINES:** Students will be under the school's jurisdiction from the time they leave campus until they return. All school rules apply. In addition there is no smoking at any time. You are in a class setting. Students not enrolled in class may not ride on the bus to the ski area.

These regulations of the ski area are designed for your health and safety:

1. Students may not leave the ski area.
2. Berkshire East Lodge Bar is off limits.
3. Students abide by Berkshire East Ski Area safety rules.

The first violation of any rule results in having your pass clipped. The second violation results in loss of pass.

**GRADING:** Rec Skiing & Snowboarding allows NO OMITS. You are expected to attend every class. Plan to leave Saturdays for any college visits. Grading is based on attendance and participation.

| | | |
|---|---|---|
| O - 1 | No absences |
| VG - 2 | One unexcused absence |
| S - 3 | Two unexcused absences |
| NI - 4 | Three unexcused absences |
| U - 5 | Four unexcused absences |

Students are expected to attend each and every class. No exceptions.
A student with 2 unexcused absences and 2 or more excused absences will receive a grade of medically excused.

**DATES:** Rec Ski & Snowboarding class will meet on the following dates:

| Wednesday | Friday |
|---|---|
| January 7 | January 9 |
| January 14 | January 16 |
| January 21 | January 23 |
| January 28 | |
| February 4 | February 6 |
| February 11 | February 13 |
| February 18 | February 20 |
| February 25 | February 27 |
| March 3 | |

**  THINK SNOW  **

EXHIBIT F

# A Skiers Responsibility Code

**Know the Code**

The National Ski Areas Association established "Your Responsibility Code" in 1966 as a code of ethics for all skiers on the mountain. Today, the code reflects not only skier safety, but snowboarder and lift safety as well.

Ultimately, safe skiing and snowboarding on the mountain is each person's responsibility.

Following "Your Responsibility Code" will help all skiers and snowboarders have a safer mountain experience.

**Your Responsibility Code** Safety on the slopes is everyone's responsibility. Ski safely - not only for yourself, but for others as well.

- Always stay in control and be able to stop or avoid objects.
- People ahead of you have the right of way. It is your responsibility to avoid them.
- Do not stop where you obstruct the trail or are not visible from above.
- Whenever starting downhill or merging into a trail, yield to others.
- Always use devices to help prevent runaway equipment. Observe all posted signs and warnings.
- Keep off closed trails and out of closed areas.
- Prior to using any lift, you must know how to load, ride, and unload safely.

**Know The Code. It's Your Responsibility.** This is a partial list. Be safety conscious.

Skiing can be enjoyed in many ways. At ski areas you may see people using alpine, snowboard, telemark, cross country and other specialized ski equipment, such as that used by disabled or other skiers. Regardless of how you decide to enjoy the slopes, always show courtesy to others and be aware that there are elements of risk in skiing that common sense and personal awareness can help reduce. Observe the code listed below and share with other skiers the responsibility for a great skiing experience.

**1.** Always stay in control.

**2.** People ahead of you have the right of way.

**3.** Stop in a safe place for you and others.

**4.** Whenever starting downhill or merging, look uphill and yield.

**5.** Use devices to help prevent runaway equipment.

**6.** Observe signs and warnings, and keep off closed trails.

**7.** Know how to use the lifts safely.

KNOW THE CODE. IT'S YOUR RESPONSIBILITY.
This is a partial list. Be safety conscious.
Officially endorsed by: NATIONAL SKI AREAS ASSOCIATION.

APPENDIX 3

1                                    Volume I
                                     Pages:  1-134
2                                    Exhibits:  None.

3              IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF MASSACHUSETTS
4

YUKIO KUSADA,
5                      Plaintiff

6         vs.                    C.A. No. 05-30043-MAP

7    BERKSHIRE EAST SKI RESORT and
     UNION TERMINAL PIERS, INC.,
8                      Defendants

9         and

10   NORTHFIELD MOUNT HERMON SCHOOL,
                       Defendant and Third-
11                     Party Plaintiff
          vs.
12
     TAKERU KUSADA,
13                     Third-Party Defendant

14         *   *   *   *   *   *   *   *

15     DEPOSITION of MICHAEL P. ATKINS called as a
     witness by the Plaintiff, pursuant to the
16   applicable provisions of the Federal Rules of
     Civil Procedure, before Susan E. Lepore,
17   Registered Professional Reporter and Notary
     Public within and for the Commonwealth of
18   Massachusetts, taken at the Northfield Mount
     Hermon School, 206 Main Street, Northfield,
19   Massachusetts, on Tuesday, November 15, 2005,
     commencing at 12:50 p.m.

20            * * * * * * * * * * * * * * * * * * * * * * * * *
21            **FLYNN REPORTING ASSOCIATES**
                **Professional Court Reporters**
22                One Exchange Place
            Worcester, Massachusetts  01608
23          (508)755-1303  *  (617)536-2727
               TOLL FREE: (888)244-8858
24                Fax (508)752-4611
              * * * * * * * * * * * * * * * * * * * * * * * * *

1    and we offered those at the student's

2    discretion.  I mean we recommended, we provided

3    the opportunity for ski lessons, but stopped

4    requiring them.

5         Q.    Whose decision was it to stop

6    requiring students to take ski lessons as part

7    of their recreational ski program at NMH?

8         A.    I don't know.  I'm not sure that I --

9    I'm not sure I can give you an honest answer.

10        Q.    What's your best estimate as to what

11   the year was when that happened?

12        A.    '96?  '97?  And that's just a guess,

13   a pure guess.

14             MR. POTTER:  I'd ask the witness not

15   to guess.

16             THE WITNESS:  Okay.

17        Q.    Do you know why the decision was made

18   by NMH to stop student participants in the

19   recreational ski program from being required to

20   take ski lessons?

21        A.    The feeling was that the quality of

22   the lessons was such that it wasn't the best use

23   of a student's time at the ski area, given the

24   limited amount of time students had to ski.  We

1    A.    Yes.  Sorry.

2    Q.    What is it about the quality of the

3    lessons that led you to that conclusion?

4    A.    Given the number of students who we

5    were transporting, the number of Northfield

6    Mount Hermon students we were transporting to

7    the ski area, and the limited number of ski

8    instructors that Berkshire East had at that

9    time, when we would show up on either a

10    Wednesday or a Friday, the groups tended to be

11    more than 15 skiers together, and I just think

12    the -- it was more than one instructor could

13    handle, you know, a group that size, and get any

14    quality instruction done.

15    Q.    Was any inquiry made to determine if

16    Berkshire East could provide additional

17    instructors, to shrink the size of the classes?

18    A.    Yes, I'm sure we talked about that

19    more than once with the lead -- the lead person

20    in the Berkshire East Ski School.

21    Q.    And what was the --

22    A.    You know, and they would -- there

23    would be a variety in the number of instructors

24    available for those ski lessons, given that some

1      Q.     Who had the conversations with
2   Berkshire East about this?
3      A.     The discussions probably would have
4   happened on a number of different levels.  I
5   would have been one of the people, and I -- I'm
6   certain that I did have the discussion.  Other
7   Northfield Mount Hermon faculty members who were
8   chaperones were -- I'm certain they would have
9   discussed this as well with the instructors,
10  with the -- certainly with the lead instructor
11  from Berkshire East.
12     Q.     When the decision to stop requiring
13  participants in the recreational ski program
14  from being required -- strike the question.
15         When the decision was made that NMH
16  students wouldn't be required to take ski
17  lessons any more, who was the person with
18  ultimate authority over that decision at NMH?
19     A.     I'd say Mr. Millard.
20     Q.     And has Mr. Millard been the person
21  with ultimate authority over whether or not
22  students are required to take ski lessons as
23  part of the recreational ski program, since the
24  time that you have been at the school?

1       Q.      -- that correct?

2       A.      Yes.

3       Q.      And you do that because the goal is

4    for them to become proficient in the particular

5    material that you're trying to teach them; is

6    that correct?

7       A.      Correct.

8       Q.      Okay.  Now, what exactly were the

9    students taught by Northfield Mount Hermon

10   School about actually how to ski?

11      A.      Now, as -- while this class was --

12   while students received physical educational

13   credit for this class, it's still called

14   recreational ski and snowboarding.  So it was

15   more recreational in nature.

16      Q.      I understand.  I'm asking you

17   specifically, at this time:  What were the

18   students who were receiving physical education

19   credits within the recreational ski program

20   actually taught, by Northfield Mount Hermon

21   School, about actually skiing?

22          MR. POTTER:  Objection.

23      A.      I can give you a -- starting from our

24   first meetings, we talked about the -- verbally,

1    we talked about proper attire; we talked about

2    safety rules; we talked about skier's

3    responsibility code; we instructed them on

4    following the school's policies, i.e.

5    attendance, tardiness, proper conduct; we

6    explain the difference between the -- you know,

7    ability levels, in other words, a beginning

8    skier versus an intermediate skier versus an

9    advanced skier or snowboarder.

10           Also, at the ski area itself, some

11    students received instruction from our physical

12    education -- our faculty members, some students

13    didn't.  It was a variety of -- of learning

14    situations or teaching situations.

15        Q.    Okay.  It's fair to say, is it not,

16    that in the 2003-2004 year, there was no program

17    in place at NMH by which every student

18    participating in the recreational ski program

19    received instruction from an NMH faculty member?

20        A.    No.  No, that's not true.

21        Q.    That's not true?

22        A.    No.

23        Q.    Okay.  So is the converse true, which

24    is that every student participating in the

1    indicated that you taught beginner badminton; is

2    that correct?

3         A.    Yes.

4         Q.    How many years did you teach that?

5         A.    I would guess ten, out of the

6    nineteen years as an instructor.

7         Q.    And did students receive instruction

8    as part of the badminton course in the PE

9    program at NMH?

10        A.    Yes.

11        Q.    And did you provide the instruction?

12        A.    Yes.

13        Q.    And please, as you did with the

14    tennis, please describe what you did in terms of

15    giving instruction to the student badminton

16    participants.

17        A.    Would have instructed in proper grip,

18    the variety of shots, proper contact point,

19    rules, etiquette, equipment, proper dress,

20    conditioning, game play, strategy.

21        Q.    Is that it?  Is that all you can

22    think of at this time?

23        A.    Yes.

24        Q.    Now, you also indicated that you

1              MR. POTTER:  Objection.

2       A.      Lessons were not required for all

3    beginners on Fridays.

4       Q.      Okay.  My question, though, is:  Who

5    is the person at NMH who had ultimate

6    responsibility, in 2003-2004, for making sure

7    that lessons for all beginners took place on

8    Fridays?

9       A.      Well, I --

10             MR. POTTER:  Objection.  You can

11   answer.

12      A.      Well, I think ultimate responsibility

13   would be our academic dean or dean of

14   curriculum.  Under that would be Mr. Millard,

15   under that would be me.

16      Q.      Who had day-to-day responsibility for

17   making sure that the recreational ski program

18   was running in the fashion that the NMH

19   administration --

20      A.      That would have been me.

21      Q.      -- thought was appropriate?

22      A.      That would have been me, day to day.

23      Q.      What arrangements were made with

24   Berkshire East to provide students who were

```
 1    my words.  I mean, I don't know if I can answer
 2    that.
 3         Q.    Well, I'm asking you that question.
 4    What's your answer?
 5         A.    I mean, I -- I mean, I'm not sure
 6    there is a -- a right answer to that, quite
 7    honestly.
 8         Q.    Well, what's your answer?
 9         A.    I don't know.
10         Q.    Well, why would it be that in the
11    skiing class there was no mandatory lesson
12    provided, whereas in the volleyball, badminton
13    and tennis classes, there was definite
14    instruction provided to the students?
15         A.    And I've answered this one before.
16    It's because the skiing classes are recreational
17    in nature.
18         Q.    And you testified that the volleyball
19    was recreational in nature as well?
20         A.    The volleyball was intramural.
21         Q.    Which you said was recreational in
22    nature; is that correct?
23         A.    All of -- I guess all of physical
24    education could be considered recreational in
```

1  nature.  But, yes.

2      Q.    Okay.

3      A.    Yes.

4      Q.    So all of those programs, that being

5  tennis, badminton and volleyball, all the

6  participants in those programs received

7  instruction for sure, whereas in skiing, there

8  was no mandatory lesson required; is that

9  correct?

10     A.    Required -- no mandatory lesson

11  required by Northfield Mount Hermon.

12     Q.    Correct?

13     A.    Right.  We -- I mean, we didn't have

14  qualified instructors to teach the lessons.  So,

15  yes, that's correct.

16     Q.    And Northfield Mount Hermon did not

17  require students, participating in their

18  recreational ski program, to take lessons --

19     A.    Correct.

20     Q.    -- in 2003-2004?  That's correct?

21     A.    Correct, yes.

22     Q.    And what -- I may have asked this.  I

23  don't mean to be redundant, but I just want to

24  make sure that I understand it.  What

1    arrangements were made so that students who

2    indicated that they wanted to take lessons

3    actually received the lessons at Berkshire East

4    in 2003-2004?

5              MR. POTTER:  I'll object, just

6    because it was asked and --

7              MR. GLUCK:  Okay.

8              MR. POTTER:  -- answered, but I'll

9    let him answer it again.

10              MR. GLUCK:  All right.  I appreciate

11    that.

12        A.    We recommended students, who were

13    beginners, to take -- that they take a lesson,

14    or that they take lessons.  What was the --

15    could I hear the question again?  Because I want

16    to make sure that I answer honestly and

17    truthfully.

18        Q.    Yes, sure.

19              (The record was read as requested.)

20        A.    Now, are you asking policy-wise?  Or

21    are you asking on a practical level, day to day?

22        Q.    Practical level, day to day.

23        A.    Practical level, day to day?  I don't

24    know, I wasn't there.  I mean, I -- day to day,

1    I don't know what happened day to day, quite

2    honestly.

3         Q.    But you were the director of the

4    recreational ski program; is that correct?

5         A.    Correct.

6         Q.    You were responsible for making sure

7    that students who indicated an interest in

8    taking ski lessons at Berkshire East actually

9    had those available to them; correct?

10        A.    Correct.

11        Q.    And you don't know whether they --

12   whether those ski lessons were actually

13   available to them or not; is that correct?

14        A.    Well, the chaperones were to let me

15   know if lessons were happening or not.  They

16   never indicated that they weren't happening.  So

17   I did not know whether they were or not.

18        Q.    Did you check to see if the lessons

19   were happening?

20        A.    I'm certain I did, and I'm certain

21   they were at -- at some point.  Again, if you

22   say day to day, on a specific day, I can't say

23   for sure.  Over the course of the season,

24   absolutely, because I would check with the

1    expected to monitor and report problems, things

2    that are going well, to a supervisor.  It's just

3    a -- it's just part of your duties as a faculty

4    member.

5         Q.    Is it your testimony that the

6    chaperones had a duty and responsibility, as NMH

7    faculty members, to report to you if the ski

8    lessons for beginners were not available to them

9    at Berkshire East in --

10        A.    Yes.

11        Q.    -- 2003-2004?

12        A.    Yes.

13        Q.    And if they failed to report that to

14   you, that was a violation of their duty as a

15   chaperone in the recreational ski program; is

16   that correct?

17        A.    I would say yes.  Yes.

18        Q.    Okay.  Did you have a duty and

19   responsibility to check with the chaperones, to

20   see if the lessons for beginner skiers were

21   available to them at Berkshire East in

22   2003-2004?

23        A.    Yes.

24        Q.    And if you failed to check with them,

1    was that a violation of your duty as the

2    director of the program in January 2004?

3         A.    Yes.

4         Q.    Okay.

5               (Interruption by court reporter.)

6               (Brief pause.)

7         Q.    I'll show you this exhibit which has

8    been marked in the previous deposition, Mr.

9    Millard's, as Exhibit 8A, and I'd ask you if you

10   recognize it, sir.

11              (Witness perusing Exhibit 8A.)

12        A.    I believe this is the attendance list

13   from the orientation meetings from --

14        Q.    Okay.

15        A.    -- when we started the term.

16        Q.    Okay.  And is that document

17   reflective of the information that the students

18   provided to NMH about their level of skiing and

19   whether or not they wanted to take a ski lesson?

20        A.    Yes.

21        Q.    And do you see, sir, that that

22   document is in alphabetical order?

23        A.    Uh-hum.  Yes.

24        Q.    And could you look down to Yukio

1    instruction.  It may or may not have been Mr.

2    Kusada.

3                MR. GLUCK:  Fair enough.

4        Q.     Now, what were the chaperones

5    instructed to do while they were at the mountain

6    on a given evening, during 2003-2004

7    recreational ski program?

8                MR. POTTER:  Objection.

9        A.     General responsibilities would have

10   included attendance while leaving school,

11   assuring that all students got to the ski area.

12   Typically one chaperone would stay in the ski

13   lodge, to help monitor the ski lodge.  The other

14   instructor or instructors, or chaperone or

15   chaperones, would typically do some skiing for

16   themselves.

17                Chaperones would be available to --

18   available in case there were any problems, any

19   concerns, any questions, either from students or

20   from Berkshire East ski instructors or

21   management; chaperones were responsible for

22   assuring that school policies and ski area

23   policies were being adhered to by our students,

24   by the Northfield Mount Hermon students;

1    using?

2         A.     No.

3         Q.     Do you know whether or not he was

4    wearing a helmet?

5         A.     Not for certain.

6         Q.     Do you know what kind of trail he was

7    skiing on, that being intermediate, beginner,

8    expert?

9         A.     Well, my understanding is the trail

10   was Big Chief, so it's a -- it's an intermediate

11   trail.  I know it's an intermediate trail.

12              MR. POTTER:  Well, once again, he

13   wasn't asking you for your understanding, he's

14   asking you if you know.  Listen to the question

15   carefully, because it's important.

16        Q.     Now, you indicated earlier that when

17   you're teaching -- I forgot which one it was --

18   one of the classes that you mentioned, that you

19   instructed the students on equipment; correct?

20        A.     Would likely instruct the students on

21   what equipment they were to use, yes.

22        Q.     Okay.  And why would you do that?

23        A.     So students would have the

24   information to -- to know what they would need

1    to conduct the activity, to participate in the

2    activity.

3        Q.    And you would tell them what kind of

4    equipment was appropriate for their level of

5    ability; is that correct?

6            MR. POTTER:  Objection.

7        A.    Not necessarily.

8        Q.    Well, let me ask you this question:

9    I don't know anything about the shot put, but

10   are there different weights of a shot put?

11       A.    Yes.

12       Q.    Okay.  So depending upon a shot-

13   putter's strength, they should use either a

14   heavier or a lighter shot put; is that correct?

15       A.    No.

16       Q.    No?  How does that work?  How do you

17   determine what's the correct weight for a

18   shot-putter to use?

19       A.    A male high school shot-putter is

20   twelve pounds -- shot put is twelve pounds, and

21   a female's is eight pounds.  Now, if you're

22   asking about our instruction in track and field

23   here at Northfield Mount Hermon, we would use

24   the lighter weight, if we would use a -- and we

1    know anything about ski equipment?

2         A.    Yes.

3         Q.    Have you had any courses related to

4    ski equipment?

5         A.    No.

6         Q.    Have you read any materials related

7    to ski equipment?

8         A.    Yes.

9         Q.    What materials have you read?

10        A.    I've read Skier Magazine in the past,

11   which talks about ski equipment.

12        Q.    Do you believe that it's important

13   for participants in the recreational ski program

14   to be using skis that are appropriate for their

15   level of ability?

16             MR. POTTER:  Objection.

17        A.    Again, it's hard to answer that

18   question, given the variety of abilities and

19   variety of experiences with our students.

20        Q.    Okay.  Do you believe that it's

21   appropriate for a beginner skier, such as Mr.

22   Yukio Kusada, to be using expert skis?

23             MR. POTTER:  Objection.

24        A.    I haven't seen Mr. Kusada ski before,

1    so I -- I can't comment.  I don't know, I really

2    don't.  I've never seen him.  I mean, he

3    indicates he's a beginning skier, but that's --

4    I haven't seen him ski, so I don't know.

5         Q.    So you don't know whether he's a

6    beginner skier or not?

7              MR. POTTER:  Objection.

8         A.    For sure, no.

9              MR. GLUCK:  Okay.  I think I'm done

10   for now.

11             MR. MONGUE:  I just have a few

12   questions for you, Mr. Atkins.

13                        EXAMINATION

14   BY MR. MONGUE:

15        Q.    You may have seen what was marked

16   during Mr. Millard's deposition, here this

17   morning, as 1A.  It's a letter from Katie

18   Benedetti to Kristen Atkins.  You saw that

19   earlier, I think, today?

20             (Atty. Mongue indicating Exhibit 1A.)

21        A.    Uh-hum.

22        Q.    Now, in that letter it refers to the

23   cost of certain items, such as $249 for lift

24   tickets?

```
 1          A.      Yes.

 2          Q.      Is that true?

 3          A.      Yes.

 4          Q.      How long does a beginner skier remain

 5     a beginner?  For example, if he's gone to the

 6     ski area 12 or 13 times, is that skier typically

 7     still a beginner?

 8                  MR. GLUCK:  Objection.

 9          A.      I think it -- it depends on the

10     individual cases.  It's hard to generalize here.

11     Some students -- I think it depends on the

12     quality of instruction, it depends on the

13     quality of terrain, it depends on the student's

14     willingness and openness to -- to learn to ski.

15     I think everyone skis a little bit differently.

16     Some students take to it very, very quickly;

17     some students take longer.

18          Q.      Over the course of your skiing career

19     have you found beginner students, after 12 or 13

20     visits to a ski area, to ski intermediate

21     trails?

22          A.      Yes.

23                  MR. GLUCK:  Objection.

24          A.      Yes.
```

```
 1    2003-2004?

 2              MR. POTTER:  Objection.

 3         A.   No.

 4         Q.   Audra Forstrom never told you about

 5    any difficulties that she was having, concerning

 6    the arrangement of ski lessons for students?

 7              MR. POTTER:  Objection.

 8              MR. MONGUE:  Objection.

 9         A.   Not that I recollect.

10         Q.   So you're not aware that an effort

11    was made to set up times, and that she had

12    trouble getting times set with Berkshire East?

13              MR. POTTER:  Objection.

14              MR. MONGUE:  Objection.

15         A.   I am not aware, correct.

16              MR. GLUCK:  Nothing further.  Thank

17    you.

18              MR. MONGUE:  I have nothing.

19              (Whereupon, at 4:30 p.m., the

20               deposition then ended.)

21

22

23

24
```

APPENDIX 4

Page 1

Volume I
Pages  1 - 121

COMMONWEALTH OF MASSACHUSETTS

District Court
Civil Action No. 05-30043-MAP

YUKIO KUSADA,
        Plaintiff,

vs.

BERKSHIRE EAST SKI RESORT,
UNION TERMINAL PIERS, INC.,
AND
NORTHFIELD MOUNT HERMON
SCHOOL,
        Defendants.

* * * * * * *

DEPOSITION of FRANK MILLARD, called as a
witness by counsel for the Plaintiff, pursuant to the
applicable provisions of the Massachusetts Rules of
Federal Procedure, before Rachel Marie Grady,
CSR No. 146900-S, Certified Shorthand Reporter and
Notary Public in and for the Commonwealth of
Massachusetts, taken at Northfield Mount Hermon
School, 28 Mount Hermon Road, Holbrook Building, Gill,
Massachusetts, on Monday, October 24, 2005, commencing
at 9:09 A.M.

************************
FLYNN REPORTING ASSOCIATES
Professional Court Reporters
One Exchange Place
Worcester, Massachusetts 01608
(508) 755-1303  * (617) 536-2727
TOLL FREE: (888) 244-8858
FAX:  (508) 752-4611

************************

1        Q.  Did you consider that an essential element

2   of the class?

3        A.  Yes.

4        Q.  Why was that essential?

5        A.  Well, I think probably it was essential to

6   get the kids to the same basic understanding of the

7   sport.  They came at various levels if it was a

8   beginning class.  In physical education, those types

9   of classes, there are often intermediate and expert

10  kids that are mixed in, because the registrar can't

11  screen them out.

12       Q.  As a self-defense teacher, did you instruct

13  the students on self-defense?

14       A.  As best I could.

15       Q.  If instruction is essential, was

16  instruction an essential element of that class as

17  well?

18       A.  Probably was more so.

19       Q.  Why is that?

20       A.  Different activity.

21       Q.  What do you mean by that?

22       A.  Well, in tennis, you know, you can show

23  someone how to rally back and forth across the net and

24  let them go practice it and do it.  They will gain

1  some expertise or not on their own.  In self-defense

2  you know -- I'm not certified as a judo person or a

3  karate person -- the moves are more choreographed:

4  We're going to do this now.  And no one goes off on

5  their own to practice that, except in group unison.

6      Q.  Were there any safety aspects that you

7  taught in self-defense at Potsdam?

8      A.  I suppose the biggest would have been when

9  you get thrown:  to slap the mat as you land to help

10 absorb the fall.  That would have been the -- I was

11 not trained in that.  That was a period of time I

12 tried to get something that the kids could do that was

13 a popular course.

14     Q.  You consider the safety aspect an important

15 part of the instruction that you provided?

16                 MR. POTTER:  Objection.

17     Q.  You can go ahead and answer.

18     A.  Yes.

19     Q.  Why was that important?

20     A.  Well, I think we were putting kids in that

21 class in situations that maybe they hadn't been in

22 before, and I think it was a class for women.  I think

23 there was some fear for some of them.  There are

24 elements of karate and judo where you can be lifted

1    purpose of the recreational ski program was when you

2    first came to Northfield Mount Hermon?

3                        MR. POTTER:  Objection.

4         A.  I guess I just saw it as part of the

5    physical education curriculum.

6         Q.  When you first came to the school, did the

7    recreational ski program fulfill part of the physical

8    educational requirement the students had at the

9    school?

10        A.  Yes.

11        Q.  So they got -- for lack of a better word --

12    "credit" for taking that class?

13        A.  Yes.

14        Q.  How many credits would they receive at the

15    time?

16        A.  You have to take physical education or

17    athletics each term, so they would have gotten a

18    credit for both terms.

19        Q.  When you first came to Northfield Mount

20    Hermon, as the chair of the phys-ed department, were

21    you the person who had ultimate authority for the

22    recreational ski program?

23        A.  That's unclear.  I mean, I guess the person

24    with the ultimate authority and responsibility is the

Page 21

1    the overseeing of the program.  I supervised that

2    person.

3         Q.   When you first came to Northfield Mount

4    Hermon, with respect to the recreational ski program,

5    who made decisions about policies with respect to the

6    program?

7         A.   What department?

8         Q.   I'm sorry?

9         A.   The physical education department.

10        Q.   They made the decisions?

11        A.   We would have, yes.  It's a part of the

12   curriculum.

13        Q.   At that time you were the chair of the

14   department?

15        A.   Yes.

16        Q.   So you were the person who had the final

17   say, so to speak, about those decisions?

18        A.   Well, I think the final say was with what

19   the majority of the department would do.  When we have

20   an activity in a program, the department has to have

21   discussion about it.  Most often we would vote on

22   anything about the program.  And, you know, if the

23   department went one way and I went another way, you

24   know, that would go up to the next level, if you will.

1    first came to the school, that were suited for

2    instruction.

3           A.   Well, the curriculum has evolved over the

4    years.  For me to be able to sit down and tell you the

5    courses -- I cannot recollect all the courses.

6           Q.   Do the best you can.

7           A.   Beginning tennis was suitable to

8    instruction.  As the chair of the department, I would

9    expect there would be more instruction than there

10   would be play.

11          Q.   But some instruction in the course?

12          A.   In an advanced tennis class, there would be

13   less instruction and more play.

14          Q.   Okay.  Can you think of any other course

15   offerings within the phys-ed department when you first

16   came to the school?

17          A.   Beginning golf.

18          Q.   Did golf receive instruction?

19          A.   Yes.

20          Q.   Any other courses?

21          A.   Beginning swimming.

22          Q.   Did swimming involve instruction?

23          A.   Yes.

24          Q.   Any others?

Page 50

1     Q.  You don't know?

2     A.  No.

3     Q.  As far as you know, as the chair of the

4  department for 20 years here, does instruction,

5  generally, in physical education contain some safety

6  component?

7     A.  It varies from activity to activity.

8     Q.  Would it be part of skiing?

9     A.  I think it would.

10    Q.  In 2003 were you the chair of the

11  department?

12    A.  Yes.

13    Q.  Was instruction a requirement of the

14  recreational ski program for skiers?

15    A.  I can't remember.  I'd have to see the

16  document.

17    Q.  You can't even remember two years ago about

18  that?

19    A.  No.

20    Q.  Have you reviewed any documents before

21  coming in here today?

22    A.  I reviewed this year's documents.

23    Q.  For the 2004/2005 year; is that correct?

24    A.  No.  For 2005.  I reviewed this week the

Page 54

1    the chair of the department back in 2003/2004?

2                    MR. POTTER:  Objection.

3        A.   Well, I'm not sure exactly what this

4    document shows.  I don't know if this is a daily

5    attendance document, whether it was an initial sign-up

6    document that chaperones created or the coordinator

7    created.

8        Q.   You've never seen this document before?

9        A.   I may have, but it's, you know, within the

10   administrative structure of our department.  As

11   department chair, you know, I'm the boss of

12   everything.  In reality, I ran the athletic end of it.

13   The coordinator of education ran the physical

14   education part of it.

15       Q.   Who was that person in 2003 and 2004?

16       A.   Michael Atkins.

17       Q.   Is he still at the school?

18       A.   Yes.

19       Q.   What is his current position?

20       A.   He's a member of the physical education

21   department.  He's the athletic director.

22       Q.   As the person who was the chair of the

23   phys-ed department in 2003 and 2004, your testimony is

24   that Michael Atkins is the person who actually had

1  charge of the recreational ski program; is that

2  correct?

3        A.   On a day-to-day basis, yes.

4        Q.   It was not you; is that correct?

5        A.   Correct, on a day-to-day basis.

6        Q.   Who was Mr. Atkins' supervisor?

7        A.   Me.

8                    MR. GLUCK:  We'll mark this as

9  Exhibit 1, please.

10                   (Exhibit No. 1 marked for

11  identification.)

12       Q.   Do you have time restrictions?

13       A.   I can take care of it if you let me make a

14  phone call.

15                   MR. GLUCK:  Let's take a break.

16                   (Recess taken.)

17       Q.   Do you know whether or not students, who

18  indicated an interest in taking lessons at Berkshire

19  East in 2003/2004, were able to receive them when the

20  course began in January?

21       A.   I don't know.

22       Q.   Who would have had responsibility for

23  making sure that students, who indicated an interest

24  in taking lessons, were able to receive them?

Page 66

1    agreement existed?

2        A.  I don't know if there were documents.

3    They'd be in the files.

4        Q.  Do you know whether the Northfield Mount

5    Hermon ski program for 2003/2004 required students to

6    use a helmet when skiing?

7        A.  Helmets would not have been required.

8        Q.  Do you know whether any representative of

9    Northfield Mount Hermon checked to see whether the ski

10   equipment, of students enrolled in the recreational

11   ski program, was appropriate for the level of skiing?

12       A.  I don't know.

13       Q.  Did the department have a practice, policy,

14   or procedure about checking to see that the ski

15   equipment, of the students enrolled in the program,

16   was appropriate for the level of skiing?

17       A.  No.

18       Q.  Whose decision was it for the phys-ed

19   department not to know about whether the ski equipment

20   was appropriate for the level of skiing?

21       A.  I don't think it was anybody's decision.

22   The program has existed for probably 30, 35 years, you

23   know.  As we know a student would bring a tennis

24   racquet to a tennis court, we know a student would

Page 67

1    bring ski equipment to a ski course or rent them.  I

2    don't think that anybody in our department, in our

3    school, would be qualified to make a judgment on their

4    safety or on how appropriate the equipment is.

5         Q.  So Northfield Mount Hermon offered a

6    recreational ski program and yet had no one within the

7    phys-ed department who was qualified to know whether

8    the equipment that was being used was safe for the

9    students; is that correct?

10              MR. POTTER:  Objection.

11        A.  I don't know if there was such a thing or a

12   qualification for someone to say that.

13        Q.  You don't know?

14        A.  No.

15        Q.  As chair of the department, don't you think

16   that is something you should know?

17        A.  As chair of the department, I would expect

18   that any kid skiing in our program would be same as

19   anybody else going to a registered ski area.

20   Basically, the biggest thing is there's a ski code of

21   conduct.

22        Q.  That's the biggest thing?

23        A.  Yeah.  That's on every ski pass in the

24   United States.  It says, number one, that skiers will

1  ski under control.  I don't know these things

2  verbatim.  I think there's:  Skiing is an activity

3  that has risk.

4         You know, by taking this ticket, you have

5  accepted those risks.  If you ski out of control, the

6  mountain will take the pass away from you.  To me,

7  that governs all the things that you're talking about.

8  Kids that have -- people that might have faulty

9  equipment becomes the responsibility of the people

10  that are running the mountain.

11      Q.  What did Northfield Mount Hermon do to

12  enhance the safety of their students when they were

13  skiing at Berkshire East, in the course of the

14  2003/2004 ski program?

15      A.  Well, there's several answers:  One, they

16  assured that the kids were transported to the

17  mountain.  Then they took attendance, when we left the

18  mountain, to assure that we had all the kids that we

19  went with.  That was the two primary safety

20  responsibilities that our chaperones had.  The

21  chaperones are also told that when they were skiing --

22  the chaperones could ski also -- if they saw a

23  Northfield Mount Hermon student behaving, you know,

24  inappropriately, they could pull that kid's pass for

Page 69

1  the day.  If the student got hurt, there was a

2  protocol in place.

3        One of our instructors could drive their

4  personal car.  The decision would be made by the

5  medical people at Berkshire East as to whether Johnny

6  or Susie needed to go to the hospital, if it was that

7  serious, or if it could wait until they got back here

8  to see our school health services.  If they need to go

9  to the hospital, then the decision is made as to

10  whether they need an ambulance or could be transported

11  in the chaperone's car.

12        Q.  Anything else?

13        A.  No.

14        Q.  Did any Northfield Mount Hermon employee

15  ever provide any ski instruction to Yukio Kusada, as

16  far as you know?

17        A.  Not to my knowledge.

18        Q.  Did Yukio Kusada ever receive any ski

19  instruction at Berkshire East, as far as you know?

20        A.  I don't know.

21        Q.  Did Northfield Mount Hermon arrange to have

22  ski lessons available for Yukio Kusada in the

23  2003/2004 ski program?

24        A.  I don't recall.

Page 70

1      Q.  Did Northfield Mount Hermon know what type

2  of ski equipment Yukio Kusada was using on February

3  20th, 2004?

4      A.  No.

5      Q.  Did Northfield Mount Hermon ever provide

6  any instruction to Yukio Kusada with respect to the

7  dangers involved with night skiing, as far as you

8  know?

9      A.  I don't know.

10     Q.  Did Northfield Mount Hermon ever require

11 that Yukio Kusada wear a helmet when skiing in the

12 recreational ski program in 2003/2004?

13     A.  Require?  No.

14     Q.  Other than transporting Yukio Kusada to the

15 mountain on February 20, 2004, what else did

16 Northfield Mount Hermon do to enhance the safety of

17 Yukio Kusada as a participant in the recreational ski

18 program, for which he received course credit under the

19 physical educational auspices?

20                 MR. POTTER:  Objection.

21     A.  At the initial meeting of the students,

22 which would have been in December, the

23 responsibilities for the course were explained to the

24 student.

1          A.   That would not have been part of our

2     conversation.

3          Q.   So you didn't talk to Mr. Atkins about

4     whether he even mentioned to the students about taking

5     ski lessons, in the course of their meeting in

6     December?

7          A.   The kids are given a sheet of paper --

8          Q.   I'm asking whether you discussed it with

9     Mr. Atkins.  Did you discuss it with Mr. Atkins?

10         A.   No.

11         Q.   As the chair of the department, don't you

12    think that it was your responsibility to check with

13    Mr. Atkins to see if they had discussed ski lessons

14    with the students who were participating in the

15    recreational ski course?

16                    MR. POTTER:   Objection.

17         A.   No.

18         Q.   Your students in the phys-ed department

19    receive lessons in badminton, tennis, and golf; is

20    that correct?

21         A.   Correct.

22         Q.   You have no idea whether they received any

23    lessons in skiing; is that correct?

24         A.   Berkshire East is a subcontractor, if you

1    enhance safety while participating in skiing?

2                    MR. POTTER:  Objection.

3         A.  I can't speak to what the lesson does.

4         Q.  So you don't have a general sense, as the

5    chair of the department in 2003/2004 and a person with

6    a master's degree in physical education, whether ski

7    lessons enhance ski safety?

8                    MR. POTTER:  Objection.

9         Q.  Is that correct?

10                   MR. POTTER:  Objection.

11        A.  I don't know what the content of a lesson

12   would be.

13        Q.  You didn't know what the content of a ski

14   lesson would be in 2003/2004, while you were chairing

15   the department; is that correct?

16        A.  I don't know if there were lessons in

17   2003/2004.  If there were, the content of the lesson

18   would be up to the ski instructors.

19        Q.  In any of the years that ski lessons were

20   provided by Berkshire East, did you ever discuss with

21   Berkshire East what information they would be

22   providing in the course of a ski lesson?

23        A.  No.

24        Q.  Did you consider that part of your duty and

Page 95

1        Q.   Mr. Potter has handed you what has been

2   marked as Exhibit 2, which I asked you to look at and

3   tell me if you recognize it.

4        A.   This has Exhibit 1 on it.

5        Q.   Exhibit 1 is from a prior deposition.

6                  MR. GLUCK:   It's the same one

7   that's been marked as Exhibit 2 in this deposition.

8                  MR. POTTER:   It is.

9        Q.   It is entitled "Permissions" at the top.

10   Is that the form you have in front of you, sir?

11        A.   Yes.

12        Q.   Tell me if you recognize the form.

13        A.   I do.

14        Q.   I'm going to ask you to look under the

15   first subheading:   "PE/A Activities Permission."  Read

16   that paragraph to yourself, please.  Just let me know

17   when you are finished.

18        A.   I'm finished.

19        Q.   The last sentence of that paragraph says,

20   "These activities will be supervised by a responsible

21   adult, and necessary safety precautions will be

22   taken."  Do you see that?

23        A.   Yes.

24        Q.   For the 2003/2004 ski program, what

1    A.   Right.

2    Q.   Other than those two things, you don't

3    personally know of anything else that would fit under

4    "necessary safety precautions" that were taken; is

5    that correct?

6                   MR. POTTER:  Objection.

7    A.   Well, the third thing you spoke of earlier,

8    in terms of what we would do in terms of an injured

9    student.

10   Q.   Right.  Other than those three things,

11   then?

12   A.   Correct.

13   Q.   Now, in the event of an injured student,

14   who is participating in the recreational ski program,

15   the chaperones' responsibility was to assist in

16   helping find a student that may be lost or injured on

17   the mountain?

18                  MR. POTTER:  Objection.

19   A.   To my knowledge, we have never had a

20   student lost on the mountain, so I can't speak to

21   that.  In terms of an injury, they would defer to the

22   ski patrol at the mountain, whose training would tell

23   them what needed to be done.  The ski patrol on the

24   mountain are first-aid certified.  I think most of

Page 100

1    mountain?

2              MR. POTTER:  Objection.

3         A.  I can't answer that.

4         Q.  I'm going to ask you to look at what you

5    have in front of you.  It's Exhibit 2.  Do you see

6    that there's a list of activities?

7         A.  Yes.

8         Q.  The first one that's listed is canoeing.

9    Do you see that?

10        A.  Yes.

11        Q.  Is canoeing one of the programs where

12   instruction was provided?

13        A.  Yes.

14        Q.  You already said swimming was.  How about

15   hiking, snowshoeing, Nordic skiing, or camping:  Was

16   instruction provided in that program?

17        A.  Yes.

18        Q.  How about rock climbing and rappeling:  Was

19   instruction provided for that program?

20        A.  Yes.

21        Q.  We're talking here about the 2003/2004

22   year, you understand that?

23        A.  Yes.

24        Q.  How about zip line traversing:  Was

Page 101

1    instruction provided in that course?

2         A.  If that took place, it was.

3         Q.  And tree climbing:  Was instruction

4    provided in tree climbing?

5         A.  If that took place.

6         Q.  You said golf.  How about SCUBA diving:

7    Was instruction provided in SCUBA diving?

8         A.  Yes.

9         Q.  How about in mountain biking:  Was

10   instruction provided in mountain biking?

11        A.  I don't know.

12        Q.  Well, the next two are varsity sports; is

13   that correct?

14        A.  Correct.

15        Q.  Varsity Alpine skiing and varsity Nordic

16   skiing:  Were instructions provided for those two

17   offerings?

18        A.  Yes.

19        Q.  For varsity ultimate Frisbee, was

20   instruction provided in that offering?

21        A.  Yes.

22        Q.  So the only one that you're unsure of is

23   mountain biking?  You don't know whether instruction

24   was provided in mountain biking in 2003/2004; is that

1  correct?

2        A.  Correct.

3        Q.  How can you be sure that instruction was

4  provided in 2003/2004 in all of the other ones that

5  you just said that instruction was provided in

6  2003/2004?

7        A.  By the nature of the activity.

8        Q.  What about the nature of the activity tells

9  you, as you sit here today, that in 2003/2004

10  instruction was provided?

11        A.  Well, the canoeing, the hiking, the rock

12  climbing, the zip line, the tree climbing, and the

13  mountain biking fall under the general auspices of the

14  physical education athletic department, but they fall

15  specifically under the auspices of the outdoor

16  program.  In that particular year, that program was

17  loosely affiliated with physical education.  The head

18  of that program ran those programs the way he wanted

19  to run those.  The affiliation was just to make sure

20  the kids got PE credit for taking those courses.  So

21  what the person did in those activities...

22            Mountain biking is quite a bit different

23  than these other activities, in that kids coming to

24  mountain biking would have had a mountain bike, which

Page 113

1      Q.  Not here today, no.  No.  By chaperones.

2  Who is Richard Eisenberg and Audra Forstrum?

3      A.  They were the people there.

4              MR. MONGUE:  I will object

5  whenever you ask that question.

6              MR. GLUCK:  Go right ahead and do

7  so.

8      Q.  I'm going to ask you:  Is that a violation

9  of the policies, practices, and procedures of

10  Northfield Mount Hermon, in the recreational ski

11  program, for lessons to be contemplated but never

12  actually delivered at Berkshire East mountain?

13              MR. POTTER:  Objection.

14              MR. MONGUE:  Objection.

15      A.  I'm not sure what the answer to that

16  question is.

17      Q.  Why not?

18              MR. POTTER:  Objection.

19      A.  I don't know how to define "violation."

20      Q.  Is it something, as the chair of the

21  department, that you would not want to see happen?

22      A.  If the understanding was that the students

23  were to have lessons, then I would think the lessons

24  would take place.

Page 117

1    helmets?

2         Q.   And the answer to that was?

3         A.   It's an unenforceable regulation, from my

4    perspective.

5         Q.   Isn't it possible for kids required to be

6    wearing helmets, that are observed to not be wearing

7    helmets, to be removed from the program?

8                    MR. POTTER:   Objection.

9         A.   I don't see that as enforceable.

10        Q.   Why not?

11        A.   Well, Berkshire East is a pretty wide, big,

12   open space with lots of people skiing.  We have three

13   chaperones there.  They may or may not be in contact

14   with the kids on a regular basis.  They may not even

15   recognize the kids skiing by as a member of our group.

16   You know, we ski there on Wednesdays and on weekends.

17   There's all sorts of school groups there.

18             Berkshire East is a very big school-group

19   mountain, so there can be 15, 20 schools there with,

20   you know, 40 or 50 kids per school.  For us to see who

21   Susie or Bill is, as they're zooming by, is -- the

22   chaperones do not have those kids in class on a daily

23   basis.  The ones they're going to know are the kids

24   that may live with them in the dorm or the kids that

1    they have in a class.  Ms. Forstrum taught math.  She

2    might know the kids.

3         Q.   Those are the reasons you feel it is not

4    enforceable?

5         A.   Because I don't think we can consistently

6    identify Northfield Mount Hermon kids.

7         Q.   Were there any discussions, in these

8    meetings, about Northfield Mount Hermon staff knowing

9    what ski equipment was being used by the students?

10        A.   No.

11        Q.   Were there any discussions about night

12   skiing within the program?

13        A.   Yes.

14        Q.   What was the substance of those

15   conversations?

16        A.   Well, I guess:  How is night skiing -- you

17   know:  Why do we go at night?  Are there alternatives

18   to night skiing?  It was that kind of thing.

19        Q.   Why did the program take place at night?

20        A.   It precedes my time at the school.

21        Q.   Well, is it just a policy that has existed

22   for many years, and it just continued without any

23   particular attention to it until this accident

24   happened?

APPENDIX 5

1                                          Volume II
                                           Pages:  1-82
2                                          Exhibits:  1A-13A

3              IN THE UNITED STATES DISTRICT COURT
               FOR THE DISTRICT OF MASSACHUSETTS
4

YUKIO KUSADA,
5                         Plaintiff

6         vs.                      C.A. No. 05-30043-MAP

7    BERKSHIRE EAST SKI RESORT and
     UNION TERMINAL PIERS, INC.,
8                         Defendants

9         and

10   NORTHFIELD MOUNT HERMON SCHOOL,
                          Defendant and Third-
11                        Party Plaintiff
          vs.
12

TAKERU KUSADA,
13                        Third-Party Defendant

14            *    *    *    *    *    *    *    *

15      CONTINUED DEPOSITION of FRANCIS E. MILLARD
     called as a witness by the Plaintiff, pursuant
16   to the applicable provisions of the Federal
     Rules of Civil Procedure, before Susan E.
17   Lepore, Registered Professional Reporter and
     Notary Public within and for the Commonwealth of
18   Massachusetts, taken at the Northfield Mount
     Hermon School, 206 Main Street, Northfield,
19   Massachusetts, on Tuesday, November 15, 2005,
     commencing at 10:20 a.m.

20
               ****************************
21             **FLYNN REPORTING ASSOCIATES**
                **Professional Court Reporters**
22                 One Exchange Place
             Worcester, Massachusetts  01608
23             (508)755-1303   *  (617)536-2727
                 TOLL FREE:  (888)244-8858
24                 Fax (508)752-4611
               ****************************

1    November 3rd, 2003 letter states that for the

2    Northfield Mount Hermon recreation program, lift

3    tickets will be $249; is that correct?

4         A.    Yes.

5         Q.    Ski rentals will be $105?

6         A.    Yes.

7         Q.    Board rentals, 175; is that correct?

8         A.    Yes.

9         Q.    And a lesson, $7; is that correct?

10        A.    Yes.

11        Q.    Do you know what kind of a lesson

12   that referred to?

13        A.    I do not.

14        Q.    And you were the director of the

15   physical education department at that time; is

16   that correct?

17        A.    That's correct.

18        Q.    And it says that "The program is

19   scheduled from January 7 to March 2nd, with no

20   skiing on Friday, January 30th;" is that

21   correct?

22        A.    Yes.

23        Q.    And it says that "Lessons for all

24   beginners will be on Fridays;" is that correct?

1       A.      Yes.

2       Q.      And did those lessons materialize?

3       A.      I do not know.

4       Q.      And you were the director of the

5  recreation -- of the physical education

6  department at that time; is that correct?

7       A.      That's correct.

8       Q.      I'll show you another document, sir,

9  and ask you if you recognize it.

10              (Witness perusing document.)

11      A.      I do.

12      Q.      What is that document?

13      A.      It's my scratchings, figuring out

14  what the cost for the course will be.

15      Q.      For the 2003-2004 year?

16      A.      Yes.

17      Q.      And you're talking -- when you say

18  "the course," you're talking about the

19  recreational ski program; is that correct?

20      A.      Yes.

21              MR. GLUCK:  Okay.  Can we have this

22  marked as 2A, please?

23              (Millard's Exhibit Number 2A was

24               marked for Identification.)

1      Q.      Is there anything, that you're aware

2  of, that prevented Northfield Mount Hermon

3  School from requiring that students

4  participating in the recreational ski program,

5  in 2003-2004, from having a helmet as a

6  prerequisite to participating in the class?

7              MR. POTTER:  Objection.

8      A.      There is nothing I am aware of.

9      Q.      Okay.

10     A.      Other than the ability to --

11     Q.      You've answered the question, sir.

12             MR. POTTER:  Well, let him finish.

13  Let him finish.

14             MR. GLUCK:  He answered the question.

15  I asked him if there's anything --

16             MR. POTTER:  Well, he can finish his

17  answer.  He's entitled --

18             MR. GLUCK:  -- that he's aware of,

19  and he said there --

20             MR. POTTER:  -- to finish his answer.

21             MR. GLUCK:  -- is nothing that he was

22  aware of.

23             MR. POTTER:  Well, he can hesitate.

24  You weren't asking another question.  There

# Berkshire East
## SKI RESORT

PO Box 727, South River Road, Charlemont, MA 01339

Telephone:  (413) 339-6617

November 3, 2003

Northfield Mount Herman
Recreation Program
Attn: Kristen Atkins
Main Street
Northfield, Ma. 01360

Dear Kristen,

For the Northfield Mt. Herman recreation program, lift tickets will be $249, ski rentals $105, board rentals, $175, and a lesson $7.  The program is scheduled from January 7 to March 2 with no skiing on Friday, January 30.  Lessons for all beginners will be on Fridays.

If you have any other questions, please call.

Yours truly,

Katie Benedetti,
Business Manager



EXHIBIT 1A
Millard
DATE: 11 5 03
SUSAN E. LEPORE

---

Berkshire East Ski Resort
PO Box 727, South River Road
Charlemont, MA 01339

www.BerkshireEast.com
info@BerkshireEast.com
(413) 339-6617

Rec Ski 2003-04

Busses #275 per
Dates Jan 7 - Mar 2 (16)

Bus cost   16 X 3 = 48 busses

275
48
2200
11200
13200

8 260
48
1760
880
$10,560

Lift Ticket $249
Ski Rental 105
Snow board rent 175
Lesson        7

   Beg skiers get one lesson per week on Fridays

$866

$1447 due to be
1307 found in calendar
    Armand ext 2257

Pizza
G Music          B Royalty
G Regan
G FH

EXHIBIT 2A
4 HOURS
DATE: 11/15/05
SUSAN E. LEPORE

APPENDIX 6

Volume I, Pgs. 1-131

COMMONWEALTH OF MASSACHUSETTS
Federal Court
No. 05-30043-MAP

- - - - - - - - - - - - - - - - - - - -

YUKIO KUSADA,                          )
Plaintiff                              )
v.                                     )
BERKSHIRE EAST SKI RESORT, )
UNION TERMINAL PIERS, INC.,)
AND NORTHFIELD                         )
MOUNT HERMAN SCHOOL,                   )
Defendant and Third Party  )
Defendant                              )
v.                                     )
TAKERU KUSADA                          )
Third Party Defendant      )

- - - - - - - - - - - - - - - - - - - -

DEPOSITION OF YUKI HASEGAWA

Thursday, May 19, 2005

1:12 p.m.

Northfield Mount Herman School

206 Main Street

Northfield, Massachusetts 01360

- - - - - - Terri Clarno - - - - - -

FLYNN REPORTING ASSOCIATES

Professional Court Reporters

One Exchange Place

Worcester, Massachusetts 01608

(508) 755-1303  * (617) 536-2727

DUPLICATE TOLL FREE: (888) 244-8858
FAX: (508) 752-4611

1    Q.   Before you actually went to Berkshire East

2    for the first time?

3    A.   Is this the first year?

4    Q.   I'll tell you.  Let me start the question

5    again.  Before you went to Berkshire East the first

6    time in your second season -- so that would be the

7    2003, 2004 school year -- did any faculty member ask

8    to look at your equipment?

9    A.   No.

10    Q.   Were you required to answer any questions

11    in the form of a test or a quiz about ski safety?

12    A.   No.

13    Q.   Were you shown any videotape about ski

14    safety?

15    A.   No.

16    Q.   Were you shown any videotape about anything

17    related to skiing?

18    A.   No.

19    Q.   Were you given any documents that related

20    to ski safety other than things that have been

21    already marked as exhibits?

22    A.   No.

23    Q.   Were you required to pass a test or a quiz

24    that related to issues of ski safety?

1     A.  No.

2     Q.  Were you given any materials that -- when I

3  say "materials" I mean written documents -- that

4  addressed issues related to night skiing?

5     A.  No.

6     Q.  Were you shown any videotape that related

7  to anything involving night skiing?

8     A.  No.

9     Q.  Did any faculty member in your second year

10  before you started skiing that first time in your

11  second year ever discuss in your presence or talk

12  about skiing at night?

13              MR. POTTER:  Objection.

14     A.  I don't recall.

15     Q.  But you were never given any materials

16  related to skiing at night?

17     A.  Materials as in writing?

18     Q.  Yes.

19     A.  No.  I was not given.

20     Q.  You don't recall if anyone ever said

21  anything to you about night skiing, is that correct?

22     A.  Do you mean ever or first time?

23     Q.  Let me rephrase the question.  You don't

24  recall before the first time you went skiing in your

A.   No.

Q.   They were all given during the day?

A.   Yes.

Q.   Do you recall if you took any of these
lessons before Yukio's injury occurred on February
20, 2004?

A.   This is personally, me, right.

Q.   Talking about you.

A.   I haven't taken any ski lessons before.

Q.   So you took no ski lessons before Yukio
suffered his injuries, is that correct?

A.   Yes.

Q.   So all of the ski lessons that you've taken
at Berkshire East were after Yukio suffered his
injuries, is that correct?

A.   Yes.

Q.   Why did you take ski lessons at Berkshire
East?

A.   It was required by the school.

Q.   When did it become a requirement by the
school?

A.   The next year, my third year, my senior
year.

Q.   So that would be --

A.   2004 to 2005.

Q.   2004, 2005?

A.   Yes.

Q.   Do you know why it became a requirement of the ski program?

A.   No.

Q.   Who told you that it was a requirement of the ski program?

A.   The faculty that was associated with the ski program this year.

Q.   Who is that?

A.   Richard Eisenberg and another person that I have no idea what his name is.

Q.   So as I understand it correctly, it was not a requirement of the Northfield Mount Herman ski program that you take a ski lesson until after Yukio suffered his injuries, is that correct?

A.   It was not a requirement.

Q.   Now, in your third year of the program, was the skiing done during the day or at night or both?

A.   During the day.

Q.   So there was no more night skiing as part of the ski program?

A.   During the night.

Page 49

Q.  Before February 20, 2004, had you ever skied with Yukio?

A.  Yes.

Q.  On how many occasions?

A.  Most of the skiing days.

Q.  Why did you ski together?

A.  We were the only Japanese students and I knew how to ski, he didn't, so I started teaching him how to ski.

Q.  As far as you know did he receive any ski instruction from anybody else other than you?

A.  I don't know.

Q.  Did he have his own skis?

A.  No.

Q.  Whose skis did he use?

A.  I don't know.

Q.  If you were to suggest the name Samuel Wilson, would that refresh your recollection?

A.  I don't know whose skis he used.

Q.  Do you know Samuel Wilson?

A.  No.

Q.  Do you know whether Mr. Kusada used the same skis each time that he skied with you up until February 20, 2004?

Page 52

1    Q.   Yes.   That's the question.

2    A.   Yes.

3    Q.   What does a green ball indicate to you when

4    you see it on a ski mountain?

5    A.   Easy.   Beginners.

6    Q.   And what does a blue triangle indicate?

7    A.   Intermediate.

8    Q.   And what does a black diamond indicate?

9    A.   The hardest, expert.

10   Q.   When you were skiing with Yukio on the

11   occasions before February 20, 2004, which trails

12   would you ski on with Yukio?

13                   MR. POTTER:   Objection.

14   A.   It varied.   The beginning of the course it

15   was green and then we went onto blue as the time

16   passed and he got better and he -- right before

17   February 20, like, I don't know how many times, but

18   we sometimes went onto the black diamond.

19   Q.   Had you ever received any materials from

20   Northfield Mount Herman that addressed the issue of

21   what the signs meant?

22   A.   No.

23   Q.   Do you know if Yukio knew what those signs

24   meant?

Page 53

1            MR. POTTER:  Objection.

2        A.   I don't know.

3        Q.   Were you required before February 20, 2004,

4    to take a test to show your knowledge of what these

5    signs meant?

6        A.   No.

7        Q.   Were you required to take any kind of a

8    test that was given to you by Northfield Mount

9    Herman to show your knowledge of anything related to

10   skiing?

11           MR. POTTER:  Objection.

12       A.   Test?  Can you clarify the word "test"?

13       Q.   Yes.  Pieces of paper on which there were

14   questions that would be written that you had to

15   answer to demonstrate your knowledge in a certain

16   area?

17       A.   No.

18       Q.   Do you know what color skis Yukio was

19   wearing on February 20, 2004?

20       A.   I don't recall.

21       Q.   Do you know what length they were?

22       A.   What what?

23       Q.   What length, how long they were.

24       A.   No.

that.  When was the last time that you saw Yukio

Kusada on February 20, 2004?

A.  Before eight o'clock, but I don't remember

the exact time.

Q.  Was there any faculty member from

Northfield Mount Herman that skied with you?  I'm

talking about just you on February 20, 2004.

A.  No.

Q.  Where was the last time you saw Yukio

Kusada on February 20, 2004?

A.  The -- I don't know what it's called.  The

middle of the Big Chief.

Q.  Big Chief is an intermediate slope, is that

correct?

A.  Yes.

Q.  Had you started together at the top of Big

Chief with Yukio?

A.  Yes.

Q.  After you got off the chairlift who went

down the mountain first?

A.  He did.  Yukio did.

Q.  Did you have any conversation with him

after you got off the chairlift, but before he

started going down the mountain at that time?

1    A.   I don't remember.

2    Q.   Why did he go first, if you know.

3    A.   He usually goes first because if something

4   happens to him and falls and the skis are out there

5   I can pick it up for him.

6    Q.   Had that happened on other occasions?

7    A.   Yes.

8    Q.   On February 20, 2004, before his accident

9   occurred, on how many occasions had he fallen that

10   you saw?

11    A.   Like, any time or that specific day?

12    Q.   That day.

13    A.   I don't recall, but not so many times.

14    Q.   More than two?

15    A.   Around two, maybe one.

16    Q.   Had he been able to get up and stand up and

17   start skiing again after he fell on those occasions?

18    A.   Yes.

19    Q.   On which -- when I say the word "trails,"

20   do you know what I mean by that?

21    A.   Yes.

22    Q.   I'm talking about the name of the mountain,

23   part of mountain you're skiing on.

24    A.   Yes.

1    Q.   When you passed him did you see him skiing?

2    A.   Yes.

3    Q.   How did he seem to be doing?

4    A.   Doing okay.   The same Yukio.

5    Q.   Was he on the right side of the trail or

6    the left side of the trail or in the middle?

7    A.   I don't remember.   I go pretty fast so I

8    don't know.

9    Q.   So you skied by him.   And as you skied by

10   him did you say anything to him?

11   A.   No.

12   Q.   As you skied by him did he say anything to

13   you?

14   A.   No.   Not that I heard him.

15   Q.   So then you skied down to the bottom, is

16   that correct?

17   A.   Yes.

18   Q.   Obviously he never made it to the bottom,

19   correct?

20   A.   Yes.

21   Q.   How long did you wait for him down at the

22   bottom?

23   A.   I waited at least 5 to 7 minutes right at

24   the bottom of the trail and I also went down a

Page 74

1    little more to the chairlift.  That's why I was

2    taking off my skis and going into the lodge just in

3    case I missed him by any chance so including that

4    about 10 to even close to 15 minutes.

5        Q.  So you took off your skis and you went into

6    the lodge?

7        A.  Yes.  And I came again once I knew he

8    wasn't there.

9        Q.  You came back outside and you put your skis

10   back on, is that correct?

11       A.  Yes.

12       Q.  Then what did you do?

13       A.  I went back and forth at the bottom of the

14   trail and the chairlift and just that.

15       Q.  You continued to ski?

16       A.  After, yes.

17       Q.  What time did you stop skiing that night?

18       A.  I stopped before eight for dinner and I ate

19   dinner and started skiing again and stopped skiing,

20   like, 15 minutes before the bus.

21       Q.  Now, on the other occasions when you skied

22   with Yukio, would you ski with him for the whole

23   time that you were at the mountain?

24       A.  Yes.  Most of the time, yes.

1   anyone that you didn't know where Yukio was before

2   you reported to the buses?

3        A.   Yes.

4        Q.   Who did you tell?

5        A.   Audra F.

6        Q.   Where were you standing when you told Audra

7   F. that you didn't know where Yukio was?

8        A.   Inside the lodge at the bottom of the

9   mountain.

10        Q.   To your best recollection, what did you

11   tell Audra at that time?

12        A.   I told her that I haven't seen Yukio for a

13   long time.

14        Q.   What, if anything, did she say to you?

15        A.   She said during ski -- during skiing

16   sometimes things like that might happen, not seeing

17   someone for a long time because that person might be

18   skiing with someone else, some other friend from the

19   same school so she told me not to worry about it too

20   much.

21        Q.   Was that the whole conversation you had

22   with Audra at that time?

23        A.   Yes.

24        Q.   What did you do next after you had that

Page 81

1  conversation?

2      A.   Started skiing again.

3      Q.   To your best recollection, how long did you

4  continue to ski until you went to the bus?

5      A.   An hour and a half, two hours.  I don't

6  know.

7      Q.   When you got to the bus Yukio was not

8  there, correct?

9                  MR. POTTER:   Objection.

10     A.   I don't ride the same bus with him.

11     Q.   So when you finished skiing you took off

12  your skis, correct?

13     A.   Yes.

14     Q.   And you went back to your bus?

15     A.   Yes.

16     Q.   When you arrived at your bus did you hear

17  anyone discussing Yukio's absence?

18     A.   No.

19     Q.   Did you have any further conversation about

20  Yukio's absence between that time when you arrived

21  at the bus until the time you arrived back at the

22  school?

23                  MR. POTTER:   Objection.

24     A.   No.

Page 94

1      A.   No.

2      Q.   Was it icy?

3      A.   I remember it was a cold day and it wasn't

4  as bright as other trails, especially compared to

5  the competition trail, I believe.  That's all I

6  remember.  I don't remember if it's icy or not.

7      Q.   Did Yukio say anything to you on the

8  evening of February 20, 2004, about any difficulty

9  he was having with his equipment?

10     A.   I remember him telling me that several

11 times he had a little difficulty stopping; stopping

12 the skis, but that's about all I remember.

13     Q.   On the occasions on September 20, 2004,

14 when Yukio mentioned to you that he was having some

15 trouble stopping, what, if anything, did you say to

16 him?

17                 MR. MONGUE:  That's February 20.

18                 MR. GLUCK:  What did I say?

19                 MR. MONGUE:  September.

20     Q.   Let me rephrase the question.  On February

21 20, 2004, on the occasions when Yukio told you that

22 he was having difficulty stopping, what, if

23 anything, did you say to him?

24     A.   I told him to go slow and just be careful

Page 110

1    Q.   Were any of the students that you knew from

2  Northfield Mount Herman that you knew, were any of

3  them wearing helmets?

4    A.   Yes.

5    Q.   Were any of them just wearing a ski hat?

6    A.   Ski hat?

7    Q.   Yes.   Were any of them just wearing a ski

8  hat?

9    A.   Yes.

10    Q.   Were any of them without either a ski hat

11  or a helmet?

12    A.   On that day specifically?

13    Q.   On that day, if you recall.

14    A.   On that day, no.   It was a cold night.

15    Q.   So they either had a helmet or a ski hat

16  on, is that correct?

17    A.   Yes.

18    Q.   To your observation?

19    A.   Can you say that again?

20    Q.   From what you could see?

21    A.   Yes.

22    Q.   Now, there were other schools that skied at

23  Berkshire East, correct?

24    A.   Yes.

1   you pronounce his name?

2        A.   Yes.

3        Q.   Do you know if Yukio was in the ski program

4   the prior year?

5        A.   Prior?

6        Q.   Do you know what I mean by that?

7        A.   No.

8        Q.   Yukio was in the ski program at Mount

9   Herman in the 2003, 2004 school year?

10       A.   Yes.

11       Q.   The year before was he in the ski program

12   at that time?

13       A.   No.

14       Q.   When did Yukio first come to this school;

15   was it that year, the 2003, 2004 year?

16       A.   No.  It's either 2002 to 2003 or 2001 to

17   2002.

18       Q.   Do you believe, based upon what you know,

19   that it was Yukio's first year in the ski program?

20       A.   Yes.

21       Q.   Do you know if he took any lessons at

22   Berkshire East?

23       A.   I'm not sure.

24       Q.   Do you know if Yukio had skied before going

Page 113

1    to Berkshire East for the very first time?

2         A.   No.

3         Q.   You don't know or he had not?

4         A.   He had not skied.

5         Q.   He had never skied?

6         A.   No.

7         Q.   Is that something he had told you?

8         A.   Yes.  He told me that it was his first

9    year.

10        Q.   The first time he went to Berkshire East,

11   did he have his own equipment with him?

12        A.   No.

13        Q.   Do you know where he got the equipment?

14   Was it from another student or did he rent it from

15   the ski area?

16        A.   He rented it.

17        Q.   He rented it from Berkshire East?

18        A.   Yes.

19        Q.   And on other occasions that year did he

20   also rent equipment at Berkshire East?

21        A.   Do you mean any of the equipment or all of

22   the equipment?

23        Q.   I take it -- I understand Yukio did not

24   have his own skis.  Did he on other occasions other

Page 116

1   trail and want to stop quickly?  Describe for me

2   what you do.

3       A.   Turn and put the weight on the -- put the

4   weight on the front of the legs and to the

5   mountainside.

6       Q.   You turn both skis together?

7       A.   Yes.

8       Q.   And kind of skid to a stop that way?

9       A.   Yes.

10      Q.   Was Yukio able to do that on February 20?

11      A.   Yes.

12      Q.   Do you know what parallel skiing is?

13      A.   Yes.

14      Q.   Was he skiing in a parallel manner as of

15  February 20 or was he still in what they call a

16  pizza or in a wedge?

17      A.   In between.

18      Q.   In between that?

19      A.   Yes.

20      Q.   Were you trying to get him or teach him to

21  parallel ski?

22      A.   On that specific day?

23      Q.   Yes.

24      A.   No.  Since he told me he had a little

Page 117

1  difficulty stopping that day I didn't push him to do

2  something a little more difficult.

3      Q.  Do you know if the skis that he was using

4  that day, if he had used them on any other prior

5  occasion?

6      A.  I don't know.

7      Q.  Once you got to Berkshire East you could

8  ski on any trail that you wanted to ski on, correct?

9      A.  Yes.

10     Q.  The choice was yours as a skier, correct?

11     A.  Could you rephrase that?

12     Q.  You, as a skier, had the choice to ski on

13 any trail at Berkshire East?

14     A.  When I was with Yukio?

15     Q.  At any time.

16     A.  When I was by myself I could ski wherever I

17 wanted.  When I was with Yukio I talked to him and

18 listened to how he feels about this particular slope

19 and it was up to me and him.

20     Q.  Did you ever talk to Yukio about skiing on

21 Big Chief trail?

22     A.  Yes.

23     Q.  Was that a trail that he felt comfortable

24 skiing on?

Page 118

1        A.  Yes.

2        Q.  I think you indicated in response to a

3    question asked a few minutes ago that you skied with

4    Yukio about -- more than five times on Big Chief

5    trail?

6        A.  Yes.

7        Q.  Did you ski on Big Chief with Yukio every

8    time you went to Berkshire East?

9        A.  Yes.

10       Q.  Was that one of your favorite trails?

11       A.  Yes.

12       Q.  A lot of students ski that trail, don't

13   they?

14       A.  Yes.

15       Q.  When you went to Berkshire East did you

16   usually ski Big Chief more than one time?

17       A.  Yes.

18       Q.  Many times?

19       A.  Many as in?

20       Q.  Four, five times?

21       A.  Two, three times.

22       Q.  So if you were skiing with Yukio eight to

23   nine times and you skied Big Chief two or three

24   times, we're talking about skiing Big Chief,

1   skiing if you had known at that time that Yukio had

2   skied off the trail?

3       A.   I didn't know.

4       Q.   You didn't know?

5       A.   No.

6       Q.   And as far as you know, nobody knew, isn't

7   that correct?

8       A.   Yes.

9                MR. POTTER:  No further questions.

10              MR. MONGUE:  I have nothing

11  further.

12            FURTHER DIRECT EXAMINATION

13  BY MR. GLUCK:

14       Q.  Just one more.  When you say it was an hour

15  and a half to two hours after you spoke to Audra

16  that you went out and skied, that's your best

17  estimate?

18              MR. POTTER:  Objection.  You can

19  answer, but I don't think that's what you said.

20              MR. GLUCK:  You actually misstated

21  it.

22              MR. POTTER:  I may have misstated

23  it.

24       Q.  When you testified that it was another hour

1   and a half to two hours that you continued skiing

2   after you told Audra that Yukio was missing, that is

3   your best estimate, is that correct?

4                    MR. POTTER:   Objection.

5        A.   Maybe it was close to an hour and a half.

6                    MR. GLUCK:   Thank you very much.

7                    (Deposition concluded at 4:19

8   p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

APPENDIX 7

Page 1

Volume I, Pgs. 1-65
COMMONWEALTH OF MASSACHUSETTS
Federal Court
No. 05-30043-MAP

------------------------------

YUKIO KUSADA,                     )
Plaintiff                         )
v.                                )
BERKSHIRE EAST SKI RESORT,        )
UNION TERMINAL PIERS, INC.,       )
AND NORTHFIELD                    )
MOUNT HERMAN SCHOOL,              )
Defendant and Third Party         )
Defendant                         )
v.                                )
TAKERU KUSADA                     )
Third Party Defendant             )

------------------------------

DEPOSITION OF AUDRA FORSTRUM

Wednesday, July 27, 2005

10:34 a.m.

Northfield Mount Herman School

206 Main Street

Northfield, Massachusetts 01360

- - - - - - Terri Clarno - - - - - -

FLYNN REPORTING ASSOCIATES

Professional Court Reporters

One Exchange Place

Worcester, Massachusetts 01608

(508) 755-1303   *   (617) 536-2727

TOLL FREE: (888) 244-8858
FAX:   (508) 752-4611

Page 4

1                          STIPULATIONS

2                          It is stipulated by and between

3   counsel for the respective parties that the

4   deposition transcript will be read and signed by the

5   deponent within thirty (30) days of receipt of

6   transcript under the pains and penalties of perjury.

7   The filing and the notarization are hereby waived.

8                          It is further agreed that all

9   objections, except as to the form of the question

10  and motions to strike, are reserved until the time

11  of trial.

12                      AUDRA FORSTRUM, sworn.

13                      MR. GLUCK:  As far as stipulation

14  are concerned, the usual fine?

15                      MR. POTTER:  I'll put it on the

16  record.  Counsel agree that all objections except as

17  to form of the questions and motions to strike will

18  be reserved until the time of trial.  The witness

19  will have 30 days to read and sign the deposition.

20  We'll waive the notarization and sealing of the

21  deposition.

22                      MR. GLUCK:  Would you please state

23  your full name?

24                      THE WITNESS:  Audra Lynn Forstrum.

1              MR. GLUCK:  Would you please spell

2    that?

3              THE WITNESS:  A-U-D-R-A, L-Y-N-N,

4    F-O-R-S-T-R-O-M.

5              MR. GLUCK:  Ms. Forstrum, my name

6    is Ron Gluck and I represent Yukio Kusada in

7    connection with injuries he suffered on February 20,

8    2004.  A lawsuit has been filed and I've asked you

9    to come here today to answer some questions.

10             There's some ground rules; if you don't

11   understand any question that I ask you, please ask

12   me to rephrase it, I'll be happy to do so.  I just

13   want to get your answers to questions that you do

14   understand.  If you answer a question I'll assume

15   that you've understood the question, okay?

16             THE WITNESS:  Yes.

17             MR. GLUCK:  The stenographer must

18   listen to what we both say and take down what we

19   both say so we have to speak at separate times,

20   okay, so please let me ask my question and I'll let

21   you answer your question.  If you need to take a

22   break at any time please let me know, I'll be happy

23   to accommodate you.  All of your answers must be

24   verbal as the stenographer can't take down nods of

1    the head, okay?

2                        THE WITNESS:   Yes.

3                    DIRECT EXAMINATION

4    BY MR. GLUCK:

5        Q.   Where do you live?

6        A.   Northfield, Massachusetts.

7        Q.   And your address, please?

8        A.   Mailing address?

9        Q.   Mailing, whatever, address.

10       A.   206 Main Street.

11       Q.   That's in Northfield?

12       A.   In Northfield.

13       Q.   How long have you lived there?

14       A.   I'm going on my fifth year.

15       Q.   Is that the address of the school, by

16   chance?

17       A.   Yes.

18       Q.   So you live at the school?

19       A.   Yes.

20       Q.   What's your date of birth?

21       A.   December 4, 1978.

22       Q.   And your Social Security number?

23       A.   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.

24       Q.   Just get some educational background; did

1   you graduate from high school?

2        A.   Yes.

3        Q.   What year and what school?

4        A.   Lincoln Academy, 1996.

5        Q.   Where is that?

6        A.   New Castle, Maine.

7        Q.   Did you go onto college?

8        A.   Yes.

9        Q.   Where?

10       A.   Dickinson College.

11       Q.   That's in Pennsylvania?

12       A.   Yes.

13       Q.   When did you graduate?

14       A.   Pardon?

15       Q.   When did you graduate?

16       A.   2000.

17       Q.   With what degree?

18       A.   Mathematics, BS in mathematics.

19       Q.   Have you had any education beyond that?

20       A.   No.

21       Q.   Starting in 2000, please give me your

22   employment.

23       A.   I worked with Guardian Savings Bank until

24   the summer of 2001.

Page 8

1      Q.   Where is that?

2      A.   That was in -- based out of Houston, but I

3  worked in Sudbury.

4      Q.   Sudbury, Mass.?

5      A.   Yes.  I think since then they've changed

6  their name and possibly gone out of business.  I'm

7  not sure.

8      Q.   What did you do there?

9      A.   It was a bank so I worked as a teller,

10  savings counselor.

11      Q.   Why did you leave the bank?

12      A.   I didn't enjoy the bank environment.

13      Q.   Where did you work next?

14      A.   Northfield Mount Herman.

15      Q.   When did you begin employment at Northfield

16  Mount Herman?

17      A.   Late August 2001, I guess.

18      Q.   In what capacity at that time?

19      A.   As a math teacher.

20      Q.   Was there anything else?

21      A.   I mean, I worked as a coach.  I mean, it's

22  a boarding school; I lived in the dorm, I coached --

23  assistant coached junior soccer team, girl's junior

24  soccer team, and assistant coach to the varsity

1  sure kids behaved, and then taking attendance and

2  then making sure they were out skiing during the

3  time.  There were other chaperones that really took

4  care of stuff.  After that we got stuff that we

5  handed and talked about to the kids the year that I

6  was head chaperon with Richard.

7    Q.  Would that have been the first time in

8  2002, 2003?

9    A.  I believe 2003 -- no, I'm sorry.  So I was

10  -- I'm trying to think.  So in 2004 I didn't do

11  anything so it must have been in 2003 was when I was

12  head chaperon with Richard and the two years prior

13  to that.

14    Q.  When you say "2003," do you mean to say --

15  let's say December 2003?

16    A.  Yes, 2003 into 2004.

17    Q.  And you were head chaperon during that

18  season?

19    A.  Yes.

20    Q.  What materials were you given by the

21  school?

22    A.  I don't really remember.  Most of it was

23  the permission slips that kids were sent home, stuff

24  like that.  I mean, it was just the forms that the

1  kids were sent, I believe, that was handed to me.

2      Q.  Were there any materials that were not

3  given to the kids that were given to you by the

4  school?

5      A.  I don't think so, no.

6      Q.  When you began as a chaperon in the ski

7  program, did you receive any training whatever from

8  the school itself?

9      A.  No.

10      Q.  What was your understanding of what your

11  duties and responsibilities were during that first

12  season that you acted as a chaperon?

13      A.  Before I was a head chaperon?

14      Q.  Yes.

15      A.  It was to ride the bus with students,

16  taking attendance as they came on, making sure they

17  behaved on the bus; and then while I was at the

18  mountain it was to walk around in the lodge, make

19  sure they were out participating in the class by

20  skiing or snowboarding, and also just snowboarding

21  myself, and then taking attendance as they got back

22  onto the bus for the way home.

23      Q.  Did those duties and responsibilities

24  change the following year; and by that I mean the

1  2003, 2004 ski season?

2       A.   When I was head chaperon?

3       Q.   When you became head chaperon.

4       A.   Yes.   When I went along with the other head

5  chaperon I had to account for everybody's attendance

6  taking and deal with the grades for the students.   I

7  helped with the meetings.   At the beginning of the

8  year we had two short meetings with the students,

9  one on each campus.   I did one of them.   And then

10  just kind of making -- more in charge of just the

11  overall making sure students are doing what they're

12  supposed to be doing.

13       Q.   And what do you mean by that?

14       A.   Making sure that they're out skiing,

15  they're not just sitting in the lodge.   Making sure

16  that they're attending class.

17       Q.   Prior to coming to Northfield Mount Herman

18  had you ever received any training in relation to

19  the operation of a ski program?

20       A.   No.

21       Q.   As we sit here today, have you ever had any

22  training with respect to the operation of the ski

23  program?

24       A.   No.

Page 18

1    snowboarding.

2        Q.   What is your understanding of what Mr.

3    Eisenberg's level of training was to operate a ski

4    program?

5        A.   I don't know.  You'd have to ask him.

6        Q.   Had you ever skied with Yukio Kusada prior

7    to February 20, 2004?

8        A.   No.

9        Q.   Prior to the time that Mr. Kusada suffered

10   his injuries, what was your understanding of what

11   kind of skis he was using?

12       A.   I didn't know.

13       Q.   Prior to his accident, what was your level

14   of understanding of what kind of boots he was

15   wearing?

16       A.   I didn't know.

17       Q.   Prior to his accident, what was your

18   understanding of whether or not he was using a

19   helmet on February 20, 2004?

20       A.   I don't know whether he was or not.

21       Q.   When you skiboarded on February -- strike

22   that.  Did you go skiboarding on February 20, 2004?

23       A.   I don't remember if I went snowboarding or

24   not.

Page 20

1   helmet with your mom?

2       A.   I couldn't tell you.  When I started

3   snowboarding, probably.

4       Q.   Were there any reasons, other than your mom

5   wanting you to wear one, that you wore a helmet?

6       A.   I just thought it was safer.

7       Q.   In what respect?

8       A.   In case I fell I had something protecting

9   my head.

10      Q.   What was your level of understanding prior

11  to Mr. Kusada's accident about his level of skiing

12  ability?

13      A.   I probably I was unaware of his level of

14  skiing.

15      Q.   Had you ever seen him ski?

16      A.   No.

17      Q.   Had you ever discussed the recreational ski

18  program with Yukio Kusada prior to this accident?

19      A.   Not that I remember.

20      Q.   What was your understanding prior to his

21  accident about where he got his skis?

22      A.   I never spoke with him about that.

23      Q.   What was your level -- strike that.  What

24  was your understanding of what trails he skied at

Page 21

1    Berkshire East when he went skiing with the

2    recreational ski program?

3        A.   I'm unaware of what trails he skied.

4        Q.   Had any employee of Northfield Mount Herman

5    ever discussed with you the issue of students

6    wearing helmets when they were participating in the

7    recreational ski program?

8        A.   No.

9        Q.   Prior to Mr. Kusada's accident had you ever

10   discussed with any of the participants in the

11   recreational ski program their use of helmets?

12       A.   I think a student borrowed my helmet once.

13   I mean, if that's what you mean.  We discussed in a

14   way I knew certain kids wore them.  I couldn't tell

15   you who did, but a student borrowed my helmet once.

16       Q.   Is that the full extent of your

17   communication with any student about the use of a

18   helmet?

19       A.   Yes.

20       Q.   When you snowboarded at Berkshire East

21   during the 2003, 2004 ski season, what trails did

22   you ski or snowboard?

23       A.   I'm not sure I remember all their names.

24       Q.   Do your best.

1    A.   I think there was one, Big Chief; I went on

2    that.   One called Outback.   I don't remember the

3    other names.

4    Q.   During the 2003, 2004 ski season, was there

5    any kind of a buddy system that you're aware of that

6    encouraged or required students to ski together?

7    A.   No.

8    Q.   Is there such a system today, as far as you

9    know?

10    A.   Not that I know of.

11    Q.   Prior to Mr. Kusada's accident had you ever

12    received any materials from the school that related

13    to night skiing?

14    A.   Not that I remember.

15    Q.   Had you ever discussed with any of the

16    students participating in the ski program in 2003,

17    2004 any issues that were particularly relevant to

18    night skiing?

19    A.   I don't remember.

20    Q.   Had you ever discussed any issues related

21    to night skiing with Yukio Kusada prior to his

22    accident?

23    A.   No.

24    Q.   Prior to February 20, 2004, when you were

Page 23

1    acting as a chaperon, had you ever been notified

2    that any skier hadn't been seen for awhile?

3        A.   From their friend?

4        Q.   From any source.

5        A.   All the time.

6        Q.   Did you have a practice, policy, or

7    procedure of what you would do if that happened

8    prior to February 20, 2004?

9        A.   There was no procedure, no.

10       Q.   Did you have a personal practice, policy,

11   or procedure about what you would do when given that

12   information?

13       A.   No.  I would just talk with the student and

14   make sure that they showed up at the bus at the end

15   of the night when we were going home -- or

16   afternoon.

17       Q.   Were you acting as a head chaperon on

18   February 20, 2004?

19       A.   Yes.

20       Q.   And you took a bus with students to

21   Berkshire East?

22       A.   That night I drove my own car.

23       Q.   Did any students ride in the car with you?

24       A.   No.

1    one bus when back, which was the one that had Yuki

2    on it.

3        Q.  At approximately what time were you asked

4    by the dean to make that inquiry of Yuki?

5        A.  The first time that I called back, I would

6    guess around 10:30, but I'm not positive on the

7    time.

8        Q.  So your best memory is that you were

9    sitting in the lodge and that Yuki approached you,

10   correct?

11       A.  Yes.

12       Q.  And he asked you if you knew where Yukio

13   was, correct?

14               MR. POTTER:  Objection.

15       Q.  Is that correct?

16               MR. POTTER:  Objection.

17       A.  Yes.

18       Q.  And what did you say?

19       A.  No.

20       Q.  Was there any further conversation with

21   Yuki Hasegawa at that time?

22       A.  I don't remember.

23       Q.  Did you ask him why he was asking that

24   question?

1    took place at that time?

2        A.    I remember checking both buses.    I don't

3    remember what order.    I remember the Northfield bus

4    was full, they had everybody there so I took the

5    attendance sheet and they went back to Northfield;

6    and then checking the Mount Herman bus and finding

7    that eventually they were missing just Yukio.    I

8    don't remember if there were other students late or

9    not.

10        Q.    When you learned that Yukio was not on the

11    Mount Herman bus -- was Yuki on that bus at that

12    time?

13        A.    Yuki was on the other bus.

14        Q.    Was there any way to communicate between

15    the buses?

16        A.    Not that I know of.

17        Q.    At the time that you learn that Yukio was

18    not on the Mount Herman bus, what did you do?

19        A.    I obviously told them to stay there until I

20    came back.    I went back up toward the mountain, I

21    stopped at the first-aid tent to see if they had

22    anybody there that had maybe fallen or had anybody

23    and informed them that we were missing a student at

24    the bus.

Page 46

1  Mount Herman School?

2      A.  Not that I know of.

3      Q.  Was it a requirement -- strike that.  Was

4  it an offering of the recreational ski program that

5  year that the student could take ski lessons at

6  Berkshire East?

7      A.  It was an offering, yes.

8      Q.  Do you know whether Yukio Kusada

9  participated in any of those instructions?

10      A.  I do not know.

11      Q.  Who was responsible for sending out the

12  permission slips to the parents?

13      A.  I don't know.  Not me.  I don't know who

14  did it.

15      Q.  Do you know if, in 2003, 2004, Northfield

16  Mount Herman School offered any instruction in any

17  of the PE courses?

18      A.  I don't know what or if any instruction was

19  given in any of the PE courses, no.

20      Q.  Was there any requirement in the

21  recreational ski, snowboarding course that the

22  students demonstrate any minimum level of ability

23  before they would be permitted to be on the

24  mountain?

1    A.  I don't know.  It may have been when I

2    spoke to the dean here.  They might have told me.

3    I'm not sure where I heard that from.

4    Q.  With regard to the recreational ski program

5    operated by the school, was Berkshire East in any

6    way involved in the supervision of the students

7    while they were out on the mountain skiing?

8    A.  Not anymore than they were with the

9    supervision of everybody on the mountain.

10    Q.  Did some of the students from the school

11    enroll in the ski school program operated at

12    Berkshire East?

13    A.  I don't think so.  We tried to set times up

14    and we had trouble getting times set with them.

15    Q.  Are you saying you had trouble getting

16    times that coincided?

17    A.  When it first happened I was not informed

18    that it was -- I was under the impression that they

19    had set up --  that the school had set up lessons.

20    They didn't.  And so when I spoke with the ski

21    school -- I don't remember who the man was that I

22    talked with -- we tried to set some times up and I

23    spoke with him on the phone, but then when I went

24    back and I mentioned it to whoever was there he

Page 54

1    wasn't there anymore and nobody had known that they

2    were -- that we had even talked.

3        Q.   So is the bottom line answer that you're

4    not aware of any of the students that were involved

5    in the ski school program operated at Berkshire

6    East?

7        A.   Right.

8        Q.   Was this recreational ski program a

9    physical education class, was it considered that?

10       A.   Yes.  A physical education class.

11       Q.   Is that why you, for example, would go

12   through the lodge and make sure the students were

13   out on the mountain?

14       A.   Exactly.

15       Q.   You've indicated here this morning that you

16   were at the mountain that entire evening and

17   throughout the morning hours, is that correct?

18       A.   Yes.

19       Q.   Were there a number of individuals involved

20   in the search?

21       A.   Yes.

22       Q.   Did you see these people -- would they come

23   back to the first-aid station?

24       A.   Some of them would come back to the

APPENDIX 8

Page 1

Volume I, Pgs. 1-75
COMMONWEALTH OF MASSACHUSETTS
Federal Court
No. 05-30043-MAP

---------------------------

YUKIO KUSADA,                    )
Plaintiff                        )
v.                               )
BERKSHIRE EAST SKI RESORT,       )
UNION TERMINAL PIERS, INC.,      )
AND NORTHFIELD                   )
MOUNT HERMAN SCHOOL,             )
Defendant and Third Party        )
Defendant                        )
v.                               )
TAKERU KUSADA                    )
Third Party Defendant            )
---------------------------

DEPOSITION OF RICHARD EISENBERG

Wednesday, July 27, 2005

12:32 p.m.

Northfield Mount Herman School

206 Main Street

Northfield, Massachusetts 01360

- - - - - - Terri Clarno - - - - - -

FLYNN REPORTING ASSOCIATES

Professional Court Reporters

One Exchange Place

Worcester, Massachusetts 01608

(508) 755-1303  * (617) 536-2727

TOLL FREE: (888) 244-8858
FAX:  (508) 752-4611

Page 9

1      Q.   When was the first time that you became

2   affiliated with that program?

3      A.   I received a note in the mail during the

4   summer of 2003 saying that I was going to be working

5   with the program.

6      Q.   Had you requested that?

7      A.   I don't recall whether I specifically

8   requested it, but I know that I made it clear that I

9   enjoyed skiing and would like to do that in the

10  course of my work here.

11     Q.   What were you informed your duties and

12  responsibilities would be as a participant in that

13  ski program?

14     A.   What was the question; when or what?

15     Q.   What.

16     A.   Okay.   Essentially ensuring attendance and

17  participation.

18     Q.   Have you ever had any formal training in

19  operating a ski program?

20     A.   No.

21     Q.   Have you ever read any materials related to

22  the operation of a ski program?

23     A.   No.

24     Q.   Have you received any training from any

1    what were you told your title would be?

2        A.   Wasn't given a title.  Wasn't anything of

3    that sort.

4        Q.   Would it be faculty representative or

5    chaperon, something like that?

6        A.   Sure.

7        Q.   Any of those would seem to apply?

8        A.   Yes.

9        Q.   What were you told your responsibilities

10   would be?

11       A.   To alternately drive to the mountain and

12   ride the bus to the mountain with the students.

13   Audra, the other chaperon, would drive the days that

14   I wasn't driving.

15            And when I'm on the bus to take attendance

16   and on the bus ride home to make sure that every

17   student who had gone to the mountain was returning

18   home from the mountain and when at the mountain to

19   periodically -- we always had to have a

20   representative of the school in the ski lodge at all

21   times and when -- sometimes I would be in there,

22   sometimes Audra would be in there, sometimes the

23   third chaperon would be in there -- and when we were

24   in there if you saw an NMH student spending more

1   than 20 minutes or so taking a break, we would

2   encourage them to go back outside and continue

3   skiing.

4         If a student were to hurt themselves, then

5   the person who drove would be responsible for taking

6   them to the hospital if the ski patrol recommended

7   that course of action.

8         Q.  Anything else?

9         A.  To ensure upholding of all of the NMH rules

10  as we saw them.  The second floor of the lodge was

11  off limits, to make sure the kids didn't go up

12  there, and if we saw any inappropriate behavior in

13  our course of skiing or in the lodge to confront it.

14  That was it.

15        Q.  Prior to February 20, 2004, did you know

16  Yukio Kusada?

17        A.  My only encounter with him was one day when

18  he was late for the bus.  So at that time I knew

19  him, I knew his face, but that was about it.  He

20  showed up late and because of that I can remember

21  him, but that was my only interaction with him.

22        Q.  Tell me anything you can remember about

23  that particular account.

24        A.  I'm stickler for timeliness.  He was

1      Q.   Prior to February 20, 2004, did you know

2    anything about Yukio Kusada's level of skiing

3    ability?

4      A.   No.

5      Q.   Did you know anything about the types of

6    skis he was using in the program?

7      A.   No.

8      Q.   Did you know anything about the types of

9    boots he was using in the program?

10     A.   No.

11     Q.   Did you know whether or not he was a person

12   who used a helmet?

13     A.   No.

14     Q.   On February 20, 2004, same questions,

15   essentially.  Do you know what types of skis he used

16   on that day?

17     A.   No.

18     Q.   Do you know whether or not he used a

19   helmet?

20     A.   No.

21     Q.   Do you know what kind of boots he was

22   using?

23     A.   No.   These questions, you're saying "do you

24   know."  Since the accident because of this case I've

Page 18

1    learned some things.  I don't know.  Does that

2    apply?

3        Q.  Fair enough.  That's a good question.

4    Right now I'm asking you on February 20, 2004, did

5    you know on that day?

6        A.  No, I didn't know.

7        Q.  What type of skis he was using?

8        A.  No.

9        Q.  What type of boots he was using?

10       A.  No.

11       Q.  Whether or not he was using a helmet?

12       A.  No.

13       Q.  What his level of skiing ability was?

14       A.  No.

15       Q.  Since that time you've learned some of

16   these things?

17       A.  Yes.

18       Q.  Prior to February 20, 2004, were you aware

19   of any practice, policy, or procedure of the

20   Northfield Mount Herman School that you were to

21   implement that related to any actions you were to

22   take if you were in the lodge and informed that a

23   student skier was missing?

24       A.  No.

Page 25

1    Q.   On February 20, 2004, was there any buddy

2    program that existed within the recreational ski

3    program?

4         A.   No.

5         Q.   Do you know what a buddy program is?

6         A.   Yes.

7         Q.   What is it?

8         A.   It's when participants in the program are

9    assigned or choose someone to stay with and who

10   they're responsible for making sure is with them.

11        Q.   Had there been any discussions, as far as

12   you're aware on or before February 20, 2004, about

13   implementing a buddy program?

14        A.   None that I'm aware of.

15        Q.   Did you ever provide any instruction to any

16   of the participants in the ski program in the 2003,

17   2004 ski year?

18        A.   Yes.

19        Q.   To whom?

20                  MR. POTTER:  Are you talking ski

21   instruction, Ron?

22                  MR. GLUCK:  Yes.

23        A.   I don't recall.  Some beginner skiers who

24   had not skied before.

Page 26

1    Q.  And that instruction was provided by you at

2  Berkshire East?

3    A.  Yes.

4    Q.  Was Mr. Kusada one of the students to whom

5  you provided instruction?

6    A.  No.

7    Q.  How did it come about that you gave

8  instruction to these students?

9    A.  There were supposed to be ski lessons

10  provided.  I forget on which day, either every

11  Wednesday or every Friday, I forget which, though,

12  and some students had signed up for those.  For

13  reasons I'm not aware of they didn't start for a few

14  weeks.  On the very first day of the program there

15  were a number of kids who knew nothing about skiing

16  so I gave them the very basics to help them get

17  started and make sure that they would do something

18  productive that day.

19    Q.  How many students received instruction from

20  you?

21    A.  Less than five.

22    Q.  How were they selected?

23           MR. POTTER:  Objection.

24    A.  I can't recall exactly.

1    Q.   Just try to exhaust your memory a little

2    bit.  Do you recall whether or not you happened to

3    see them standing outside the lodge and could tell

4    that these people didn't know how to ski and you

5    went over to them and said, Hey, let me show you.

6    A.   That's possible.  I may have asked anyone

7    who was interested to come over and I can show you

8    how to ski.  I don't remember beyond that.

9    Q.   You mentioned that there were supposed to

10   be some ski lessons.  What do you base that on?

11   A.   I don't remember how I learned that.  It

12   was either Audra mentioned it to me at some point or

13   Mike Atkins mentioned it to me or it was on some

14   document somewhere.  I don't remember how I learned

15   that, but I'm sure that I knew that.

16   Q.   Who, from Northfield Mount Herman School,

17   was it that was to provide these ski lessons?

18                   MR. POTTER:  Objection.

19   A.   No one from Northfield Mount Herman School.

20   Q.   From what other entity were the lessons to

21   be provided?

22                   MR. POTTER:  Objection.

23   A.   From Berkshire East.

24   Q.   Do you know if any students from Northfield

1    A.    No.

2    Q.    Did anyone from Northfield Mount Herman

3    School to your knowledge ever inspect the equipment

4    that students participating in the program were

5    using while in the program?

6    A.    No.

7    Q.    Did anyone from Northfield Mount Herman

8    School ever supervise the actual skiing done by

9    participants of the program during the 2003, 2004

10   season?

11   A.    That depends on what you mean by

12   "supervise."  On occasions I would be skiing with

13   students.

14   Q.    Did you ever ski with Yukio Kusada?

15   A.    Not to my knowledge.

16   Q.    Did you ever discuss skiing with Yukio

17   Kusada?

18   A.    No.

19   Q.    Have you ever received instruction on how

20   to instruct skiers?

21   A.    No.

22   Q.    Have you ever been on a ski patrol?

23   A.    No.

24   Q.    When was the first time that you learned

1  Q. Anything else?

2  A. No.

3  Q. Do you believe that that was adequate

4  instruction?

5                    MR. POTTER:  Objection.

6  A. Yes.

7  Q. Did the school provide any instruction

8  whatever to the students participating in the

9  recreational ski program about what equipment was

10  appropriate for them to be using given their level

11  of skiing ability?

12  A. No.

13  Q. Do you believe that that was appropriate?

14                    MR. POTTER:  Objection.

15  A. Yes.  I believe that it was appropriate

16  that we did not give them instruction.

17  Q. Why is that?

18  A. Beginner skiers would be getting equipment

19  from ski shops, which would make sure that the skis

20  are appropriately sized and set for those skiers and

21  advanced skiers know how to do the same and -- or --

22  I should correct that -- know about settings and

23  about ski sizes and would have had, we believed,

24  appropriate skis.

1    A.  I'm not sure.

2    Q.  Was there a sign-up list for those lessons?

3    A.  I don't remember how it was managed.

4    Q.  Do you know if Yukio Kusada had signed up

5  for any lessons at Berkshire East?

6    A.  I don't know.

7                MR. MONGUE:  Thank you.  That's

8  all I have.

9                REDIRECT EXAMINATION

10  BY MR. GLUCK:

11    Q.  I just want to ask a few additional

12  questions.  You mentioned earlier that -- I think

13  it was you.  Maybe it was Ms. Forstrum -- that

14  lessons had been discussed or arranged, but they

15  never actually happened for the first several weeks.

16  Why was that?

17                MR. POTTER:  Objection.

18    A.  I never got an answer to that.

19    Q.  Did you inquire?

20    A.  Casually.

21    Q.  To whom?

22    A.  Audra.

23    Q.  What did she tell you?

24    A.  That she wasn't sure.

APPENDIX 9

```
 1                                    Volume I
                                      Pages:  1-85
 2                                    Exhibits:  None.

 3            IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF MASSACHUSETTS
 4
      YUKIO KUSADA,
 5                        Plaintiff

 6            vs.                    C.A. No. 05-30043-MAP

 7      BERKSHIRE EAST SKI RESORT and
        UNION TERMINAL PIERS, INC.,
 8                        Defendants

 9            and

10      NORTHFIELD MOUNT HERMON SCHOOL,
                          Defendant and Third-
11                        Party Plaintiff
              vs.
12
        TAKERU KUSADA,
13                        Third-Party Defendant

14            *    *    *    *    *    *    *    *

15        DEPOSITION of JOHN A. HERICK, JR., called as
      a witness by the Plaintiff, pursuant to the
16    applicable provisions of the Federal Rules of
      Civil Procedure, before Susan E. Lepore,
17    Registered Professional Reporter and Notary
      Public within and for the Commonwealth of
18    Massachusetts, taken at the Berkshire East Ski
      Resort, South River Road, Charlemont,
19    Massachusetts, on Wednesday, January 25, 2006,
      commencing at 11:05 a.m.

20
              ****************************
21            FLYNN REPORTING ASSOCIATES
              Professional Court Reporters
22               One Exchange Place
           Worcester, Massachusetts  01608
23         (508)755-1303  *  (617)536-2727
             TOLL FREE: (888)244-8858
24             Fax (508)752-4611
              ****************************
```

1      A.      No.

2      Q.      There's been testimony by Audra

3  Forstrom that there was difficulty arranging the

4  ski lessons here at Berkshire East in January of

5  2004.  Does that refresh your recollection?

6          MR. POTTER:  Objection.

7      A.      No.

8      Q.      As you sit here now, can you think of

9  any reason that she would have testified that

10  there was difficulty arranging ski lessons here

11  at Berkshire East in January of 2004?

12          MR. POTTER:  Objection.

13      A.      No, I can't think of why there would

14  have been an issue.  You know, unless there was

15  a busing issue and they were coming later than

16  they were slotted or something for it or -- you

17  know, I don't know.

18      Q.      In 2004, January, did Berkshire East

19  ski school have a protocol for what would take

20  place during the first lesson for a beginner?

21      A.      Can you explain what you mean by

22  "protocol?"

23      Q.      Was there any procedure that was in

24  place?

1    teaching them how to put on their skis?  Just

2    that one question at this time.

3         A.    It would vary, depending on the

4    student.

5         Q.    Okay.  Could you give me a range?

6         A.    If you're working -- no.  Yes,

7    somewhere between 30 seconds and 20 minutes.

8         Q.    Okay, fair enough.  And then how much

9    time would be spent, again with a range for that

10   beginner skier's first lesson, teaching them how

11   to walk in their skis?

12        A.    Could be 30 seconds to 20 minutes,

13   depending if they fell or not.

14        Q.    Okay.  All right.  And by the end of

15   the first lesson, generally speaking, what has

16   that first-time skier in the beginner lesson

17   been taught, other than how to put on their skis

18   and how to walk in their skis?  What else have

19   they been taught in that one hour?

20        A.    They would be taught how to take off

21   their skis.

22        Q.    Okay.

23        A.    How to get up when they fell, and

24   hopefully -- and, you know, also, basically how

1    to move around the slope, maybe, you know, some

2    basic turning and stopping.

3         Q.    Okay.  And where would that take

4    place?

5         A.    Right here.

6               (Witness indicating out window.)

7         Q.    Okay.  And this is, again, without

8    the use of any kind of a chair lift; is that

9    correct?

10        A.    Unless they were to that point

11   already, yes.

12        Q.    Okay.

13        A.    They would have to be able to not

14   only go down the hill, but also hike up the hill

15   a little bit and turn and stop, before they

16   would take a chair lift up anywhere.

17        Q.    Okay.  What kind of stopping methods

18   are the students taught on that very first

19   lesson?

20        A.    There's a few different methods.  One

21   would be just a parallel stop, like a hockey

22   stop; the other one would be what we call a

23   wedge or a snowplow, where you're separating

24   your skis out; and then I guess the third form

1   course of these lessons, does the Berkshire East

2   ski school teach their ski students how to stop

3   on skis?

4       A.    Yes.

5       Q.    All right.  And in the course of

6   lessons, does the Berkshire East ski school

7   teach the students how to control their speed?

8       A.    Yes.

9       Q.    And how is that done?

10      A.    Through turning, through stopping,

11  and through using the -- choosing the correct

12  trails.

13      Q.    Which was -- which brings me to my

14  next question.  In the course of ski lessons

15  here at Berkshire East, students are taught

16  about terrain selection; is that correct?

17      A.    Yes.

18      Q.    What are they taught about terrain

19  selection?

20      A.    They're, of course, taught never to

21  go above their ability level.  They're also

22  told, at the end of the lesson, you know, what

23  terrain they've been on and what terrain they

24  should be practicing on.

1      Q.     Why is it important for the students

2   to be taught not to ski above their ability

3   level?

4                MR. POTTER:  Objection.

5      Q.     Strike that.  Is it important for the

6   students to be taught not to ski above their

7   ability level?

8      A.     Yes.

9      Q.     Why?

10     A.     So that they're not injured or

11  scared, or put in an environment that they could

12  be in danger.

13     Q.     Is it important for th I students to

14  be taught which trail they've been on?

15               MR. POTTER:  Objection.

16     A.     Yes.

17     Q.     Why?

18     A.     So that they know what they've done,

19  and they know where they can go during their

20  free time.

21     Q.     Is it important for the students to

22  be taught which trails they should be practicing

23  on?

24               MR. POTTER:  Objection.

1          A.      Say that one more time?

2          Q.      Is it important for the students in

3     the ski lesson to be taught what trails they

4     should be practicing on?

5               MR. POTTER:  Objection.

6          A.      Yes.

7          Q.      Why is that?

8          A.      So that they know what terrain

9     they've done and where -- where they should be

10    working on their skills as skiers, and so

11    they're safe.

12         Q.      Do you recommend lessons for beginner

13    skiers?

14         A.      Yes.

15         Q.      Why?

16         A.      So that they learn correctly.

17         Q.      Is it important for them to learn

18    correctly?

19               MR. POTTER:  Objection.

20         Q.      In your opinion.

21               MR. POTTER:  Objection.

22         A.      Yes.

23         Q.      Why?

24         A.      So that when they do -- if they ever

1    and then of course around cold it's being safe,

2    you know, around cold, frostbite, stuff like

3    that.

4        Q.    What are the students taught, here in

5    the lessons here at Berkshire East, about icy

6    conditions at night?

7        A.    In the lessons we would go over how

8    to ski on ice, at a certain point in the

9    lessons, and how to avoid it, if possible.

10       Q.    What are they taught about how to

11   avoid the ice, if possible?

12       A.    Just how to, of course, stay under

13   control while you're skiing, and ski around it

14   if possible.

15       Q.    What are they taught, in the ski

16   lessons here at Berkshire East, about how to

17   stay under control?

18       A.    They would be taught how to control

19   their speed through turning and taking breaks.

20       Q.    What are they taught here at

21   Berkshire East, in the lessons, about how to

22   control their speed through turning?

23       A.    They're -- they would be taught, you

24   know, of course that they should be turning and

1          A.      To my knowledge, not really.

2          Q.      To your knowledge, does the PSIA

3    provide guidelines about how to instruct

4    students on turning?

5          A.      Yes.

6          Q.      Are you familiar with those

7    guidelines?

8          A.      Yes.

9          Q.      So consistent with those guidelines,

10   what are the students taught about turning here

11   at Berkshire East ski school?

12         A.      Similar techniques, of course.

13         Q.      In the beginner lessons, do the ski

14   instructors here at Berkshire East currently

15   look at the equipment that the student in the

16   lesson brings that first time?

17                 MR. POTTER:  Objection.

18         A.      Does the instructor look at the

19   student's equipment?

20         Q.      Yes.

21         A.      Of course.

22         Q.      Okay.  Is it -- strike that.

23                 In January of 2004, if a student were

24   in a beginner lesson at Berkshire East, would

```
 1     the instructor have looked at their equipment?

 2               MR. POTTER:  Objection.

 3          A.    Of course.

 4               MR. POTTER:  Objection.

 5          Q.    And why would the instructor have

 6     looked --

 7               MR. POTTER:  Objection.

 8          Q.    -- at the equipment?

 9          A.    To make sure, of course, that the

10     equipment was at the ability level of the

11     student; to make sure the equipment fit, the

12     boot and the ski; and to make sure that the

13     equipment the student had was designed for the

14     ability level of the student.

15          Q.    And if the student was in a lesson

16     here at Berkshire East in January of 2004 and

17     had equipment which the instructor believed was

18     not appropriate for their level of ability, what

19     was the instructor required to do under the

20     policies that were in place at the time?

21               MR. POTTER:  Objection.

22          A.    The student in a lesson?

23          Q.    Yes.

24          A.    Okay.  So they would probably have a
```

1   discussion with the chaperone about why they

2   were wearing certain equipment and -- and

3   depending on what the resolution was with the

4   chaperone from whichever school they were at,

5   the decision would be made whether they get

6   rental equipment from us our not.

7        Q.     Are you familiar with the Atomic

8   SX-11 ski?

9        A.     Yes.

10       Q.     What can you tell me about your

11  knowledge about that ski?

12       A.     It's an advanced level ski for an

13  advanced level skier.  It's a very -- a very

14  stiff ski.  It's a fast ski, made for -- for

15  racers.

16       Q.     If a student at the ski school here

17  at Berkshire East was a beginner, based on the

18  form that they filled out, and was in a lesson

19  here in January of 2004 and was using the SX-11

20  ski, based upon the policies you had in place

21  here, what would the instructor have done about

22  that?

23                 MR. MONGUE:  Objection.

24                 MR. POTTER:  Objection.

1    Q.    Go ahead.

2    A.    We would have discussed it with the

3  chaperone because the ski would, of course, be

4  a -- it's a very stiff ski, and for teaching

5  beginner lessons, a beginner would have trouble

6  turning with the ski and stopping because it's a

7  lot stiffer ski compared to a beginner ski,

8  which is a lot softer ski, more forgiving.

9    Q.    And in February of 2004, if the

10  student here at the Berkshire East ski school

11  was in a lesson and using the SX-11 and they

12  were a beginner skier, based on the form that

13  they had filled out, and based on the policy

14  that you had in place, what would the instructor

15  have done had the instructor seen that ski in a

16  lesson?

17            MR. POTTER:  Objection.

18            MR. MONGUE:  Objection.

19    A.    Probably would have done the same

20  thing that they would have done in January.

21    Q.    Which was, again, if you could repeat

22  it?

23            MR. POTTER:  Objection.

24    A.    Which was, again, you know,

1    intermediate slopes.

2         So then, of course, once you made it

3    through your beginner stages of skiing, you

4    would be able to stop at a -- at any moment,

5    under control; you would be able to turn and

6    avoid obstacles; you would be able to turn to

7    control your speed; you would be able to ride

8    the lifts competently by yourself, get on the

9    lift, get off the lift by yourself; and be ready

10   to practice on some intermediate terrain that

11   could be a little bit steeper or have some, you

12   know, different features to it.

13        Q.    And was it the practice, policy and

14   procedure of Berkshire East ski school, back in

15   January and February of 2004, for the

16   instructors to look for these progressions in

17   the students in their classes?

18        A.    Yes.

19        Q.    And is it based upon their

20   observations that they would make

21   recommendations to the students that were in the

22   classes?

23             MR. POTTER:   Objection.

24        A.    Yes.

1    Q.    Were the students in the ski class

2  here at Berkshire East, in January and February

3  of 2004, given anything in writing at the end of

4  the lessons, such as report card --

5    A.    No.

6    Q.    -- to show how they're doing?

7    A.    No.

8    Q.    But they were told verbally, at the

9  end of a lesson, what --

10    A.    Yes.

11    Q.    -- the instructor thought?

12    A.    Uh-hum.  Yes.

13    Q.    Could you describe the differences

14  between green, blue and black terrain here at

15  Berkshire East?

16    A.    Green terrain is trails that are --

17  that are beginner terrain; blue trails would be

18  intermediate terrain; and black trails would be

19  expert terrain.

20    Q.    And is it fair to say that the green

21  terrain is the one that would be recommended for

22  the beginner skiers?

23        MR. POTTER:  Objection.

24    A.    Yes.

1      Q.    Okay.  And are they taught about

2   equipment selection?

3      A.    Yes.

4      Q.    Are they taught that they should

5   choose equipment that's appropriate for their

6   level of skiing?

7      A.    Yes.

8      Q.    Are they taught about what they

9   should do if they subsequently find themselves

10  out on the mountain, but they're having trouble

11  stopping with the equipment they're using?

12             MR. POTTER:  Objection.

13     A.    Yes.

14     Q.    And are they taught that they should

15  come down to the bottom of the mountain and

16  address the equipment issue with people in the

17  rental shop?

18             MR. POTTER:  Objection.

19     A.    Yes.

20     Q.    And why are they taught that?

21             MR. POTTER:  Objection.

22     A.    So that they would be safe.

23     Q.    Are you familiar with the plaintiff,

24  Yukio Kusada?

1       A.     No.

2       Q.     Have you ever given him a ski lesson?

3       A.     No, not that I'm aware of.

4       Q.     Do you know if's he ever taken a ski

5  lesson here at Berkshire East?

6       A.     No.

7             MR. MONGUE:  No, you don't know?

8       A.     I do not know.

9       Q.     As part of the ski lessons for

10  beginners, do the instructors here at Berkshire

11  East teach the students, in the lesson, about

12  the Skier Responsibility Code?

13       A.     It will come up in discussion as part

14  of one of the beginner lessons.

15       Q.     What are they taught about the Skier

16  Responsibility Code?

17       A.     That they need to adhere to it.

18       Q.     And as a part of that, are they

19  taught about the importance of maintaining

20  control while they're skiing?

21       A.     Yes.

22       Q.     And they're given instruction on how

23  to control their speed; is that correct?

24       A.     Yes.

1      A.      That's correct.

2      Q.      Assume, if you will, that he came

3  here eleven times during that period, twice a

4  week during that period prior to February 20,

5  2004.  Were lessons available to him during that

6  period of time?

7              MR. GLUCK:  Objection.

8      Q.      As far as you know.

9      A.      As far as I know, lessons were

10  available for Northfield Mount Hermon at a given

11  time.

12      Q.      All right.  Do you have any -- well,

13  strike that.

14              Do you know whether any students from

15  Northfield Mount Hermon took any lessons that

16  year during January or February of 2004?

17      A.      I do not know of any, if any

18  Northfield Mount Hermon students took lessons in

19  2004, no.

20      Q.      You didn't witness the accident in

21  this case; is that correct?

22      A.      That's correct, I did not witness it.

23      Q.      Do you know of anybody who did

24  witness it?

1    for safety reasons.

2              MR. GLUCK:   That's all I have.

3                     EXAMINATION

4    BY MR. POTTER:

5         Q.    I just want to be clear on one point,

6    and that is:  If somebody has been here at the

7    mountain skiing on eleven different occasions,

8    or approximately ten or eleven different

9    occasions in one season, and has skied on a

10   variety of trails, let's just say intermediate

11   and beginner trails at the mountain, and you

12   have never seen that person ski, you have no

13   idea whether or not -- or, strike that -- you

14   have no idea where that skier lands in the

15   spectrum of skiers; is that correct?

16        A.    That is correct, I would not.  If

17   I've never seen the person ski, I would not know

18   where their ability level was.

19        Q.    And in your experience, if someone

20   has been here skiing ten or eleven times before

21   and has skied Green trails, Blue trails and even

22   a Black Diamond, that person has more

23   experience, in your experience, than somebody

24   who came here the first day and had never put on

1    a pair of skis; is that correct?

2         MR. GLUCK:  Objection.

3         A.    In my experience, that person would

4    have more experience than someone who's never

5    put on skis before.

6         Q.    All right.  And if -- assuming that

7    that person, during that month and a half, had

8    learned how to -- was sort of halfway between

9    parallel skiing and wedging, would it be your

10   opinion that that person had an ability to

11   control himself while skiing on Blue or Green

12   trails?

13        MR. GLUCK:  Objection.

14        A.    In my experience, if they were in a

15   wedge or a basic parallel, and halfway in

16   between there, it would be, in my experience,

17   that they would be on beginner terrain still.

18   It does not mean they wouldn't venture off to

19   intermediate stuff, but it's probably above

20   their ability level.

21        Q.    And do you see a lot of skiers, at

22   that level, skiing Big Chief?

23        A.    More than I would like.

24        Q.    But the mountain, so far as you know,

APPENDIX 10

Volume I, Pgs. 1-30

COMMONWEALTH OF MASSACHUSETTS

Federal Court

No. 05-30043-MAP

---------------------------

YUKIO KUSADA,                    )
Plaintiff                        )
v.                               )
BERKSHIRE EAST SKI RESORT,       )
UNION TERMINAL PIERS, INC.,      )
AND NORTHFIELD                   )
MOUNT HERMAN SCHOOL,             )
Defendant and Third Party        )
Defendant                        )
v.                               )
TAKERU KUSADA                    )
Third Party Defendant            )
---------------------------

DEPOSITION OF SAMUEL WILSON

Thursday, May 19, 2005

4:27 p.m.

Northfield Mount Herman School

206 Main Street

Northfield, Massachusetts 01360

- - - - - - Terri Clarno - - - - - -

FLYNN REPORTING ASSOCIATES

Professional Court Reporters

One Exchange Place

Worcester, Massachusetts 01608

(508) 755-1303   * (617) 536-2727

DUPLICATE  TOLL FREE: (888) 244-8858

FAX:  (508) 752-4611

1    Q.   When did you meet him?

2    A.   I met him my sophomore year here.  He was

3    in my dorm.  I'm trying to remember if this was my

4    sophomore or junior year here.

5    Q.   What year would that be?

6    A.   2002, 2003, one of those.  I don't remember

7    if he was in my dorm my sophomore year, but I

8    remember he was my junior year, last year.

9    Q.   Have you ever skied with him?

10   A.   No.

11   Q.   Have you ever seen him ski?

12   A.   No.

13   Q.   Did you ever lend him skis?

14   A.   Yes, I did.

15   Q.   On how many occasions?

16   A.   Once I gave them to him and he had them for

17   the time.

18   Q.   You still have those skis?

19   A.   Yes, I do.

20   Q.   Where are they?

21   A.   They're at my house in Beverly.

22   Q.   I'm going to ask you to please keep the

23   skis at your house in Beverly and I'm going to take

24   possession of them at some point in the course of

1    this case.  We'll get them back to you at some

2    point, but it's very important that nothing happen

3    to those skis and they be allowed to be examined.

4        A.   Sure.

5        Q.   Who was the manufacturer of those skis?

6        A.   Atomic.

7        Q.   What length were they?

8        A.   178; no, 170.

9        Q.   What model?

10       A.   Supercross 11, SX11.

11       Q.   How old are they today?

12       A.   They're three years old today.

13       Q.   If you could describe the type of ski they

14   are; would you say that they're a racing ski?

15       A.   It's an all-mountain ski made for anything.

16   You can use it for racing, you can use it for just

17   recreational skiing.

18       Q.   Are they, as far as you know -- are they

19   made for expert skiers?

20       A.   They're marketed for expert skiers, but

21   they're not necessarily made for them.

22       Q.   Did you ever lend Yukio Kusada boots, ski

23   boots?

24       A.   No, I did not.

APPENDIX 11

Page 1

Volume I, Pgs. 1-42
COMMONWEALTH OF MASSACHUSETTS
Federal Court
No. 05-30043-MAP

---------------------------

```
YUKIO KUSADA,                   )
Plaintiff                       )
                                )
v.                              )
BERKSHIRE EAST SKI RESORT,      )
UNION TERMINAL PIERS, INC.,     )
AND NORTHFIELD                  )
MOUNT HERMAN SCHOOL,            )
Defendant and Third Party       )
Defendant                       )
                                )
v.                              )
TAKERU KUSADA                   )
Third Party Defendant           )
```

---------------------------

DEPOSITION OF SUSAN CLOUGH

Wednesday, July 27, 2005

2:28 p.m.

Northfield Mount Herman School

206 Main Street

Northfield, Massachusetts 01360

- - - - - - Terri Clarno - - - - - -

FLYNN REPORTING ASSOCIATES

Professional Court Reporters

One Exchange Place

Worcester, Massachusetts 01608

(508) 755-1303  *  (617) 536-2727

TOLL FREE: (888) 244-8858
FAX:  (508) 752-4611

1    Q.   I'm sorry.  Did you chaperon on days when

2    you were not permitted to ski for free?

3    A.   No.

4    Q.   Were you given any instruction by the

5    Northfield Mount Herman School in how to properly

6    chaperon the recreational ski program?

7    A.   No.

8    Q.   Were you given any documents that detailed

9    your duties and responsibilities?

10   A.   No.

11   Q.   Did anyone ever discuss with you what you

12   should do as a chaperon?

13   A.   Yes.

14   Q.   Who was that?

15   A.   Ted Borland.  I'm sorry -- Ted is the son

16   -- Dave Borland.

17   Q.   Is he an employee of the school?

18   A.   No.

19   Q.   Who is he?

20   A.   Well, currently he's the spouse of a

21   faculty member.

22   Q.   What was he when he gave you --

23   A.   Well, he was the spouse of a faculty member

24   and I believe hired as -- to run the program.

Page 14

1      A.   And he was just very busy.

2      Q.   What did he do at Mount Snow?

3      A.   Ski instructor, ski patrol.

4      Q.   So if I understand it, you signed up when

5  they requested volunteers and you showed up at the

6  bus on the appointed day, is that correct; and when

7  you arrived at the bus, Dave Borland greeted you and

8  informed you of what your duties and

9  responsibilities would be, is that correct?

10     A.   Yes.

11     Q.   What did he tell you?

12     A.   Just check off who gets on the bus, make

13  sure no one gets rowdy on the bus, check off after

14  we're done at Berkshire East.  While we're at

15  Berkshire East, just keep your eyes on the kids, not

16  letting them stay inside too long.  And then when

17  it's time to leave check them back in the on the bus

18  and let them know.  So we had a chart and I would

19  give him the chart at the end.

20     Q.   Did anything change in terms of your duties

21  and responsibilities in the second season, that

22  being the 2003, 2004 season?

23     A.   No.

24     Q.   Did you chaperon once a week or twice a

1      Q.  They might be inside or outside?

2      A.  Yes.

3      Q.  Did they typically ski or not ski during

4 the 2003, 4 season.

5      A.  Audra's a boarder so she usually -- and

6 he's a skier -- so they usually skied some.

7      Q.  Do you know Yukio Kusada?

8      A.  No.

9      Q.  You never met him?

10     A.  Just from coming on the bus.

11     Q.  But you have seen him before on the bus?

12     A.  Not -- I had to have, but I would not know

13 him.

14     Q.  So in other words, if he were to walk in

15 here today with 13 other people, would you be able

16 to pick him out as Yukio Kusada, assuming all were

17 Asian?

18     A.  No.

19     Q.  Have you ever spoken to him, to the best of

20 your knowledge?

21     A.  Just that day.

22     Q.  Just which day?

23     A.  The day that he was -- had the accident

24 when he came on the bus.  I had to ask everybody for

1    an ID.

2        Q.   We'll get to that.   Prior to the date of

3    the accident did you have any knowledge whatever of

4    what kind of skis he was using?

5        A.   No.

6        Q.   Did you have any knowledge of what kind of

7    boots he was using?

8        A.   No.

9        Q.   Did you have any knowledge of what level

10   ski ability he had?

11       A.   No.

12       Q.   Did you have any knowledge of what trails

13   he skied at Berkshire East?

14       A.   No.

15       Q.   Did you have any knowledge of whether or

16   not he had ever taken a ski lesson?

17       A.   No.

18       Q.   Did you have any knowledge of whether or

19   not he'd ever been instructed on how to take

20   precautions for night skiing?

21       A.   No.

22       Q.   Did you have any knowledge of whether or

23   not he wore a helmet --

24       A.   No.

APPENDIX 12

1                                                    Volume: I

2                                                    Pages: 1-59

3

4              UNITED STATES DISTRICT COURT

5                DISTRICT OF MASSACHUSETTS

6                              C.A. No. 05-30043-MAP

7

8    ------------------------------------

9    YUKIO KUSADA,

10                     Plaintiff,

11        v.

12   BERKSHIRE EAST SKI RESORT, UNION

13   TERMINAL PIERS, INC., and NORTHFIELD

14   MOUNT HERMON SCHOOL,

15                     Defendants.

16   ------------------------------------

17

18            DEPOSITION of MARI KUSADA

19        Monday, October 17, 2005, 1:42 p.m.

20              HOLLAND & KNIGHT, LLP

21               10 St. James Avenue

22               Boston, Massachusetts

23

24      Court Reporter:  Paulette Cook, RPR/RMR

Mari Kusada

18

1    Q.  Had you ever been to the United States prior

2  to coming here to see Yukio after the accident?

3    A.  Yes.

4    Q.  When had you been to the United States prior

5  to the accident?

6    A.  No.

7    Q.  Did you help Yukio select Northfield Mount

8  Hermon School?

9    A.  Yes.

10    Q.  What was it about Northfield Mount Hermon

11  School that appealed to you?

12    A.  One, she's heard that it was a well-known

13  school even in the United States.  Number two, they

14  appeared to take good care of the international

15  students.  Number three, the principal and the

16  instructors/teachers all live on campus with their

17  family.  And looking from the safety standpoint --

18  yeah, the safety of the students standpoint, it gave

19  her a sense of comfort.

20    Q.  Why did Yukio choose Northfield Mount Hermon

21  School, if you know?

22    A.  Most probably because it's very well-known

23  school, and he felt that it gives him an opportunity

24  for the future.

Mari Kusada

37

1    A.   No, I haven't.

2    Q.   Have you discussed with your husband whether

3    he ever signed any forms for the Northfield Mount

4    Hermon School to allow Yukio to ski?

5         MR. GLUCK:   I'm going to object on the

6    husband/wife privilege, but I'll allow her to

7    answer.  Go ahead.

8         MR. POTTER:   I understand.

9    A.   Yes, we did discuss about the ski program --

10   she and her husband discussed Yukio attending the

11   ski program.

12   Q.   What did he say, and what did you say?

13        MR. GLUCK:   Objection.

14   A.   We discussed that since Yukio has never

15   skied before, that it would be a good opportunity

16   for him to learn how to ski.  Yes, I remember

17   discussing that.

18   Q.   Did you discuss anything else about the ski

19   program with your husband?

20        MR. GLUCK:   Objection.

21   A.   No, we didn't discuss any further.  I

22   totally entrusted the school.  And since Yukio said

23   it's the -- part of the curriculum, that she assumed

24   that the school was going to teach him from step

Mari Kusada

38

1    one.  So she never questioned it.

2        Q.  Do you have in your possession documents and

3    I mean in Japan with your husband's signature on

4    them?

5        A.  I might have to search, but I'm sure I have

6    it.

7        Q.  And do you have documents in your possession

8    in Japan with your son Yukio's handwriting on them?

9        A.  Recently she cleaned out Yukio's room and

10   redid the room and changed the furniture and so

11   forth.  So she can't -- she's not positively sure

12   that she could -- she would find anything from the

13   past.

14       Q.  While you were at the Northfield Mount

15   Hermon School -- strike that.

16              While you were in Massachusetts in the

17   United States visiting with your son when he was at

18   the hospital in Springfield, you said that you had a

19   conversation with Ms. Cole at the hospital

20   concerning the skiing?

21       A.  Yes.

22       Q.  Can you tell me who was present during that

23   conversation?

24       A.  I don't recall who it was, but I'm sure I

APPENDIX 13

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

YUKIO KUSADA,                          )
    Plaintiff                      )
                     )
                     )
vs.                                    )     Civil Action
                     )     No.: Civil Action No.: 05-30043-MAP
                     )
NORTHFIELD MOUNT HERMON                )
SCHOOL, FRANCIS MILLARD and            )
MICHAEL ATKINS,                        )
    Defendants                     )
                     )
v.                                     )
                     )
TAKERU KUSADA                          )
    Third Party Defendant          )

**AFFIDAVIT OF MARILYN BUCK, ED.D.**

    I, Marilyn Buck, on oath depose and say:

1.    I reside at 625 East 200 South, Tipton, Indiana.

2.    I have an Ed.D. in Physical Education from Brigham Young University, Provo, Utah.

3.    The emphasis of my doctorate in Physical Education was curriculum and instruction.

4.    Prior to receiving my doctorate I coached and taught physical education in Junior High School and High Schools in Huxley, Iowa from 1976 to 1986.

5.    From 1986 to 1989 I was a graduate teaching assistant at Brigham Young University in the Physical Education program.

2

6. From 1989 to 1996 I was an Assistant Professor of Physical Education at Ball State University in Muncie, Indiana with a specialization in teaching methodology.

7. From 1996 to 2001 I was an Associate Professor at Ball State University in Muncie, Indiana with a specialization in teaching methodology.

8. From 1999 to 2005 I was the Coordinator of the Physical Education Teaching Major at Ball State University in Muncie, Indiana.

9. From 1999 to 2003 I was the Assistant to the Chair of the Sports and Physical Education Division of the School of Physical Education at Ball State University.

10. From 2000 to 2002 I was the Coordinator of the Sports and Physical Education Graduate Programs of at Ball State University in Muncie, Indiana.

11. From 2001 to the present I have been a Professor of Physical Education with a specialization in teaching methodology at Ball State University in Muncie, Indiana.

12. From 2003 to 2005 I was the Associate Chair of the Sports and Physical Education Division in the School of Physical Education, Sport and Exercise Science at Ball State University in Muncie, Indiana.

13. Much of my professional life has been devoted to teaching college students to become physical education teachers.

3

14.   I have served professional organizations in multiple capacities including being a director of the International Council for Health, Physical Education, Recreation, Sport and Dance, Sports Pedagogy Commission from 1998 to 2004.

15.   I am Board of Governor of the American Alliance for Health, Physical Education, Recreation and Dance.

16.   I was a member of the Executive Committee of the National Association for Sport and Physical Education, Middle and Secondary School Physical Education Council from 1998 to 2001.

17.   I was a member of the National Planning Committee for Standards Conference No. 1 and No. 2 from 2000 to 2001.

18.   I served as President of the National Association for Kinesiology and Physical Education in Higher Education from 2003 to 2004 and as Parliamentarian of said organization from 2005 to 2006.

19.   I was President of the Midwest District of the American Alliance for Health, Physical Education, Recreation and Dance from 2003 to 2004 and as a member of the Board of Directors from 2005 to the present.

20.   I have been a member of the Sport and Physical Education Curriculum Committee at the School of Physical Education at Ball State University for ten years.

21.   I am familiar with the customs, practices and standards, for physical education classes in secondary schools in the United States of America.

4

22.   There is no known exception that would put the 2003-2004 Northfield Mount Hermon School physical education ski class known as Recreational Skiing outside of the customs, practices and standards for physical education classes in the United States of America.

23.   Northfield Mount Hermon School's failure to instruct Yukio Kusada on proper terrain selection and its failure to implement a policy to monitor the terrain selection of its students in the physical education ski class in 2003 – 2004 was in violation of the customs, practices and or standards for physical education classes in the United States of America.

24.   Northfield Mount Hermon School's policy of recommending but not requiring the use of helmets in the physical education ski class in 2003- 2004 was a violation of the customs, practices and or standards for Physical Education classes in the United States of America.

25.   Northfield Mount Hermon School's policy of not requiring lessons for beginner skiers in the physical education ski class in 2003-2004 was a violation of the customs, practices and or standards for Physical Education classes in the United States of America.

26.   Northfield Mount Hermon School's failure to assess the skiing ability of Yukio Kusada in the course of his participation in the physical education ski class in 2003- 2004 was a violation of the customs, practices and or standards for Physical Education classes in the United States of America.

5

27.    Northfield Mount Hermon School's failure to provide instruction to Yukio Kusada in the selection of his ski equipment during his participation in the physical education ski class in 2003-2004 was a violation of the customs, practices and or standards for Physical Education classes in the United States of America.

28.    Northfield Mount Hermon's School's failure to ascertain that the skis Yukio Kusada was using on February 20, 2004 were appropriate for his beginner level of skiing ability was a violation of the customs, practices and or standards for Physical Education classes in the United States of America.

29.    Northfield Mount Hermon's School's failure to provide lessons to Yukio Kusada, who specifically requested them as a beginner skier in the 2003-2004 in physical education ski class, was a violation of the customs, practices and or standards for Physical Education classes in the United States of America.

30.    The failure of Northfield Mount Hermon's School to mandate use of a buddy system for the 2003-2004 physical education ski course in which Yukio Kusada was a participant was a violation of the customs, practices and or standards for physical education classes in the United States of America.

31.    The failure of Francis Millard, as Chair of the Physical Education and Athletics Department, to mandate instruction of students in the 2003-2004 physical education ski class, on proper terrain selection for their level of skiing ability and his failure to implement monitoring of terrain selection of said students was in

6

violation of the customs, practices and or standards for physical education educators in the United States of America.

32.    The failure of Francis Millard, as Chair of the Physical Education and Athletics Department to mandate the use of helmets in the physical education ski class in 2003- 2004 was a violation of the customs, practices and or standards for Physical Education educators in the United States of America.

33.    The failure of Francis Millard, as Chair of the Physical Education and Athletics Department, to mandate lessons for beginner skiers in the physical education ski class in 2003-2004 was a violation of the customs, practices and or standards for Physical Education educators in the United States of America.

34.    The failure of Francis Millard, as Chair of the Physical Education and Athletics Department to mandate assessment of the skiing ability of Yukio Kusada in the course of his participation in the physical education ski class in 2003- 2004 was a violation of the customs, practices and or standards for Physical Education educators in the United States of America.

35.    The failure of Francis Millard, as Chair of the Physical Education and Athletics Department, to mandate instruction to Yukio Kusada in the selection of his ski equipment during his participation in the physical education ski class in 2003-2004 so that Kusada was taught the difference between skis intended for a beginner versus those intended for an expert and the dangers of using skis unfit for

his beginner level of ability was a violation of the customs, practices and or standards for Physical Education educators in the United States of America.

36.    The failure of Francis Millard, as Chair of the Physical Education and Athletics Department, to mandate that it be ascertained that the skis Yukio Kusada was using on February 20, 2004 were appropriate for his beginner level of skiing ability was a violation of the customs, practices and or standards for Physical Education educators in the United States of America.

37.    The failure of Francis Millard, as Chair of the Physical Education and Athletics Department to ensure that ski lessons were provided to Yukio Kusada, who specifically requested them as a beginner skier in the 2003-2004 in physical education ski class, was a violation of the customs, practices and or standards for Physical Education educators in the United States of America.

38.    The failure of Francis Millard, as Chair of the Physical Education and Athletics Department, to mandate use of a buddy system for the 2003-2004 physical education ski course in which Yukio Kusada was a participant was in violation of the customs, practices and or standards for physical education educators in the United States of America.

39.    The failure of Michael Atkins, as a physical education teacher and coordinator of the physical education course in which Yukio Kusada participated in 2003-2004, to coordinate the program so that Yukio Kusada received instruction on proper terrain selection, and on the dangers of improper terrain selection, for his

8

beginner level of skiing ability was in violation of the customs, practices and or standards for physical education educators in the United States of America.

40.    The failure of Michael Atkins, as a physical education teacher and coordinator of the physical education course in which Yukio Kusada participated in 2003-2004 to coordinate the course so as to ensure that lessons were available to Yukio Kusada, was a violation of the customs, practices and or standards for Physical Education educators in the United States of America.

41.    The failure of Michael Atkins, as a physical education teacher and coordinator of the ski course in which Yukio Kusada participated in 2003-2004 to coordinate the course so that assessment of Yukio Kusada's ability and progress occurred was a violation of the customs, practices and or standards for Physical Education educators in the United States of America.

42.    The failure of Michael Atkins, as a physical education teacher and coordinator of the ski course in which Yukio Kusada participated in 2003-2004 to coordinate the class so that Kusada was taught the difference between skis intended for a beginner versus those intended for an expert, and the dangers of using skis unfit for his beginner level of ability, was a violation of the customs, practices and or standards for Physical Education educators in the United States of America.

43.    The failure of Michael Atkins, as a physical education teacher and coordinator of the ski course in which Yukio Kusada participated in 2003-2004 to

coordinate the program so that it was ascertained that the skis Yukio Kusada was using on February 20, 2004 were appropriate for his beginner level of skiing ability, was a violation of the customs, practices and or standards for Physical Education educators in the United States of America.

44.    The failure of Michael Atkins, as a physical education teacher and coordinator of the ski course in which Yukio Kusada participated in 2003-2004, to ascertain that ski lessons were provided to Yukio Kusada, who specifically requested them as a beginner skier, was a violation of the customs, practices and or standards for Physical Education educators in the United States of America.

45.    The failure of Michael Atkins, as a physical education teacher and coordinator of the 2003-2004 physical education ski course in which Yukio Kusada was a participant to mandate and implement a buddy system for this course was in violation of the customs, practices and/or standards for physical education educators in the United States of America.

Signed under the pains and penalties of perjury this _19th_ of December, 2006.

Marilyn M. Buck

Marilyn Buck, Ed.D.

**Certificate of Service**

I, certify that this document field through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on December 22, 2006 via first class mail.

Heather A. Engman

Ronald E. Gluck

VITA
MARILYN M. BUCK

**Home:**        625 E 200 S, Tipton, IN 46072  (765) 675-9091

**Work:**        AT 202, College of Applied Sciences and Technology,  Ball State University,
Muncie, IN 47306  (765) 285-5955  FAX (765) 285-1071
E-mail:mbuck@bsu.edu

## ACADEMIC DEGREES

B. S.    in physical education with a math minor
Iowa State University, Ames, Iowa
May 1974
Graduated with distinction

M. S.    in physical education with an emphasis in sport psychology and a minor in educational
psychology
University of Utah, Salt Lake City, Utah
June 1978

Ed. D.    in physical education-sports with an emphasis in curriculum and instruction and a minor
in educational leadership (administration)
Brigham Young University, Provo, Utah
August 1989

## PROFESSIONAL EXPERIENCE

2005 - present Associate Dean, College of Applied Sciences and Technology, Ball State
University

2003 - 2005    Associate Chair, Sport and Physical Education Division, School of Physical
Education, Sport, and Exercise Science, Ball State University

2001 - present Professor, Ball State University, Muncie, Indiana
Area of specialty:  Teaching methodology.

2000 - 2002    Coordinator, Sport and Physical Education Graduate Programs

1999 - 2003    Assistant to the Chair, Sport and Physical Education Division, School of Physical
Education, Ball State University

1999 - 2005    Coordinator, Physical Education Teaching Major

1996 - 2001    Associate Professor, Ball State University, Muncie, Indiana
Area of specialty:  Teaching methodology.

Other classes taught:  Computer competency,  swimming, measurement and evaluation, skill analysis, foundations, research design, curriculum design

1989 - 1996    Assistant Professor, Ball State University, Muncie, Indiana
Area of specialty:  Teaching methodology.
Other classes taught:  Computer competency, softball/volleyball teaching techniques, basketball officiating, swimming, measurement and evaluation, skill analysis

1986 - 1989    Graduate teaching assistant, Brigham Young University, Provo, Utah
Classes taught:  Archery, beginning and intermediate swimming, beginning and intermediate badminton, beginning basketball, beginning volleyball, water fitness, skills and teaching techniques in basketball and softball, teaching methods, assisted with student teaching supervision, basketball and volleyball officiating

1974 - 1986    Health and physical education instructor, junior high girls basketball and track coach, Ballard Junior High, Ballard Community Schools, Huxley, Iowa

1981 - 1986    Varsity girls cross country coach, Ballard High School, Ballard Community Schools, Huxley, Iowa

1979 - 1986    Organizer and coach, South Story Track Club, Huxley, Iowa
Coached one age-group national champion and four other top ten finishers and many state champions

1976 - 1979    Assistant varsity softball coach, Ballard High School, Ballard Community Schools, Huxley, Iowa

1973 - 1974    Exercise physiology lab assistant, Iowa State University, Ames, Iowa

1972 - 1974    Clerical secretary and administrative assistant, Women's Intramurals, Iowa State University, Ames, Iowa

1973    Swimming instructor, Iowa State University, Ames, Iowa

## SPECIAL AREA OF PROFESSIONAL INTEREST

Main emphasis:        Curriculum development and instruction
Minor emphases:       Computers and administration
Certifications:       Permanent teaching certificate, state of Iowa
                      Physical education, math, and coaching endorsements
National Safety Council Adult CPR

## NON-DEGREE STUDY, CONTINUING EDUCATION

| | |
|---|---|
| 1984 | Des Moines Area Community College
BASIC Computer Programming |
| 1983-1984 | American Institute of Business, Des Moines, Iowa
Computer Programming
Accounting |
| 1979 | University of Northern Iowa
Cross Country Coaching Workshop |
| 1976 | Concordia University, Montreal, Canada
Health and Fitness Practices in Sweden
Track and Field Symposium, World Cup II |

## PROFESSIONAL ORGANIZATIONS

American Alliance for Health, Physical Education, Recreation and Dance - Life Member
Midwest District of the American Alliance for Health, Physical Education, Recreation and Dance
Indiana Association for Health, Physical Education, Recreation and Dance - Life Member
National Association for Kinesiology and Physical Education in Higher Education
Phi Kappa Phi
Phi Delta Kappa
International Council for Health, Physical Education, Recreation, Sport, and Dance

## OFFICES HELD IN PROFESSIONAL ORGANIZATIONS

International Council for Health, Physical Education, Recreation, Sport, and Dance
    Member -- Sport Pedagogy Commission, 2004 - present
    Director -- Sport Pedagogy Commission, 1998 - 2004

American Alliance for Health, Physical Education, Recreation and Dance
    Member of the Local Planning Committee -- 2005 American Alliance for Health, Physical
    Education, Recreation, and Dance National Convention, Chicago
    Nominations Committee Member for President-Elect, 2004-2006
    Member of the Board of Governors, 2002-2003, 2005-present

National Association for Sport and Physical Education
    Middle and Secondary School Physical Education Council Executive Committee, 1998-
    2001
    Member, National Planning Committee for Standards #1 & 2 Conference, 2000-2001
    Member, National Planning Committee for Sport and Physical Education Technology
    Conference, 1999

4

Chair, National Planning Committee for Sport and Physical Education Technology
Conference, 1997
Technology Task Force, 1995-1996

National Association for Kinesiology and Physical Education in Higher Education
Parliamentarian - 2005-2006
Past President - 2004-2005
President - 2003-2004
President-Elect - 2002-2003
Elections Committee, Chair - 2000-2001
Vice President - 1999-2000
Vice President-Elect - 1998-1999
Future Directions Committee - 1998
Membership Committee, Chair and Co-chair - 1994-1995
Membership Committee - 1992-1995
Member, Presidential Advisory Committee - 1993
Associate Editor, Scholarly Publications, *Chronicle of Physical Education in Higher Education* - 1996-1999
Technology Task Force - 1996
Developed Electronic Physical Education in Higher Education Directory

Midwest District of the American Alliance for Health, Physical Education, Recreation, and Dance
Board of Governors Representative - 2005-present
Past President - 2004-2005
President - 2003-2004
President-elect - 2002-2003
Secretary - 1999-2002
Executive Secretary Evaluation Committee - 1999-present
Constitution and Bylaws Committee - 2004-2005
Leadership Committee - 1999, 2000
Executive Secretary Search Committee - 1998-1999
Restructure Committee - 1998-2000
Past Vice President, Physical Education - 1998-1999
Vice President, Physical Education - 1997-1998
Vice President-Elect, Physical Education - 1996-1997
Chair, Professional Preparation - 1995-1996
Chair-Elect, Professional Preparation - 1994-1995

Indiana Association for Health, Physical Education, Recreation, and Dance
Technology Council, 1997-2001
Home Page Committee Chair, 1997

5

## SERVICE TO BALL STATE UNIVERSITY

### University-Level Service Summarized

Member, Vice President for Marketing, Communications, and Enrollment Management - 1 year
Member, President Search Committee - 1 year
Member, Provost and Vice President for Academic Affairs Search Committee - 2 years
Member, Vice President for Information Technology and Executive Assistant to the President
    Search Committee - 1 year
Member, Assistant Dean of Students Search Committee - 1 year
Member, Strategic Plan Implementation and Assessment Committee - 3 years
Undergraduate Core Curriculum Task Force I - 2 years
Undergraduate Core Curriculum Task Force II - 1 year
Phi Kappa Phi - Vice President - 1 year
Membership Committee - Phi Kappa Phi - 1 year
Selection Committee for Emens Outstanding Senior - 3 years
Selection Committee for Junior Scholarship Award - 3 years
Participant, Cardinal Roundtable - 3 years
Member, Administrative Group - 3 years
Member, Governance Task Force, NCA Self-study - 2 years
Member, NCAA Self-study Steering Committee - 2 years
Member, Governance and Commitment to Rules Compliance Sub-committee, NCAA Self-study
    - 2 years
Member, University Senate - 11 years
Chair, University Senate - 3 years
Vice Chair, University Senate - 2 years
Chair, University Governance Committee - 2 years
Member, University Governance Committee - 4 years
Member, American Council for Education/Kellogg Leadership Team - 5 years
Member, Teacher Education Committee - 6 years
Chair, Teacher Education Committee - 2 years
Member, University Senate Agenda Committee - 6 years
Member, Retention Grant Review Committee - 1 year
Represented University on Indiana Commission for Higher Education State Nominating
    Committee to select next faculty member - 3 years (chair)
Represented University at the Faculty Leadership Conference hosted by Indiana Commission for
    Higher Education - 2 years
Member, Student Teaching Evaluation Forms Committee - 3 years
Member, Past Senate Chairs Group - 1 year
Member, Budget Focus Groups - 1 year
Member, Senate Ad Hoc Advisory Committee on Enrollment and Resources - 1 year
Participant, PEW Roundtable Discussions - 2 years
Member, Professional Affairs Council - 6 years
Secretary, Professional Affairs Council - 1 year
Vice-Chair, Professional Affairs Council - 1 year

6

Chair, Professional Affairs Council - 1 year
Member, Salary and Benefits Committee - 3 years
Chair, Salary and Benefits Committee - 1 year
Member, Undergraduate Education Council - 3 years
Secretary, Undergraduate Education Council - 1 year
Member, Provost's Blue Ribbon Commission on ways Ball State University Can Improve K-12
     Education in Indiana - 3 years

College Service Summarized

College Representative to TEPASC - 2 years
College Representative on Web Advisory Committee - 1 year
Alternate for College Appeal Panel - 1 year
College PEW Roundtable Planning Committee - 1 year

School of Physical Education Service Summarized

Search Committees for various positions - 16 years
Mentor - 5 different faculty
Majors Admission and Retention Committee (MARC) - 13 years
Sport and Physical Education Curriculum Committee - 10 years
Computer Competency Committee - 10 years
International Committee - 7 years (2 years as chair)
Promotion and Tenure Committee - 5 years (secretary - 1 year)
Director of Physical Education Teacher Education Lab - 11 years
Coordinate Multimedia Cart Use - 7 years
Coordinate Advising - 5 years
Departmental Honors Coordinator - 4 years
Web Publisher - 6 years
Korsgaard Outstanding Graduate Student Selection Committee - 4 years
Salary Committee - 1 year
Expenditure Reduction Committee - 1 year
Physical Education Program Board - 3 years
Task Force for School Restructuring - 1 year
Graduate Council - 2 years
Awards Committee - 3 years (chair - 2 years, secretary - 1 year)
Name Change Committee - 1 year

**HONORS AND AWARDS**

Meritorious Service Award, Midwest District of the American Alliance for Health, Physical
     Education, Recreation, and Dance, 2004
Service Award, National Association for Physical Education in Higher Education, 2001
Research highlighted in Ball State University publication, *BeneFacta*, 2000

Leadership Recognition Award, Indiana Association for Health, Physical Education, Recreation and Dance, 1998

Outstanding Tenure-line Teacher, School of Physical Education, Ball State University, 1993-1994

Listed in Who's Who in American Education, 1992

## PUBLICATIONS

Buck, M. M. (In Press). Technology chapter. In N. Schmottlach & J. McManama, *Physical Education Activity Handbook*, (11th ed.). San Francisco, CA: Benjamin Cummings.

Buck, M. M., & Lund, J. (In Press). *Instructional strategies for secondary school physical education* (6th ed.). Dubuque, IA: McGraw-Hill.

Woodard, R., Lund, J., Wayda, V., & Buck, M. (2004). Daily physical education, physical fitness, and middle school students. *Journal of the International Council for Health, Physical Education, Recreation, Sport & Dance, 40*(4), 20-23.

Buck, M. M., Floyd, P., & Jable, T. (2004). *Foundation of physical education.* Atlanta, GA: Wadsworth.

Lund, J., Woodard, R., Wayda, V., & Buck, M. (2003). An examination of content knowledge used by inservice physical education teachers in Indiana. *Indiana Journal for Health, Physical Education, Recreation, and Dance, 32*(1), 10-17.

Lund, J., Woodard, R., Wayda, V., & Buck, M. (2002). Survey of Indiana physical educator's content knowledge. *Indiana Journal for Health, Physical Education, Recreation and Dance, 31*(3), 23-28.

Buck, M. M. (2002). Video aids improvement of physical skills. *Curriculum Technology Quarterly, 11*(3), 4.

Buck, M. M. (2002). *Heart rate assessment.* NASPE Assessment Series Monograph. Reston, VA: NASPE.

Buck, M. M. (2002). Softball. In N. Schmottlach & J. McManama, Ed., *Physical education activity handbook.* San Francisco: Benjamin Cummings. (pp. 295-309).

Buck, M. M. (2002). Technology and physical education programs of the future. In N. Schmottlach & J. McManama, Ed., *Physical education activity handbook.* San Francisco: Benjamin Cummings. (pp. 17-23).

Harrison, J. M., Blakemore, C. L., & Buck, M. M. (2001). *Instructional strategies for secondary school physical education* (5th ed.). Dubuque, IA: McGraw-Hill.

Buck, M. (2000). A physical fitness requirement: Results of implementation. In *Research on Teaching and Research on Teacher Education*, Proceedings of the AIESEP International Seminar, Lisbon, Portugal, November21-24, 1996, Carriero da Costa, F., Diniz, J. A., Carvalho, L. M., & Onofre, M. S., Eds.

Buck, M. (2000). Departments respond to teacher education reform effort. *Institution Transformation: A Report on the ACE Project on Leadership and Institutional Transformation*, p. 11.

Buck, M. (1999). Teaching methods: meeting the needs of students throughout the world - summary of sport pedagogy symposium. *International Council for Health, Physical Education, Recreation, Sport, and Dance Journal, 36*(1), 28.

Buck, M. M. (1999). Technology: A tool to enhance achievement of physical education objectives. *Indiana Journal for Health, Physical Education, Recreation and Dance, 28*(1), 17-18.

Buck, M. M. (1996). Interdisciplinary approach to teaching: K-12 physical education. *Journal of Interdisciplinary Research in Physical Education, 1*(1), 7-14.

Harrison, J. M., Blakemore, C. L., Buck, M. M., & Pellett, T. L. (1996). *Instructional strategies for secondary school physical education* (4th ed.). Dubuque, IA: Brown & Benchmark.

Harrison, J. M., Blakemore, C. L., Buck, M. M., & Pellett, T. L. (1996). *Instructor's manual for Instructional strategies for secondary school physical education* (4th ed.). Dubuque, IA: Brown & Benchmark.

Harrison, J. M., Fellingham, G. W., & Buck, M. M. (1995). Self-efficacy, attribution, and volleyball achievement. *International Journal of Physical Education, 32*(4), 4-10.

Kirkpatrick, B., & Buck, M. M. (1995). Heart adventures challenge course: A lifestyle education activity. *The Journal of Physical Education, Recreation & Dance, 66*(2), 17-24.

Kirkpatrick, B., & Buck, M. M. (1995). Ultra physical education -- Looking to the future. *Journal of the International Council for Health, Physical Education, Recreation, Sport, and Dance, 31*(2), 33-37.

Buck, M. M., & Kirkpatrick, B. (1995). Funding sources for new wellness programs: Finding your way through the maze. *Strategies, 8*(5), 5-9.

Harrison, J. M., Fellingham, G. W., Buck, M. M., & Pellett, T. L. (1995). The effects of practice and command styles of instruction on rate of change in volleyball performance and self-efficacy of high-, medium-, and low-skilled learners. *Journal of Teaching in Physical Education, 14*, 328-339.

Harrison, J. M., Buck, M., & Pellett, T. (1995, April/May). Volleyball instruction: Results of using game and equipment modifications. *Coaching Volleyball*, 12-15.

Buck, M. M., & Assmann, N. (1995). Computer training received and needed by Indiana public school physical education teachers. *Indiana Journal for Health, Physical Education, Recreation and Dance, 24*(1), 34-37.

Buck, M. M., & Assmann, N. (1994). Computer usage by Indiana public school physical education teachers: Part II. *Indiana Journal for Health, Physical Education, Recreation and Dance, 23*(3), 9-12.

Buck, M. M., & Assmann, N. (1994). Computer usage by Indiana public school physical education teachers. *Indiana Journal for Health, Physical Education, Recreation and Dance, 23*(2), 14-16.

Buck, M. M. (1994). NAPEHE survey results: Part II. *The Chronicle of Physical Education in Higher Education, 5*(3), 6, 12-13.

Buck, M. M. (1994). NAPEHE survey results: Part I. *The Chronicle of Physical Education in Higher Education, 5*(2), 5, 13.

Masters, K. S., Lindsay, G. B., Buck, M. M., & Dobbs, G. M. (1993). Physical fitness of seventh graders: A descriptive analysis with implications for physical education teachers and administrators. *Indiana Journal for Health, Physical Education, Recreation and Dance, 22*(3), 33-36.

Buck, M. M. (1992). Softball. In D. C. Seaton, N. Schmottlach, J. L. McManama, I. A. Clayton, H. C. Leibee, & L. L. Messersmith, *Physical Education Handbook*, Englewood Cliffs, NJ: Prentice-Hall (pp. 279-293).

Harrison, J. M., & Buck, M. M. (1992). Instructor's manual for *Instructional Strategies for Secondary School Physical Education* (3rd. ed.). Wm. C. Brown Publishers.

Buck, M., Harrison, J. M., & Bryce, G. R. (1991). An analysis of learning trials and their relationship to achievement in volleyball. *Journal of Teaching in Physical Education, 10*, 134-152.

Buck, M., & Harrison, J. M. (1990). An analysis of game play in volleyball. *Journal of Teaching in Physical Education, 10*, 38-48.

Buck, M., & Harrison, J. M. (1990). Improving student achievement in physical education. *Journal of Physical Education, Recreation & Dance, 62*(7), 40-44.

Buck, M., Harrison, J. M., Fronske, H., & Bayles, G. (1990). Teaching biomechanics concepts to junior high physical education classes. *Journal of Physical Education, Recreation and Dance, 61*(6), 91-95.

Buck, M., Harrison, J. M., Fronske, H., & Bayles, G. (1990). Quad ball. *Journal of Physical Education, Recreation and Dance, 61*(2), 7.

## ABSTRACTS

Wayda, V., Lund, J. L., Buck, M., & Woodard, R. (2004). Employability skills: What are we teaching our students. *Research Quarterly for Exercise and Sport, 75*, A-84.

Lund, J. L., Woodard, R., Wayda, V., & Buck, M. M. (2003). Survey of Indiana physical educator's content knowledge. *Research Quarterly for Exercise and Sport, 74*, A-48.

Griffin, L. L., Hall, S. J., Meaney, K. S., Dunn, J. M., Buck, M., LaMaster, K. J., Chen, A., & Cruz, L. M. (2003). Life as an academic in the 21st century–Part 1: Establishing strong mentoring and Part II: Navigating the tenure and promotion process. *Research Quarterly for Exercise and Sport, 74*, A-93, A-94.

Buck, M. M. (2002). Use of technology in physical education. *2002 China-US Conference on Physical Education Program and Abstracts*, 10. Beijing, China.

Buck, M. M., & Lund, J. (2002). Performance based assessment of pedagogical skills. *2002 China-US Conference on Physical Education Program and Abstracts*, 10. Beijing, China.

Buck, M. M. (1997). The skill-fit model for improving fitness and skills simultaneously, 37. AIESEP World Conference on Teaching, Coaching and Fitness Needs in Physical Education and the Sport Sciences, Singapore.

Buck, M. M. (1997). Incorporating interdisciplinary units into physical education classes, 111. AIESEP World Conference on Teaching, Coaching and Fitness Needs in Physical Education and the Sport Sciences, Singapore.

Buck, M. M. (1996). Review of research using heart rate monitors: Implications for effective teaching. *Book of Abstracts: Research on Teaching and Research on Teacher Education*, 15. AIESEP International Seminar, Lisbon, Portugal.

Buck, M. M. (1996). A physical fitness requirement: Results of implementation. *Book of Abstracts: Research on Teaching and Research on Teacher Education,*16. AIESEP International Seminar, Lisbon, Portugal.

Buck, M. M. (1996). Symposium: Heart rate monitor research. *Research Quarterly for Exercise and Sport, 67*(Supplement), A-36.

Burton, C. J., & Buck, M. M. (1996). The heart rates of elementary children during physical education. *Research Quarterly for Exercise and Sport, 67*(Supplement), A-37.

McManama, J., Buck, M. M., Burton, C. J., & O'Connor, C. (1996). Improving cardiovascular fitness in a college beginning volleyball class. *Research Quarterly for Exercise and Sport, 67*(Supplement), A-37-38.

Kirkpatrick, B., & Buck, M. M. (1996). Comparing changes in cardiovascular measures of middle school students. *Research Quarterly for Exercise and Sport, 67*(Supplement), A-38.

Buck, M. M., & McManama, J. (1995). Improving skill and fitness concurrently: Can it be done? *Abstracts of the '95 World Congress of the International Council for Health, Physical Education, Recreation, Sport, and Dance.* Gainesville, FL.

Harrison, J., & Buck, M. (1991). Relationship of learning trials and learner characteristics to volleyball achievement using USVBA-recommended game modifications. *Abstracts of the 1991 World Congress of the International Association of Physical Education Schools in Higher Education.* Atlanta, GA.

Buck, M., & Harrison, J. M. (1990). A new research technique for analyzing learning. *Abstracts of Research Papers, 56th Annual Convention of the Southwest District of the American Alliance for Health, Physical Education, Recreation, and Dance.* Albuquerque, NM.

Buck, M. (1990). An analysis of learning trials and their relationship to achievement in volleyball. *Abstracts of Research Papers, 56th Annual Convention of the Southwest District of the American Alliance for Health, Physical Education, Recreation, and Dance.* Albuquerque, NM.

Buck, M. (1990). An analysis of learning curves in volleyball. *Abstracts of Research Papers, 56th Annual Convention of the Southwest District of the American Alliance for Health, Physical Education, Recreation, and Dance.* Albuquerque, NM.

Buck, M., & Harrison, J. M. (1989). An analysis of learning trials and their relationship to achievement in volleyball. *The R. Tait McKenzie Symposium on Sport.* Knoxville, TN.

12

## CREATIVE ENDEAVORS

Buck, M., & McManama, J. (2000). Space Shuttle Adventure. Curriculum materials and
videotape marketed and sold by US Games.

Buck, M., & McManama, J. (1997). Time travel adventure activity.
Curriculum materials and videotape being marketed and sold by US Games.

## PUBLISHED COMMUNICATIONS

Buck, M. (2003-2004). President's Messages in *The Chronicle of Higher Education in Physical
Education*

Buck, M. (2003). Wrote greetings for the Michigan AHPERD Convention, Illinois AHPERD
Convention, Wisconsin AHPERD Convention, and NAPEHE Convention which were
included in the convention programs.

Buck, M. (September, 1998). Scholarly publications. *The Chronicle of Physical Education in
Higher Education, 9*(3), 2,19.

Buck, M. (May, 1998). Scholarly publications. *The Chronicle of Physical Education in Higher
Education, 9*(2), 2.

Buck, M. (February, 1998). Scholarly publications. *The Chronicle of Physical Education in
Higher Education, 9*(1), 2.

Buck, M. (September, 1997). Scholarly publications. *The Chronicle of Physical Education in
Higher Education, 8*(3), 2,19.

Buck, M. (May, 1997). Scholarly publications. *The Chronicle of Physical Education in Higher
Education, 8*(2), 2, 19.

Buck, M. (February, 1997). Scholarly publications. *The Chronicle of Physical Education in
Higher Education, 8*(1), 2, 19.

Buck, M. (September, 1996). Scholarly publications. *The Chronicle of Physical Education in
Higher Education, 7*(3), 2,19.

Buck, M. (May, 1996). Scholarly publications. *The Chronicle of Physical Education in Higher
Education, 7*(2), 2.

## PROFESSIONAL PAPERS AND PRESENTATIONS

Wayda, V., Lund, J., Buck, M., & Woodard, R. (2005). Physical Education Student and Teacher
Perceptions of Dispositions
AAHPERD National Convention, Chicago, IL

Wayda, V., & Buck M. (2005). Learning More by Doing: A Teaching Strategy that Eliminates
the "But"
NAKPEHE Conference, Tucson, AZ

Buck, M. (2004, December). National Physical Education Standards: What Are They? Why Do
We Need Them?
Michigan Association for Health, Physical Education, Recreation and Dance Convention,
Columbus, OH.

Buck, M., Crouch, S., & Hicks, L. (2004, November). A Comprehensive Education for Every
Child: Physical Education and Health Education Are Core
IAHPERD Convention, Indianapolis, IN.

Buck, M. M. (2004, September). No Child Left Behind
Midwest District AAHPERD Leadership Conference, Angola, IN.

Davis, R., & Buck, M. (2004, September) Special Education and Adapted Physical Education in
the United States
Intensive Program, University College Worcester, Worcester, UK

Wayda, V., Lund, J.L., Buck, M. & Woodard, R. (2004, April) Employability skills: What are we
teaching our students?
AAPHERD, New Orleans, LA.

Lund, J.L., Wayda, V., & Buck, M. (2004, January).  Teacher Preparation for Physical Activity:
The Past, the Present, the Future
NAPEHE, Clearwater Beach, FL.

Buck, M. (2003, November). Eliminating the barriers to physical activity.
Michigan Association for Health, Physical Education, Recreation and Dance Convention,
Traverse City, MI.

Buck, M., Hicks, L., Duchane, K., Cothran, D, & Hare, M. (2003, November). Meeting both
physical education standards and health standards.
IAHPERD Convention, Indianapolis, IN.

14

Buck, M. M. & Lund, J. (2003, October) Meeting standards through performance-based
    assessment: The Ball State model
    Physical Education Teacher Education Conference, Baton Rouge, LA.
        Prepared and submitted proposal and assisted in the development of the poster but
        was unable to attend due to the dates conflicting with the Midwest District
        Leadership Conference

Griffin, L. L., Hall, S. J., Meaney, K. S., Dunn, J. M., Buck, M., LaMaster, K. J., Chen, A., &
    Cruz, L. M. (2003, April). Life as an academic in the 21st century–Part 1: Establishing
    strong mentoring and Part II: Navigating the tenure and promotion process.
    AAHPERD, Philadelphia, PA.

Lund, J.L., Woodard, R., Wayda, V., & Buck, M. (2003, April) Survey of Indiana Physical
    Educator's Content Knowledge.
    AAPHERD, Philadelphia, PA.

Lund, J.L., Wayda, V., & Buck, M. (2003, January).  Employability Skills: Setting the Stage for
    Student Success after Graduation.
    NAPEHE, Long Beach, CA

Buck, M. M. (2002, July). Use of technology in physical education. 2002 China-US Conference
    on Physical Education, Beijing, China.

Buck, M. M. (2002, April) Seeking national board certification in physical education: Support
    system.
    American Alliance for Health, Physical Education, Recreation, and Dance National
    Convention, San Diego, CA

Woodard, R., Lund, J. L., Wayda, V., & Buck, M. (2002, April). Daily physical education,
    physical fitness, and middle school students.
    American Alliance for Health, Physical Education, Recreation, and Dance National
    Convention, San Diego, CA

Lund, J. L., Wayda, V., & Buck, M. (2002, April). Evaluating preservice teachers' attitudes and
    dispositions: Mentioning the "Unmentionables".
    American Alliance for Health, Physical Education, Recreation, and Dance National
    Convention, San Diego, CA

Buck, M. (2002, February). United States perspective on the structure of sport.
    International Week, University College Worcester, Worcester, UK

Lund, J., & Buck, M. (2002, January). Assessment project report.
    Professional Preparation Conference, Mitchell, IN.

Buck, M. (2002, January). Standards usage.
    Professional Preparation Conference, Mitchell, IN.

Lund, J., Buck, M., & Wayda, V. (2002, January). Using accountability effectively in teacher
    education.
    National Association for Physical Education in Higher Education Conference, San
    Antonio, TX.

Buck, M. (2001, November). Liability in coaching.
    Indiana Association for Health, Physical Education, Recreation and Dance Conference,
    Indianapolis, IN

Buck, M. (2001, July). National boards: How universities can help. Catch the Thrill of the Skill,
    NASPE National Standards Conference, Kansas City, MO

Buck, M. (2000, November). Uses of technology in physical education
    IVth International Sports Sciences Congress, Hacettepe University, Ankara, Turkey

Buck M. (2000, November). New research techniques for analyzing learning
    IVth International Sports Sciences Congress, Hacettepe University, Ankara, Turkey

Buck, M. (2000, July). Training PETE students to use heart rate monitors: The Ball State
    University model
    Linking Physical Activity and Fitness, National Association for Sport and Physical
    Education Standards #3 & 4 Conference, Baltimore, MD

Buck, M. (2000, July). Required fitness tests for preservice teachers: Preparation for modeling
    Standard 3
    Linking Physical Activity and Fitness, National Association for Sport and Physical
    Education Standards #3 & 4 Conference, Baltimore, MD

Buck, M. (1999, November). Liability issues in physical education: Implications of court
    decisions on teaching
    Indiana Association for Health, Physical Education, Recreation and Dance Conference,
    Ft. Wayne, IN

Buck, M., McManama, J., Barker, T., & Northcroft, S. (1999, November). Space Shuttle
    Adventure: K-12
    Indiana Association for Health, Physical Education, Recreation and Dance Conference,
    Ft. Wayne, IN

Buck, M. M. (1999, October). Training preservice and inservice teachers in the use of technology
    in physical education
    NASPE National Teacher Education Conference in Physical Education: Exemplary
    Practice in Teacher Education, Bloomingdale, IL

Buck, M. M. (1999, July). Achieving individual fitness goals: Using heart rate monitors
International Council for Health, Physical Education, Recreation, Sport, and Dance
World Congress, Cairo, Egypt

Buck, M. M. (1999, April). Healthy alternatives for enhancing physical education and health with
technology
Legacy 21 Professional Development Series - TV Program
Broadcast from Ball State but had national audience

Buck, M. (1998, November). Legal liability issues in physical education.
Indiana Association for Health, Physical Education, Recreation and Dance Conference,
Indianapolis, IN

Buck, M., & McManama, J. (1998, November). Fitness standards for physical education majors:
issues and answers
Indiana Association for Health, Physical Education, Recreation and Dance Conference,
Indianapolis, IN

Buck, M. (1998, November). Technology - What's happening in Indiana.
Indiana Association for Health, Physical Education, Recreation and Dance Conference,
Indianapolis, IN

Buck, M. (1998, November). PowerPoint basics.
Indiana Association for Health, Physical Education, Recreation and Dance Conference,
Indianapolis, IN

Buck, M. M. (1998). Uses of technology in physical education.
HyperMedia 98, Muncie, IN

Wilson, T., Buck, M., & Wayda, V. (1998, April). Interscholastic coaching certification.
American Alliance for Health, Physical Education, Recreation and Dance National
Conference, Reno, NV

Buck, M. M. (1998, April). Technology in high school physical education.
Legacy 21 Professional Development Series - TV Program
Broadcast from Ball State but had national audience

Buck, M. M. (1998, February). Technology in middle school physical education.
Legacy 21 Professional Development Series - TV Program
Broadcast from Ball State but had national audience

17

Buck, M. M. (1997, December). The skill-fit model for improving fitness and skills simultaneously.
AIESEP World Conference on Teaching, Coaching and Fitness Needs in Physical Education and the Sport Sciences, Singapore.

Buck, M. M. (1997, December) Incorporating interdisciplinary units into physical education classes.
AIESEP World Conference on Teaching, Coaching and Fitness Needs in Physical Education and the Sport Sciences, Singapore

Buck, M. (1997, November). Computer programs to enhance physical education.
Indiana Association for Health, Physical Education, Recreation and Dance Conference, Indianapolis, IN

Buck, M. (1997, November). Creating a homepage.
Indiana Association for Health, Physical Education, Recreation and Dance Conference, Indianapolis, IN

Buck, M. (1997, November). Using video cameras to increase skill learning in physical education.
Indiana Association for Health, Physical Education, Recreation and Dance Conference, Indianapolis, IN

Buck, M. (1997, November). Using presentation software.
Indiana Association for Health, Physical Education, Recreation and Dance Conference, Indianapolis, IN

Ignico, A., & Buck, M. (1997, November). Tap into new sources of funding for your program.
Indiana Association for Health, Physical Education, Recreation and Dance Conference, Indianapolis, IN

Buck, M. (1997, October). Integrating technology into physical education teaching.
HyperMedia 97: Integrating Technologies into Teaching & Learning Conference, Muncie, IN

Buck, M., & Thomson, W. (1997, March). Practical applications of technology in teaching physical education.
American Alliance for Health, Physical Education, Recreation, and Dance National Convention, St. Louis, MO

Strand, B., Reeder, S., Pratt, B., Levine, J., Greenburg, J., & Buck, M. M. (1997, March). Using Polar heart rate monitors as a grading and motivating tool.
American Alliance for Health, Physical Education, Recreation, and Dance National Convention, St. Louis, MO

Buck, M. (1997, February). Introducing pre-service teachers to physical education national content standards.
Midwest District of the American Alliance for Health, Physical Education, Recreation, and Dance Conference, Milwaukee, WI

Buck, M., Thomson, W. C., McManama, J., & Ignico, A. (1997, February). Enhancing fitness and skill using heart rate monitors.
Midwest District of the American Alliance for Health, Physical Education, Recreation, and Dance Conference, Milwaukee, WI

Buck, M., Thomson, W. C., McManama, J., & Ignico, A. (1997, February). Infusing fitness into skill development units.
Midwest District of the American Alliance for Health, Physical Education, Recreation, and Dance Conference, Milwaukee, WI

Buck, M.  (1996, November). Review of research using heart rate monitors: Implications for effective teaching.
Research on Teaching and Research on Teacher Education,
AIESEP International Seminar, Lisbon, Portugal.

Buck, M. M. (1996, November). A physical fitness requirement: Results of implementation.
Research on Teaching and Research on Teacher Education,
AIESEP International Seminar, Lisbon, Portugal

Buck, M. (1996, October). Technology moving physical education into the 21st century.
Indiana Association for Health, Physical Education, Recreation and Dance Conference, Evansville, IN.

Sparks, W., Buck, M., Blakemore, C., & Pellett, T. (1996, April). Preparing teachers in a changing world: An overview of quality programs in physical education teacher education.
American Alliance for Health, Physical Education, Recreation, and Dance National Convention, Atlanta, GA.

Burton, C. J., & Buck, M. M. (1996, April). The heart rates of elementary children during physical education.
American Alliance for Health, Physical Education, Recreation, and Dance National Convention, Atlanta, GA.

McManama, J., Buck, M. M., Burton, C. J., & O'Connor, C. (1996, April). Improving cardiovascular fitness in a college beginning volleyball class.
American Alliance for Health, Physical Education, Recreation, and Dance National Convention, Atlanta, GA.

Kirkpatrick, B., & Buck, M. M. (1996, April). Comparing changes in cardiovascular measures of middle school students.
American Alliance for Health, Physical Education, Recreation, and Dance National Convention, Atlanta, GA.

Assmann, N., & Buck, M. (1996, January). Technology: Training teachers for the future.
Midwest District of the American Alliance for Health, Physical Education, Recreation, and Dance Conference, Dearborn, MI.

Buck, M. (1996, January). Safe practices in physical education: Legal liability issues.
Midwest District of the American Alliance for Health, Physical Education, Recreation, and Dance Conference, Dearborn, MI.

Buck, M., McManama, J., & Ignico, A. (1995, October). Using heart rate monitors in physical education.
National Conference on Teacher Education in Physical Education (Sponsored by the National Association for Sport and Physical Education), Morgantown, WV.

Buck, M. M., & McManama, J. (1995, July). Improving skill and fitness concurrently: Can it be done?
'95 World Congress of the International Council for Health, Physical Education, Recreation, Sport, and Dance, Gainesville, FL.

Buck, M. M. with Barb Ettl, Cathie Burton, & Caryn O'Connor. (1995, April - May). Technology workshops for Indiana physical education teachers. Conducted 6 workshops throughout the state of Indiana under the sponsorship of the Indiana Department of Education, Ball State University, and the Indiana Association for Health, Physical Education, Recreation, and Dance.

Ignico, A., & Buck, M. (1995, March). A practical strategy for enhancing sport skill assessment.
American Alliance for Health, Physical Education, Recreation, and Dance, Portland, OR.

Buck, M, & Sparks, W. (1995, February). Physical education teacher education curriculum round table: Concerns and possible solutions.
Midwest District of the American Alliance for Health, Physical Education, Recreation, and Dance, Arlington Heights, IL.

Buck, M., & McManama, J. (1995, January). Tech training for the future I: From college to public schools.
Expanding Horizons: Technology in Physical Education Conference, San Antonio, TX.

Burgess, S., Ignico, A., & Buck, M. (1995, January). Tech training for the future III: Computer applications for physical education classes.
Expanding Horizons: Technology in Physical Education Conference, San Antonio, TX.

20

Ignico, A., & Buck, M. (1994, November). Integrating heart rate technology into the
undergraduate teacher preparation program.
Indiana Association for Health, Physical Education, Recreation & Dance State
Convention, Merrillville, IN.

Buck, M., Kirkpatrick, B., & Burton, C. (1994, April). A computerized fitness system.
American Alliance for Health, Physical Education, Recreation, and Dance, Denver, CO.

Buck, M., & Pellett, T. L. (1994, February). Knowledge of teacher effectiveness and content
development: Implications for teacher education.
Midwest District Conference of the American Alliance for Health, Physical Education,
Recreation and Dance, Morgantown, WV.

Buck, M. M. (1993, November). The heart adventure and tropical rain forest challenge courses.
Vigo County School Corporation, Terre Haute, IN.

Buck, M. M. (1993, November). Using heart rate monitors.
Vigo County School Corporation, Terre Haute, IN.

Assmann, N., & Buck, M. (1993, October). Beginning computer workshop for physical
educators.
Indiana Association for Health, Physical Education, Recreation & Dance State
Convention, Indianapolis, IN.

Buck, M., & Assmann, N. (1993, October). Results of a survey of computer usage by Indiana
physical education teachers.
Indiana Association for Health, Physical Education, Recreation & Dance State
Convention, Indianapolis, IN.

Harrison, J. M., Pellett, T., & Buck, M. M. (1993, March). The effect of drill, game and
equipment modifications on achievement by low-skilled learners.
American Alliance for Health, Physical Education, Recreation, and Dance, Washington,
DC.

Buck, M. M. (1993, February). A step by step approach to evaluating teaching with a goal of
improving teacher effectiveness.
Midwest District Conference of the American Alliance for Health, Physical Education,
Recreation and Dance, Toledo, OH

Buck, M. M., & Feingold, R. (1993, January). Is NAPEHE working toward the future or the
past? A view of one member.
National Association for Physical Education in Higher Education National Conference,
Fort Lauderdale, FL

Buck, M. M. (1992, October). Improving teacher effectiveness in middle and high school physical education.
Indiana Association for Health, Physical Education, Recreation & Dance State Convention, Fort Wayne, IN

Buck, M. M. (1992, August). Classroom management.
S.H.A.P.E. Workshop, Elkhart, IN

Buck, M. (1992, May). Physical Best changes.
Presentation for county physical education teachers, Wes-Del High School, Gaston, IN.

Harrison, J., & Buck, M. (1992, April). Relationships of self-efficacy, causal dimension, and sport orientation to volleyball achievement.
American Alliance for Health, Physical Education, Recreation and Dance, Indianapolis, IN.

Harrison, J., & Buck, M. (1992, February). An analysis of practice and command styles of instruction on the volleyball achievement and self-efficacy of high-, medium-, and low-skilled learners.
Southwest District of the American Alliance for Health, Physical Education, Recreation and Dance, Phoenix, AZ.

Harrison, J., & Buck, M. (1992, January). Game play changes in volleyball resulting from instruction using game and equipment modifications: A follow-up study.
National Association of Physical Education in Higher Education. Scottsdale, AZ.

Buck, M. (1991, June). Physical Best workshop for Delaware County, Indiana, physical education teachers. Muncie, IN.

Buck, M. (1991, March). 7th grade assessment results. School Health Task Force Presentation/Press Conference, Muncie, IN.

Harrison, J., & Buck, M. (1991, January). Relationship of learning trials and learner characteristics to volleyball achievement using USVBA-recommended game modifications. World Congress of the International Association of Physical Education Schools in Higher Education. Atlanta, GA.

Buck, M. (1990, November). School Health Task Force: Physical Best program. Live Healthy, Delaware County Workshop VII, Muncie, IN.

Buck, M. (1990, March). Preserving the future of physical education through increasing student achievement.
Chadron State College. Chadron, NB.

22

Buck, M., & Harrison, J. M. (1990, February). Improving student achievement in physical education.
American Alliance for Health, Physical Education, Recreation and Dance, Southwest District, Albuquerque, NM.

Buck, M., & Harrison, J. M. (1990, February). New Research Techniques for Analyzing Learning: An Analysis of Learning Trials and Achievement
American Alliance for Health, Physical Education, Recreation and Dance, Southwest District, Albuquerque, NM.

Buck, M., & Harrison, J. M. (1990, January). A new research technique for evaluating student achievement.
National Association of Physical Education in Higher Education, San Diego, CA.

Buck, M., & Harrison, J. M. (1989, October). An analysis of learning trials and their relationship to achievement in volleyball.
R. Tait McKenzie Pedagogy Symposium, Knoxville, TN.

## GRANTS FUNDED

Lilly II Departmental Retention Initiatives Grant (2004)
*Development of a School-Wide Advising Center in the School of Physical Education* (with Tony Mahon) Funded $12,500.

Lilly II Departmental Retention Initiatives Grant (2003)
*Genesis of a Professional* Funded $11,400.(with Tony Mahon) Grant was for 18 months and concluded December 31, 2004.

Summer Advising Project. (2002). Funded $2500
Lilly II Grant

Summer Assessment Grant. (2002). Funded $4800
Office of Academic Assessment and Institutional Research

Summer School Marketing Grant. (2002). Funded $1000
School of Continuing Education and Public Service (with Valerie Wayda)

Developing a Standardized Assessment Tool for Middle School Physical Education. Funded $66,626
Indiana Department of Education (2001) (with Jacalyn Lund)

Training School of Physical Education Undergraduate Advisors. Funded $11,600
Retention Programs for Faculty Advising, Lilly Endowment, Inc. (2001) (with Dave Pearson)

23

Coaching Education: Making it a Viable Option. Funded $10,000
    George and Frances Ball Fund (2001) (with Valerie Wayda)

Faculty Development to Implement Computer Competency Plan. Funded $4,500
    21st Century Fund for Faculty Development (2000)

Faculty and Study Exchanges with University College Worcester. Funded $3,500
    International Programs Endowment Fund (2000) (with Rebecca Woodard)

Space Shuttle Adventure Video. Funded $4000
    Indiana Space Consortium (NASA) (1999) (with Jerre McManama)

Development of a Space Shuttle Adventure Interdisciplinary Unit. Funded $24,084
    Indiana Space Consortium (NASA) (1998) (with Jerre McManama)

Development of a Space Shuttle Adventure Interdisciplinary Unit. Funded $24,454
    Indiana Space Consortium (NASA) (1997) (with Jerre McManama)

Faculty Development Project to Increase Technology Use by School of Physical Education
    Faculty. Funded $4000
    21st Century Fund, Ball State University Faculty Development Grant (1997)

1997 US Games Beyond Innovations. Funded $4517.12
    US Games, Inc. (1997) (with Jerre McManama)

POLAR Technology Training Project. Funded $3145
    POLAR Electro, Inc. (1997-1999) (with Arlene Ignico)

The Wellness Profile. Funded $995
    MicroFit Inc. (1997)

Beyond Innovations: Creating Interdisciplinary Units of Instruction. Funded $2,100
    US Games, Inc. (1994) (with Jerre McManama)

1994 POLAR Technology Training Project. Funded $30,512
    POLAR CIC, Inc. (1994) (with Arlene Ignico)

Computer Competency. Funded $1279.
    College of Applied Sciences and Technology, Ball State University, Muncie, IN (1993)

A Survey of Computer Usage of Indiana Public School Physical Education Teachers. Funded
    $700
    Indiana Association for Health, Physical Education, Recreation and Dance (1992) (with
    Nikki Assmann)

24

Computer Competency. Funded $395
    College of Applied Sciences and Technology, Ball State University, Muncie, IN (1991)

An Analysis of Two Instructional Methods and Their Effects on the Number and Quality of
    Learning Trials and Achievement in Volleyball. Funded $1037
    Office of Research and Sponsored Programs, New Faculty Grant Competition. Ball State
    University, Muncie, IN. (1990)

## CONSULTING

Curriculum Development
    Huntington North High School
    Huntington, IN
    2001

Using Heart Rate Monitors
    Taylor Middle School
    Kokomo, IN
    2001

Fitness Program and Assessments
    Pierre Moran Middle School
    Elkhart, IN
    2000-2001

Physical Education Curriculum Development
    Liberty-Perry School Corporation
    Selma, IN
    1998

Conducted Technology in Physical Education Inservice Meetings for Catholic schools
    South Bend and Ft. Wayne, IN
    1998

Wellness theme curriculum development
    Selma Middle School,
    Selma, IN
    1996-1997

Performance based assessment (PBA) Planning
    Richmond High School,
    Richmond, IN
    1997

25

Penn High School, Block Scheduling and Technology in Curriculum Development
    Mishawaka, IN
    1996

Physical education program evaluation and curriculum development
    Arsenal Tech High School
    Indianapolis, IN
    1994 - 1997

Physical education program evaluation and curriculum development
    Lake City High School
    St. Johns, IN
    May 1995 - 1996

Wellness theme project
    Union School Corporation, Modoc, IN
    August 1993 - May 1996

Physical education program evaluation and curriculum development
    Twin Lakes School Corporation, Monticello, IN
    May 1992 - 1993

Use of WordPerfect for Newspaper Lay-outs
    Frankfort Senior High School, Frankfort, IN.
    September, 1991



BALL STATE
UNIVERSITY

COLLEGE OF APPLIED SCIENCES AND TECHNOLOGY

Muncie, Indiana 47306-0245
Phone: 765-285-5818
Fax: 765-285-1071

March 31, 2006

Ronald E. Gluck
Attorney at Law
Breakstone, White-Lief & Gluck, P. C.
Two Center Plaza
Suite 530
Boston, MA 02108-1906

RE:    =    Yukio Kusada

Dear Mr. Gluck:

        At your request, I have reviewed discovery information to perform an objective assessment of the standard of care and deviation, if any, from the standard of care in connection with the athletic department at Northfield Mount Herman School and, specifically, Frank Millard and Michael Atkins in connection with the skiing incident involving Yukio Kusada on February 20, 2004 at Berkshire East.

        In connection with my assignment, I have reviewed deposition transcripts of the following individuals:

1.    Frank Millard

2.    Michael Atkins

3.    Richard Eisenberg

4.    Audra Forstrum

5.    Susan Clough

6.    Yuki Hasaegawa

7.    Yukio Kusada

8.    John Herrick

In addition, I have reviewed documents from Northfield Mount Herman School from students who participated in the physical education course known as the recreational ski program at Northfield Mount Herman School in the year 2003 – 2004.

## FACTS

During his senior year at Northfield Mount Herman School, Yukio Kusada registered for the physical education course known as the Recreational Ski Program. He informed the school that he was a beginner skier and desired to take ski lessons. Northfield Mount Herman School recommended that students participating in the physical education class wear a helmet, but did not require that they do so. Northfield Mount Herman School notified the students that they were to obtain ski equipment, including skis, poles and boots, on their own. Mr. Kusada borrowed his skis from a student, Samuel Wilson. They were Atomic SX11 skis, which I understand are designed for an advanced skier. Prior to taking part in the 2003 - 2004 ski course at Northfield Mount Herman School, Yukio Kusada had never skied. No one from the administration of Northfield Mount Herman School was aware of what kind of skis and equipment Yukio Kusada was using throughout the ski course. Prior to the evening of February 20, 2004, no one from the administration and/or the athletic department at Northfield Mount Herman School knew whether or not Yukio Kusada used a helmet while participating in the ski course. On or before February 20, 2004, Yukio Kusada received no instruction on skiing from any representative, faculty member or administrative individual at Northfield Mount Herman School. Yukio Kusada received no ski lessons at Berkshire East on or before February 20, 2004.

Michael Atkins was the coordinator of the ski course, and Frank Millard was his supervisor in 2003 and 2004. Mr. Atkins had daily responsibility for the skiing program. Mr. Millard had secured the contract with Berkshire East and had been involved with the program for many years. Mr. Atkins and Mr. Millard stated no instruction was provided by the school and was not necessary because this was a recreational ski program. Neither provided active supervision at the program site, Berkshire East.

The chaperones, Richard Eisenberg, Audra Forstrum, and Susan Clough, were assigned to chaperone the ski program for which students received course credit. None of the chaperones were provided any ski training as supervisors, nor were any of them trained as physical educators. I am not aware if any of them received formal training as coaches within their degree programs or by other means. They were told that the duties of a chaperone included taking

attendance while boarding the buses at the school and when returning from the mountain; controlling behavior on the bus; maintaining one chaperone in the lodge at all times so that students did not take too long a break; watching to make sure rules were observed; and driving injured students to the hospital as indicated by the staff at Berkshire East.

As stated earlier, helmets were recommended, but not required to be worn by students. The reason provided for not requiring helmets was that the requirement could not be enforced.

Skiing instruction was expected to be provided for students who requested it, but for some reason it did not occur for this group. Ms. Forstrum, the head chaperone, did not know why lessons were unavailable. She did not report any problem with the lesson unavailability to any of her supervisors of the ski program. Neither Mr. Millard nor Mr. Atkins inquired of the chaperones if lessons were taking place or how they were progressing.

On February 20, 2004 Mr. Kusada had been skiing with a student, Yuki Hasegawa and went down an intermediate trail in contrast to his beginner level of ability. When Mr. Hasegawa did not see him at the end of the run, the friend provided this information to one of the chaperones who dismissed the information, indicating that this type of information was provided all the time. It was determined when buses were loading to go back to the school at approximately 9:45 p.m. that Mr. Kusada was missing. It is my understanding that Mr. Kusada was found near a tree in an unconscious state at approximately 4:00 a.m.

## STANDARD OF CARE

The standard of care for physical education teachers requires the individuals to provide effective supervision, appropriate and well-conducted activities and safe and appropriate environmental conditions. Supervision is defined as the quality and quantity of control exerted by teachers or coaches over the individuals for whom they are responsible. The supervisors must be trained and demonstrate the skills necessary to fulfill the duties assigned. The amount of supervision required depends upon the participant's age and skill level, the activity, the risk associated with the activity and their ability to understand and appreciate the risks and consequences of their own actions. These risks must be explained to the student who must demonstrate knowledge of the risks before engaging in the activity.

Supervision guidelines require the supervisors to move about the area to maximize contact with the participants and to keep the activities within the ability level of the individual students It is not required that students be insight at all times. The activity, capacity and experience of the student and the number of participants in the class dictate the level of supervision required. With each of these guidelines, staff training is critical for the supervisors to have the appropriate supervisory skills.

Students should expect that every effort has been made to provide a safe environment. This includes the requiring of safety equipment as indicated by the activity in which the student is participating. It also includes the school providing appropriate and safe equipment for the level of ability that the student possesses in the particular event. The age, skill, experience and level of play will play a role in determining the level of risk and the type and amount of safety equipment needed. Failure to use protective measures within a program of instructional competition would constitute a violation of proper professional procedure.

Teachers are to select activities that are reasonable for the ability levels of the individuals involved. In addition to selecting appropriate activities, the teacher is expected to provide instruction that is both accurate in its detail and is presented in a manner that maximizes the likelihood of the participant's success. This instruction should include not only information regarding the techniques for successful performance, but warnings regarding any potentially hazardous element of the activity and specific guidelines for minimizing these risks.

To be effective, instruction must be augmented by accurate and detailed feedback. The simple act of telling a person how to perform a particular skill in no way guarantees success.

In the area of environmental conditions, the student must be provided with equipment equal to the individual's skill level. Equipment requiring a skill level beyond that of the individual in question would be a violation of the above-stated standard.

In summary, the standard of care for a physical education program at a school requires that the activities to be selected are at a level appropriate to the student's skill level. In addition, instruction with feedback and continuous evaluation should be provided, the amount determined by the skill level of the individual. Further, the equipment should be appropriate to the skill level of the individual who is using it, and protective equipment should be required whenever available, especially in situations of increased risk of injury. In

addition, supervision should be provided by individuals who have been trained to perform the specific supervisory role and who have received ongoing staff development. Individuals should not be allowed to participate in an activity at a level at which the individual has not demonstrated the ability to safely perform the activity. This requires demonstration of competency by the student to individuals with expertise in instruction and supervision in the activity in question.

## OPINION

It is my opinion with a reasonable degree of educational expertise and scientific certainty that the following deviations from the standard of care occurred in this matter:

1.    Inadequate supervisory training for the chaperones;

2.    Inadequate supervision of the students;

3.    Inadequate instruction, feedback and continuous evaluation of performance of the students; and

4.    Inadequate creation of and implementation of rules requiring use of appropriate safety equipment.

Skiing is a sport in which the risk of injury is very real. To minimize the risk of injury, within the context of a physical education class, instruction is mandatory. Asking the students to self-report skiing ability is an appropriate beginning to determine ability level of all students. After that, a skill assessment should have been completed by individuals competent to make this determination. Those individuals determined to need instruction to begin skiing should have been required to receive instruction prior to ever beginning any skiing. It should have begun on the first day and continued throughout the program to check on progress. This would have met the standard for feedback and evaluation of performance. Another aspect of instruction that should have occurred was to provide each student with a list of safety rules and expectations of the orientation session and they should have been reminded often of those rules. Mr. Millard stated that it was the students' responsibility to get a lesson if they wanted one. The standard of care required teachers to be sure that it was provided. Through instruction, students will be taught proper terrain selection so that they are informed of the risks of skiing on terrain which is beyond their ability. Students would be taught how to properly stop and turn on their equipment. Students would be taught about the importance of using

skis which are appropriate for their level of ability. Students would be taught that if they were having trouble with their equipment that they should seek assistance from a supervisor or mountain staff. Failure to provide instruction is a deviation from the standard of care for physical education programs in general and specifically for the physical education course in which Mr. Kusada was enrolled, which was administered by Michael Atkins and Frank Millard. Deposition testimony revealed that instruction was required in all of the other physical education courses offered by Northfield Mount Herman School in 2003 and 2004. The only exception to this rule was the ski course.

Northfield Mount Herman School, Frank Millard and Michael Atkins also deviated from the standard of care of requiring appropriate safety equipment. Specifically, no one provided any guidance to Mr. Kusada about what skis he should use or not use when taking part in the ski course. It is well known in the ski industry, that equipment is specifically designed for various levels of ability. The standard of care required that Mr. Kusada receive guidance on the selection of the skis and that the physical education instructors and/or supervisors be aware of the equipment that he was using to minimize the risk of injury.

Further, the standard of care required that Mr. Kusada be required to wear a helmet. Due to the risk of head injury in skiing helmets were available at the time of this incident which were intended to minimize the risk of head injury. In the context of a physical education program at a school the standard of care required that the students be taught about helmet use and that they be required to use helmets to minimize the risk of injury. The explanation given for not requiring a helmet was that this requirement could not be enforced. There are measures available to enforce rules such as this. As an example, a rule could have been implemented stating that if a student was found on the mountain without a helmet, they would be removed from the ski class that day, and for a second violation they would be expelled from the class for which they were receiving credit. This type of deterrent is effective in physical education programs. Supervisors and chaperones should be on the mountain, skiing and/or stationed at the top or bottom of the lift to make sure that students were wearing helmets and to make sure that they were not having difficulties while on the mountain. These methods should have been employed to ensure student compliance with rules concerning helmet use. If three chaperones were an inadequate amount to supervise the number of students skiing, then additional chaperones should have been employed to make supervision effective.

The physical education program at Northfield Mount Herman School and Frank Millard and Michael Atkins also deviated from the standard of care requiring appropriate supervisory training for the chaperones. Mr. Eisenberg, Ms. Forstrum and Ms. Clough received no training in actual ski instruction, in

terrain selection, in equipment selection or in any other aspect of ski safety awareness that would have made them appropriate candidates for being a chaperone. None of the chaperones conveyed any information to Yukio Kudada in the nature of ski instruction, terrain selection, or equipment selection.

Mr. Millard and Mr. Atkins failed to instruct the chaperones that if a student was reported missing, they were to report that fact promptly to the appropriate personnel at the mountain. In this case, the information was reported to Ms. Forstrum by Yuki Hasaegawa, and she did not report this information to the officials at the mountain for approximately 2 hours when the buses were about to leave for the school. This was a violation of the standard of care in the physical education setting. Mr. Atkins and Mr. Millard provided no guidance or rules for the chaperones to follow in the event that this type of situation materialized.

Mr. Millard and Mr. Atkins also failed to give instruction to the chaperones about exactly what information they were to obtain from any student who reported a student to be missing. In this case, the standard of care required that Ms. Forstrum obtain all material information concerning Mr. Kusada's last known whereabouts, the type of clothing he was wearing, and the time that he was last seen and that she provide this information to the authorities at Berkshire East.

Procedures to provide appropriate supervision for a skiing activity were not in place, which should have included a buddy system and a faster response to a missing student who might have been injured.

These opinions are made with a reasonable degree of educational and scientific certainty.

*Marilyn M. Buck*

Marilyn M. Buck, Ed.D.
Professor of Physical Education
Associate Dean
College of Applied Sciences and Technology
Ball State University
Muncie, IN 47306

APPENDIX 14

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

YUKIO KUSADA,                    )
      Plaintiff              )
                            )
vs.                             )     Civil Action
                            )     No.: Civil Action No.: 05-30043-MAP
                            )
NORTHFIELD MOUNT HERMON   )
SCHOOL, FRANCIS MILLARD and   )
MICHAEL ATKINS,             )
      Defendants           )
                            )

## AFFIDAVIT OF LAWRENCE E. THIBAULT, SC.D.

I, Lawrence E. Thibault on oath depose and say:

1.     I reside at 9 Creekview Circle, West Chester, Pennsylvania.

2.     I have an Sc.D. in Mechanical Engineering from George Washington University received in 1979.

3.     From 1971 to 1980 I was a research engineer with the National Institute of Health, Biomedical Engineering Branch.

4.     From 1980 to 1984 I was an Assistant Professor of Bioengineering and Neurosurgery at the University of Pennsylvania School of Engineering and Applied Science and the School of Medicine.

5.     From 1984 to 1991 I was an Associate Professor of Bioengineering and Neurosurgery at the University of Pennsylvania, Department of Bioengineering, School of Engineering and Applied Science and the School of Medicine.

6.     From 1991 to 1994 I was a Professor and Chairman of the Department of Bioengineering at the University of Pennsylvania, School of Engineering and Applied Science.

7.     From 1991 to 1995 I was a Professor of Bioengineering in Neurosurgery and Orthopedic Surgery at the University of Pennsylvania, School of Medicine.

2

8.      From 1982 to 1995 I was an Associate Director of the Head Injury Center, Department of Neurosurgery, School of Medicine, at the University of Pennsylvania.

9.      From 1990 to 1995 I was the Executive Director, Laboratories for Injury, Research and Prevention at the Department of Bioengineering, University of Pennsylvania.

10.     From 1995 to 1998 I was a Professor in Neurosurgery and Director of the Division of Bioengineering in the Department of Neurosurgery at Allegheny University of Health Sciences.

11.     From 1998 to 2001 I was a Professor in the School of Biomedical Engineering, Science and Health Systems, Drexel University.

12.     In 2000 I founded Biomechanics, Inc. and remain a principal in the company.

13.     Biomechanics is a well established branch of biomedical science and engineering dedicated to elucidating the mechanisms of human injury and determining qualitatively the thresholds at which injury to the human body occurs.

14.     I have authored or co-authored in excess of 250 papers and presentations, mostly on various aspects of the biomechanics of head injury.

15.     I am the recipient of the Bertil Aldman Award from the International Research Council on the biomechanics on impact, contributions to impact, trauma, research and head injury.   I am the recipient of the Melville Medal from the American Society of Mechanical Engineers, the Nicholas Andry Award from the America Association of Bone and Joint Surgeons and the William Stickle Award from the American Academy of Podiatric Surgeons.

16.     I am the recipient of the Best Scientific Paper Award, from the Association for the Advancement of Automotive Medicine – Brain Injury Biomechanics.

17.     I have served as Chairman of the Bioengineering Division for the American Society of Mechanical Engineers.

3

18.    I have been the principal or co-principal investigator for 20 studies related to the biomechanics of head injury for entities including the National Institute of Health, the U.S. Department of Transportation, General Motors Corporation, the Centers of Disease Control and the National Football League.

19.    I have served as Chairman of the Bioengineering Division for the American Society of Mechanical Engineers.

20.    I have reviewed the medical records of Yukio Kusada in connection with injuries he suffered on February 20, 2004.  Records reviewed confirm that Mr. Kusada suffered traumatic brain injury, diffuse axonal injury, right occipital subdural hematoma, right temporal epidural hematoma, right posterior sub arachnoid hemorrhage, right sphenoid fracture, left occipital epidural hematoma with contusion in addition to leg injuries.

21.    The method available to estimate Mr. Kusada's impact velocity is the failure criteria for his various scalp, skull and brain injuries.

22.    Based upon the biomechanical data Mr. Kusada's impact velocity was approximately 20 miles per hour, which would be reasonably associated with a Delta V of 20 miles per hour.  Anything in excess of this value would have most probably caused comminuted and depressed skull fracture.  There is no discussion of such trauma in the medical records.

23.    Helmets are designed to absorb energy and to reduce the stresses acting upon the head in an impact event.

24.    During Mr. Kusada's impact with the tree, the stopping distance of his head would be approximately 3/8 of an inch which represents a full scalp compression and skull bending prior to fracture.

25.    During Mr. Kusada's impact with the tree, the stopping distance of his head was approximately 0.38 inches, which represents a full scalp compression and skull bending with fracture.

4

26.     A helmet would provide at least 1.00 inch of stopping distance, excluding shell deformation, attenuating and distributing the impact load acting on Mr. Kusada's head.  This would reduce the forces acting on Mr. Kusada's head by approximately 300%.

27.     A helmet would have prevented skull fracture, contusions to the brain and it would have substantially reduced the diffuse axonal injury (DAI) and the acute subdural hematoma.  I    named    the white matter injury DAI in 1982.

5

Signed under the pains and penalties of perjury this 19th of December, 2006.


Lawrence E. Thibault, Sc.D.

2

**Certificate of Service**

I, certify that this document field through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on December 22, 2006 via first class mail.

Ronald E. Gluck

Heather A. Engman

# biomechanics
### N C

439 South Governor Printz Blvd.
Essington, Pennsylvania 19029

Telephone 215.271.7720
Facsimile 215.271.7740
www.biomechanicsINC.com

March 31, 2006

Ronald E. Gluck, Esquire
Breakstone, White-Lief & Gluck, P.C.
Two Center Plaza, Suite 530
Boston, Massachusetts  02108-1906

RE: Yukio Kusada

Dear Mr. Gluck:

Please accept this letter as a biomechanical analysis and report regarding the above-referenced matter.  The following materials were received for review in the preparation of this report:

- Photographic report and video prepared by James Isham;
- Color copies of photographs of the accident site;
- Site inspection video;
- Supplemental report of Frank Field;
- Report of Douglas Katz, M.D.;
- Various medical records and reports regarding Yukio Kusada.

The incident in question occurred on February 20, 2004 at Berkshire East Ski Resort in Charlemont, Massachusetts.  Yukio Kusada was night skiing, was unaccounted for and presumed to be missing.  Medical records indicate that Yukio Kusada was found on February 21, 2004 by using thermoimaging. The records also indicate that he had been missing anywhere from 5-10 hours.

A report prepared by volunteer ski patroller Frank Field indicates that Yukio Kusada was found right near the bottom of Big Chief.  He was off the trail and in the woods.  He observed Yukio Kusada's body in a supine position at the base of a large tree.  He was being tended to by other ski patrollers.  Rod Fielding indicated that in addition to an obvious head injury, he suspected that the left femur may be broken.  Frank Field conducted an examination of the head and cervical spine.  He noticed an abrasion of approximately 2 inches in diameter above the right eye on the forehead.  Pupils were dilated and slightly unequal in size.  The right pupil seemed to dilate slightly further when exposed to light. Each eye rotated inward toward the bridge of the nose after being exposed briefly to the light from a penlight.  Cervical collar was secured around the neck and patient was secured to a backboard for transport via sled from the scene to the ski patrol base station.

ER clinical record: head injury skiing.  Unresponsive, posturing.  Intubate. Good breath sounds.  Found unconscious.  Not found for ≈ 10 hours.  Unconscious. Right pupil dilated, left pupil reactive.  Abrasions, hematoma right temporoparietal.  CHI.

Medical/surgical H&P: skiing vs. tree.  Night skiing, missing for 8 hours, found unresponsive and posturing.  Right facial abrasion.  Posturing.  Edema left calf. Right facial laceration with ecchymosis.

2/21   CT cervical spine
No evidence of cervical spine injury.

2/21   CT abdomen
No abdominopelvic injury.

2/21   CT head

Multiple areas of parenchymal contusion including the left temporal lobe posteriorly, the right caudate, and the frontal lobes bilaterally with small areas of hemorrhage.  Subarachnoid hemorrhage in the interpeduncular and perimesencephalic cistern.  Subdural blood layering along the tentorium. Epidural hematoma anterior to the tip of the right temporal lobe measuring up to 15 mm from the inner table of the skull.  Small extra-axial collection in the posterior fossa on the right, which may be either an epidural or a subdural hematoma.  May be a fracture around the region of the right lambdoidal suture adjacent to the extra-axial collection.  Fracture transversely through the greater wing of the sphenoid on the right.  Also fractures of the anterior and medial wall of the right maxillary sinus.

Impression:

- Epidural hematoma anterior to the right temporal lobe
- Extra-axial collection in the posterior fossa on the right
- Subdural blood layering along the tentorium
- Subarachnoid hemorrhage in the interpeduncular and perimesencephalic cisterns
- Multiple areas of parenchymal cerebral contusion.
- Fracture of anterior medial wall of right maxillary sinus
- Fracture of greater wing of the sphenoid on the right
- Possible fracture near the lambdoidal suture on the right.

2/21   ICU note
Skiing last night, last seen at 7:30 p.m.  Unable to locate until early a.m.  Found unresponsive and posturing.  Intubation difficult but successful.  GCS estimated at 4.  Sedated and paralyzed.  Neuro: waking up slightly.

**Brief Medical Summary:**

2/21/04        BHSA-Greenfield EMS Report
Chief complaint: head injury.
Present illness: fall, internal bleeding, sporting event, unconscious.
Trauma: sports related, high speed, impact; patient believed to have hit a tree or large hole when skiing. Found outside after several hours; blunt trauma; struck stationary object.

Patient clenching teeth and posturing arms. Increased resps and heart rate. Started a little sweating/incontinent of urine. Yet at times responsive (groaning) to pain (palpation of left lower leg). Upper body warm. Lower body cooler/feet cold yet good color (+ pulses).

Head face: raccoon eyes, abrasions, closed head injury, hematoma, swelling. Left eye: dilated.
Right eye: abrasion, blunt injury. No reaction, swollen, dilated.
Both eyes posturing at times. Unable to get a reaction from pupils. Right orbit + cheek swollen. Dried blood right temporal area. Forehead swollen + above right ear.

Patient's left arm flexed to chest. Right arm either flailing around or flexing. Both hands making fists. Patient did groan initially when palpating left shinbone area. Removed ski boots-feet cold yet color good. Later patient just winced with palpation of left leg. Closed head injury-probable subdural. GCS=5.

Obtunded; ski accident; probable closed head injury. ? left leg injury. Obvious swelling to right side of head/face, right orbit bruise. A little dried blood on face/hair—no obvious lacerations. Patient posturing=left arm to chest, right arm flailing and both hands making fists, teeth clenching. Shallow resps but clear. Some groaning when palpating lower left leg.

2/21-3/10/04  Baystate Medical Center
Trauma: skier found down for approximately 4 hours. Found down in trees with decorticate posturing. Unresponsive on arrival with spontaneous respirations. Right pupil 5mm reactive, left pupil 3mm reactive. Lower left extremity red, tight, no deformity. GCS=5.

Trauma clinical record: found down at Berkshire east ski resort. Right pupil 5mm, left pupil 3mm, both reactive. Was in field for 5-6 hours. Right scalp/face abrasion. Decorticate posturing. Hematoma. Left leg with abrasion and edema anteriorly.

hematoma, right posterior subarachnoid hematoma, right sphenoid fracture, left occipital epidural hematoma with contusion and axonal injury. Found to have compartment syndrome of the left lower extremity. Mental status improved during stay. Transfer to Rehab.

3/10/04        BHSA-Springfield EMS Report
Transfer to Spaulding Rehab Hospital. Head injury. Nursing staff states that patient has been non-verbal since brought in. Alert to surroundings. Transport without incident.

3/10-4/9/04    Spaulding Rehab Hospital
3/25/04 report of Paul Wang, D.O.: admitted to brain injury rehab program. Receiving physical therapy, occupational therapy, speech-language pathology. Attention and arousal seemed to improve with Ritalin. Complaints of left foot pain in the sole of his foot. Slight decreased dorsiflexion. May be secondary to a left peroneal nerve injury. Also some neuropathic pain; started Neurontin. Trigger points located in his left gastrocnemius muscle and performed injections. 6 episodes of lockjaw which were reduced. Lockjaw may have been due to some muscle spasming. Decreased insight and awareness as well as decreased trunk control which has improved significantly. Moderately severe cognitive deficits including disorientation, decreased attention and impaired short term memory, working memory and problem solving. Improved verbal initiation. Overall pleased with his progress.

3/29 & 4/1/04 report of Kaaren Bekken, Ph.D.: neuropsychological evaluation. Estimated above average intellectual capacity presents with many areas of compromise after severe TBI. Verbal skills appear to be more affected than visual skills. Significant inattention, lexical access, verbal expression and executive function difficulties affect functioning across domains. Academic skills fall well below expectation with the exception of math calculation and well below the levels expected for attained educational level. Results are consistent with TBI.

4/9/04 Discharge summary: discharge diagnoses:

- Traumatic brain injury status post axonal injury, status post right occipital subdural hematoma, right temporal epidural hematoma, right posterior subarachnoid hemorrhage, right sphenoid fracture, left occipital epidural hematoma with contusion.
- Status post left compartment syndrome; status post fasciotomy.
- Decreased range of motion of the left ankle most likely secondary to prolonged lack of movement; Achilles heel contracture.
- Status post G tube.
- Status post tracheostomy.

Return to Japan and continue cognitive therapy. If improved return to U.S. to take some college courses at a community college.

2/22   CT head
No increased bleeding in the previous described hemorrhages and no new
hemorrhage.  No appreciated on the previous study is a right parietal bone
nondisplaced fracture.  Worsening right sided scalp edema.

2/23   Consultation
Night skiing, missing for 8 hours.  Found responsive, posturing.  GCS=4.  Right
temporal EDH, left [sic?] occipital EDH, right posterior SDH, occipital SDH,
axonal shear, right sphenoid fracture, left tib/fib fracture. Severe TBI; status post
left fasciotomy.

2/24   MRI cervical spine
Negative; note is made of subarachnoid hemorrhage in the posterior fossa.

2/25   CT head

Perhaps slight increase in the posterior temporal subdural hemorrhage.  Stable
subdural hemorrhage in the right inferior temporal lobe.  No change in the right
tentorial subdural hematoma. Stable intraventricular hemorrhage in the right
lateral ventricle. Decreased amount of subdural hematoma seen below the level
of the 4th ventricle.  Contusions are stable in the right frontal lobe and in the
anterior aspect of the right lateral ventricular horn, consistent with diffuse axonal
injury.  Small right posterior fossa epidural hematoma may be somewhat slightly
decreased in size.

3/1   CT sinuses
Persistent sinus disease improved since 2/22/04.  Bilateral facial fractures are
again noted without change.

3/3   Operative report

Procedure: upper GI endoscopy with percutaneous endoscopic gastrostomy tube
placement.
Postoperative diagnosis: severe closed head injury, inability to take oral food,
malnourishment, pneumonia. Sinusitis, left compartment syndrome status post
fasciotomy.

Procedure: debridement and closure of fasciotomy sites.

3/10   Discharge Summary

Final diagnosis:

Epidural hematoma. Skiing accident.  Found around a tree in the woods after 8-9
hours.  Thermoimaging was used to find him.  GCS=4 at admission.  CT of the
head revealed right occipital subdural hematoma, right temporal epidural

11/11 & 12/15/05    Margaret O'Connor, Ph.D.
Neuropsychological evaluation. Received cognitive rehab in Japan and in China.
Returned to U.S. in August 2005 to resume his academic work on a limited basis.
Currently a freshman at Boston University. Receiving note taking help, tutoring
and extra time on examinations. Resumed outpatient therapies at Spaulding
Rehab Hospital. Reports persistent problems with memory, attention and
general reasoning abilities. Also reports problems with his left foot, a dislocated
jaw and back pain.

Findings indicate global and persistent cognitive deficits affecting attention,
memory, analytic abilities and processing speed. Presents as confused,
lethargic and depressed. Overall level of performance was far below
expectations based on his baseline level of intelligence. Cognitive deficits have
and will continue to undermine his academic progress and daily living skills for an
indefinite period of time. Deficits fall in the severe range of impairment. Deficits
are permanent. Clinical experience has been that patients with severe cognitive
impairments have significant limitations in terms of occupational abilities.

On 2/27/06, a neurological evaluation was performed by Douglas Katz, M.D. The
report indicates: traumatic brain injury in a skiing accident on 2/20/04. Severe
diffuse axonal injury, left leg compartment syndrome, significant residual
cognitive impairments, depression. "I believe it is unlikely that he will be able to
complete college level studies at Boston University. I believe it is also likely that
the effects of this injury will permanently limit his vocational capacity and ability to
attain and maintain employment in the future." A ski helmet would have
prevented brain injury or significantly reduced the severity of the brain injury.

## Biomedical Engineering and Scientific Analysis

We were asked to review and analyze the file material associated with this
unfortunate incident. Our analysis is directed toward the biomechanics of the
documented injuries and the mechanisms associated with each and every
reported injury sustained by Mr. Kusada that are consistent with the published
injury tolerance data. It is hoped that the biomechanical analysis will help shed
light on the issue of "Injury Mechanisms" and, thereby, help provide insight into
the circumstances of this accident. Further, we have been requested to address
the issues associated with head protection.

The study of the biomechanics of human injury is a widely recognized, well-
established branch of biomedical science and engineering dedicated to
elucidating the mechanisms of human injury and determining quantitatively the
thresholds at which injury to the human body occurs. This serves two purposes:
determining quantitatively the thresholds at which injury to the human body
occurs in order to develop improved strategies for injury control, and to

understand the injury at the tissue and cellular level as well as the systemic level in order to develop new approaches for therapeutic intervention. A biomechanical analysis of the subject incident depends, in part, on the diagnoses and findings documented by clinicians in the medical record. The medical records were reviewed in this instance to analyze the potential injury mechanisms associated with the subject accident.

While clinicians are trained to examine, diagnose and treat injury, the biomechanical engineer seeks to determine the mechanism of a particular injury through application of formal training in engineering, life sciences, advanced mathematics, and physics. Quantitative assessments of injury mechanism can be objectively analyzed using principles of biomechanics to determine the potential for the injuries allegedly sustained during the incident in question when the forces acting on an individual are compared to published injury tolerance criteria. The clinician should not attempt to determine the causal relationship between the forces generated by a given event and the diagnosed injury unless they are also formally trained in biomechanics and have analyzed the events.

The magnitude of an applied external force can be related to the probability of injury, and injury severity has been quantified for each part of the human anatomy in the Abbreviated Injury Severity Handbook. The American Medical Association, and the Society of Automotive Engineers have assembled this Handbook in joint efforts with the Association for the Advancement of Automotive Medicine. Reference volumes of experimental biomechanical literature such as The Handbook of Human Tolerance contain injury tolerance values and data for failure of various tissues of the human body. The data for the development of these invaluable tools has come from human cadaver studies, animal experiments, physical model studies, isolated tissue research, anthropomorphic test device experiments, human volunteers and real world accident analysis. The volume of research findings related to injury mechanics has grown substantially over the past 25 years, particularly with regard to CNS trauma. We now understand the mechanisms of specific forms of trauma from the macroscopic level to the cellular level in many instances. This has permitted us to better define the associated injury tolerance levels and in particular injury to the central nervous system.

Mr. Kusada sustained an impact to the right frontal and lateral aspects of his head when he left the trail upon which he was skiing. According to the medical record there were clear data to fully describe the resulting pathology. In this case the head impact produced scalp contusion, underlying skull fractures, distributed contusions of the brain, and hemorrhage at various locations including the subarachnoid, epidural and subdural spaces. There was also a discussion of Diffuse Axonal Injury. The forces required to generate this injury portrait are at a level in excess of approximately 1500-2500 pounds.

INC

The facts of this incident teach us that Mr. Kusada's body was located within the vicinity of a tree, which was located off of the ski trail. It is estimated that he was in that location for 8-9 hours before he was found. It is also clear that he had no head protection, i.e., he was not wearing a helmet at the time of his impact with the tree. The only method available to estimate his impact velocity is the failure criteria for his various scalp, skull and brain injuries. Based upon the biomechanical data his impact velocity was approximately 20 mph, which would be reasonably associated with a Delta-V of 20 mph. Anything in excess of this value would have most probably caused comminuted and depressed skull fracture. There is no discussion of such trauma in the medical record.

Helmets are designed to absorb energy and to reduce the stresses acting upon the head in an impact event. They are very effective in this regard.

During Mr. Kusada's impact with the tree the stopping distance of his head would be approximately 3/8 in., which represents full scalp compression and skull bending prior to fracture. A helmet would provide at least 1.0 in. of stopping distance, excluding shell deformation, attenuating and distributing the impact load acting on Mr. Kusada. This would reduce the forces acting on Mr. Kusada's head by approximately 300%. The helmet would prevent skull fracture, contusions to the brain, and would have substantially reduced the ASDH and DAI.

These opinions are offered with a reasonable degree of biomedical engineering and scientific certainty. References are available upon request.

I will supplement this report as additional information may become available.


Yours truly,


Lawrence E. Thibault, Sc.D.          Kirk L. Thibault, Ph.D.

# LAWRENCE E. THIBAULT

## Curriculum Vitae
## January 2003

**ADDRESS:**    Home:    106 Keepsake Lane
Chadds Ford, PA 19317

Former Academic Positions:    Professor and Chairman Bioengineering
University of Pennsylvania
Philadelphia, Pennsylvania (Resigned)

Professor and Director
Injury Research Institute
School of Biomedical Engineering, Science
And Health Systems
Drexel University
Philadelphia, Pennsylvania (Retired)

Biomechanics Inc:    439 South Governor Printz Blvd.
Essington, Pennsylvania  19029

**PHONE:**    Home:    610-459-4702
Office:    215-271-7720    Fax:  215-271-7740
E-mail:    lthibault@biomechanicsINC.com

**SOCIAL SECURITY NO:**  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

**DATE OF BIRTH:**    September 23, 1943, Philadelphia, PA

**EDUCATION:**    **B.S.**, Drexel University, 1967
**M.S.**, George Washington University
**Sc.D.**, George Washington University, 1979
**M.A.,** (Honorary) University of Pennsylvania, 1984

Thesis - The Effects of Hydrodynamically Induced
Shear Stress on Transmural Transport Processes in the
Artery Wall - Advisors, S. Yuan and J. Feir

### SCHOLARSHIPS:

Department of Defense Scholarship, U.S. Navy, Undergraduate Engineering Education, Drexel University

National Institutes of Health Fellowship, Graduate Education and Research in Bioengineering, George Washington University, in a consortium with Georgetown University, The Catholic University of America, and NIH

### HONORS and AWARDS:

Bertil Aldman Award, International Research Council on the Biomechanics of Impact - contributions to impact trauma research in head injury (macro to micro levels)

Nicholas Andry Award, Association of Bone and Joint Surgeons - cervical spine injury biomechanics

Fellow, AIEMB

Best Scientific Paper Award, Association for the Advancement of Automotive Medicine - brain injury biomechanics

William Stickle Gold Award, American Academy of Podiatric Surgeons - vascular injury at the cellular level

ASME Bioengineering Division, Best Scientific Paper Award - calcium transmembrane transport in cellular injury

Melville Medal, American Society of Mechanical Engineers - strain dependent calcium flux in trauma to the cell membrane....Mechanoporation

Award of Merit, Association for the Advancement of Automotive Medicine - biomechanics of central nervous system injury in the automotive crash environment

Chairman, Bioengineering Division, American Society of Mechanical Engineers

Chairman, Alliance for Engineering in Medicine and Biology

2

## POSITIONS HELD:

| | |
|---|---|
| 1963-1969 | Research Engineer<br>U.S. Naval Ship Engineering Center<br>Philadelphia, Pennsylvania |
| 1969-1971 | Research Engineer<br>Westinghouse Research and Development Center<br>Medical Systems Division, Life Support Systems<br>Churchill, Pennsylvania |
| 1971-1980 | Research Engineer<br>National Institutes of Health<br>Biomedical Engineering Branch<br>Bethesda, Maryland |
| 1980-1984 | Assistant Professor of Bioengineering and Neurosurgery<br>University of Pennsylvania<br>School of Engineering and Applied Science<br>Philadelphia, Pennsylvania |
| 1984-1991 | Associate Professor of Bioengineering and Neurosurgery<br>University of Pennsylvania<br>Department of Bioengineering<br>School of Engineering and Applied Science<br>Philadelphia, Pennsylvania |
| 1991-1994 | Professor and Chairman<br>University of Pennsylvania<br>Department of Bioengineering<br>School of Engineering and Applied Science<br>Philadelphia, Pennsylvania |
| 1991-1995 | Professor of Bioengineering in Neurosurgery and<br>Orthopaedic Surgery<br>School of Medicine<br>University of Pennsylvania<br>Philadelphia, Pennsylvania |
| 1982-1995 | Associate Director, Head Injury Center<br>Department of Neurosurgery<br>School of Medicine<br>University of Pennsylvania |

| 1990-1995 | Executive Director, Laboratories for Injury Research and Prevention Department of Bioengineering University of Pennsylvania |
|---|---|
| 1995-1998 | Professor in Neurosurgery and Director, Division of Bioengineering Department of Neurosurgery Allegheny University of the Health Sciences |
| 1998-2001 | Professor School of Biomedical Engineering, Science and Health Systems Drexel University |
| 2000-present | Founder, Biomechanics, Inc. |

## ADMINISTRATIVE RESPONSIBILITIES:

| 1980-1981 | Secretary, Bioengineering Department Faculty, University of Pennsylvania |
|---|---|
| 1982 | Search Committee, Chairman of Bioengineering University of Pennsylvania |
| 1983-1986 | Chairman, Security Committee, University of Pennsylvania |
| 1984-1985 | Personnel Committee, SEAS, University of Pennsylvania |
| 1990-1991 | Undergraduate Curriculum Chairman, Bioengineering University of Pennsylvania |
| 1991-1994 | Department Chairman, Bioengineering University of Pennsylvania |
| 1992-1994 | Search Committee, Chairman, Orthopaedic Surgery School of Medicine, University of Pennsylvania |
| 1995-1999 | Center for Neuroscience, Research Planning Committee, AUHS, MCP- Hahnemann School of Medicine |
| 1997 | University Research Committee |
| 1997 | Search Committee, Chairman, Department of Rehabilitation and Physical Medicine, AUHS |

## MEMBERSHIP IN SCIENTIFIC AND PROFESSIONAL SOCIETIES:

1976-1977    Chairman, Industrial Activities Committee, Bioengineering Division, The American Society of Mechanical Engineers

1978-1981    Chairman, Medical Devices Standards Committee, Bioengineering Division, The American Society of Mechanical Engineers

1980-1985    Executive Committee, Bioengineering Division, The American Society of Mechanical Engineers

1982    Executive Council, Alliance for Engineering in Medicine and Biology

1982    Program Chairman, Bioengineering Winter Annual Meeting, The American Society of Mechanical Engineers

1982    General Chairman, Annual Conference on Engineering in Medicine and Biology

1982    Chairman, Bioengineering Division, American Society of Mechanical Engineers

1988    Neural Trauma Society

1990    Association for the Advancement of Automotive Medicine, AAAM

1995    Board of Directors, AAAM

## RESEARCH EXPERIENCE AND DIRECTION:

| | |
|---|---:|
| Experimental Head Injury Laboratory - NINCDS - NIH, 1980-1982. Co-Principal Investigator | $ 340,000 |
| Determination of the Constitutive Properties of Brain and Experimental Stress Analysis in Head Injury, Biomechanics Department, U.S. D.O.T., NHTSA, 1982-1984, Principal Investigator | $ 200,000 |
| Computerized Analysis of the Biomechanical Correlations of Head Injury, Biomechanics Department, U.S.D.O.T., NHTSA 1982-1984, Co-Principal Investigator | $ 200,000 |
| Experimental Head Injury Laboratory - NINDCS - NIH 1982-1985, Co-Principal Investigator | $ 800,000 |

Physical Model Experiments in Head Injury Biomechanics,
Biomechanics Department, U.S.D.O.T., NHTSA, 1985
Principal Investigator                                              $   110,000

Effects of Mechanical Stress on Matrix Synthesis in Endothelial
Cell Culture, NHLBI - NIH
1985-1990, Co-Principal Investigator                                $   750,000

Experimental Head Injury Laboratory, NINCDS - NIH
1985-1988, Co-Principal Investigator                               $ 1,300,000

Torsional Driving Point Impedance Characterization of the Head,
Ohio State University and NHTSA
1985, Principal Investigator                                        $    37,000

Automated Digitization of High Speed Film of Physical Model
Experiments, Wayne State University and General Motors Corp.
1986, Principal Investigator                                        $    25,000

Biomechanics of Neural and Neurovascular Injury
Centers for Disease Control 1987-1990
Principal Investigator                                              $   780,000

Biomechanics of Human Injury (Program Project)
Centers for Disease Control, 1990-1993,
Principal Investigator.                                            $ 1,100,000

The Head Injury Center
National Institutes of Health, NINCDS, 1990-1993
Co-Principal Investigator.                                         $ 1,700,000

Effect of Mechanical Forces on Vascular Cells
National Institutes of Health, NHLBI, 1991-1995
Co-Principal Investigator.                                         $  400, 000

Biomechanics of CNS Injury (Program Project )
Centers for Disease Control, 1993-1996
Principal Investigator                                             $ 1,200,000

The Head Injury Center
National Institutes of Health, NINCDS, 1993-1998
Co-Principal Investigator                                         $ 3,750,000

Biomechanics of Neuro and Neurovascular Injury
Centers for Disease Control, 1996-1999
Principal Investigator                                            $ 1,100,000

6

Mild Traumatic Brain Injury in the NFL, 1997-1999
NFL Charities
Principal Investigator                                              $    165,000

Pediatric Head Injury
The Kimmel - Spiller Foundation, 1998
Principal Investigator                                              $     50,000

A System to Estimate a Concussion Severity Index-Phase I     $     90,000
SBIR, NINDS, NIH (submitted), 2003
Principal Investigator

Retreval of Axons Post Acute Trauma-Phase I
SBIR, NINDS, NIH (in preparation), 2003
Principal Investigator                                              $     98,000


**JOURNALS/ EDITOR, REVIEWER:**

Annals of Biomedical Engineering

Biophysical Journal

Journal of Biomechanical Engineering

Journal of Biomechanics

Journal of Neural Trauma

Journal of Neurosurgery

Journal of Orthopaedic Research

Journal of Dental Research

Society of Automotive Engineers

Association for the Advancement of Automotive Medicine

International Research Conference on the Biokinetics of Impact

Advisory Group for Aerospace Research and Development

7

## TEACHING EXPERIENCE:

| B.E. 100 | Introduction to Bioengineering (Lectures in Injury Biomechanics) |
|---|---|
| B.E. 200 / 203 | Intermediate Biomechanics <u>(Originator of Course)</u> |
| B.E. 209 | Bioengineering Laboratory  <u>(Originator of Course)</u> |
| B.E. 350 | Momentum, Energy and Mass Transport |
| B.E. 352 | Applied Physical Chemistry |
| B.E. 451 | Advanced Transport Phenomena |
| B.E. 462 | Bioengineering Design for Chemical Engineering Minors <u>(Originator of Course)</u> |
| B.E. 462-465 | Mechanical, Chemical, Materials and Electrical Design Recitation |
| B.E. 495 | Senior Design Thesis |
| B.E. 510 | Continuum Mechanics |
| B.E. 633 | Biofluids II (Low Reynolds Number Hydrodynamics) <u>(Originator of Course)</u> |
| B.E. 700 | Special Topics in Biomechanics and Trauma <u>(Originator of Course)</u> |
| B.E. 899 | Biomechanics of Brain and Spinal Cord Injury <u>(Originator of Course )</u> |

FOUR COURSE SEQUENCE IN BIOMECHANICS: (Developed for the PhD Program at Allegheny University of the Health Sciences)

    A. Cellular and Molecular Biomechanics
    B. Tissue Mechanics
    C. Organ Biomechanics
    D. Whole Body Biomechanics

Supervised 90 students in B.E. 100 projects

Supervised 47 Senior Design Theses

Dissertation Committee Member:
>28 students in Bioengineering
>5 students in Chemical Engineering

## DISSERTATIONS / THESES - SUPERVISED:

Bianchi, Annette, M.S. Thesis, University of Pennsylvania, "Physical Model Studies of Acute Subdural Hematoma", 1983.

Hess, Karen Luke, M.S. Thesis, University of Pennsylvania, "Analytical Model for Acute Subdural Hematoma", 1985.

Margulies, Susan Sheps, Ph.D. Dissertation, University of Pennsylvania, "Biomechanics of Traumatic Coma in the Primate," 1987.

Green, Catherine, M.S. Thesis, University of Pennsylvania, "Response of Isolated Vascular Tissue to High Strain Rate Extension", 1987.

Galbraith, James, Ph.D. Dissertation, University of Pennsylvania, "Effects of Stretch on the Electrophysiology of the Giant Axon of the Squid", 1987.

Blum, Richard, M.S. Thesis, University of Pennsylvania, "Mechanical Properties of the Baboon Brain", 1986. M.D., University of Pennsylvania, 1988.

Hunter, Catherine, Ph.D. Dissertation, University of Pennsylvania, "Effects of Mechanical Deformation on the Conductance of a Lipid Bilayer Membrane", 1988.

Winston, Flaura, Ph.D. Dissertation, University of Pennsylvania, "The Modulation of Intracellular Free Calcium Concentration by Biaxial Extensional Strains of Bovine Pulmonary Artery Endothelial Cells", 1989. M.D., University of Pennsylvania 1991.

Barbee, Kenneth, Ph.D. Dissertation, University of Pennsylvania, "Mechanism for Vascular Smooth Muscle Cell Response to Mechanical Stimuli", 1991.

Boock, Robert, Ph.D. Dissertation, University of Pennsylvania, "Vascular Response to Mechanical Deformation", 1991.

Meaney, David, Ph.D. Dissertation, University of Pennsylvania, "Biomechanics of Acute Subdural Hematoma in the Primate and Human", 1991.

Landsman, Adam, Ph.D. Dissertation, University of Pennsylvania, "Response of Aging Vascular Cells to Mechanical Stimulation", 1992.

9

Saatman, Kathryn, Ph.D. Dissertation, University of Pennsylvania, "Response of an Isolated Myelinated Nerve Fiber as a Model for Neural Trauma", 1993.

Cargill, Robert, Ph.D. Dissertation, University of Pennsylvania, "A Cell Culture Model for Neural Injury", 1994

Billiar, Kristin, M.S., An In-Vitro Model for Mechanically Induced Vasospasm, University of Pennsylvania, 1994.

Arbogast, Kristy, M.S., The Constitutive Properties of the Human Brain Stem, University of Pennsylvania, 1995.

Bilston, Lynne, Ph.D. Dissertation, University of Pennsylvania, "The Biomechanics of Transient Spinal Cord Trauma", 1995.

LaPlaca, Michelle, Ph.D. Dissertation, University of Pennsylvania, " Hydrodynamically Induced Shear Stress Effects on Neuronal Cells in Culture- A Model for neural Trauma", 1996

Goldstein, Daniel, Ph.D. Dissertation, University of Pennsylvania, "The Biomechanics of Cervical Spine Injury", 1997.

Blackman, Brett, Ph.D. Dissertation, "The Response of Endothelial Cells to Variable Strain Rate Loading-The Viscoelastic Behavior of the Cell Membranes", 1998

Mazuchowski, Edward, Ph.D. Dissertation, University of Pennsylvania, "Constitutive Properties of the Human Cervical Spinal Cord", 1999

**VISITING PROFESSORSHIPS:**

Georgia Institute of Technology
Oxford University
University of Pittsburgh
University of Virginia
Massachusetts Institute of Technology
Harvard University
Ohio State University
University of Maryland
Pennsylvania State University
Lehigh University

10

## LECTURES BY INVITATION:

**Thibault, L.E.** "In-Vitro Models for Neural Injury", Naval Medical Research Institute, Bethesda, Maryland, 1980

**Thibault, L.E.** "Cardiopulmonary Bypass Device Standards: An Engineering Perspective", American Academy of Cardiovascular Perfusion, C.C. Reed, ed., San Francisco, California, Vol. 2, 1981.

**Thibault, L.E.** "Biomechanics of Head Injury and Isolated Tissue Studies", Biomechanics Department, National Highway Traffic Safety Administration, U.S. Department of Transportation, Washington, D.C., 1981.

**Thibault, L.E.** "Biomechanics and Head Injury in Automotive Safety", Association Peugeot Renault, Paris, France, 1982.

**Thibault, L.E.** "Dynamic Physical Model Experiments in Head Injury Research", Biomechanics Department, National Highway Traffic Safety Administration, U.S. Department of Transportation, Washington, D.C., 1982.

**Thibault, L.E.** "Head Injury Research - An Update on the Biomechanical Aspects", U.S. Army Aeromedical Research Laboratory, Fort Rucker, Alabama, 1983.

**Thibault, L.E.** "Head Injury Modeling", Winter Conference on Brain Research, Keystone, Colorado, 1983.

**Thibault, L.E.** "Biomechanics and Scaling in Head Injury", General Motors, Biomedical Sciences Department, R & D Center, Warren, Michigan, 1983.

**Thibault, L.E.** "Mild Head Injury - Tank Gunner Performance", U.S. Army, Human Factors Engineering Meeting, New Orleans, Louisiana, 1984.

**Thibault, L.E.** "Head Injury Tolerance Criteria", Transport Canada, Ottawa, Ontario, 1985.

**Thibault, L.E.** "Biomechanics of Diffuse Brain Injuries", Experimental Safety Vehicle Conference, Oxford, England, 1985.

**Thibault, L.E.** "Physical and Analytical Models in Neural Trauma", General Motors, Biomedical Sciences Dept., R & D Center, Warren, Michigan, 1986.

**Thibault, L.E.** "Isolated Tissue Models for Trauma Research", NAII, Chicago, Illinois, 1986.

11

**Thibault, L.E.** "Biomechanics and Brain Injury", Medical College of Virginia, Richmond, Virginia, 1987.

**Thibault, L.E.** "Mechanically Induced Vasospasm in Brain Injury", National Institute of Health, Bethesda, Maryland, 1987.

**Thibault, L.E.** "Mechanics and Cell Injury", Cardiovascular Research Center, Osaka, Japan, 1987.

**Thibault, L.E.** "Physical Models and Finite Element Models in Head Injury Research", Georgia Institute of Technology, Atlanta, Georgia, 1988.

**Thibault, L.E.** "Ion Transport in Cell Injury", University of Pittsburgh, Pittsburgh, Pennsylvania, 1988.

**Thibault, L.E.** "Biomechanics of Neural and Neurovascular Injury", Center for Disease Control, Atlanta, Georgia, 1988.

**Thibault, L.E.** "Vascular Trauma", National Institutes of Health, Bethesda, Maryland, 1988.

**Thibault, L.E.** "Biomechanics of Traumatic Coma", Joint Chiefs Sponsored Biomechanics Meeting, Naval Biodynamics Laboratory, New Orleans, Louisiana, 1988.

**Thibault, L.E.** "Human Head Injury Tolerance Criteria", University of Maryland, 1989

**Thibault, L.E.** "Cellular Injury", Division of Injury Control and Epidemiology", CDC, Atlanta, Georgia, 1989.

**Thibault, L.E.** "A Study of Improved Head Injury Tolerance Criteria", NHTSA, Washington, D.C., 1989.

**Thibault, L.E.** "Wound Healing- Cellular Response to Mechanical Stress", NIH, Bethesda, Maryland, 1990

**Thibault, L.E.** "Analytical Models for Head Injury", Ohio State University, Columbus, Ohio, 1990

**Thibault, L.E.** "Calcium Transport in Injured Neural Tissue", Institut National De Recherche Sur Les Transports et Leur Securite, Lyon, France, 1990.

**Thibault, L.E.** "CNS Trauma: The Biomechanics of Brain Injury", University of Virginia, 1990.

**Thibault, L.E.** "Head Injury in the Automotive Environment", World Congress on Emergency and Disaster Medicine, Montreal, 1991

**Thibault, L.E.** "Biomechanics of Human Injury", AAAM, 1991

**Thibault, L.E.** "Stress Coupled Transport", Harvard University, 1993

**Thibault, L.E.** "Cell Membrane Permeability as a Function of Mechanical Strain", M.I.T., 1993

**Thibault, L.E.** "Biomechanics of CNS Trauma", AAAM, 1993

**Thibault, L.E.** "Advances in Neurotrauma Research ", College of Physicians, Phila., PA 1995

**Thibault, L.E.** "Mechanoporation of Cell Membranes", NIH, Bethesda, 1996

**Thibault, L.E.** "Mild Traumatic Brain Injury", State Farm Insurance, Princeton, NJ, 1997

**Thibault, L.E.** "Head Injury and Head Protection", Kawasaki, Phoenix, AR, 1997

**Thibault, L.E.** "Biomechanics and Forensic Pathology", Research Committee, Pennsylvania Department of Public Health, Philadelphia, 1998

**Thibault, L.E.** "Pediatric Head Injury", St. Christopher's Hospital For Children, Philadelphia, 1998

## PATENTS:

Hemoglobin-Oxygen Equilibrium Curve Analyzer, Patent Number 4,209,300

Apparatus for Mechanically Stimulating Cells, Patent Number 4,851,354

Safety Propeller, Patent Number 5,044,884

Automated Eye Exam – The Pupilometer, Patent Number (Pending)

Computer Based Test for Cerebral Concussion, Patent Number (Pending)

13

## BOOKS / CHAPTERS IN BOOKS / EDITORSHIPS:

**Thibault, L.E.,** ed. Proceedings of the 35th Annual Conference on Engineering in Medicine and Biology, Vol. 24, Philadelphia, PA, AEMB, Bethesda, MD, 1982.

**Thibault, L.E.,** ed. "Advances in Bioengineering.", American Society of Mechanical Engineers, New York, NY, 1982.

Gennarelli, T.A. and **Thibault, L.E.,** "Biomechanics of Head Injury," Neurosurgery, R.H. Wilkens and S. Rengachary, eds., McGraw-Hill, 1983; Chapter 178.

Gennarelli, T.A. and **Thibault, L.E.,** "Biological Models of Head Injury," Central Nervous System Trauma, NINCDS, J. Polishock and D. Becker, eds., 1985; pp. 392-405, Chapter 25.

**Thibault, L.E.** and Gennarelli, T.A., "Biomechanics and Craniocerebral Trauma," Central Nervous System Trauma, NINCDS, J. Poulishock, and D. Becker eds., 1985; pp. 370-390, Chapter 24.

**Thibault, L.E.** and Gennarelli, T.A., "Biomechanics in CNS Trauma", Central Nervous System Trauma, NINCDS, 1990.

**Thibault, L.E.,** " Isolated Tissue and Cellular Biomechanics" in " Accidental Injury: Biomechanics and Prevention", eds. Nahum, A. and Melvin, J., Springer-Verlag, 1993.

**Thibault, L.E**. and Barbee, K.A. "The Biomechanics of Cellular and Tissue Injury", in "Accidental Injury: Biomechanics and Prevention" in "Accidental Injury: Biomechanics and Prevention", 2nd edition, eds. Nahum, A and Melvin, J., Springer-Verlag, 1999.

## BIBLIOGRAPHY

Gennarelli, T. A., A. K. Ommaya and **L. E. Thibault.** "Comparison of Translational and Rotational Head Motions in Experimental Cerebral Concussion." Stapp, S.A.E. **14**: 797-803, 1971.

Gennarelli, T. A., **L. E. Thibault** and A. K. Ommaya. "Pathophysiologic Response to Rotational and Translational Acceleration of the Head". Stapp, S.A.E. **15**: 296-308, 1972.

Ommaya, A. K. and **L. E. Thibault.** "Head and Spinal Injury Tolerance with no Direct Impact". Biokinetics of Impact., IRCOBI, **2:** 311-320, 1973.

Ommaya, A.K., Gennarelli, T.A. and **Thibault, L.E.**, "Traumatic Unconsciousness: Mechanisms of Injury to the Brain in Violent Shaking of the Head," <u>American Association of Neurological Surgeons,</u> Los Angeles, CA, 1973.

Ommaya, A.K., Gennarelli, T.A. and **Thibault, L.E.**, "Effect of Dynamic Mechanical Loading of Frog Sciatic Nerve," <u>Society for Neuroscience,</u> 364, 1974.

Gennarelli, T.A. and **Thibault, L.E.**, "Functional Response of the Central Nervous System to Controlled Inertial Loading," <u>27th Annual Conference on Engineering in Medicine and Biology,</u> Philadelphia, PA, 1974.

**Thibault, L.E.**, Gennarelli, T.A., Tipton, H.W. and Carpenter, D.O., "Physiological Response of Isolated Nerve Tissue to Dynamic Mechanical Loads," <u>27th Annual Conference on Engineering in Medicine and Biology,</u> Philadelphia, PA, 1974.

Gennarelli, T.A. and **Thibault, L.E.**, "Neural Microtrauma: Functional Effects of Mechanical Loading on Isolated Neural Tissue," <u>American Association of Neurological Surgeons,</u> Miami, FL, 1975.

Gennarelli, T.A, Ommaya, A.K. and **Thibault, L.E.**, "Correlations of Clinical and Experimental Head Injury," <u>Congress of Neurological Surgeons,</u> Atlanta, GA, 1975.

Lebowitz, E.A., **Thibault, L.E.** and Adelstein, R.S., "Phosphorylation of Cat Myocardial Myosin and M-Line Protein and Enhancement by Norepinephrine," <u>49th Scientific Session of the American Heart Association,</u> Miami, FL, 1976.

Berger, R.L., Martin, M.A. and **Thibault, L.E.**, "An Isoperibol Differential Thermal-pH Titration Apparatus," <u>32nd Annual Colorimetry Conference,</u> Sherbroke, Canada, 1977.

Gennarelli, T.A., **L.E. Thibault**, Neural Microtrauma, Proc. of Am. Assoc. Neurolog. Surg., Toronto, 1977.

Vern, B. A., W. H. Schuette and **L. E. Thibault**. "Potassium Clearance in the Cortex: A New Analytical Model." <u>J. Neurophysiol.</u> **4**(5): 1015-1022, 1977.

Devereaux, D.F., **Thibault, L.E.**, Boretos, J. and Brennan, M.F., "Quantitative and Qualitative Impairment of Wound Healing by Adriamycin," <u>Society of Surgical Oncology,</u> San Diego, CA, 1978.

Owens, S.W., Schuette, W.H., Bull, J.M., Lees, D., **Thibault, L.E.** and Wang-Peng, J., "The Effect of Thermally-Induced Respiratory Alkalosis on Enthrocyte 2.3 DPG Levels and Hemoglobin p50 Determinations," <u>53rd Congress International Anesthesia Research Society,</u> Hollywood, CA, 1979.

Devereaux, D. F., P. A. Thistlethwaite, **L. E. Thibault** and M. F. Brennan. "Effects of Tumor Bearing and Protein Depletion on Wound Breaking Strength in the Rat." J. of Surg. Res. **27**: 233-238, 1979.

Devereaux, D. F., **L. E. Thibault**, J. Boretos and M. F. Brennan. "The Quantitative and Qualitative Impairment of Wound Healing by Adriamycin." Cancer. **43**(3): 932-938, 1979.

Talbot, T. L., **L. E. Thibault,** W. H. Schuette, R. M. Winslow and H. W. Tipton. "Breath by Breath Gas Analysis During Exercise Stress Testing." Advances in Bioengineering. ed. M. Wells, pp.21-24, A.S.M.E. New York, 1979.

**Thibault, L. E.** and D. L. Fry. "Modulation of Evans Blue Dye Uptake in a Canine Aorta Tissue Preparation By Hydrodynamically-Induced Wall Shear Stress." Advances in Bioengineering. ed. V. Mow, pp.41-45, A.S.M.E. New York, 1980

Schuette, W.H., **Thibault, L.E.**, Talbot, T.L. and Tipon, H.W., "Synchronous Integration: A Method for Rapid Determination of the Mean Value of Pulsatile Signals," Association for the Advancement of Medical Instrumentation, San Francisco, CA, 1980.

Talbot, T.L., **Thibault, L.E.** and Schuette, W.H., "A System for Time-Gated, Pulsed-Doppler Velocity Profile Measurements," Association for the Advancement of Medical Instrumentation, San Francisco, CA, 1980.

**Thibault, L. E.** "The Modulation of Transendothelial Mass Transport by Hydrodynamically-Induced Wall Shear Stress." The Role of Fluid Mechanics in Atherosclerosis. ed. R. Nerem, pp. 26-30 National Science Foundation., Houston, 1980.

Lewis, C. A., **L. E. Thibault,** R. M. Pratt and L. L. Brinkley. "An Improved Culture System for Secondary Palatal Elevation." In Vitro. **16**(6): 453-460, 1980.

**Thibault, L. E.**, W. H. Schuette and D. Lees. "An Instrument to Determine the Hemoglobin-Oxygen Equilibrium Curve Based on the Calculated Diffusion of Oxygen Across a Semi-Permeable Membrane." J. Biomed. Eng. **18**: 401-406, 1980.

Devereaux, D. F., T. J. Triche, B. L. Webber, **L. E. Thibault** and M. F. Brennan. "A Study of Adriamycin Reduced Wound Breaking Strength in Rats: An Evaluation by Light and Electron Microscopy, Induction of Collagen Maturation and Hydroxyproline Assay." Cancer. **45**(4): 964-971, 1980.

Lees, D.E., Schuette, W.H., **Thibault, L.E.**, Kim, Y.E., Tipton, H.W., and MacNamara, T.E. "Computerized Determination of the Oxygen Dissociation Curve", Anesthes. **53**(3), Sept., 1980

**Thibault, L. E.**, J. A. Galbraith, C. J. Thompson and T. A. Gennarelli. "The Effects of High Strain Rate Uniaxial Extension on the Electrophysiology of Isolated Neural Tissue." Advances in Bioengineering. ed. D.Viano, pp 19-23, A.S.M.E. New York, 1981.

**Thibault, L. E.,** T. A. Gennarelli and C. J. Thompson. "Experimental Head Injury in the Primate: Functional Changes in Response to a Variation of the Kinematics." Advances in Bioengineering. ed. D. Viano  pp- 50-54, A.S.M.E. New York, 1981

Shamberger, R. C., T. L. Talbot, H. W. Tipton, **L. E. Thibault** and M. F. Brennan. "The Effects of Ultrasonic and Thermal Treatment on Wounds." J. of Plastic and Reconstruct. Surg. **68**(6): 860-870, 1981.

Shamberger, R. C., P. A. Thistlethwaite, **L. E. Thibault,** T. L. Talbot and M. F. Brennan. "Effects of Testosterone Propionate on Wound Healing in Normal and Castrate Rats." J. of Surg. Res. **33**: 58-68, 1982.

Gennarelli, T. A. and **L. E. Thibault.** "Biomechanics of Acute Subdural Hematoma." J. of Trauma. **22**: 680-686, 1982.

Gennarelli, T. A., **L. E. Thibault,** J. H. Adams, D. I. Graham, C. J. Thompson and R. M. Marcincin. "Diffuse Axonal Injury and Traumatic Coma in the Primate." Annal. Neurol. **12**: 564-574, 1982.

**Thibault, L. E.**, A. Bianchi, J. A. Galbraith and T. A. Gennarelli. "Physical Model Experiments of the Brain Undergoing Dynamic Loading." Advances in Bioengineering. ed. L.Thibault , pp. 41-45, A.S.M.E. New York, 1982.

Gennarelli, T. A. and **L. E. Thibault.** "Acceleration Damage to the Brain." Impact Caused by Linear Acceleration. ed. J. Haley, pp. 101-109, NATO. Cologne, 1982.

**Thibault, L.E.**, Galbraith,J., and Gennarelli, T.A., "Mechanical Properties of the Baboon Brain: An in-vitro study", Proceedings from 35th Annual Conference on Engineering in Medicine and Biology, Philadelphia, PA, 1982

**Thibault, L. E.** and T. A. Gennarelli. "The Development of Intracranial Tissue Component Failure Criteria as a Consequence of Controlled Inertial Loading." Impact Injury Caused by Linear Acceleration. ed. J.Haley pp. 110-111, NATO. Cologne, 1982.

Gennarelli, T. A., **L. E. Thibault,** J. H. Adams, D. I. Graham, C. J. Thompson and R. M. Marcincin. "Diffuse Axonal Injury in the Primate." Advances in Neural Trauma. ed. J. Jane pp. 143-151, Raven Press, 1983.

Gennarelli, T. A., **L. E. Thibault,** R. M. Marcincin and C. J. Thompson. "Effect of Direction of Head Motion on Intracranial Pressure in Experimental Head Injury." Intracranial Pressure. IV  ed.Sano, pp. 483-486, Springer-Verlag, 1983.

17

Gennarelli, T. A., **L. E. Thibault**, J. Jane and O. Steward. "Axonal Damage in Mild Head Injury Demonstrated by the Nauta Method." Advances in Neurotraumatology. ed.Villani, pp.37-41 Excerpta Medica, 1983

Gennarelli, T. A.and **L. E. Thibault**, "Experimental Production of Prolonged Traumatic Coma in the Primate." Advances in Neurotraumatology. ed Villani, pp 31-34 Excerpta Medica, 1983

**Thibault, L. E.** and D. L. Fry. "Mechanical Characterization of Membrane-Like Biological Tissue." J. of Biomech. Eng. 105: 31-38, 1983.

Adams, J. H., T. A. Gennarelli, D. I. Graham, G. Scott and **L. E. Thibault**. "Diffuse Axonal Injury in Non-Missile Head Injury." Recent Advances in Neural Trauma. ed. Harris, 1983 .

Winston, F.K., **Thibault, L.E.** and Macarak, E.J., "Effects of Cyclic Biaxial Strains on the Physiology and Morphology of Bovine Aortic Endothelial Cells," American Chemical Society, 189th Meeting, Miami, FL, 1984.

Hunter, C.M., **Thibault, L.E.**, Mueller, P., "A Method to Study Loading Effects on Channel-Doped Bilayers," 38th Annual Conference on Engineering in Medicine and Biology, Chicago, IL, 1985.

Winston, F.K., **Thibault, L.E.** and Macarak, E.J., "The In-Vitro Response of Endothelium to Mechanical Loading," 38th Annual Conference on Engineering in Medicine and Biology, Chicago, IL, 1985.

Galbraith, J., **Thibault, L.E.**, Matteson, D.R. and T.A. Gennarelli, "Effects of Uniaxial Stretch on the Squid Giant Axon," in 38th Annual Conference on Engineering in Medicine and Biology, Chicago, IL, 1985.

Gennarelli, T. A., **L. E. Thibault**, J. H. Adams, D. I. Graham and C. J. Thompson. "Diffuse Axonal Injury and Traumatic Coma in the Primate." Trauma of the Central Nervous System. ed. R.G.Dacey, pp 169-193, Raven Press, New York, 1985.

Gennarelli, T. A., M. Pastusko, T. Sakamoto, G. Tomei, A. Duhaime, R. Wiser and **L. E. Thibault**. "ICP After Experimental Diffuse Head Injuries." Intracranial Pressure VI. ed.Teasdale pp 15-20 Springer-Verlag. Berlin,1985.

Margulies, S.S., **Thibault, L.E**. and Gennarelli, T.A., "Physical Models of Head Injury," 38th Annual Conference on Engineering in Medicine and Biology, Chicago, IL, 1985.

Blum, R.H., **Thibault, L.E.** and Gennarelli, T.A., "In-Vivo Indentation of the Cerebral Cortex," 38th Annual Conference on Engineering in Medicine and Biology, Chicago, IL, 1985.

18

Margulies, S. S., **L. E. Thibault** and T. A. Gennarelli. "A Study of Scaling and Head Injury Criteria Using Physical Model Experiments." Biokinetics of Impact., IRCOBI **14**: 223-234, 1985.

**Thibault, L. E.** and T. A. Gennarelli. "Biomechanics of Diffuse Brain Injuries." Experimental Safety Vehicles., **10**: 145-156, 1985.

Berger, R. L., H. E. Cascio, N. Davids, C. J. Gibson, M. Marini and **L. E. Thibault.** "An Automated Differential Thermal Potentiometric Titration Apparatus for Binding Studies." J. Biochem. and Biophys. Methods. **10**: 245-259, 1985.

Talbot, T. L., W. H. Schuette, H. W. Tipton, **L. E. Thibault**, F. L. Brown and R. M. Winslow. "Noninvasive Detection of the Anaerobic Threshold During Computer-Controlled Exercise Testing." J. Biomed.Eng. **23**: 579-584, 1985.

Graham, D. I., J. H. Adams, T. A. Gennarelli and **L. E. Thibault.** "The Distribution Nature and Time Course of Diffuse Axonal Injury." Brit. Soc. of Neuropath. , 1986.

Duhaime, A. C., T. A. Gennarelli, **L. E. Thibault,** D. A. Bruce, S. S. Margulies and R. Wiser. "The Shaken Baby Syndrome: A Clinical and Experimental Study." J. Neurosurg. **66**: 409-415, 1987.

Goldstein, D. C., H. L. Kundel, M. E. Daube-Witherspoon, **L. E. Thibault** and E. J. Goldstein. "A Silicone Gel Phantom Suitable for Multimodality Imaging." Investigative Radiology. **2**: 153-157, 1987.

Gennarelli, T. A., **L. E. Thibault,** G. Tomei, R. Wiser, D. I. Graham and J. H. Adams. "Directional Dependence of Brain Injury Due to Angular Acceleration." Stapp, S.A.E. **31**: 49-53, 1987.

Galbraith, J.A., **Thibault, L.E.**, Matteson, D.R. and Gennarelli, T.A., "Mechanical Characterization of the Isolated Axon and Associated Electrophysiological Changes," 13th Northeast Bioengineering Conference, Philadelphia, PA, 1987.

Winston, F.K., **Thibault, L.E.**, Gonfien, S. and Macarak, E.J., "Response of Endothelial Cells to Biaxial Deformation," 13th Northeast Bioengineering Conference, Philadelphia, PA. 1987.

Hunter, C.M., **Thibault, L.E.** and Mueller, P. "Effects of Strain on Transport Through Ion Channels," 13th Northeast Bioengineering Conference, Philadelphia, PA. 1987.

Winston, F.K., **Thibault, L.E.**, Gorfien, S.F. and Macarak, E.J., "A Mechanism for the Physiological Response of Endothelial Cells to Cyclic Biaxial Strains," Hugh Lofland Conference on Arterial Wall Metabolism, Winston-Salem, NC, 1987.

19

Hunter, C.M. and **Thibault, L.E.**, "Effects of Mechanical Strain on Ion Transport Across Channel Containing Lipid Bilayers," <u>AIChE Annual Meeting</u>, New York, NY, 1987.

**\*Thibault, L.E.,** Winston, F.K., Gorfein, S.F. and Macarak, E.J., "Transients in Intracellular $Ca^{++}$: A Consequence of Mechanical Stimulation of Endothelial Cells in Culture," <u>8th International Conference of the Cardiovascular System Dynamics Society,</u> Osaka, Japan, 1987.

Gorfien, S.F., **Thibault, L.E.**, Winston, F.K. and Macarak, E.J., "Fibronectin and Type III Collagen Production by Bovine Pulmonary Artery Endothelium Subjected to Cyclic Biaxial Strain," <u>Cell Biology,</u> Washington, D.C., 1987.

Winston, F.K., **Thibault, L.E.**, Gorfien, S.F. and Macarak, E.J., "Response of Endothelial Cells in Culture to Cyclic Biaxial Strain," <u>AIChE Annual Meeting</u>, New York, NY, 1987.

**Thibault, L. E.**, S. S. Margulies and T. A. Gennarelli. "The Temporal and Spatial Deformation Response of a Brain Model in Inertial Loading." <u>Stapp, S.A.E.</u> **31:** 267-272, 1987.

Barbee, K.A. and **Thibault, L.E.**, "Strain Measurements in Vascular Smooth Muscle Cells Grown on a Biaxially Stretched Substrate," <u>IEEE, Engineering in Medicine and Biology,</u> Seattle, WA, 1989.

Meaney, D.F. and **Thibault, L.E.**, "Using Physical Models to Determine Cortical Strains in the Brain During Dynamic Loading," <u>IEEE, Engineering in Medicine and Biology,</u> Seattle, WA, 1989.

Saatman, K.E. and **Thibault, L.E.**, "Rapid Elongation of a Myelinated Nerve Fiber: A Model for Neural Injury," <u>IEEE, Engineering in Medicine and Biology</u>, Seattle, WA, 1989.

**Thibault, L.E.** The Effects of Mechanical Deformation on Transmembrane Ion Transport: A Model for Cell Injury, <u>Tissue Engineering,</u> ed. S. Woo and Y. Seguchi , pp 39-42, ASME, New York, NY, 1989.

Boock, R.J. and **Thibault, L.E.**, "Dynamic Elongation of Fluid and Air-Filled Elastic Tubes: A Model for Cerebral Blood Vessel Trauma," <u>IEEE, Engineering in Medicine and Biology</u>, Seattle, WA, 1989.

Margulies, S. S. and **L. E. Thibault.** "An Analytical Model of Traumatic Diffuse Brain Injury." <u>J. Biomech. Eng.</u> **111:** 241-249, 1989.

Winston, F. K., E. J. Macarak, S. F. Gorfein and **L. E. Thibault.** "A System to Reproduce and Quantify the Biomechanical Environment of the Cell." <u>J. App. Physio.</u> **67**(1): 397-405, 1989.

Gorfein, S. F., F. K. Winston, **L. E. Thibault** and E. J. Macarak. "Mechanical Stimulation Reduces Soluble Fibronectin Secreted by Pulmonary Artery Endothelial Cells." J. Cell Physiol. **139**: 492-500, 1989.

Gennarelli, T.A., **Thibault, L.E.,** Tipperman, R., Tomei, G., Sergot, R., Brown, M., Maxwell, W.L., Graham, D.I., Adams, J.H., Irvine, A., Gennarelli, L.M., Duhaime, A.C., Boock, R., and Greenberg, J. Axonal injury in the optic nerve: A new model of mammalian central nervous system damage that simulates diffuse axonal injury in the brain. J. Neurosurgery, **71**: 244-250, 1989.

**\*Thibault, L.E.** The Biomechanical Aspects of Axonal Injury. First World Congress of Biomechanics, La Jolla, CA, 1990.

**\*Thibault, L.E.** A Model for Cell Membrane Permeability Changes in Response to Dynamic Mechanical Deformation. First World Congress of Biomechanics, La Jolla, CA, 1990.

Cargill, R.S. and **Thibault, L.E.** An In-vitro Model for Neural Trauma. First World Congress of Biomechanics, La Jolla, CA, 1990.

Boock, R.J. and **Thibault, L.E.** Cerebral Vascular Deformations in High Strain Rate Loading. First World Congress of Biomechanics, La Jolla, CA, 1990.

Meaney, D.F. and **Thibault, L.E.** Tissue Failure Criterion for Parasagittal Bridging Veins. First World Congress of Biomechanics, La Jolla, CA, 1990.

Barbee, K.A. and **Thibault, L.E.** Mechanically-induced Calcium Transients in Vascular Smooth Muscle. First World Congress of Biomechanics, La Jolla, CA, 1990.

Saatman, K.E. and **Thibault, L.E.** Change in Cytosolic Free Calcium Associated With Mechanical Stimulation of a Myelinated Axon First World Congress of Biomechanics, La Jolla, CA, 1990.

**\*Thibault, L.E.** Strain-Dependant Calcium Flux in Endothelial Cells in Culture. Lofland Conference, Hemodynamics and the Artery Wall, San Antonio, Tx, 1990.

Barbee, K.A. and **Thibault, L.E.** Model for the Mechanics of Vascular Smooth Muscle Cells Cultured on a Deformable Substrate. IEEE,Engineering in Medicine and Biology, Philadelphia, Pa., 1990.

Gennarelli, T.A, **L.E. Thibault,** D. Ross, and D.F. Meaney, Enhancement of Axonal Damage in the Forebrain Using Contralateral Craniectomy During Controlled Cortical Impact Injury in the Rat, 8th Annual Neurotrauma Meeting, 1990, St. Louis, MO.

Boock, R.J. and **Thibault, L.E.** An Experimental and Analytical Approach to the Development of a Range of Neurovascular Trauma Indices. Biokinetics of Impact, IRCOBI, **19**: 169-180, 1990.

Meaney, D.F. and **Thibault, L.E.** Physical Model Studies of Cortical Brain Deformation in Response to High Strain Rate Inertial Loading. Biokinetics of Impact, IRCOBI **19**: 215-224,1990.

**Thibault, L.E.**, Gennarelli, T.A., Margulies, S.S., Marcus, J. and Eppinger, R. The Strain Dependent Pathophysiological Consequences of Inertial Loading on Central Nervous System Tissue. Biokinetics of Impact, IRCOBI, **19**: 191-202, 1990.

**Thibault, L.E.** and Gennarelli, T.A. Brain Injury: An Analysis of Neural And Neurovascular Trauma in the Non-human Primate. AAAM, **34**: 337-352, 1990.

Margulies, S.S., **Thibault, L.E.** and Gennarelli, T.A. Physical model simulations of brain injury of the primate. J. Biomechanics, **23** (8): 823-836, 1990.

*Thibault, L. Single Cell and Isolated Tissue Models for CNS Trauma. in Biomechanics of Trauma. 1991, Detroit, MI.

*Thibault, L. and K. Barbee. Strain Rate Sensitivity of Enhanced Calcium Permeability: A Model for Cell Injury in Culture. in Third US-China-Japan Conference on Biomechanics. 1991. Atlanta, GA.

Gennarelli, T., **Thibault, L.**, Goldstein, D., Bilston, L., Brasko, J., Meaney, D., and Ross, D. Axonal Injury in the Rat Cerebral Cortex in a Modified Rigid Indentor Cortical Impact Model, 9th Annual Neurotrauma Meeting, 1991, New Orleans, LA.

*Thibault, L.E. and Barbee, K. Micromechanical Analysis of Vascular Tissue Subjected to Controlled Mechanical Stimulation in Cell Culture. FASEB Workshop Atlanta, Ga., 1991

Saatman, K. and **Thibault, L.E.**, Myelinated Nerve Fiber Response to Dynamic Uniaxial Stretch, Biokinetics of Impact, IRCOBI , **12**, 115-125, 1991.

**Thibault, L.E.**, R. Boock, and T. Gennarelli. Strain Dependent Ischemia in Brain Tissue as a Function of Inertial Loading of the Head, Biokinetics of Impact, IRCOBI, **12**, 101-113, 1991.

Barbee, K. and **L. Thibault.** Mechanically Induced Vascular Smooth Muscle Contraction and Cellular Injury. Advances in Bioengineering 21: 34-37, ASME Pub. NY, 1991.,

**Thibault, L.E.**, Landsman, A.S., The Response of Aging Aortic Endothelium to Mechanical Stimulation in Cell Culture, Biomechanics Symposium, AMD-v, **120**, ed. R.L. Spliker, Friedman, M.H., p. 5-9, ASME Pub, NY, 1991.

Boock, R. and **L. Thibault**. Strain and Strain Rate Dependent Vasoconstriction, Advances in Bioengineering, 21: 38-41, ASME Pub, NY,1991.

Kotapka, M.J., Gennarelli, T.A., Graham, D.I., Adams, J.H., **Thibault, L.E.**, Ross, D.T. and Ian Ford, Selective Vulnerability of Hippocampal Neurons in Acceleration-Induced Experimental Head Injury. J. Neurotrauma 8:247-258, 1991.

Landsman, A.S., **Thibault, L.E.**, Meaney, D.F., Cargill, R.S., A New System to Study Mechanical Deformation and the Resultant Calcium Transients in Endothelial Cells, Advances in Bioengineering, **22**: 9-13, ed. M.W. Bidez, ASME Pub., NY, 1992.

Bilston L.E., D.F. Meaney, **L.E. Thibault**, "Modeling the Mechanical Properties of the Cervical Spinal Cord", Advances in Bioengineering, **22**: 71-75, ed. M.W. Bidez, ASME Pub., NY, 1992.

Saatman, K.E., **Thibault, L.E.**, Meaney, D.F., The Biomechanics of Isolated Myelinated Nerve as Related to Brain Injury, Advances in Bioengineering, 22: 549-553, ed. M.W. Bidez, ASME Pub., NY, 1992.

Gennarelli T.A., **L.E.Thibault**, D. Goldstein, L. Bilston, J. Brasko, D.F. Meaney, D.T. Ross, Axonal Injury in the Rat Cortex in a Modified Rigid Indenter Cortical Impact Model, J Neurotrauma 9:60, 1992.

*****Thibault, L.E.** Single Cell and Isolated Tissue Models for CNS Trauma, Biomechanics of Trauma, Detroit, Michigan, 1992.

Margulies, S.S., and **Thibault, L.E.**, T.A. A Proposed Human Tolerance Criteria for Diffuse Axonal Injury. J. Biomechanics, **25**: 917-923, 1992

**Thibault, L.E.**, Meaney, D.F., Marmarou, A., and Anderson B. Biomechanical Aspects of the Fluid Percussion Model for Brain Injury, J. Neurotrauma 9 (**4**), 311-322, 1992.

**Thibault, L.E.**, Meaney, D.F., Gennarelli, T.A., A Model of the Intracellular Calcium Distribution Throughout the Brain as a Function of Inertial Loading in Various Planes, Biokinetics of Impact, IRCOBI, **13**, 311-319,1992.

Cargill, R.S., **Thibault, L.E.**, The Use of In Vitro Models for Neural Injury With Superimposed Hypoxia in the Development of New Head Injury Tolerance Criteria, Biokinetics of Impact, IRCOBI, **13**, 320-328, 1992.

Meaney, D.F., **Thibault, L.E.**, Gennarelli, T.A., Rotational Brain Injury Tolerance Criteria as a Function of Vehicle Crash Parameters, Biokinetics of Impact, IRCOBI, **14**, 1992.

Margulies SS, Meaney DF, Bilston LB, **Thibault LE**, Campeau NG, Riederer SJ. In vivo motion of the human cervical spinal cord in extension and flexion. Biokinetics of Impact, IRCOBI; 213-224, 1992.

Meaney, D.F., **L.E. Thibault**, J. Brasko, D.T. Ross, T.A. Gennarelli, "Significance of impact velocity in the production of axonal injury in the rat cerebral cortex using rigid indentation", Journal of Neurotrauma, v. 9, no. 3, p. 393, 1993.

Ommaya, A.K., **Thibault, L.E.**, Boock, R., Meaney, D.F., "The Talk and Die (TAD) Syndrome: A Possible Biomechanical Mechanism", ASTM , 1993.

Meaney, D.F., **Thibault, L.E.**, "A multidisciplinary approach for investigating the biomechanical aspects of axonal injury", Proceedings of the Third Injury Prevention Through Biomechanics Symposium, pp. 229-239, 1993.

Galbraith, JA, Thibault,LE, and Mattesou, DR. Mechanical and electrical responses of the squid giant axon to simple elongation. Journal of Biomechanical Engineering 115(1): 13-22, 1993.

Meaney, D.F., K.L. Thibault, T.A. Gennarelli, **L.E. Thibault**, "Experimental investigation of the relationship between head kinematics and intracranial tissue deformation", Advances in Bioengineering, v. 24: 8-11, 1993.

Ross, D.T., D.F. Meaney, D.H. Smith, J.A. Brasko, **L.E. Thibault**, T.A. Gennarelli, "Distribution of diffuse axonal injury following inertial closed head injury in the miniature swine" Soc. Neurosci. Abstr., v. 19, Part 2, p.1486, 1993.

Barbee, K.A. and **Thibault, L.E.**, Micromechanical Analysis of Vascular Tissue Subjected to Controlled Mechanical Stimulation, FASEB, Atlanta, GA, 1991.

Meaney, D.F., **Thibault. L.E.**, Smith, D., Ross, D.T., Gennarelli, T.A., "Diffuse axonal injury in the miniature pig:  Biomechanical development and injury threshold", Advances in Bioengineering, 1993

LaPlaca, M.C., Cargill, R.S., and **Thibault, L.E.**  Intracellular free calcium shifts in cultured neurons in response to mechanical injury. 11th Annual Neurotrauma Society Meeting, Washington, DC, 1993.

Goldstein, D., Meaney, D., and **Thibault, L.**  Electrophysiological Response of the Crayfish Ventral Spinal Cord to Tensile Loading.  11th Annual Neurotrauma Society Meeting,  1993, Washington, DC.

**Thibault, L.E.**, Brain Injury from the Macro to the Micro Level and Back Again: What Have We Learned to Date?, Biokinetics of Impact, IRCOBI, **14,** 3-25, 1993.

Bilston, L.E., D. F. Meaney, **Thibault, L.E.,** The Development of a Physical Model to Measure Strain in a Surrogate Spinal Cord During Hyperflexion and Hyperextension, Biokinetics of Impact, IRCOBI, **14**, 255-268, 1993.

Boock, B., Doan, D., and Goldstein, D., **Thibault, L.E.,** Model for short-term intracranial pressure changes following traumatic injury, Annals of Biomedical Engineering, **21**, 645-653, 1993.

Winston, F.K., Macarak, E.J. and **Thibault, L.E.**, An Analysis of the Time-Dependent Changes in Intracellular Calcium Concentration in Endothelial Cells in Cell Culture, J. Biomech. Eng., **115** (2), 160-168, 1993.

Goldstein, D., and **Thibault, L.** An In Vitro Model of Spinal Cord Injury After Uniaxial Loading. 2nd World Congress of Biomechanics, Amsterdam, The Netherlands, July, 1994

Bilston, L.E., and **L.E. Thibault**, "Kinematics of the in vivo human cervical spine in flexion and extension", 2nd World Congress of Biomechanics, Amsterdam, The Netherlands, July 1994.

LaPlaca, M.C., and **Thibault, L.E.,** An in-vitro Model: Mechanical Response of Cultured Neurons to Hydrodynamic Loading, Advances in Bioengineering, 1994.

K.B. Arbogast, D.F. Meaney, **L.E. Thibault.** "A physical model study of the biomechanics of upper brainstem injury." 2nd World Congress of Biomechanics, Amsterdam, The Netherlands, July, 1994.

Cargill, R.S., **Thibault, L.E.** "Strain and Strain Rate Dependence of the Mechanically Induced Increase in Cytosolic Free Calcium of Neural-like Cells.", 2nd World Congress of Biomechanics, Amsterdam, The Netherlands, 1994.

LaPlaca, M.C. and, **Thibault L.E.,** A Novel Cell Shearing Device to Study Injury of Neurons in-vitro, Second World Congress of Biomechanics, Amsterdam, 1994

Barbee, K.A., Macarak E.J., and **Thibault, L.E.**, Strain Measurements in Cultured Vascular Smooth Muscle Cells Subjected to Mechanical Deformation, Annals of Biomedical Engineering, **22**: 1, 1994.

McGonigle, P., S. McElligot, J. Brasko, D. Meaney, **L. Thibault**, T. Gennarelli, D. Ross "Patterns of decreased striatal [$^3$H]kainic acid binding correlate with the topography of corticostriatal degeneration following modified cortical impact in adult rats", J Neurotrauma 11:119, 1994

Brasko, J., K.Arbogast, D. Meaney, **L. Thibault**, T. Gennarelli, D. Ross, "Patterns of axonal and neuronal injury following application of mild negative pressure to the cortical surface of adult rats", J Neurotrauma, 11:104, 1994

25

Goldstein, D.M., D.F. Meaney, **L.E. Thibault,** "Electrophysiological response of the crayfish ventral spinal cord to tensile loading", J Neurotrauma, Vol. 11 (1), 1994

Welsh F.A., Harris V.A., Brasco J., Meaney, D.F., **Thibault, L.E.**, Gennarelli, T.A.,and Ross,D.T., Association of c-fos Expression Patterns with the Topography of Cortico-Cortical Neuronal Injury Contralateral to Modified Cortical Impact in Adult Rats. J. Neurotrauma 11:130, 1994

Meaney, D.F., **Thibault, L.E.**, and Gennarelli, T.A. Rotational Brain Injury Tolerance Criteria as a Function of Vehicle Crash Parameters, IRCOBI, 51-62, 1994

LaPlaca, M.C., Cargill, R.S., and **Thibault, L.E.**, Intracellular Free Calcium Shifts in Cultured Neurons in Response to Mechanical Injury, J. Neurotrauma, 11 (1):116,1994.

Ommaya, A., Bandak, F and **Thibault, L.**, Mechanics of Impact Head Injury; J. Impact Eng., 15, (4), 535-560, 1994.

Meaney, D. F., **Thibault, L.E.**, Winkelstein, B.A., Brasko, J., Ross, D.T., Gennarelli, T.A., "Modification of the cortical impact brain injury model to produce axonal damage in the rat cerebral cortex", J. Neurotrauma, 11: 5, 599-612, 1995

LaPlaca, M.C., and **Thibault, L.E.**, Role of Free Calcium in the Response of Cultured Ntera 2 Neurons to Mechanical Injury, J. Neurotrauma 12 (1) :128, 1995.

Goldstein, D., and **Thibault, L.E.**, A Uniaxial Loading Model for Spinal cord Injury using Suction Electrodes to Cause Deformation, Neurotrauma Society, Miami, 1995.

LaPlaca, M.C. and **Thibault, L.E.**, MK-801 Reduces Glutamate-induced Cytosolic Free Calcium Increases in Mechanically Injured Ntera-2 Neurons, J. Neurotrauma,12(5):969, 1995

Munir,M., LaPlaca,M.C., **Thibault, L.E.**, McGonigle, P. Changes in Intracellular Free Calcium Levels During Delayed Excitotoxicity and Rescue in NT2-N Neurons, Society for Neuroscience 21:1344, 1995.

LaPlaca ,M.C., Djali, S., Saatman, K.E., and **Thibault, L.E.**, Glutamate Mediated Cell Damage in Mechanically Injured Ntera-2 Neurons, Society for Neuroscience 21:497, 1995.

Rubin, Y., LaPlaca, M.C., Smith, D. H., **Thibault, L.E.**, and Lenkinski, R.E., The Effects of N-acetyaspartate Acid on the Intracellular Free Calcium Concentration in Ntera2-neurons, Neuroscience Letters 198: 209-212, 1995.

Mazuchowski, E. L., Whitley, P.E., and **Thibault, L.E**. Cervical Spinal Cord Injury Tolerance Under +Gz Acceleration, AGARD, Vol 579, 1995

LaPlaca, M.C., Billiar, K.L., Goldstein, D., and **Thibault, L.E.**, Biomechanical Considerations for Modeling Brain and Spinal Cord Injury in-vitro,J. Neurotrauma, 12 (3): 374, 1995.

La Placa, M.C., Barbee, K.A., Blackman, B.R., and **Thibault, L.E.**, An in-vitro Model for Investigating Mechanisms of Traumatic Neural Injury, CDC-Wayne State Injury Research Volume, 1996

Cargill, R. S., and **Thibault, L.E.**, Acute Alterations in Calcium in NG108-15 Cells Subjected to High Strain Rate Deformation and Chemical Hypoxia: An In- Vitro Model for Neural Trauma, J. Neurotrauma, **13**, 7, 395-407, 1996.

Goldstein, D.M., Mazuchowski, E.L., Whitley, P.E., and **Thibault, L.E.**, The Mechanical and Electrophysiological Response of the Spinal Cord to Uniaxial Dynamic Loading, CDC-Wayne State Injury Research Volume, 1996.

**Thibault, L.E.**, Gennarelli, T.A., Goldstein, D.and Fijan, R.S., "Biomechanical Thinking: Head Injury in Roadway Crashes", Recovery (7), 3, 1996.

Barbee, K.A., LaPlaca, M.C., Blackman, B.R., and **Thibault, L.E.**, The Loading-Rate Sensitivity of Endothelial Cells to Flow, ASME Mechanics and Materials, 1996.

Blackman, B.R., Laplaca, M.C., Barbee, K.A., and **Thibault, L.E.**, Sensitivity of Endothelial Cell Response to the Onset Rate of Shear Stress, Advances in Bioengineering, Vol. 33 195-197, 1996.

LaPlaca, M.C., and **Thibault, L.E.**, Evidence of a Mechanical Contribution in the Response on Ntera-2 Neurons to a Rapid Deformation Injury in-vitro, J. Neurotrauma, 13(10): 608, 1996.

LaPlaca, M.C. and **Thibault, L.E.**, An In Vitro Traumatic Injury Model to Examine the Response of Neurons to a Hydrodynamically - Induced Deformation, Annal of Biomed Eng, **25**: 665 - 677, 1997.

La Placa, M.C., Lee, V. M. - Y., and **Thibault, L.E.**, An In Vitro Model of Traumatic Neuronal Injury: Loading Rate - Dependent Changes in Acute Cytosolic Calcium and Lactate Dehydrogenase Release, J. Neurotrauma, **14** (6), 355 - 368, 1997.

Torg, J.S., Corcoran, T.A., **Thibault, L.E.**, Pavlov, H., Sennett, B.J., Naranja, R. J., and Priano, S., Cervical Cord Neuropraxia: Classification, Pathomechanics, Morbidity, and Management Guidlines, J. Neurosurg, **87**: 843 -850, 1997.

Bilston, L.E. and **Thibault, L.E.**, The Mechanical Properties of the Human Cervical Spinal Cord, <u>Annal of Biomed Eng</u>, **24** (1), 67 - 74, 1997.

Bilston, L.E. and **Thibault, L.E.**, The Biomechanics of the Cervical Spinal Cord During Hyperflexion and Hyperextension Injuries, <u>I.J. Crashworthiness</u>, **2** (2) 207 - 218, 1997.

Cargill, R. S., and **Thibault, L.E.**, Acute Alterations in Calcium in NG108-15 Cells Subjected to High Strain Rate Deformation and Chemical Hypoxia: An In- Vitro Model for Neural Trauma, <u>J. Neurotrauma</u>, **13** (7), 395-407, 1997.

**Thibault, L.E.**, Gennarelli, T.A., Goldstein, D. and Fijan, R.S., "Biomechanical Thinking: Head Injury in Roadway Crashes", <u>Recovery</u> **7** (3), 1997.

Blackman, B.R., Barbee, K.A., and **Thibault, L.E.**, An Investigation of the Temporal Gradient of Shear Stress as a Modulator of Endothelial Cell Response, <u>A.S.M.E. Advances in Bioengineering</u>, 1997.

Goldstein, D. M., Mazuchowski, E. L., Gdula, W., and **Thibault, L.E.**, In Vitro and Mathematical Models of Axonal Injury in CNS Trauma, <u>WSU Injury Research Advances</u>, 1997.

Mazuchowski, E. L., Thibault, K. L., Youssef, A., Kurtz, S.M., Barbee, K.A., and **Thibault, L.E.**, Structural and Mechanical Properties of the Developing Human Skull with Numerical Simulation During Impact Loading, <u>WSU Injury Research Advances</u>, 1997.

Blackman, B., **Thibault, L**. and Barbee, K., Calcium Response of Endothelial Cells to Shear Stress: New Insight into an Old Controversy, <u>Biomedical Engineering Society Meeting</u>, San Diego, CA, 1997.

LaPlaca, M.C., Blackman, B.R., **Thibault, L.E.** and Barbee, K.A., Alterations in Intracellular Free Calcium Concentration and LDH Release Due to Hydrodynamic-Induced Deformation, <u>WSU Injury Research Advances</u>, 1997.

LaPlaca, M.C. and **Thibault, L.E.**, Dynamic Mechanical Deformation of Neurons Triggers an Acute Calcium Response and Cell Injury Involving the N-Methyl-D-Aspartate Glutamate Receptor, <u>Journal of Neuroscience Research</u> **52**; 220-229, 1998.

Gennarelli, T.A., **Thibault, L.E.**, and Graham, D.I., Diffuse Axonal Injury: An Important Form of Traumatic Brain Injury, <u>The Neuroscientist</u>, 4: 3, 202-215, 1998.

Runge, C.F., Youssef, A., Thibault, K. L., Kurtz, S.M., Magram, G., and **Thibault, L.E.**, Material Properties of the Human Infant Skull and Suture: Experiments and Numerical Analysis, WSU Injury Research Advances, 1998.

Barbee, K. A., Yazdi, J., Fijan, R., Croul, S.E., and, **Thibault L. E.**, Basic Mechanics of the Guinea Pig Optic Nerve Stretch Model for CNS Injury, WSU Injury Research Advances, 1998.

Barbee, K., Blackman, B. and **Thibault, L.** Neural Cell Injury: Characterization and Treatment Strategies, Third World Congress of Biomechanics, Sapporo, Japan, 1998

Kurtz S. M., Thibault, K. L., Giddings, V. L., Runge, C. F., and **Thibault, L. E.**, Finite Element Analysis of the Deformation of the Human Infant Head Under Impact Conditions, WSU Injury Research Advances, 1998.

Barbee, K. A., Ford, C. M., Blackman, B. R., and **Thibault, L. E.**, Neural Cell Injury: Characterization and Treatment Strategy, WSU Injury Research Advances, 1998.

Kurtz, S.M., **Thibault, K.L.**, Kothari, M., Giddings, V.L. and **Thibault, L.E.** "Structural Response of the Infant Braincase to Multidirectional Impacts." World Congress of Biomechanics, Japan, 1998.

Thibault, K.L., Kurtz, S.M., Runge, C.F., Giddings, V.L. and **Thibault, L.E.** "Numerical Assessment of Skull Fracture, Diffuse Brain Injury and Subdural Hematoma Risk for the Pediatric Population." CDC Ninth Injury Prevention Through Biomechanics Symposium, Detroit, MI, 1999.

Thibault, K.L., Kurtz, S.M., Runge, C.F., Giddings, V.L. and **Thibault, L.E.** "Material Properties of the Infant Skull and Application to Numerical Analysis of Pediatric Head Injury." International IRCOBI Conference on the Biomechanics of Impact, Sitges, Spain, 1999.

Blackman,B.R., Barbee, K.A., and **Thibault, L.E.**, In vitro cell shearing device to investigate the dynamic response of cells to a controlled hydrodynamic environment. Annals of Biomedical Engineering, 28(4): 363-72, 2000.

Blackman, B.R., **Thibault, L.E.**, and Barbee, K.A., Selective modulation of endothelial cell [Ca ] response to flow by the onset rate of shear stress. Journal of Biomechanical Engineering. 122(3): 274-282, 2000

Ommaya, A.K., Goldsmith, W., and **Thibault, L.**, Biomechanics and neuropathology of adult and paediatric head injury. Brit. Journal of Neurosurg., 16(3): 220-242, 2002

29

Thibault, K.L., Giddings, V.L., **Thibault, L.E.**, Computer Simulation of Infantile Head Injury Mechanics, (to be submitted) 2003.

Barbee, K.A., Blackman, B.R., Thibault,K.L., **Thibault, L.E.**, Membrane Injury and Neural Trauma, (to be submitted) 2003.

Barbee, K.A., Yazdi, J., Croul, S.E., **Thibault, L.E.**, An In Vivo Model for Axonal Injury, (to be submitted) 2003.

Thibault, K.L., Youssef, A., Magram, G., **Thibault, L.E.** Mechanical Characterization of the Developing Skull, (to be submitted) 2003.

Barbee, K. Yazdi, J., Thibault, K.L., Croul, S. and **Thibault, L.E.**, In Vivo Mechanics of the Guinea Pig Optic Nerve, (to be submitted), 2003.

Barbee, K., Yazdi, J., Thibault, K.L., Croul, S., and **Thibault, L.E.**, Production and Detection of Acute Axonal Injury In Vivo, (to be submitted), 2003.

Hunter, C.M., Thibault, K.L., **Thibault, L.E.**, "Effect of biaxial strain of artificial lipid bilayers", (to be submitted), 2003.

**Thibault, L.E.** and Thibault, K.T., "Stretch Induced Intracellular Calcium Transients in an Isolated Axon: A Model for Neural Injury." (to be submitted), 2003.

**Thibault, K.L.** ,Fijan, R.F., McGinnis, G. and Thibault, L.E. A Computer Based System for Administration of Neuropsychological Testing in Cases of Mild Traumatic Brain Injury. (to be submitted), 2003.

McGinnis, G., **Thibault, K.L.** and Thibault, L.E. Preliminary Study of Mild Traumatic Brain Injury Using a PC Based System - Pre and Post Concussive Findings. (to be submitted), 2003.

**Thibault, K.L.** McGinnis, G., and Thibault, L.E. Processing Time as a Measure of Concussion Severity. (to be submitted), 2003.

Meaney, D. F., Thibaukt, K.L.and **L. E. Thibault**. "A parametric study using physical models to investigate superior margin brain deformation"

Meaney, D. F., Thibault,L.E. and **L. E. Thibault**. "Ultimate failure limit of parasagittal bridging veins across a range of age groups"

Landsman, A.S., D.F. Meaney, **L.E. Thibault**, E.J. Macarak, "Physiologic response and strain rate dependence of endothelial cells to measured regional cellular deformation".

Landsman, A.S., **L.E. Thibault**, R.S. Cargill, "Strain Rate Dependence of Intracellular Calcium Transients Observed in Bovine Aortic Endothelial Cells".

## PROGRAMS/PROJECT RESPONSIBILITIES (INDUSTRIAL AND GOVERNMENT RESEARCH LABORATORY EXPERIENCE 1963-1979)

### U.S. Naval Ship Engineering Center:

Vibration Studies of the J75-FT4 Gas Turbine Propulsion System

Vibration Studies of the Saturn Gas Turbine Driven Generator System

Controls System Analysis of the Jupiter Gas Turbine Driven Generator System

Sea Salt Aerosol Studies for the Development of Separator Systems for Gas Turbine Engines

Control System Design for Smokeless Combustion in Gas Turbine Propulsion Systems

Field Studies, Trouble-Shooting, Failure Analysis and Repair of Gas Turbine Engines in the Fleet

All reports written for Department of Defense Documentation Center.

### Westinghouse Research and Development Center:

Whole Body Oxygen Uptake Rate Monitor

Blood Oxygen Content Analyzer

Continuous Blood p02 Catheter

Portable Breathing Apparatus for Emergency Use

Computerized Patient Monitoring System with Non-Fade Display, Electronic Memory and Arrhythmia Detection

Long-Term Portable Breathing Apparatus with $CO_2$. Scrubbing and Chemical Generation of Oxygen

Rescue Vehicle for Mine Disasters

### National Institutes of Health:

System for the Experimental Investigation of Head Injury in the Primate, NINCDS

31

Kinematic Linkage to Produce Controlled Inertial Loading of an Experimental Model in Head Injury Research, NINCDS Dense Piezoelectric Accelerometer for Use in the Brain During Inertial Loading Studies, NINCDS

Physical Models of the Skull and Brain for Use in Dynamic Moire Analysis of Strain, NINCDS

System for the Experimental Investigation of Head Injury in the Primate, NINCDS Solid-State Programmer for Auto-Sequencing High Speed Photography, Oscillographic Recording, Hydraulic and Pneumatic Operations in Experimental Head Injury, NINCDS

Kinematic Linkage to Produce Controlled Inertial Loading of Experimental Animal Model in Head Injury Research, NINCDS

System to Obtain High Speed X-Rays of Implants in the Brian Undergoing Steady-State Vibration, NINCDS

Neutrally Dense Piezoelectric Accelerometer for Use in the Brain During Inertial Loading Studies, NINCDS

Physical Models of the Skull and Brain for Use in Dynamic Moire Analysis of Strain, NINCDS

Fluidic Controlled Indentor for Studies of Brain Tissue Deformation and Concomitant Neurophysiological Alterations, NINCDS

Optical Device for the Measurement of Intracranial Pressure, NINCDS

Life Support System for Papillary Muscle Culture Including Dialysis and Membrane Oxygenation, NHLBI

Isometric Force Transducer and Electrical Simulation for Muscle Tissue Culture Systems, NHLBI

System to Culture Palatal Specimens from Fetal Mice Including Video Monitoring via Fibre Optic Probes of the Palatal Region, NIDR

System to Measure the Mechanical Properties of Skin, NCI

Fluidic-Controlled Pulsatile Mattress for Surgical Tables, NINCDS

System to Apply Controlled Levels of Hydrodynamically-Induced Wall Shear Stress on Arterial Tissue Specimens In-Vitro, NHLBI

Automated System for Video-Densitometry, NHLBI

Calibration System for an Electrochemical Shear-Rate Transducer, NHLBI
Automated Differential, pH, Thermal, Titration Apparatus, NHLBI

Automated System to Measure the Hemoglobin-Oxygen Equilibrium Curve for Sample of Whole Blood or Hemoglobin Solutions, NHLBI

Capillary Membrane Oxygenator, NIA

Reaction Cell for Automated Potentiometric Titration and Spectrophotometric Analysis, NIAMD

System to Mechanically Stress Biological Cell in Culture, NIDR

Automated and Computer-Controlled Exercise Stress Test Device Which Includes the Determination of Anaerobic Threshold from Respiratory Gas Analysis, NHLBI

System to Produce Transient Hydrostatic Pressure Loading and Large Scale Deformation of Nerve Fibers In-Vitro, NINCDS

System to Study the Somatosensory Evoked Responses in Children and Adults Through Mechanical Stimulation of the Proprioceptive Fibers, NINCDS

Device to Measure the Displacement of the Axonal Membrane of the Squid During the Propagation of the Action Potential, NIMH

System to Automatically Decontaminate an Ultracentrifuge and Its Contents in the Event of Catastrophic Failure, NIAID

Device to Measure the Mechanical Properties of Peripheral Nerve In Situ, NINCDS

Thermistor for the Measurement of Heats of Reaction in Protein Titrations, NHLBI

Analytical Model for Potassium Transport in the Cortex, NINCDS

Analysis of Heat Transfer During Whole Body Hyperthermia Treatment of Metastatic Cancer, NCI

## CONSULTING ACTIVITIES:

| | |
|---|---|
| 1975-1976 | Armed Forces Radiobiology Research Institute, |
| 1980-1986 | Southwest Research Institute |
| 1980-Present | National Institutes of Health, National Heart, Lung, and Blood Institute, Laboratory for Technical Development |
| 1981 | Chairman, National Consensus Workshop on Head and Neck Injury, Experimental Modeling, NHTSA, D.O.T. |
| 1982-Present | United States Army |
| 1983-Present | National Institutes of Health, National Institute of Arthritis and Metabolic Disease |
| 1983 | Association Peugeot -Renault |
| 1983 | Commonwealth of Pennsylvania, Department of Transportation |
| 1983-Present | Commonwealth of Pennsylvania, Attorney General |
| 1984-Present | National Institutes of Health, National Institute of Neurological Communicative Disease and Stroke |
| 1984-Present | Technical Advisory Board, Neonatal Products, CAS Medical |
| 1986 | Joint Chiefs of Staff, Department of Defense. |
| 1986-Present | General Motors Corporation |
| 1989-Present | Chrysler Corporation. |
| 1990-Present | Suzuki |
| 1992 | The Whitaker Foundation |
| 1992-Present | Daimler Benz |
| 1992-Present | Bell Sports |
| 1993-Present | Yamaha |

Lawrence E. Thibault, Sc.D.

| | |
|---|---|
| 1995-Present | Black and Decker |
| 1995-Present | Makita |
| 1994-Present | The National Center for Injury Prevention and Control CDC, Atlanta |
| 1994-Present | Honda |
| 1994-Present | Mazda |
| 1994-Present | Ford Motor Company |
| 1994-Present | Daimler Chrysler |
| 1998-Present | The National Football League |
| 1999-Present | Specialty |
| 2000-Present | Isuzu |
| 2000-Present | Conrail |
| 2000-Present | Fisher - Price |
| 2000-Present | Riddell |
| 2000-Present | Canadian Pacific |
| 2001-Present | Kia |
| 2001-Present | Nissan |
| 2002-Present | Freightliner |
| 2002-Present | Graco |
| 2002-Present | New Jersey Transit |
| 2002-Present | SEPTA |
| 2002-Present | PECO |
| 2003-Present | Volvo |

## Lawrence Thibault's Testimony (July 2001-Current)

| **Caption** Taiquan Barlow | **Caption** Hillock v. Graco |
|---|---|
| **Trial** | **Trial** |
| **Deposition**    4/9/2003 | **Deposition**    5/16/2002 |

| **Caption** McLaughlin v. Michael R. Brassard and Fisher Engineering | **Caption** Perry v. Badger Express |
|---|---|
| **Trial** | **Trial** |
| **Deposition**    9/13/2002 | **Deposition**    11/7/2002 |

| **Caption** Mulligan v. Essex County Improvement Authority | **Caption** Mohney v. Bauer |
|---|---|
| **Trial** | **Trial** |
| **Deposition**    4/15/2002 | **Deposition**    10/16/2002 |

| **Caption** Gonzalez v. Bermudez | **Caption** Briggs v. Graco |
|---|---|
| **Trial** | **Trial** |
| **Deposition**    6/25/2002 | **Deposition**    2/2/2004 |

| **Caption** Garmon v. Daimler Chrysler Corporation, et al. | **Caption** Parikh v. Migala & The Fitness Super Store, Inc. |
|---|---|
| **Trial** | **Trial** |
| **Deposition**    10/4/2002 | **Deposition**    5/21/2003 |

| **Caption** Vaden v. Bell Helmets, Inc., et al. | **Caption** Zatlokovicz v. Conrail |
|---|---|
| **Trial** | **Trial** |
| **Deposition**    5/10/2002 | **Deposition**    10/29/2002 |

| **Caption** Perez and Castanon v. Riddell, Inc., et al. | **Caption** Jopson v. Bugada |
|---|---|
| **Trial** | **Trial** |
| **Deposition**    5/22/2002 | **Deposition**    7/23/2003 |

| **Caption** Marsella v. DePiano | **Caption** Kania v. Larson |
|---|---|
| **Trial** | **Trial** |
| **Deposition**    3/19/2002 | **Deposition**    11/24/2003 |

| **Caption** Sosa v. Giovine | **Caption** Abbott v. Freightliner |
|---|---|
| **Trial** | **Trial** |
| **Deposition**    6/14/2002 | **Deposition**    3/4/2004 |

| **Caption** Dresdner v. Chrysler | **Caption** Frometa v. Velda Farms |
|---|---|
| **Trial** | **Trial** |
| **Deposition**    11/13/2002 | **Deposition**    5/1/2003 |

## Lawrence Thibault's Testimony (July 2001-Current)

| Caption | Umali v. USA Cycling | | Caption | Roberts v. McRay Crane & Rigging, Inc. |
|---|---|---|---|---|
| **Trial** | | | **Trial** | |
| **Deposition** | 10/29/2003 | | **Deposition** | 3/30/2005 |

| Caption | Rosen v. USF Red Star | | Caption | Albo v. Evenflo |
|---|---|---|---|---|
| **Trial** | | | **Trial** | |
| **Deposition** | 6/3/2004 | | **Deposition** | 12/14/2005 |

| Caption | Garcia v. Atlantis Submarines | | Caption | Wozniak v. Metabo AG |
|---|---|---|---|---|
| **Trial** | | | **Trial** | |
| **Deposition** | 4/26/2005 | | **Deposition** | 6/29/2005 |

| Caption | Valdivia v. Century Products | | Caption | Schroeder (Rachel) |
|---|---|---|---|---|
| **Trial** | | | **Trial** | 3/11/2002 |
| **Deposition** | 3/2/2004 | | **Deposition** | |

| Caption | Bell v. Suzuki | | Caption | Calabrese v. Konick, et. al. |
|---|---|---|---|---|
| **Trial** | | | **Trial** | 4/24/2002 |
| **Deposition** | 8/31/2004 | | **Deposition** | |

| Caption | Gibson v. DaimlerChrysler | | Caption | Benjamin v. Mehrtens |
|---|---|---|---|---|
| **Trial** | | | **Trial** | 6/11/2002 |
| **Deposition** | 5/18/2005 | | **Deposition** | |

| Caption | Wheaton v. Ford Motor Company | | Caption | Clark v. DeMarsico |
|---|---|---|---|---|
| **Trial** | | | **Trial** | 6/21/2002 |
| **Deposition** | 3/4/2005 | | **Deposition** | 4/18/2002 |

| Caption | Lawson v. Graco | | Caption | Fedor v. Freightliner |
|---|---|---|---|---|
| **Trial** | | | **Trial** | 7/11/2002 |
| **Deposition** | 9/17/2004 | | **Deposition** | |

| Caption | Tedder v. Ford Motor Company | | Caption | Milligan v. Ford |
|---|---|---|---|---|
| **Trial** | | | **Trial** | 8/22/2002 |
| **Deposition** | 1/18/2006 | | **Deposition** | 10/9/2001 |

| Caption | Benson v. Riddell | | Caption | Sison v. Daimler Chrysler, Corp. |
|---|---|---|---|---|
| **Trial** | | | **Trial** | 8/23/2002 |
| **Deposition** | 7/8/2005 | | **Deposition** | |

# Lawrence Thibault's Testimony (July 2001-Current)

| | |
|---|---|
| **Caption** Potochnick v. Perry | **Caption** Dredden v. Mazoch |
| **Trial** 10/15/2002 | **Trial** 4/1/2004 |
| **Deposition** | **Deposition** |

| | |
|---|---|
| **Caption** Schwartz v. General Motors | **Caption** Sanders v. Bauer |
| **Trial** 10/23/2002 | **Trial** 10/22/2004 |
| **Deposition** | **Deposition** 12/16/2003 |

| | |
|---|---|
| **Caption** Stapleton v. Freightliner | **Caption** Schneider, Christopher |
| **Trial** 12/18/2002 | **Trial** 1/25/2005 |
| **Deposition** 8/16/2002 | **Deposition** |

| | |
|---|---|
| **Caption** Quinby ( John) | **Caption** Nguyen v. State Farm |
| **Trial** 1/28/2003 | **Trial** 2/3/2005 |
| **Deposition** | **Deposition** 8/24/2004 |

| | |
|---|---|
| **Caption** Levering v. Bryant | **Caption** McIntyre v. Clark Equipment Company |
| **Trial** 4/2/2003 | **Trial** 4/21/2005 |
| **Deposition** | **Deposition** |

| | |
|---|---|
| **Caption** Commonwealth v. Galt, III | **Caption** Limburg v. Koehring Cranes, Inc. |
| **Trial** 5/6/2003 | **Trial** 10/20/2005 |
| **Deposition** | **Deposition** 6/24/2005 |

**Caption** Allen v. GM

**Trial** 6/13/2003
**Deposition** 3/13/2003

**Caption** Carpenter v. Mobile Dredging and Pumping Co.

**Trial** 6/17/2003
**Deposition**

**Caption** DeGenaro v. Ford

**Trial** 11/12/2003
**Deposition**

**Caption** Womack v. Fallon

**Trial** 3/30/2004
**Deposition**

APPENDIX 15

# ISHAM & ASSOCIATES

P.O. Box 2619   Taos, NM 87571
(505) 776-8268    Fax 776-2131
e-mail jisham@newmex.com

3/23/2006

Ron Gluck, Esq.
Two Center Plaza, Suite 530
Boston, Massachusetts 102108-1906

    Re: Yukio Kusada v Mount Hermon School
    Expert Report

This report covers my review of relevant materials on the above matter and my site inspection of Berkshire East Ski Area on 3/23/2005.

My conclusions and opinions are based on my 25+ years as a Snow Sports Safety Expert and my 45 years of involvement in the snow sports industry in multiple capacities of resort operations and management. In addition to the above, I have visited skiing/ snowsports operations and facilities, as a consultant in Virginia, Vermont, Maine, Pennsylvania, Colorado, California, Connecticut, Nevada, New Mexico, New Hampshire, North Carolina, Minnesota, Illinois, Ohio, British Columbia, Montana, Idaho, Arizona, Wisconsin, Wyoming and Utah.

I James W. Isham, state that I have been declared an expert in the field of Snow Sports Safety in courts in New Mexico, Colorado, Utah, California, Vermont, Minnesota, Virginia , New Hampshire and Pennsylvania. I have served as a Snow Sports Safety consultant and Expert Witness since 1979, a ski area management and operations specialist since 1963 and have been a Professional Ski Instructor since 1959. I have directed numerous ski school operations in the United States and New Zealand and been Director of Skier Services operations and Risk Management at ski areas in the United States. My experience in the Snow Sports industry spans more than 45 years and covers virtually every aspect of ski area operation from design, layout and construction of facilities to facilities management, including trail design and layout, lift construction and operation, ski school operation, rental shop operation, first aid training, employee training, skier safety and risk management .

I am enclosing a copy of my current resume plus a listing of my publications.

Page 2.

Materials Reviewed:
. Photo of tree and surrounding area where Mr. Kusada was found.
. Timeline of events from Mount Hermon School.
. Trail map of Berkshire East.
. Incident Report from Berkshire East Mountain (Laurie Bassett)
. Patrol Run Sheet.
. Report on Yukio Kusada accident from Mt Hermon School.
. Supplemental report of skiing accident (Frank Field).
. Massachusetts State Police Report.
. One page document outlining seasonal schedule-Mt. Hermon School.
. Rec Skiing and Snow Boarding 2003-2004.
. Letter from Mt. Hermon School to parents.
. Skiers Responsibility Code.
. Incident Report from Berkshire East.
. Deposition of Yuki Hasegawa.
. Deposition of John A. Herrick, Jr.
. Deposition of Katie Benedetti.
. Deposition of Michael P. Atkins.
. Deposition of Samuel Wilson.
. Deposition of Audra Forstrum.
. Deposition of Richard Eisenberg.
. Site Inspection, photos and videotape done on 3/23/2005.

OBSERVATIONS:

On Friday, February 20, 2004, Yukio Kusada went skiing on a Mount Hermon School sponsored trip. The busses from the school took two busloads of students up to Berkshire East ski area for a night session. The busses were scheduled to leave Mt. Hermon school at 4:00 pm and leave Berkshire East after skiing at 9:15 p.m.

The Mt. Hermon skiing program was scheduled to operate Wednesday afternoons and Friday evenings starting January 7, 2004. All sessions were to be at Berkshire East ski area and night sessions were to leave the school campus at between 4:00 p.m. and 4:50 p.m.

On the evening in question, after arriving at Berkshire East, Yukio and his friend Yuki Hasegawa began skiing together. By Yuki's account the two rode the Main lift (Summit Express) several times prior to the accident. Sometime between 7:00 and 8:00 while

Page 3.

Yukio and Yuki had been skiing together on a trail named Big Chief, Yuki arrived at the bottom of the mountain and observed that Yukio was no longer with him. Yuki said he waited several minutes outside at the bottom of the mountain for Yukio then went into the base lodge and found one of the chaperones, Audra Forstrom. Yuki said he inquired of Ms. Forstrom if she had seen Yukio to which she replied "no". Ms. Forstrom encouraged Yuki to go on out, ski some more and she would meet him at the bus later.

Yuki, after his conversation with Ms. Forstrom, resumed skiing and reported to the proper return bus at the assigned time of 9:15.

The busses were scheduled to leave Berkshire East ski area at 9:30 p.m. When all the students had returned to the busses, attendance was checked and it was discovered that one was missing. The missing student was Yukio Kusada. The bus chaperones elected to send one of the busses back to its destination and to hold the second bus until they found the missing Yukio.

Yukio's absence from the bus was then reported to the Berkshire East ski patrol (at around 9:50 p.m.) and the patrol planned to look for Yukio during their end of day mountain sweep.

Once Yukio's absence was reported to the ski patrol and plans to search for him during sweep, the chaperone that was attending to the last bus, the Northfield bus, left Berkshire East ski area with Yukio still missing from the bus and returned with the bus to its assigned destination at Mount Hermon School. Upon arrival at around 10:15, it is learned that Yuki had seen Yukio between 7:30 and 8:00 p.m. on the mountain. It was not until approximately 11:30 that the information from Yuki having last seen Yukio on Big Chief trail was relayed to the ski patrol. The ski patrol had been searching intensely since Yukio's absence was reported.

After many hours of searching, including assistance from the State Highway department, snowmobiles and the entire ski patrol staff, Yukio was found. Yukio was discovered at approximately 3:55 p.m. When found, Yukio was unconscious, off the skiing surface in the wooded area bordering the lower Big Chief trail, unresponsive, but breathing. The patrol performed their assessment according protocol, located an abrasion on the right side of Yukio's head above the eye and determined that Yukio a possible femur fracture and serious head trauma. The patrol staff loaded Yukio onto a backboard, administered oxygen and transported him to the the base of the mountain from where he was taken to thebase of the mountain for further evaluation and treatment.

Page 4.

Inclement weather prevented a State police chopper from evacuating Yukio from Berkshire East. Yukio was taken by ambulance from Berkshire East to the nearest hospital facility by the Charlemont EMS. Yukio's parents who lived in Japan, were contacted and in the days following, arrangements for the parents to come to the United States were made. Yukio was moved to the Spaulding Rehabilitative hospital in Boston for further treatment.

By all reports, Yukio had been skiing between 8 and 11 times at the time of the accident. Although lessons were supposed to be offered to all students who wanted them, none were actually made available to t he Mount Hermon School skiing program. Yukio had been obliged to learn to ski on his own and according to Yuki's statement, he was not a very adept skier and was even having trouble stopping on the evening of his accident.

Students could make their own choice for obtaining skis. Yukio had borrowed a pair of skis from a friend. The skis Yukio was using at the time of his accident were Atoimic Supercross SX11, 170 cm. in length. Yukio told Yuki that he was having difficulty stopping with these skis, which were lent to him by a friend, Samuel Wilson. The Atomic Supercross SX11 is a ski designed for a very advanced skiing ability. The materials, flex characteristics and torsional rigidity of this ski would discourage the skidding skills necessary for a beginner skier. This ski is built for high speed, all mountain carving at advanced skill levels, and would negatively affect a beginner skiers attempts to ski safely, turn and stop.

CONCLUSIONS:

1. Mount Hermon School skiing program failed to provide its student participants with even the minimum , basic safety information prior to traveling to the mountain to ski. The handout information given to students at the only pre skiing session was information concerning school policy, grading, bus schedules and dates of the program.

2. It is customary when organizing and sponsoring any type of outdoor sports program, like skiing, which has the inherent potential for serious injury that the sponsoring organization provide comprehensive training and information sessions for participants which focus on basic safety information. Mount Hermon School provided no training or information to its participants regarding the inherent risks of skiing, the skiers responsibility or basic safety considerations to employ while skiing.

3. According to testimony of Mike Atkins, program co-ordinator, there was no attention given to the skiers in the skiing program's safety and well being by providing lessons to the participants. On the information sheets given to potential participants it is

Page 5.

indicated that lessons would be available, however no lessons were available or given to the participants in Mt.. Hermon's skiing program.Other school sponsored activities, like volleyball, tennis and badminton which were offered by Mount Hermon School all had instruction as a component of the activity.

4. The chaperones for the skiing program received no training in what to do with the students aside from their requirement to take roll on the bus and make sure students were not loitering in the day lodge during skiing hours. The chaperones were not instructed in how to teach the participants to ski, how to evaluate their progress or how to check each students' equipment to ensure that the student was using proper equipment and had skiing skills and ability appropriate to the equipment they were using while skiing.

5. The communication between the busses and the emergency group on the grounds of Berkshire East when trying to find Yukio was hopelessly lacking. Word did not get back to Berkshire East that Yuki had been skiing with Yukio on Big Chief trail until after 11:30 p.m., yet Yuki had inquired of Yukio's whereabouts from the chaperone much earlier in the evening. The communication in this situation was hopelessly inadequate.

6. Both busses were allowed to leave Berkshire East and return to Mount Hermon School before they found Yukio. Leaving a ski area in a group bus without all students whereabouts being accounted for is unconscionable. Both busses should have been held at Berkshire East until all students could have been notified of Yukio's absence and given the opportunity to tell the chaperones if, when and where they had last seen Yukio. If Mt. Hermon chaperones had been trained to do this proceedure, Yuki could have very early on identified a time and location that he had last seen Yukio, therefore, most likely Yukio would have been found and rescued many hours earlier.

7. No extra caution or safety information was given to the Mt. Hermon School participants as regards the potential for more hazardous conditions that could likely exist when skiing at night. Mount Hermon School failed to initiate any sort of "buddy" system with its participants which if such a system, which is a commonly used method, would have minimized the rescue problems that occurred and would have provided a good way for the chaperones to know the whereabouts of their participants.

8. Although represented as a graded activity, Mount Hermon School made no effort to monitor the progress, abilities or equipment being used by its participants. As a result Yukio Kusada was allowed to ski with no training, at a very low skill level with loaned skis which were considerably more difficult to use for a person with his limited skiing ability.

Page 6.

9. Although mention is made in the handout materials from Mount Hermon School to the skiing participants that helmets are "recommended" it would have been advisable and in the best interests of the students to require that helmets be worn while skiing. It appears that had Yukio been wearing a helmet at the time of his accident, his injury would have been much less severe.

OPINIONS:

1. Mount Hermon School's organization, training and execution of their skiing program was grossly inadequate and negligent.

2. Mount Hermon School failed to provide instruction, as advertised in their handout literature, for beginning skiers and as a result of this failure contributed to Yukio Kusadas accident. Ski lessons are a great benefit for all beginner skiers. Instruction serves to provide the lesson taking student with the necessary skills for safe skiing, equipment awareness as well as information about dealing with the environment of skiing. Students are taught how to stop, turn, control their speed through use of turn shape and terrain as well as their Responsibilities for safe skiing. Yukio did not have the benefit if this skilll development and as a result was not able to safely control his course and direction while skiing on the night of the accident..

3. Mount Hermon School failed to train and equip their chaperones with adequate skills and knowledge on accepted practices of group management and safety related issues and as a result contributed to Yukio Kusada's accident.

4. Mount Hermon School's lack of policy which allowied busses to leave the ski area before all students are present or accounted for was negligent and careless and clearly contributed to Yukio Kusada's not being found for at least eight hours after his accident.

5. Mount Hermon School carelessy and negligently ignored the necessity of providing the skiing participants with complete information surrounding safe skiing and information for how to ski safely at night.

6. Mount Hermon School was negligent in their failure to require all students to wear a helmet at all times while skiing.

Page 7.

This preliminary report was prepared at the request of counsel for the Plaintiff. I reserve the right to change or amend this report as needed when and if new information becomes available.

Very truly yours,

James W. Isham

# ISHAM & ASSOCIATES

P.O. Box 2619   Taos, NM 87571
(505) 776-8268    Fax 776-2131
e-mail jisham@newmex.com

## JAMES WALTER ISHAM

### EMPLOYMENT HISTORY

Mr. Isham's experience ranges from operation management and instructing at family-owned operations to upper level responsibility in one of the country's premier ski resorts. During his employment in the ski industry, Mr. Isham has been involved in all facets of building and running ski resorts including design and construction of trails, lifts, snow making, grooming, signage and marking. He is experienced in all issues affecting ski instruction, from both the student's perspective and the perspective of training and certifying of ski instructors. His mountain operations knowledge and expertise includes snowmaking, slope maintenance, signage, lighting, skier safety and risk management.

| | |
|---|---|
| 1959-1960 | Taos Ski Valley, Taos, New Mexico, Ski Instructor |
| 1960-1963 | Sierra Blanca Ski Resort (Ski Apache), Ruidoso, New Mexico Lift construction, Snowmaking Crew, Head Ski Instructor |
| 1963-1972 | Sierra Blanca Ski Resort, Ski School Director, Slope Layout and Construction, Lift Construction, Ruidoso, New Mexico |
| 1969-1971 | Coronet Peak, New Zealand, Ski School Director, Grooming and Lifts Layout |
| 1969 | Canadian Ski Instructors Alliance, Guest Examiner, Banff, Alberta |
| 1971 | Founder, New Zealand Ski Instructors Alliance Created organization and established New Zealand's first National Instructor's Certification Program (still in existence) Established and operated the first New Zealand/United States International Exchange of Ski Area Management Personnel for the purposes of training and educating New Zealand management staff in grooming, slope maintenance and operational procedures. |
| 1972-1976 | Copper Mountain Resort, Colorado, Ski School/Skier Services Director. Duties included operation of ski rental facilities, cross country and Nordic Nursery programs, Adult and Children's Ski Schools and Accessory Sales. This upper level management position included weekly consulting and participation in signage, trail marking, grooming and maintenance. |
| 1977 | Parallel Haus, Dallas, Texas, General Manager and Ski School Director |
| 1977-1980 | Taos Ski Valley, Taos, New Mexico, Ski School Supervisor, Instructor and |

# ISHAM & ASSOCIATES

P.O. Box 2619   Taos, NM 87571
(505) 776-8268     Fax 776-2131
e-mail jisham@newmex.com

NASTAR Racing Coordinator

| | |
|---|---|
| 1981-1988 | Copper Mountain Resort, Copper Mountain, Colorado, Ski School Operations Director, Duties included Cross-Country Ski School, Two Children's Nurseries, Community Day Care, Adult and Youth Ski Schools, Racing Education, the Seniors Program (Over the Hill Gang) and the snow-boarding staff. These functions employed approximately 250 people. |
| 1988-1989 | Eldora Mountain Resort, Nederland, Colorado, Skier Services Manager, Duties included Cross-Country Center, including its trail layout and maintenance and Ski School, Adult and Youth Ski Schools, Children's Nursery Programs, Off Site Sales, Rental Shop, Racing Department, Ski Area Risk Management and General Manager On Duty. |
| 1989-2000 | Taos Ski Valley, Taos, New Mexico, Ski School Safety Coordinator, Masters Program Coordinator |
| 2000 – Present | Sales Representative for various sports equipment and accessory companies. Snow sports expert – Isham & Associates – principal. |

## PROFESSIONAL SKI INSTRUCTOR ACHEIVEMENTS

Mr. Isham has been a member of the Professional Ski Instructors of America since 1960. The Rocky Mountain Division has more than 12,000 members and includes the states of New Mexico, Colorado, Texas, Arizona and Wyoming. PSIA is recognized nationally as the authority on proper instructional technique and is the certifying body for ski instructors. Mr. Isham has held many of the top elected posts at Regional and National PSIA levels. He is a major contributor to the formalization and definition of ski instruction and to the expansion of the PSIA.

Mr. Isham has been a guest lecturer for National Ski Areas Association, National Ski Patrol and PSIA in their fall seminar series which travels from coast to coast giving lectures and training on various aspects of ski area operation. Mr. Isham has, at these seminars, lectured on topics including: Risk Management, Skier Safety and Management, Development and Training.

## NATIONAL LEADERSHIP HIGHLIGHTS:

National Board of Directors (PSIA)
Chairman, National Ski School Management Committee
National Education Committee, 1987-1992
Chairman, National Ski Safety Education Committee
National Certification Committee, 1987-1992
PSIA Education Committee, 1979-1986
PSIA Safety Committee, 1983-1992
Divisional Representative (PSIA-RM)
National Ski School Directors Committee, 1983-1992

# ISHAM & ASSOCIATES

P.O. Box 2619   Taos, NM 87571
(505) 776-8268     Fax 776-2131
e-mail jisham@newmex.com

Seminar leader for PSIA and NSAA management training;
Conducted a series of seminars across the country for the purpose of better educating ski
area management in the latest staff training, risk management and safety
programs in 1987, 1988, 1989, 1990, 1991, 1997.
Chairman, PSIA Ski School Management Committee, 1988-1992.
Member, School Management Committee 1992-2000.

## PSIA- ROCKY MOUNTAIN DIVISION LEADERSHIP:

| | |
|---|---|
| 1964- present | Board of Directors |
| 1972-1978 | Certification Vice-President |
| 1979-1983 | President |
| 1981-1987 | Education Vice-President |
| 1988-1992 | PSIA Representative, Ski School Director's Committee |
| 1992-1999 | Member, Ski School Management Committee |

## MAJOR CONTRIBUTIONS TO PSIA AND PSIA-ROCKY MOUNTAIN DIVISION:

Founded Divisional Clinic Program. This program now operates all training programs
for PSIA-RM and has been adopted by all other PSIA divisions.
Created and implemented the Divisional Clinic Leader Program. This program defines
the standard nationwide for instructor education at the divisional levels. The DCL brings
the national guidelines of the PSIA directly to the individual ski instructor through clinics
and examinations.
During tenure as President, established the educational master plan which has
been adopted by many PSIA divisions.
As Certification Vice-President, wrote and produced the first certification
handbook for candidates and examiners.
As Education Vice-President, created special training and education programs for
children's instructors.
Served as PSIA Examiner for ski instructor certification from 1969 to 2002.

## CONTRIBUTIONS TO EDUCATION:

Keynote Speaker, Central Division, PSIA, 1990, Fall Seminar
Keynote Speaker, Canadian Alliance, 1993
Designed curriculum and hired staff for New Mexico Highlands University
Associates of Arts degree course in ski instruction.
Established curriculum and conducted a course in Ski School Management for
Colorado Mountain College.
Staff Guest Lecturer for NSAA Fall Seminar National Tour, 1987-1997

## RACING & SKI COACHING EXPERIENCE:

Current member U.S. Ski Coaches Association, Certified Coach
Eldora Ski Area, Racing Coordinator for NASTAR, Businessman's League and

# ISHAM & ASSOCIATES

P.O. Box 2619   Taos, NM 87571
(505) 776-8268     Fax 776-2131
e-mail jisham@newmex.com

Race Camps, 1989-1990
Adult Recreational Race Training Coordinator, Copper Mountain Resort, 1981-1988
NASTAR Race Coordinator, Taos Ski Valley, 1979-1981
Race Coordinator, Coronet Peak, New Zealand, 1969-1971
NASTAR Pace Setter, 1972-1985

## NATIONAL & REGIONAL PUBLICATIONS:

Strategy for Risk Management in the Ski School Operation
Isham, PSIA, NSAA (revised 1998)
Contributing writer to:
Ski Area Management
Ski Magazine
Ski Business Magazine
Skiing Magazine
Member Update, NSAA
Instructor to Instructor, PSIA Publication
Newspapers throughout New Mexico, Colorado and Texas
Operation and policy manuals for ski schools, rental and repair shops.
Television and panel discussion group leader.
The Professional Skier
Ski School Management Newsletter
Advanced Educator Newsletter

## QUALIFICATIONS IN OTHER FIELDS AND ADDITIONAL CAREER HIGHLIGHTS:

Memberships:
    National Ski Patrol
    American Society of Testing and Materials
    United States Ski Coaches Association, Certified Coach
    United States Ski Association

Professional Ski Instructors Association
    Awarded recognition and lifetime membership in 1991

Colorado Ski Country USA:
    Consultant for safety and risk management
    Member task force on skier safety, 1989-1990

American National Red Cross:
    Staff Instructor, American Red Cross National Aquatics School,
    Lake Murray, Oklahoma
    First Aid Instructor
    Water Safety Instructor

# ISHAM & ASSOCIATES

P.O. Box 2619   Taos, NM 87571
(505) 776-8268    Fax 776-2131
e-mail jisham@newmex.com

Boy Scouts of America:
  Eagle Scout and Silver Explorer Awards
  Annual Report to the Governor of Texas

Member, United States Professional Tennis Association
  1980-1991 Examiner of Tennis Instructors for United States
  Professional Tennis Registry

  1976 Staff Tennis Instructor, Vic Braden, Coto de Caza, California
  1980-1987 Head Tennis Professional, Copper Mountain Resort, Colorado
  1988-1991 Staff Instructor, Quail Ridge Inn, Taos, New Mexico

## EDUCATION:

Texas Tech University,
  1958-1962, Major English Literature, Business Minor
  Masters Program, Texas Tech (Allowed to begin graduate school before
  completing undergraduate program -- no degree)
Advanced Management Studies, Mountain States Employers Council
Advanced Presentation Skills,
  AT & T National Training Center, Denver, Colorado
Management Development, Copper Mountain, Colorado
Management and Personnel Training, Mountain States Employers Council,
Denver, Colorado

## PERSONAL INFORMATION:

Birth date:      October 9, 1940
Citizen by birth of the U.S.A.
Military Service: United States Army, Honorable discharge, 1965

# ISHAM & ASSOCIATES

P.O. Box 2619   Taos, NM 87571
(505) 776-8268    Fax 776-2131
e-mail jisham@newmex.com

*To the best of my knowledge, the following list includes all of my testimonies given either at trial or deposition during the period of 2002 to 2006:*

| Case Name: | Date of testimony: | Court and Case No.: | Attorney: | Type of Testimony: | Location: |
|---|---|---|---|---|---|
| *McIntire v. Haggard* | April, 2002 | Denver District Court | Jim Chalat | Deposition | Colorado |
| *Kane v. Telluride Ski Company* | January, 2003 | San Miguel, Telluride District F 01-CV-75 | Peter Riciardelli | Deposition | Colorado |
| *Platt v. Aspen Ski Co.* | March, 2003 | Pitkin District Court, Aspen County 02-CV-3 | Peter Thomas | Deposition | Colorado |
| *Pelkowski v. Little Switzerland* | April, 2004 | Washington County, Crevit Ct Branch 2 Melguon, WI 03-CV-115 | Kelly Centofanti | Deposition | Wisconsin |
| *Griggs v. Wintergreen* | April, 2004 | Albermarle County Circuit Court Charlottesville, VA CL-03-9452 | Bruce Rasmussen/ Brian Slaughter | Deposition | Virginia |
| *Griggs v. Wintergreen* | July, 2004 | Albermarle County Circuit Court Charlottesville, VA CL-03-9452 | Bruce Rasmussen/ Brian Slaughter | Trial Testimony | Virginia |

# ISHAM & ASSOCIATES

P.O. Box 2619   Taos, NM 87571
(505) 776-8268    Fax 776-2131
e-mail jisham@newmex.com

| Case Name: | Date of testimony: | Court and Case No.: | Attorney: | Type of Testimony: | Location: |
|---|---|---|---|---|---|
| Shepler v. Lee Canyon | August, 2004 | 8th District of Nevada, Clark County A452622 | Dennis Prince | Deposition | Nevada |
| Stephens v. Breckenridge | 2005 | District Court, Summit County, State of Colorado 2004CV 236 | Robert Schuetze | Deposition | Colorado |
| Carlson v. Solitude | April 2005 | 3rd District Court, Salt Lake County, State of Utah 020900689 | Mark Ethington | Deposition | Utah |
| ABS v. Wilson | September 2005 | Civil No. 020500398, Sate of Utah | Christian Hague | Deposition | Utah |
| Mavreshko v. Fernwood | November 2005 | Civil Action No. 04-CV-457 Pennsylvania | Dennis Callahan, | Trial | Pennsylvania |
| Upke v. Marshall Mountain | December 2005 | Mont. Case No.: BVO 2112 State District Court, Missoula, Montana | Maxon Davis | Trial | Missoula, Montana |
| Vine v Bear Valley | December 2005 | California Superior Ct CV31705 | Mike Danko | Deposition | California |

# ISHAM & ASSOCIATES

P.O. Box 2619   Taos, NM 87571
(505) 776-8268     Fax 776-2131
e-mail jisham@newmex.com

| Case Name: | Date of testimony: | Court and Case No.: | Attorney: | Type of Testimony: | Location: |
|---|---|---|---|---|---|
| *Albert v OberGatlinburg et.al* | January 2006 | US District court Eastern Dist/Tennessee No:3:02-CV-277 | Richard Baker | Deposition | Tennessee |

# ISHAM & ASSOCIATES

P.O. Box 2619   Taos, NM 87571
(505) 776-8268    Fax 776-2131
e-mail jisham@newmex.com

# JAMES W. ISHAM
# BIBLIOGRAPHY OF WRITTEN MATERIALS

### Published Materials:

Isham, James W. , "Helmets Do Not Make the Ski Slopes Safe," New York Times, Sunday, January 19, 2003.

Isham, James W. , "Watch Your Weight." Skiing Magazine, September 1979.

Isham, James W., "Skiing Tip: Hold a Pole for Good Arm-Hand Positioning," Skiing Magazine, November, 1979.

Isham, James W., "Skiing Tip: Do the Wedge Hop," Skiing Magazine, Spring 1980.

Isham, James W., "Unbuckle for Shakey Turns" Skiing Magazine, December 1980

Isham, James W., "Low Hands for Better Balance," Skiing Magazine, January 1981

Isham, James W., "Air the Armpit for Balanced Turns," Skiing Magazine, December 1982.

Isham, James W., "Skiing Tip: Anticipate with Matador Turns," Skiing Magazine, December 1982.

Isham, James W., "Use the Ski Tips as a Sensor," Skiing Magazine, February 1983 pp. 108.

Isham, James W., "Inside Foot Under the Belly Button," Skiing Magazine, September 1983

Isham, James W., "Skiing Quiz- Which Stance for Best Balance, " Skiing Magazine, October 1983.

Isham, James W., "Skiing Quiz - What's the Best Way to Edge," Skiing Magazine, November, 1983.

Isham, James W., "Visualization: Get an Eyeful," The Copper Cable, November 1983.

# ISHAM & ASSOCIATES

P.O. Box 2619    Taos, NM 87571
(505) 776-8268    Fax 776-2131
e-mail jisham@newmex.com

Isham, James W., "Skiing Quiz - Which Motion Increases Ski Pressure," _Skiing Magazine_, December 1983.

Isham, James W., "Skiing Quiz - What's the Best Way to Start Your Turn?" _Skiing Magazine_, January 1984.

Isham, James W., "Skiing Quiz - What's the Best Arm Position," _Skiing Magazine_, October 1984.

Isham, James W., "Skiing Quiz - What Kind of Turn, Long or Short?" _Skiing Magazine_, February 1984.

Isham, James W., "Raise One Ski to Avoid a Ski," _Skiing Magazine_, February 1984

Isham, James W., "Ski Pro Says 'hike the hip" _The Copper Cable_, October 25 - November 7, 1985

Isham, James W., "Skiing Tip: For Checking Your Stance. . . The Shadow Knows." _Skiing Magazine_, Spring, 1985

Isham, James W., "Skiing Tip: Are you a Butterfly or a Bee? _Skiing Magazine_.

Isham, James W., "What to Expect Your First Days on Skis," _Skiers Directory_, 1987.

## _Peer Reviewed Materials:_

Isham, James W., "Control the Turn Finish One Foot at a Time."

Isham, James W., "Air the Armpit to Balance Your Turns."

Isham, James W., "Drive the Downhill Hand."

Isham, James W."How do you Learn?"

Isham, James W. "Soar From Turn to Turn."

Isham, James W.,"Use Matador Turns to Learn Anticipation."

Isham, James W., "Put the Inside Foot Under the Belly Button."

# ISHAM & ASSOCIATES

P.O. Box 2619   Taos, NM 87571
(505) 776-8268    Fax 776-2131
e-mail jisham@newmex.com

Isham, James W., "Feel the Steel"

Isham, James W., "Watch Out for The Trees!"

Isham, James W., "Ski With Bicycle Handlebars for Smoother (Rounder) Turns."

Isham, James W., "Use the Tip as a Radar Sensor"

Isham, James W., "Tighten the Grip - Tighten the Radius"

Isham, James W., "Step On Your Soapbox for Better Turns"

Isham, James W., "Skiing with Geronimo's Relatives"

Isham, James W., "Pointer: Exploding the Powder Myth."

Isham, James W., "Observe the SLOW Signs."

Isham, James, W., "Make Mogul Skiing Easier"

Isham, James W., "Create a Visual Aid for Your Turns"

Isham, James W., "Caution: Trails Merge Dowhill"

Isham, James W., "Zone Therapy at Taos Ski Valley"

## _Newsletters Published by Isham & Associates:_

Isham & Associates for PSIA, PSIA Rocky Mountain Ski School Management, Winter, 1989

Isham & Associates for PSIA, PSIA Rocky Mountain Ski School Management, Spring 1990

Isham, James W., "Taos' Ski School Helps Preserve Resort's Bottom Line and Boosts Employee Enthusiasm," Member Update NSAA, October, 1994

Isham, James W., "Negligence Claim Against Nevada Ski Area Denied by Jury" Update, Isham & Associates February 1991.

# ISHAM & ASSOCIATES

P.O. Box 2619   Taos, NM 87571
(505) 776-8268      Fax 776-2131
e-mail jisham@newmex.com

Isham, James W., "Snowboarder Collision - Defense Verdict." Update, Isham & Associates February 1995.

Isham, James W., "Negligence Claim Against Arizona Ski Area Denied" Update, Isham & Associates, August 1994.

Isham, James W., "Ghionis v. Deer Valley - Ski School ACL Injury - Defense Verdict," Update, Isham & Associates, January 1996.

## *Manuals & Handbooks:*

Isham, James W., Taos Ski Valley Safety Program Handbook

Isham, James W., Taos Ski Valley Skiing Personnel Evaluation Program

Isham, James W., Masters Ski Week, Taos Ski Valley, 1995-1996

Isham, James W., Risk Management in the Ski School Operation, Manual, NSAA, PSIA, NSP

**APPENDIX 16**

| Last Name | First Name | | | Beginner | Interm | LessonYes | RentalYes |
|---|---|---|---|---|---|---|---|
| ▓▓▓▓ | ▓▓▓▓ | PEC214 | N | | X | | |
| ▓▓▓▓ | ▓▓▓▓ | PEC214 | H | | X | | |
| ▓▓▓▓ | ▓▓▓▓ | PEC224 | H | | X | | |
| ▓▓▓▓ | ▓▓▓▓ | PEC224 | H | X | | | X |
| ▓▓▓▓ | ▓▓▓▓ | PEC224 | N | X | | X | X |
| ▓▓▓▓ | ▓▓▓▓ | PEC224 | N | | X | | |
| ▓▓▓▓ | ▓▓▓▓ | PEC224 | H | | X | | |
| ▓▓▓▓ | ▓▓▓▓ | PEC224 | H | | X | | |
| ▓▓▓▓ | ▓▓▓▓ | PEC224 | H | X | | | X |
| ▓▓▓▓ | ▓▓▓▓ | PEC224 | N | X | | X | X |
| ▓▓▓▓ | ▓▓▓▓ | PEC224 | N | | X | | X |
| ▓▓▓▓ | ▓▓▓▓ | PEC224 | N | | | | |
| Kusada | Yukio | PEC214 | H | X | | X | |
| ▓▓▓▓ | ▓▓▓▓ | PEC224 | H | | X | | |
| ▓▓▓▓ | ▓▓▓▓ | PEC214 | H | | X | | |
| ▓▓▓▓ | ▓▓▓▓ | PEC224 | H | | X | | |
| ▓▓▓▓ | ▓▓▓▓ | PEC214 | N | | X | | X |
| ▓▓▓▓ | ▓▓▓▓ | PEC224 | N | | X | | |
| ▓▓▓▓ | ▓▓▓▓ | PEC224 | N | X | | | |
| ▓▓▓▓ | ▓▓▓▓ | PEC224 | H | | X | | |
| ▓▓▓▓ | ▓▓▓▓ | PEC224 | H | X | | X | |
| ▓▓▓▓ | ▓▓▓▓ | PEC214 | N | X | | | X |
| ▓▓▓▓ | ▓▓▓▓ | PEC224 | H | | X | | |
| ▓▓▓▓ | ▓▓▓▓ | PEC214 | N | | X | | |
| ▓▓▓▓ | ▓▓▓▓ | PEC214 | H | | X | | |
| ▓▓▓▓ | ▓▓▓▓ | PEC214 | H | | X | | |
| ▓▓▓▓ | ▓▓▓▓ | PEC214 | H | | X | | |
| ▓▓▓▓ | ▓▓▓▓ | PEC224 | N | | X | | |
| ▓▓▓▓ | ▓▓▓▓ | PEC224 | H | X | | | |
| ▓▓▓▓ | ▓▓▓▓ | PEC224 | N | X | | X | |
| ▓▓▓▓ | ▓▓▓▓ | PEC224 | N | | X | | |
| ▓▓▓▓ | ▓▓▓▓ | PEC224 | X | | X | | |
| ▓▓▓▓ | ▓▓▓▓ | PEC214 | N | | X | | |
| ▓▓▓▓ | ▓▓▓▓ | PEC224 | N | | X | | |
| ▓▓▓▓ | ▓▓▓▓ | PEC224 | H | | X | | |
| ▓▓▓▓ | ▓▓▓▓ | PEC224 | N | | X | | |
| ▓▓▓▓ | ▓▓▓▓ | PEC224 | N | X | | X | X |
| ▓▓▓▓ | ▓▓▓▓ | PEC224 | H | | X | | |
| ▓▓▓▓ | ▓▓▓▓ | PEC224 | H | | X | | |
| ▓▓▓▓ | ▓▓▓▓ | PEC214 | H | | X | | |
| ▓▓▓▓ | ▓▓▓▓ | PEC214 | H | | X | | |
| ▓▓▓▓ | ▓▓▓▓ | PEC214 | H | | X | | |
| ▓▓▓▓ | ▓▓▓▓ | PEC224 | N | X | | X | X |
| ▓▓▓▓ | ▓▓▓▓ | PEC224 | H | | X | | |
| ▓▓▓▓ | ▓▓▓▓ | PEC224 | N | | X | | |
| ▓▓▓▓ | ▓▓▓▓ | PEC214 | N | | X | | |
| ▓▓▓▓ | ▓▓▓▓ | PEC214 | N | X | | X | |

24

APPENDIX 17

2003/04

## NORTHFIELD MOUNT HERMON SCHOOL
### *Athletic Office*

**Graduation Year**
❏ 2004  ❏ 2005
❏ 2006  ❏ 2007

# Permissions

**Campus Address**
*(for returning students)*
❏ Northfield
❏ Mount Hermon

Name of student ___Yukio Kusada___

Student house ___C II___
FOR RETURNING STUDENTS

**Day Student**
❏ Yes ❏ No

## PE/A Activities Permission

During the year, some courses offered by physical education and athletics or activities sponsored by student programs require off-campus trips by students and include the use of facilities that we feel require special parental permission. These activities will be supervised by a responsible adult, and necessary safety precautions will be taken.

**This permission will remain in effect for the duration of your son's or daughter's career at NMH.**

*I am willing to have my son/daughter take part in the activities indicated below. I release and will hold the school and its staff harmless from any liability that might result from my son/daughter engaging in these activities.*

☑Yes ❏ No   **Canoeing**—on the Connecticut River and nearby lakes, rivers, and ponds. A swimming test and a tip test are required before any participation.

☑Yes ❏ No   **Recreational Alpine Skiing and Snowboarding**—slopes and lifts at public areas. Cost is approximately $375.

☑Yes ❏ No   **Swimming**—outdoors

☑Yes ❏ No   **Hiking, Snowshoeing, Nordic Skiing, or Camping**—day and/or overnight trips

☑Yes ❏ No   **Rock Climbing and Rappeling**—as an organized activity

☑Yes ❏ No   **Zip Line Traversing**—as an organized activity

☑Yes ❏ No   **Tree Climbing**—as an organized activity

☑Yes ❏ No   **Varsity Golf**—two practices a week and some home matches at Crumpin-Fox Golf Club. Cost is approximately $150.

☑Yes ❏ No   **Scuba Diving**—confined water and open water training

☑Yes ❏ No   **Mountain Biking**

☑Yes ❏ No   **Varsity Alpine Skiing**—lift tickets for four days a week and bus transportation. Cost is approximately $400.

☑Yes ❏ No   **Varsity Nordic Skiing**—trail fees at a cross-country ski center when no snow at NMH. Cost is approximately $150.

☑Yes ❏ No   **Varsity Ultimate Frisbee**—transportation to and from National Championships, when invited. Cost is approximately $400.

Parent/Guardian signature _____

APPENDIX 18

November 13, 2003

Dear Parent or Guardian,

Your son or daughter has requested to participate in Recreational Downhill Skiing or Snowboarding for winter term Physical Education assignment. He or she has received instruction on how to be considered for this program.

This course is designed for beginner and intermediate skiers and snowboarders. The program will operate on Wednesdays and Fridays. Beginning skiers may receive a ski lesson once each week and approximately six hours of skiing time per week. For the safety of your son / daughter, a helmet is recommended for snowboarders / skiers.

An activity fee of approximately $375-$400 will be billed to you to cover transportation and lift ticket at Berkshire East Ski Area in Charlemont, MA. If your child has a ski pass, the cost is approximately $126 for transportation. Ski rentals are available when pre-paid for the term, $105. This includes skis, boots, poles. Snowboards are available when pre-paid for the term, $175. It is the responsibility of the student to provide the rental fee payment by check, payable to Berkshire East, or to provide a credit card number, at the December 3rd campus meeting.

Your son / daughter would enjoy this special program. If you have any questions, please call 413-498-3466 or 413-498-3314. If you would like to give your permission for your son / daughter to participate in this program, see below. We need this permission form signed and returned by Dec 3rd for your son or daughter to be considered for enrollment.

Sincerely,

Frank Millard, Chair of Phys Ed & Athletics
Audra Forstrom, Rec Ski/Snowboard Coordinator
Richard Eisenberg, Rec Ski/Snowboard Coordinator

.........................................................................................................................................

Please fax to 413-498-3649 or mail to be received by Dec 3 to be considered for enrollment.

Rec Ski & Snowboarding
Northfield Mt. Hermon School
Meany Gym, 206 Main Street
Northfield, MA 01360

Student Name _____    Parent / Guardian _____
                                                                                              Signature

_____ I give permission for my son / daughter to participate in the NMH Rec Skiing and Snowboarding program.

_____ I understand that my son / daughter is responsible for their own ski or snowboard equipment. NMH and Berkshire East Ski Area are not responsible.

_____ I understand that the class fee is approx $375-$400. Ski rentals are an additional charge.

_____ I understand that the class is graded on the basis of attendance and participation. Students are required to attend every class.

_____ I understand that for my son's / daughter's safety, NMH strongly recommends that they wear a helmet while snowboarding / skiing.

Please fax to 413-498-3649 or mail
to be received by Dec 3 to be
considered for enrollment.

Rec Ski & Snowboarding
Northfield Mt. Hermon School
Meany Gym, 206 Main Street
Northfield, MA  01360

Student Name  Yukio Kusada  Parent / Guardian _____

Signature

✓  I give permission for my son / daughter to participate in the NMH Rec Skiing and
Snowboarding program.

✓  I understand that my son / daughter is responsible for their own ski or snowboard
equipment.  NMH and Berkshire East Ski Area are not responsible.

✓  I understand that the class fee is approx $375-$400. Ski rentals are an additional charge.

✓  I understand that the class is graded on the basis of attendance and participation.
Students are required to attend every class.

✓  I understand that for my son's / daughter's safety, NMH strongly recommends that they
wear a helmet while snowboarding / skiing.

APPENDIX 19

EXHIBIT 6 A
Millard
DATE: 11/15/05
SUSAN E. LEPORE

# REC SKIING & SNOWBOARDING
## 2003 - 2004

This class is designed for beginner and intermediate downhill skiers and snowboarders. PE ski classes will be held at Berkshire East this winter. The program is a physical education course. Beginner skiers may receive a one hour ski lesson each week and approximately 6 hours of free skiing time per week. Snowboarders will receive approximately 7 hours of free boarding time. Snowboarding lessons may be arranged for an additional fee of $7 per lesson, Fridays only.

**CLASS MEETING:** Class will meet Wednesday and Friday when school is in session. The first ski trip will be Jan 7. The last class is Wednesday, Mar 3. There is a required organizational meeting for Rec Skiing & Snowboarding students on Wednesday, Dec. 3 on campus. Students will be sent detailed reminders of this meeting. Attendance will be taken. Students must attend this meeting to be considered for the program.

**TIME SCHEDULES:**

| Wednesday | 1:30 | Bus # 1 leaves N flagpole and goes to Berkshire East |
| | 1:35 | Bus # 2 leaves N flagpole and goes to H |
| | 1:30 | Bus # 3 leaves H and goes to Berkshire East |
| | 2:35 | Ski lessons |
| | 4:45 | Bus # 1 leaves Berkshire East, goes directly to N |
| | | Bus # 2 leaves Berkshire East, stops at H |
| | | Bus # 3 leaves Berkshire East, goes directly to H |
| Friday | 4:00 | Dinner in Alumni Hall and Marquand |
| | 4:45 | Bus # 1 leaves N flagpole and goes to Berkshire East |
| | 4:50 | Bus # 2 leaves N flagpole and goes to H |
| | 4:45 | Bus # 3 leaves H and goes to Berkshire East |
| | 9:15 | Bus # 1 leaves Berkshire East, goes directly to N |
| | | Bus # 2 leaves Berkshire East, stops at H |
| | | Bus # 3 leaves Berkshire East, goes directly to H |

**CANCELLATIONS:** If skiing must be cancelled on any given day, this information will be put on SWIS, Student Announcements on Wednesday by 12:30, Friday by 3:30.

**MEALS:** Meals will be eaten in Marquand (N) and Alumni Hall (H) before departure.

**COST:** The total cost of the program is approximately $375-$400 which is billed to your parent or guardian. Miscellaneous accounts cannot be billed. This fee includes lift ticket $249 and transportation $126. If you have your own ski pass at Berkshire East, the cost is $126 for transportation.

**REFUNDS:** Refunds will be given for medical reasons only. Only injuries that prevent a skier from completing the season will be considered. A student who is medically excused for the term prior to:

January 15 - 75% refund
February 5 - 50% refund
February 14 - 25% refund

**RENTALS:** Students may rent equipment at Berkshire East. A ski package of skis, boots, and poles is $105 per term pre-paid. Snowboards are available for $175 per term pre-paid. It is the student's

responsibility to provide payment by check (payable Berkshire East) for rentals. Students should bring their rental fee check to the Dec 3rd meeting.

**SKI STORAGE:** There is no ski storage available at Berkshire. NMH will have three coach busses each with available storage space below to accommodate ski equipment.

**GUIDELINES:** Students will be under the school's jurisdiction from the time they leave campus until they return. All school rules apply. In addition there is no smoking at any time. You are in a class setting. Students not enrolled in class may not ride on the bus to the ski area.

These regulations of the ski area are designed for your health and safety:

1. Students may not leave the ski area.
2. Berkshire East Lodge Bar is off limits.
3. Students abide by Berkshire East Ski Area safety rules.

The first violation of any rule results in having your pass clipped. The second violation results in loss of pass.

**GRADING:** Rec Skiing & Snowboarding allows NO OMITS. You are expected to attend every class. Plan to leave Saturdays for any college visits. Grading is based on attendance and participation.

| | |
|---|---|
| O - 1 | No absences |
| VG - 2 | One unexcused absence |
| S - 3 | Two unexcused absences |
| NI - 4 | Three unexcused absences |
| U - 5 | Four unexcused absences |

Students are expected to attend each and every class. No exceptions.
A student with 2 unexcused absences and 2 or more excused absences will receive a grade of medically excused.

**DATES:** Rec Ski & Snowboarding class will meet on the following dates:

| Wednesday | Friday |
|---|---|
| January 7 | January 9 |
| January 14 | January 16 |
| January 21 | January 23 |
| January 28 | |
| February 4 | February 6 |
| February 11 | February 13 |
| February 18 | February 20 |
| February 25 | February 27 |
| March 3 | |

\* \*   THINK SNOW   \* \*

APPENDIX 20

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

YUKIO KUSADA,

          Plaintiff,

v.

BERKSHIRE EAST SKI RESORT, UNION
TERMINAL PIERS, INC., NORTHFIELD
MOUNT HERMON SCHOOL, FRANCIS
MILLARD and MICHAEL ATKINS,

          Defendants.

v.

TAKERU KUSADA,

          Third Party Defendant.

Civil Action No.  05-30043-MAP

ANSWERS OF MICHAEL ATKINS TO FIRST SET OF
INTERROGATORIES PROPOUNDED BY THE PLAINTIFF, YUKIO KUSADA

INTERROGATORIES

INTERROGATORY NO. 1:

Please state your name, date of birth, home address, occupation, duties in that position, length of time in that position, name and address of your employer, and business address.

ANSWER NO. 1:

Michael P Atkins  January 24, 1961, Box 4905, 206 Main Street, Northfield, MA 01360,

Associate Director of Athletics for over 20 years at Northfield Mount Hermon School, 206 Main

Street, Northfield, Mass.-Athletics and teaching of physical education.

INTERROGATORY NO. 2:

Please state the name of your employer, job title and a full and complete description of your duties and responsibilities with respect to the recreational ski program at Northfield Mount Hermon School from November 2003 through March 2004.

ANSWER NO. 2:

Northfield Mount Hermon School, Coordinator of Physical Education. Recreational

ski/snowboard program supervisor.

INTERROGATORY NO. 3:

Do you claim that Yukio Kusada received any instruction from Berkshire East Ski Resort
on January 7, 2004, January 9, 2004, January 14, 2004, January 16, 2004, January 21, 2004,
January 23, 2004, January 28, 2004, February 4, 2004, February 6, 2004, February 11, 2004,
February 13, 2004, February 18, 2004 or February 20, 2004.

ANSWER NO. 3:

I do not know whether he received instruction from Berkshire East or not. Upon

information and belief, instruction was offered at Berkshire East by Berkshire East Ski Area

Instructors for students who wanted instruction but instruction was not required. Yukio Kusada

was 18 years old, an adult and, upon information and belief, capable of assuming responsibility

for himself and it was his decision whether or not to take instruction.

INTERROGATORY NO. 4:

If you claim that Yukio Kusada received any ski instruction from ski instructors at
Berkshire East Ski Resort on January 7, 2004, January 9, 2004, January 14, 2004, January 16,
2004, January 21, 2004, January 23, 2004, January 28, 2004, February 4, 2004, February 6,
2004, February 11, 2004, February 13, 2004, February 18, 2004 or February 20, 2004, please
describe in detail all information upon which you rely in support of that claim and state
specifically what instruction he received.

ANSWER NO. 4:

See answer to Interrogatory No. 3.

INTERROGATORY NO. 5:

If you claim that Yukio Kusada received any ski instruction from ski instructors at
Berkshire East Ski Resort on January 7, 2004, January 9, 2004, January 14, 2004, January 16,
2004, January 21, 2004, January 23, 2004, January 28, 2004, February 4, 2004, February 6,
2004, February 11, 2004, February 13, 2004, February 18, 2004 or February 20, 2004, please
provide factual basis for said claim by stating the name and address of all individuals who have
provided information in support of that claim and, for each such individual, state what
information was provided.

ANSWER NO. 5:

See answer to Interrogatory No. 3.

INTERROGATORY NO. 6:

Please state everything that you did to ensure that Yukio Kusada received ski instructions from ski instructors at Berkshire Ski Resort on January 7, 2004, January 9, 2004, January 14, 2004, January 16, 2004, January 21, 2004, January 23, 2004, January 28, 2004, February 4, 2004, February 6, 2004, February 11, 2004, February 13, 2004, February 18, 2004 and February 20, 2004.

ANSWER NO. 6:

All recreational skiers/snowboarders attended an informational meeting on December 15,

2003 which I ran. The meeting gave students all the information on they needed to know,

including the skiers responsibility code and reminders about skiing ability and proper equipment.

Upon information and belief, Yukio Kusada was at that meeting. I stated that lessons were not

mandatory but that we recommended every skier take a ski lesson, especially beginners. We

asked each student to state his or her ski or snowboarding ability and check if they were

interested in lessons. Upon information and belief, arrangements had been made for Berkshire

East Ski Area to provide ski instructors and lessons. Yukio Kusada was 18 years old and it was

his decision whether or not to take ski lessons.

INTERROGATORY NO. 7:

Please state everything that you did to ensure that Yukio Kusada was wearing skis intended for his level of skiing ability on January 7, 2004, January 9, 2004, January 14, 2004, January 16, 2004, January 21, 2004, January 23, 2004, January 28, 2004, February 4, 2004, February 6, 2004, February 11, 2004, February 13, 2004, February 18, 2004 and February 20, 2004.

ANSWER NO. 7:

At the meeting described above, all skiers/snowboarders were asked to supply their own

skis or snowboard. We provided a retail shop to buy skis, or they could rent skis at Berkshire

East. Chaperones did not check what kind of skis students were wearing every day as a protocol,

but may have skied with students recreationally. All students including Yukio Kusada were informed that they were responsible for their own equipment as part of the program and that ski rentals were available from Berkshire East Ski Area. Upon information and belief, Yukio Kusada received the information, was 18 years old and was fully capable of assuming responsibility for his own ski equipment which was available from Berkshire East Ski Area.

INTERROGATORY NO. 8:

Please state everything that you did to ensure that Yukio Kusada received instruction concerning turning on skis on January 7, 2004, January 9, 2004, January 14, 2004, January 16, 2004, January 21, 2004, January 23, 2004, January 28, 2004, February 4, 2004, February 6, 2004, February 11, 2004, February 13, 2004, February 18, 2004 or February 20, 2004.

ANSWER NO. 8:

In addition to the meeting above, we annually requested that Berkshire East provide ski instructors for the first day of the program to help beginners who chose to take lessons. See also answers to Interrogatories No. 3 and 6.

INTERROGATORY NO. 9:

Please state everything that you did to ensure that Yukio Kusada received instruction concerning stopping on skis on January 7, 2004, January 9, 2004, January 14, 2004, January 16, 2004, January 21, 2004, January 23, 2004, January 28, 2004, February 4, 2004, February 6, 2004, February 11, 2004, February 13, 2004, February 18, 2004 and February 20, 2004.

ANSWER NO. 9:

In addition to the meeting above, we annually requested that Berkshire East provide ski instructor for the first day of the program to help beginners who chose to take lessons. See answers to Interrogatory No. 3 and 6.

INTERROGATORY NO. 10:

Please state everything that you did to ensure that Yukio Kusada received instruction in terrain selection on January 7, 2004, January 9, 2004, January 14, 2004, January 16, 2004, January 21, 2004, January 23, 2004, January 28, 2004, February 4, 2004, February 6, 2004, February 11, 2004, February 13, 2004, February 18, 2004 and February 20, 2004.

ANSWER NO. 10:

See answers to Interrogatories 3 and 6. In addition to the meeting on December 15, 2003, we annually requested that Berkshire East provide ski instructors for the first day of the program to help beginners who chose to take lessons. In addition, upon information and belief, all students were informed that slopes marked with black diamonds were for experts, slopes marked with blue squares were for intermediates and slopes marked green were for beginners. Further, upon information and belief, Yukio Kusada was 18 years old, was skiing with a friend, Yuki Hasagawa, who was an experienced skier who provided Yukio Kusada with instruction. Yukio Kusada was an adult and was fully capable of and responsible for deciding whether to learn by himself, or with assistance from a more experienced friend or by taking lessons from Berkshire East instructors, and what slopes he could ski on. He had, in fact, skied on the trail where the accident happened on multiple occasions prior to February 20, 2004.

INTERROGATORY NO. 11:

Please state everything that you did prior to February 20, 2004 to train Audra Forstrum, Richard Eisenberg and Susan Clough to be chaperones for the Physical Education course known as the Recreational Ski Program and for each act of training that you provided please state the date, time and location that said training was provided, the names and addresses of the people present at the training session and a full description of the documents or other materials used to train said individuals.

ANSWER NO. 11:

Audra Forstrum was the assistant chaperone for the recreational ski program in 2002-2003, so learned a great deal from the previous lead chaperone David Borland. I met with Audra Forstrum prior to the informational meeting with students on December 15, 2003. We went over all the program information and details, the skiers responsibility code and her role as lead chaperone. I met with Richard Eisenberg at a second meeting. Audra Forstrum and Richard Eisenberg were present when I ran the Mount Hermon campus meeting for students who had

signed up for the 2003-2004 Recreational Ski & Snowboarding Program. This program was a

participation only program. That is, to receive credit a student had to show up and participate.

Audra Forstrum, Richard Eisenberg and Susan Clough were teachers at NMH who were

designated as chaperones and whose responsibilities were to ensure attendance, ensure

participation, and ensure students followed NMH rules of conduct. As teachers at NMH, they

were familiar with the rules of conduct including, but not limited to, no drinking, and no drugs.

By education and experience as teachers at NMH, they were qualified to act as chaperones to

ensure attendance, ensure participation and to ensure students followed the NMH rules of

conduct. They were also experienced at providing information to students who signed up for the

Recreational Ski Program.

INTERROGATORY NO. 12:

Please state whether you had the authority to implement a requirement that all students
participating in the Recreational Ski Program for December of 2003 through February of 2004
wear helmets.

ANSWER NO. 12:

I did not.

INTERROGATORY NO. 13:

Please state why students who participated in the recreational ski program at Northfield
Mount Hermon School on February 20, 2004 were not required to wear helmets.

ANSWER NO. 13:

Helmets were recommended but not required for participants in the NMH Recreational

Ski and Snowboarding Program.. They were not required at Berkshire East Ski Area. They

were not required to my knowledge by any private secondary or public school in our

geographical area. They were not required by law in Massachusetts. They are not required to

my knowledge by any ski association and accordingly, in my opinion any such requirement

would be unenforceable. Moreover, Yukio Kusada was 18 years old, an adult in Massachusetts and fully capable of making the decision to wear or not to wear a helmet. Some students chose to follow the recommendation and some did not. Each student, including Yukio Kusada, accepted responsibility for making his or her own decision.

<u>INTERROGATORY NO. 14:</u>

Please state everything that you did to ensure that ski lessons were available for Northfield Mount Hermon students on January 7, 2004, January 9, 2004, January 14, 2004, January 16, 2004, January 21, 2004, January 23, 2004, January 28, 2004, February 4, 2004, February 6, 2004, February 11, 2004, February 13, 2004, February 18, 2004 and February 20, 2004.

<u>ANSWER NO. 14:</u>

Frank Millard made the initial contact with Berkshire East Ski Area for the recreational ski program. I followed up with details as to number of students, dates and times we would attend, and ski lesson times. Berkshire East Ski Area was to provide certified ski instructors for lessons. This information was passed on to the students at the organizational meeting and to Audra Forstrum.

<u>INTERROGATORY NO. 15:</u>

For each and every person whom you expect to call as an expert witness or liability witness at trial, please state the following:

    a.     the identity of each such expert by name and address,'

    b.     the subject matter on which each of the experts refer to in your previous answer is expected to testify;

    c.     the substance of the facts and opinion to which each of the fore mentioned experts is expected to testify.

<u>ANSWER NO. 15:</u>

    (a.-c.) 1.     Jasper Sheally, PhD, 425 French Road, Rochester, New York. Dr.

Sheally's resume and opinions have been disclosed and are incorporated herein by reference.

2.    Ken Shure, Bradford Associates, 17 Avery Square, P.O. Box 311,

Needham, Massachusetts 02494. Mr. Shure's resume and opinions have been disclosed and are

incorporated herein by reference.

## INTERROGATORY NO. 16:

Have students enrolled in the recreational ski program at Northfield Mount Hermon
School ever been required to take ski lessons at Berkshire East Ski Mountain?  Please state the
factual basis for your answer.

## ANSWER NO. 16:

Upon information and belief, yes, but the requirement was discontinued and was not part

of the 2003-2004 program.  Personal knowledge of the program.

## INTERROGATORY NO. 17:

If your answer to the preceding interrogatory is in the affirmative, please state the year
and reason that said requirement of mandatory ski lessons was eliminated and state the name,
address and job title of the person who made the decision to eliminate ski lessons as a mandatory
requirement of participation in the recreational ski program.

## ANSWER NO. 17:

Upon information and belief, the decision was made after the 1993 or 1994 ski season to

offer ski lessons on a recommended but voluntary basis.  We made this decision for a variety of

reasons.  Feedback from students played a part.  The fact that students learn in different ways

played a part.  Some benefit from "class type" instruction.  Some benefit more from doing.

Students who were interested in receiving instruction took advantage of the opportunity for

instruction.  Students who decided "class type" instruction was not the best way for them to learn

chose other options including learning from friends and more experienced skiers and that worked

well for them.  This decision was made between, Mr. Millard, a representative from Berkshire

East and the Physical Education Coordinator at the time.  I do not know those names.

**INTERROGATORY NO. 18**:

Were students who participated in the recreational ski program at Northfield Mount Hermon School during the 2003 — 2004 ski season required to take ski lessons at Berkshire East Ski Mountain?

**ANSWER NO. 18**:

No. Lessons were recommended but not required.

**INTERROGATORY NO. 19**:

If your answer to the preceding interrogatory is in the negative, please state why ski lessons were not a mandatory requirement of the recreational ski program at Northfield Mount Hermon School during the ski season 2003 - 2004.

**ANSWER NO. 19**:

Ski lessons had not been mandatory for about 10 years and the program worked well.

Students who were interested in receiving instruction took advantage of the opportunity for

instruction. Students who decided class instruction was not the best way for them to learn, chose

other options including learning from friends and more experienced skiers.

**INTERROGATORY NO. 20**:

Please state the name, address and job title of the individual who was responsible for deciding that students participating in the recreational ski program were not required to wear helmets as part of the mandatory requirements of participation in the recreational ski program.

**ANSWER NO. 20**:

It was not the responsibility of one individual. Several people were involved in the

decision including Michael Atkins, Coordinator of Physical Education, Mary Franzoso, Director

of Purchasing at the Northfield Mount Hermon School, and Frank Millard, Chairman of the

Athletic Department.

**INTERROGATORY NO. 21**:

Please state in specific detail each and every thing you did to instruct Yukio Kusada in the importance of wearing a ski helmet while participating in the recreational ski program during the months of November and December 2003 and January and February of 2004. Please include in your answer the specific dates on which you spoke with Mr. Kusada of the importance of

wearing ski helmets and the names and addresses of all individuals present when you spoke about this topic with Mr. Kusada.

ANSWER NO. 21:

At the orientation meeting on December 15, 2003, I recommended to all students that they wear a helmet. Upon information and belief, Yukio Kusada was present. I described why students should wear a helmet and why we did not require students to wear a helmet. I also gave the students an option of purchasing a helmet through a local sports shop.

INTERROGATORY NO. 22:

If you claim that any agent, servant and/or employee of Northfield Mount Hermon School provided Yukio Kusada with instruction concerning stopping on skis, turning on skis, equipment selection, and/or terrain selection, please state said individuals name and address and state specifically what instruction said individual gave to Mr. Kusada.

ANSWER NO. 22:

I do not know.

INTERROGATORY NO. 23:

Please list the names and addresses of all individuals whom you will call as a witness at the trial in this action.

ANSWER NO. 23:

Northfield Mount Hermon School objects to this interrogatory on the grounds that it seeks information or documents which are protected by the attorney-client privilege, seeks information or documents which constitute the work product of the Northfield Mount Hermon School or its attorneys, seeks information or documents which constitute the mental impressions, conclusions, opinions or legal theories of its attorneys, seeks information or documents which were prepared in anticipation of litigation and/or trial and seeks a legal opinion and analysis from a lay person. Without waiving its objections, Northfield Mount Hermon School has been advised that no decision has been made regarding the identity of those persons expected to testify during the trial of this matter. Northfield Mount Hermon School refers Yukio Kusada to the list

# 3749544_v1

of individuals set forth in the initial disclosures of the parties, to the depositions which have been taken of Sam Wilson, Yukio Hasegawa, Audra Forstrum, Richard Eisenberg, Susan Clough, Frank Millard, Lorren Byrom, Michael Atkins, Ed Ralicki, and Frank Field, and to the reports listed in Interrogatory 5.

INTERROGATORY NO. 24:

Please state whether you had the authority to implement a mandatory buddy system for the Recreational Ski Program at Northfield Mount Hermon School from December, 2003 to the end of February, 2004.

ANSWER NO. 24:

Objection as ambiguous. If you mean, did I have authority to order that every student stay with another student during the time the student spent at Berkshire East, then I had that authority. But that was not a requirement of Northfield Mount Hermon School nor was it a requirement of Berkshire East Ski Area. The students were high school students. Yukio Kusada was 18 years old. Berkshire East Ski Area is a relatively small ski area. It is my opinion that Yukio Kusada was capable of making this decision for himself. Upon information and belief, he did ski with Yuki Hasagawa on most occasions when he attended as a participant in the program.

INTERROGATORY NO. 25:

Please state why no buddy system was in effect for the Recreational Ski Program at Northfield Mount Hermon School on February 20, 2004.

ANSWER NO. 25:

Objection as ambiguous. The recreational ski program has been operating at Berkshire East Ski Area for approximately 30 years. In that time, there has never been a requirement by Northfield Mount Hermon School or Berkshire East Ski Area that any student stay with another student during the entire time the student spent at Berkshire East. Based on over 30 years of experience with thousands of students, the system of allowing students to make decisions about

11

will ski with and when has worked well, has allowed students to grow and mature, and has contributed to the popularity of the program. Thousands of students have learned how to ski in this program and how to make good, responsible decisions for themselves. Yukio Kusada was 18 years old and fully capable of doing so.

Signed under the penalties of perjury this _30th_ day of September 2006.

_Michael P. Atkins_
Michael Atkins

OBJECTIONS BY:

MICHAEL ATKINS

By his attorneys,

HOLLAND & KNIGHT LLP

_Harold W. Potter_
Harold W. Potter, Jr. (BBO No. 404240)
10 St. James Avenue
Boston, MA 02116
(617) 523-2700

_I hereby certify under the pains and penalties of perjury that this document was served upon counsel for all parties in this case on Oct 13 2006 by hand/by mail_

# 3749544_v1

12