UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| YUKIO KUSADA, | ) | |
| Plaintiff | ) | |
| | ) | |
| vs. | ) | Civil Action |
| | ) | No.:  Civil Action No.: 05-30043-MAP |
| | ) | |
| NORTHFIELD MOUNT HERMON | ) | |
| SCHOOL, FRANCIS MILLARD and | ) | |
| MICHAEL ATKINS, | ) | |
| Defendants | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| TAKERU KUSADA | ) | |
| Third Party Defendant | ) | |

**RESPONSE OF PLAINTIFF, YUKIO KUSADA, TO DEFENDANTS' STATEMENT OF
UNDISPUTED FACTS, TOGETHER WITH ADDITIONAL STATEMENTS OF UNDISPUTED
FACTS BY YUKIO KUSADA**

Plaintiff, Yukio Kusada ("Kusada"), hereby submits his response to the Defendants' Statement of

Undisputed Facts, together with additional undisputed facts.

**Response to Defendants' Statement of Undisputed Facts**

1.    Correct.

2.    Correct.

3.    Correct.  Additionally, Atkins was the direct coordinator of the physical education ski course in

2003 – 2004 and was responsible for the skiing class's day to day operations, including ensuring

that beginner students such as Kusada, who desired skiing lessons, received skiing lessons, and

supervising and training the chaperones.  (Atkins Dep at 61:16-22; 80:6-10, App. 3)

4.    Correct.

5.    Correct.

6.    Correct.

7.      Correct.

8.      Correct.

9.      Correct.

10.     Correct.

11.     Correct.

12.     Correct.  Additionally, students in the skiing class received a grade and credit to fulfill physical education requirements and credits necessary for graduation.  (Course Description, App. 19; Millard Dep at 19:11-18, App. 4)

13.     Correct.

14.     Correct.

15.     Correct.

16.     Correct.

17.     Correct.

18.     Correct.

19.     Correct.

20.     Correct.

21.     Correct.

22.     Correct.

23.     Correct.

24.     Correct.

25.     Correct.

26.     Correct.

27.     Correct.

28.     Correct.

29.    Correct.

30.    Correct.

31.    Correctly quoted.  However, while this provision does not relate to defendants' motion for summary judgment, plaintiff will later argue that this provision does not apply to the plaintiff.

32.    Correct.

33.    Correct.

34.    Correct.

35.    Correct.

36.    Correct.  However, NMH did not provide any instruction or guidance on how to choose equipment.  (Atkins Dep at 32:23-33-14, App. 3; Eisenberg Dep at 38:7-12, App. 8)

37.    Correct.

38.    Correct.

39.    Correct.

40.    Correct.  Additionally, Yukio Kusada had never skied prior to enrolling in the NMH ski course. (Hasegawa Dep. at 112:24-113:9, App. 6).

41.    Correct.

42.    Correct.

43.    Correct.

44.    Correct.

45.    Correct.

46.    Correct.  In addition, course description stated that "This class is designed for beginner and intermediate downhill skiers and snowboarders..." and "Students will be under the school's jurisdiction from the time they leave campus until they return."  All of the other information in the course description was purely logistical in nature and pertained to how the course was graded,

ski rentals, the dates and times buses would be arriving and departing, cost of the program, meals, and the organizational meeting. (Course Description, App. 19)

47.    Correct.

48.    Correct; however, defendants did not educate students regarding why helmets were an important safety device. (Forstrum Dep at 21:9-19, App. 7; Atkins Dep at 32:23-33-14, App. 3).

49.    Correct.  However, defendants provided no guidance or instruction regarding how to choose appropriate and safe equipment.  (Atkins Dep at 32:23-33-14, App. 3; Eisenberg Dep at 38:7-12, App. 8)

50.    Correct. However, lessons were ultimately unavailable.  (Eisenberg Dep at 26:9-27:15; 64:11-24, App. 8; Forstrum Dep at 53:10-54, App. 7)

51.    Correct.

52.    Correct.

53.    Correct.

54.    Correct.

55.    Correct.

56.    Correct.  During the 2003 – 2004 ski season there was no mandatory buddy system in the NMH ski course.  (Forstrum Dep at 22:4 -7, App. 7)

57.    Correct.

58.    Correct.

59.    Consistent with Hasegawa's deposition testimony.

60.    Consistent with Hasegawa's deposition testimony.

61.    Plaintiff contests this statement.  No one other than Hasegawa, including any NMH employee, ever evaluated or determined Kusada's ability to start skiing more difficult trails.  (Atkins Dep 121:24-122:4, App. 3; Eisenberg Dep at 25:15-26:6, App. 8; Forstrum Dep at 20:10-21:3, App. 7)

62.   Plaintiff contests this statement.  No one other than Hasegawa, including any NMH employee, ever evaluated or determined Kusada's ability to start skiing more difficult trails.  (Atkins Dep 121:24-122:4, App. 3; Eisenberg Dep at 25:15-26:6, App. 8; Forstrum Dep at 20:10-21:3, App. 7)

63.   Consistent with Hasegawa's deposition testimony.

64.   Consistent with Hasegawa's deposition testimony.

65.   Plaintiff contests this statement.  Hasegawa testified that Kusada was having difficulty stopping on skies and fell one or two times with his skies coming off which were retrieved by Hasegawa, on the date of the incident.  (Hasegawa Dep at 69:8-15; 94:7-12, App. 6)

66.   Plaintiff contests this statement.  Hasegawa testified that Kusada was having difficulty stopping on skies and fell one or two times with his skies coming off which were retrieved by Hasegawa on the date of the incident.  (Hasegawa Dep at 69:8-15; 94:7-12, App. 6)

67.   Consistent with Hasegawa's deposition testimony.  According to Herrick, skiing between a parallel and a wedge indicates that Kusada was still a beginner and should be on beginner terrain.  (Herrick Dep at 80:8-23, App. 9, App. 9)

68.   Plaintiff contests this statement.  This is a misstatement of Hasegawa's testimony.  In fact he said that Big Chief was Hasegawa's favorite trail, not Kusada's.  (Hasegawa Dep at 118:10-11, App. 6)

69.   Plaintiff contests the characterization of Kusada feeling comfortable skiing on Big Chief because Kusada has no memory of the incident, was having trouble stopping on the date of the incident, was falling on the date of the incident and Hasegawa himself did not try to teach plaintiff anything new on the date of the incident because plaintiff was having trouble.  (Plaintiff's Ans. to Ints. Propounded by NMH, Answer No. 14; Hasegawa Dep at 69: 8-15; 94:7-12, App. 6)

**Helmets**

70.   Correct.

71.    Correct.

72.    Correct.

73.    Correct.

74.    Correct.

75.    Correct.

76.    Correct.

77.    Plaintiff contests this statement. The standard of care for students in a *physical education skiing class* mandated that helmets be required. (Buck Aff ¶ 24, App. 13)

78.    Correct.

79.    Plaintiff contests this statement. Plaintiff's expert stated that the standard of care for students in a skiing class is to require helmets. (Buck Aff ¶ 24, App. 13)

80.    Correct. Notably, however, this does not apply to skiers enrolled in a physical education curricular skiing class.

