UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

YUKIO KUSADA, )
    Plaintiff )
)
vs. ) Civil Action
) No.: Civil Action No.: 05-30043-MAP
)
NORTHFIELD MOUNT HERMON )
SCHOOL, FRANCIS MILLARD and )
MICHAEL ATKINS, )
    Defendants )
)
v. )
)
TAKERU KUSADA )
    Third Party Defendant )

**MEMORANDUM IN SUPPORT OF OPPOSITION OF PLAINTIFF TO DEFENDANTS'
NORTHFIELD MOUNT HERMON SCHOOL, FRANCIS MILLARD,
AND MICHAEL ATKINS MOTION FOR SUMMARY JUDGMENT**

I. **INTRODUCTION**

On February 20, 2004, a tragedy occurred as a result of the negligence of the defendants Northfield Mount Hermon School ("NMH"), Francis Millard ("Millard") and Michael Atkins ("Atkins"). On that date, the Plaintiff, Yukio Kusada, ("Kusada") was a 12th grade student at NMH participating in NMH's physical education night ski class at Berkshire East Ski Resort ("Berkshire East") when he skied into a tree suffering life altering brain and leg injuries. Kusada was not found until four o'clock in the morning, approximately eight hours after he was last seen.

When Kusada enrolled in the class eight weeks earlier he had never skied. He informed NMH that he was a beginner and wanted ski lessons. NMH assured enrollees in the class that this was a physical education class and that lessons would be available to all beginners. Over the six weeks that Kusada participated in the class, Defendants failed to provide Kusada with any ski lessons which, at Berkshire East's ski school, would have taught speed control, stopping, turning, terrain selection, equipment selection, and assessment of his ability to ski non-beginner trails. Defendants failed to require the use of helmets and failed to explain why helmets were an essential safety device. Defendants required

students to obtain their own equipment without any guidance whatsoever concerning appropriateness for their level of ability. Kusada borrowed skis from a dorm mate which, unbeknownst to Kusada, were expert skis unsafe for beginner skiers. No one ever told Kusada that the skis he was using were unsafe for his level of ability. As it turned out, Defendants merely provided transportation to and from Berkshire East, which was a life altering violation of their duty to Kusada. Defendants' failures resulted in Kusada skiing on borrowed expert skies on an intermediate slope at night without a helmet. This recipe for disaster produced tragedy when Kusada skied off the trail and hit the tree.

Defendants' argument that plaintiff may not, as a matter of law, be permitted to proceed with his case because defendants owed plaintiff no duty is incorrect in several ways. The special relationship between the school, its administrators and Kusada imposed a duty on defendants to use reasonable care to protect Kusada's safety while he was participating in the physical education class. Defendants also had a duty to use reasonable care because they voluntarily undertook to provide a skiing class at Berkshire East. In this case, defendants breached their duty by failing to provide Kusada with ski lessons, failing to require helmet use, failing to provide or inspect Kusada's equipment, failing to assess Kusada's skiing ability, and failing to provide terrain selection instruction.

Defendants' argument that plaintiff may not, as a matter of law, be permitted to proceed with his case because no one knows precisely how Kusada skied into the tree is off base. Plaintiff has produced ample expert opinion and factual evidence that defendants' failure to use reasonable care in managing and implementing the physical education ski course was a substantial contributing cause to Kusada's massive traumatic brain injury and severe leg injury. A jury is permitted to conclude that the multiple failures of each of the defendants in their management of the physical education course were a substantial contributing cause to Kusada skiing into the tree.

Further, the opinion of Plaintiff's expert biomechanical engineer, Lawrence Thibault, Sc.D., a world-renowned expert on head injury biomechanics, establishes that a helmet would have prevented Kusada's skull fractures and would have significantly reduced the severity of his traumatic brain injury. Thus, for the purpose of Summary Judgment, the exact reason that Kusada skied into the tree is irrelevant.

Defendants' arguments that helmets, lessons, and the use of safe and appropriate equipment are not required by ski resorts or the American Medical Association, are post-tragedy excuses for their failure to protect their student by educating him, assessing his progress, and ascertaining that he was using proper safety and ski equipment during their physical education course.

## II.   FACTS

The NMH 2003 – 2004 Physical Education Skiing Class

NMH is a private boarding school located in Northfield, Massachusetts. *Defendant Statement of Undisputed Facts* ("Dt.") ¶ 1, 4, 5. At NMH, each student is required to participate in a sport or take a physical education course for credit each term. *Plaintiff Statement of Undisputed Facts* ("Pf.") ¶ 135. The NMH "Recreational Ski Program," held at Berkshire East (Dt. ¶ 11), is an elective course that can be taken to fulfill the physical education requirement and to receive credits necessary for graduation (Pf. ¶ 135; Df. ¶ 12) and is graded based on attendance and participation. (Pf. ¶ 136) Kusada enrolled in the skiing course in 2004 during his senior year of high school in order to fulfill his physical education requirement. (Pf. ¶ 135) Kusada had never skied prior to enrolling in this course. (Pf. ¶ 134)