81.    Plaintiff contests this statement. Plaintiff's expert stated that the standard of care for students in a skiing class is to require helmets. (Buck Aff ¶ 24, App. 13)

**February 20, 2004**

82.    Correct. Additionally, Hasegawa testified that Kusada had trouble stopping on his skis on several occasions on the evening of February 20, 2004 and fell one or two times with his skies coming off (Hasegawa Dep at 69 :8-15, 94:7-12; 116:20-117:2, App. 6)

83.    Correct.

84.    Correct. Kusada, however, was a beginner skier. (Herrick Dep at 81:6-20, App. 9, App. 9)

85.    Correct.

86.    Correct.

87.    Correct. When Hasegawa and Kusada skied together, Hasegawa followed Kusada because in the event that Kusada fell and his skies came off, Hasegawa could retrieve his equipment for him. This had happened on other occasions and on one or two occasions on February 20, 2004 before Kusada was injured. (Hasegawa Dep at 69:2-15, App. 6).

88.    Correct.

89.    Correct.

90.    Correctly quoted.   Additionally, Hasegawa testified that the "same Yukio" had had trouble stopping on his skis on several occasions on the evening of February 20, 2004 (Hasegawa Dep at 94:10-12, App. 6) and had fallen one or two times that evening and had his skies come off. (Hasegawa Dep at 69:2-15, App. 6)

91.    Correct.

92.    Incorrect.   Hasegawa went into the lodge to report to Forstrum and Clough that he had become separated from Kusada. (Hasegawa Dep at 73:23-74:4, App. 6)

93.    Correct.

94.    Correct.

95.    Correct. Forstrum had known since approximately 8:00 that Hasegawa reported that Kusada was missing. (Hasegawa Dep at 126:24-127:5, App. 6).

96.    Correct.

97.    Correct.

98.    Correct.

99.    Correct. Kusada has no memory of the incident as a result of the severe traumatic brain injury he sustained. (Plaintiff's Ans. to Ints. Propounded by NMH, Answer No. 14)

100.    Correct. Kusada has no memory of the incident as a result of the severe traumatic brain injury he sustained. (Plaintiff's Ans. to Ints. Propounded by NMH, Answer No. 14)

101.   Correct. Kusada has no memory of the incident as a result of the severe traumatic brain injury he sustained. (Plaintiff's Ans. to Ints. Propounded by NMH, Answer No. 14)

102.   Correct. Kusada has no memory of the incident as a result of the severe traumatic brain injury he sustained. (Plaintiff's Ans. to Ints. Propounded by NMH, Answer No. 14)

103.   Correct. Kusada has no memory of the incident as a result of the severe traumatic brain injury he sustained. (Plaintiff's Ans. to Ints. Propounded by NMH, Answer No. 14)

104.   Correct.

**Kusada's Experts**

Marilyn Buck, Ed.D.

105.   Correct. In addition, Dr. Buck has a doctoral degree in Physical Education from Brigham Young University. The emphasis of her doctoral thesis was curriculum and instruction. Prior to receiving her Doctorate she taught Physical Education and coached for ten years in Junior High School and High School. She has devoted a large part of her professional life to teaching college students to become Physical Education teachers in her positions as Assistant Professor, Associate Professor, and Professor of Physical Education at Ball State University. She was Coordinator of the Physical Education Teaching Major in the School of Physical Education at Ball Sate University and Coordinator of the Physical Education Graduate Programs at Ball State University. Included among the numerous positions and offices she has held nationally are Executive Committee member for the National Association for Sport and Physical Education, Middle and Secondary School Physical Education Council and member of the National Planning Committee for the Physical Education Standards Conference. (Buck Aff ¶ 2,3,4,5,8,10,11, 13,17,21).

106.   Correct, however this is irrelevant to her opinion that defendants did not comply with the standard of care for a physical education course.

107.    Correct, however this is irrelevant to her opinion that defendants did not comply with the standard of care for a physical education course.

108.    Correct.  Correct, however this is irrelevant to her opinion that defendants did not comply with the standard of care.

109.    Correct, however this is irrelevant to her opinion that defendants did not comply with the standard of care for a physical education course.

110.    Correct, however this is irrelevant to her opinion that defendants did not comply with the standard of care for a physical education course.

111.    Correct, however this is irrelevant to her opinion that defendants did not comply with the standard of care for a physical education course.

112.    Correct, however this is irrelevant to her opinion that defendants did not comply with the standard of care for a physical education course.  Further, there is no exception that would place NMH, as a private secondary school in New England, outside of the standard of care for physical education courses in the United States. (Buck Aff ¶ 22, App. 13)

113.    Correct, however this is irrelevant to her opinion that defendants did not comply with the standard of care for a physical education course.

114.    Correct, however this is irrelevant to her opinion that defendants did not comply with the standard of care for a physical education course.

115.    Correct, however this is irrelevant to her opinion that defendants did not comply with the standard of care for a physical education course.

116.    Correct, however this is irrelevant to her opinion that defendants did not comply with the standard of care for a physical education course.

117.    Correct, however this is irrelevant to her opinion that defendants did not comply with the standard of care for a physical education course.

118.    Correct, however this is irrelevant to her opinion that defendants did not comply with the standard of care for a physical education course.

119.    Correct, however this is irrelevant to her opinion that defendants did not comply with the standard of care for a physical education course.

James Isham

120.    Correct.

121.    Correct, as there were no eyewitnesses.

122.    Correct, as there were no eyewitnesses.

123.    Correct.

124.    Plaintiff disputes this statement. Isham's opinions implicitly apply to Millard and Atkins because they were responsible for administering the program. (Millard Dep at 54:10-12, App. 4; Atkins Dep at 61:16-22; 80:6-10, App. 3)

125.    Correct. However, Isham has "directed numerous ski school operations in the United States and New Zealand and been Director of Skier Services operations and Risk Management at ski areas in the United States." (Isham Report, page 1, App. 15)

126.    Correct.

127.    Correctly quoted.

128.    Correct; however, Isham's opinion is based on students enrolled in physical education skiing courses and is not limited to private secondary schools in New England. By implied logic he was also not aware that those other schools did not have those requirements. See ¶ 127, above.