In 2004, Millard was the chair of the physical education department and had ultimate authority over the skiing class. (Pf. ¶ 137) Atkins was the coordinator of physical education and was responsible for the skiing class's day to day operations, ensuring that students such as Kusada, who desired skiing lessons, received skiing lessons, and supervising and training the chaperones. (Pf. ¶ 138) Atkins stated that it was the chaperones' responsibility to inform him if ski lessons were not taking place, and admitted that it was his duty and responsibility to check with chaperons to ensure lessons were being provided, and that it was a violation of his duty as the director of the program if this didn't happen. (Pf. ¶ 187) Millard was responsible for supervising Atkins. (Pf. ¶ 139)

Upon enrollment in the course Kusada received a PE/A Activities Permission Form, which stated that all students "will be supervised by a responsible adult, and necessary safety precautions will be taken." (Dt. ¶ 30) A second form stated that (1) "I understand that the class is graded on the basis of attendance and participation;" (2) "I understand that my son/daughter is responsible for their own ski or

3

snowboard equipment..."; and (3) "I understand that for my son/daughter's safety, NMH strongly recommends that they wear a helmet while snowboarding/skiing." (Dt. ¶ 33-37). Nothing prevented NMH from requiring helmets as a prerequisite to participation in the ski class. (Pf. ¶ 233) Consistent with the practice of many of his classmates, Kusada did not wear a helmet. (Pf. ¶ 232)

Mari Kusada, plaintiff's mother, totally entrusted NMH with respect to the ski program. (Pf. ¶ 295) Since the ski course was part of the NMH curriculum Mari Kusada assumed the school was going to teach Kusada skiing from step one. (*Id.*) Also, initially NMH as a school appealed to Mrs. Kusada because from the safety standpoint it provided her with a sense of comfort. (Pf. ¶ 296)

Organizational Meeting

Prior to beginning the skiing course, Atkins ran a one hour organizational meeting at NMH that Kusada attended at which students were given a few pages which comprised the Course Description and the Skier's Responsibility Code. (Dt. ¶ 41-44)

The course description stated: "This class is designed for beginner and intermediate downhill skiers and snowboarders... Beginner skiers may receive a one hour ski lesson each week and approximately 6 hours of free skiing time per week..." (Pf. ¶ 143) The description also stated that "Students will be under the school's jurisdiction from the time they leave campus until they return." (Pf. ¶ 144) All of the other information in the course description was purely logistical in nature and pertained to how the course was graded, ski rentals, the dates and times buses would be arriving and departing, cost of the program, meals, and the organizational meeting. (Pf. ¶ 145)

Additionally, students were informed they had to provide their own skiing or snowboarding equipment for the course. (Pf. ¶ 150) On February 20, 2004, Kusada was using skies he borrowed from his dorm-mate, Sam Wilson, which were Atomic, 170 Supercross 11 skies and designed for very advanced and/or expert skiers. (Pf. ¶ 156, 157)

The organizational meeting and course description are most notable for what they did not contain. They did not contain any information or instruction pertaining to how to actually ski, how to maintain control, how to stop or turn safely, or which skiing equipment is appropriate for the skiing ability of each

student. (Pf. ¶ 147) Students did not receive one single minute of actual skiing instruction or demonstration. *Id.* Students did not even watch a video on how to ski. *Id.*

The Skier's Responsibility Code was established by the National Ski Areas Association and included, for example, the guidelines to "always stay in control" and "stop in a safe place for you and others." (Pf. ¶ 146) Although the Code was given to students and discussed, the students were not given any physical and/or technical instruction or demonstration on how to actually stay in control or stop while skiing. (Pf. ¶ 147) Atkins admitted that it is, in fact, impossible to teach skiing while sitting in a classroom. (Pf. ¶ 148)

Further, no effort was made to ensure that Kusada actually understood and/or could implement the topics covered in the orientation meeting, the Skier's Responsibility Code, safety considerations, or knowledge of appropriate equipment. (Pf. ¶ 149)

Chaperones

The skiing class had three chaperones: Audra Forstrom (head chaperone), Richard Eisenberg, and Susan Clough, who would accompany the students to Berkshire East for each class. (Pf. ¶ 178) NMH limited the chaperones' responsibilities to taking attendance, assuring that students got to and from Berkshire East, monitoring the lodge, ensuring that general NMH and Berkshire East policies were followed, and ensuring that students returned to campus safely. (Pf. ¶ 179) One chaperone would ride in each bus and Eisenberg and Fostrum would alternate driving in a separate car in case an injured student needed to be taken to the hospital. (Pf. ¶ 180)

Again, the chaperones are most striking for what they were not: The chaperones were not skiing instructors. (Pf. ¶ 181) Head Chaperone, Forstrum, had no training on how to run a ski program before she became a chaperone and received no training from NMH when she became a chaperone. (Pf. ¶ 165, 166) The chaperones did not receive any training or instruction in how to supervise or facilitate a physical education class with many students. (Pf. ¶ 181) The chaperones were unaware of Kusada's level of skiing ability, what trails he skied, what skis he used, whether he used a helmet and did not know whether or not he was using equipment that was safe and appropriate for his ability level. (Pf. ¶ 167, 168, 175, 181) The

chaperones did not provide any skiing instruction to Kusada (Pf. ¶ 188) and did not ensure that students, like Kusada, who requested skiing lessons actually received skiing lessons (*Id.*)