129.    Correct.

130.    Correct. However, none of the programs Isham ran were part of a graded physical education course for credit; they were in connection with ski resorts. (Isham Report, page 1, App. 15)

131.    Correct.

132.    Correct.

133.    Correct. However, this is irrelevant to NMH, Millard, and Atkins.

**Additional Factual Statements of Plaintiff Yukio Kusada**

**Background**

134.    Yukio Kusada had never skied prior to enrolling in the NMH ski course. (Hasegawa Dep. at 112:24-113:9, App. 6).

**The NMH 2003 – 2004 Physical Education Skiing Class**

135.    At NMH, each student is required to participate in a sport or take a physical education course for credit each term. (Millard Dep at 19:11-8, App. 4)

136.    The skiing course is a graded Physical Education class, which is graded based on attendance and participation. (Course Description, App. 19)

137.    Frank Millard was the chair of the physical education department and had ultimate authority over the skiing class. (Millard Dep at 50:10-12; 54:10-12, App. 4)

138.    Michael Atkins was the Coordinator of Physical Education and was responsible for the skiing class's day to day operations, including ensuring that students who desired skiing lessons received skiing lessons, and supervising and training the chaperones. (, App. 3 at 61:16-22; 80:6-10)

139.    Millard was responsible for supervising Michael Atkins. (Millard Dep at 55:6-7, App. 4)

140.    As department chair, Frank Millard, was the boss of everything. (Millard Dep at 54:10-12, App. 4).

141.    Michael Atkins, as Coordinator of Physical Education, ran the physical education part of the Athletics Department in 2003 and 2004. (Millard Dep. at 54:12-16, App. 4).

142.    Students paid approximately $375.00 extra to participate in the Physical Education Ski Course. (Permission Slip, App. 18).

**Organizational Meeting and Course Description**

143.    The course description provided to students stated:  "This class is designed for beginner and
        intermediate downhill skiers and snowboarders... Beginner skiers may receive a one hour ski
        lesson each week and approximately 6 hours of free skiing time per week..."  (Course
        Description, App. 19)

144.    The course description also stated that "Students will be under the school's jurisdiction from the
        time they leave campus until they return."  (Course Description, App. 19)

145.    All of the other information in the course description was purely logistical in nature and pertained
        to how the course was graded, ski rentals, the dates and times buses would be arriving and
        departing, cost of the program, meals, and the organizational meeting.  (Course Description, App.
        19)

146.    The Skier's Responsibility Code was established by the National Ski Areas Association and
        included, for example, the guidelines to "always stay in control" and "stop in a safe place for you
        and others."  (Code)

147.    The organizational meeting, course description, and Code are most notable for what they did not
        contain.  They did not contain any information or instruction pertaining to how to actually ski,
        how maintain control, how to stop or turn safely, or which skiing equipment is appropriate.
        Students did not receive actual skiing instruction or demonstration.  Students did not watch a
        video on how to ski.  (Hasegawa Dep at 39:13-18, App. 6; Code; Course Description, App. 19;
        Atkins Dep at 32:23-33-14, App. 3)

148.    Atkins admitted that it is impossible to teach skiing in a classroom.  (Atkins dep at 93:6-13, App.
        3)

149.    Students' level of understanding and/or ability to implement topics covered during the
        organizational meeting or safety considerations was not tested. (Hasegawa Dep at 39-40, App. 6)

150. NMH informed students participating in the skiing physical education course that they were to provide their own equipment. (Permission Slip, App. 18)

151. NMH provided no guidance on what equipment was appropriate for Yukio Kusada's level of skiing ability. (Eisenberg Dep at 38:7-12, App. 8)

152. NMH Athletic Office represented that the skiing activity would be supervised by a responsible adult (PE/A Form, App. 17).

153. NMH Athletic Office represented that necessary safety precautions would be taken in the physical education ski course. (PE/A Form, App. 17)

154. The necessary safety precautions taken by NMH in conducting the physical education ski class consisted of three things according to department Chair, Frank Millard: 1) getting the students to and from the mountain, 2) giving the students the piece of paper containing the Skiers' Code of Conduct and reminding them about that throughout the term and 3) being prepared to take an injured student to the hospital. (Millard Dep at 95:24-98:12, App. 4).

155. When teaching other physical educations courses, Atkins instructed students on equipment so that they would have the information to know what they would need to conduct the activity to participate in the activity. (Atkins Dep at 117:16-118:2, App. 3).

156. Kusada borrowed skis from a dorm mate, Samuel Wilson, and the skis were Atomic, 170 Supercross XL 11 skis. (Wilson Dep at 10:13-4; 11:5-10, App. 10).

157. Atomic, 170 Supercross XL 11 skis are designed for very advanced and/or expert skiers. (Herrick Dep at 17, App. 9; Isham Report, page 4, App. 15).

158. The Atomic SX 11 ski, which is the model that Kusada was wearing on February 20, 2004, is an advanced level ski for an advanced level skier. It is a very stiff ski. It is a fast ski made for racers. (Herrick Dep at 39:10-15, App. 9).

159.  NMH did not give students in the ski course any written materials that addressed the meaning of signs for beginner, intermediate and expert trails. (Hasegawa Dep at 52:19-22, App. 6).

160.  NMH did not require students to demonstrate any specific skiing knowledge to participate in the physical education ski course. (Hasegawa Dep at 53:3-17, App. 6).

161.  NMH informed students for participating in the physical education ski class in 2003 – 2004 that they will be under the school's jurisdiction from the time they leave campus until they return. (Course Description, App. 19, App. 19).

162.  NMH informed students participating in the Physical Education Ski Class in 2003 – 2004 that they were in a class setting. (Course Description, App. 19).

163.  The course description stated that "This class is designed for beginner and intermediate downhill skiers and snowboarders…" and "Students will be under the school's jurisdiction from the time they leave campus until they return." All of the other information in the course description was purely logistical in nature and pertained to how the course was graded, ski rentals, the dates and times buses would be arriving and departing, cost of the program, meals, and the organizational meeting. (Course Description, App. 19)

**Skiing Class Chaperones**

164.  Audra Forstrum was the head chaperone of the ski course in 2003 – 2004. (Forstrum Dep at 12:14-19, App. 7)

165.  When she began as a chaperone in the ski program, Forstrum received no training whatsoever from NMH. (Forstrum Dep at 13:6-9, App. 7)

166.  Forstrum had never received any training in relation to the operation of a ski program prior to coming to NMH. (Forstrum Dep 14:17-20, App. 7)

167.    Forstrum never skied with Kusada, did not know what kind of skis he was using, did not know what kind of boots he was wearing and did not know whether he was using a helmet. (Forstrum Dep at 18:6-20, App. 7).

168.    Forstrum was unaware of Kusada's level of skiing, did not know where he got his skis, and did not know what trails he skied at Berkshire East when he skied with the Ski Program. (Forstrum Dep at 20:10-21:3, App. 7).