Skiing Instruction

The physical education course description indicated that students would receive one hour of skiing lessons per week during the skiing course. (Pf. ¶ 143) These lessons were recommended for beginners, but not required. (Pf. ¶ 182) On the NMH list of ski class participants, Kusada indicated that he was a beginner and that he desired skiing lessons. (Pf. ¶ 190) Atkins and Millard were supposed to arrange for skiing lessons to be provided by qualified Berkshire East ski instructors (Pf. ¶ 203, 300), as NMH did not have its own qualified ski instructors. (Pf. ¶ 192) Apparently, however, Millard and Atkins never actually arranged for the skiing lessons to be provided, and on the first day of the course it became apparent to the chaperones that no skiing lessons were available. (Pf. ¶ 183-185)

John Herrick, the Ski School director at Berkshire East, testified that beginner ski school students at Berkshire East are taught how to stop, turn, and control their speed and are instructed on which trails and equipment are safe and appropriate for their ability level. (Pf. ¶ 204-211) He testified that had an instructor seen a student such as Kusada using the Atomic SX 11 ski a chaperone would have been notified. *Id.*

Thus, when students arrived at the mountain for the first day of the skiing course, there were no lessons, despite the fact that many of the students, including Kusada, knew absolutely nothing about skiing and had indicated that they needed skiing lessons. (Pf. ¶ 183) Forstrom reportedly spoke with Berkshire East ski school and attempted, unsuccessfully, to arrange lessons (Pf. ¶ 184), and she discussed the lack of lessons with Eisenberg. (Pf. ¶ 185) The chaperones did not tell Atkins or Millard that the lessons were not being provided. (Pf. ¶ 186, 187) It was the chaperones' responsibility to inform Atkins that ski lessons were not taking place. (*Id.*) It was Atkins' duty and responsibility to check with chaperones to ensure lessons were being provided, and it was a violation of his duty as the director of the program if this didn't happen. (*Id.*)

6

Further, none of the chaperones taught Kusada how to ski and none inspected his equipment to ensure it was safe and appropriate. (Pf. ¶ 188) In fact, to this day, Atkins, Millard, and the chaperones have no idea (aside from the classroom meeting) what skiing instruction – if any – Kusada received during the NMH physical education skiing course. (Pf. ¶ 188, 198, 199, 229) There was no requirement that students demonstrate a minimum level of skiing proficiency before being allowed to ski on the mountain without supervision. (Pf. ¶ 189)

NMH did not mandate ski instruction, but did mandate instruction in the following physical education courses: tennis, badminton, golf, canoeing, swimming, hiking, snowshoeing, nordic skiing, camping, rock climbing, rappelling, zip line traversing, tree climbing, scuba diving; and in the following varsity sports: alpine and nordic skiing and varsity ultimate Frisbee. (Pf. ¶ 222, 292)

In addition to failing to provide students with skiing lessons or safety instruction, NMH, Millard, and Atkins failed to require the "buddy" system at the mountain (Pf. ¶ 231).

February 20, 2004

During the Recreational Ski Program, Kusada generally skied with his friend, Yuki Hasegawa. (Pf. ¶ 235) Because Kusada had no idea how to ski and because no other instruction was available, Hasegawa attempted to teach Kusada how to ski. (*Id.*) Hasegawa testified that Kusada had trouble stopping on his skis and fell multiple times with his skis coming off. (Pf. ¶ 239, 240) In fact, Hasegawa made a point of skiing behind Kusada – in anticipation that Kusada would fall and his skies would come off – so that Hasegawa could retrieve Kusada's equipment for him. (*Id.*)

On February 20, 2004 at around 7:30 p.m., Kusada and Hasegawa were skiing Big Chief trail, an intermediate slope. (Pf. ¶ 293, 294) Kusada had been having difficulty with the skies he was using (Pf. ¶ 239, 240, 241) and told Hasegawa that he had difficulty stopping his skis. (*Id.*) Kusada and Hasegawa started at the top of Big Chief (Pf. ¶ 293, 294) At the middle of Big Chief, Hasegawa, who had been following Kusada, skied past Kusada to the bottom. (Dt. ¶ 89)

When Hasegawa reached the bottom of the trail, Kusada was not with him. (Dt. ¶ 91) Hasegawa waited for at least 5 to 7 minutes, and then went to chairlift and to the lodge. (Pf. ¶ 242) At approximately

8:00 p.m., Hasegawa informed head chaperone Forstrom that he had become separated from Kusada and that did not know where Kusada was. (Pf. ¶ 243) At approximately 9:50 p.m., Kusada did not show up at the bus to return to school and Forsrum finally reported this to the ski patrol, almost two hours after she was informed the plaintiff was missing. (Pf. ¶ 95, Dt. ¶ 95) Sadly, Kusada was missing for eight hours and was not discovered until around 4:00 a.m. the next morning. (Dt. ¶ 97) It was apparent that he had skied off the trail and hit a tree. (Dt. ¶ 98) Kusada suffered a badly broken leg and compartment syndrome. (Pf. ¶ 238) His most devastating injury, however, was his severe traumatic brain injury; Kusada was eventually diagnosed with several areas of bleeding into his brain, skull fractures, brain contusion, and diffuse axonal injury. (*Id.*)