169.    Neither Atkins nor Millard had ever discussed with chaperone Audra Forstrum the idea of students wearing helmets. (Forstrum Dep at 4-8, App. 7)

170.    Forstrum, as head chaperone, never discussed helmet use with any of the participants in the ski course. (Forstrum Dep at 21:9-19, App. 7).

171.    Forstrum, as head chaperone, never discussed any issues related to night skiing with Kusada. (Forstrum Dep at 21:20-23, App. 7).

172.    Prior to February 20, 2004, the date of Kusada's, injuries there was no practice, policy or procedure in place regarding what Forstrum should do if a student skier had not been seen for a while. (Forstrum Dep at 22:24-23:9, App. 7).

173.    Chaperone, Susan Clough, was never given any instruction by NMH in how to properly chaperone the Recreational Ski Program. (Clough Dep 11:4-7, App. 11)

174.    As of February 20, 2004, Susan Clough, chaperone of the ski course, did not know Yukio Kusada, a student in the class. (Clough Dep at 16:7-8, App. 11).

175.    Chaperone, Susan Clough, had no knowledge of the kind of skis Yukio Kusada used, the kind of boots he used, the level of the skiing ability, what trails he skied at Berkshire East, whether or not he had ever taken a ski lesson, whether or not he had ever been instructed on how to take precautions for night skiing or whether or not he wore a helmet. (Clough Dep at 17:2- 24, App. 11).

176.    The responsibility of the chaperones was to check off who gets on the bus, make sure that no one gets rowdy on the bus and check off after they were finished at Berkshire East.  While at Berkshire East, the chaperones job was to keep their eye on the kids, not letting them stay inside too long.  When it was time to leave, the chaperones responsibility was to check them back onto the bus.  (Clough Dep at 14:12-19, App. 11; Forstrum Dep at 14:4-16, App. 7; Eisenberg Dep 12:9-14, App. 8).

177.    No chaperone of NMH ever assessed the skiing ability of Yukio Kusada.  (Clough Dep at 14:12-19, App. 11; Forstrum Dep 14:4-16, App. 7; Eisenberg Dep at 12:9-14, App. 8)

178.    Chaperones, Audra Forstrum, Michael Eisenberg and Susan Clough, who were supervised by Michael Atkins had responsibility for making sure that students, including Yukio Kusada, who indicated an interest in taking lessons were able to receive them.  (Millard Dep at 55:22-56:6, App. 4)

179.    Chaperones were required to take attendance, assure that students got to and from Berkshire East; monitor the lodge; ensure that general NMH and Berkshire East policies were followed; and ensure students returned to campus safely.  (Atkins Dep at 97:4-98:12, App. 3; Eisenberg Dep at 12:9-13:7, App. 8)

180.    One chaperone would ride in each bus and Eisenberg and Forstrum would alternate driving in a separate car in case an injured student needed to be taken to the hospital.  (Eisenberg Dep at 12:9-14; 13:1-7, App. 8)

181.    The chaperones are most striking for what they were not:  The chaperones were not were not skiing instructors.  (Eisenberg Dep at 29:19-21, App. 8; see ¶ 168, 169, 176, and 180, above)  The chaperones did not receive any training or instruction in how to supervise or facilitate a physical education class with many students (Forstrum Dep at 13:5-9, App. 7; Eisenberg Dep at 9:18-24, App. 8; Clough Dep at 16:7-8, App. 11).  The chaperones were not familiar with all of the

students, and Clough and Forstrum did not even know who Kusada was prior to the incident. (Millard Dep at 117:11-17; 118:5-6, App. 4)  The chaperones were unaware of Kusada's level of skiing ability, did not know whether he was beginner, intermediate, or advanced, and did not know whether or not he was using equipment that was safe and appropriate for his ability level. (Forstrum Dep at 20:10-14, App. 7; Eisenberg Dep at 17:1-4; 18:13-14, App. 8)

**Lessons**

182.    Skiing lessons were recommended for beginners, but not required.  (Atkins Dep at 78-79, App. 3)

183.    On the first day of the course, many of the students, including Kusada, knew nothing about skiing and had indicated that they needed skiing lessons; however, lessons were unavailable.  (Eisenberg Dep at 26:9-18, App. 8)

184.    Forstrum  spoke with Berkshire East ski school and attempted, unsuccessfully, to arrange lessons. (Forstrum Dep 53:10-54:2, App. 7)

185.    Eisenberg and Forstrum  even discussed the fact that there were supposed to be lessons. (Eisenberg Dep at 27:9-15; 64:11-24, App. 8)

186.    The chaperons did not tell Atkins or Millard that the lessons were not being provided.  (Atkins Dep at 131: 4-9, App. 3).

187.    Atkins testified that it was chaperones' responsibility to inform him that ski lessons were not taking place, that it was his duty and responsibility to check with chaperons to ensure lessons were being provided, (Atkins Dep at 85:5-24; 86:1-3, App. 3) and that it was a violation of his duty as the director of the program if this didn't happen (*Id.*)

188.    None of the chaperones taught Kusada how to ski and none inspected his equipment to ensure it was safe and appropriate.  (Eisenberg Dep at 29:2-6; 38:7-12, App. 8; Forstrum Dep at 18:6-20, App. 7; Clough Dep at 16:7-8, App. 11)

189. There was no requirement that students demonstrate a minimum level of skiing proficiency before being turned loose on the mountain. (Forstrum Dep at 46:20-47:1, App. 7)

190. Kusada indicated to the school that he was a beginner and that he desired skiing lessons. (NMH list of ski class participants, App. 18)

191. In all of the physical education courses at NMH in 2003 – 2004, except for the skiing course, all of the participants received instruction. (Atkins Dep at 77:10-17, App. 3).

192. NMH did not have qualified instructors to teach ski lessons. (Atkins Dep at 78;13-15, App. 3).

193. NMH did not require students in the physical education ski course to take lessons because NMH did not have qualified instructors to teach the lessons. (Atkins Dep at 78:10-15, App. 3).

194. NMH decided to discontinue mandatory ski lessons for participants in the skiing physical education course because Mr. Millard and Mr. Atkins believed that the quality of the lessons was such that it was not the best use of the students' time, even if they were beginner skiers. (Atkins Dep at 19:21-21:1, App. 3).

195. Frank Millard was the person with ultimate authority over the decision not to require beginner skiers to take ski lessons. (Atkins Dep at 23:12-19, App. 3).

196. As part of the physical educational courses on tennis and badminton, Michael Atkins provided lessons which included instruction on proper grip, the variety of shots, proper contact point, rules, etiquette, equipment, proper dress, conditioning, game play and strategy. (Atkins Dep at 44;13-20, App. 3).