Plaintiff's Experts

Marilyn M. Buck, Ed.D.:   Dr. Buck has a doctoral degree in physical education. (Pf. ¶ 255) She reviewed the deposition transcripts of the defendants, NMH staff, Hasegawa, and Herrick, as well as NMH documents pertaining to the skiing course. (Pf. ¶ 297) It is her opinion that defendants failed to provide adequate supervisory training for chaperones; failed to provide adequate supervision for the students; failed to provide adequate instruction; feedback, and continuous evaluation of students; and failed to adequately create and implement rules for use of safe and appropriate equipment. (Pf. ¶ 259-281)

More specifically, Dr. Buck stated the following:  To minimize the risk of injury, within the context of a physical education class, instruction is mandatory; Millard and Atkins failed to ensure that instruction was provided to students in the physical education course. (Pf. ¶ 298) Instructions would have included proper terrain selection; proper equipment selection; ongoing skill assessment and feedback; and, most importantly, how to stop, turn, and control speed while skiing. (*Id.*) Additionally, the standard of care required that students' equipment be inspected to ensure its appropriateness; however, Millard, Atkins, and the chaperones failed to inspect Kusada's equipment and/or otherwise ensure it was safe and appropriate, and were wholly unaware of the equipment Kusada was actually using. (*Id.*) The standard of care also required that chaperones be trained in protocols regarding what should be done when a student is reported missing; Millard and Atkins failed to provide this training for the chaperones. (*Id.*) Finally, the

standard of care in a course such as this required use of the simple, old fashioned "buddy system," which Millard and Atkins also failed to require. (*Id.*)

Mr. James Isham: Mr. Isham is a snow sports safety expert. (Pf. ¶ 299) He also reviewed the deposition transcripts in this case and inspected the accident site. (*Id.*) It is his opinion that if Kusada had received lessons from a qualified ski instructor, Kusada would have learned how to safely control his course and direction while skiing; his equipment would have been inspected and ensured to be safe for his ability level, and as a result, Kusada would not have been using inappropriate equipment on the night of the incident; and he would have received necessary safety information for proper terrain selection and safe night skiing. (Pf. ¶ 249, 253) Mr. Isham also opined that the chaperones did not have adequate skills and knowledge to properly supervise a safe skiing class. (Pf. ¶ 250) Finally, Mr. Isham opined that the standard of care for beginner skiers in a ski class is to require helmets. (Pf. ¶ 254)

Dr. Lawrence Thibault, Sc.D.: Dr. Thibault has a doctoral degree in biomechanical engineering. (Pf. ¶ 282) He reviewed Kusada's medical records. (Pf. ¶ 284) Dr. Thibault opined that if Kusada was wearing a helmet at the time of the incident, it would have reduced the forces acting on Kusada's head by approximately 300%, would have prevented the skull fractures and contusions to the brain, and would have substantially reduced the bleeding in the brain and diffuse axonal injury. (Pf. ¶ 290, 291)

## ARGUMENT

A party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, if any show that there is no genuine issues as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The evidence must be viewed in the light most favorable to the non-moving party and the non-moving party is entitled to the benefit of all reasonable inferences that can be drawn from the evidence. Fed. R. Civ. P. 56(c); *J.I. Corp. v. Federal Ins. Co.*, 920 F.2d 118 (1st Cir.1990). Further, "summary judgment is rarely appropriate with respect to the merits of a negligence case." *Appleby v. Daily Hampshire Gazette*, 395 Mass. 32, 37 (1985) (citations omitted); *Manning v. Nobile*, 411 Mass. 382, 388 (1991).

Through the evidence and expert opinion the Plaintiff meets his burden of proving the four elements of negligence, duty, breach of duty, causation, and damages. Summary Judgment is wholly inappropriate as a result.

### III. NMH, Millard, and Atkins had a Legal Duty to Use Reasonable Care to Prevent Injury to Kusada during the Physical Education Course

NMH, Milliard, and Atkins had a legal duty to use reasonable care to prevent injury to Kusada during the physical education course because of the special relationship between the school, its administrators, and Kusada, because of social values, and because defendants voluntarily undertook to provide the course and to provide responsible supervision and safety precautions during the course.

1. *Defendants had a Duty to Act with Reasonable Care to Prevent Foreseeable Harm to Kusada Because They Stood in Special Relationship to Him*

It is well established in Massachusetts that schools and school administrators stand in a special relationship with students and have a duty to ensure that students are reasonably safe. *Alter v. City of Newton*, 35 Mass.App.Ct. 142, 145 (1993) (city had duty to provide student with a reasonably safe school premises), citing *Whitney v. Worcester*, 373 Mass. 208, 223 (1977); *Mullins v. Pine Manor College*, 389 Mass. 47, 54 (1983) (college had duty to protect resident student from foreseeable harm); *Irwin v. Ware*, 392 Mass. 745, 756 (1984). The criteria for creating the special relationship and legal duty include "whether a defendant could reasonably foresee that he would be expected to take affirmative action to protect the plaintiff and could anticipate harm to the plaintiff from the failure to do so." *Irwin*, 392 Mass. at 756. Such foreseeability is based on whether the plaintiff reasonably relied on defendant to take affirmative action, if defendant has impeded other persons who might seek to render aid, statutory duties, property ownership, or some other basis. *Id.* Applying those criteria to the facts of this case it is clear that a special relationship and therefore legal duty existed between Kusada, NMH, and its administrators.