197. The amount of time that a skier remains a beginner depends on the quality of instruction, the quality of terrain, and the student's willingness and openness to learn to ski. (Atkins Dep at 129:9-17, App. 3).

198. Michael Atkins has no recollection of chaperone Audra Forstrum ever telling him about any difficulties she was having concerning arrangement of ski lessons for students. (Atkins Dep at 131: 4-9, App. 3).

199. Michael Atkins was not aware that an effort was made by chaperone Audra Forstrum to set up times for NMH students to take ski lessons and that she had trouble getting times set with Berkshire East. (Atkins Dep at 131:10-15, App. 3).

200. Yukio Kusada received no ski instruction from chaperone Richard Eisenberg. (Eisenberg Dep at 25:15-26:6, App. 8)

201. Yukio Kusada informed NMH that he was a beginner skier and wanted ski lessons. (NMH list of ski class participants, App. 16).

202. NMH students did not enroll in the ski school program at Berkshire East in 2003 – 2004 because NMH tried to set times up but had trouble getting times set with Berkshire East. (Forstrum Dep at 53:10-54:7, App. 7).

203. Although the letter between Berkshire East and NMH about a 2003 – 2004 ski program states that lessons for all beginners would be on Fridays, Frank Millard does not know whether those lessons ever materialized. (Millard Vol. 2 Dep at 7:23-8:3, App. 5, Exhibit 1A).

204. In 2003 – 2004 John Herrick was the Director of the Ski School at Berkshire East. First time skiers taking their first lesson would learn how to put on their skis, how to walk on skis and how to take off their skis, how to get up when they fell, how to move around the slope and some basic turning and stopping. (Herrick Dep at 21:14-22:2, App. 9).

205. In the course of lessons at Berkshire East Ski School students are taught to control their speed through turning, stopping and choosing the correct trails. (Herrick Dep at 29:5-12, App. 9).

206. In the Berkshire East Ski School students are taught never to go above their ability level, in addition to being told what terrain they have been on and what terrain they should be practicing on. (Herrick Dep at 29:18-24, App. 9).

207. At Berkshire East Ski School it is considered important for students to be taught not to ski above their ability level so that they are not injured or scared or put in an environment that they could be in danger. (Herrick Dep at 30:5-12, App. 9).

208. At Berkshire East Ski School it is also considered important for the students to be taught what trails they should be practicing on so that they know what terrain they have done and where they should be working on their skills as skiers and so they are safe. (Herrick Dep at 30:13-31:11, App. 9).

209. Students taking lessons at Berkshire East Ski School are taught how to stay under control through turning, different turn radiuses, and how to traverse the hill. (Herrick Dep 34:15-35:10, App. 9).

210. At Berkshire East Ski School ski instructors in January of 2004 would have looked at the equipment used by students in their class to make sure that their equipment was at the ability level of the student, to make sure that the equipment fit and to make sure that the equipment that the student had was designed for the ability level of the student. (Herrick Dep at 37:23-38:14, App. 9).

211. A student in the Berkshire East Ski School in January of 2004 would have had his equipment looked at by an instructor and if the equipment was not appropriate for the level of ability the instructor would have had a conversation with the chaperone and depending upon what the resolution was with that chaperone, the decision would be made whether to get rental equipment. (Herrick Dep at 38:15-39:6, App. 9).

212. In January and February of 2004 if a beginner skier at Berkshire East Ski School was using the Atomic SX 11 ski in a ski lesson, the ski instructor would discuss that fact with the chaperone

because the ski would be a very stiff ski with which a beginner would have trouble turning and stopping. (Herrick Dep at 39:16-40:20, App. 9).

213.    It was the practice, policy and procedure of Berkshire East Ski School in January and February of 2004 for the instructors to look for progressions in students in their classes and based upon their observations, make recommendations to the students. (Herrick Dep at 46:13-47:12, App. 9).

214.    Students in the Berkshire East Ski School are taught that they should choose equipment that is appropriate for their level of skiing and are taught what they should do if they subsequently find themselves on the mountain having trouble with the equipment that they are using, which is to come down to the bottom of the mountain and address the equipment issue with people in the rental shop so that they would be safe. (Herrick Dep at 59:1-22, App. 9).

215.    Students taking beginner lessons at Berkshire East Ski School are taught about the Skiers' Responsibility Code.  They are taught that they need to adhere to it, they are taught the importance of maintaining control while skiing and they are given instruction on how to control their speed while skiing. (Herrick Dep at 60:9-24, App. 9).

216.    John Herrick, Director of the Ski School at Berkshire East, does not know if any NMH students took lessons in 2004. (Herrick Dep at 71:17-19, App. 9).

217.    If a student skiing at Berkshire East were in a wedge or halfway in between a wedge and parallel, they would, in the experience of John Herrick, should still be skiing on beginner terrain. (Herrick Dep at 81:6-20, App. 9)

218.    The Physical Education Department at NMH chaired by Frank Millard had no practice, policy or procedure about the checking to see that the ski equipment of the students enrolled in the program, such as Yukio Kusada, was appropriate for the level of skiing. (Millard Dep at 66:13-17, App. 4).

219.  No one in the Physical Education Department of NMH would be qualified to make a judgment on the safety or appropriateness of ski equipment. (Millard Dep at 67:1-4, App. 4).

220.  No NMH employee ever provided any ski instruction to Yukio Kusada. (Millard Dep at 69:14-17, App. 4).

221.  NMH did not know what type of ski equipment Yukio Kusada was using on February 20, 2004. (Millard Dep at 70:1-4, App. 4).

222.  Students in the Physical Education Department in 2003 – 2004 received lessons in sports such as badminton, tennis and golf. (Millard Dep at 72:18-21, App. 4)

223.  NMH did the following to enhance the safety of their students, including Yukio Kusada, when they were skiing at Berkshire East during the 2003 – 2004 Ski Program and nothing else: transported them to the mountain, took attendance, monitored poor behavior on the mountain if they saw it and bring them to the hospital in the case of injury that did not require ambulance. (Millard Dep at 68:11-13, App. 4).

224.  The comprehensive list of all that NMH did to enhance the safety of their students did not include ensuring that they had lessons, assessing their progress, provide instruction on terrain selection, require helmet use, provide instruction on equipment selection, provide instruction on night skiing. (Millard Dep at 68:11-13, App. 4).

225.  If a student signed up for tennis and was provided with no instruction that would be a violation of the students' agreement with NMH. It was important for students who were beginner skiers in the 2003 – 2004 Physical Education Ski Program to receive ski instruction. (Millard Dep at 92:12-17, App. 4).

226.  As Chair of the Physical Education Department at NMH in 2003 – 2004 Frank Millard would expect that if the understanding that students coming, including Yukio Kusada, were to have lessons, then lessons would take place. (Millard Dep at 113:20-24, App. 4).