Kusada was a high school student from Japan attending NMH, a boarding school in Massachusetts. NMH provided room, board, education, security, and all that such schools provide to their students. NMH informed the students that they were under the school's jurisdiction while in the physical education ski class. Certainly NMH could foresee that it would be expected to take affirmative

action to protect students in its physical education classes. In fact, defendants represented to Kusada and his parents that the "course will be supervised by a responsible adult, and all necessary safety precautions will be taken." Kusada relied on this representation when he enrolled in the ski course and informed the school that he was a beginner skier who wanted to take lessons. Additionally, there is no one other than defendants who would provide protection, skiing lessons, or safety instruction to Kusada in the ski course, as Millard and Atkins failed to arrange for Berkshire East to provide the necessary instruction. Further, Atkins and Millard, as physical education professionals, would be expected to foresee the harm that would occur if they allowed a beginner skier to ski at night, with no lessons, without a helmet, on an intermediate slope, and on skis too advanced for his level of ability.

2. *Defendants also had a Duty to Act with Reasonable Care to Prevent Harm to Kusada Because of "Social Values and Customs."*

The duty owed by schools and school officials to students is also based on existing social values and customs. *Mullins*, 389 Mass. at 51. In *Mullins*, a college student sued the college and its vice president after she was attacked and raped while in her dorm room by an unidentified assailant. The Massachusetts Supreme Judicial Court held that the school and its vice president had a duty, based on existing social values and customs, to prevent physical harm to its students by third parties. *Mullins*, 389 Mass. at 51, 52. The SJC provided several examples of "existing social values and customs" which created the duty on the school, including: (1) the concentration of young women on a campus creates a favorable opportunity for criminal acts; (2) threat of criminal acts on a campus is self evident; (3) the college is the party in the best position to take steps to ensure safety and no student can implement their own safety or security system; (4) and some students may not be fully aware of the dangers present on a metropolitan college campus. *Id.* These social values and customs are virtually identical to the criteria enumerated in *Irwin*, 392 Mass. at 756, for the creation of a special relationship.

The same "social values" and criteria which the SJC held created a duty in *Mullins*, and a special relationship in *Irwin*, are present in this case. First, just as the concentration of young women on a college campus created a favorable opportunity for crime, when a student beginner skier is put on a ski

slope at night, with the wrong equipment, and without any instruction whatsoever, it creates a favorable condition for injury.

Second, the threat of injury while skiing is self evident to physical education professionals. Millard and Atkins were aware that skiing carried a significant risk of injury. Unfortunately, they demonstrated this awareness by taking the grossly inadequate steps of discussing the Skier's Responsibility Code in a classroom and by requiring one chaperone to drive a separate car to Berkshire East in case an injured student required transportation to the hospital.

Third, NMH, Millard, and Atkins were the only parties in a position to ensure that a safe ski program was in place. NMH represented that lessons would be available to all beginners. Kusada, as a beginner, certainly could not teach himself to ski safely, and he lacked the knowledge to assess whether his equipment was appropriate or to determine which trails were appropriate for his ability level. Finally, NMH is a boarding school and was in *loco parentis* to Kusada. Kusada's only source of daily adult supervision and guidance was from NMH and its faculty.

Fourth, Kusada, as a novice skier, was not fully conscious of the dangers that were present while skiing. According to Plaintiff's physical education expert, Marliyn Buck Ed.D., "risks must be explained to the student who must demonstrate knowledge of the risks before engaging in the activity." (Buck Report, App. 13) Although Atkins discussed the Skier's Responsibility Code in the organizational meeting, Kusada did not have the requisite experience to put this information to use. For example, simply telling Kusada to maintain control while skiing or to stop in a safe place was not meaningful – and could not be implemented – because Kusada did not know how to adequately maintain control or stop or turn in the first place. As such, it was impossible for Kusada to anticipate the dangers of skiing and take steps to minimize that danger.

3. *Defendants' Arguments that they Owed No Duty to Kusada Blatantly Ignores the Fact that Kusada was Injured while Participating in the Defendants' Graded Physical Education Course for Credit.*

Defendants' reliance on *Judson v. Essex Agricultural and Technical Institute*, 418, Mass. 159 (1994) and *Erickson v. Tsutsumi*, 2000 WL 1299515 (Mass. Super. Ct.) is misplaced. In *Judson* and

12

*Erickson*, the plaintiffs were not injured during one of the defendants' courses or while they were under the school's jurisdiction; and, for that reason, the courts concluded that defendants owed no duty. The basis for the duty required by NMH, Millard, and Atkins is that defendants' failed to safely administer their physical education *class*.