227.   Beginner skiers were to receive one lesson per week in the 2003 – 2004 NMH Physical Education Ski Course. (Millard Dep at 11:11-23, App. 4).

228.   Frank Millard never ascertained whether beginner skiers in the 2003 – 2004 Ski Program at NMH got one lesson per week on Fridays. (Millard Dep at 12:2-9, App. 4).

229.   NMH informed participants in the Physical Education Ski Course in 2003 – 2004 that the class was designed for beginner and intermediate down hill skiers, that the program was a physical education course, that beginner skiers may receive a one hour ski lesson each week and that there would be approximately six hours of free skiing time per week. (Millard Dep at 21:6-24, App. 4, Exhibit 6A)

230.   NMH has required students to take lessons in the physical education ski course prior to the 2003 – 2004 school year, and since the 2003 – 2004 school year, but did not require lessons during the 2003 – 2004 school year. (Hasegawa Dep at 44:13-45:3, App. 6).

**Helmets and the Buddy System**

231.   During the 2003 – 2004 ski season there was no buddy system in the NMH ski course. (Forstrum Dep at 22:4 -7, App. 7)

232.   Some of the NMH students were wearing helmets and some were not. (Hasegawa Dep at 110:1-4, App. 6).

233.   There was nothing that prevented NMH from requiring students participating in the 2003 – 2004 ski course to use a helmet. (Millard Vol 2 Dep 55:1-8, App. 5)

234.   It was NMH's policy that helmets were recommended, but not required. (Permission Slip, App. 18)

**February 20, 2004**

235.   Because Kusada had no idea how to ski and because no other lessons or instruction was available, Hasegawa attempted to teach Kusada how to ski. (Hasegawa Dep at 49:7-12, App. 6)

236.  When Kusada did not show up for the buses, Forstrum checked the first aid tent and the lodge and informed first aid tent that a student was missing. (Forstrum Dep at 39:19-40:7, App. 7)

237.  At around 10:30 p.m., one of the deans asked Hasegawa where he last saw Kusada. (Forstrum Dep at 28:3-7, App. 7)

238.  As a result of the incident in this case, Kusada suffered a badly broken leg and compartment syndrome. His most devastating injury, however, was his severe traumatic brain injury; Kusada was eventually diagnosed with several areas of bleeding into his brain, skull fractures, brain contusion, and diffuse axonal injury. Kusada, who once had a very bright future, is now totally and completely disabled. (Plaintiff's Ans. to Ints. Propounded by NMH, Answer No. 14)

239.  Kusada had trouble stopping on his skis on several occasions on the evening of February 20, 2004. (Hasegawa Dep at 94:10 – 12, App. 6).

240.  When Hasegawa and Kusada skied together, Hasegawa would follow Kusada in case Kusada fell down with his skies coming off, Hasegawa could retrieve his equipment for him. This had happened on other occasions and on one or two occasions on February 20, 2004 before Kusada was injured. (Hasegawa Dep at 69:2-15, App. 6).

241.  Just before Hasegawa saw Kusada for the last time before his injury, he was skiing the same way that he had that night. (Hasegawa Dep at 73:1-4, App. 6). Kusada had trouble stopping on his skis on several occasions on the evening of February 20, 2004. (Hasegawa Dep at 94:10-12, App. 6). Kusada was having difficulties stopping that day. (Hasegawa Dep at 116:20-117:2, App. 6).

242.  Hasegawa waited at least 5 to 7 minutes at the bottom of the trail then went into the lodge to look for Kusada. (Hasegawa Dep at 73:23-74:4, App. 6).

243.  In the lodge, Hasegawa told head chaperone Audra Forstrum that he had not seen Kusada for a long time. (Hasegawa Dep at 80:12-13, App. 6).

244.    Forstrum told Hasegawa not to worry about it too much.  Hasegawa then continued skiing. (Hasegawa Dep at 80:10-81:2, App. 6).

245.    Hasegawa continued to ski for close to 1 ½ hours after he told Audra Forstrum that he had not seen Kusada for a long time.  (Hasegawa Dep at 126:24-127:5, App. 6).

246.    When Kusada was skiing with Hasegawa on February 20, 2004, he was skiing in between a parallel manner and a wedge.  (Hasegawa Dep at 116:14-19, App. 6).

247.    On February 20, 2004, Yuki Hasegawa did not attempt to teach Kusada to parallel ski because Kusada was having difficulties stopping that day.  (Hasegawa Dep at 116:20-117:2, App. 6).

**James Isham**

248.    Isham stated that in his opinion, the NMH skiing course failed to provide its student participants with even the minimum, basic safety information prior to traveling to the mountain to ski.  (Isham Report Page 4, paragraph 1 of Conclusions, App. 15).

249.    It is customary when organizing and sponsoring any type of outdoor sports program, like skiing, which has the inherent potential for serious injury that the sponsoring organization provide comprehensive training and information sessions for participants which focus on basic safety information.  NMH provided no training or information to its participants regarding the inherent risks of skiing, the skiers' responsibility or basic safety considerations to employ while skiing. (Isham Report  Page 4, paragraph 2 of Conclusions, App. 15).

250.    The chaperones for the skiing program received no training in what to do with the students aside from their requirement to take roll on the bus and make sure students were not loitering in the day lodge during skiing hours.  The chaperones were not instructed in how to teach the participants to ski, how to evaluate their progress or how to check each student's equipment to ensure that the student was using proper equipment and had skiing skills and ability appropriate to the equipment they were using while skiing.  (Id.)

251.   No extra caution or safety information was given to the NMH participants as regards the potential for more hazardous conditions that could likely exist when skiing at night. (Id. at paragraph 7)

252.   NMH failed to initiate any sort of "buddy" system with its participants which if such a system, which is a commonly used method, would have minimized the rescue problems that occurred and would have provided a good way for the chaperones to know the whereabouts of their participants. (Isham Report, Page 5, paragraph 4 of Conclusions, App. 15).

253.   Although represented as a graded activity, NMH made no effort to monitor the progress, abilities or equipment being used by its participants.  As a result Yukio Kusada was allowed to ski with no training, at a very low skill level with loaned skis which were considerably more difficult to use for a person with his limited skiing ability.  (Isham Report Page 5, paragraph 8 of Conclusions, App. 15).

254.   Although mention is made in the handout materials from NMH to the skiing participants that helmets are "recommended" it would have been advisable and in the best interests of the students to require that helmets be worn while skiing.  It appears that had Kusada been wearing a helmet at the time of his accident, his injury would have been much less severe. (Isham Report Page 6, paragraph 9 of Conclusions, App. 15).