As such, Kusada's age has absolutely no bearing on whether or not NMH, Millard, and Atkins owed a duty of care to Kusada. Massachusetts courts have repeatedly held that schools and school administrators, including colleges where most, if not all, of the students are over 18 years old, owe a duty to students to prevent physical harm. *Mullins*, 389 Mass. at 51, 52; *Alter*, 35 Mass.App.Ct. at 145. Whether or not the duty exists is based on the special relationship – stemming from the physical education class itself – and the social factors discussed above and is in no way tied to age. See *Mullins*, 389 Mass. at 51, 52. In fact, the SJC in *Mullins*, acknowledged that *adult* women on a college campus may lack the experience necessary to protect themselves, and therefore it was incumbent on the school to protect the students. *Id.*

Additionally, defendants assert that they did not owe a duty to Kusada because he was injured during an off campus "extracurricular activity." This is a blatant misstatement of the facts. The NMH ski program was not an "extracurricular activity" – it was a graded physical education course for credit. The course description clearly stated that students were under the school's jurisdiction. The fact that the course took place off campus does not eliminate the special relationship between NMH, Millard, Atkins and students participating in the school's course.

Defendants argue that the "community consensus" does not require them to ensure Kusada wore a helmet, used appropriate equipment, or received lessons because Kusada has not identified any "private secondary schools in New England operating a recreational ski program" that require helmets, lessons, or equipment inspection and because helmets are not uniformly required by ski resorts or the American Medical Association. This a mischaracterization of the community consensus standard articulated in *Mullins*. The relevant "community consensus" is what the community of *physical education professionals* are required to do with their physical education classes. The community consensus for all

13

physical education courses in the United States is to provide instruction. Dr. Buck's report states that the standard of care in physical education – the "consensus" among physical education professionals – is that instruction is mandatory, supervision and ongoing assessment are mandatory, and teachers must ensure that students are using appropriate equipment.[1]

Defendants' special relationship and duty arise form the fact that Kusada was enrolled in a physical education class for credit. The fact that Berkshire East and other ski resorts do not require lessons, helmet use, and inspection of equipment – for their general population of skiers – is irrelevant to this case, as those organizations do not stand in a special relationship to physical education curricular ski students, as NMH did to Kusada, and therefore may have no legal duty to require or provide lessons or provide supervision.

Nonetheless, Massachusetts courts have explicitly held that a higher duty of care is owed to students who are enrolled in ski resort skiing class than to skiers who are not in a class. In *Sanchez-Souquet v. Jiminy Peak, Inc.*, 1997 WL 693018 (Mass. Super.), a seven year old girl enrolled in a beginner level ski class was moved into an advanced class because she wanted to ski with her brother. *Id.* at 1. She had difficulty on the more advanced trails, and was eventually discovered to have skied into a tree. *Id.* The Court denied the defendant ski resort's motion for a directed verdict, citing a Utah case which noted that

> "the duty owed by a ski resort to students enrolled in the resort's instructional program, is significantly higher than the duty to the non-student patrons of the resort. The student pays a fee for ski instruction, and informs the resort that he or she is not knowledgeable about the skiing sport. The ski student is not in the position, through experience or knowledge to assume the risks of skiing, and relies upon his or her instructor to bring him or her up to the level of competence to assume those risks." *Sanchez-Souquet*, 1997 WL 693018 at 3, 4, citing *Ghionis v. Deer Valley Resort, Co., Ltd.*, 838 F.Supp. 789 (D.Utah 1993).

Again, the fact that ski areas do not require their general patrons to use helmets or to take lessons is not relevant to the duty owed by NMH, Millard, or Atkins to Kusada; defendants' duty is based on the fact that this incident occurred during the school's physical education course.

---

[1] In fact, defendants provide instruction in the other physical education classes offered at NMH.

14

4.  *Defendants' Had a Duty to Use Reasonable Care in its Skiing Course Because it Voluntarily Undertook to Provide a Supervised and Safe Course and its Failure to Use Reasonable Care Increased the Risk of Harm to Kusada.*

"One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if (a) his failure to exercise such care increases the risk of such harm, or (b) the harm is suffered because of the other's reliance upon the undertaking." *Mullins*, 389 Mass. at 52, citing Restatement of Torts (Second) §323. NMH, Millard, and Atkins voluntarily undertook to provide a physical education skiing course. The course description stated that "beginner skiers may receive a one hour ski lesson each week." The PE/A permission form stated the Recreational Ski Program "will be supervised by a responsible adult, and necessary safety precautions will be taken." Kusada and his parents paid tuition and an extra fee to NMH in order to take part in the skiing class. Mrs. Kusada entrusted NMH and believed that since the ski course was part of the curriculum, Yukio would be taught to ski from step one.