**Marilyn Buck, Ed.D.**

255.   Buck has an Ed.D. in Physical Education from Brigham Young University, Provo, Utah.  (Buck Aff ¶ 2, App. 13)

256.   Buck's professional life has been devoted largely to teaching college students to become physical education teachers.  (Buck Aff ¶ 13, App. 13)

257.   Buck is familiar with the customs, practices and standards, for physical education classes in secondary schools in the United States of America.  (Buck Aff ¶ 21, App. 13)

258.  There is no known exception that would put the 2003-2004 Northfield Mount Hermon School physical education ski class known as Recreational Skiing outside of the customs, practices and standards for physical education classes in the United States of America. (Buck Aff ¶ 22, App. 13)

259.  Northfield Mount Hermon School's failure to instruct Kusada on proper terrain selection and its failure to implement a policy to monitor the terrain selection of its students in the physical education ski class in 2003 – 2004 was in violation of the customs, practices and or standards for physical education classes in the United States of America. (Buck Aff ¶ 23, App. 13)

260.  Northfield Mount Hermon School's policy of recommending but not requiring the use of helmets in the physical education ski class in 2003- 2004 was a violation of the customs, practices and or standards for Physical Education classes in the United States of America. (Buck Aff ¶ 24, App. 13)

261.  Northfield Mount Hermon School's policy of not requiring lessons for beginner skiers in the physical education ski class in 2003-2004 was a violation of the customs, practices and or standards for Physical Education classes in the United States of America. (Buck Aff ¶ 25, App. 13)

262.  Northfield Mount Hermon School's failure to assess the skiing ability of Yukio Kusada in the course of his participation in the physical education ski class in 2003- 2004 was a violation of the customs, practices and or standards for Physical Education classes in the United States of America. (Buck Aff ¶ 26, App. 13)

263.  Northfield Mount Hermon School's failure to provide instruction to Yukio Kusada in the selection of his ski equipment during his participation in the physical education ski class in 2003-2004 was a violation of the customs, practices and or standards for Physical Education classes in the United States of America. (Buck Aff ¶ 27, App. 13)

264. Northfield Mount Hermon's School's failure to ascertain that the skis Yukio Kusada was using on February 20, 2004 were appropriate for his beginner level of skiing ability was a violation of the customs, practices and or standards for Physical Education classes in the United States of America. (Buck Aff ¶ 28, App. 13)

265. Northfield Mount Hermon's School's failure to provide lessons to Yukio Kusada, who specifically requested them as a beginner skier in the 2003-2004 in physical education ski class, was a violation of the customs, practices and or standards for Physical Education classes in the United States of America. (Buck Aff ¶ 29, App. 13)

266. The failure of Northfield Mount Hermon's School to mandate use of a buddy system for the 2003-2004 physical education ski course in which Yukio Kusada was a participant was a violation of the customs, practices and or standards for physical education classes in the United States of America. (Buck Aff ¶ 30, App. 13)

267. The failure of Francis Millard, as Chair of the Physical Education and Athletics Department, to mandate instruction of students in the 2003-2004 physical education ski class, on proper terrain selection for their level of skiing ability and his failure to implement monitoring of terrain selection of said students was in violation of the customs, practices and or standards for physical education educators in the United States of America. (Buck Aff ¶ 31, App. 13)

268. The failure of Francis Millard, as Chair of the Physical Education and Athletics Department to mandate the use of helmets in the physical education ski class in 2003- 2004 was a violation of the customs, practices and or standards for Physical Education educators in the United States of America. (Buck Aff ¶ 32, App. 13)

269. The failure of Francis Millard, as Chair of the Physical Education and Athletics Department, to mandate lessons for beginner skiers in the physical education ski class in 2003-2004 was a

violation of the customs, practices and or standards for Physical Education educators in the United States of America. (Buck Aff ¶ 33, App. 13)

270.   The failure of Francis Millard, as Chair of the Physical Education and Athletics Department to mandate assessment of the skiing ability of Yukio Kusada in the course of his participation in the physical education ski class in 2003- 2004 was a violation of the customs, practices and or standards for Physical Education educators in the United States of America.  (Buck Aff ¶ 34, App. 13)

271.   The failure of Francis Millard, as Chair of the Physical Education and Athletics Department, to mandate instruction to Yukio Kusada in the selection of his ski equipment during his participation in the physical education ski class in 2003-2004 so that Kusada was taught the difference between skis intended for a beginner versus those intended for an expert and the dangers of using skis unfit for his beginner level of ability was a violation of the customs, practices and or standards for Physical Education educators in the United States of America. (Buck Aff ¶ 35, App. 13)

272.   The failure of Francis Millard, as Chair of the Physical Education and Athletics Department, to mandate that it be ascertained that the skis Yukio Kusada was using on February 20, 2004 were appropriate for his beginner level of skiing ability was a violation of the customs, practices and or standards for Physical Education educators in the United States of America.  (Buck Aff ¶ 36, App. 13)

273.   The failure of Francis Millard, as Chair of the Physical Education and Athletics Department to ensure that ski lessons were provided to Yukio Kusada, who specifically requested them as a beginner skier in the 2003-2004 in physical education ski class, was a violation of the customs, practices and or standards for Physical Education educators in the United States of America. (Buck Aff ¶ 37, App. 13)

274.    The failure of Francis Millard, as Chair of the Physical Education and Athletics Department, to mandate use of a buddy system for the 2003-2004 physical education ski course in which Yukio Kusada was a participant was in violation of the customs, practices and or standards for physical education educators in the United States of America.  (Buck Aff ¶ 38, App. 13)

275.    The failure of Michael Atkins, as a physical education teacher and coordinator of the physical education course in which Yukio Kusada participated in 2003-2004, to coordinate the program so that Yukio Kusada received instruction on proper terrain selection, and on the dangers of improper terrain selection, for his beginner level of skiing ability was in violation of the customs, practices and/or standards for physical education educators in the United States of America. (Buck Aff ¶ 39, App. 13)

276.    The failure of Michael Atkins, as a physical education teacher and coordinator of the physical education course in which Yukio Kusada participated in 2003-2004 to coordinate the course so as to ensure that lessons were available to Yukio Kusada, was a violation of the customs, practices and or standards for Physical Education educators in the United States of America.  (Buck Aff ¶ 40, App. 13)

277.    The failure of Michael Atkins, as a physical education teacher and coordinator of the ski course in which Yukio Kusada participated in 2003-2004 to coordinate the course so that assessment of Yukio Kusada's ability and progress occurred was a violation of the customs, practices and or standards for Physical Education educators in the United States of America.  (Buck Aff ¶ 41, App. 13)