Defendants had a duty to recognize that responsible supervision and safety precautions were necessary to protect Kusada from injury during the physical education skiing class. Physical education expert, Dr. Buck, stated that the standard of care in physical education classes – in order to prevent injury – requires active supervision, continuous evaluation and assessment, appropriate safety equipment, and careful instruction regarding safety rules. Based on expert opinion, as well as common sense, it is more likely that Kusada would be injured if defendants failed to use reasonable care in providing the skiing course and in providing responsible supervision and safety precautions. It is also known that that Kusada and his parents relied on defendants' ability to responsibly supervise students and to take safety precautions when Kusada decided to attend NMH and his parents agreed to pay the tuition. Mrs. Kusada testified that one of the reasons the family chose NMH initially was the safety of the school, it gave her comfort. Defendants voluntarily undertook to provide a physical education course at Berkshire East and stated that the course "will be supervised by a responsible adult, and necessary safety precautions will be

15

taken." Defendants, therefore, had a duty to use reasonable care in implementing the physical education course.

Plaintiff has met his burden of establishing that defendants owed a duty to Kusada. Additionally, as described in the affidavit and report of physical education expert, Dr. Buck, defendants' multiple failures in the management of their ski class constitute a breach of that duty.

### IV. Plaintiff has Presented Affirmative Evidence to Demonstrate that it is More Likely than Not that Defendants' Breach of Duty Caused Kusada's Injuries.

Plaintiff has produced affirmative evidence in the form of expert opinions and established facts sufficient for a reasonable jury to conclude that defendants' failures in the management and supervision of the ski course more likely than not caused Kusada to ski into a tree and sustain a permanently disabling head injury and serious leg injury. Plaintiff has met his burden on the element of causation; therefore, defendants' motion for summary judgment must fail.

1. *Kusada Need Only Show that there was a Greater Probability than Not that he was Injured Because Defendants Failed to Use Reasonable Care.*

Ordinarily, causation is a question of fact for the jury to be proved by a preponderance of the evidence. *Mullins*, 389 Mass. at 58; *Zezuski v. Jenny Mfg. Co.*, 363 Mass. 324, 328, 329 (1973). "A plaintiff need only show that there was greater likelihood or probability that the harm complained of was due to causes for which the defendant was responsible than from any other cause." *Mullins*, 389 Mass. at 58. "The plaintiffs are not required to eliminate entirely all possibility that the defendant's conduct was not a cause. It is enough that they introduce evidence from which reasonable men may conclude that it is more probable that the event was caused by the defendant than that it was not." *Mullins*, 389 Mass. at 58. The plaintiff simply must show that the defendants' negligence was a "substantial factor" in bringing about harm to the plaintiff. *Johnson v. Summers*, 411 Mass. 82, 88 (1991), citing Restatement (Second) of Torts § 431 (1965). "An expert's opinion based on facts in evidence is sufficient proof of causation." *Mullins*, 389 Mass. at 58, citing *Zezuski*, 363 Mass. at 327.

16

2.  *Kusada is Entitled to the Benefit of All Reasonable Inferences.*

Moreover, at summary judgment, the non-moving party is entitled to the benefit of all reasonable inferences that can be drawn from the evidence. *J.I. Corp.*, 920 F.2d at 118. A reasonable or rational inference is one that is based on probabilities rather than possibilities, and is not the product of speculation or conjecture. *Alholm v. Town of Wareham*, 371 Mass. 621 (1976). See also *Johnson*, 411 Mass. at 82 (expert testimony regarding complications caused by police officers' failure to bring plaintiff directly to a hospital after plaintiff was injured during arrest was sufficient evidence for jury to reasonably infer that delay in medical care caused plaintiff's permanent injury); *O'Malley*, 17 Mass.App.Ct. at 332 (reasonable inference that negligent supervision of a manager of safe deposit box operation would result in loss to plaintiff); *Mullins*, 389 Mass. at 47 (expert testimony was sufficient evidence for reasonable jury to infer that negligent design of campus security system caused student to be physically injured by intruder); *Zezuski*, 363 Mass. at 324 (jury permitted to infer that fire at gas station was caused by negligence of individual pumping gas, despite absence of direct evidence).

3.  *Kusada is Not Required to Produce Direct Evidence Showing Precisely How the Incident Occurred; The Jury Will Be Permitted to Infer that Defendants' Negligence was a Substantial Contributing Cause of Kusada's Injuries.*

Massachusetts law simply does not require, as defendants contend, that plaintiff produce direct evidence showing precisely how the incident occurred in order to establish causation. *Mullins*, 389 Mass. at 58; *Johnson*, 411 Mass. at 88 (1991), citing Restatement (Second) of Torts § 431 (1965); *Zezuski*, 363 Mass. at 327. In *Zezuski*, plaintiff gas station owner alleged that defendant employee who delivered gas to the station was negligent in causing an explosion and fire. 363 Mass. 325, 326. There was no direct evidence regarding what initiated the explosion, but there was a "rumor" that two boys were seen near the truck and threw a match which ignited the explosion. *Id.* The Court held that even though there was no direct evidence regarding precisely how the explosion started, the jury was permitted to reasonably infer, based on the evidence and their own common knowledge, that the fire was more likely than not due to the defendant's negligence. *Id.* at 330. "The mere existence of other possible causes did not preclude the jury from finding that defendants' negligence was the proximate cause of plaintiff's damage." *Id.* at 329.