278.    The failure of Michael Atkins, as a physical education teacher and coordinator of the ski course in which Yukio Kusada participated in 2003-2004 to coordinate the class so that Kusada was taught the difference between skis intended for a beginner versus those intended for an expert, and the dangers of using skis unfit for his beginner level of ability, was a violation of the customs,

practices and or standards for Physical Education educators in the United States of America. (Buck Aff ¶ 42, App. 13)

279.   The failure of Michael Atkins, as a physical education teacher and coordinator of the ski course in which Yukio Kusada participated in 2003-2004 to coordinate the program so that it was ascertained that the skis Yukio Kusada was using on February 20, 2004 were appropriate for his beginner level of skiing ability, was a violation of the customs, practices and or standards for Physical Education educators in the United States of America. (Buck Aff ¶ 43, App. 13)

280.   The failure of Michael Atkins, as a physical education teacher and coordinator of the ski course in which Yukio Kusada participated in 2003-2004, to ascertain that ski lessons were provided to Yukio Kusada, who specifically requested them as a beginner skier, was a violation of the customs, practices and or standards for Physical Education educators in the United States of America. (Buck Aff ¶ 44, App. 13)

281.   The failure of Michael Atkins, as a physical education teacher and coordinator of the 2003-2004 physical education ski course in which Yukio Kusada was a participant to mandate and implement a buddy system for this course was in violation of the customs, practices and/or standards for physical education educators in   (Buck Aff ¶ 45, App. 13)

**Lawrence Thibault, Sc.D.**

282.   Thibault had an Sc.D. in Mechanical Engineering from George Washington University received in 1979. (Thibault Aff ¶ 2, App. 14)

283.   Biomechanics is a well established branch of biomedical science and engineering dedicated to elucidating the mechanisms of human injury and determining qualitatively the thresholds at which injury to the human body occurs. (Thibault Aff ¶ , App. 13)

284.   Thibault reviewed the medical records of Yukio Kusada in connection with injuries he suffered on February 20, 2004.  Records reviewed confirm that Mr. Kusada suffered traumatic brain

injury, diffuse axonal injury, right occipital subdural hematoma, right temporal epidural hematoma, right posterior sub arachnoids hemorrhage, right sphenoid fracture, left occipital epidural hematoma with contusion in addition to leg injuries. (Thibault Aff ¶ 20, App. 14)

285. The method available to estimate Mr. Kusada's impact velocity is the failure criteria for his various scalp, skull and brain injuries. (Thibault Aff ¶ 21, App. 14)

286. Based upon the biomechanical data Mr. Kusada's impact velocity was approximately 20 miles per hour, which would be reasonably associated with a Delta V of 20 miles per hour. Anything in excess of this value would have most probably caused comminuted and depressed skull fracture. There is no discussion of such trauma in the medical records. (Thibault Aff ¶ 22, App. 14)

287. Helmets are designed to absorb energy and to reduce the stresses acting upon the head in an impact event. (Thibault Aff ¶ 23, App. 14)

288. During Mr. Kusada's impact with the tree, the stopping distance of his head would be approximately 3/8 of an inch which represents a full scalp compression and skull bending prior to fracture. (Thibault Aff ¶ 24, App. 14)

289. During Mr. Kusada's impact with the tree, the stopping distance of his head was approximately 0.38 inches, which represents a full scalp compression and skull bending with fracture. (Thibault Aff ¶ 25, App. 14)

290. A helmet would provide at least 1.00 inch of stopping distance, excluding shell deformation, attenuating and distributing the impact load acting on Mr. Kusada's head. This would reduce the forces acting on Mr. Kusada's head by approximately 300%. (Thibault Aff ¶ 26, App. 14)

291. A helmet would have prevented skull fracture, contusions to the brain and it would have substantially reduced the diffuse axonal injury (DAI) and the acute subdural hematoma. (Thibault Aff ¶ 27, App. 14)

**Miscellaneous**

292.    NMH mandated instruction in the following physical education courses: canoeing, swimming, hiking, snowshoeing, Nordic skiing, camping, rock climbing, rappelling, zip line traversing, tree climbing, scuba diving; and the following varsity alpine and Nordic skiing, varsity ultimate Frisbee. (Millard 100:4-102:2)

293.    The Big Chief Trail is an intermediate slope. (Hasegawa Dep at 68:13-15, App. 6)

294.    Kusada and Hasegawa were skiing together on Big Chief just prior to Kusada's incident. (Hasegawa Dep 68:1-12, App. 6)

295.    Mari Kusada totally entrusted the school with respect to the ski program. Since Kusada said it was part of the curriculum she assumed the school was going to teach him from step one. (Mari Kusada Dep at 37:18-38:1, App. 12)

296.    NMH appealed to the Kusada family because from the safety standpoint it gave Mari Kusada a sense of comfort. (Mari Kusada Dep at 18:10-19, App. 12)

297.    Dr. Buck reviewed the deposition transcripts of the defendants, NMH staff, Hasegawa, and Herrick, as well as NMH documents pertaining to the skiing course. (Buck Report, App. 13)

298.    Dr. Buck's Report states the following: To minimize the risk of injury, within the context of a physical education class, instruction is mandatory; Millard and Atkins failed to ensure that instruction was provided to students in the physical education course. Instructions would have included proper terrain selection; proper equipment selection; ongoing skill assessment and feedback; and, most importantly, how to stop, turn, and control speed while skiing. Additionally, the standard of care required that students' equipment be inspected to ensure its appropriateness; however, Millard, Atkins, and the chaperones failed to inspect Kusada's equipment and/or otherwise ensure it was safe and appropriate, and were wholly unaware of the equipment Kusada was actually using. The standard of care mandated that Kusada be required to wear a helmet. The standard of care required chaperones to be on the mountain, not in the lodge, in order to

ensure students were complying with safety rules and not having difficulty on the mountain. The standard of care also required that chaperones be trained in protocols regarding what should be done when a student is reported missing; Millard and Atkins failed to provide this training for the chaperones. The standard of care in a course such as this required use of the simple, old fashioned "buddy system," which Millard and Atkins also failed to require. (Buck Report, App. 13)

299.    Mr. Isham is a snow sports safety expert; he reviewed the deposition transcripts and examined the accident site. (Isham Report, App. 15)

300.    Atkins believed that arrangements had been made with Berkshire East to provide ski instructors and lessons. (Atkins Interrogatory Answers, No. 6, App. 20)

By His Attorneys

BREAKSTONE, WHITE-LIEF & GLUCK, P.C.

RONALD E. GLUCK
BBO #196950
Two Center Plaza
Suite 530
Boston, MA  02108-1906
(617) 723-7676

HEATHER A. ENGMAN
BBO # 662304
Two Center Plaza, Suite 530
Boston, MA  02108-1906
(617) 723-7676

**Certificate of Service**

I, certify that this document field through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on December 22, 2006 via first class mail.

Ronald E. Gluck

Heather A. Engman