17

The jury was also permitted to discount the circumstantial evidence that two boys threw a match into the gasoline. *Id.* at 330. See also *Mullins*, 389 Mass. at 58-62 (reasonable for jury to infer that one or a combination of factors allowed assailant to gain access to college campus and dorm room, even though there was no direct evidence regarding exactly how assailant gained access). As in *Zezuski*, where no one saw how the fire started, a reasonable jury in the present case may conclude, based on expert opinion and numerous undisputed facts concerning the skiing course, that defendants' failures in the operation of the ski course, including the failure to provide even an iota of instruction on actual skiing technique, equipment selection, and terrain selection, caused Kusada to lose control on February 20, 2004 and ski into a tree.

Additionally, "the law presumes that a warning, if given, will be heeded." *Glicklich v. Spievack*, 16 Mass.App.Ct. 488, 493 (1983). See also *Harlow v. Chin*, 405 Mass. 697, 702, 703 (1989). Thus, it will be reasonable for a jury to infer that if Kusada was warned on what equipment to use, which slopes to ski, and how to stop and control his skiing, he would have done so and would thereby have avoided his injury.

4.   *Kusada Has Produced Ample Affirmative Evidence to Establish Causation.*

Kusada has produced an abundance of expert opinion that defendants' negligence caused Kusada's injuries. Physical education expert Dr. Buck stated that in order to reduce the risk of injury, skiing instruction must be provided in physical education classes. John Herrick, the Ski School director at Berkshire East, testified that beginner ski school students at Berkshire East are taught how to stop, turn, and control their speed and are instructed on which trails and equipment are safe and appropriate for their ability level. (Pf. ¶ 204-211) He testified that had an instructor seen a student such as Kusada using the Atomic SX 11 ski a chaperone would have been notified. *Id.* Plainly, from the testimony of John Herrick, had the ski lessons at Berkshire been arranged for Kusada, as he requested, he would very likely not have ended up on the wrong skis, on the wrong slope and he would have been taught proper methods to control his speed by proper stopping and turning. Snow sports safety expert Isham's opinions are in accordance with John Herrrick's testimony. Isham stated that Kusada was using expert skies at the time

18

of the incident that would be exceedingly difficult for a beginner skier to control. Isham also opined that had Kusada received lessons from a qualified instructor, his equipment would have been inspected and determined to be inappropriate for his skiing ability, and that inappropriate equipment substantially contributed to Kusada losing control and skiing into a tree. It is reasonable and permissible for a jury to infer that had Kusada received lessons and safety instruction, he would not have been on inappropriate skis, would not have been on an inappropriate trail, would have learned how to control his speed and to stop and turn effectively, and more likely than not would have slowed, stopped, or turned before hitting the tree.

Further still, plaintiff has produced expert opinion of Dr. Thibault, the biomechanical engineering expert, who states that a helmet more likely that not would have prevented Kusada's skull fractures and would have substantially reduced the severity of his brain injury. It is reasonable for a jury to conclude that defendants' failure to require helmets caused Kusada to sustain a far more severe head injury than he otherwise would have.

5.  *Plaintiff's Expert Opinions are Based on Factual Evidence, are Not Conjecture, and are Sufficient to Establish Causation.*

Defendants attempt to portray the expert opinions of Buck and Isham as speculation and conjecture because no witness actually saw Kusada hit the tree must fail because it is contrary to Massachusetts law. As stated by defendants, "expert opinion… must be based on either the expert's direct personal knowledge, on evidence already in the record… or on a combination of those sources." *LaClair v. Silberline Manufacturing Co.*, 379 Mass. 21, 32 (1979). Buck, Isham, and Thibault based their opinions on evidence already in the record – undisputed facts from defendants' deposition testimony and Kusada's medical records – that defendants did not provide Kusada with skiing lessons, did not require helmets, and did not ensure Kusada was using safe and appropriate equipment. It is established that Kusada had difficulty stopping and lost control of his skis earlier on the evening of February 20, 2004. It is established that Kusada sustained fractures, multiple head bleeds, and diffuse axonal injury as a direct result of skiing into a tree. Defendants do not dispute that a helmet would have significantly reduced

19

these injuries. Plaintiff's expert's opinions are based on factual evidence, are sufficient to establish causation, and may be subject to appropriate cross examination concerning foundation.

Plaintiff has presented far reaching facts and expert opinion which establish that defendants owed plaintiff a duty, that they breached said duty, and caused plaintiff's damages. Further, there are numerous genuine issues of material fact for determination by jury which make Summary Judgment inappropriate in this case.

## Conclusion

For the reasons stated and upon the authorities cited, plaintiff respectfully requests that the Court DENY defendants' Motion for Summary Judgment.

By His Attorneys

BREAKSTONE, WHITE-LIEF & GLUCK, P.C.

_____
RONALD E. GLUCK
BBO #196950
Two Center Plaza
Suite 530
Boston, MA  02108-1906
(617) 723-7676

_____
HEATHER A. ENGMAN
BBO # 662304
Two Center Plaza, Suite 530
Boston, MA  02108-1906
(617) 723-7676

## Certificate of Service

I, certify that this document field through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on December 22, 2006 via first class mail.

_____
Ronald E. Gluck

_____
Heather A. Engman